# 24-30115

# In The United States Court Of Appeals For The Fifth Circuit

**DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,**

*Plaintiffs - Appellees*,

v.

**NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,**

*Defendant – Appellant,*

**STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,**

*Intervenors – Appellants,*

v.

**UNITED STATES OF AMERICA,**

*Intervenor – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA, BATON ROUGE THE HONORABLE SHELLY DECKERT DICK, U.S. DISTRICT JUDGE 053N-3: 3:22-CV-178

———————

## BRIEF OF APPELLANT

———————

<div style="display:flex">

Phillip Strach
Cassie Holt
Alyssa Riggins
NELSON MULLINS RILEY & SCARBOROUGH, L.L.P.
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3812
phil.strach@nelsonmullins.com
cassie.holt@nelsonmullins.com
alyssa.riggins@nelsonmullins.com

John C. Conine, Jr.
John C. Walsh
SHOWS, CALI & WALSH, L.L.P.
628 Saint Louis Street
Baton Rouge, LA 70802
(225) 346-1461
coninej@scwllp.com
john@scwllp.com

</div>

*Counsel for Appellant*    *Counsel for Appellant*

# CERTIFICATE OF INTERESTED PERSONS

### *Nairne, et al. v. Landry*, **Case No: 24-30115**

Pursuant to Fifth Cir. R. 28.2.1, a certificate of interested persons is not required because Appellant is a governmental party.

> *s/ Phillip J. Strach*
> Phillip J. Strach
> *Attorney of Record for Defendant-Appellant Nancy Landry, in her official capacity as Secretary of State of Louisiana*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 5th Cir. R. 28.2.3, Defendant-Appellant Nancy Landry, in her official capacity as Secretary of State of Louisiana, respectfully submits that oral argument would be helpful to the Court given the complexities and nuances of the issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS........................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................ ii

TABLE OF AUTHORITIES.......................................................................vi

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUES ..............................................................................1

STATEMENT OF THE CASE...................................................................................1

    I.    Demographic Background..............................................................................1

    II.    Louisiana's 2022 Redistricting Process .....................................................3

    III.    Plaintiffs Challenge the 2022 Plans Under §2 of the VRA...................4

        A.    Post-*Allen* Expedited Litigation...................................................5

        B.    Pre-Trial Motions in Limine ........................................................8

        C.    Trial on the Merits.......................................................................9

SUMMARY OF THE ARGUMENT ......................................................................12

ARGUMENT ........................................................................................................14

    I.    Standards of Review....................................................................................14

    II.    Rushed Proceedings Lead to Error...........................................................15

    III.    The District Court's Misunderstanding Of *Gingles* I and Racial Predominance led to Legal and Factual Errors .................................18

A.      Plaintiffs' Illustrative Plans Fail the Numerosity Requirement Because the Minority Populations Used to Achieve Majority are Not Compact ..........................................21

1.      The district court misunderstood the legal standards on compactness ..............................................................21

2.      Defense expert Trende dispositively proved the Illustrative Plans failed to contain compact minority populations ....................................................................23

3.      The District Court erred in discrediting MOI .................32

B.      Plaintiffs' Illustrative Plans are Not Reasonably Configured ................................................................35

1.      The Illustrative Plans prioritized race over traditional geography criteria ..........................................36

2.      The Illustrative Plans fails to respect communities of interest, core retention, and ignores incumbents ........42

3.      The district court erred in excluding defense expert testimony of Johnson and Barber ..................................43

IV.     Plaintiffs Failed to Show *Gingles* II and *Gingles* III ...........................47

A.      Plaintiffs failed to show legally significant racially polarized voting in the proposed Illustrative Districts because Handley failed to perform a district-specific, functional analysis .....................................................47

B.      The error of the district court's pre-trial orders infected the *Gingles* II and II analysis .........................................49

V.      The District Court Committed Error on the Totality of the Circumstances ........................................................55

A.      The district court erred in finding for Plaintiffs on Senate Factors 2 and 7 .........................................................56

B.  The district court erred in weighing the remaining Senate Factors ...................................................................................58

VI.  The Court Lacked Jurisdiction ............................................................63

CONCLUSION ....................................................................................................64

CERTIFICATE OF SERVICE ..............................................................................65

CERTIFICATE OF COMPLIANCE .....................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)..............................................................33, 54

*Ala. Legis. Black Caucus v. Alabama*,
    575 U.S. 254 (2015)....................................................................19, 47

*Allen v. Milligan*,
    599 U.S. 1 (2023)......................................................................*passim*

*Alexander v. S.C. State Conf. of the NAACP*,
    144 S. Ct. 1221 (2024)..............................................................*passim*

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023) ...........................................................9

*Bartlett v. Strickland*,
    556 U.S. 1 (2009)............................................................................47

*Bethune-Hill v. Virginia State Bd. of Elections*,
    580 U.S. 178 (2017)..............................................36, 43, 44, 47

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) ........................................................18

*Brazos River Auth. v. GE Ionics, Inc.*,
    469 F.3d 416 (5th Cir. 2006) ............................................15, 49, 50

*Brnovich v. Democratic National Committee*,
    141 S. Ct. 2321 (2021)....................................................................50

*Carswell v. Camp*,
    54 F.4th 307 (5th Cir. 2022) ..........................................................16

*Clark v. Calhoun Cnty*,
    88 F.3d 1393 (5th Cir. 1996) ....................................................60, 62

*Cooper v. Harris*,
    581 U.S. 285 (2017)..................................................................*passim*

*Cousin v. Sundquist*,
  145 F.3d 818 (6th Cir. 1998) ........................................................18

*Covington v. N. Carolina*,
  316 F.R.D. 117 (MDNC 2016) *aff'd*, 581 U.S. 1015 (2017) ...........13, 47, 48

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020)...................................................................15

*Dickinson v. Auto Ctr. Mfg. Co.*,
  733 F.2d 1092 (5th Cir. 1983) ........................................................1

*Dillon v. Bay City Const. Co.*,
  512 F.2d 801 (5th Cir. 1975) ........................................................16

*Fairley v. Hattiesburg, Miss.*,
  584 F.3d 660 (5th Cir. 2009) ...............................................*passim*

*Fisher v. R.D. Werner Co.*,
  1 F.3d 1236 (5th Cir. 1993) ..........................................................55

*Fusilier v. Landry*,
  963 F.3d 447 (5th Cir. 2020) ........................................................56

*Gonzalez v. Harris Cnty.*,
  601 F. App'x 255 (5th Cir. 2015)..................................................17

*Houston v. Lafayette Cnty*,
  56 F.3d 606 (5th Cir. 1995) ....................................13, 21, 22, 32

*In re Reapportionment of the Colorado General Assembly*,
  647 P.2d 209 (Colo. 1982)............................................................32

*In re: Taxotere (Docetaxel) Prod. Liab. Litig.*,
  26 F.4th 256 (5th Cir. 2022) ................................................50, 54

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
  456 U.S. 844, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982) .............15

*Johnson v. De Grandy*,
  512 U.S. 997 (1994)................................................21, 55, 57, 58

*Karcher* v. *Daggett*,
  462 U.S. 725 (1983)...................................................................20

*League of United Latin Am. Citizens, Council No. 4424 v. Clements*,
  999 F.2d 831 (5th Cir. 1992) ..................................................61

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)...........................................................21, 57

*Lewis v. Ascension Par. Sch. Bd.*,
  806 F.3d 344 (5th Cir. 2015) ...................................................14

*Lopez v. Abbott*,
  339 F. Supp. 3d 589 (S.D. Tex. 2018)......................................56

*Luttrell v. United States*,
  320 F.2d 462 (5th Cir. 1963) ....................................................55

*Magnolia Bar Ass'n v. Lee*,
  994 F.2d 1143 (5th Cir. 1993), *cert. denied*,
  510 U.S. 994 (1993)...........................................................16, 17

*Miller v. Johnson*,
  515 U.S. 900 (1996)...................................................................20

*Moss v. Ole S. Real Est., Inc.*,
  933 F.2d 1300 (5th Cir. 1991) ........................................15, 43, 50

*N.A.A.C.P. v. Fordice*,
  252 F.3d 361 (5th Cir. 2001) .............................................*passim*

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006).........................................................................6

*Robinson v. Ardoin*,
  86 F.4th 574 (2023) ...............................................................7, 35

*Rodriguez v. Harris Cnty.*,
  964 F. Supp. 2d 686 (S.D. Tex. 2013)......................................17

*Rose v. Sec'y, State of Georgia*,
  87 F.4th 469 (11th Cir. 2023) ...................................................................18

*Sanchez v. Colorado*,
  97 F.3d 1303 (10th Cir. 1996) ..................................................................18

*Sensley v. Albritton*,
  385 F.3d 591 (5th Cir. 2004) .......................................................14, 22, 31, 32

*Shaw v. Reno*,
  509 U.S. 630 (1993).....................................................................................19

*Stokes v. Georgia-Pacific Corp.*,
  894 F.2d 764 (5th Cir.1990) .......................................................................15

*Teague v. Attala County*,
  92 F.3d 283 (5th Cir. 1996) ........................................................................55

*Thomas v. Reeves*,
  961 F.3d 800 (5th Cir. 2020 ........................................................................63

*Thornburg v. Gingles*,
  478 U.S. 30 (1986)...............................................................................*passim*

*United States v. Barnes*,
  979 F.3d 283 (5th Cir. 2020) ......................................................................44

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) .................................................................59, 62

*Westwego Citizens for better Gov't v. City of Westwego*,
  906 F.2d 1042 (5th Cir. 1990) ................................................. 13-14, 17, 49

**Statutes**

22 U.S.C. § 2284 ...............................................................................1, 5, 63

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1292(a)(1).............................................................................1

52 U.S.C. § 10301(b) .........................................................................58

Voting Rights Act of 1965 § 2, 52 U.S.C. § 10301 ........................................*passim*

**Constitutional Provisions**

U.S. Const. amend. XIV .................................................................3, 18

U.S. Const. amend XV....................................................................3

**Rules**

Fed. R. App. P. 4(a)(1)(A) ................................................................1

Fed. R. App. P. 28(i) ....................................................................63

Fed. R. Civ. P. 52(c).................................................................10, 11

Rule 21 ................................................................................3

**Other Authorities**

S. Rep. No. 97-417 (1982) ................................................................58

## JURISDICTIONAL STATEMENT

Defendant contends that the district court did not have subject matter jurisdiction over this case because 22 U.S.C. §2284 mandates that the case be transferred to a three-judge panel as the Plaintiffs challenged "the apportionment of any statewide body." ROA.493-506.

Nevertheless, assuming *arguendo* the district court had jurisdiction, Defendant appeals from the final order entered on February 8, 2024 and all other orders ancillary, related, and precedent thereto pursuant to 28 U.S.C. §1291 and §1292(a)(1). *See Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1102 (5th Cir. 1983). Defendant's filed a timely notice of appeal on February 19, 2024 pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure. ROA.9271-9273.

## STATEMENT OF THE ISSUES

1. Did the district court apply the correct legal standards, and make proper evidentiary rulings and plausible findings, under the *Gingles* preconditions and the totality of the circumstances?

2. Was the Court required to convene a three-judge panel?

## STATEMENT OF THE CASE

### I.    Demographic Background.

According to the 2020 Census, Louisiana's total population is 4,657,757. ROA.15820. This is an 2.74% increase from the prior decade. *Id.* Of that total,

3,570,528 make up the state's voting age population. Based upon the 2020 Census, the total Black population[1] in Louisiana constitutes 33.13% of the State's population. *Id.* This represents a slight increase from 2000 where the total Black population comprised 32.86% of the State's population. *Id.*[2] Since 2000, the Black Voting Age Population ("BVAP") in Louisiana has grown by only 1.3% to the present level of 31.52%. ROA.15826.

The census also revealed that there are few areas of Louisiana where Blacks comprise a majority of the Voting Age population. In fact, only 6 parishes are at or majority BVAP, with another two at 45-49%. But, these areas are geographically scattered across the state. ROA.11457:

Figure 2: Parish Map and Black Voting Age Population



---

[1] "Black population" refers to the "Any Part Black" Census designation.

[2] While the minority population in Louisiana increased by 6.8%, that increase was largely due to increases in other minority groups, not Black population. ROA.15820-15821.

Moreover, only three cities in Louisiana are both large enough to support single legislative districts and have a majority-Black VAP: Shreveport, New Orleans, and Baton Rouge. ROA.11455, 11495-11496.

## II. Louisiana's 2022 Redistricting Process.

On June 11, 2021, the Legislature adopted Joint Rule 21, which established "[r]edistricting criteria to promote the development of constitutionally and legally acceptable redistricting plans." ROA.15708. The criteria required that (a) plans comply with the Fourteenth and Fifteenth Amendments to the United States Constitution, and all other applicable federal and state laws; (b) that districts be contiguous; (c) districts be single member, with substantially equal population (with a maximum deviation of +/-5%); and (d) that due consideration be given to traditional district alignments.[3] *Id.*

Joint Rule 21 also provided that redistricting plans should be based upon whole Voting Tabulation Districts ("VTDs"), respect "the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of the state[,]" and maintain communities of interest. *Id.*

H.B. 14, the state House plan, became effective on March 9, 2022 (the "2022 House Plan"). ROA.14491-14554, 14584-14885. The 2022 House Plan contains 105

---

[3] President Cortez testified that he read this criterion to mean that "if your district elected you, and you've done a good job, they also have a right to reelect you." ROA.10130-10131. Thus, this addresses both incumbency protection, and core retention.

districts. Of those, 29 are majority-Black; one more than the prior decade's plan. ROA.14584-14885, 14655-14660.

S.B. 1, the state Senate plan, became effective on March 9, 2022 (the "2022 Senate Plan"). ROA.14886-15080, 14555-14583. The 2022 Senate Plan contains 39 districts. Of those, 11 are majority-Black districts. ROA.14886-15080, ROA.13686 at 12:1-5.

## III.    Plaintiffs Challenge the 2022 Plans Under §2 of the VRA.

On March 14, 2022, a group of Black Louisianians and two organizations sued the Louisiana Secretary of State ("Defendant" or the "Secretary") for declaratory and injunctive relief, alleging that certain districts[4] in the 2022 House Plan and 2022 Senate Plan (collectively, the "2022 Plans") violated §2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. §10301. ROA.64-123.

To prove the *Gingles* I precondition, Plaintiffs offered an illustrative House plan ("IHP") and illustrative Senate plan ("ISP") (collectively, the "Illustrative Plans") drawn by their expert Mr. Cooper that contained more majority-Black districts than the 2022 Plans. In light of Louisiana's statewide BVAP of 31.25%, a strictly proportional House plan would contain 33 majority-Black districts and a strictly proportional Senate plan would contain 12 majority-Black districts.

---

[4] While the Prayer for Relief purported to challenge the entirety of the 2022 Plans, Plaintiffs clarified over the course of litigation that they were only challenging 47 districts. ROA.1885-1889, 7199-7200.

ROA.11442. Plaintiffs' Illustrative Plans contain 35 majority-Black House districts and 14 majority-Black Senate districts—exceeding proportionality by 2 seats in the IHP and 2 seats in the ISP. *Id.*

Clay Schexnayder, Speaker of the Louisiana House of Representatives, and Patrick Page Cortez, President of the Louisiana Senate, in their official capacities, moved to intervene as defendants on April 4, 2022. ROA.196-213. The State of Louisiana also moved to intervene as a defendant on April 19, 2022. ROA.447-461.

On April 22, 2022, Defendant moved to convene a three-judge court pursuant to 28 U.S.C. §2284 or, in the alternative, certify an interlocutory appeal. ROA.493-506. Plaintiffs opposed that Motion. ROA.536-585. The district court denied the motion to convene a three-judge panel over a year later. ROA.6914-6916. On May 17, 2022, the district court granted the motions to intervene. ROA.627-632.

On July 18, 2022, Defendants filed a Joint Motion to Stay, pending a decision by the United States Supreme Court in *Allen v. Milligan*, 599 U.S. 1 (2023). ROA.793-807, which the Court granted on August 30, 2022. ROA.990-994. At no point prior to the stay did Plaintiffs move for a preliminary injunction.

### A. Post-*Allen* Expedited Litigation.

Following the United States Supreme Court's final decision in *Allen*, Plaintiffs moved on June 9, 2023 to vacate the stay and impose an expedited schedule. ROA.997-1002, 1004-1012. The motion for an expedited schedule referenced a

"motion for preliminary injunction" that Plaintiffs claimed would be filed "no later than June 15, 2023" and sought a hearing less than a month later. ROA.1004-1006. The Court noticed a telephonic status conference for June 21, 2023. ROA.39. Plaintiffs again assured the Court that a preliminary injunction would be filed by that date. ROA.1038-1041. No motion for preliminary injunction was ever filed.

At the status conference on June 21, 2023, Judge Dick provided the parties with two trial dates in November. *See* ROA.1053-1057. As raised in the conference and in subsequent filings, Defendants alerted the court to issues posed by a November trial. ROA.1042-1051. Specifically, Defendants raised that approximately 1,152 elections were set to occur in Louisiana's Primary and General Elections on October 14, 2023 and November 18, 2023, respectively. Defendants argued a trial date in the same period imposed significant burdens on Defendants and would cause undue voter confusion under *Purcell v. Gonzalez*, 549 U.S. 1, 8 (2006). Defendants requested a later trial date to alleviate this prejudice, and so that experts could utilize the 2023 election results in the racially polarized voting ("RPV") analysis required under *Gingles* II and III. ROA.1042-1048. The district court denied Defendants' request without explanation and set the trial for November 27, 2023. ROA.40 at Rec. Doc. 97.

Following the district court's decision setting the trial date, the matter was referred to a Magistrate Judge for scheduling. *Id.* At a telephone conference on June

29, 2023, Plaintiffs proposed a schedule that would allow them to supplement their 2022 Expert Reports (served before the matter was stayed). ROA.1072-1078. The next day, and without an order, Plaintiffs served expert reports anyway. Plaintiffs significantly amended four of the five expert reports, and even included new Illustrative Plans. *Id.* Defendants requested six weeks to respond in light of the fact that plaintiffs had over a year to supplement their reports. *Id.* Defendants' request was denied in a scheduling order entered approximately two weeks after the scheduling conference. ROA.1193-1195. The July 17, 2023 scheduling order set an expedited timeline giving the parties 1.5 months to complete fact discovery, and 35 days from the order to complete all expert reports *Id.* Defendants were given less than 30 days to respond to Plaintiffs' "supplemental" expert reports—which they had over a year to perfect—and the nature of which changed Defendants' experts' analyses. *Id.* The deadlines in the scheduling order were "final". *Id.*

In light of the expedited scheduling order, Defendants formally moved to continue the trial, in order to consider the election data from the highly probative 2023 legislative elections—the only endogenous elections available. ROA.1100-1106. Approximately one week later, the State filed a renewed continuance motion in light of the district court's scheduling of a remedial proceeding in *Robinson v. Ardoin* for October 3-5, 2023, arguing that litigating *Robinson* detracted from the already expedited expert discovery deadlines here, which did not permit Defendants

sufficient time to prepare for trial. ROA.1202-1213. The district court denied the continuance motions. *See* ROA.45, 1193-1194.

**B. Pre-Trial Motions in Limine.**

Consistent with the truncated and expedited scheduling order, on October 6, 2023, Defendants moved to exclude the testimony and reports of Plaintiffs' sole *Gingles* II and III expert Dr. Lisa Handley on the grounds that her analysis was based on an unreliable database that skewed her RPV analysis. ROA.1504-1691. Defendants also moved for summary judgment because Plaintiffs lacked standing to challenge all legislative districts except for the six allegedly diluted House and Senate districts that the remaining four individual Plaintiffs resided in. ROA.1692-1889. Plaintiffs moved to exclude the testimony and reports of defense experts Trende, Johnson, and Solanky, ROA.1893-1935.

On November 7, 2023, the district court denied Defendants' motion to exclude Handley's testimony and reports. ROA.6869-6876. The next day, the court granted Plaintiffs' motion to exclude in part, permitting defense experts Trende and Johnson to testify at trial, but completely excluding the admission of any testimony or evidence prepared by Solanky. ROA.6900-6913. The court also limited Johnson's testimony, barring him from offering any opinion testimony on the differences between Cooper's 2022 and 2023 Illustrative plans or any other evidence about "Cooper's motives when drawing the illustrative maps." *Id.*

On November 9, 2023, Defendants jointly filed a Notice of Constitutional Question asserting that if the court were to find for Plaintiffs, the relief would require an unconstitutional interpretation of the VRA for the reasons articulated in Justice Kavanaugh's concurrence in *Allen*, 599 U.S. at 45. ROA.7052-7054. On November 14, 2023, the district court denied Defendants' joint motion for summary judgment. ROA.7191-7205.

On November 22, 2023, Defendants again jointly moved the district court to stay the trial, arguing *inter alia* that the issue of whether §2 confers a private right of action would likely soon appear in front of the United States Supreme Court in light of the Eighth Circuit's recent ruling in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). ROA.7212-7223. The motion to stay was denied on the first day of trial. ROA.9449. Defendants jointly moved to dismiss the case on the same grounds on November 29, 2023. ROA.7231-7249. The motion to dismiss was denied. ROA.9135-9141.

### C. Trial on the Merits.

A seven-day bench trial was held from November 27, 2023 through December 5, 2023 before the Honorable Judge Shelly D. Dick.

On the fourth day of trial, Defendants orally moved the court pursuant to Fed. R. Civ. P. 52(c) for a judgment as a matter of law that §2 does not provide for a private right of action, Plaintiffs lacked standing, that Plaintiffs failed to present a

viable remedy, and Plaintiffs failed to show that the minority population was compact under *Gingles* I. ROA.10106-10120. The court took the Rule 52(c) Motion under advisement, and ultimately denied the motion. ROA.9142, 10120-10121.

In Plaintiffs' case in chief, Plaintiffs offered testimony from seven fact witnesses and seven expert witnesses. ROA.9440-9982, 10725-10939. In response, Defendants offered Senate President Cortez and Ms. Sherri Hadskey, Commissioner of Elections for Louisiana, as fact witnesses. ROA.10102-10190, 10497-10528. Defendants also offered experts: Dr. John Alford (ROA.10190-10262, 11313-11360); Mr. Sean Trende (ROA.10262-10323, 11618-11756, 11799-11803); Dr. Doug Johnson (ROA.10323-10462, 11184-11226, 11372-11430); Dr. Michael Barber (ROA.10463-10724, 11435-11563, 11757-11786); Dr. Alan Murray (ROA.10529-10600, 10979-11090); and Dr. Jeffrey Lewis (ROA.10601-10768, 11270-11312, 11431-11434).

As to the exclusion of Solanky, Defendants made a motion to reconsider his exclusion during Handley's direct examination after counsel for Plaintiffs opened the door by affirmatively asking questions regarding Solanky's reports. ROA.9810-9811. The motion was denied. *Id.* Defendants renewed the motion for reconsideration after cross-examination, which was again summarily denied. ROA.9852-9854. Defendants made a proffer of Solanky's reports at the close of their case in chief. ROA.10769-10772, 11564-11617, 11787-11798, 11804-11856.

During the direct examination of Johnson, Defendants requested reconsideration of the court's ruling excluding portions of Johnson's report that spoke to the issue of racial predominance. ROA.10329-10334. Despite the fact that Cooper expressly disclaimed that race predominated in his drawing of the Illustrative Districts on direct, the district court denied the motion to reconsider, and excluded portions of Johnson's report that attacked the credibility of Cooper's testimony. ROA.10332-10334, ROA.10772-10774.

Despite acknowledging that racial predominance was a valid defense raised by Defendants, ROA.10639, the court issued inconsistent rulings throughout Defendants' case in chief that excluded evidence it deemed went to Cooper's subjective intent. *See infra* §IIIB. Additionally, though defense expert Barber was not subject to a *Daubert* motion, Plaintiffs objected for the first time at trial to the admission of Barber's opinions on Cooper's intent. ROA.10495-10491. While the objections to Barber's reports were overruled, individual objections were sustained throughout the course of Barber's direct examination. 10639-10640, 10644-10655, 10650-10653. Defendants made a proffer of Barber's testimony of his opinion that race predominated in Cooper's drawing of the Illustrative Plans. ROA.10722-10723.

On February 8, 2024, the district court entered an order and separate appendix enjoining all future elections under the 2022 Plans. Defendants filed timely notices of appeal. ROA.9122-9227, 9271-9273, 9274-9276, 9317-9318.

## SUMMARY OF THE ARGUMENT

The opinion from the court below represents a rushed court failing to heed guidance from the Supreme Court that §2 requires "an intensely local appraisal." *Allen,* 599 U.S. at 19. The error began with an ill-conceived 4.5-month schedule leading up to a November, 2023 trial. This schedule left precious little time for defense experts to conduct the "intensely local appraisal" needed of §2 and insufficient time to respond to new reports by Plaintiffs' experts who had been working for a year.

The error was compounded when the district court effectively flipped the burden of proof on Defendants. It is undisputed, that Plaintiffs had the burden of proof in this matter, *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009), but the district court flipped this burden, excluding Defendants' experts, and then severely limited the reports and testimony of others. In doing so the court below excluded: (1) evidence revealing that Plaintiffs' only RPV expert based her report on a faulty database that assigned more votes to candidates than voters in the precinct; and (2) evidence and testimony of racial predominance, in violation of several Supreme Court cases crediting the same evidence. These errors sanitized the district court's record at trial, excluding key information to valid defenses, which impacted the substantial rights of Defendants, even after Plaintiffs' own experts were allowed to testify about the prohibited subjects on

direct. These issues alone demand reversal for a new trial considering the excluded evidence.

But even on the sanitized record, there is more error. The district court's trial rulings and opinion reveal a deeply flawed understanding of *Gingles.* Specifically, the district court discarded Defendants' evidence that the minority groups in Plaintiffs' illustrative districts were not compact. Instead, the district court relied only upon measures of compactness of the districts themselves. This court has already determined that such an opinion requires reversal: *Houston v. Lafayette Cnty*, 56 F.3d 606, 611 (5th Cir. 1995). The district court also doubled down on the flawed reasoning of the pre-trial motions on racial predominance, issuing trial orders that reveal a deep misunderstanding of traditional districting criteria, and what constitutes a reasonably configured district under *Gingles* I.

There's more. Errors from the pre-trial orders continued to infect the court's opinions on *Gingles* II and III, and the Court failed to make Plaintiffs prove their burden by conducting the required district effectiveness analysis which is "used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." *Covington v. N. Carolina*, 316 F.R.D. 117, 169 (M.D.N.C. 2016) *aff'd* 581 U.S. 1015 (2017). Moreover, the Court failed to consider highly probative endogenous elections, which this Court has already held is error. *Westwego*

*Citizens for better Gov't v. City of Westwego*, 906 F.2d 1042, 1045 (5th Cir. 1990).

Finally, the district court bungled the totality of the circumstances inquiry, refusing to

even discuss relevant testimony that politics, not race, weighed in Defendants' favor

on Factor 2. This alone is reversable error. *Fairley,* 584 F.3d at 668.

In sum, error beget error at every turn. And with the next legislative elections

three years away, there is plenty of time to correct the district court's egregious errors

before the error infects Louisiana's elections in 2027.

## ARGUMENT

### I.    Standards of Review.

This Court "reviews de novo the legal standards the district court applied to

determine whether §2 has been violated." *Sensley v. Albritton*, 385 F.3d 591, 595

(5th Cir. 2004). Given the "intensely local appraisal" required in adjudicating §2

claims, this Court "review[s] the district court's findings on the *Gingles* threshold

requirements and its ultimate findings on vote dilution for clear error." *Id.* "A finding

is clearly erroneous if it is without substantial evidence to support it, the court

misinterpreted the effect of the evidence, or this court is convinced that the findings

are against the preponderance of credible testimony." *Lewis v. Ascension Par. Sch.

Bd.*, 806 F.3d 344, 353 (5th Cir. 2015). However, in districting cases there is a

"special danger" that "a misunderstanding of what the law requires may infect what

is labeled a finding of fact." *Alexander v. S.C. State Conf. of the NAACP*, 144 S.Ct.

1221, 1240–41 (2024). If the district court "bases its findings upon a mistaken impression of applicable legal principles" this court "is not bound by the clearly erroneous standard. *Id. quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, n. 15, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

Similarly, the standard on admissibility of evidence is twofold—first the underlying legal analysis, is reviewed de novo, then the evidentiary ruling itself is reviewed for an abuse of discretion. *Stokes v. Georgia.-Pacific Corp.*, 894 F.2d 764, 767 (5th Cir.1990).  However, evidentiary rulings based on the resolution of a legal issue are reviewed de novo.  *Moss v. Ole S. Real Est., Inc.,* 933 F.2d 1300, 1305-06 (5th Cir. 1991); *Brazos River Auth. v. GE Ionics, Inc*., 469 F.3d 416, 423 (5th Cir. 2006).

## II.    Rushed Proceedings Lead to Error.

"[R]ushed, high-stakes, low-information decisions" like the ones made by the court below to expedite the schedule, resulted in rushed proceedings that ignored relevant evidence, and ultimately led to a case riddled with legal error. *Dep't of Homeland Sec. v. New York,* 140 S.Ct. 599, 600 (Gorsuch, J., concurring).

The scheduling decisions by the court below allowed Plaintiffs to have their cake and eat it too. The district court gave Plaintiffs *both* their rushed trial date (approximately 4.5 months after the stay) and allowed Plaintiffs to supplement their existing expert reports, with work completed in the year the case was stayed.

ROA.45, 1194-1195. Ultimately this led to Plaintiffs introducing new illustrative plans that moved approximately 118,000 voters, and prejudiced Defendants by rendering moot all previous work done by Defendants' experts before the stay. ROA.11408. This lightning schedule resulted in Defendants' experts lacking sufficient time to conduct a full analysis of Plaintiffs' expert reports. ROA.11593, 11788. As discussed above, Defendants moved for a new trial date to alleviate this prejudice no fewer than four times. Each request was denied. Nor is there a rational explanation for the rush, when the next legislative elections are not until 2027.

"It was highly prejudicial" to Defendants to "compel them to pull together their entire case" in such a short period of time. *Dillon v. Bay City Const. Co*., 512 F.2d 801, 804 (5th Cir. 1975) A district court's scheduling decisions are reviewed for abuse of discretion. *Carswell v. Camp,* 54 F.4th 307, 311 (5th Cir. 2022).[5] The district court abused its discretion in: (1) setting such a rushed schedule which undisputedly gave Defendants' insufficient time to prepare expert reports and (2) failing to stay the trial in order to evaluate the performance of the endogenous elections under 2022 Plans in the fall 2023 elections.

This Court has routinely held that endogenous elections are "more probative of unequal electoral opportunity." *See Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143,

---

[5] Arguably, under *Alexander,* because the district court clearly misunderstood the legal guidance on endogenous elections, this pre-trial decision should be reviewed de novo. 144 S.Ct. at 1240–41.

1149 (5th Cir. 1993), *cert. denied*, 510 U.S. 994 (1993); *Rodriguez v. Harris Cnty.*, 964 F.Supp.2d 686, 759 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F.App'x 255 (5th Cir. 2015) (collecting cases). In fact, it is reversable error for courts not to consider endogenous elections. *Westwego*, 906 F.2d at 1045.

Due to the scheduling order in this matter, ROA.1193-1195, no parties could consider the potentially outcome-determinative 2023 legislative election results. Even Plaintiffs and their RPV expert Handley complained of the lack of endogenous elections needed to perform a district-specific analysis. ROA.15780, 6674 ("Dr. Handley was facing sparse data because, at the time she did her analysis and wrote her report, no state legislative elections with the new adopted districts had yet taken place for her to analyze.");("Courts have consistently held that endogenous elections, as elections for the same office within the same area, are more probative than exogenous elections." *Id.* (citing *Magnolia Bar Ass'n,* 994 F.2d at 1149)).

As discussed above, the schedule also prevented defense experts from conducting complete analyses because of the material changes to Plaintiffs' expert reports with the 10 days allotted between Plaintiffs' Reply expert reports and Defendants' Surrebuttal expert reports being due. *See e.g.* ROA.11593, 11788.

With no new legislative elections until 2027, the district court rushed into a November 2023 trial which severely limited Defendants' ability to defend the case. Moreover, in setting trial for November, the court foreclosed consideration of

endogenous elections. Such a decision can only result from the court's fundamental misunderstanding of the legal importance of these endogenous elections.

## III.    The District Court's Misunderstanding Of *Gingles* I and Racial Predominance led to Legal and Factual Errors.

It is undisputed that the purpose of the first *Gingles* precondition is to test whether the "minority group" is "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district" *Allen*, 599 U.S. at 18 (brackets in original). Thus, the test for the first prong of *Gingles,* is whether, (1) the minority group is both sufficiently large and geographically compact to make up a majority (also known as the "numerosity requirement") of a (2) reasonably configured district. *Id.*

Several circuits have interpreted *Gingles* I to require plaintiffs to "offer[ ] a satisfactory remedial plan." *Rose v. Sec'y, State of Georgia*, 87 F.4th 469, 475–76 (11th Cir. 2023); *see also, Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1025 (8th Cir. 2006) (Gruender, J., concurring). A "satisfactory remedial plan" is not one that a legislative body could not enact because of constitutional or other infirmities. *Sanchez,* 97 F.3d at 1311-13; *Cousin v. Sundquist*, 145 F.3d 818, 829 (6th Cir. 1998). Here, Plaintiffs failed to present a satisfactory remedial plan. As discussed *infra* 57-58, Plaintiffs' Illustrative Plans not only seek impermissible extra proportionality, but are also racial gerrymanders in violation of the 14th Amendment which could not have been enacted

18

by the Louisiana Legislature. Because the district court failed to evaluate whether Plaintiffs' illustrative plans could be a viable remedy, in particular refusing to conduct a proper inquiry into racial predominance, and actively excluded evidence regarding the same, the district court committed reversable error.

Even assuming *arguendo* Plaintiffs offered a satisfactory remedial plan, Plaintiffs failed to prove their burden under the first *Gingles* precondition because they failed to offer evidence that the minority group is sufficiently large to "constitute a majority in a reasonably configured district." *Allen*, 599 U.S. at 18. In assessing the reasonable configuration requirement, the Supreme Court has "flatly rejected" that States should "be forced to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria such as county, city, and town lines." *Id.* at 43–44, (Kavanaugh, J. concurring) (collecting cases).

The Supreme Court has recognized at least six "traditional districting criteria." The first set involves geography, including compactness, contiguity, and respect for political subdivisions like, cities, towns, and county (in this case parish) boundaries. *Id.* Tellingly, these inquiries are also important in racial gerrymandering claims. *See e.g Shaw v. Reno*, 509 U.S. 630, 647 (1993); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272, (2015). The Supreme Court has also recognized preservation of communities of interest, core retention, and protecting incumbents as traditional

districting criteria. *Miller v. Johnson,* 515 U.S. 900, 916 (1995); *Karcher* v. *Daggett*, 462 U.S. 725, 740, (1983).

Plaintiffs' Illustrative Plans showed a complete disregard for traditional districting criteria, and a hyperfocus on the racial numerosity requirement. Plaintiffs' expert, Cooper, drew oddly shaped districts that sliced and diced their way across parish, city, and municipal lines, in order to pick up far-flung, non-compact, Black populations in an attempt to meet the *Gingles* I numerosity requirement. *Supra* §IIIA. Cooper's choices cannot be explained by core retention, which he largely ignored. *Supra* §III.B.2, and as Defendants' experts objectively showed, meeting the racial numerosity requirement predominated over all other districting decisions in the Illustrative Plans. The district court largely ignored all of this evidence—actively excluding Defendants' evidence wherever possible, then unjustifiably discounting the remainder. Because §2 "never requires" the adoption of districts that violate traditional redistricting criteria, or subordinate those criteria to racial considerations, *Allen*, 599 U.S. at 29–30, the district court's legal analysis of *Gingles* I is deeply flawed and requires reversal. *Cooper v. Harris*, 581 U.S. 285, 305 (2017).

### A. Plaintiffs' Illustrative Plans Fail the Numerosity Requirement Because the Minority Populations Used to Achieve Majority are Not Compact.

#### 1.   The district court misunderstood the legal standards on compactness.

"[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). Precedent is clear that "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("LULAC"); *Houston*, 56 F.3d at 611. While plaintiffs are not required to present an "aesthetic ideal of compactness," plaintiffs must prove that the minority population itself is "sufficiently compact to constitute a majority in a single-member district." *Sensley*, 385 F.3d at 596.

To meet this burden, Plaintiffs can use district compactness as *part* of their evidence, but it cannot be the *only* evidence on compactness. In fact, this Court in *Houston*, reversed and remanded a district court's decision as clearly erroneous[6] for only assessing the shape of illustrative districts themselves. 56 F.3d at 611.

---

[6] Again, because the district court based it's factual determinations on compactness "upon a mistaken impression of the applicable legal principles" they should be reviewed de novo. *Alexander,* 144 S.Ct. at 1240-41. But, even under the previous clear error standard, the District Court's findings must be reversed.

Specifically, the *Houston* court held that "[t]he district court should have focused on the size and concentration of the minority population," as opposed to solely the district shape. *Id.* As shown below, the district court committed the exact same legal error.

The Illustrative Plans were drawn exclusively by Plaintiffs' expert, Cooper. Yet Cooper did nothing to assess the compactness of the Black population grouped within his proposed new majority-Black districts. ROA.10071. He deemed that inquiry "not necessary" and "something that one does not need to do to answer the *Gingles* I inquiry." *Id.* In fact, Cooper thought it irrelevant that the Black population was located in separate parts of the district. ROA.10072. Cooper is wrong. While the shape of the illustrative district itself is relevant, it is not the sole consideration. *Sensley*, 385 F.3d at 596. Cooper's erroneous interpretation of *Gingles* I was whole-heartedly endorsed by the district court which relied only upon district compactness measures for the IHP and ISP districts themselves, ROA.9163-9164. The district court also misconstrued Defendants' argument on *Gingles* I, claiming Defendants argued that "the districts in the Illustrative Plan produced by Cooper are not sufficiently compact." ROA.9165. Tellingly, this opinion is supported by no evidentiary citation.

2.  <u>Defense expert Trende dispositively proved the Illustrative Plans failed to contain compact minority populations.</u>

Defendants offered Mr. Trende[7] to "examine the demonstration districts and examine whether the populations in those districts were compact." ROA.10271-10272, 11624. Trende was accepted as an expert in political methodology, American politics with an emphasis on voting behavior and redistricting, and the VRA. ROA.10270-10271. First, Trende explained the difference between population compactness and district compactness. ROA.10272. He testified that measures like Reock and Polsby-Popper are appropriate for measuring whether a district's *boundaries* are compact, but are not useful for measuring whether the *populations* contained within the district are compact. *Id.* As Trende explained, "you can think of it in terms of this courtroom. If you wanted to know whether the courtroom itself was compact you could easily measure the boundaries, the walls of the courtroom, and you could apply Polsby-Popper, Reock, you could see how much of the bounding circle the courtroom filled. But if you wanted to know whether the people within the courtroom were distributed in a compact manner, you can't really measure the points . . . So the literature explores different ways of measuring the compactness of the individuals." ROA.10272-70273. No expert disputed this testimony.

---

[7] Trende, who at the time of trial completed all requirements for his Ph.D. and was awaiting the award of the physical document, was often referred to as "Dr. Trende" in the district court's opinion. ROA.9166.

Then Trende did what no Plaintiffs' expert attempted to do: assess compactness of the minority population itself.  Trende first employed a qualitative approach, examining choropleth and dot density maps showing the dispersion of Black population. *See* ROA.10274-75, 11630. This allowed a visual inspection of the minority groups *within* the districts themselves to determine if they were compact. For example, Trende showed that in IHD1 in the Shreveport area, the Black population is not visually compact but rather spread out, separated by White populations:



Figure 3: Percent BVAP in census blocks contained in Cooper Illustrative Map, District 1. White areas indicate empty blocks. Dashed blue lines reflect Parish boundaries.



Figure 5: Location of Black and White populations in Cooper Illustrative District 1. One blue dot represents 10 Black residents of voting age. One orange 'x' represents 10 White residents of voting age. Dashed blue lines reflect Parish boundaries.

ROA.11631, 11633.

Trende then layered onto the visual approach by applying quantitative approaches and metrics that could measure population compactness. While Trende

used both Moment of Inertia ("MOI") and the areal/Chen & Rodden compactness measures, ROA.11634, 11636, 10278-10282, Trende primarily relied upon the MOI approach, which is defined as "as the 'sum of squared distances from each person to [their] district's center'" ROA.11635.  In fact, MOI is one of the oldest redistricting metrics. ROA.11634-11635 (citing scholarly articles regarding MOI and its use in redistricting dating back to 1963). Trende used the MOI approach in a very particular fashion.  As Trende explained, a district with a particular BVAP of say 58% can have multiple configurations of populations sufficient to constitute 50%+1 of the population. ROA.10280.  Trende used MOI to identify the *most* compact minority population within a district sufficient to constitute 50%+1 of the voting age population. ROA.10280.  No expert disputed that the groups Trende identified were, in fact, the most compact minority groups, nor did any expert attempt to demonstrate that a more compact group existed in any of the illustrative districts.

Applying this method, Trende produced a new set of dot plots, with the most compact district marked in a dashed-blue line overlaying the original dot plot.



IHD1 shows there is a compact Black population in the City of Shreveport. ROA.10286. As the dashed line shows, the Shreveport population is insufficient to comprise 50+1 BVAP in this district. *Id.* In other words, this population does not illustrate what *Gingles* I requires.  Instead, Trende testified, the district stretches beyond Shreveport, out to Caddo lake, over halfway to the Arkansas border. *Id.*  In doing so, the district crosses heavily white and sparsely populated areas, which were not added to achieve population equality, but to add the isolated black populations, with the compact minority population in Shreveport, in order to meet the numerosity requirements. *Id.;* ROA.11639.

While Trende found the same patterns present in other Illustrative Districts,[8] at least two other examples warrant highlighting. In the Natchitoches area, Cooper drew IHD23 to a bare majority of 50.56% BVAP in an area where no majority-BVAP district existed under the 2022 House Plan. ROA.11654. To do this Cooper took black population from Natchitoches and Campti in the southeast (BVAP 9,291), Coushatta and Edgefield in the northeast (BVAP 1,825), and Mansfield (BVAP 4,246) in the West to obtain a bare majority of 196 Black voters. *Id.* As shown below (ROA.11655-11656), this reveals a strikingly non-compact minority population:

---

[8] ROA.11662-11673 (Lake Charles' IHD34 and 38 reach into rural white areas to pick up isolated census blocks with isolated black individuals, without which the map cannot reach numerosity); ROA.11677-11680 (IHD29 contains a geographically compact Black population east of the Mississippi River, but to achieve numerosity, the IHD must cross over the river into rural white areas to pick up Black residents; ROA.11681-11684 (IHD61- this barely majority-minority district (50.2%) needs every black resident in the district to achieve numerosity, which it does by venturing into heavily white areas, not to meet one-person-one vote, but the numerosity requirement); ROA.11685-11688 (IHD63 and 65 only achieve numerosity by pulling in Black residents from heavily white precincts in the outskirts and rural areas of the Parishes close to Baton Rouge); ROA.11689-11693 (IHD60 cobbles together minority groups from dispersed portions of the area by crisscrossing the Mississippi river thereby connecting 5,531 Black voters in Gonzales, with 1,307 Black voters in White Castle, and 3,760 Black voters in Plaquemine to achieve the 50%+1 threshold.



Layering these maps with the MOI approach shows dashed blue lines sitting on top of the district  boundary. While this is the most compact *district* possible to achieve numersity, it does not mean these clearly geographically disparate minority groups are compact. ROA.11654-11658.



The same is true of the new majority-Black Illustrative Senate Districts. Cooper drew his first ISD in the Shreveport Region. The graphic below shows a comparison between the 2022 Plan (below/left) and the ISP (below right) in the Region. ROA.11714-11716. Notably, SD39 was already majority-Black.

 

Cooper achieves the numerosity requirement in ISD38 only by stitching together disparate Black populations in the region, taking a portion of the existing district found in Caddo Parish (which drops the BVAP of ISD39 by 11.2%), crossing the Red River into Bossier City, and then running out again into rural Bossier Parish, picking up predominantly White populations along the way. Below are Trende's dotplots and choropleth maps ROA.11717-11720:



And again, as you can see, the MOI approach, overlayed on the existing dot plot reveals that the Black populations picked up in the rural areas were not to meet one-person-one vote requirements, but to meet the numerosity requirement, as nearly every blue dot is included within the blue-dashed lines ROA.11721:



These graphics reveal that ISD39, becomes plagued with the same issues as IHD1, requiring the district to meander into largely white rural areas, to pick up additional black voters. ROA.11726-11728.[9]

Based upon these methods, Trende concluded that Cooper's illustrative majority-Black districts were "not based upon compact minority populations" and that areas within some of Cooper's illustrative districts that capture disparate Black populations "are not large enough to constitute a majority of the district." ROA.11627-28, 11755. *See Cooper*, 581 U.S. at 305 ("When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, §2 simply does not apply."). When properly assessing the minority population itself, it is clear that Plaintiffs failed to meet their burden under *Gingles I*. *See Sensley,* 385 F.3d at 598 (rejecting a proposed district that would "lump together two groups of African–American citizens who were from two distinct communities . . . which are separated by considerable distance (approximately 18 miles) and share few community

---

[9] Trende observed the same issues in the Greater New Orleans and Baton Rouge areas. ISD19, grabs voters from Northern Jefferson Parish and meanders into portions of St. Charles Parish from Orleans, where Cooper took heavily Black towns like Woodmere and Waggaman and taking in largely White voters in Westwego and Destrehan to meet majority status. ROA.11749-11754. Cooper also transformed ISD3, which previously had a compact population center in the enacted plan, to a sprawling district resembling a horse galloping, with clearly non-compact Black populations. ROA.11743-11748. In Baton Rouge, ISD17 paired dispersed Black populations in New Roads and Plaquemine to meet the minimum numerosity requirement. ROA.11732-11737.

interests.") In each region where Plaintiffs demand additional majority-BVAP districts, Cooper fails the *Sensley* test by combining far flung discrete populations, who have nothing in common in order to meet the numerosity requirements.

### 3. The District Court erred in discrediting MOI.

Because the district court erroneously believed the *Gingles* I test was only compactness of a "district" rather than the "minority population" it "rejected" Trende's MOI approach calling it "completely useless."[10] ROA.9166. But, by discrediting the only population compactness measure discussed in this trial, the court below made it impossible to comply with this Court's admonition that district compactness is only part of the inquiry. *Houston*, 56 F.3d at 611. This error is compounded by the fact that no one disputed that Trende properly applied MOI. Instead, the district court erroneously claimed that "the moment of inertia methodology has never been used in a VRA §2 case." ROA9166. First, this is patently false. *See In re Reapportionment of the Colorado Gen. Assembly,* 647 P.2d 209, 212 (Colo. 1982). Second, even if it were true, novelty alone is not a plausible basis for rejecting a methodology, as all methods, including those now widely

---

[10] The district court came to the same conclusion about the areal approach. For the same reasons stated in this section, the district court erred in discrediting that peer-reviewed methodology as well. ROA.9167. The district court's findings on MOI and the areal approach are "infected" by the district court's "misunderstanding of what [*Gingles* I] requires, and are thus reviewed de novo. *Alexander*, 144 S.Ct. at 1240-41.

accepted, are used somewhere for the first time. This is especially true since the MOI approach has been subjected to substantial peer review (ROA.9166); and the district court credited testimony of another witness stating that MOI was peer reviewed and accepted in the field of geography. ROA.9166.[11] Moreover, no party, has suggested an *alternative* method of measuring population compactness, as it is undisputed that the traditional scores of Reock and Polsby-Popper are measures only for district compactness.

But error begets error, as the district court also embarked upon a lengthy complaint about MOI, claiming that it "fails to consider communities of interest and traditional boundaries," ignores the legislature's "mandate of equal populations among districts," and is "oversimplistic" when compared to the "considerably more complicated and nuanced" task of "drawing . . . a VRA compliant map." ROA.9166. But this flips the burden of proof on its head.[12] It is the *Plaintiff's burden* to put on illustrative districts, not Defendants'. *Fairley*, 584 F.3d at 669. The MOI approach

---

[11] It is especially odd that the court used Murray's statement that MOI was an accepted use in geography to club Trende. First, *Gingles* I, tests the geography of the district. Second, peer reviewed approaches span several disciplines. By the district court's own logic, the statistical methodologies of Ecological Inference and Ecological Regression, which is widely used by Political Scientists (including those credited by the court), should only be used by statisticians.

[12] While all of the district court's findings on *Gingles I* are entitled to de novo review because of it's misunderstanding of the law, *Alexander*, 144 S.Ct. at 1240-41, these findings should also be reviewed de novo because the Court applied the incorrect burden of proof. *Abbott v. Perez*, 585 U.S. 579, 607 (2018).

fails to consider these things for a simple reason: It is not being used to draw maps here.  Defendants are simply testing whether that already-drawn district does what it must: demonstrates that there is a *compact* minority population sufficient to constitute a majority of the population in the illustrative district. *Id.* Thus, of course MOI, doesn't demand equal population. Nor does MOI account for geographic features or communities of interest because that is not what compactness metrics do. Like Reock and Polsby-Popper, MOI measures compactness without regard for other redistricting considerations.  If Plaintiffs believed that there was a more compact minority group that could constitute a majority of the district's population than Trende's approach highlighted, they should have identified it.  After all, that is their burden.  That they failed to do so speaks volumes.

And even though the district court's analysis of the MOI and areal approaches to compactness was riddled with basic errors, this Court does not even have to analyze this error-soaked reasoning.  Trende's ultimate conclusion draws upon the dotplots and choropleth maps contained in his 100+ page report. Visual inspections of these maps alone lay bare the lack of compact minority groups in the Illustrative Plans on their own. ROA.11755.  That Plaintiffs' experts completely ignored all of this is bad enough, but that the *district court* ignored them is error.

## B. Plaintiffs' Illustrative Plans are Not Reasonably Configured.

An Illustrative Plan drawn to meet *Gingles* I cannot be reasonably configured if it has "group[ed] together geographically dispersed minority voters into unusually shaped districts without concern for traditional districting criteria…" *Allen*, 599 U.S. at 43-44 (Kavanaugh, J. Concurring). Nor, as recognized by the district court,[13] can a district be reasonably configured if race predominated in the drawing to the subordination of other traditional districting criteria. In *Robinson v. Ardoin*, this Court "recognized 'a difference between being aware of racial considerations and being motivated by them'" and that awareness of race is permissible because §2 demands such considerations. 86 F.4th 574, 593 (2023). Being conscious of race is permissible, but "race may not be the predominant factor in drawing district lines unless [there is] a compelling reason." *Allen*, 599 U.S. at 31 (quoting *Cooper*, 581 U.S. at 291). Race predominates when traditional redistricting considerations like compactness, contiguity, and core retention are "subordinated" to race. *Cooper*, 587 U.S. at 291, *Alexander*, 144 S.Ct. at 1234. (*Supra* p. 18-21). Here, the record reveals that Cooper either largely ignored traditional districting considerations, or subordinated them in favor of racial considerations to meet the admitted racial target of the Illustrative Districts.

---

[13] ROA.10639.

1. <u>The Illustrative Plans Prioritized race over traditional geography criteria.</u>

When asked explicitly whether race predominated on direct examination, Cooper said it did not. ROA.10000-10001. But, unlike in *Allen* where Defendants were allowed to rebut this claim with circumstantial evidence, the court below simply forced everyone to take Cooper's word for it—even though the evidence reveals otherwise. In fact, it is undisputed that the Census Block data provided by Cooper with his illustrative plans contained only (1) the total population by race and ethnicity, and (2) the voting age population by race and ethnicity that come from Caliper Corporation.[14] ROA11192. The file did not contain any citizen age population, or any other socio-economic data. *Id.* Thus, it is not surprising that Cooper effectively admitted that any focus on traditional redistricting principles were "*post hoc* justifications [he] in theory could have used but in reality did not." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189–90 (2017). Cooper testified that he was looking at race while he was drawing the Illustrative Plans, focusing only on areas of the state where the Black population experienced growth or had high levels of BVAP. ROA.10070-10071. He did not move any district lines to improve compactness or to reduce political subdivision splits—which are both traditional districting criteria. ROA.10043.

---

[14] Caliper Corporation makes the maptitude districting software utilized by Cooper.

The egregious splits of both political subdivisions and Louisiana's natural geography were extensively covered by Trende and discussed above. *Supra* §IIIA.2.

On this point, Defendants also offered Dr. Barber. Barber was accepted as an expert in political science, American politics, voting behavior and patterns, and simulated maps. ROA.10469. Barber created simulated maps, drawn to follow race neutral criteria that also followed traditional redistricting criteria like contiguity, respecting political subdivisions, and compactness. His goal was to create a benchmark set of "comparison maps that also use the same political geography" with which plans could be compared to determine if they were "reasonably configured." ROA.11445. Barber found that the Illustrative Plans both deviated from traditional redistricting principals of minimizing parish and municipal splits as compared to the median of the simulations. ROA.11455, 11496. For example, the median number of municipalities split in Barber's Senate simulations was 22, while the ISP split 35. The same is true for parishes, where the median simulation parish splits was 34, while Cooper's was 61. ROA11455.[15]

The root of some of these splits is based in Cooper's need to create extra proportionality in Louisiana's only regions with higher BVAP. Only three majority-

---

[15] Barber's report also reveals that the 2022 Plans had a higher number of splits as compared to the simulations, but when Barber accounted for Core Retention, it appeared adherence to that criteria accounted for a number of those splits. ROA.11455, 11460-11462, 11496-11501.

Black areas of the state have a large enough population to support a Senate and House district. ROA.11455, 11495-6. Cooper carved out an additional majority-Black Senate district in each of these three areas: Shreveport/Caddo (from 1 to 2), Baton Rouge (from 2 to 3), and New Orleans (from 5 to 6). Barber's 100,000 simulations revelated *no* plans with this number of majority-Black senate districts in any of these regions. The same is true of the House, where Cooper carved out an additional majority-black district in Caddo (going from 3 to 4), Natchitoches (going from 0 to 1), Calcasieu (going from 1 to 2), Iberville/Ascension/St James (going from 1 to 2) and Baton Rouge (going from 6 to 8). ROA11493. Again, Barber's 100,000 simulated plans revealed no plans with additional districts in Baton Rouge and Calcasieu, and revealed additional districts in Iberville/Ascension/St. James and Natchitoches only 0.001% and 0.002% of the time respectively. *Id.* Even in Caddo, only .16% of Barber's simulations had 4 majority-Black districts. *Id.*

Barber then analyzed how the illustrative districts came to be such a statistical outlier among his simulations. Barber confirmed much of this was related to parish or municipality splits, and noted the racial divide along those splits. In the case of Caddo, ISD38 wandered across parish and city lines into rural areas to pick up population. Barber also showed, through a shaded precinct analysis, (below), that SD 38 winds around a cluster of predominately white precincts, which Cooper drew into SD 36. ROA11473.



In the House, Barber's analysis revealed something similar in Calcasieu Parish, showing that the district's "arms" divide Lake Charles, extending in several different directions capturing precincts with larger Black populations. ROA.11526.



Barber also conducted a city split analysis of Shreveport, which showed that in an effort to get a fourth majority-Black district, Cooper split parts of Shreveport into 5 main districts, whereas the 2022 Enacted Map only split Shreveport into 4 main districts. ROA.11511.



(a) 2022 Enacted Map          (b) Cooper Illustrative Map

Johnson bolstered these findings by demonstrating that Cooper created new majority-Black districts in the Shreveport, Lake Charles, Baton Rouge, Iberville, and Orleans areas without reference to traditional districting principles like compactness, major roads, neighborhoods, or other clear visible features. ROA.11237-11259. Johnson further demonstrated that the percent BVAP of each of the majority-Black District's in Cooper's Illustrative Plans were drawn just over 50% BVAP. Indeed, 10 of Cooper's 35 majority-Black districts in the IHP are between 50 and 53% BVAP; 8 of those 10 are between 50.03% and 50.9%. ROA.16233-16235. And 9 of Cooper's 14 majority-Black districts in the ISP are between 50 and 53% BVAP. ROA.11268. Johnson opined that this was the result of intentionally splitting urban areas to divide Black population, thereby maximizing the number of majority-Black districts. ROA.10375, 11261-11269.

41

2. <u>The Illustrative Plans fails to respect communities of interest, core retention, and ignores incumbents.</u>

Preserving communities of interest was a key provision of the Legislature's criteria for the 2022 Plans. ROA.15708. In support of his Illustrative Plans, Cooper identified "key multi-parish cultural regions." However, as noted by Johnson (and ignored by the district court), many of the regions Cooper defines are based on Wikipedia, or sources that list no shared characteristics "since Louisiana achieved statehood in 1812." ROA11196-8.[16] Even assuming, *arguendo,* this is a proper way to identify communities of interest, Cooper fails to even comply with his own communities of interest. For example, his IHP splits each cultural region between one to seven times, while the ISP splits these cultural reasons between three to eight times. ROA.11198. Thus, it is no wonder that Cooper admitted that he was not trying to minimize splits of communities of interest in drawing the Illustrative Plans. ROA.10065, 10084-10085 (admitting to not knowing whether high school football teams play each other despite citing them as a community of interest in his report).

Furthermore, Plaintiffs' communities of interest expert Dr. Colten admitted that he did not speak with Cooper until after the Illustrative Plans were drawn. ROA.9707, 9722, 9724. Cooper confirmed Colten's admissions, that all

---

[16] Cooper also purports to analyze communities of interest based on economic planning districts, Metropolitan Statistical Areas (MSAs), which are defined by the Federal Census. Each of these areas are also split numerous times (MSA's up to 8 times) in Cooper's Illustrative Plans. ROA11198-99.

justifications were post-hoc. ROA.10058, ROA.10059. This post-hoc expert testimony must be rejected. *See Bethune-Hill*, 580 U.S. at 189-90. Moreover, Cooper's own data, showed no data other than race and age were in the maptitude software. ROA.11234-11236.

Core retention and incumbency protection were also considered by the Legislature. ROA.15708. Barber also addressed this in his report. Specifically, Barber found that the 2022 Plans retained a higher percentage of district cores statewide than both the ISP (ROA11460) and IHP (ROA11499), but that in areas where Cooper sought to draw additional majority-Black districts, the retention rates were significantly lower. ROA11529. This "failure to consider core retention betrays a blinkered view of the redistricting process… as lawmakers "usually begin with the existing map and make alterations to fit various districting goals." *Alexander*, 144 S.Ct. at 1245. In sum, because the Illustrative Plans did not adhere to traditional redistricting criteria, or subordinated those criteria to considerations of race, Plaintiffs fail the *Gingles* I inquiry to produce "reasonably configured" districts.

3. <u>The district court erred in excluding defense expert testimony of Johnson and Barber.</u>

Additionally, the district court erred in excluding portions of Johnson and Barber's opinions on racial predominance. Because the error stemmed from the district court's fundamental misunderstanding of the applicable law, the standard of review is de novo. *Id.* at 1240-41; *Moss*, 933 F.2d at 1305-06.

Rebuttal experts may properly opine on intent so long as their opinions are inferential in nature and are drawn from "circumstantial evidence." *United States v. Barnes*, 979 F. 3d 283, 296, 303 (5th Cir. 2020). Courts routinely admit expert testimony in districting cases to show that race predominated in the drawing of district lines when it can be inferred from the circumstances. *See, e.g., Cooper*, 581 U.S. at 315-16 (crediting expert opinion "that 'race, and not party,' was 'the dominant factor' in [the district's] design"). The district court clearly did not understand the law on racial predominance, and its findings stemming from this misunderstanding led to the exclusion of key defense material, which now must be reviewed de novo. *Alexander*, 144 S.Ct. at 1240-41.

First, the district court erred in its pretrial order excluding Johnson's opinions on "whether race appears to be the predominant consideration used in drawing" the Illustrative Plans, ROA.6904-6905, even though the court acknowledged that racial predominance is a valid defense in a §2 case. ROA.10639.[17] Moreover, as discussed (*supra* §III.B.1), Johnson's analysis was properly drawn from circumstantial evidence revealing inconsistencies between Illustrative Plans and the traditional districting principles Cooper claimed to have followed, *Bethune-Hill*, 580 U.S. at 190. *See, e.g.*, ROA.11186-11191. The district court erred in excluding this evidence.

---

[17] Notably, the Secretary asserted racial predominance as a defense. ROA.444.

At trial, Plaintiffs' counsel directly asked Cooper about racial predominance. ROA.10000-10001. But despite opening the door to the issue, and the district court's concession that racial predominance was a valid defense, ROA.10639, the district court erroneously denied Defendants' motion for reconsideration, upholding the exclusion of key portions of Johnson's reports that directly rebutted Cooper's statements on direct. ROA.10331; Instead, the district court now claimed that evidence on racial predominance was admissible, but that defense experts could not opine on Cooper's subjective intent (even using circumstantial evidence). Notably, Johnson was still largely prevented from testifying on predominance, nor did the court allow the previously struck portions of Johnson's report to be admitted.

Throughout the trial, the court made inconsistent rulings on the admissibility of expert testimony attempting to distinguish evidence that it deemed improper (intent), from evidence that is clearly relevant and admissible showing that race was the predominant motive in the drawing of the Illustrative Plans. But, this is a distinction without a difference, as the court *should* consider evidence of racial predominance as part of an inquiry into whether the district is reasonably configured. *Allen*, 599 U.S. at 31-32. This led to wildly inconsistent rulings. ROA.10290-10291 (sustaining objection on Cooper's method to allocating Black populations in Baton Rouge); ROA.10362-10363 (admitting testimony on "racial targets" to explain configurations in Illustrative Plans); ROA.10365 (sustaining objection to testimony

45

regarding how a district zigs or zags to pick up a particular community); ROA.10375 (permitting testimony on carving out a low BVAP area to create a majority-Black district); ROA.10365 (sustaining objection and offering "you can ask it in a different way, and maybe Dr. Johnson will answer it using different terminology"). These inconsistent rulings reveal a deep misunderstanding of districting law, and what experts are allowed to opine about with regard to racial predominance.

For example, despite Barber's meticulous review of the boundaries and decisions made by Cooper and robust simulation analyses, the court excluded testimony of Barber's ultimate conclusion on whether race predominated as going to Cooper's subjective intent. Barber's proffered testimony showed that race predominated in the drawing of the Illustrative Plans, "in particular, the boundaries of those additional majority-BVAP districts." ROA.10722-10723. Barber opined that after an exhaustive "forensic examination" (ROA.10474) "it's simply a statistical impossibility that those criteria could give rise to the illustrative map without race being the predominant factor." ROA.10723. The court excluded this highly probative evidence, and in fact, refused to even sit on the bench to hear it.

The district court erred in sanitizing the record of the most probative evidence rebutting Cooper's affirmative statements on racial predominance. Moreover, these evidentiary rulings were clearly based on a misconception as to the legal application of racial predominance in §2 cases and as such, require reversal.

**IV.    Plaintiffs Failed to Prove *Gingles* II and *Gingles* III.**

*Gingles* II and III, which are often analyzed together, require that Plaintiffs show that the minority group is politically cohesive, and demonstrate that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. This requires a showing of legally significant racially polarized voting in the district at issue. *Covington*, 316 F.R.D. at 167. Notably, racially polarized voting does not become legally significant absent evidence that white bloc voting "normally will defeat the combined strength of minority support plus 'white crossover' votes . . . ." *Gingles*, 478 U.S. at 56. And as the Supreme Court has observed, "[i]t is difficult to see how the majority-bloc-voting-requirement could be met in a district where, by definition, white voters join in sufficient numbers with the minority voters to elect the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 16 (2009).

> **A. Plaintiffs failed to show legally significant racially polarized voting in the Illustrative Districts because Handley failed to perform a district-specific, functional analysis.**

*Gingles* requires a district-specific, functional analysis of electoral behavior within a particular election district. *Bethune-Hill*, 580 U.S. at 194; *Alabama*, 575 U.S. at 275–76. More specifically, the correct analysis to satisfy these *Gingles* prongs as the court in *Covington* observed, is a "district effectiveness analysis" which is "used to determine the minority voting-age population level at which a district becomes

effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." 316 F.R.D. at 169, n.46. While "evidence of especially severe racially polarized voting ... can help support finding the existence of *Gingles'* third factor," a "general finding regarding the existence of any racially polarized voting, no matter the level, is not enough." *Id*. 167. As the Supreme Court has explained, "statistically significant racially polarized voting" in past elections can demonstrate a relationship between race and voting, but "that generalized conclusion fails to meaningfully (or indeed, at all) address the relevant local question" whether, in the new district, "black voters would encounter sufficient white bloc-voting to cancel their ability to elect representatives of their choice." *Cooper*, 581 U.S. at 304 n.5.

Handley admitted that she did not conduct a district-specific analysis, except for her effectiveness scores which only examine the districts as drawn. ROA.10931. Instead, Handley analyzed seven geographic "areas of interest" in the state based on the location of Cooper's additional majority-BVAP districts. ROA.15715. There is no corresponding analysis of the threshold level of BVAP required for when the district provides an opportunity for Black voters to elect their candidate of choice.

Handley did not include in her "areas of interest" other areas in Cooper's illustrative maps that "generally encompass areas within majority-Black districts under the 2022 [] illustrative majority-Black districts." *Id.* ROA.15840, 15854. This means

Handley studied only the areas with additional majority-Black districts created by Cooper, not areas with existing majority-Black districts that Cooper also re-drew. This, along with the fact that the district court blindly accepted Handley's statistical analysis without giving due weight to the flaws in her methodology discussed *infra*, show that the district court erred in finding that Plaintiffs met their burden under *Gingles* III.

### B. The error of the district court's pre-trial orders infected the *Gingles* II and III analysis.

The district court's rushed pre-trial orders infected the remainder of the *Gingles* analysis with error. For the reasons stated above, endogenous elections are the more probative elections for an RPV analysis, *supra* §II, and it was reversible error for the court to set a schedule that prohibited their use. *Westwego*, 906 F.2d at 1045; *Brazos*, 469 F.3d at 423.

Additionally, the district court's pre-trial exclusion of the work of defense expert Dr. Solanky as irrelevant and unreliable must be reversed because the district court applied the wrong legal rule and conflated the burden of proof. *Id.* Defendants retained Dr. Tumulesh Solanky, PhD, a mathematician and statistician with over thirty years' experience, and the chair of the University of New Orleans' Math Department ROA.11595-11617, to study voting patterns and assess Handley's work on Cooper's Illustrative Plans. Solanky focused on the underlying assumptions Handley made about racial voting patterns in her aggregated estimates to determine whether she presented reliable evidence of racially polarized voting. This is well within the

"purpose of rebuttal testimony [which] is to explain, repel, counteract, or disprove the evidence of the adverse party." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 267 (5th Cir. 2022).

Solanky first framed his analysis by showing voting patterns and political participation for Louisianans broken down by party affiliation and race. ROA.11564-11574. This evidence is highly relevant to the totality of the circumstances. *See Gingles*, 478 U.S. at 36-37; *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 658 (2021). In failing to recognize that this information had relevance beyond *Gingles* II and III (ROA.6913), the district court misunderstood the law and applied the wrong rule. *Brazos*, 469 F.3d at 423; *Moss*, 933 F.2d at 1305-06; *Alexander*, 144 S.Ct. at 1240-41.

Solanky then began testing the underlying assumptions Handley made regarding voting in Louisiana, including than voters in certain parishes voted homogeneously, and how these assumptions impacted her analysis. Solanky first did this using Handley's data and statistical methodology, ecological inference RxC modeling ("EI RxC")[18], to examine several parishes with changed districts within Cooper's Illustrative Plans. ROA.11574-11580. To explore this phenomenon further, Solanky also examined precincts within certain parishes of the Illustrative

---

[18] Three other experts, including Handley used this methodology, and none were excluded.

Plans, to specifically study the "potential impact of urbanization on how white and black voters vote." ROA.11580-11581. Solanky again used EI RxC, but this time by VTD densities to determine the impact of the rural/urban divide. ROA.11580-11594. Here, Solanky showed that, Handley wrongfully assumed that all voters across an entire parish or region voted the same. ROA.11591-11593, 11787-11798, 11804-11856. Again, this is highly relevant to undermine Handley's assumptions and methodology, especially in areas of Louisiana where there are multiple districts in a single parish—including Shreveport, Baton Rouge, and New Orleans.

In response to Solanky's criticisms, Handley produced a "caddo_precincts" spreadsheet with her rebuttal report on August 11, 2023. In the 10 days allotted to him by the district court to respond under the scheduling order,  Solanky determined that Handley's allocation method led her to report more votes cast in a precinct than the total voter turnout in the precinct. ROA.11794. Though Solanky had insufficient time to assess the full scope of Handley's allocation method errors—an example in Solanky's rebuttal report shows the deeply flawed nature of Handley's error:

**Table 2: Dr. Handley's Votes for Candidates in 2020 Presidential Election (Reproduced first five rows (precincts) and Columns BW to CH from Dr. Handley's "caddo_precincts" Spreadsheet[9])**

| BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| president_as | president_bc | president_co | president_c | president_c | president_f | presidentl | president_l | president_l | president_s | president_s | president_t |
| 0.00 | 1.15 | 1.15 | 0.00 | 191.04 | 1.32 | 1.19 | 0.00 | 3.88 | 0.00 | 0.00 | 0.00 |
| 2.42 | 0.00 | 0.00 | 0.00 | 423.03 | 0.00 | 4.75 | 0.00 | 369.52 | 0.00 | 0.00 | 1.15 |
| 1.21 | 0.00 | 0.00 | 1.39 | 489.74 | 0.00 | 5.94 | 0.00 | 9.04 | 0.00 | 0.00 | 0.00 |
| 2.42 | 1.15 | 0.00 | 1.39 | 808.14 | 0.00 | 3.57 | 0.00 | 104.65 | 0.00 | 0.00 | 1.15 |
| 4.83 | 5.76 | 1.15 | 4.17 | 1437.38 | 0.00 | 5.94 | 1.23 | 111.11 | 0.00 | 1.22 | 11.46 |

**Table 3: Estimated Bias for First 5 Precincts in Caddo Parish due to Dr. Handley's Methodology: 2020 Presidential Elections**

| Parish | Precinct | Total Candidate Votes | Total Voter Turnout | More Votes than Voters? |
|---|---|---|---|---|
| Caddo Parish | 1 | 199.73 | 182 | Yes, 17.73 Votes Surplus |
| Caddo Parish | 2 | 800.86 | 948 | No, 147.14 Votes Fewer |
| Caddo Parish | 3 | 507.32 | 471 | Yes, 36.32 Votes Surplus |
| Caddo Parish | 4 | 922.47 | 868 | Yes, 54.47 Votes Surplus |
| Caddo Parish | 5 | 1584.25 | 1427 | Yes, 157.26 Votes Surplus |

ROA.11791. As shown in Tables 2 and 3, Handley's allocation method for early and absentee voters led to over-allocation of votes for particular candidates in some precincts and under-allocation for other candidates in other precincts. ROA.11791-11798. This is extremely relevant, not to mention concerning, in areas of the Illustrative Plan where Parishes, like Caddo are divided into several districts. This is because RPV analysis is based on estimations for how many voters of a certain race voted for each candidate in each district. ROA.15711. Thus, this undermines the calculations for the districts themselves. And, as shown by Solanky's supplemental report, the pattern showed over and under allocations that corresponded to race of the voter and party:

**Depiction of Handley's Biased Allocation of Early Votes to Greenup**





**Depiction of Handley's Biased Allocation of Early Votes to Ardoin**





ROA.11853.

Moreover, because approximately 30.6% of Louisianians voted early or by absentee in the election years Handley studied, Solanky's opinions are directly relevant to Handley's RPV analysis, and indicate that the margin of error could be sky-high in her results. ROA.11576. In fact, even Handley conceded at trial that misallocating approximately 25% of votes within a plan could make a difference in winning or losing an election. ROA.10936. By failing to cap the number of early and absentee votes per precinct, Handley's RPV analysis and estimates are not reliable, and the court erred by excluding Solanky's opinions, and refusing to allow any rebuttal on the subject.

The district court's order excluding this evidence is flawed. First, the order misconstrues the burden of proof in §2 cases. Specifically, the court below critiqued Solanky for "offer[ing] utterly no opinion on racially polarized voting," analyzing additional elections where there was no Black candidate, and studying political polarization rates. ROA.6911-6913. But Solanky was not required to offer an opinion on RPV because Plaintiffs, not Defendants, must show racially polarized voting to meet the *Gingles* preconditions. *Abbott*, 138 S. Ct. at 2333, 2326. Instead, Solanky was a proper <u>rebuttal</u> witness brought to explain, repel, counteract, and call into question the affirmative analysis brought by Handley. *In re Taxotere*, 26 F.4th at 267. Because the district court made this finding "based on the application of an incorrect burden of proof, the finding cannot stand." *Abbott*, 138 S. Ct. at 2326.

Furthermore, the district court's order entirely fails to acknowledge Solanky's criticisms of Handley's database and her allocation method. This "failure to take note of substantial contrary evidence" alone, justifies "remand[ing] the case for further findings," *Fairley*, 584 F.3d at 668.

Finally, the district court's sanitizing of the record as to the flaws in Handley's reports was amplified at trial when counsel for Plaintiffs opened the door. Despite Handley opining about Solanky on direct, (ROA.9810-9812), the court denied a motion to reconsider his exclusion, (ROA.9852-9854) preventing Defendants from being able to "explain, repel, counteract, or disprove the evidence of the adverse

party." *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir. 1963). This, of course, is reversable error. *Id. See also Fisher v. R.D. Werner Co.,* 1 F.3d 1236 (5th Cir. 1993)

Defendants' defense was undermined by the exclusion of Solanky's opinions. Had Solanky testified at trial and his reports admitted into evidence, the results of this case would have been vastly different. The proffer of Solanky's reports shows that Solanky would have testified on the undeniable error in Handley's RPV estimates. This effectively gutted Plaintiffs' only evidence of racially polarized voting under *Gingles* II and III, and could have turned the totality of the circumstances analysis in Defendants' favor.

## V.    The District Court Committed Error on the Totality of the Circumstances.

Even if Plaintiffs satisfy the *Gingles* preconditions, they still have the burden to prove under "the totality of the circumstances" that "the challenged electoral system is equally open to minority voters." *Teague v. Attala County*, 92 F.3d 283, 287 (5th Cir. 1996); *Johnson*, 512 U.S. at 1013-1014. This requires the court to engage in "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality," guided by the Senate Factors. *Allen*, 599 U.S. at 19.  The district court properly acknowledged that at least one of the Senate Factors is inapplicable in Louisiana[19], but it erred in finding

---

[19] SF4 is inapplicable because Louisiana legislative elections do not use candidate slating. ROA.9202.

the other eight Senate Factors favored Plaintiffs. Specifically, the district court erred in failing to conduct the "intensely local appraisal required" to properly weigh the totality of the circumstances.

## A. The district court erred in finding for Plaintiffs on Senate Factors 2 and 7.

This Court previously held that Senate Factors 2 and 7 are the most important in the totality of the circumstances analysis. *NAACP v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001). Senate Factor 2 ("SF2") looks to "the extent to which voting in the elections of the state or political subdivision is racially polarized[.]" *Gingles*, 478 U.S. at 37. "Some" evidence of RPV is insufficient for Plaintiffs to meet their burden of proof under SF2. *Fordice*, 285 F.3d at 368 (evidence establishing "some" racially polarized is insufficient). And evidence from "exogenous, decades-old elections" only supports, at best, a marginal case of RPV. *Fusilier v. Landry*, 963 F.3d 447, 562 (5th Cir. 2020). In fact, analysis of SF2 requires the district court "to determine whether racial bias or partisan politics better explains the voting patterns." *Lopez v. Abbott*, 339 F.Supp.3d 589, 604 (S.D. Tex. 2018).

In finding SF2 "weigh[ed] heavily" in Plaintiffs favor, the district court relied on the EI analyses conducted by Plaintiffs' experts. ROA.9199-9201. But, at best, these analyses only prove that "some" racially polarized voting exists in Louisiana. As explained *supra*, Handley only used exogenous elections. And King only used one election—the 2022 United States Senate race—in his EI analysis. ROA.9201.

56

This limited statistical evidence does not "weigh heavily" in Plaintiffs favor—especially when compared to defense expert's Alford's credible testimony.

Alford credibly determined that voting in Louisiana is politically, not racially, polarized. ROA.10236. Specifically, Alford demonstrated that Black voters tend to support Democratic candidates and White voters tend to support Republican candidates with levels of support remaining constant regardless of candidate's race. ROA.11320-11325. Overall, Alford concluded that the "high cohesion demonstrated by Black voters in these elections is not a function of Black voters coalescing around Black candidates, but rather is a function of Black voter preferences for Democratic party candidates." ROA.11329-11330. Alford's conclusions on political polarization undermine Plaintiffs' limited statistical evidence of RPV. As the district court recognized, Alford's analysis is relevant to the totality of the circumstances (ROA.9195), but it abused its discretion by ignoring Alford's testimony, claiming (wrongly) that "Defendants did not rebut Dr. King's EI analysis or testimony." ROA.9201.

Senate Factor 7 ("SF7") looks at "the extent to which members of the minority group have been elected to public office in the jurisdiction[.]" *Gingles*, 478 U.S. at 37. Like with SF2, the extent of the minority's election rates to the particular office at issue are more probative than election rates to other political offices. *See Fordice*, 252 F.3d at 368-69. But SF7, and §2 for that matter, have never required proportional representation. *Johnson*, 512 U.S. at 1014; *LULAC*, 548 U.S. at 436.

The district court erred by equating SF7 to a need for strict proportionality. Specifically, the Court found that the "Enacted Maps are not proportional" because 29/105 House district and 11/39 Senate Districts were majority BVAP. ROA9210. But, §2 explicitly disavows proportionality, plainly stating "nothing in this section establishe[]s a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. §10301(b). Instead, the probative questions are whether the evidence shows that "no members of a minority group have been elected to office" or that only "a few minority candidates" have been. S. Rep. No. 97-417 at 29 n. 115 (1982). Nearly 30% of the Legislature is lightyears beyond no (or "a few") members. Moreover, because Plaintiffs proceeded with their case examining the state by region, the district court erred by failing to consider proportionality on a regional level. *Johnson*, 512 U.S. at 1021-22. And as Barber shows, the 2022 Plans were already proportional, both regionally and statewide. ROA.11442.

**B. The district court erred in weighing the remaining Senate Factors.**

The district court's errors in SF2 and SF7 are sufficient in and of themselves to amount to clear error. *See Fordice*, 252 F.3d at 368. But the district court's error extended into the remaining Senate Factors. On the whole, the court below failed to conduct the legally required specific, localized analysis on these factors too, and thus erred in finding that Plaintiffs met their burden of proof. Proper analysis of the

functional reality of the political process in Louisiana shows that Black voters have an equal opportunity to participate in the political process in the State.

Senate Factor 1 ("SF1") looks at the extent of any history of official discrimination that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process. *Gingles*, 478 U.S. at 36-37. While historical examples of discrimination give context, the inquiry is whether the effects of past discrimination impede the ability of the minority group to participate in the political process today. *Fordice*, 252 F.3d at 367-68; *see also Allen*, 599 U.S. at, 12-14. Under SF1, this Court finds "contemporary" examples of official discrimination more probative. *Veasey*, 830 F.3d at 257-58.

On SF1, the district court relied upon evidence pre-1982 from Plaintiffs' expert Gilpin. But, Gilpin could not provide a single post-1982 example of discrimination from the Louisiana legislature. Instead, Gilpin admitted that a recent felony voter law expanded access of Black voters to the ballot in Louisiana ROA.9742-9743. Left without any relevant contemporary examples of state-sponsored discrimination on the factual record before it, the district court erred by citing facts from unrelated cases (involving other jurisdictions) to manufacture factual findings for Plaintiffs. ROA.9196-9199. But the record in this case shows that Black registered voters make up not only the majority of registered Democrats in Louisiana, but also a majority of Democrats voting in statewide elections over the

last decade.[20] Moreover, *every single* leadership position in the Legislature's Democratic Caucus is held by a member of the Legislative Black Caucus.[21] By exerting effective control over one of two major parties, the Black community has an equal opportunity to participate and elect candidates. The district court abused its discretion in ignoring, and excluding evidence relevant to SF1.

Senate Factor 3 ("SF3") analyzes the extent to which the state has used "unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures" that could enhance the opportunity for discrimination. *Gingles*, 478 U.S. at 37. The district court wholly ignored that Louisiana does not have malapportioned legislative districts or anti-single shot provisions, and instead focused instead on the Court's own unsubstantiated opinions that Louisiana's majority-vote requirements and frequent elections discriminate against minority voters. ROA.9201-9202. Notably, a majority vote requirement itself is not discriminatory. *Fordice*, 252 F.3d at 371. It is only when the majority vote requirement operates "'to the detriment of minority voters' and negate[s] their potential strength." *Clark v. Calhoun Cnty*, 88 F.3d 1393, 1397 (5th Cir. 1996) that the requirement becomes problematic.  The district court failed

---

[20] Solanky's excluded reports speak directly to these points (ROA.11567-11574).
[21] https://house.louisiana.gov/H_Reps/H_Reps_ Caucus_Democrats; https://louisianademocrats.org/our-party/our-leaders/ https://www.house.louisiana.gov/llbc/index_members

to cite to a single source in its finding that "this type of calendar of elections breeds voter fatigue and confusion, which is amplified in poor and undereducated communities." ROA.9202. Thus, with a lack of any credible evidence, the court abused its discretion in finding SF3 weighed in favor of Plaintiffs.

Senate Factor 5 ("SF5") looks to at whether members of the minority group bear the effects of discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process. *Gingles*, 478 U.S. at 37. While Plaintiffs' expert Burch alleged that past discrimination impacted education, employment, and health of Black Louisianans, she wholly failed to connect her analysis to a hinderance in the minority group's ability to effectively participate in the political process. Nor could she. As shown above, Black voters effectively control the Democratic party. In accepting Burch's commentary, without examining whether there was, in fact, depressed participation of Black voters, the Court committed error. *League of United Latin Am. Citizens, Council No. 4424 v. Clements*, 999 F.2d 831, 867 (5th Cir. 1992) (en banc) (holding that the district court "employed the wrong legal standard" by only looking at socioeconomic disparities and history of discrimination). *See also Fairley*, 663 F. App'x at 297-98.

Senate Factor 6 ("SF6") analyzes "whether political campaigns have been characterized by overt or subtle racial appeals[.]" *Gingles*, 478 U.S. at 37. Proof of SF6 requires Plaintiffs to present specific evidence of campaigns marred by racial

appeals overt enough to amount to a denial or abridgement of the right to vote. *Veasey*, 830 F.2d at 261. Notably, mailers on issues like illegal immigration or the police are merely anecdotal evidence that are insufficient to meet the plaintiffs' burden of proof. *Id.* Here, the district court erred in relying on the same sort of anecdotal evidence. ROA.9205-9206.

Senate Factor 8 ("SF8") looks to "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[.]" *Gingles*, 478 U.S. at 37. This factor is of "limited relevance" unless the evidence shows that a lack of responsiveness is comprehensive and systematic. *Clark*, 88 F.3d at 1400-01. The evidence relied upon below was limited in time and scope, dealing mostly with the challenged legislation itself. ROA.9207-9208. But instead of making local assessments of the responsiveness of the elected officials in the challenged districts, the district court rooted its SF8 analysis in "review of the cumulative evidence which support Senate Factors 1, 2, 3 and 5" which it determined "lead to the inevitable conclusion" that the Legislature "remains unresponsive to the needs of Black communities in Louisiana." ROA.9208. That sweeping generalization is far from the "intensely local appraisal" that the totality analysis mandates. *Allen,* 599 U.S. at 19.

Senate Factor 9 ("SF9") looks to whether the policy underlying the state's use of voting qualifications, prerequisites, standards, practices, or procedure is tenuous.

*Gingles*, 478 U.S. at 37. Like with SF8, the district court again summarily concluded that evidence from other factors demonstrated "the use of voting practices and procedures is tenuous to anything other than disenfranchising Black voter participation in the political process." ROA.9208-9209. Thus, the district court again erred by failing to conduct an "intensely local appraisal" and weighing SF9 in favor of Plaintiffs without citing a single fact on the record.

## VI.    The Court Lacked Jurisdiction.

For the reasons stated in Defendant's Motion to Convene (ROA.493-506), and in Judge Willett's concurring opinion in *Thomas v. Reeves*, 961 F.3d 800, 811-818 (5th Cir. 2020) (en banc) the statutory construction and history surrounding 28 U.S.C §2284 required a three-judge panel to hear this case.

The court also lacked jurisdiction, because Plaintiffs had no standing to challenge the 2022 Plans statewide. Defendant agrees with Legislative Intervenors' position on standing and, pursuant to Fed.R.App.28(i), adopt Legislative Intervenors-Appellants' Brief.

Finally, the district court's decision should also be reversed and vacated because §2 does not provide for a private right of action. Pursuant to Fed.R.App.28(i), Defendant adopts the Attorney General's brief on this subject.

## CONCLUSION

For the reasons stated herein, and in Legislative Intervenors Appellant Brief, the district court's decision below should be reversed or vacated.

Respectfully submitted,

*s/ Phillip Strach*
Phillip J. Strach
Alyssa M. Riggins
Cassie A. Holt
NELSON MULLINS RILEY &
SCARBOROUGH LLP
301 Hillsborough Street
Suite 1400
Raleigh, NC 27603
Phone: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

John C. Walsh
John C. Conine, Jr.
SHOWS, CALI & WALSH, LLP
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Phone: (225) 346-1461
john@scwllp.com
coninej@scwllp.com

*Counsel for Appellant Nancy Landry*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing ***Brief*** with the Clerk of Court using the CM/ECF system which will send notice of such filing to all registered CM/ECF users:

Date: July 17, 2023

*s/ Phillip J. Strach*
Phillip J. Strach
*Attorney of Record for Defendant-Appellant Nancy Landry, in her official capacity as Secretary of State of Louisiana*

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitation set forth in

set forth in FRAP 32(a)(7)(A). This brief contains <u>12, 993 words</u>.

2.      This brief complies with the typeface requirements of FED. R. APP. P.

32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft® Word

in 14-point font size in Times New Roman.

<div align="right">

*s/ Phillip J. Strach*
Phillip J. Strach
*Attorney of Record for Defendant-Appellant*
*Nancy Landry, in her official capacity as*
*Secretary of State of Louisiana*

</div>