No. 24-30115

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE
WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING
INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN
HARRIS, REVEREND,

*Plaintiffs - Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF
LOUISIANA,

*Defendant - Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH
B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER
OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,

*Intervenors - Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor - Appellee.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:22-cv-00178-SDD-SDJ

---

**OPENING BRIEF OF LEGISLATIVE INTERVENOR-APPELLANTS**

Richard B. Raile
Katherine L. McKnight
E. Mark Braden
BAKER HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Telephone: 202.861.1711
Email: rraile@bakerlaw.com

Michael W. Mengis
BAKER HOSTETLER LLP
811 Main Street
Suite 1100
Houston, TX 77002

Patrick T. Lewis
BAKER HOSTETLER LLP
127 Public Square
Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
Robert J. Tucker
BAKER HOSTETLER LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215

*Attorneys for Intervenor-Appellants, Phillip
DeVillier, in his official capacity as Speaker
of the Louisiana House of Representatives,
and Cameron Henry, in his official capacity
as President of the Louisiana Senate*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. R. 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusals.

**Intervenor Defendants-Appellants**: Clay Schexnayder and Patrick Page Cortez, in their official capacities as Speaker of the Louisiana House of Representatives and President of the Louisiana Senate, succeeded by Phillip DeVillier and Cameron Henry, in their official capacities as Speaker of the Louisiana House of Representatives and President of the Louisiana Senate, in accordance with Fed. R. Civ. P. 25(d), represented by Baker & Hostetler LLP attorneys Richard B. Raile, Katherine L. McKnight, E. Mark Braden, Michael W. Mengis, Patrick T. Lewis, Erika Dackin Prouty, and Robert J. Tucker.

**Intervenor Defendant-Appellant**: State of Louisiana, by and through Attorney General Jeff Landry, succeeded by Attorney General Elizabeth B. Murrill, in accordance with Fed. R. Civ. P. 25(d), represented by Louisiana's Office of the Attorney General attorneys Elizabeth Baker Murrill, Amanda Marie LaGroue, Carey T. Jones, Jeffrey Michael Wale, Jorge Benjamin Aguinaga, and Morgan Brungard; and by Office of the Governor attorney Angelique Duhon Freel; and by Holtzman Vogel Josefiak Torchinsky PLLC attorneys Jason B. Torchinsky, Andrew B. Pardue, Brennan Bowen, and Phillip Michael Gordon.

**Defendant-Appellant**: R. Kyle Ardoin, in his official capacity as Secretary of State for Louisiana, succeeded by Nancy Landry, in her official capacity as Secretary of State for Louisiana, in accordance with Fed. R. Civ. P. 25(d), represented by Shows, Cali & Walsh, LLP attorneys John Carroll Walsh and John Clifton Conine, Jr.; and by Nelson Mullins Riley & Scarborough LLP attorneys Phillip J. Strach, Alyssa M. Riggins, and Cassie A. Holt; and by Baker Donelson Bearman Caldwell & Berkowitz attorney John E. Branch, III; and by attorney Charlton J. Meginley.

**Intervenor-Appellee**: United States of America, by and through United States attorney Justin Alan Jack, represented by the United States Attorney's Office for the Middle District of Louisiana; and by United States Department of Justice Civil Rights Division Voting Section attorney Daniel J. Freeman; and by United States Department of Justice Civil Rights Division Appellate Section attorneys Noah Bokat-Lindell and Erin Helene Flynn.

**Plaintiffs-Appellees**: Dorothy Nairne, Jarrett Lofton, Clee E. Lowe, Alice Washington, Rose Thompson, Steven Harris, Alexis Calhoun, Black Voters Matter Capacity Building Institute, Louisiana State Conference of the National Association for the Advancement of Colored People (NAACP), represented by Adcock Law LLC attorney John N. Adcock; and by Cozen O'Connor attorneys Amanda Giglio, Josephine M. Bahn, Michael B. de Leeuw, and Robert S. Clark; and by NAACP Legal Defense & Educational Fund attorneys Colin Burke, Kathryn C. Sadasivan, Leah C. Aden, Stuart C. Naifeh, Isabel Sara Rohani, and Victoria Wenger; and by NAACP Legal Defense Fund DC attorneys Jared Evans and Sara Rohani; and by American

Civil Liberties Union Foundation attorneys Dayton Campbell-Harris, Garrett Muscatel, Luis Manuel Rico Roman, Megan C. Keenan, Nora Ahmed, Samantha Osaki, Sarah E. Brannon, Sophia Lin Lakin, Adriel Cepeda Derieux, and Ming Cheung; and by ACLU of Louisiana attorneys Megan E. Snider and Stephanie Legros; and by Harvard Law School attorneys Daniel J. Hessel and Tiffany Alora Thomas; and by attorney Ronald Lawrence Wilson.

Dated: July 17, 2024                    Respectfully submitted,


                                        */s/ Richard B. Raile*
                                        Richard B. Raile

                                        *Attorneys for Intervenor-Appellants, Phillip DeVillier, in his official capacity as Speaker of the Louisiana House of Representatives, and Cameron Henry, in his official capacity as President of the Louisiana Senate*

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to 5th Cir. R. 28.2.3, Legislative Intervenor-Appellants request oral argument. As this brief demonstrates, the decision below presents questions of overriding public concern impacting millions of Louisiana voters, as well as multiple questions of law and fact. The Court would benefit from oral argument in considering the weighty issues presented in this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................... i

STATEMENT REGARDING ORAL ARGUMENT.................................. iv

TABLE OF AUTHORITIES ..................................................... vii

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION............................................. 2

STATEMENT OF ISSUES....................................................... 3

STATEMENT OF THE CASE .................................................... 3

SUMMARY OF THE ARGUMENT............................................. 9

STANDARDS OF REVIEW .................................................... 11

ARGUMENT ..................................................................... 12

    I.    Plaintiffs Lack Standing for Most of the Relief the District Court Issued ............................................................ 12

        A.    Precedent Rejects the District Court's Theory of Statewide Harm.............................................. 12

        B.    Associational Standing Cannot Justify the Injunction....... 14

        C.    Organizational Standing Is Unavailable........................... 19

    II.    Plaintiffs' Section 2 Claim Fails on the Merits........................... 26

        A.    The District Court Erred on the First Precondition........... 27

        B.    The District Court Erred on the Second and Third Preconditions ............................................ 36

        C.    Plaintiffs' Demand for More Than Proportionality Is Unfounded ................................................ 45

CONCLUSION........................................................................ 55

CERTIFICATE OF SERVICE ................................................................... 56

CERTIFICATE OF COMPLIANCE ......................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ................................................................. 3, 4, 27, 54

*Allen v. Milligan,*
   599 U.S. 1 (2023).............................................................................*passim*

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ................................................................. 22

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.,*
   829 F. Supp. 2d 802 (D. Minn. 2011 ..................................................... 42

*Baird v. Consol. City of Indianapolis,*
   976 F.2d 357 (7th Cir. 1992) ................................................................. 45

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................................... 20

*Bd. of Trs. New Orleans Emps. Int'l Longshoremen's Ass'n v. Gabriel,*
   *Roeder, Smith & Co.,*
   529 F.3d 506 (5th Cir. 2008) ................................................................. 11

*Bethune-Hill v. Va. State Bd. of Elections,*
   326 F. Supp. 3d 128 (E.D. Va. 2018) ...............................................29, 36

*Bethune-Hill v. Va. State Bd. of Elections,*
   580 U.S. 178 (2017) ............................................................................... 36

*Callais v. Landry,*
   __ F. Supp. 3d __, 2024 WL 1903930 (W.D. La. Apr. 30, 2024) .............. 29

*Carney v. Adams,*
   592 U.S. 53 (2020) ................................................................................. 12

*Citizens Project v. City of Colorado Springs,*
   2024 WL 3345229 (D. Colo. July 9, 2024) ........................................21, 22

*City of Baker Sch. Bd. v. City of Baker*,
2007 WL 9702694 (M.D. La. Jan. 12, 2007) ............................................ 24

*Complaint of Borghese Lane, LLC*,
2023 WL 3114851 (W.D. Pa. Apr. 27, 2023) .......................................... 42

*Conway Sch. Dist. v. Wilhoit*,
854 F. Supp. 1430 (E.D. Ark. 1994) ....................................................... 24

*Cooper v. Harris*,
581 U.S. 285 (2017) ............................................................... 2, 4, 54

*Davis v. Passman*,
442 U.S. 228 (1979) ................................................................... 23

*Fairley v. Hattiesburg*,
662 F. App'x 291 (5th Cir. 2016) ........................................... 45, 50, 52, 53

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................. 19, 20, 21

*Fusilier v. Landry*,
963 F.3d 447 (5th Cir. 2020) ........................................................ 45, 52

*Gahagan v. U.S. Citizenship & Immigr. Servs.*,
911 F.3d 298 (5th Cir. 2018) ............................................................ 36

*Georgia v. Ashcroft*,
539 U.S. 461 (2003) .................................................................... 3

*Gill v. Whitford*,
585 U.S. 48 (2018) ................................................................. *passim*

*Growe v. Emison*,
507 U.S. 25 (1993) .................................................................... 29

*Harding v. Cnty. of Dallas*,
948 F.3d 302 (5th Cir. 2020) ........................................................ 12, 13

*Holder v. Hall*,
512 U.S. 874 (1994) .................................................................... 48

*Holmes v. Sec. Inv. Prot. Corp.*,
  503 U.S. 258 (1992) ............................................................25, 26

*Houston v. Lafayette Cnty.*,
  56 F.3d 606 (5th Cir. 1995) ...................................................... 28

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) ...................................................... 42

*In re Isbell Records, Inc.*,
  774 F.3d 859 (5th Cir. 2014) ...................................................... 18

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ...........................................................*passim*

*Kumar v. Frisco Indep. Sch. Dist.*,
  476 F. Supp. 3d 439 (E.D. Tex. 2020)....................................... 24

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*,
  82 F.4th 345 (5th Cir. 2023) ...................................................... 21

*League of United Latin Am. Citizens v. Clements*,
  986 F.2d 728 (5th Cir. 1993) ...................................................... 37

*League of United Latin Am. Citizens v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ...................................................... 37

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ...........................................................*passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................... 23, 25, 26

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*,
  56 F.3d 904 (8th Cir. 1995) ...................................................... 46

*Luce v. United States*,
  469 U.S. 38 (1984)...................................................................... 44

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................. 12

*Luna v. Cnty. of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018) ..................................................... 51

*Luv n' Care, Ltd. v. Laurain*,
    2021 WL 7907283 (W.D. La. Mar. 29, 2021).......................................... 44

*McConchie v. Scholz*,
    577 F. Supp. 3d 842 (N.D. Ill. 2021) ....................................................... 51

*Miller v. Johnson*,
    515 U.S. 900 (1995) ............................................................................1, 54

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)....................................................................... 17, 23

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ....................................................... 11, 15, 20

*Nguyen v. Excel Corp.*,
    197 F.3d 200 (5th Cir. 1999) ................................................................... 16

*North Carolina v. Covington*,
    585 U.S. 969 (2018) ................................................................................. 13

*Oh v. Philadelphia Cnty. Bd. of Elections*,
    2008 WL 4787583 (E.D. Pa. Oct. 31, 2008) ............................................ 24

*Overton v. City of Austin*,
    871 F.2d 529 (5th Cir. 1989) ................................................................... 38

*Perez v. Pasadena Indep. Sch. Dist.*,
    165 F.3d 368 (5th Cir. 1999) ................................................................... 11

*Perez v. Pasadena Indep. Sch. Dist.*,
    958 F. Supp. 1196 (S.D. Tex. 1997) ........................................................ 38

*Roberts v. Wamser*,
    883 F.2d 617 (8th Cir. 1989) ..............................................................24, 25

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022) ..................................................27, 28, 34, 35

*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023) .............................................................23, 35

*Rodriguez v. Bexar Cnty.*,
  385 F.3d 853 (5th Cir. 2004) ...........................................................37, 40

*Rodriguez v. Pataki*,
  308 F. Supp. 2d 346 (S.D.N.Y.) ............................................................ 47

*Rose v. Raffensperger*,
  511 F. Supp. 3d 1340 (N.D. Ga. 2021) .................................................. 17

*Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. McWherter*,
  877 F. Supp. 1096 (W.D. Tenn. 1995) ................................................... 50

*Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. Sundquist*,
  209 F.3d 835 (6th Cir. 2000) ................................................................. 48

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016)............................................................. 42

*Sensley v. Albritton*,
  385 F.3d 591 (5th Cir. 2004) ...............................................10, 11, 33, 34

*Shaw v. Hunt*,
  517 U.S. 899 (1996) .............................................................................. 48

*Shaw v. Reno*,
  509 U.S. 630 (1993) ..................................................................... 3, 54, 55

*Simmons v. UBS Fin. Servs., Inc.*,
  972 F.3d 664 (5th Cir. 2020) ................................................................ 25

*Soto Palmer v. Hobbs*,
  686 F. Supp. 3d 1213 (W.D. Wash. 2023).........................................48, 49

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ................................................................... 14, 15, 17

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................... 15, 17, 18

*Tenn. Conf. of the NAACP v. Lee*,
__ F.4th __, 2024 WL 3219054 (6th Cir. June 28, 2024) .......................... 21

*Texas State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) .............................................21, 22

*Thomas v. Bryant*,
938 F.3d 134 (5th Cir. 2019) ................................................ 45

*Thomas v. Reeves*,
961 F.3d 800 (5th Cir. 2020) ................................................ 45

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011) .........................................................24, 25

*Thornburg v. Gingles*,
478 U.S. 30 (1986).................................................*passim*

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991)................................................ 16

*United States v. Graves*,
5 F.3d 1546 (5th Cir. 1993) ................................................. 44

*United States v. Licausi*,
413 F.2d 1118 (5th Cir. 1969)............................................... 44

*United States v. Perry*,
35 F.4th 293 (5th Cir. 2022) ................................................ 40

*United States v. Wise*,
221 F.3d 140 (5th Cir. 2000) ............................................... 11

*Vaughan v. Lewisville Indep. Sch. Dist.*,
475 F. Supp. 3d 589 (E.D. Tex. 2020)....................................... 24

*Westwego Citizens for Better Gov't v. City of Westwego*,
906 F.2d 1042 (5th Cir. 1990)............................................... 34

*White-Battle v. Democratic Party of Va.*,
323 F. Supp. 2d 696 (E.D. Va. 2004) ....................................... 24

*Willy v. Admin. Rev. Bd.*,
   423 F.3d 483 (5th Cir. 2005) ................................................... 16

*Wis. Legislature v. Wis. Elections Comm'n*,
   595 U.S. 398 (2022) .......................................................... 4, 5, 35

**Statutes**

28 U.S.C. § 1292 ..................................................................... 2

28 U.S.C. § 1331 ..................................................................... 2

52 U.S.C. § 10301 ............................................................*passim*

52 U.S.C. § 10302 ................................................................ 23

**Rules**

Fed. R. App. P. 29 ................................................................... 2

Fed. R. Civ. P. 26 .................................................................. 42

Fed. R. Evid. 702 .................................................................. 42

**Other Authorities**

*Aggrieved*, Webster's Third New International Dictionary of the
   English Language, Unabridged 41 (1971) ............................... 23

# INTRODUCTION

The Supreme Court recently reiterated that the "exacting requirements" of § 2 of the Voting Rights Act (VRA) "help ensure" that redistricting remains "the duty and responsibility of the States, not the federal courts." *Allen v. Milligan*, 599 U.S. 1, 29-30 (2023) (quotation and alteration marks omitted). They also prevent § 2 from being used for "[f]orcing proportional representation," which "is unlawful and inconsistent" with the statute and the Constitution. *Id.* at 28. The Court explained that § 2 litigation "has rarely been successful," and that its requirements have "become[] more difficult" to meet "as residential segregation decreases." *Id.* at 28-29 (citation omitted). Above all, § 2 must not become a vehicle for "methodically carving the country into racially designated electoral districts." *Id.* at 29 n.4 (citation omitted).

Spurning those warnings, the district court issued what may be the most expansive § 2 ruling ever. Louisiana's enacted House and Senate redistricting plans include 40 majority-Black districts, the most in State history. Dissatisfied with that outcome, four individuals and two entities (Plaintiffs) brought this case demanding *nine additional* majority-Black districts. That would exceed proportionality, just after the Supreme Court reemphasized that § 2 "does not mandate a proportional number of majority-minority districts." *Id.* at 43 (Kavanaugh, J., concurring). To achieve that feat, Plaintiffs' expert strung together disparate and isolated Black communities into illustrative districts carefully designed to hit racial targets in a "policy of maximizing majority-black districts." *Miller v. Johnson*, 515 U.S. 900, 924 (1995). The district court granted all relief Plaintiffs

requested—and more. It found § 2 violations in 25 districts and then enjoined every one of the State's 144 legislative districts.

The district court erred. Plaintiffs lack standing to challenge all but two districts the court found cracked or packed. On the merits, the district court applied the wrong legal standard in assessing minority-group compactness and improperly excluded expert analysis demonstrating fatal flaws in the Plaintiffs' statistical effort to prove racial bloc voting. And the district court erred in finding § 2 liability "from mere failure to guarantee a political feast." *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). By achieving substantial proportionality, the enacted plans adequately protect against "political famine" for the State's Black voters. *Id.* That is all § 2 requires. The Supreme Court has rejected the doctrine that "whenever a legislature *can* draw a majority-minority district, it *must* do so." *Cooper v. Harris*, 581 U.S. 285, 305-06 (2017). Because that is what the district court ordered, this Court should reverse.[1]

## STATEMENT OF JURISDICTION

The district court asserted jurisdiction over Plaintiffs' federal-law VRA claim under 28 U.S.C. § 1331, but jurisdiction remains contested. *See* Argument § I, *infra*. This Court has jurisdiction under 28 U.S.C. § 1292(a) to review the district court's permanent injunction entered on February 8, 2024. ROA.9122-12. Phillip DeVillier, Speaker of the Louisiana House of Representatives, and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(i), this brief adopts the arguments of the briefs filed by the Attorney General and Secretary of State.

Cameron Henry, President of the Louisiana Senate, in their respective official capacities, whose predecessors intervened below as defendants, timely appealed on March 6, 2024. ROA.9317-18.

## STATEMENT OF ISSUES

1.    Do four individuals and two entities have constitutional and statutory standing to mount statewide challenges to two legislative redistricting plans?

2.    Did the district court apply the correct legal standards, and make proper evidentiary rulings and plausible findings, under the *Gingles* preconditions?

3.    Does § 2 require that Louisiana provide more majority-Black districts than the Black percentage of the voting-age population in the State and in regions relevant to Plaintiffs' claims?

## STATEMENT OF THE CASE

1.    After each decennial census, "States must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). In Louisiana, the Legislature is responsible for redistricting the 39-seat Senate plan and 105-seat House plan. ROA.9123.

"Redistricting is never easy." *Abbott v. Perez*, 585 U.S. 579, 585 (2018). "The Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." *Id.* at 585-86 (quoting *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*)). Purposefully creating a new majority-minority district is presumptively

unconstitutional. *Cooper*, 581 U.S. at 299-301. On the other hand, a state violates § 2 "if its districting plan provides 'less opportunity' for racial minorities 'to elect representatives of their choice.'" *Abbott*, 585 U.S. at 587 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (*LULAC*)). The Supreme Court has "interpreted this standard to mean that, under certain circumstance[s], States must draw 'opportunity' districts in which minority groups form 'effective majorit[ies].'" *Id.* (citation omitted). A plaintiff seeking to compel a majority-minority district must, as a threshold matter, satisfy three "*Gingles*" preconditions: that (1) the relevant minority group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district," (2) the relevant minority group is "politically cohesive," and (3) the "district's white majority … 'vote[s] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301-02 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)).

"If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 585 U.S. at 614. Additionally, "race-based districting is narrowly tailored" and allowable only "if a State had 'good reasons' for thinking that the Act *demanded* such steps." *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022) (citation omitted).

4

2.    In 2022, the Legislature passed House and Senate redistricting plans that likely provide the most majority-Black districts in Louisiana history. ROA.15835. As shown, both plans together contain 40 majority-Black districts,

**Figure 11: Number of Majority-Black Legislative Districts By Plan – 1990s to 2020s**

| Decennial Census | Legislative Plan | Statewide Majority-Black Senate Districts | Statewide Majority-Black House Districts |
|---|---|---|---|
| 2000 | 1990 | 10 | 26 |
| 2000 | 2001 | 9 | 27 |
| 2010 | 2001 | 9 | 23 |
| 2010 | 2011 | 11 | 28 |
| 2020 | 2011 | 10 | 28 |
| 2020 | 2022 | 11 | 29 |

compared to 39 in 2010 and 32 in 2000. *Id.* The Black percentage of the State's voting-age population has not materially increased since 2000: it has grown by 1.3% from 29.95% to 31.25%. ROA.15826; *see also* ROA.9145 (similar finding as to total population). While record evidence shows "a 23.08% gain in the minority population," this is almost entirely attributable to growth in the State's Hispanic population, not its Black population. ROA.15827. "U.S. Census data shows that the African American population is somewhat dispersed across the state, with higher concentrations in urban areas." ROA.9145.

3.    Plaintiffs are four individual Black voters (the Individual Plaintiffs) and two advocacy groups, Black Voters Matter Capacity Building Institute and the Louisiana State Conference of the NAACP (the Entity Plaintiffs). ROA.255-65; ROA.9130-31. They filed this § 2 case in the district court, calling for three additional majority-Black Senate districts and six additional majority-Black

House districts—for a total of 49 majority-Black districts. ROA.252. Plaintiffs sued the Secretary of State. Subsequently, the Attorney General, on behalf of the State, and the House Speaker and the Senate President, on behalf of the State's legislative interests, intervened as defendants.

Plaintiffs focused on specific regions of Louisiana. In the Senate, they identified three "clusters" for additional majority-Black districts: one embracing Bossier and Caddo Parishes; the second embracing Jefferson and St. Charles Parishes; and the third embracing East and West Baton Rouge, Iberville, and Point Coupee Parishes. ROA.15724-29. In the House, Plaintiffs focused on five clusters: one embracing DeSoto, Natchitoches, and Red River Parishes; one consisting of Calcasieu Parish; one embracing Bossier and Caddo Parishes; one embracing Ascension and Iberville Parishes; and one embracing East Baton Rouge and East Feliciana Parishes. ROA.15726-40. Plaintiffs assert that one or more majority-Black districts must be added to each cluster. ROA.15840; ROA.15854. In each cluster, the enacted plans provide a number of majority-Black districts substantially equal in proportion to the Black voting-age population (BVAP) of the cluster. ROA.11504; ROA.11520; ROA.11527; ROA.11536; ROA.11466; ROA.11474; ROA.11481.

4.    The case entered discovery. The Secretary of State sought information concerning the Entity Plaintiffs' intentions to assert standing of members. ROA.1263-64, ROA.1274. The Louisiana NAACP signaled an intent to assert member standing but resisted disclosure of information about members under a First Amendment privilege theory. ROA.1242-47; ROA.1289-91;

ROA.1304. Negotiations and motion practice ensued, and the discovery deadline passed. Then, the magistrate judge ordered that the Louisiana NAACP identify under seal the names and addresses of members whose standing it would assert. ROA.6867; ROA.9389. The Louisiana NAACP responded with a confidential list of ten names and addresses, *see* ROA.10945, but one name was later withdrawn. Defendants sought discovery from these individuals, but the district court denied that request. ROA.10951; ROA.7206. Defendants moved for summary judgment on the ground that Plaintiffs lack standing except in a few districts. ROA.1696-1713. The district court denied that motion. ROA.7205.

The parties served competing expert reports. Defendants sponsored reports by Dr. Tumulesh Solanky, which demonstrated that the polarized-voting estimates of Plaintiffs' expert, Dr. Lisa Handley, were unreliable because large numbers of absentee votes skewed her measures, which compare voting choices and minority percentages by precinct. ROA.11574-94; ROA.11794. Plaintiffs moved in limine to exclude Dr. Solanky's opinions, and the district court granted that motion, reasoning that Dr. Solanky had not used a large enough sample set to prove anything about racial voting patterns and that his consideration of partisan electoral choices was irrelevant in a racial vote-dilution case. ROA.6911-12.

5.     The district court held a seven-day bench trial beginning November 27, 2023, and issued an opinion on February 8, 2024, concluding "that the Louisiana State House and Senate electoral maps enacted by the Louisiana

Legislature … violate § 2 of the VRA." ROA.9122. The court found that four Individual Plaintiffs and the two Entity Plaintiffs had standing, but did not identify the districts they have standing to challenge. ROA.9130-35. On the first *Gingles* precondition, the court dismissed evidence showing that Plaintiffs' illustrative districts combined disparate and disconnected minority groups, ruling that "the distribution of minority populations" is irrelevant. ROA.9167. It also deemed irrelevant and, in some cases inadmissible, evidence that the illustrative plans were predominantly race-based, concluding that this "has no probative value in the context of a VRA § 2 vote dilution case." ROA.9174. The court found the precondition met based on statewide evidence of district geometric shapes. ROA.9163-64.

On the second and third preconditions, the court deemed Dr. Handley's methods dispositive in Plaintiffs' favor. ROA.9195. Notably, the court at trial permitted Dr. Handley to testify to rebut Dr. Solanky's opinions, which the court had previously excluded. ROA.9853-54. Defense counsel moved for admission of his opinions, and the court denied that motion. ROA.9853-54.

Under the totality-of-circumstances inquiry, the court received evidence, inter alia, that Plaintiffs demanded more than proportionality. The court found this fact irrelevant, noting minor differences between the statewide BVAP and statewide percentage of majority-Black districts. ROA.9210. The court concluded that proportionality is a statewide inquiry in every case and that the inquiry favored Plaintiffs. It did not address their demand to achieve more than proportionality, even at the statewide level.

The court "ORDERED that elections" under the enacted plans "be and are hereby ENJOINED." ROA.9212. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

The order below is legally and clearly erroneous and should be reversed or vacated.

I.      Plaintiffs lack standing to challenge all 144 legislative districts or even all districts the court below deemed infirm. In a vote-dilution case, a plaintiff may challenge—at most—the district where that plaintiff resides. The district court, however, issued statewide holding. Individual Plaintiffs reside only in two of 25 districts the court deemed cracked or packed. But the court enjoined every district in two plans.

The district court erred to the extent it relied on the Entity Plaintiffs' standing assertions. First, the Louisiana NAACP did not timely disclose members, and the district court abused its discretion in enabling it to use a First Amendment privilege as both sword (to assert member standing) and shield (to thwart discovery into members). Second, the district court did not make findings sufficient to establish members' standing, which at most could cover only four additional districts where the court found § 2 flaws. Third, the Entity Plaintiffs did not establish Article III standing in their own right; they alleged simply that they spent money in response to (or in anticipation of) the State's plans. And fourth, the Entity Plaintiffs lack a right of action under § 2 to enforce an interest in resource conservation.

II.    On the merits, the district court issued what may be the most sweeping § 2 liability order ever. That improbable result is legally and clearly erroneous.

A.    Under the first *Gingles* precondition, which demands proof that the minority population is compact, the court applied the wrong legal standard. It looked to district shape at a statewide level where it should have looked at minority-group compactness for each illustrative district. Under the correct standard, Plaintiffs cannot succeed because they presented no evidence of minority-group compactness. The defense evidence showed that this is a case like *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), where discrete minority communities grouped in illustrative districts are separated by a considerable distance. Moreover, this Court's precedent required the district court to examine whether the illustrative districts were configured for predominantly racial reasons. The district court wrongly dismissed that standard, along with evidence relevant to it.

B.    Under the second *Gingles* precondition, which requires evidence of racially polarized voting, the district court committed clear error. It relied on a study that did not reliably account for high levels of absentee voting. That study assumed that absentee and in-person voters in different areas share voting preferences, which is manifestly not the case. The district court abused its discretion in excluding probative expert opinion demonstrating the flaws in that assumption. It wrongly believed the expert had to make affirmative demonstrations when he was a rebuttal expert offered to critique Plaintiffs' expert.

10

C.    The district court erred in requiring more majority-minority districts than the Black percentage of the voting-age population in areas where § 2 liability is alleged. Supreme Court precedent rejects that outcome in all but unusual cases. Here, Plaintiffs framed regional claims that should have been adjudged on a regional basis. The district court wrongly applied an inflexible statewide standard. And, under both standards, Plaintiffs demanded more than proportionality, the district court appeared to demand that, and its order is erroneous.

## STANDARDS OF REVIEW

"'The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo.'" *Bd. of Trs. New Orleans Emps. Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008) (citation omitted). "The court examines standing *de novo*." *NAACP v. City of Kyle*, 626 F.3d 233, 236 (5th Cir. 2010). It "reviews *de novo* the legal standards the district court applied to determine whether §2 has been violated." *Sensley*, 385 F.3d at 595. The Court "review[s] de novo the legal standards a court applies to determine whether Section 2 has been violated" and reviews "the district court's findings on the *Gingles* threshold requirements and its ultimate findings of vote dilution … for clear error." *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999). The Court reviews the "admission or exclusion of expert testimony [for] abuse of discretion." *United States v. Wise*, 221 F.3d 140, 148 (5th Cir. 2000).

11

# ARGUMENT

## I. Plaintiffs Lack Standing for Most of the Relief the District Court Issued

The district court erroneously deemed Plaintiffs to have standing to challenge the entire "State House and Senate electoral maps." ROA.9212. Plaintiffs bore "the burden" to satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). They were required to prove that they "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). Where challengers' allegation of harm "is the dilution of their votes, that inquiry is district specific." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Accordingly, § 2 plaintiffs must show residency "in a district where their vote has been cracked or packed." *Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020). Plaintiffs failed to meet this test as to all but three districts, and the district court erred in enjoining 144 districts in two redistricting plans.

### A. Precedent Rejects the District Court's Theory of Statewide Harm

The district court erred in applying a "theory of statewide injury." *Gill*, 585 U.S. at 69. *Gill* rejected that theory, holding that allegations of vote dilution give rise only to an injury that "is district specific." *Id.* at 66. By contrast, an allegation of "statewide harm" presents "the kind of undifferentiated, generalized grievance about the conduct of government" that falls short under Article III. *Id.* at 68 (citation omitted). Although *Gill* involved allegations of political gerrymandering, this Court in *Harding* recognized that dilution alleged under § 2

is conceptually the same and, following *Gill*, required proof "that each voter resides in a district where their vote has been cracked or packed." *Harding*, 948 F.3d at 307.

The district court inverted the analysis by asking *whether* Plaintiffs have standing but not *what* they may challenge. As to the four Individual Plaintiffs, it stated that each "reside[s] in a cracked or packed voting district under the Enacted Map." ROA.9129. Even if that were true, *but see* note 1, *infra*, the district court was also obliged to decide which districts they had standing to challenge. *Gill*, 585 U.S. at 69. Because redistricting plaintiffs may challenge only "those legislative districts in which they reside," *North Carolina v. Covington*, 585 U.S. 969, 976 (2018), the court should have cabined the claims and its injunction to those districts. Finding that the four Individual Plaintiffs resided, respectively, in HD60, HD66, and HD25, the district court should have considered claims only against those districts.[2] ROA.9130.

Instead, the district court appeared to hold that these four Plaintiffs had standing to challenge all "the alleged vote dilution," ROA.9131, "under the Enacted Map," ROA.9129. The court clarified the scope of standing it recognized by enjoining all "elections under S.B. 1 and H.B. 14" and determining that "the State House and Senate electoral maps … violate § 2 of the Voting Rights Act." ROA.9212. The court dispensed standing on a statewide basis on the flawed

---

[2] Two Individual Plaintiffs reside in HD66. ROA.9130. It was not found to be cracked or packed. *See* ROA.9153.

view that a voter may challenge—not just that voter's district—but also "the Enacted Map." ROA.9129. The district court's theory of "statewide harm" is legally wrong. *Gill*, 585 U.S. at 68. At least 105 individual challengers would be needed to justify its injunction.

Even understood in conjunction with the district court's liability findings, its dispensation of standing was grossly overbroad. On the merits, the court found that eighteen specific House districts and seven specific Senate districts "were packed" or "cracked."[3] ROA.9150; *see also* ROA.9153. But it identified Plaintiff residents in only two of those (HD25 and HD60). *See* ROA.9130. That left 23 districts where § 2 liability was found (including all such Senate districts) without a Plaintiff.

## B. Associational Standing Cannot Justify the Injunction

The district court also permitted the Louisiana NAACP to sue on behalf of members. ROA.9131-33. It erred in doing so.

An organization may claim "standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (*SFFA*) (citation omitted). This type of "representational" standing requires an entity to "demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

---

[3] The Senate districts are SD5, SD7, SD8, SD10, SD15, SD19, and SD39. ROA.9150. The House districts are HD2, HD4, HD5, HD7, HD13, HD22, HD25, HD29, HD34, HD35, HD37, HD60, HD61, HD63, HD65, HD68, HD69, and HD70. ROA.9153.

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (citation omitted). The Louisiana NAACP (but not BVM) invoked this doctrine. Its assertion was deficient.

1.   The Louisiana NAACP failed to prove that named members would have standing "in their own right." *SFFA*, 600 U.S. at 199 (citation omitted). As a threshold matter, this requires "naming the affected members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see City of Kyle*, 626 F.3d at 237.

The Louisiana NAACP refused to name members until it was too late for "verifying the facts." *Summers*, 555 U.S. at 499. During discovery, the Secretary of State propounded interrogatory and document requests for information about the organization's members. ROA.1263-64; ROA.1274. But the Louisiana NAACP resisted discovery on the ground of First Amendment privilege. ROA.1242-47; ROA.1289-91; ROA.1304. Defendants responded that the Louisiana NAACP should either abandon its assertion of associational standing or submit that assertion to discovery—including with appropriate confidentiality protections. *See* ROA.1351; ROA.1399. After negotiations, and proceedings before a magistrate judge—which included an order denying discovery that was reversed and remanded by the district judge—the discovery deadline passed without any member disclosure. *See, e.g.*, ROA.1393; ROA.1394; ROA.1396; ROA.1447; ROA.1487; ROA.5991; ROA.9345.

Then, the magistrate judge issued an order directing that the Louisiana NAACP identify under seal the names and addresses of any members whose

standing it would assert. ROA.6867; ROA.9389. The Louisiana NAACP responded with ten names and addresses, *see* ROA.10945, but later withdrew one name. Defendants were entitled to discovery about these individuals to confirm, among other things, the accuracy of assertions, voting eligibility, and voting history. Defendants sought such discovery, but the district court permitted only a deposition of the Louisiana NAACP's president, not of individuals disclosed. ROA.10951; ROA.7206. Next, the district court admitted hearsay evidence purportedly about these individuals over objections at trial, ROA.10951-52, and ultimately found that "Plaintiffs established the associational standing of the Louisiana NAACP." ROA.9133.

The district court abused its discretion in accepting this evidence. Privileges may not be used "as both a sword and a shield." *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999). "A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected [privileged information] for self-serving purposes." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (cited in *Nguyen*, 197 F.3d at 207 n.18). When a litigant "uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005). The district court enabled the Louisiana NAACP to use privilege defensively to shield information about members and then offensively to selectively reference (unconfirmed) member identities at trial. This was highly prejudicial. Defendants lacked any practical way to vet the information, and the district court erred by declining Defendants' request for

depositions of members disclosed after the discovery deadline. Where privilege was asserted to that effect, the court should have excluded the evidence.

2. Even with that information, the district court did not make sufficient findings. It simply held that there are "Louisiana NAACP members who are Black registered voters whose vote is allegedly diluted by the district where they live." ROA.9132. From that, it held that "Plaintiffs established the associational standing of the Louisiana NAACP." ROA.9133. That holding is fatally built on the district court's erroneous "theory of statewide injury." *Gill*, 585 U.S. at 69. As discussed, the district court could adjudicate only claims against districts where these individuals (and the Individual Plaintiffs) were proven to reside. But it made no findings on that question and instead "dispensed" standing "in gross." *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024) (citation omitted).

Moreover, while necessary, a determination of residency is insufficient. An association must also demonstrate that named members "would otherwise have standing to sue in their own right." *SFFA*, 600 U.S. at 199 (citation omitted). For example, in *Summers*, the Supreme Court explained that evidence of members in an environmental case would have to establish that they "plan to make use of the specific sites" subject to the litigation and "will find their recreation burdened" by "the challenged procedures." 555 U.S. at 499. Here, the district court made no findings that disclosed members reside in any particular challenged districts, intend to vote, or prefer candidates preferred by most Black voters, as is necessary for standing under § 2. *See Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1352 (N.D. Ga. 2021). Nor did any evidence show when the disclosed

17

members joined the Louisiana NAACP, which is essential given that standing is judged "as of the commencement of the suit." *In re Isbell Records, Inc.*, 774 F.3d 859, 869-70 (5th Cir. 2014).

More fundamentally, standing cannot be based solely on "organizations' self-descriptions of their membership," even if "no one denies them." *Summers*, 555 U.S. at 499 (citation omitted). A showing by competent evidence, tested in adversarial proceedings, is necessary to ensure the accuracy of self-descriptions. *See id.* (finding that proof of standing is impossible "[w]ithout individual affidavits"). But Defendants were denied even the most basic discovery about the members (like birth dates) necessary to verify, before trial, whether the disclosed individuals were even registered voters. *See* ROA.10961. It was impossible to ascertain whether the names referred to real people or whether those people had standing. The record was woefully insufficient for the district court to find standing, and it erred in accepting unvetted assertions as positive proof.

3.    The belated and prejudicial disclosures do not in any event justify the sweeping injunction. The Louisiana NAACP did not disclose members in all 144 legislative districts. And the belatedly disclosed members are alleged to reside in only four of the 25 districts where the district court found dilution—SD8, ROA.10957; HD34, ROA.10952; HD65, ROA.10953; and HD68, ROA.10954. Accounting for districts where Individual Plaintiffs reside, 14 House districts and six Senate districts deemed dilutive below are without either

an Individual Plaintiff or disclosed Louisiana NAACP member.[4] If nothing else, the district court erred in deciding § 2 claims against 20 legislative districts where no Plaintiff and no disclosed member of a Plaintiff is alleged to reside.

## C.    Organizational Standing Is Unavailable

Most of the injunction rests on (if anything) the court's erroneous finding that the Entity Plaintiffs have standing in their own right. This was error on many fronts.

### 1.    Constitutional Standing

To "have standing 'to sue on their own behalf for injuries they have sustained,' … organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citation omitted). The standard is not met here.

a.    The harm of vote dilution arises "from a burden on those plaintiffs' own votes." *Gill*, 585 U.S. at 69. Organizations cannot meet the test that applies to individuals in this setting because they cannot suffer a burden on votes they do not have. The district court found standing under a theory of "resource diversion," ROA.9133, but that is a novel and heretofore unrecognized means of

---

[4] The districts are HD2, HD4, HD5, HD7, HD13, HD22, HD29, HD35, HD37, HD60, HD61, HD63, HD69, HD70, SD5, SD7, SD10, SD15, SD19, and SD39. *Compare* ROA.10944-58, *with* ROA.9150, *and* ROA.9153. The Louisiana NAACP also disclosed members in HD1, HD101, SD17, or SD38. RO10946; ROA.10955; ROA.10956; ROA.10957. But the district court did not find that these districts are cracked or packed.

addressing vote dilution. *Gill*, 585 U.S. at 68-69 (observing that "other possible theories" for challenging allegedly dilutive districts remain unrecognized). Vote dilution claims have been recognized in different forms since 1962 and have consistently rested on a "showing" of "disadvantage to" the plaintiffs "as individuals." *Baker v. Carr*, 369 U.S. 186, 206 (1962). A harm to entity resources does not fit the vote-dilution context and should not be recognized.

      b.     Moreover, the specific type of resource-diversion theory the district court applied was just unanimously rejected by the Supreme Court. The district court found standing because, "in response" to the enactment of the challenged districting plans, the Organizational Plaintiffs allegedly diverted resources from their "core activities toward previously unplanned response strategies." ROA.9134-35. The Supreme Court unanimously rejected the view that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Medicine*, 602 U.S. at 395; *compare* ROA.9133-35. In that case, the Court found it insufficient that organizations opposed to abortion "incurr[ed] costs to oppose FDA's actions" in approving an abortion-inducing drug. *All. for Hippocratic Medicine*, 602 U.S. at 394. "An organization," the Court held, "cannot manufacture its own standing in that way." *Id.*

      The district court allowed the Entity Plaintiffs to manufacture standing. For BVM, the district court cited testimony, *see* ROA.9134, describing mere "lobbying activities" that do not establish Article III standing. *NAACP*, 626 F.3d at 238. These included a 2021 "redistricting roadshow," before the redistricting, and a "redistricting takeover event" during the redistricting. ROA.9606. BVM's

lobbying continued "when the maps were voted on" and then converted into efforts "to hold legislators accountable following the redistricting map," ROA.9616-17, which the district court found were meant to "counteract" the enacted plans. ROA.9134. Likewise, the district court found that the Louisiana NAACP "undertook additional organization and mobilization efforts to counteract the effects of the Enacted Maps." ROA.9134.

*Alliance for Hippocratic Medicine* deemed this inadequate. Like the plaintiff organizations there, the Entity Plaintiffs claim injury in the form of "engaging in public advocacy and public education" "to oppose [Louisiana's] actions." 602 U.S. at 394. And the Supreme Court's ruling there equally rules out such a standing theory here: "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* This decision "susses out the narrow scope of the diversion-of-resources injury claimed by Plaintiffs here." *Citizens Project v. City of Colorado Springs*, 2024 WL 3345229, at *7 (D. Colo. July 9, 2024) (rejecting standing assertion of advocacy groups on this basis); *Tenn. Conf. of the NAACP v. Lee*, __ F.4th __, 2024 WL 3219054, at *12 (6th Cir. June 28, 2024) (same); *see also Tex. State LULAC v. Elfant*, 52 F.4th 248, 254-56 (5th Cir. 2022), *cert. denied sub nom. Texas State LULAC v. Torres*, 144 S. Ct. 70 (2023).

Besides, the evidence established that these lobbying efforts do "not differ" from BVM's "routine activities," as these projects *are* its routine activities. *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 352 (5th

Cir. 2023) (citation omitted) (quotation and alteration marks omitted); *see* ROA.9605-06. And, even assuming cognizable resource diversion, it is not causally related to electoral districts: BVM would have spent the same resources for roadshows and takeovers if the Legislature had adopted maps BVM favored. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999). An injunction now saves none of those expenses.

The Louisiana NAACP's claim to standing by resource-diversion due to "voter apathy" fares no better. The Louisiana NAACP's president testified that, in "the last election cycle," when "Governor John Bel ran, everybody was excited," such that the entity "had resources," and donors were "[c]alling us to give us the money to help get the vote out," and "money flowed." ROA.9568. But during *that* time period, Louisiana had *fewer majority-Black districts* than under the enacted plans. ROA.15835-36. The Louisiana NAACP's president testified that "this year" its get-out-the-vote efforts are like "going to a funeral." ROA.9569; *see also* ROA.9134 (finding injury from "voter apathy"). But the difference is not the number of majority-Black districts—which has increased—but the fact that "Governor John Bel" is no longer a candidate. ROA.9569. The record "fails to link any diversion of resources specifically to" the challenged maps. *Elfant*, 52 F.4th at 254. The "record shows that Plaintiffs have *already* been using their respective resources" in an environment without the number of majority-minority districts they desire. *Citizens Project*, 2024 WL 3345229, at *6. To the extent the district court found a link between the Louisiana NAACP's "apathy" related resource-diversion and the 2021 redistricting plans, *see* ROA.9134,

"its evidence is inapposite," and its conclusion is "clearly erroneous." *Murthy*, 144 S. Ct. at 1988 n.4.

### 2. Statutory Standing

The Entity Plaintiffs also do not possess a right of action to enforce § 2. "Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress … to determine in addition, who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241 (1979). Accordingly, courts must "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Legislative Appellants contest that any right of action is available to enforce § 2, for the reasons stated in the joint Petition for Initial Hearing En Banc. C.A.5 Doc. 125-1. However, recognizing that the Petition was denied by an evenly divided vote, and that a panel of this Court recognized a private right of action in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) (*Robinson II*), we focus on a narrower argument.

Assuming *Robinson II* was rightly decided, it did not consider whether organizations (as compared to minority voters) may sue under § 2 to vindicate a resource-diversion interest. *See id.* at 587-88. The answer is no. *Robinson II* located the right of action in VRA § 3, which references "a proceeding" by "an aggrieved person." 52 U.S.C. § 10302(a); *see* 86 F.4th at 588. An "aggrieved" person is one "suffering from an infringement or denial of legal rights," *Aggrieved*, Webster's Third New International Dictionary of the English Language,

Unabridged 41 (1971), and § 2 forbids the "right … to vote" from being infringed on "account of race or color," 52 U.S.C. § 10301(a). Because a "person" in this context must be an "an individual human being," *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 460 (E.D. Tex. 2020) (citation omitted), § 2 at most authorizes suit only by "voters" alleging "infringement of the right to vote on account of race." *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989). It does not authorize suits by entities pursuing cost-cutting objectives.

In *Roberts*, the Eighth Circuit rejected a claim by a candidate for office who sought redress for "the loss of the votes that he claims he would have received if not for the allegedly disproportionate difficulties of black voters in coping with" the challenged electoral mechanism. 883 F.2d at 621. Other courts have followed suit. Claims by candidates have failed, *Oh v. Philadelphia Cnty. Bd. of Elections*, 2008 WL 4787583, at *7 (E.D. Pa. Oct. 31, 2008); *White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 703 (E.D. Va. 2004), *aff'd*, 134 F. App'x 641 (4th Cir. 2005), as have claims by local governments resisting statutes governing their elections, *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1433 (E.D. Ark. 1994); *City of Baker Sch. Bd. v. City of Baker*, 2007 WL 9702694, at *2 (M.D. La. Jan. 12, 2007), as did the claim of a white voter asserting he "votes in lockstep with minority groups in all elections," *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020). Similarly, the Supreme Court in *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011), held that statutory standing under Title VII of the Civil Rights Act for a "person claiming to be aggrieved" does not include "any person injured in the Article III sense." *Id.* at 176. Instead, a

plaintiff must be "an employee" of the defendant and a "victim" of a Title VII violation. *Id.* at 178; *see Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 668 (5th Cir. 2020) (rejecting statutory standing under Title VII because the plaintiff "was not" an "employee" of the defendant).

As in *Roberts*, the Entity Plaintiffs do not "claim that [their] right to vote has been infringed because of [their] race." 883 F.2d at 621. Nor could they. They are nonprofit entities that have neither a race nor voting rights. Insofar as they assert standing in their own right, they claim injuries to their resources. The benefits of relief to them are no different from the benefits § 2 enforcement might confer on candidates hoping for votes from minorities, white voters who share minority voting preferences, or local governments that object to state laws the VRA may override. The Entity Plaintiffs' position that § 2 redresses injuries to its monetary bottom line ignores the "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" under § 2. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 (1992).

"[B]ackground principles" confirm that statutory standing is absent in this case. *See Lexmark*, 572 U.S. at 129. The Supreme Court has directed courts to "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* (citation omitted); *see also Thompson*, 562 U.S. at 176-78 (construing the term "aggrieved" to incorporate a zone-of-interest test). The statute is named the *Voting* Rights Act, not the Non-Profit Resources Conservation Act. Its "purpose … is to protect minority voters," *Roberts*, 883 F.2d at 621, and it guarantees "the right of

any citizen of the United States to vote," regardless of "race or color," 52 U.S.C. § 10301(a). It "requires no guesswork" to see that non-profit cost reduction is not within the zone of interests. *Lexmark*, 572 U.S. at 131.

Moreover, courts must "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Id.* at 132. The standard is not met "if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* at 133 (quoting *Holmes*, 503 U.S. at 268-69). In this case, the Entity Plaintiffs' alleged harms are remote and derivative. They allege that district lines dilute Black electoral power and, by consequence, impact their own operating costs. The harm to themselves is, at most, incidental to the injury allegedly suffered by others. *See Holmes*, 503 U.S. at 269-70. Accordingly, the Court should reverse the injunction as to all districts where an Individual Plaintiff does not reside.

## II.   Plaintiffs' Section 2 Claim Fails on the Merits

For a § 2 claim to succeed, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority

group." *Abbott*, 585 U.S. at 614. Here, Plaintiffs failed to demonstrate these pre-conditions, and the district court's contrary holdings were erroneous.

### A.    The District Court Erred on the First Precondition

Under the first precondition, the "minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably con-figured district." *Milligan*, 599 U.S. at 18 (citation omitted). This "requires the possibility of creating more than the existing number of reasonably compact dis-tricts with a sufficiently large minority population to elect candidates of its choice." *Johnson*, 512 U.S. at 1008. The district court erred in finding this stand-ard satisfied.

1.    The court failed to analyze the compactness of the minority popu-lation. "The first *Gingles* condition refers to the compactness of the minority pop-ulation, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (citation omitted); *see also Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (*Robinson I*) (directing review of "the compactness of the *minority population* in the proposed district, not the proposed district itself"). That is be-cause, under § 2, "the injury is vote dilution." *LULAC*, 548 U.S. at 433. If the minority group is not compact, the challenged district "cannot be responsible for minority voters' inability to elect its candidates." *Gingles*, 478 U.S. at 50. To serve this purpose, and to "limit judicial intervention" in redistricting, the first precondition imposes "exacting requirements." *Milligan*, 599 U.S. at 29-30.

The district court's approach was far from exacting. It issued the improb-able holding that 17% and 18% of districts in each respective plan (seven in the

Senate, eighteen in the House) are cracked or packed. ROA.9150, ROA.9153. It found this even though the enacted plans provide the most majority-Black districts in Louisiana history. The Supreme Court recently observed that "the compactness requirement becomes more difficult" as time progresses and "residential segregation decreases." *Milligan*, 599 U.S. at 28-29 (quotation marks omitted). Somehow, the district court managed to deliver what may be the most expansive first-precondition ruling ever. Only legal error could explain this startling outcome.

Plaintiffs presented no evidence to the correct standard, and the district court did not hold them to it. Indeed, Plaintiffs' demographer, Mr. Cooper, deemed review of minority compactness "not necessary" and "something that one does not need to do to answer the *Gingles* I inquiry." ROA.10071. His improper legal opinion was wrong. *See LULAC*, 548 U.S. at 433. Yet the district court adopted that theory, examined only the "compactness of [the] Illustrative Plan[s]" themselves, ROA.9167, and deemed a "granular analysis of the distribution of minority populations within an illustrative district" irrelevant. *Id.* It made no findings concerning the compactness of the minority community "on a district-by-district basis." *Robinson I*, 37 F.4th at 218. But *Gingles* itself directed courts to consider how "integrated" minority voters are in a district. *See* 478 U.S. at 50; *see also Houston v. Lafayette Cnty.*, 56 F.3d 606, 610-11 (5th Cir. 1995).

2.    Under the correct standard, the first condition could not be satisfied. As noted, Plaintiffs presented no evidence on minority-group compactness and attacked the inquiry itself. *Gingles* "does not assume" its preconditions are met;

"plaintiffs must prove" them. *Growe v. Emison*, 507 U.S. 25, 42 (1993) (quoting *Gingles*, 478 U.S. at 46). Their failure to do so should end this case.

Moreover, defense evidence showed that the minority population is not sufficiently compact to form additional majority-BVAP districts. Defense expert Sean Trende presented dot-density maps showing how Black population is distributed within Mr. Cooper's illustrative districts. *See* ROA.11630; ROA.10274-75. These maps show the location of voting-age individuals by race with dots representing 10 individuals each.[5] This has been credited as a reliable method to analyze residential patterns. *See, e.g., Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 146 (E.D. Va. 2018) (three-judge court); *Callais v. Landry*, __ F. Supp. 3d __, 2024 WL 1903930, at *12 (W.D. La. Apr. 30, 2024) (three-judge court).

---

[5] In Dr. Trende's version, blue dots represent Black residents, and orange dots represent white residents.

29

Dr. Trende's maps show that Cooper's illustrative districts do not group compact Black populations. For example, the Black population in Illustrative House District ("IHD") 23 in the Natchitoches region is not compact; it is spread out:



ROA.11657. Black voting-age persons grouped into IHD-1 also live substantially apart, with some in urban Shreveport and others in distant rural areas:

30



ROA.11633; *see also* ROA.11637.

Likewise, IHD-38 must traverse 15 miles east of Lake Charles to gain

Black residents from the town of Iowa:



ROA.11662, ROA.11670. And ISD-17, centered in Baton Rouge, "unit[es] ge-
ographically disparate clusters of Black voters" from New Roads and
Plaquemine:



ROA.11732, ROA.11735. These and other maps show similar patterns across Cooper's illustrative districts. ROA.11691; ROA.11696; ROA.11720; ROA.11752.

This case is in all respects like *Sensley*, which rejected a proposed district that would "lump together two groups of African-American citizens who were from two distinct communities … which are separated by considerable distance (approximately 18 miles) and share few community interests." 385 F.3d at 598; *see also LULAC*, 548 U.S. at 433 (rejecting "a district that combines two farflung

segments of a racial group"); *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1045 (5th Cir. 1990). In each region of focus, Cooper did what *Sensley* condemned, stringing disparate pockets of Black population together.

Mr. Cooper claimed he considered socio-economic data and "cultural regions" and "planning districts." ROA.10065-66. The district court credited this assertion, ROA.9156, but applied the wrong legal standard in evaluating its significance. As noted, "compactness must be shown on a district-by-district basis, for a 'generalized conclusion' cannot adequately answer 'the relevant local question.…'" *Robinson I*, 37 F.4th at 218 (citation omitted). Cooper admitted the socio-economic data he considered is reported only at a regional (or parish/municipal) level. ROA.10066. That is too high a level of generality to show compactness for legislative districts, which are drawn within and across parishes and cities. *See* ROA.10347-48.

The district court made no findings of socio-economic features by district, and the record did not permit that. Cooper did not use socio-economic data disaggregated to the block-group level, where district lines are drawn. ROA.10068-70. Nor did he review that data for each parish or municipality where he drew districts. ROA.10071. And Cooper admitted it was impossible to avoid splitting his enormous regional communities-of-interest, which he kept "in the background" during his work, ROA.10064-65, because the regional lines he identified all "kind of crisscrossed one another[.]" ROA.10065. This information does nothing to prove that any minority group anywhere is compact.

3.     The court erred even in analyzing "the compactness of the contested district." *LULAC*, 58 U.S. at 433. The court did not find compactness by district; it conducted a plan-wide analysis. Plaintiffs proffered two measurements of district-shape compactness. ROA.10272-73. But they focused on statewide averages, and the district court made findings only concerning averages by plan. ROA.9163-64. It made no findings by district. This was legal error. This Court has held that courts "cannot rely" on analysis that "addresses compactness on a plan-wide basis, not a district-by-district basis." *Robinson I*, 37 F.4th at 218-19 (citing *Wis. Legislature,* 595 U.S. at 404).

4.     The district court erroneously failed to apply "[t]he line" the Supreme Court has "long drawn … between consciousness" of race "and predominance." *Milligan*, 599 U.S. at 33 (plurality opinion). Under settled law, "race may not be 'the predominant factor in drawing district lines unless there is a compelling reason.'" *Id.* at 31 (citation and alteration marks omitted). This Court therefore held that "the Equal Protection implications" of race-based line drawing apply to illustrative plans proposed under § 2, because "a legislatively enacted map would be subject to Equal Protection review." *Robinson II*, 86 F.4th at 595 n.4.

Rejecting that holding, the district court held that intent behind illustrative districts "has no probative value in the context of a VRA § 2 vote dilution case." ROA.9174. The district court's citation to *Milligan* for that view, *see* ROA.9174, was perplexing, since its lead opinion applied the predominance test to § 2 illustrative plans. *See Milligan,* 599 U.S. at 31-33. Moreover, *Robinson II* resolved that

question and binds courts in this Circuit. *See Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (discussing "the well-settled rule of orderliness").

The district court's legal error infected its findings and evidentiary rulings. The court excluded or found irrelevant evidence tending to show that race predominated in Plaintiffs' illustrative plans. ROA.9176 (rejecting as "irrelevant" simulation evidence offered to show intent); ROA.6905-07 (excluding Dr. Johnson's opinions that circumstantial evidence shows predominant racial motivation). The court's misapprehension of law also caused it to miss "the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017). The district court found that Mr. Cooper's effort to maximize majority-Black districts required that he "lower the BVAP in many other existing majority-Black districts," ROA.9153, which is overriding evidence of racial predominance, *see Bethune-Hill*, 326 F. Supp. 3d at 157-58. And Mr. Cooper's testimony demonstrated an overwhelmingly racial purpose in line-drawing. ROA.10048-49; ROA.10043; ROA.10057-58; ROA.10047. Because the district court applied the wrong standard, this Court should, at a minimum, remand for a proper predominance assessment. *See Bethune-Hill*, 580 U.S. at 193.

### B.    The District Court Erred on the Second and Third Preconditions

The second and third *Gingles* preconditions require proof that the relevant minority group "is politically cohesive" and that, in the absence of a § 2 remedy,

a White voting bloc will usually "defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18 (citation omitted). Because voting patterns by race cannot be discerned from election results, § 2 plaintiffs must present "statistical evidence." *League of United Latin Am. Citizens v. Clements*, 986 F.2d 728, 744 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). Plaintiffs' statistical evidence was clearly flawed. The district court erred in crediting it and in excluding expert opinion critiquing it.

### 1.    Dr. Handley

The district court clearly erred in finding that Plaintiffs "have proven both preconditions" by the opinions of their polarized-voting expert, Dr. Lisa Handley. ROA.9196. The clear-error standard compels reversal where the Court is "left with the definite and firm conviction that a mistake has been committed" or if the findings are not "plausible" in light of the record. *Rodriguez v. Bexar Cnty.*, 385 F.3d 853, 860 (5th Cir. 2004) (citations omitted). In the § 2 context, courts commit clear error when they ignore or improperly evaluate evidence under the *Gingles* preconditions. *Id.*; *see also Clements*, 999 F.2d at 864.

a.    The district court erroneously credited Dr. Handley's analysis "that because of the clearly racially polarized voting in Louisiana, Black voters can only elect their candidate of choice if a district is drawn that gives them that opportunity." ROA.9189 (citing ROA.15741). Dr. Handley's estimation methods (ecological inference and ecological regression) compare precinct minority populations with precinct vote totals to determine whether there is a correlation between minority population and candidate preferences. ROA.9781-82; *see also*

*Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1215 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) (describing methods).

But Dr. Handley used an unreliable method to allocate early and absentee votes to precincts. Louisiana does not record or publish the precincts where absentee votes are cast, but instead reports that information at the much wider parish level. ROA.9783-84; ROA.9190. This poses a problem for methods that compare *precinct* voting choices with *precinct* demographics. Such methods miss information not reported by precinct. In Louisiana, 30.6% of voters used early or absentee voting since 2012, and 45.6% did in 2020. ROA.11575-76; *see also* ROA.9784-85 (Dr. Handley acknowledging "25 to almost 50 percent of the votes were early votes").

At such levels of absentee participation, statistical comparisons will be inaccurate without a reliable allocation method. *See* ROA.11576. Dr. Handley admitted there were "too many early votes" to "ignore," so "they had to be allocated" to precincts. ROA.9784-85. Without accounting for absentee votes, the error rate would be larger than 25%. *See* ROA.10897 (Dr. Handley criticizing a defense expert for studying elections in a prior district with a 75% overlap with a current district, reasoning that the omitted "25 percent could have made a difference in terms of winning or losing."). This is too large to overlook. *See Overton v. City of Austin*, 871 F.2d 529, 539 (5th Cir. 1989) (per curiam) (holding that "a trial court should not ignore the imperfections of the data used nor the limitations of statistical analysis" when evaluating racially-polarized voting).

Dr. Handley attributed absentee votes to precincts in an unreliable manner. She allocated early and absentee votes to specific precincts proportionally based on the votes received by each candidate in the election-day vote in those precincts. *See* ROA.15714; ROA.9783. That method does not work because it wrongly assumes a close correlation between voting preferences of absentee and in-person voters. For example, if 55% of election-day voters in a precinct voted for Donald Trump, Dr. Handley's method would allocate the same proportion of absentee votes for Trump to that precinct. But mail-in voting populations frequently exhibit different voting preferences from election-day voting populations, as Dr. Handley's own analysis showed, ROA.9811-12, and voters of different parts of parishes exhibit different voting preferences, ROA.11592.[6] Dr. Handley's method ignored these differences, treating voters in urban and rural areas of a parish, and election-day and absentee voters, as interchangeable. But the purpose of studying voting patterns is to observe preferences, not to attribute the preferences of some populations to others. Doing that is little better than "to ignore" those preferences, ROA.9784, since the method shows virtually the same result by precinct as the election-day totals would show standing alone.

b.    Separately, when allocating absentee votes, Dr. Handley did not cap the number of absentee votes assigned to each precinct by total turnout.

---

[6] Dr. Solanky found a divergence of voting preferences between absentee and election-day voters in 2020, where Joe Biden received "52.2% of his votes [in Louisiana] as early and absentee votes," whereas Trump received "just 41.5% of [his] votes" as early or absentee votes. ROA.11575.

Consequently, the total votes for certain candidates were overestimated in some precincts and underestimated in others. Dr. Handley admitted that, in some instances, she allocated more votes for candidates in precincts than voter turnout. ROA.9848.

These errors rendered Dr. Handley's analysis unreliable and incapable of satisfying the second and third preconditions. *Rodriguez*, 385 F.3d at 867 (reversing district court's finding of polarization because flawed statistical analysis left "*no* information" as to how voters "*actually* vote"). The district court clearly erred in making findings based on these methods.

### 2.  Dr. Solanky

The district court compounded this error by excluding as unreliable and irrelevant opinions of defense expert Dr. Solanky, whose role was to criticize Dr. Handley. The "rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022). Nevertheless, the district court granted a motion in limine excluding Dr. Solanky's opinions, ROA.6910-13, and refused to reconsider its decision at trial. ROA.9853-54.[7] Then, the court admitted testimony by Dr. Handley *responding* to Dr. Solanky's opinions, even though they were excluded. *See* ROA.9809-11. The district court ultimately found that "there is no evidence that" Dr. Handley's allocation method "rendered the analysis infirm or the conclusions unreliable." ROA.9191. But there was such evidence; the court just wrongly excluded it.

---

[7] The Secretary of State proffered Dr. Solanky's reports. ROA.10769-72.

a.     Dr. Solanky authored two reports that criticized Dr. Handley's method of allocating absentee voters to precincts.[8] The first report evaluated whether Dr. Handley's assumptions impacted her analysis. Dr. Solanky applied ecological-inference estimation (which Dr. Handley used) to several parishes and precincts within parishes to show that Dr. Handley's method produces unreliable results, because it wrongly treats all precincts the same. ROA.11574-94. Dr. Solanky's second report offered further criticism of Dr. Handley's allocation method. He showed that her work allocated more votes to a precinct "than the actual precinct voter turnout in 1906 out of 3760 precincts" in Louisiana, biasing the results. ROA.11794. He also expanded his analysis showing the variation "in the percentage of white voters voting for a democrat candidate from parish to parish" and that more densely populated areas "consistently vote differently" than less densely populated areas. ROA.11795.

b.     The district court ignored Dr. Solanky's second report and misunderstood his first. The court erroneously believed that Dr. Solanky presented "an attempt to demonstrate white cross-over voting" and rejected that effort because his "data set is so limited that the conclusions reached are unreliable." ROA.6911-12.

---

[8] Dr. Solanky is clearly qualified as a statistical expert. He is a Ph.D. statistician who chairs the Department of Mathematics at the University of New Orleans. ROA.11566. Dr. Solanky has been retained as an expert in statistics in over 40 cases and is considered an expert in "anything which deals with data; modeling of data, making predictions based on data, sampling of data," and so on. ROA.6020. The district court found no deficiencies in his qualifications.

But Dr. Solanky's opinions were offered not to address polarization but to demonstrate Dr. Handley's errors. That evidence is highly relevant to Plaintiffs' burdens under § 2 and Federal Rule of Evidence 702. ROA.9815. It is "the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiffs' experts' reports." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 835 (D. Minn. 2011); *see also Huss v. Gayden,* 571 F.3d 442, 455 (5th Cir. 2009) (rebuttal expert permitted to testify that expert's methodology was unsupported by medical literature); Fed. R. Civ. P. 26(a)(2)(D)(ii). Dr. Solanky did not have to demonstrate any affirmative theory. Rebuttal witnesses may "criticize other experts' theories and calculations without offering alternatives." *Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023) (collecting cases); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 51 (S.D.N.Y. 2016) (rebuttal witness "was under no obligation to create models or methods of his own"). The district court clearly erred insofar as it considered Dr. Solanky's opinions irrelevant.

It also clearly erred insofar as it deemed Dr. Solanky's opinions unreliable. Dr. Solanky did not need the fulsome dataset required to show something affirmative about voting patterns, when he merely assessed Dr. Handley's work. Even a few failings in her assumptions would call her entire method into doubt. It was sufficient that Dr. Solanky's ecological-inference study of twelve elections in five parishes "showed significant variation from parish to parish in the percentage of white and black voters voting for a democrat or republican candidate." ROA.6911. The partisan element of this—which the district court focused

on—is relevant, not to identify Black and white candidates of choice, but to show that voting preferences are not uniform by region. This, in turn, undermined Dr. Handley's assumption of uniformity, regardless of whether Democratic candidates can reliably be deemed Black-preferred candidates under *Gingles*. The same was true of Dr. Solanky's finding that "the percentage of white voters who voted for a democrat … steadily increase[d] … [in more] densely populated [areas]." ROA.6911. This, too, undermined Dr. Handley's assumptions. Meanwhile, the district court was wrong to say that Dr. Solanky "disclosed no scientific method for his data selection." ROA.6912. This was disclosed. *See* ROA.6023-24.

It was also not relevant whether, as the district court believed, "[t]he *Gingles II* and *III* inquiry is," or is not, "advanced by analyzing outcomes in elections where there is no black candidate." ROA.6911. Candidate race does not bear on accuracy in reporting election results by precinct.[9] The salient point, as Dr. Solanky explained, was that "Dr. Handley has not addressed what bias her solution creates in the EI results she has presented…." ROA.11575; *see also* ROA.11592 (concluding that parishes studied "have different voting patterns, and sometimes different areas within the same parish vote differently," but Dr. Handley "made no attempt in her report to investigate [the] assumption" that voters in an "entire parish or region vote as a block"). Whatever the race of

---

[9] Moreover, nine contests Dr. Solanky analyzed did involve a Black candidate. *See* ROA.11788.

candidates, a method estimating voting preferences by any category cannot reliably assume uniformity of one population (whether defined by region or voting method) by looking to other populations.

    c.    The district court erred again by not admitting Dr. Solanky's testimony after circumstances changed at trial. The court allowed Dr. Handley to testify on direct, over objection, about her response to Dr. Solanky's report, where she offered, for the first time, an analysis attempting to show that her allocation method was unbiased. ROA.9809-11 (discussing ROA.15798-801). The court admitted Dr. Handley's rebuttal reports, over objection, to allow Plaintiffs to satisfy their "burden to show the reliability of [Dr. Handley's] opinion testimony." ROA.9815. Defense counsel sought reconsideration, explaining that Plaintiffs "opened the door" to Dr. Solanky's opinions by eliciting a response to his excluded reports from Dr. Handley's direct testimony. ROA.9853-54. The district court still refused to admit his opinions.

    This was error for two reasons. First, rulings in limine are "subject to change when the case unfolds," *Luce v. United States,* 469 U.S. 38, 41 (1984), and should be reconsidered "with the benefit of … the unfolding events at trial," *United States v. Graves,* 5 F.3d 1546, 1552 (5th Cir. 1993). The relevance and reliability of Dr. Solanky's opinions came into clear focus during Dr. Handley's testimony and required reconsideration. Second, a party that places into issue evidence excluded in an order in limine "opens the door" to evidence on the same topic. *See, e.g.*, *United States v. Licausi,* 413 F.2d 1118, 1120-21 (5th Cir. 1969); *Luv n' Care, Ltd. v. Laurain*, 2021 WL 7907283, at \*3

(W.D. La. Mar. 29, 2021). Here, Plaintiffs elicited Dr. Handley's response to Dr. Solanky's excluded reports and opened the door to his reports. Fundamental fairness required that his opinions be admitted.

## C.    Plaintiffs' Demand for More Than Proportionality Is Unfounded

The district court erred in finding vote dilution under the totality of circumstances. Satisfaction of the *Gingles* "'preconditions' is necessary, but not sufficient, to establish liability." *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Id.* (citation omitted). Proof of three *Gingles* preconditions is not enough where "other considerations show that the minority has an undiminished right to participate in the political process." *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992).

One factor meriting "great weight" is the "proportionality analysis," which "links the number of majority-minority voting districts to minority members' share of the relevant population." *Fairley v. Hattiesburg*, 662 F. App'x 291, 300-01 (5th Cir. 2016) (citation omitted). "[T]he existence of majority-minority districts 'in substantial proportion to the minority's share of voting age-population' should caution courts against creating more majority-minority districts." *Thomas v. Bryant*, 938 F.3d 134, 163 n.138 (5th Cir. 2019) (citation omitted), *vacated on other grounds, Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020) (en banc). A § 2 challenge is disfavored as to districting schemes "whose pertinent features

[are] majority-minority districts in substantial proportion to the minority's share of voting-age population." *Johnson*, 512 U.S. at 1013. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017.

Accordingly, the Supreme Court in *Johnson* held that vote dilution will ordinarily not exist where minority voters in the relevant "area would enjoy substantial proportionality." *Id.* at 1014; *see Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904, 912 (8th Cir. 1995) (observing that this consideration "has recently been given special importance by the Supreme Court"). In *Johnson*, the substantial proportionality of majority-Hispanic districts to Hispanic voting-age population in Miami-Dade County was so decisive that the Supreme Court reversed a finding of § 2 on that basis alone. *See* 512 U.S. at 1014-15. This Court should do the same.

### 1. The Plans Are Substantially Proportional at the Regional Level

#### a. This Case Warrants a Regional Analysis

A threshold question is whether to judge proportionality at the statewide or regional level. *Compare Johnson*, 512 U.S. at 1017 (regional analysis) *with LULAC*, 548 U.S. at 437-38 (statewide analysis). The district court erroneously held that "proportionality is a statewide inquiry" in every case. ROA.9211. *LULAC*, which the district court cited, held that a statewide approach was appropriate "in *these* cases," referring to the four consolidated cases before it. *See* 548 U.S. at 437 (emphasis added). The *LULAC* opinion had referred to "these cases" at least

six other times to reference the cases before it, not all § 2 cases. *See id.* at 434, 436-38, 445-46. VRA § 2 resists "single-minded" doctrines and "demand[s] that courts employ a … refined approach." *Milligan*, 599 U.S. at 26. The district court's single-minded doctrine was erroneous.

As in *Johnson*, "the relevant population" is that of the geographic areas where Plaintiffs focused their claim. 512 U.S. at 1017; *see also id.* at 1021-22. First, as in *Johnson*, Plaintiffs have "litigated" this case on "smaller geographical scale[s]" than the entire plans. *See id.* at 1021-22 (analyzing proportionality regionally because the plaintiffs did not "frame their dilution claim in statewide terms"). Plaintiffs have made clear that they challenge only *specific districts*" in "*specific areas*"—namely, "the Shreveport area, Jefferson Parish, and in the East Baton Rouge area" of the Senate plan and "the Shreveport area, the East Baton Rouge area, the Ascension area, the Lake Charles area, and the Natchitoches area" of the House plan. ROA.6108. Their evidence focuses on these areas, as their demographic evidence looks at district configurations by region, and they measure voting patterns by region as well. *See* ROA.9148; ROA.15840; ROA.15854; ROA.15717. Their expert called these "areas of interest." ROA.15715. Accordingly, Plaintiffs have not "alleged statewide vote dilution based on a statewide plan." *LULAC*, 548 U.S. at 438. Where claims focus on regions of a state, courts—following *Johnson*—have conducted a regional analysis. *See, e.g.*, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 428 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004) (finding "the most appropriate geographical point of reference is Bronx County and the five districts under the Senate Plan that are located

there entirely or primarily"); *Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000) (looking to a "seven-county area"); *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1232 n. 11 (W.D. Wash. 2023), *cert. denied before judgment sub nom.*, *Trevino v. Palmer*, 144 S. Ct. 873 (2024) (focusing on Yakima Valley region).

Second, under foundational § 2 principles, the analysis "should ordinarily" be regional. *Rural*, 209 F.3d at 843. Rights under § 2 protection do not "belong[] to the minority as a group"; instead, § 2 liability "is proved for a particular area." *Shaw v. Hunt*, 517 U.S. 899, 917-18 (1996) (*Shaw II*). *Johnson* rejected the idea that "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class." 512 U.S. at 1019. Without guardrails, a "statewide basis" of proportionality poses severe constitutional risks, including "a racially based understanding of the representative function." *See Holder v. Hall*, 512 U.S. 874, 908-09 (1994) (Thomas, J., concurring). Accordingly, absent unique circumstances, such as "racially polarized voting—and the possible submergence of minority votes—throughout" a state, *LULAC*, 548 U.S. at 438, the analysis should be local, *see Soto Palmer*, 686 F. Supp. 3d at 1232 n. 11 (distinguishing unique facts of *LULAC*); *Rural*, 209 F.3d at 843 (resting default principle on § 2 fundamentals).

Third, the size and numerosity of Louisiana legislative districts calls for a regional approach. Louisiana's 105 House districts and 39 Senate districts afford representation on a more localized basis than its six congressional districts, and "[a] statewide assessment of proportionality seems particularly inappropriate

here where the interests and representation of" voters in "rural and agricultural" regions "may diverge significantly from those who live in" other areas. *Soto Palmer*, 686 F. Supp. 3d at 1232 n. 11. It is difficult to see how a claim of vote dilution can be "based on a statewide plan" in this context, *LULAC*, 548 U.S. at 438, where various regions of the state operate and can be configured and reconfigured independently of each other.

> **b.    Substantial Proportionality or Better Exists in the Relevant Regions Plaintiffs Challenged**

Viewed from the regional vantagepoint, the relevant Black communities enjoy substantial proportionality, or better. The enacted House plan provides that in:

- the Shreveport region, with three majority-BVAP districts of eight total (or 37.5%) in a region of 39.1% BVAP, ROA.11504; *see Johnson*, 512 U.S. at 1014 (finding substantial proportionality in 50% Hispanic VAP region where 45% of districts were majority-Hispanic);

- the Lake Charles region, with one majority-BVAP district of five total (20%) in an area of 25.1% BVAP, ROA.11520;

- the East Baton Rouge region, with six majority-BVAP districts of 11 total (54%) in a region that is 43.9% BVAP, ROA.11527;

- the Iberville-Ascension region, with one majority-BVAP district of four total (25%) in a region with a 29% BVAP, ROA.11536.

In each region, to add one additional majority-Black district would exceed proportionality. Plaintiffs demand at least that and, in the Baton Rouge region, an increase of *three* districts, so that 75% of the districts in a 40% BVAP region are majority-Black. In all instances, the House plan provides substantial

proportionality. *See Fairley*, 662 F. App'x at 299 (finding proportionality because increasing majority-minority districts would substantially exceed proportionality); *Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. McWherter*, 877 F. Supp. 1096, 1107 n.12 (W.D. Tenn.), *aff'd sub nom.*, *Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. Sundquist*, 516 U.S. 801 (1995) (similar).

In the Senate plan, proportionality exists in every region Plaintiffs challenge:

- In the Shreveport region (39.1% BVAP), one of three districts is majority-BVAP (33.33%), ROA.11466;

- In the Jefferson and St. Charles region (26.6% BVAP), one of five districts is majority-BVAP (20% BVAP), ROA.11474;

- In the Baton Rouge region (34.3% BVAP), three of eight districts are majority-BVAP (37.5%), ROA.11481.

In each region, to add one additional majority-BVAP district would exceed proportionality. Plaintiffs demand precisely that, and the district court ordered it. In each region, Plaintiffs demand that the Court "guarantee a political feast." *Johnson*, 512 U.S. at 1017.

### 2.    The Plans Are Substantially Proportional at the Statewide Level

The substantial-proportionality standard is also satisfied at the statewide level. Louisiana's BVAP is 31.25%, 29 of 105 House districts (27.6%) are majority-Black, and 11 of 39 Senate districts (28.2%) are majority-Black. ROA.11439. Plaintiffs' illustrative plans, by comparison, create 35 majority-Black House districts (33.3% of the total) and 14 majority-Black Senate districts (35.9% of the

total). ROA.11439-40. Insofar as their challenge is statewide, Plaintiffs demand more than proportionality.

The district court looked at the small gaps between the State's BVAP percentage and the percentage of majority-BVAP districts in each map and stated that "the enacted plan challenged in this case does not reflect proportionality." ROA.9210. Legal error drove that finding. The standard is "rough proportionality," not perfect proportionality. *Johnson*, 512 U.S. at 1023. *Johnson* rejected challenges to Florida's House districts, even though only 45% of the districts were majority Hispanic in a 50% Hispanic voting-age population area. *Id.* at 1013-14. The Supreme Court subsequently explained that "[t]here is, of course, no 'magic parameter,' and 'rough proportionality,' must allow for some deviations." *LULAC*, 548 U.S. at 438 (citation omitted). The Court in *LULAC* therefore assumed that a 16% to 22% comparison between majority-minority districts and minority voting-age percentage qualified as substantially proportionate. *See id.* Lower courts have followed suit. *See, e.g.*, *McConchie v. Scholz*, 577 F. Supp. 3d 842, 863 (N.D. Ill. 2021) (three-judge court) (finding substantial proportionality in respective comparisons of 8.5% and 10% representation with 11.1% minority percentage); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1133 (E.D. Cal. 2018) (finding proportionality in 30% Hispanic CVAP jurisdiction where 20% of districts were Hispanic CVAP majorities). Here, the House plan is just 3.65 percentage points below proportionality, and the Senate plan is just 3.05 percentage points below proportionality. *See* ROA.11439-40. The standard of substantial proportionality is met.

Moreover, the district court failed to correct for Plaintiffs' demand for more than proportionality. They seek 35 majority-BVAP House districts—three more than proportionality—and 14 majority-BVAP Senate districts—two more than proportionality. The district court should have capped the number of additional majority-BVAP districts at proportionality, rather than issue a ruling endorsing without reservation Plaintiffs' demand for maximization.

### 3.     Vote Dilution Cannot Be Found Under the Circumstances

Under the circumstances, the substantial proportionality confirms there is no vote dilution. To be sure, *Johnson* declined to treat proportionality as a "safe harbor." 512 U.S. at 1019. However, this factor bears "great weight," *Fairley*, 662 F. App'x at 300-01, that can dictate the outcome, as in *Johnson*. This Court has previously reversed a § 2 liability ruling on the basis of one weighty factor. *See Fusilier*, 963 F.3d at 462 (finding linkage factor alone outweighed other factors). *Johnson* and its progeny clarify that demands for better than proportionality will be meritorious only in circumstances not present here.

*Johnson* notes proportionality would not be a legitimate § 2 defense "in cases of alleged dilution by the manipulation of district lines," such as where a jurisdiction's neutral criteria would result in majority-minority districts beyond the minority's proportion of the population, and the jurisdiction avoided that outcome. *Johnson*, 512 U.S. at 1018-19. For example, in *LULAC*, the Court found the Hispanic group's likely proportionality offset by "other evidence of vote dilution," including that the Hispanic community was growing and becoming increasingly active, only to see its opportunity district dismantled, and that

the legislature used "race to create the facade of a Latino district." 548 U.S. at 438-41. That is nothing like this case. Louisiana's plans contain more majority-Black districts than ever, the Black population has remained stagnant over the past 20 years, and the only way to achieve the maximization Plaintiffs demand is by careful, race-based line drawing to group non-compact minority populations into districts a smidgen above 50% BVAP. *See Fairley*, 662 F. App'x at 300 ("[I]f a city drew district lines with the predominant purpose of achieving strict racial proportionality, the city would have to defend the resulting districts under a strict scrutiny analysis."). Likewise, there is no evidence of invidious electoral manipulation like "ballot box stuffing, outright violence, discretionary registration, property requirements, the poll tax, and the white primary." *Johnson*, 512 U.S. at 1018.

*Johnson* suggested § 2 might command more than proportionality to avoid an outcome where "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class," as might occur where "the most blatant racial gerrymandering in half of a county's single-member districts" were alleged to be "offset by political gerrymandering in the other half." 512 U.S. at 1019. That is not so here, where Plaintiffs demands exceed proportionality at every relevant level, state and local. It was in such a case that *Johnson* deemed proportionality to foreclose a § 2 claim. *See id.* at 1014-15.

The district court's contrary conclusion circuitously referred back to its "analysis of the *Gingles* preconditions." ROA.9210. *Johnson* confronted such logic and rejected it, holding that the question of vote dilution "must still be

addressed explicitly," even where the *Gingles* preconditions are met, and "without isolating any other arguably relevant facts from the act of judgment." 512 U.S. at 1012. The Supreme Court has likewise explained that a proper application of § 2 will render suits "rarely … successful" and "limit judicial intervention to 'those instances of intensive racial politics'" that involve "the 'excessive role of race in the electoral process.'" *Milligan*, 599 U.S. at 29-30 (alteration marks and citation omitted). It has also clarified that the totality-of-circumstances factors are a plaintiff's to "prove," not a defendant's to disprove. *Abbott*, 585 U.S. at 614; *see also Johnson*, 512 U.S. at 1011.

The district court's view that the *Gingles* preconditions render a finding of dilution all but inevitable, ROA.9196, transforms § 2 into an unconstitutional "policy of maximizing majority-black districts." *Miller*, 515 U.S. at 924. "Forcing proportional representation is unlawful and inconsistent with th[e] [Supreme] Court's approach to implementing § 2." *Milligan*, 599 U.S. at 28; *see also id.* at 43 (Kavanaugh, J., concurring) ("*Gingles* does not mandate a proportional number of majority-minority districts."). Compelling *more* than proportionality is all the more unlawful and unconstitutional. The Supreme Court has rejected as "a legal mistake" the doctrine that "whenever a legislature *can* draw a majority-minority district, it *must* do so." *Cooper*, 581 U.S. at 305-06. The district court's contrary view "may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters." *Shaw I*, 509 U.S. at 657. In the enacted plans, 53.6% of Black voting-age persons in the House—and 55.6% in the Senate—reside in majority-

Black districts. Plaintiffs propose that 61.1% of Black voting-age persons in the House and 60.6% of Black voting-age persons in the Senate be placed into majority-Black districts. ROA.15837; ROA.15859. The injunction enforcing that concept "rationally [can] be understood only as an effort to segregate voters by race." *Shaw I*, 509 U.S. at 651. Section 2's "exacting requirements" are supposed to prohibit that. *Milligan*, 599 U.S. at 30. The district court's contrary views are erroneous—and dangerous—and should be corrected.

## CONCLUSION

The district court's injunction should be reversed or vacated.

Dated:  July 17, 2024                      Respectfully submitted,

                                           */s/ Richard B. Raile*

Michael W. Mengis                          Richard B. Raile
BAKER & HOSTETLER LLP                      Katherine L. McKnight
811 Main Street                            E. Mark Braden
Suite 1100                                 BAKER & HOSTETLER LLP
Houston, TX 77002                          1050 Connecticut Ave., N.W.
                                           Suite 1100
Patrick T. Lewis                           Washington, D.C. 20036
BAKER & HOSTETLER LLP                      Telephone: 202.861.1711
127 Public Square                          Email: rraile@bakerlaw.com
Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
Robert J. Tucker
BAKER & HOSTETLER LLP
200 Civic Center Dr.
Suite 1200
Columbus, OH 43215

## CERTIFICATE OF SERVICE

I certify that on July 17, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.


Dated:  July 17, 2024                     Respectfully submitted,


                                          */s/ Richard B. Raile*
                                          Richard B. Raile
                                          BAKER & HOSTETLER LLP
                                          1050 Connecticut Ave., N.W.
                                          Suite 1100
                                          Washington, DC 20036
                                          Telephone: 202.861.1711
                                          Email: rraile@bakerlaw.com

                                          *Attorney for Phillip DeVillier and*
                                          *Cameron Henry*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 5th Cir. R. 32.2 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,863 words.

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2308 in 14-point Calisto MT font.

Dated:  July 17, 2024                              Respectfully submitted,


                                                   */s/ Richard B. Raile*
                                                   Richard B. Raile
                                                   BAKER & HOSTETLER LLP
                                                   1050 Connecticut Ave., N.W.
                                                   Suite 1100
                                                   Washington, DC 20036
                                                   Telephone: 202.861.1711
                                                   Email: rraile@bakerlaw.com

                                                   *Attorney for Phillip DeVillier and Cameron Henry*