No. 24-30115

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE
WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING
INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN
HARRIS, REVEREND,

*Plaintiffs - Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF
LOUISIANA,

*Defendant - Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH
B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER
OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,

*Intervenors - Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor - Appellee.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:22-cv-00178-SDD-SDJ

---

**RECORD EXCERPTS OF LEGISLATIVE INTERVENOR-APPELLANTS**

Richard B. Raile
Katherine L. McKnight
E. Mark Braden
BAKER HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Telephone: 202.861.1711
Email: rraile@bakerlaw.com

Michael W. Mengis
BAKER HOSTETLER LLP
811 Main Street
Suite 1100
Houston, TX 77002

Patrick T. Lewis
BAKER HOSTETLER LLP
127 Public Square
Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
Robert J. Tucker
BAKER HOSTETLER LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215

*Attorneys for Intervenor-Appellants, Phillip
DeVillier, in his official capacity as Speaker
of the Louisiana House of Representatives,
and Cameron Henry, in his official capacity
as President of the Louisiana Senate*

# TABLE OF CONTENTS

| Tab # | Document Title | ROA # |
|---|---|---|
| 1 | District Court Docket Sheet–3:22-CV-178 | ROA.1-63 |
| 2 | Order on Motion to Compel | ROA.1447-1450 |
| 3 | Order | ROA.5991-5993 |
| 4 | Order on Motion in Limine | ROA.6900-6913 |
| 5 | Order on Motion for Summary Judgment | ROA.7191-7205 |
| 6 | Pretrial Conference | ROA.7206-7208 |
| 7 | Order | ROA.9122-9212 |
| 8 | Order | ROA.9213-9227 |
| 9 | Notice of Appeal to the USCA for the Fifth Circuit | ROA.9271-9273 |
| 10 | Notice of Appeal to the USCA for the Fifth Circuit | ROA.9274-9276 |
| 11 | Notice of Appeal to the USCA for the Fifth Circuit | ROA.9317–9318 |

# TAB 1

APPEAL

# U.S. District Court
# Middle District of Louisiana (Baton Rouge)
# CIVIL DOCKET FOR CASE #: 3:22-cv-00178-SDD-SDJ

Nairne et al v. Ardoin
Assigned to: Chief Judge Shelly D. Dick
Referred to: Magistrate Judge Scott D. Johnson
Related Cases:  3:22-cv-00211-SDD-SDJ
                    3:22-cv-00214-SDD-SDJ
 Case in other court:  5th Circuit Court of Appeals, 24-30115
Cause: 28:2201 Injunction

Date Filed: 03/14/2022
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

**Plaintiff**

**Dorothy Nairne**
*Dr.*

represented by

**John N. Adcock**
Adcock Law LLC
3110 Canal Street
LA
New Orleans, LA 70119
225-284-6327
Fax: 504-308-1266
Email: jnadcock@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Giglio**
Cozen O'Connor
3 World Trade Center
New York, NY 10007
917-716-4736
Email: agiglio@cozen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Hessel**
Harvard Law School
3085 Wasserstein Hall
6 Everett Street
Cambridge, MA 02138
917-403-4976
Email: dhessel@law.harvard.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dayton Campbell-Harris**
American Civil Liberties Union Foundation
125 Broad Street
18th Floor
New York, NY 10004
425-516-8400

Email: dcampbell-harris@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garrett Muscatel**
American Civil Liberties Union Foundation
125 Broad St
New York, NY 10004
805-750-9973
Email: gmuscatel@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Evans**
NAACP Legal Defense Fund
DC
700 14th St NW
Suite 600
Washington, DC 20005
318-652-2203
Email: jevans@naacpldf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Josephine M Bahn**
Cozen O'Connor
1200 19th Street, NW
Third Floor
Washington, DC 20036
202-280-6484
Email: jbahn@cozen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn C. Sadasivan**
NAACP Legal Defense & Educational Fund
40 Rector Street
FL 5
New York, NY 10006
702-606-6049
Email: ksadasivan@naacpldf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street
5th Floor
New York, NY 10006
212-965-2200
Email: laden@naacpldf.org
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
American Civil Liberties Union Foundation
125 Broad Street
18th Fl.
New York, NY 10004
*PRO HAC VICE*

**Megan C. Keenan**
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005
740-632-0671
Email: mkeenan@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
ACLU of Louisiana
1340 Poydras St.
Ste 2160
New Orleans, LA 70112
504-522-0628
Email: msnider@slls.org
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
Cozen O'Connor
3 WTC, 175 Greenwich Street
Ste 55th Floor
New York, NY 10007
212-908-1331
Fax: 212-509-9492
Email: mdeleeuw@cozen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
American Civil Liberties Union Foundation
of Louisiana
1340 Poydras St
Suite 2160
New Orleans, LA 70112
917-842-3902
Email: nahmed@laaclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
Cozen O'Connor
One Liberty Place

1650 Market Street
Suite 2800
Philadelphia, PA 19103
215-665-2041
Fax: 267-507-1564
Email: robertclark@cozen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
701 Poydras Street
Suite 4100
New Orleans, LA 70139
504-525-4361
Fax: 504-525-4380
Email: cabral2@aol.com
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
American Civil Liberties Union Foundation,
Inc.
125 Broad Street
New York, NY 10004
909-815-9291
Email: sosaki@aclu.org
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
NAACP Legal Defense Fund
700 14th Street NW
Ste 600
Washington, DC 20005
202-365-2154
Email: srohani@naacpldf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
American Civil Liberties Union Foundation
Voting Rights Project
915 15th St NW
Washington, DC 20005
202-675-2337
Email: sbrannon@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street

Ste 18th Floor
New York, NY 10004
212-519-7836
Email: slakin@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
ACLU of Louisiana
Legal
1340 Poydras St
Ste 2160
New Orleans, LA 70112
504-444-6046
Email: swillis@laaclu.org
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
NAACP Legal Defense Fund
40 Rector Street
5th Floor
New York, NY 10006
212-965-2200
Email: snaifeh@naacpldf.org
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
Harvard Law School
Voting Rights Project
6 Everett St
Suite 4105
Cambridge, MA 02138
617-998-1582
Email: tthomaslundborg@law.harvard.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
NAACP Legal Defense & Educational Fund,
Inc.
40 Rector Street
Ste 5th Floor
New York, NY 10006
212-965-2267
Email: vwenger@naacpldf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Jarrett Lofton**
*TERMINATED: 10/05/2023*

represented by **John N. Adcock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<span style="color:red">24-30115.5</span>

**Amanda Giglio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Hessel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dayton Campbell-Harris**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Evans**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Josephine M Bahn**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn C. Sadasivan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clee E. Lowe**                    represented by    **John N. Adcock**
*Rev.*                                               (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Amanda Giglio**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Daniel J. Hessel**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Dayton Campbell-Harris**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Garrett Muscatel**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jared Evans**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Josephine M Bahn**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Kathryn C. Sadasivan**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Leah C. Aden**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Luis Manuel Rico Roman**
                                                     (See above for address)
                                                     *PRO HAC VICE*

                                                     **Megan C. Keenan**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Alice Washington**                    represented by  **John N. Adcock**
*Dr.*                                                    (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Amanda Giglio**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Daniel J. Hessel**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Dayton Campbell-Harris**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Garrett Muscatel**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jared Evans**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Josephine M Bahn**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Kathryn C. Sadasivan**
                                                        (See above for address)
                                                        *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Black Voters Matter Capacity Building Institute**

represented by **John N. Adcock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Giglio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Hessel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dayton Campbell-Harris**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garrett Muscatel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Evans**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Josephine M Bahn**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn C. Sadasivan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**

(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Louisiana State Conference of the NAACP**      represented by   **John N. Adcock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel J. Hessel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dayton Campbell-Harris**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garrett Muscatel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Evans**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Josephine M Bahn**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn C. Sadasivan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rose Thompson**                    represented by    **John N. Adcock**
*Dr.*                                                  (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Amanda Giglio**
                                                       (See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Hessel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dayton Campbell-Harris**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garrett Muscatel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared Evans**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Josephine M Bahn**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn C. Sadasivan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leah C. Aden**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven Harris**                    represented by   **John N. Adcock**
*Rev.*                                               (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Amanda Giglio**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Daniel J. Hessel**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Dayton Campbell-Harris**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Garrett Muscatel**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jared Evans**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Josephine M Bahn**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Kathryn C. Sadasivan**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Leah C. Aden**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Luis Manuel Rico Roman**
                                                     (See above for address)
                                                     *PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexis Calhoun**                    represented by    **John N. Adcock**
*TERMINATED: 10/05/2023*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Amanda Giglio**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Daniel J. Hessel**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Dayton Campbell-Harris**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jared Evans**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Josephine M Bahn**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Kathryn C. Sadasivan**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Leah C. Aden**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Luis Manuel Rico Roman**
(See above for address)
*PRO HAC VICE*

**Megan C. Keenan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan E. Snider**
(See above for address)
*TERMINATED: 06/03/2022*
*ATTORNEY TO BE NOTICED*

**Michael B. de Leeuw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert S. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Lawrence Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samantha Osaki**
(See above for address)
*TERMINATED: 08/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara Sara Rohani**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Brannon**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sophia Lin Lakin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Legros**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart C. Naifeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiffany Alora Thomas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Wenger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**R. Kyle Ardoin**
*in his official capacity as Secretary of State*
*of Louisiana*

represented by **John Carroll Walsh**
Shows. Cali & Walsh, LLP
P. O. Drawer 4425
628 St. Louis Street
Baton Rouge, LA 70821
225-346-1461
Fax: 225-346-1467
Email: john@scwllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W. Mengis**
Baker & Hostetler
811 Main Street, Suite 1100
Houston, TX 77002
713-646-1330
Fax: 713-751-1717
Email: mmengis@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa Riggins**
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Ave
Suite 200
Raleigh, NC 27612

919-329-3800
Email: alyssa.riggins@nelsonmullins.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassie Holt**
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Ave
Suite 200
Raleigh, NC 27612
919-329-3886
Email: cassie.holt@nelsonmullins.com
*ATTORNEY TO BE NOTICED*

**Charlton J Meginley**
138 Willow Bend Dr
Madisonville, LA 70447
9852902265
Email: cjmeginley@gmail.com
*TERMINATED: 01/18/2024*
*ATTORNEY TO BE NOTICED*

**John E. Branch , III**
Nelson Mullins Riley & Scarborough LLP
Raleigh, North Carolina
GlenLake One
4140 Parklake Avenue
Ste Second Floor
Raleigh, NC 27612
919-329-3828
Email: john.branch@nelsonmullins.com
*TERMINATED: 03/01/2024*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
Shows, Cali & Walsh, L.L.P.
628 St. Louis St.
Baton Rouge, LA 70802
(225) 346-1461
Email: coninej@scwllp.com
*ATTORNEY TO BE NOTICED*

**Phillip J. Strach**
Nelson Mullins Riley and Scarborough LLP
GlenLake One
4140 Parklake Avenue
Suite 200
Raleigh, NC 27612
919-329-3812
Email: phil.strach@nelsonmullins.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas A. Farr**
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Avenue
Suite 200
Raleigh, NC 27612
919-329-3803
Fax: 919-329-3799
Email: tom.farr@nelsonmullins.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

Clay Schexnayder                    represented by **Michael W. Mengis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Efrem Mark Braden**
Baker & Hostetler
1050 Connecticut Ave NW
11th Floor
Washington, DC 20036
*PRO HAC VICE*

**Erika Dackin Prouty**
Baker & Hostetler LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215
614-462-4710
Email: eprouty@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine L. McKnight**
Baker Hostetler
1050 Connecticut Avenue Nw
Suite 1100
Washington, DC 20036
202-861-1618
Fax: 202-861-1783
Email: kmcknight@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick T. Lewis**
Baker & Hostetler LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
216-861-7096
Email: plewis@bakerlaw.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard B. Raile**
Baker & Hostetler
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
*PRO HAC VICE*

**Robert J. Tucker**
Baker & Hostetler, LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215
614-462-2680
Email: rtucker@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Patrick Page Cortez**                    represented by    **Michael W. Mengis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Efrem Mark Braden**
(See above for address)
*PRO HAC VICE*

**Erika Dackin Prouty**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine L. McKnight**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick T. Lewis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard B. Raile**
(See above for address)
*PRO HAC VICE*

**Robert J. Tucker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**State of Louisiana**
*by and through Attorney General Jeff Landry*

represented by

**Elizabeth Baker Murrill**
Louisiana's Office of the Attorney General
P.O. Box 94005
Baton Rouge, LA 70804
225-326-6766
Email: murrille@ag.louisiana.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W. Mengis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Marie LaGroue**
Louisiana Department of Justice
1885 N. 3rd Street
Baton Rouge, LA 70802
225-326-6006
Email: lagrouea@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Andrew B. Pardue**
Holtzman Vogel Josefiak Torchinsky PLLC
15405 John Marshall Highway
Haymarket, VA 20169
540-321-8260
Email: apardue@hvjt.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Angelique Duhon Freel**
State of Louisiana Office of the Governor
900 3rd Street
Ste 4th Floor
Baton Rouge, LA 70802
225-342-2788
Fax: 225-342-7099
Email: Angelique.Freel@la.gov
*TERMINATED: 01/10/2024*
*ATTORNEY TO BE NOTICED*

**Brennan Bowen**
2575 East Camelback Rd
Suite 860
Phoenix, AZ 85016
540-341-8808
Email: bbowen@holtzmanvogel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carey T. Jones**
Carey T. Jones
Loisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70802
225-326-6017
Fax: 225-326-6096
Email: JonesCar@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Jason Brett Torchinsky**
Holtzman Vogel PLLC
Holtzman Vogel PLLC
2300 N Street, NW
Suite 643a
Washington, DC 20037
202-737-8808
Email: jtorchinsky@holtzmanvogel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Michael Wale**
Office of the Governor
900 N. Third Street
4th Floor
Baton Rouge, LA 70802
225-326-7015
Email: jeffrey.wale@la.gov
*TERMINATED: 01/04/2024*
*ATTORNEY TO BE NOTICED*

**Phillip Michael Gordon**
Holtzman Vogel Josefiak Torchinsky PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
540-341-8808
Email: pgordon@holtzmanvogel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**United States of America**     represented by     **Justin Alan Jack**
United States Attorney's Office, Middle
District of Lou
777 Florida Street
Suite 208
Baton Rouge, LA 70801
225-336-8857
Email: justin.jack@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel J. Freeman**

DOJ-Crt
Voting Section, Civil Rights Division
950 Pennsylvania Ave. NW
Ste 4CON 8.143
Washington, DC 20530
202-305-4355
Email: daniel.freeman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Phillip DeVillier**                    represented by   **Michael W. Mengis**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Intervenor**

**Cameron Henry**                        represented by   **Michael W. Mengis**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/14/2022 | 1 | COMPLAINT against R. Kyle Ardoin ( Filing fee $ 402 receipt number ALAMDC-2405905.), filed by Dorothy Nairne. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet)(Adcock, John) (Attachment 2 and 4 replaced on 3/15/2022 to correct page orientation) (ELW). (Entered: 03/14/2022) |
| 03/14/2022 | 2 | Summons Submitted as to R. Kyle Ardoin (Adcock, John) (Entered: 03/14/2022) |
| 03/15/2022 | 3 | Summons Issued as to R. Kyle Ardoin. (NOTICE: Counsel shall print and serve both the summons and all attachments in accordance with Federal Rule of Civil Procedure 4.) (ELW) (Entered: 03/15/2022) |
| 03/15/2022 | 4 | MOTION for Nora Sam Ahmed to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2406428) by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Snider, Megan) (Entered: 03/15/2022) |
| 03/16/2022 | | MOTION(S) REFERRED: 4 MOTION for Nora Sam Ahmed to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2406428). This motion is now pending before the USMJ. (ELW) (Entered: 03/16/2022) |
| 03/16/2022 | 5 | ORDER granting 4 Motion for Nora Sam Ahmed to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 3/16/2022.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 03/16/2022) |
| 03/16/2022 | 6 | |

| | | |
|---|---|---|
| | | SUMMONS Returned Executed by Black Voters Matter Capacity Building Institute, Jarrett Lofton, Louisiana State Conference of the NAACP, Dorothy Nairne, Clee E. Lowe, Rose Thompson, Alice Washington. R. Kyle Ardoin served on 3/16/2022, answer due 4/6/2022. (Adcock, John) (Entered: 03/16/2022) |
| 03/25/2022 | 7 | SCHEDULING CONFERENCE ORDER: Telephone Scheduling Conference set for 6/23/2022 at 10:00 AM before Magistrate Judge Scott D. Johnson. Status Report due by 6/9/2022. Signed by Magistrate Judge Scott D. Johnson on 3/24/2022. (KAH) (Entered: 03/25/2022) |
| 03/29/2022 | 8 | Ex Parte MOTION for Alora Thomas to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410948) by All Plaintiffs. (Attachments: # 1 Declaration of Alora Thomas, # 2 Proposed order, # 3 Certificate of Good Standing)(Adcock, John) (Entered: 03/29/2022) |
| 03/29/2022 | 9 | Ex Parte MOTION for Sophia Lin Lakin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410950) by All Plaintiffs. (Attachments: # 1 Declaration of Sophia Lin Lakin, # 2 Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 03/29/2022) |
| 03/29/2022 | 10 | Ex Parte MOTION for Samantha Osaki to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410955) by All Plaintiffs. (Attachments: # 1 Declaration of Samantha Osaki, # 2 Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 03/29/2022) |
| 03/29/2022 | 11 | Ex Parte MOTION for Sarah E. Brannon to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410959) by All Plaintiffs. (Attachments: # 1 Declaration of Sarah E. Brannon, # 2 Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 03/29/2022) |
| 03/31/2022 | | MOTION(S) REFERRED: 10 Ex Parte MOTION for Samantha Osaki to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410955), 9 Ex Parte MOTION for Sophia Lin Lakin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410950), 8 Ex Parte MOTION for Alora Thomas to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410948), 11 Ex Parte MOTION for Sarah E. Brannon to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2410959). This motion is now pending before the USMJ. (NLT) (Entered: 03/31/2022) |
| 03/31/2022 | 12 | ORDER granting 8 , 9 , 10 , and 11 Motions for Alora Thomas, Sophia Lin Lakin, Samantha Osaki and Sarah E. Brannon to Appear Pro Hac Vice.<br><br><span style="color:red">ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.</span><br><br>. Signed by Magistrate Judge Scott D. Johnson on 3/31/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 03/31/2022) |
| 04/04/2022 | 13 | MOTION of The Presiding Officers of the Louisiana Legislature to Intervene by Clay Schexnayder, Patrick Page Cortez. (Attachments: # 1 Exhibit A, # 2 Proposed Pleading; proposed Answer, # 3 Proposed Pleading; proposed Order)(Mengis, Michael) Modified on 4/5/2022 to edit text (ELW). (Entered: 04/04/2022) |
| 04/04/2022 | 14 | |

| | | |
|---|---|---|
| | | AMENDED COMPLAINT *filed by all Plaintiffs* against R. Kyle Ardoin, filed by Dorothy Nairne.(Adcock, John) (Entered: 04/04/2022) |
| 04/05/2022 | | MOTION(S) REFERRED: 13 MOTION to Intervene . This motion is now pending before the USMJ. (ELW) (Entered: 04/05/2022) |
| 04/06/2022 | | MOTION(S) REFERRED: 13 MOTION to Intervene . This motion is now pending before the USMJ. (NLT) (Entered: 04/06/2022) |
| 04/08/2022 | 15 | MOTION for Katherine L. McKnight to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415220) by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 04/08/2022) |
| 04/08/2022 | 16 | Ex Parte MOTION for Patrick T. Lewis to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415251) by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit A, # 2 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 04/08/2022) |
| 04/08/2022 | 17 | Ex Parte MOTION for Erika D. Prouty to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415256) by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit A, # 2 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 04/08/2022) |
| 04/08/2022 | 18 | Ex Parte MOTION for Kathryn C. Sadasivan to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415270) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Kathryn C. Sadasivan, # 3 Proposed Order)(Adcock, John) (Entered: 04/08/2022) |
| 04/08/2022 | 19 | Ex Parte MOTION for Leah C. Aden to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415272) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Leah C. Aden, # 3 Proposed Order)(Adcock, John) (Entered: 04/08/2022) |
| 04/08/2022 | 20 | Ex Parte MOTION for Stuart C. Naifeh to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415275) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Stuart C. Naifeh, # 3 Proposed Order)(Adcock, John) (Entered: 04/08/2022) |
| 04/08/2022 | 21 | Ex Parte MOTION for Victoria Wenger to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415281) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Victoria Wenger, # 3 Proposed Order)(Adcock, John) (Entered: 04/08/2022) |
| 04/08/2022 | | MOTION(S) REFERRED: 16 Ex Parte MOTION for Patrick T. Lewis to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415251), 20 Ex Parte MOTION for Stuart C. Naifeh to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415275), 17 Ex Parte MOTION for Erika D. Prouty to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415256), 21 Ex Parte MOTION for Victoria Wenger to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415281), 15 MOTION for Katherine L. McKnight to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415220), 19 Ex Parte MOTION for Leah C. Aden to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415272), 18 Ex Parte MOTION for Kathryn C. Sadasivan to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2415270). This motion is now pending before the USMJ. (EDC) (Entered: 04/08/2022) |

| | | |
|---|---|---|
| 04/08/2022 | 22 | ORDER granting 15 , 16 , 17 , 18 , 19 , 20 , and 21 Motions for Katherine L. McKnight, Patrick T. Lewis, Erika D. Prouty, Kathryn C. Sadasivan, Leah C. Aden, Stuart C. Naifeh, and Victoria Wenger to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 4/8/2022. <br><br> ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration. <br><br> (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 04/08/2022) |
| 04/12/2022 | 23 | ORDER: Considering that the above titled actions involve common questions of law and fact, and further that judicial efficiency will be achieved. Civil Action No. 22-211-SDD-RLB and Civil Action No. 22-214-BAJ-RLB shall be reassigned to Chief Judge Shelly D. Dick and Magistrate Judge Scott D. Johnson for all further proceedings. Signed by Chief Judge Shelly D. Dick and Judge Brian A. Jackson on 4/12/2022. (LLH) (Entered: 04/12/2022) |
| 04/13/2022 | 24 | Ex Parte MOTION for John E. Branch, III to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416856) by R. Kyle Ardoin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 04/13/2022) |
| 04/13/2022 | 25 | Ex Parte MOTION for Thomas A. Farr to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416859) by R. Kyle Ardoin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 04/13/2022) |
| 04/13/2022 | 26 | Ex Parte MOTION for Cassie A. Holt to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416866) by R. Kyle Ardoin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 04/13/2022) |
| 04/13/2022 | 27 | Ex Parte MOTION for Alyssa M. Riggins to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416867) by R. Kyle Ardoin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 04/13/2022) |
| 04/13/2022 | 28 | Ex Parte MOTION for Phillip J. Strach to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416870) by R. Kyle Ardoin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 04/13/2022) |
| 04/13/2022 | | MOTION(S) REFERRED: 27 Ex Parte MOTION for Alyssa M. Riggins to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416867), 24 Ex Parte MOTION for John E. Branch, III to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416856), 28 Ex Parte MOTION for Phillip J. Strach to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416870), 26 Ex Parte MOTION for Cassie A. Holt to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416866), 25 Ex Parte MOTION for Thomas A. Farr to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2416859). This motion is now pending before the USMJ. (ELW) (Entered: 04/13/2022) |
| 04/13/2022 | 29 | ORDER granting 24 , 25 , 26 , 27 , and 28 Motions for John E. Branch, III, Thomas A. Farr, Cassie A. Holt, Alyssa M. Riggins, and Phillip J. Strach to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 4/13/2022. <br><br> ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register |

| | | |
|---|---|---|
| | | for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 04/13/2022) |
| 04/14/2022 | 30 | Ex Parte MOTION for Richard B. Raile to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2417491) by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit A, # 2 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 04/14/2022) |
| 04/14/2022 | | MOTION(S) REFERRED: 30 Ex Parte MOTION for Richard B. Raile to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2417491). This motion is now pending before the USMJ. (ELW) (Entered: 04/14/2022) |
| 04/14/2022 | 31 | ORDER granting 30 Motion for Richard B. Raile to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 4/14/2022.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 04/14/2022) |
| 04/18/2022 | 32 | ANSWER to 14 Amended Complaint by R. Kyle Ardoin.(Strach, Phillip) (Entered: 04/18/2022) |
| 04/19/2022 | 33 | MOTION to Intervene by State of Louisiana -Attorney General Jeff Landry. (Attachments: # 1 Proposed Pleading; Order, # 2 Proposed Pleading; Answer)(Freel, Angelique) (Entered: 04/19/2022) |
| 04/22/2022 | 34 | MOTION to Convene a Three-Judge Court or in the Alternative, To Certify An Interlocutory Appeal by R. Kyle Ardoin. (Attachments: # 1 Memorandum in Support)(Strach, Phillip) Modified on 4/22/2022 to edit text (ELW). (Entered: 04/22/2022) |
| 04/25/2022 | 35 | Ex Parte MOTION for Jared Evans to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2420741) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Jared Evans, # 3 Proposed order)(Adcock, John) (Entered: 04/25/2022) |
| 04/25/2022 | 36 | Ex Parte MOTION for Sara Rohani to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2420743) by All Plaintiffs. (Attachments: # 1 Cert. of good standing, # 2 Declaration of Sara Rohani, # 3 Proposed Order)(Adcock, John) (Entered: 04/25/2022) |
| 04/25/2022 | | MOTION(S) REFERRED: 33 MOTION to Intervene . This motion is now pending before the USMJ. (NLT) (Entered: 04/25/2022) |
| 04/25/2022 | | MOTION(S) REFERRED: 35 Ex Parte MOTION for Jared Evans to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2420741). This motion is now pending before the USMJ. (JEG) (Entered: 04/25/2022) |
| 04/25/2022 | | MOTION(S) REFERRED: 36 Ex Parte MOTION for Sara Rohani to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2420743). This motion is now pending before the USMJ. (JEG) (Entered: 04/25/2022) |

| | | |
|---|---|---|
| 04/25/2022 | 37 | ORDER granting 35 and 36 Motions for Jared Evans and Sara Rohani to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 4/25/2022.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 04/25/2022) |
| 04/28/2022 | 38 | ORDER: Before the Court is a 33 Motion to Intervene, filed by the State of Louisiana on April 19, 2022. Any opposition(s) to the Motion to Intervene (R. Doc. 33) must be filed by Plaintiffs no later than May 2, 2022. If any Plaintiff does not oppose the Motion to Intervene (R. Doc. 33), they must file a Notice of No Opposition as soon as possible, but again no later than May 2, 2022. Signed by Magistrate Judge Scott D. Johnson on 4/28/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(KAH) (Entered: 04/28/2022) |
| 05/02/2022 | 39 | RESPONSE in Opposition to 33 MOTION to Intervene filed by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Brannon, Sarah) (Entered: 05/02/2022) |
| 05/08/2022 | 40 | RESPONSE in Opposition to 34 MOTION to convene a three-judge panel filed by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Brannon, Sarah) (Entered: 05/08/2022) |
| 05/13/2022 | 41 | MOTION to Move Scheduling Conference to an Earlier Date in Order to Preventa Situation in which Final Judgment Comes too Close to the Election Deadlines by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Exhibit A, # 4 Exhibit B)(Adcock, John) Modified on 5/17/2022 to edit the text (NLT). (Entered: 05/13/2022) |
| 05/16/2022 | | MOTION(S) REFERRED: 41 MOTION to Continue To move Scheduling Conference . This motion is now pending before the USMJ. (ELW) (Entered: 05/16/2022) |
| 05/17/2022 | 42 | ORDER granting 13 Motion of the Presiding Officers of the Louisiana Legislature to Intervene and 33 Motion to Intervene. Signed by Magistrate Judge Scott D. Johnson on 5/17/2022. (KAH) (Entered: 05/17/2022) |
| 05/17/2022 | 43 | ANSWER to 1 Complaint, by Patrick Page Cortez, Clay Schexnayder.(NLT) (Entered: 05/18/2022) |
| 05/17/2022 | 44 | ANSWER to 1 Complaint, by State Of Louisiana.(NLT) (Entered: 05/18/2022) |
| 05/18/2022 | 45 | MOTION for Expedited Hearing on 41 MOTION to Move Scheduling Conference to an Earlier Date in Order to Preventa Situation in which Final Judgment Comes too Close to the Election Deadlines by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Adcock, John) Modified on 7/17/2023 to correct text (ELW) (Entered: 05/18/2022) |
| 05/19/2022 | 46 | ORDER: Plaintiffs' 45 Motion for Expedited Consideration is GRANTED. Plaintiffs' 41 Motion to Move the Scheduling Conference is DENIED, as unnecessary. Signed by Magistrate Judge Scott D. Johnson on 5/19/2022. (KAH) (Entered: 05/19/2022) |

| 05/20/2022 | 47 | Ex Parte MOTION for Efrem Mark Braden to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2431250) by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 05/20/2022) |
| --- | --- | --- |
| 05/20/2022 | 48 | ANSWER to 14 Amended Complaint by Patrick Page Cortez, Clay Schexnayder.(Mengis, Michael) (Entered: 05/20/2022) |
| 05/23/2022 | | MOTION(S) REFERRED: 47 Ex Parte MOTION for Efrem Mark Braden to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2431250). This motion is now pending before the USMJ. (ELW) (Entered: 05/23/2022) |
| 05/23/2022 | 49 | ORDER granting 47 Motion for Efrem Mark Braden to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 5/23/2022.<br><br><span style="color:red">ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.</span><br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 05/23/2022) |
| 06/03/2022 | 50 | MOTION to Substitute Stephanie Willis in place of Megan E. Snider as Attorney by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington. (Attachments: # 1 Proposed Order)(Snider, Megan) (Entered: 06/03/2022) |
| 06/03/2022 | | MOTION(S) REFERRED: 50 MOTION to Substitute Stephanie Willis in place of Megan E. Snider as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 06/03/2022) |
| 06/03/2022 | 51 | ORDER granting 50 Motion to Substitute Attorney. Stephanie Legros for Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington replacing Megan E. Snider. Signed by Magistrate Judge Scott D. Johnson on 6/3/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 06/03/2022) |
| 06/09/2022 | 52 | Joint STATUS REPORT by All Plaintiffs. (Adcock, John) (Entered: 06/09/2022) |
| 06/22/2022 | 53 | Ex Parte MOTION for Michael B. De Leeuw to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2442163) by All Plaintiffs (Attachments: # 1 Cert. of good standing, # 2 Declaration of Michael B. De Leeuw, # 3 Proposed Order)(Adcock, John) (Entered: 06/22/2022) |
| 06/22/2022 | 54 | Ex Parte MOTION for Amanda Giglio to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2442164) by All Plaintiffs (Attachments: # 1 Cert. of good standing, # 2 Declaration of Amanda Giglio, # 3 Proposed Order)(Adcock, John) (Entered: 06/22/2022) |
| 06/23/2022 | | MOTION(S) REFERRED: 53 Ex Parte MOTION for Michael B. De Leeuw to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2442163), 54 Ex Parte MOTION for Amanda Giglio to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2442164). This motion is now pending before the USMJ. (ELW) (Entered: 06/23/2022) |

| | | |
|---|---|---|
| 06/23/2022 | 55 | ORDER granting 53 and 54 Motions for Michael B. De Leeuw and Amanda Giglio to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 6/23/2022. <br><br> ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration. <br><br> (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 06/23/2022) |
| 06/23/2022 | 66 | Minute Entry for proceedings held before Magistrate Judge Scott D. Johnson: Scheduling Conference held on 6/23/2022. The Court addressed its two main areas of concern, given the disagreements outlined in the parties' joint Status Report. The Court issues the instant Scheduling Order pursuant to Rule 16(b) of the Federal Rules of Civil Procedure: Amended Pleadings due by 7/1/2022. Discovery due by 10/17/2022. F.R.C.P. 26(a)(1) disclosures due by 6/16/2022. Plaintiff's Expert Witness List due by 7/15/2022. Defendant's Expert Witness List due by 9/2/2022. Plaintiff's Expert Reports due by 7/22/2022. Defendant's Expert Reports due by 9/9/2022. Discovery from Experts due by 9/30/2022. Motions shall be filed by 10/28/2022. Proposed Pretrial Order due by 12/5/2022. Pretrial Conference set for 12/19/2022 at 02:30 PM in chambers before Chief Judge Shelly D. Dick. Joint jury instructions, voir dire, verdict forms, and trial briefs due by 12/23/2022. Bench Trial set for 1/17/2023 - 1/25/2023 at 09:00 AM in Courtroom 3 before Chief Judge Shelly D. Dick. (KAH) (Entered: 08/10/2022) |
| 06/30/2022 | 56 | First MOTION for Jason Torchinsky to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445221) by State Of Louisiana (Attachments: # 1 Affidavit, # 2 Attachment Certificate of Good Standing, # 3 Attachment List of Admissions)(Wale, Jeffrey) (Entered: 06/30/2022) |
| 06/30/2022 | 57 | First MOTION for Phillip Gordon to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445240) by State Of Louisiana (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Proposed Pleading;)(Wale, Jeffrey) (Entered: 06/30/2022) |
| 06/30/2022 | 58 | First MOTION for Andrew B. Pardue to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445243) by State Of Louisiana (Attachments: # 1 Affidavit, # 2 Attachment, # 3 Proposed Pleading;)(Wale, Jeffrey) (Attachment 2 replaced on 7/1/2022) (ELW). Modified on 7/1/2022 to correct page orientation (ELW). (Entered: 06/30/2022) |
| 06/30/2022 | 59 | Proposed Order to 56 First MOTION for Jason Torchinsky to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445221) by State Of Louisiana. (Wale, Jeffrey) Modified on 7/1/2022 to edit text (ELW). (Entered: 06/30/2022) |
| 07/01/2022 | | MOTION(S) REFERRED: 57 First MOTION for Phillip Gordon to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445240), 58 First MOTION for Andrew B. Pardue to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445243), 56 First MOTION for Jason Torchinsky to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2445221). This motion is now pending before the USMJ. (ELW) (Entered: 07/01/2022) |
| 07/05/2022 | 60 | ORDER granting 56 , 57 , and 58 Motions for Jason Torchinsky, Phillip Gordon, and Andrew B. Pardue to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 7/5/2022. |

| | | |
|---|---|---|
| | | <span style="color:red">ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.</span><br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 07/05/2022) |
| 07/18/2022 | 61 | Joint MOTION to Stay by State Of Louisiana (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Torchinsky, Jason) (Entered: 07/18/2022) |
| 07/29/2022 | 62 | MOTION for Samantha Osaki to Withdraw as Attorney by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Proposed Order)(Osaki, Samantha) (Entered: 07/29/2022) |
| 08/01/2022 | | MOTION(S) REFERRED: 62 MOTION for Samantha Osaki to Withdraw as Attorney . This motion is now pending before the USMJ. (JEG) (Entered: 08/01/2022) |
| 08/01/2022 | 63 | ORDER granting 62 Motion to Withdraw Samantha Osaki as Attorney. Signed by Magistrate Judge Scott D. Johnson on 8/1/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 08/01/2022) |
| 08/08/2022 | 64 | MEMORANDUM in Opposition to 61 Joint MOTION to Stay filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Brannon, Sarah) (Entered: 08/08/2022) |
| 08/09/2022 | 65 | Notice of Deficiency with Administrative Procedure III(A)(1) as to 64 Memorandum in Opposition to. Pursuant to Administrative Procedure III(A)(1), Each exhibit should be submitted individually in CM/ECF with an exhibit number and short description (e.g., Ex.1 Plaintiff Depo). REQUIRED CORRECTION: The filer is directed to refile the exhibits in the proper format using the event Exhibit located under Other Documents in the CM/ECF system and link the exhibits to the previously filed document. The main document for this event shall be an exhibit list of the exhibits being attached. (JEG) (Entered: 08/09/2022) |
| 08/10/2022 | 67 | Exhibit(s) to 64 Memorandum in Opposition to by All Plaintiffs. (Attachments: # 1 Exhibit A - Def. Discovery Responses, # 2 Proposed Order)(Brannon, Sarah) (Entered: 08/10/2022) |
| 08/11/2022 | 68 | MOTION for Status Conference by All Plaintiffs (Attachments: # 1 Memorandum in Support of Motion for Status Conference, # 2 Proposed Order for Status Conference)(Brannon, Sarah) (Entered: 08/11/2022) |
| 08/12/2022 | 69 | RESPONSE to 68 MOTION for Status Conference filed by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Ex. A, # 2 Ex. B, # 3 Ex. C)(Prouty, Erika) (Entered: 08/12/2022) |
| 08/12/2022 | | MOTION(S) REFERRED: 68 MOTION for Status Conference . This motion is now pending before the USMJ. (EDC) (Entered: 08/12/2022) |
| 08/12/2022 | 70 | ORDER granting 68 Motion for Status Conference. A Telephone Status Conference is set for 8/15/2022 at 02:00 PM before Magistrate Judge Scott D. Johnson. Counsel participating in the Conference shall call using the AT&T Teleconference System five minutes prior to the conference. Counsel will receive a separate e-mail containing dial-in information prior to the conference. Signed by Magistrate Judge Scott D. Johnson on 8/12/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document |

| | | associated with this entry.) (KAH) (Entered: 08/12/2022) |
|---|---|---|
| 08/15/2022 | 71 | Notice of Deficiency with Administrative Procedure III(A)(1) as to 69 Response to Motion for Status Conference. Pursuant to Administrative Procedure III(A)(1), Each exhibit should be submitted individually in CM/ECF with an exhibit number and short description (e.g., Ex.1 Plaintiff Depo). REQUIRED CORRECTION: The filer is directed to refile the exhibits in the proper format using the event Exhibit located under Other Documents in the CM/ECF system and link the exhibits to the previously filed document. The main document for this event shall be an exhibit list of the exhibits being attached. (EDC) (Entered: 08/15/2022) |
| 08/15/2022 | 72 | Exhibit(s) to 69 Response by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Exhibit Exhibit A - ESI Protocol, # 2 Exhibit Exhibit B - Topics for Meet & Confer 08.01.2022, # 3 Exhibit Exhibit C - 2022.08.09 Response Letter to Plaintiffs)(Mengis, Michael) (Entered: 08/15/2022) |
| 08/15/2022 | 73 | Joint MOTION for Leave to File Reply in Support of Joint Motion to Stay Proceedings *(ECF No. 61)* by State Of Louisiana (Attachments: # 1 Proposed Order Proposed Order, # 2 Proposed Pleading; Reply in Support of Joint Motion to Stay)(Torchinsky, Jason) (Entered: 08/15/2022) |
| 08/15/2022 | 74 | Minute Entry/Order for proceedings held before Magistrate Judge Scott D. Johnson: Status Conference held on 8/15/2022. The Court addressed the three discovery-related issues described in both Plaintiffs' Motion for Status Conference (R. Doc. 68) and the Response (R. Doc.69). The Court gave the parties guidance, emphasizing the value of practical problem solving in the place of costly litigation of inflexible, adversarial positions. (KAH) (Entered: 08/16/2022) |
| 08/19/2022 | 75 | Consent MOTION to Modify Scheduling Order by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Proposed Order)(Brannon, Sarah) Modified on 8/22/2022 to edit the text (NLT). (Entered: 08/19/2022) |
| 08/22/2022 | 76 | ORDER granting 73 Joint MOTION for Leave to File Reply in Support of Joint Motion to Stay Proceedings *(ECF No. 61)* filed by State Of Louisiana. Signed by Chief Judge Shelly D. Dick on 8/22/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 08/22/2022) |
| 08/22/2022 | 77 | REPLY in Support of 61 Joint MOTION to Stay Proceedings filed by State Of Louisiana. (LLH) (Entered: 08/22/2022) |
| 08/22/2022 | | MOTION(S) REFERRED: 75 Consent MOTION to Amend 66 Scheduling Conference,Set Scheduling Order Deadlines. This motion is now pending before the USMJ. (ELW) (Entered: 08/22/2022) |
| 08/23/2022 | 78 | ORDER granting 75 Motion to Modify. The deadlines listed below, which were previously set by the Court's June 23, 2022 Scheduling Order (R. Doc. 66), are modified as follows: Completing fact discovery and filing any related motions due by 10/17/2022. Completing expert discovery and filing any related motions due by 10/21/2022. Defendant and Intervenors' Expert Reports due by 9/9/2022. Plaintiffs' Rebuttal Expert Reports due by 9/23/2022. Defendant and Intervenors' Sur- Rebuttal Expert Reports due by 10/7/2022. Signed by Magistrate Judge Scott D. Johnson on 8/23/2022. (KAH) (Entered: 08/23/2022) |
| 08/30/2022 | 79 | RULING granting 61 Joint Motion to Stay Proceedings. Signed by Chief Judge Shelly D. Dick on 8/30/2022. (SWE) (Entered: 08/30/2022) |

| 09/01/2022 | 80 | ORDER of ADMINISTRATIVE CLOSURE: The bench trial set for January 17, 2023 and pretrial conference set for December 19, 2022 are CANCELLED. These proceedings are ADMINISTRATIVELY CLOSED, pending the stay of this matter. Signed by Chief Judge Shelly D. Dick on 08/31/2022. (ELW) (Entered: 09/01/2022) |
|---|---|---|
| 12/02/2022 | 81 | NOTICE of Change of Address by Tiffany Alora Thomas (Thomas, Tiffany Alora) (Entered: 12/02/2022) |
| 06/09/2023 | 82 | MOTION to Vacate 79 Order on Motion to Stay by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Attachment Proposed Order)(Brannon, Sarah) (Entered: 06/09/2023) |
| 06/09/2023 | 83 | MOTION for Expedited Hearing on 82 MOTION to Vacate 79 Order on Motion to Stay *& Forthcoming Motion for Preliminary Injunction* by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Attachment Proposed Order)(Brannon, Sarah) (Entered: 06/09/2023) |
| 06/12/2023 | 84 | Ex Parte MOTION for Dayton Campbell-Harris to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593413) by All Plaintiffs (Attachments: # 1 Exhibit 1- Declaration of Applicant, # 2 Exhibit 2 - Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 06/12/2023) |
| 06/12/2023 | 85 | Ex Parte MOTION for Luis Manuel Rico Roman to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593416) by All Plaintiffs (Attachments: # 1 Exhibit 1- Declaration of Applicant, # 2 Exhibit 2 - Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 06/12/2023) |
| 06/12/2023 | 86 | Ex Parte MOTION for Megan C. Keenan to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593418) by All Plaintiffs (Attachments: # 1 Exhibit 1- Declaration of Applicant, # 2 Exhibit 2 - Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 06/12/2023) |
| 06/12/2023 | 87 | Notice to Counsel: Telephone Conference set for 6/21/2022 at 11:00 AM before Chief Judge Shelly D. Dick. Participant instructions will be sent separately by email.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 06/12/2023) |
| 06/20/2023 | 88 | MOTION to Enroll Amanda M. LaGroue as Attorney by State of Louisiana (Attachments: # 1 Proposed Pleading; Proposed Order)(Jones, Carey) (Entered: 06/20/2023) |
| 06/20/2023 | 89 | NOTICE of Fax Filing Correspondence to Court by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington. (LLH) (Entered: 06/20/2023) |
| 06/21/2023 | | MOTION(S) REFERRED: 88 MOTION to Enroll Amanda M. LaGroue as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 06/21/2023) |
| 06/21/2023 | | MOTION(S) REFERRED: 86 Ex Parte MOTION for Megan C. Keenan to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593418), 84 Ex Parte MOTION for Dayton Campbell-Harris to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593413), 85 Ex Parte MOTION for Luis Manuel Rico |

| | | |
|---|---|---|
| | | Roman to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2593416), 88 MOTION to Enroll Amanda M. LaGroue as Attorney . This motion is now pending before the USMJ. (LLH) (Entered: 06/21/2023) |
| 06/21/2023 | 90 | ORDER granting 84 , 85 , and 86 Motions for Dayton Campbell-Harris, Luis Manuel Rico Roman, and Megan C. Keenan to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 6/21/2023.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 06/21/2023) |
| 06/21/2023 | 91 | ORDER granting 88 Motion to Enroll as Attorney. Added attorney Amanda Marie LaGroue for State of Louisiana. Signed by Magistrate Judge Scott D. Johnson on 6/21/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 06/21/2023) |
| 06/21/2023 | 92 | NOTICE of Defendants Joint Notice Regarding Trial Dates by R. Kyle Ardoin (Attachments: # 1 Exhibit Secretary of State November and December Election Timeline)(Strach, Phillip) (Entered: 06/21/2023) |
| 06/21/2023 | 93 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Telephone Conference held on 6/21/2023. The Court advised that the Motion to Vacate Order on Motion to Stay will be granted and will set this for an expedited trial. The Court refers this matter to the Magistrate Judge for a scheduling order. The Court and parties discussed potential trial dates. The parties shall confer and report back to the Court with the mutually agreed upon date (SWE) (Entered: 06/21/2023) |
| 06/22/2023 | 94 | RESPONSE to 92 Notice of (other) *Regarding Trial Dates* filed by All Plaintiffs. (Brannon, Sarah) (Entered: 06/22/2023) |
| 06/22/2023 | 95 | ORDER granting 82 Motion to Vacate 79 Order on Motion to Stay . Signed by Chief Judge Shelly D. Dick on 6/22/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 06/22/2023) |
| 06/22/2023 | 96 | ORDER denying as MOOT 83 Motion for Expedited Hearing on 82 MOTION to Vacate 79 Order on Motion to Stay *& Forthcoming Motion for Preliminary Injunction*. Signed by Chief Judge Shelly D. Dick on 6/22/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 06/22/2023) |
| 06/22/2023 | 97 | ORDER: The Court has received 92 Notice of Defendants' Joint Position on Trial Schedule and Plaintiffs' 94 Response. Trial for this matter is set to commence on 11/27/2023 through 12/8/2023 at 09:00 AM in Courtroom 3 before Chief Judge Shelly D. Dick. The Court refers this matter to the Magistrate Judge for a scheduling order consistent with the trial date. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 06/22/2023) |
| 06/23/2023 | 98 | ORDER: A Telephone Scheduling Conference is set for 6/29/2023 at 03:00 PM before Magistrate Judge Scott D. Johnson to discuss issuing a scheduling order consistent with 97 Order. Counsel participating in the Conference shall call using the AT&T Teleconference System five minutes prior to the conference. Counsel will receive a separate e-mail containing dial in information prior to the conference. Signed by Magistrate Judge Scott D. Johnson on 6/23/2023. (This is a TEXT ENTRY ONLY. There |

| | | is no hyperlink or PDF document associated with this entry.)(KAH) (Entered: 06/23/2023) |
|---|---|---|
| 06/29/2023 | 99 | NOTICE of Defendants' Joint Notice of Proposed Pre-Trial Schedule by Patrick Page Cortez, Clay Schexnayder (Prouty, Erika) (Entered: 06/29/2023) |
| 06/29/2023 | 100 | NOTICE of Plaintiffs Proposed Pre-trial Schedule 99 Notice of (other) by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Patrick Page Cortez, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne (Attachments: # 1 Exhibit A)(Brannon, Sarah) (Entered: 06/29/2023) |
| 07/03/2023 | 101 | NOTICE of Defendants' Joint Supplemental Notice of Proposed Pre-Trial Schedule by Patrick Page Cortez, Clay Schexnayder (Prouty, Erika) (Entered: 07/03/2023) |
| 07/04/2023 | 102 | Opposition to Defendants Supplemental Notice on Proposed Pre-trial Schedule 101 Notice of (other) by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Exhibit proposed discovery schedule)(Brannon, Sarah) Modified on 7/5/2023 to edit text (ELW). (Entered: 07/04/2023) |
| 07/05/2023 | 103 | Joint Reply Notice to 102 Plaintiffs' Opposition and Request for Supplemental Scheduling Conference by Patrick Page Cortez, Clay Schexnayder (Prouty, Erika) Modified on 7/6/2023 to edit text (ELW) (Entered: 07/05/2023) |
| 07/07/2023 | 104 | NOTICE of Change of Address by R. Kyle Ardoin (Strach, Phillip) (Entered: 07/07/2023) |
| 07/11/2023 | 105 | Ex Parte MOTION for Josephine M. Bahn to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2605171) by All Plaintiffs (Attachments: # 1 Certificate of Good Standing, # 2 Declaration)(Adcock, John) (Entered: 07/11/2023) |
| 07/12/2023 | | MOTION(S) REFERRED: 105 Ex Parte MOTION for Josephine M. Bahn to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2605171). This motion is now pending before the USMJ. (EDC) (Entered: 07/12/2023) |
| 07/12/2023 | 106 | NOTICE of Filing of Updated Certificate of Good Standing 105 Ex Parte MOTION for Josephine M. Bahn to Appear Pro Hac Vice by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Patrick Page Cortez, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Clay Schexnayder, State of Louisiana, Rose Thompson, Alice Washington (Adcock, John) Modified on 7/12/2023 to edit docket text. (JEG). (Entered: 07/12/2023) |
| 07/12/2023 | 107 | MOTION to Continue November 27, 2023, Trial Date by R. Kyle Ardoin, Patrick Page Cortez, Clay Schexnayder, State of Louisiana (Attachments: # 1 Exhibit Exhibit A)(Mengis, Michael) (Entered: 07/12/2023) |
| 07/12/2023 | 108 | ORDER granting 105 Motion for Josephine M. Bahn to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 7/12/2023.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 07/12/2023) |
| 07/14/2023 | 109 | MEMORANDUM in Opposition to 107 MOTION to Continue November 27, 2023, Trial |

| | | |
|---|---|---|
| | | Date filed by All Plaintiffs. (Attachments: # 1 Exhibit A - Expert Report)(Brannon, Sarah) (Entered: 07/14/2023) |
| 07/17/2023 | 110 | Minute Entry/ Scheduling Order for proceedings held before Magistrate Judge Scott D. Johnson. Pretrial Conference held on 7/17/2023. Discovery due by 9/1/2023. Defendant`s Expert Witness List due by 7/13/2023. Third Party Defendant`s Expert Witness List due by 8/15/2023. Plaintiff`s Expert Reports due by 6/30/2023. Defendant`s Expert Reports due by 7/28/2023. Third Party Defendant`s Expert Reports due by 8/21/2023. Discovery from Experts due by 9/29/2023. Motions shall be filed by 10/6/2023. Proposed Pretrial Order due by 10/20/2023. Findings of Facts and Conclusion of Law due by 10/27/2023. Pretrial Conference set for 11/14/2023 at 02:30 PM in chambers before Chief Judge Shelly D. Dick. Trial briefs due by 11/20/2023. Bench Trial set for 11/27/2023 through 12/1/2023 at 09:30 AM in Courtroom 3 before Chief Judge Shelly D. Dick. Bench Trial set for 12/4/2023 AND 12/5/2023 at 09:30 AM in Courtroom 3 before Chief Judge Shelly D. Dick. (ELW) (Entered: 07/17/2023) |
| 07/19/2023 | 111 | Ex Parte MOTION for Robert J. Tucker to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2608458) by Patrick Page Cortez, Clay Schexnayder (Attachments: # 1 Exhibit Exhibit A - Declaration of Robert Tucker in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit Exhibit 1 - Certificate of Good Standing from Ohio for Robert Tucker, # 3 Proposed Pleading; proposed Order Granting PHV Admission of Robert Tucker)(Mengis, Michael) (Entered: 07/19/2023) |
| 07/19/2023 | 112 | MOTION to Continue Trial by State of Louisiana (Attachments: # 1 Attachment Memorandum in Support, # 2 Exhibit Letter from U.S. Supreme Court, # 3 Proposed Pleading; Proposed Order Granting Motion)(Jones, Carey) (Entered: 07/19/2023) |
| 07/19/2023 | 113 | MOTION to Expedite by State of Louisiana (Attachments: # 1 Proposed Pleading; Proposed Order)(Jones, Carey) (Entered: 07/19/2023) |
| 07/19/2023 | 114 | ORDER: denying 113 MOTION to Expedite. Opposition to 112 MOTION to Continue Trial shall be filed by 7/26/2023. Replies will not be permitted. Signed by Chief Judge Shelly D. Dick on 7/19/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 07/19/2023) |
| 07/20/2023 | | MOTION(S) REFERRED: 111 Ex Parte MOTION for Robert J. Tucker to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2608458). This motion is now pending before the USMJ. (ELW) (Entered: 07/20/2023) |
| 07/20/2023 | 115 | ORDER granting 111 Motion for Robert J. Tucker to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 7/20/2023.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 07/20/2023) |
| 07/21/2023 | 116 | MOTION for Brennan Bowen to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2609994) by State of Louisiana (Attachments: # 1 Affidavit Exhibit A, # 2 Attachment Certificate of Good Standing, # 3 Proposed Pleading; Proposed Order)(Wale, Jeffrey) (Entered: 07/21/2023) |
| 07/21/2023 | | MOTION(S) REFERRED: 116 MOTION for Brennan Bowen to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2609994). This motion is now pending |

| | | |
|---|---|---|
| | | before the USMJ. (LLH) (Entered: 07/21/2023) |
| 07/24/2023 | 117 | ORDER granting 116 Motion for Brennan Bowen to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 7/24/2023.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 07/24/2023) |
| 07/26/2023 | 118 | MEMORANDUM in Opposition to 112 MOTION to Continue Trial filed by All Plaintiffs. (Brannon, Sarah) (Entered: 07/26/2023) |
| 08/09/2023 | 119 | MOTION for Protective Order by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington (Attachments: # 1 Memorandum, # 2 I. Sara Rohani Declaration, # 3 Exhibit 1 - Sec'y of State First Set of Interrogatories and Requests for Production, # 4 Exhibit 2 - NAACP Louisiana Discovery Responses, # 5 Exhibit 3 - July 20, 2023 Sec'y of State Letter to Plaintiffs, # 6 Exhibit 4 - July 25, 2023 Plaintiffs Letter to Sec'y of State, # 7 Exhibit 5 - Aug. 2023 Email Correspondence, # 8 Michael W. McClanahan Declaration, # 9 Proposed Order)(Rohani, Sara) (Entered: 08/09/2023) |
| 08/10/2023 | 120 | Notice to Counsel Resetting Hearing: (TIME CHANGE ONLY) Pretrial Conference re-set for 11/14/2023 at 10:00 AM in chambers before Chief Judge Shelly D. Dick. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 08/10/2023) |
| 08/10/2023 | | MOTION(S) REFERRED: 119 MOTION for Protective Order . This motion is now pending before the USMJ. (ELW) (Entered: 08/10/2023) |
| 08/16/2023 | 121 | MEMORANDUM in Opposition to 119 MOTION for Protective Order filed by R. Kyle Ardoin. (Attachments: # 1 Exhibit 1 - Plaintiffs' Fact Witness List, # 2 Exhibit 2 - Defendant's Proposed Order)(Strach, Phillip) (Entered: 08/16/2023) |
| 08/16/2023 | 122 | RESPONSE to 119 MOTION for Protective Order filed by Patrick Page Cortez, Clay Schexnayder. (Attachments: # 1 Attachment Proposed Order)(Prouty, Erika) (Entered: 08/16/2023) |
| 08/17/2023 | 123 | ORDER : The 119 Motion for Protective Order be DENIED without prejudice as Plaintiff failed to sufficiently confer with its opponents in good faith. The parties are additionally ORDERED to confer by phone, video, or inperson, as soon as possible. But in any event, this conference must occur no later than 5:00 p.m. CST on Monday, August 21, 2023. Signed by Magistrate Judge Scott D. Johnson on 8/17/2023. (ELW) (Entered: 08/17/2023) |
| 08/18/2023 | 124 | MOTION to Enroll John C. Conine, Jr. as Additional Attorney by R. Kyle Ardoin (Attachments: # 1 Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 08/18/2023) |
| 08/21/2023 | | MOTION(S) REFERRED: 124 MOTION to Enroll John C. Conine, Jr. as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 08/21/2023) |
| 08/21/2023 | 125 | ORDER granting 124 Motion to Enroll Additional Attorney. Added attorney John Clifton Conine, Jr. for R. Kyle Ardoin. Signed by Magistrate Judge Scott D. Johnson on |

| | | |
|---|---|---|
| | | 8/21/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 08/21/2023) |
| 08/23/2023 | 126 | Motion for Joint Request for a Status Conference by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington (Naifeh, Stuart) Modified on 8/25/2023 to edit text and event type (ELW). Modified on 8/29/2023 (KAH). (Entered: 08/23/2023) |
| 08/28/2023 | | MOTION(S) REFERRED: 126 MOTION. This motion is now pending before the USMJ. (ELW) (Entered: 08/28/2023) |
| 08/29/2023 | 127 | ORDER granting 126 Motion for Status Conference. A video Status Conference is set for 8/30/2023 at 03:00 PM before Magistrate Judge Scott D. Johnson. The participant instructions are attached. Finally, given the September 1, 2023 discovery deadline, the parties are ORDERED to continue their efforts to confer and resolve this issue ahead of the conference. Signed by Magistrate Judge Scott D. Johnson on 8/29/2023. (KAH) (Entered: 08/29/2023) |
| 08/30/2023 | 130 | Minute Entry for proceedings held before Magistrate Judge Scott D. Johnson: A video Status Conference was held on 8/30/2023. The Conference stemmed from the Court's recent denial of the NAACPs Motion for Protective Order.The parties have resolved the discovery issue first raised in the Motion for Protective Order. The Court ORDERS that any Stipulation agreed on by the parties must be filed in the record for the Court's review. (JEG) (Entered: 09/01/2023) |
| 08/31/2023 | 128 | Consent MOTION for Protective Order *Governing SOS_000948* by R. Kyle Ardoin (Attachments: # 1 Exhibit Proposed Consent Protective Order)(Strach, Phillip) (Entered: 08/31/2023) |
| 09/01/2023 | 129 | NOTICE of Hearing: A Status Conference is set for 9/1/2023 at 11:00 AM by video before Magistrate Judge Scott D. Johnson. (KAH) (Entered: 09/01/2023) |
| 09/01/2023 | 131 | Minute Entry/Order for proceedings held before Magistrate Judge Scott D. Johnson: Video Status Conference held on 9/1/2023 to discuss the substantive issue that 119 Motion for Protective Order raised. The parties are therefore ORDERED to again confer either in-person, by video, or by phone and make every effort to resolve this discovery issue without the Court's involvement. The Court will automatically deny any discovery motion filed before this additional conference has taken place. And as always, the Court encourages the parties to request a conference with the Court if its guidance could avoid the need for motion practice. (EDC) (Entered: 09/01/2023) |
| 09/01/2023 | 132 | MOTION to Compel Plaintiffs' Response to Defendant's Interrogatory No. 3 by R. Kyle Ardoin (Attachments: # 1 Attachment Memo ISO Motion to Compel, # 2 Exhibit Exhibit 1 - Aug. 29, 2023 Corresopndence, # 3 Exhibit Exhibit 2 - Proposed Order)(Strach, Phillip) (Entered: 09/01/2023) |
| 09/01/2023 | 133 | Consent MOTION to Withdraw *Plaintiffs Mr. Jarrett Lofton and Ms. Alexis Calhoun* by All Plaintiffs (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Order)(Brannon, Sarah) (Entered: 09/01/2023) |
| 09/05/2023 | | MOTION(S) REFERRED: 132 MOTION to Compel Plaintiffs' Response to Defendant's Interrogatory No. 3 . This motion is now pending before the USMJ. (LLH) (Entered: 09/05/2023) |
| 09/05/2023 | | |

| | | |
|---|---|---|
| | | MOTION(S) REFERRED: 128 Consent MOTION for Protective Order *Governing SOS_000948*. This motion is now pending before the USMJ. (ELW) (Entered: 09/05/2023) |
| 09/05/2023 | 134 | NOTICE of ABBREVIATED Briefing Schedule on 132 MOTION to Compel Plaintiffs' Response to Defendant's Interrogatory No. 3 : Any response by the NAACP to the Secretary of States recent Motion to Compel (R. Doc. 132) must be filed as soon as possible, but in any event, no later than midnight on Wednesday, September 6, 2023. The NAACPs response should clearly identify every Louisiana Senate District and Louisiana House District at issue in this litigation. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Johnson, Scott) (Entered: 09/05/2023) |
| 09/06/2023 | 135 | RESPONSE in Opposition to 132 MOTION to Compel Plaintiffs' Response to Defendant's Interrogatory No. 3 filed by All Plaintiffs. (Attachments: # 1 Exhibit A - Suppl. Interrog. Resp., # 2 Exhibit B - McClanahan Decl.)(Rohani, Sara) (Entered: 09/06/2023) |
| 09/08/2023 | 136 | ORDER denying 132 Motion to Compel. Signed by Magistrate Judge Scott D. Johnson on 9/8/2023. (Johnson, Scott) (Entered: 09/08/2023) |
| 09/08/2023 | 137 | TRANSCRIPT REQUEST by Patrick Page Cortez, Clay Schexnayder for proceedings held on 9/1/2023 before Judge Scott D. Johnson.. (Mengis, Michael) Modified on 9/8/2023 form sent to Magistrate Judges CRD via email (ELW). (Entered: 09/08/2023) |
| 09/14/2023 | 138 | ORDER granting 128 Consent Motion for Protective Order Governing SOS_000948. Signed by Magistrate Judge Scott D. Johnson on 9/13/2023. (LLH) (Entered: 09/14/2023) |
| 09/14/2023 | 139 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Status Conference hearing before Judge Scott D. Johnson held on 9/1/23. Court Reporter: Janice Russell. Phone Number: (757) 422-9089; e-mail: trussell31@tdsmail.com.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (Russell, J.) (Entered: 09/14/2023) |
| 09/14/2023 | 140 | TRANSCRIPT REQUEST by Black Voters Matter Capacity Building Institute, Alexis Calhoun, Steven Harris, Jarrett Lofton, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington for proceedings held on 9/1/23 before Judge Scott D. Johnson.. (Rohani, Sara) Modified on 9/15/2023 form sent to Magistrate Judges CRD via email. (ELW). (Entered: 09/14/2023) |
| 09/18/2023 | 141 | Ex Parte MOTION for Daniel J. Hessel to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2637996) by All Plaintiffs (Attachments: # 1 Declaration of Applicant, # 2 Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 09/18/2023) |
| 09/18/2023 | 142 | |

| | | |
|---|---|---|
| | | Ex Parte MOTION for Rob Clark to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2638008) by All Plaintiffs (Attachments: # 1 Oath and Declaration of Applicant, # 2 Certificate of Good Standing, # 3 Proposed Order)(Adcock, John) (Entered: 09/18/2023) |
| 09/18/2023 | | MOTION(S) REFERRED: 141 Ex Parte MOTION for Daniel J. Hessel to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2637996), 142 Ex Parte MOTION for Rob Clark to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2638008). This motion is now pending before the USMJ. (LLH) (Entered: 09/18/2023) |
| 09/18/2023 | 143 | ORDER granting 141 and 142 Motions for Daniel J. Hessel and Rob Clark to Appear Pro Hac Vice. <br><br> ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration. <br><br> Signed by Magistrate Judge Scott D. Johnson on 9/18/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 09/18/2023) |
| 09/22/2023 | 144 | MOTION Review and Objections to Magistrate Judge's Order Denying Defendant's Motion to Compel by R. Kyle Ardoin (Attachments: # 1 Attachment Memorandum in Support)(Strach, Phillip) (Entered: 09/22/2023) |
| 10/05/2023 | 145 | ORDER denying 107 Motion to Continue Trial. Signed by Chief Judge Shelly D. Dick on 10/5/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/05/2023) |
| 10/05/2023 | 146 | ORDER denying 112 Motion to Continue Trial. Signed by Chief Judge Shelly D. Dick on 10/5/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/05/2023) |
| 10/05/2023 | 147 | ORDER granting 133 Consent MOTION to Withdraw *Plaintiffs Mr. Jarrett Lofton and Ms. Alexis Calhoun.* Signed by Chief Judge Shelly D. Dick on 10/5/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 10/05/2023) |
| 10/06/2023 | 148 | Joint MOTION in Limine *to Exclude Dr. Lisa Handley's Testimony and Reports* by R. Kyle Ardoin (Attachments: # 1 Attachment Joint Memorandum in Support, # 2 Exhibit 1 - Dr. Handley June 30, 2023 Report, # 3 Exhibit 2 - Dr. Handley Deposition Excerpts, # 4 Exhibit 3 - Dr. Handley Excel Metadata, # 5 Exhibit 4 - Dr. Solanky July 28, 2023 Report, # 6 Exhibit 5 - Dr. Solanky Aug. 21, 2023 Rebuttal Report)(Strach, Phillip) (Entered: 10/06/2023) |
| 10/06/2023 | 149 | Joint MOTION for Summary Judgment by R. Kyle Ardoin (Attachments: # 1 Attachment Joint Memorandum in Support, # 2 Attachment Joint Statement of Undisputed Material Facts, # 3 Exhibit 1 - Individual Plaintiffs' Responses to Def. Ardoin's First Set of Discovery, # 4 Exhibit 2 - William S. Cooper Corrected Exhibits H-I and I-I, # 5 Exhibit 3 - Louisiana NAACP 30(b)(6) Depo. Transcript Excerpts, # 6 Exhibit 4 - BVM 30(b)(6) Depo. Transcript Excerpts, # 7 Exhibit List 5 - Louisiana NAACP's Supplemental Response to Interrogatory No. 3)(Strach, Phillip) (Entered: 10/06/2023) |
| 10/06/2023 | 150 | Consent MOTION for Leave to Exceed Page Limitation by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. |

| | | |
|---|---|---|
| | | Lowe, Dorothy Nairne, Alice Washington (Attachments: # <u>1</u> Proposed Pleading; - Motion to Exclude Proposed Expert Testimony, # <u>2</u> Proposed Pleading; - Memorandum in Support of Motion to Exclude Proposed Expert Testimony, # <u>3</u> Exhibit A, # <u>4</u> Exhibit B, # <u>5</u> Exhibit C, # <u>6</u> Exhibit D, # <u>7</u> Exhibit E, # <u>8</u> Exhibit F, # <u>9</u> Exhibit G, # <u>10</u> Exhibit H, # <u>11</u> Exhibit I, # <u>12</u> Exhibit J, # <u>13</u> Exhibit K, # <u>14</u> Exhibit L, # <u>15</u> Exhibit M, # <u>16</u> Exhibit N, # <u>17</u> Exhibit O, # <u>18</u> Exhibit P, # <u>19</u> Exhibit Q, # <u>20</u> Exhibit R, # <u>21</u> Exhibit S, # <u>22</u> Attachment Proposed Order Granting Consent Motion to Exceed Page Limit)(Brannon, Sarah) (Entered: 10/06/2023) |
| 10/10/2023 | 151 | Notice of Deficiency with Administrative Procedure III(A)(1) as to <u>150</u> Motion for Leave. Pursuant to Administrative Procedure III(A)(1), Each exhibit should be submitted individually in CM/ECF with an exhibit number and short description (e.g., Ex.1 Plaintiff Depo). <br><br>REQUIRED CORRECTION: The filer is directed to refile the exhibits in the proper format using the event Exhibit located under Other Documents in the CM/ECF system and link the exhibits to the previously filed document. The main document for this event shall be an exhibit list of the exhibits being attached. Each exhibit MUST include a description (e.g., Ex.1 Plaintiff Depo). (ELW) (Entered: 10/10/2023) |
| 10/10/2023 | <u>152</u> | Exhibit(s) to <u>150</u> Consent MOTION for Leave to Exceed Page Limitation by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # <u>1</u> Exhibit A - Trende Report, # <u>2</u> Exhibit B - Trende Dep. Tr., # <u>3</u> Exhibit C - Chen & Rodden Article, # <u>4</u> Exhibit D - Trende Reply, # <u>5</u> Exhibit E - Johnson Surrebuttal, # <u>6</u> Exhibit F - Johnson Report, # <u>7</u> Exhibit G - Johnson Dep. Tr., # <u>8</u> Exhibit H - Cooper Rebuttal, # <u>9</u> Exhibit I - Common Cause v. Lewis, # <u>10</u> Exhibit J - Covington v. North Carolina, # <u>11</u> Exhibit K - Colten Rebuttal, # <u>12</u> Exhibit L - Cooper Report, # <u>13</u> Exhibit M - Solanky Dep. Tr., # <u>14</u> Exhibit N - Solanky Report, # <u>15</u> Exhibit O - Handley Rebuttal, # <u>16</u> Exhibit P - Alford Report, # <u>17</u> Exhibit Q - Lewis Report, # <u>18</u> Exhibit R - Solanky Rebuttal, # <u>19</u> Exhibit S - Handley Report)(Brannon, Sarah) (Entered: 10/10/2023) |
| 10/13/2023 | <u>153</u> | RESPONSE in Opposition to <u>144</u> MOTION Review and Objections to Magistrate Judge's Order Denying Defendant's Motion to Compel filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # <u>1</u> Exhibit A - Michael McClanahan Dep. Tr. Excerpts)(Rohani, Sara) (Entered: 10/13/2023) |
| 10/16/2023 | 154 | ORDER granting unopposed <u>150</u> MOTION for Leave to Exceed Page Limitation. All parties are hereby granted leave to file Memorandum in response to Motions to exclude opposing experts in excess of the 25-page limit proscribed in Local Rule 7(g).Signed by Chief Judge Shelly D. Dick on 10/16/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/16/2023) |
| 10/16/2023 | <u>155</u> | Consent MOTION to Amend *Scheduling Order* by R. Kyle Ardoin (Attachments: # <u>1</u> Attachment Proposed Order Granting Consent Motion to Amend)(Strach, Phillip) (Entered: 10/16/2023) |
| 10/16/2023 | <u>156</u> | MOTION to Exclude the Proposed Expert Testimony of Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky, by Black Voters Matter Capacity Building Institute, Steven Harris, Clee E. Lowe, Dorothy Nairne (Attachments: # <u>1</u> Attachment Memo in Support, # <u>2</u> Exhibit A - Trende Report, # <u>3</u> Exhibit B - Trende Dep. Tr., # <u>4</u> Exhibit C - Chen & Rodden Article, # <u>5</u> Exhibit D - Trende Reply, # <u>6</u> Exhibit E - Johnson Surrebuttal, # <u>7</u> Exhibit F - Johnson Report, # <u>8</u> Exhibit G - Johnson Dep. Tr., # <u>9</u> |

| | | |
|---|---|---|
| | | Exhibit H - Cooper Rebuttal, # 10 Exhibit I - Common Cause v. Lewis, # 11 Exhibit J - Covington v. North Carolina, # 12 Exhibit K - Colten Rebuttal, # 13 Exhibit L - Cooper Report, # 14 Exhibit M - Solanky Dep. Tr., # 15 Exhibit N - Solanky Report, # 16 Exhibit O - Handley Rebuttal, # 17 Exhibit P - Alford Report, # 18 Exhibit Q - Lewis Report, # 19 Exhibit R - Solanky Rebuttal, # 20 Exhibit S - Handley Report, # 21 Attachment Order).(LLH) (Entered: 10/17/2023) |
| 10/17/2023 | | MOTION(S) REFERRED: 155 Consent MOTION to Amend *Scheduling Order*. This motion is now pending before the USMJ. (ELW) (Entered: 10/17/2023) |
| 10/17/2023 | 157 | For good cause shown, the parties consent Motion to Amend (R. Doc. 155) the Scheduling Order (R. Doc. 110) is GRANTED, and the deadlines at issue are AMENDED, as follows: the Pre-Trial Order must now be filed by October 27, 2023; the Findings of Fact and Conclusions of Law must now be filed by November 9, 2023; and the Counter Deposition Designations must now be filed by November 6, 2023. Signed by Magistrate Judge Scott D. Johnson on 10/17/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Johnson, Scott) (Entered: 10/17/2023) |
| 10/24/2023 | 158 | ORDER granting 144 Objections to Magistrate Judge's Order Denying Defendant's Motion to Compel. The Court finds that standing has been raised by the Defendant. The Motion to Compel is hereby referred back to the Magistrate Judge for reconsideration. Signed by Chief Judge Shelly D. Dick on 10/24/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/24/2023) |
| 10/27/2023 | 159 | ORDER: The issue before the Court for reconsideration concerns the scope of discovery related to the Louisiana NAACPs associational standing. As to 132 MOTION to Compel Plaintiffs' Response to Defendant's Interrogatory No. 3 Video Conference before the Magistrate Judge set for 11/2/2023 at 11:00 AM in by video before Magistrate Judge Scott D. Johnson. Signed by Magistrate Judge Scott D. Johnson on 10/26/2023. (Attachments: # 1 Attachment Zoom instructions)(ELW) (Entered: 10/27/2023) |
| 10/27/2023 | 160 | Joint MEMORANDUM in Opposition to 156 MOTION in Limine filed by R. Kyle Ardoin. (Attachments: # 1 Exhibit 1 - Murray Dep. Tr. Excerpts, # 2 Exhibit 2 - Covington Hr'g Tr. Excerpts, # 3 Exhibit 3 - Colten Dep. Tr. Excerpts, # 4 Exhibit 4 - Cooper Dep. Tr. Excerpts)(Strach, Phillip) (Entered: 10/27/2023) |
| 10/27/2023 | 161 | Proposed Pretrial Order by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (For your free look at document, enter your Individual PACER login and pw to confirm your right to view). (Brannon, Sarah) (Entered: 10/27/2023) |
| 10/27/2023 | 162 | STRICKEN FROM THE RECORD MEMORANDUM in Opposition to 148 Joint MOTION in Limine *to Exclude Dr. Lisa Handley's Testimony and Reports* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Brannon, Sarah) Modified on 11/2/2023 to remove document as it has been stricken by Order #166 (LLH). (Entered: 10/27/2023) |
| 10/27/2023 | 163 | MEMORANDUM in Opposition to 149 Joint MOTION for Summary Judgment filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # 1 Opposing Statement of Material Facts, # 2 Exhibit 1 - Omari Ho-Sang Dep. Tr., # 3 Exhibit 2 - BVM-LA-Leg 000517881, # 4 Exhibit 3 - Omari Ho-Sang |

| | | |
|---|---|---|
| | | Declaration, # 5 Exhibit 4 - BVM-LA-LEG 0002891-93, # 6 Exhibit 5 - BVM-LA-LEG 0000383-84, # 7 Exhibit 6 - BVM-LA-LEG 0003053, 0005833-36, 0005840, # 8 Exhibit 7 - Michael McClanahan Dep. Tr., # 9 Exhibit 8 - NAACP Bylaws, # 10 Exhibit 9 - Michael McClanahan Declaration, # 11 Exhibit 10 - Dr. Dorothy Nairne Declaration, # 12 Exhibit 11 - Rev. Clee Earnest Lowe Declaration, # 13 Exhibit 12 - Dr. Alice Washington Declaration, # 14 Exhibit 13 Rev. Steven Harris Declaration)(Rohani, Sara) (Entered: 10/27/2023) |
| 11/01/2023 | 164 | Notice of Deficiency with Administrative Procedure III(A)(1) as to 162 Memorandum in Opposition to,. Pursuant to Administrative Procedure III(A)(1), Each exhibit should be submitted individually in CM/ECF with an exhibit number and short description (e.g., Ex.1 Plaintiff Depo).<br><br>REQUIRED CORRECTION: The filer is directed to refile the exhibits in the proper format using the event Exhibit located under Other Documents in the CM/ECF system and link the exhibits to the previously filed document. The main document for this event shall be an exhibit list of the exhibits being attached. Each exhibit MUST include a description (e.g., Ex.1 Plaintiff Depo). (ELW) (Entered: 11/01/2023) |
| 11/02/2023 | 165 | MEMORANDUM in Opposition to 148 Joint MOTION in Limine *to Exclude Dr. Lisa Handley's Testimony and Reports* filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # 1 Exhibit 1 - Handley initial report, # 2 Exhibit 2 - Solanky initial report, # 3 Exhibit 3 - Handley deposition excerpts, # 4 Exhibit 4 - Alford deposition excerpts, # 5 Exhibit 5 - Solanky deposition excerpts, # 6 Exhibit Handley supplemental report, # 7 Exhibit 7 - LA data details VEST, # 8 Exhibit 8 - report Dr. Lichtman)(Brannon, Sarah) (Entered: 11/02/2023) |
| 11/02/2023 | 166 | ORDER: Considering that Plaintiffs filed 165 Memorandum in Opposition to 148 Joint MOTION in Limine to Exclude Dr. Lisa Handley's Testimony and Reports to correct the 164 Notice of Deficiency, the Clerk's Office is directed to strike 162 Memorandum in Opposition to maintain clarity of the record. Signed by Chief Judge Shelly D. Dick on 11/2/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 11/02/2023) |
| 11/02/2023 | 167 | TRANSCRIPT REQUEST by R. Kyle Ardoin for proceedings held on 11/02/2023 before Judge Hon. Scott D. Johnson.. (Conine, John) (Entered: 11/02/2023) |
| 11/02/2023 | 168 | TRANSCRIPT REQUEST by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington for proceedings held on 11/02/2023 before Judge Hon. Scott D. Johnson.. (Rohani, Sara) Modified on 11/6/2023 form sent to Magistrate Judges CRD via email (ELW). (Entered: 11/02/2023) |
| 11/02/2023 | 169 | Minute Entry for proceedings held before Magistrate Judge Scott D. Johnson: Motion Hearing held on 11/2/2023. The parties discussed the issue before the Court on reconsideration (R. Doc. 158). The NAACP clearly has the burden of establishing associational standing. The Court ORDERS the Louisiana NAACP to supplement its Answer to Interrogatory No. 3 by providing both the name and address of the individual member(s) from the challenged districts that the NAACP intends to offer at trial to establish associational standing, or any other part of its claim. Any member not identified in the NAACP's supplemental response will be presumed to be outside the scope of evidence to be offered in the matter by the NAACP. The NAACP must supplement its Answer by 5:00 p.m. (CST) on November 6, 2023. To protect the First Amendment rights of any identified NAACP member, the parties jointly made, and the Court GRANTED, an |

| | | |
|---|---|---|
| | | oral Motion to Modify the current Protective Order (R. Doc. 138) to include information identifying individual members of the Louisiana NAACP, who are not named parties. The Court ORDERS that any discovery or information produced after this Order - whether provided in response to Interrogatory No. 3 or otherwise that concerns the identity of a Louisiana NAACP member, who is not a party to this lawsuit, will be protected by and subject to the terms of the Protective Order (R. Doc. 138) previously entered by the Court. (KAH) (Entered: 11/05/2023) |
| 11/06/2023 | 170 | ORDER: In light of the 169 Minute Entry/Order, the parties are hereby ordered to submit supplemental briefs, if any, in support or opposition of the 149 Joint Motion for Summary Judgment by 11/7/23. Any supplemental briefing should be limited to five pages on the issue of NAACP associational standing. Signed by Chief Judge Shelly D. Dick on 11/6/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 11/06/2023) |
| 11/07/2023 | 171 | RULING denying 148 Motion in Limine. Signed by Chief Judge Shelly D. Dick on 11/7/2023. (SWE) (Entered: 11/07/2023) |
| 11/07/2023 | 172 | Joint SUPPLEMENTAL BRIEF TO 149 Joint MOTION for Summary Judgment filed by R. Kyle Ardoin. (Strach, Phillip) (Entered: 11/07/2023) |
| 11/07/2023 | 173 | SUPPLEMENTAL BRIEF TO 163 Memorandum in Opposition to,,, *Defendants' Summary Judgment Motion* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Second Supplemental Responses to Interrogatories to Organizational Plaintiffs')(Rohani, Sara) (Entered: 11/07/2023) |
| 11/08/2023 | 174 | RULING granting in part and denying in part 156 Motion in Limine. The 156 Motion is DENIED as to Sean Trende, GRANTED in part, and DENIED in part as to Dr. Douglas Johnson, and GRANTED as to Dr. Tumulesh K.S. Solanky. Signed by Chief Judge Shelly D. Dick on 11/8/2023. (SWE) (Entered: 11/08/2023) |
| 11/08/2023 | 175 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Status hearing before Judge Scott D. Johnson held on 11/2/23. Court Reporter: Janice Russell. Phone Number: (757) 422-9089; e-mail: trussell31@tdsmail.com.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/29/2023. Redacted Transcript Deadline set for 12/11/2023. Release of Transcript Restriction set for 2/6/2024. (Russell, J.) (Entered: 11/08/2023) |
| 11/09/2023 | 176 | RULING denying 34 Motion to Convene a Three-Judge Court or in the Alternative, To Certify An Interlocutory Appeal. Signed by Chief Judge Shelly D. Dick on 11/9/2023. (SWE) (Entered: 11/09/2023) |
| 11/09/2023 | 177 | Proposed Findings of Fact by R. Kyle Ardoin. (Strach, Phillip) (Entered: 11/09/2023) |
| 11/09/2023 | 178 | NOTICE of Constitutional Question by R. Kyle Ardoin (Strach, Phillip) (Entered: 11/09/2023) |

| 11/09/2023 | [179](#) | Proposed Findings of Fact by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Brannon, Sarah) (Entered: 11/09/2023) |
|---|---|---|
| 11/13/2023 | [180](#) | Joint REPLY in Support of [149](#) Joint MOTION for Summary Judgment filed by R. Kyle Ardoin. (Attachments: # [1](#) Attachment Reply Statement of Undisputed Material Facts)(Strach, Phillip) (Entered: 11/13/2023) |
| 11/14/2023 | [181](#) | RULING denying [149](#) Motion for Summary Judgment. (SWE) (Entered: 11/14/2023) |
| 11/14/2023 | [182](#) | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Pretrial Conference held on 11/14/2023. Parties discussed matters related to trial. Parties shall comply with the deadlines set forth as stated. (SWE) (Entered: 11/14/2023) |
| 11/22/2023 | [183](#) | MOTION to Enroll Charlton J. Meginley as Additional Attorney by R. Kyle Ardoin (Attachments: # [1](#) Proposed Pleading; Proposed Order)(Walsh, John) (Entered: 11/22/2023) |
| 11/22/2023 | [184](#) | Joint MOTION to Stay by R. Kyle Ardoin (Attachments: # [1](#) Attachment Memorandum in Support of Joint Motion to Stay)(Strach, Phillip) (Entered: 11/22/2023) |
| 11/24/2023 | [185](#) | MEMORANDUM in Opposition to [184](#) Joint MOTION to Stay filed by All Plaintiffs. (Brannon, Sarah) (Entered: 11/24/2023) |
| 11/27/2023 | [186](#) | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/27/2023. For oral reasons given, the Court DENIES the [184](#) Joint Motion to Stay Proceedings. Stipulations and Joint Exhibits are admitted into the record. Witnesses sworn and testified. Court recesses until 11/28/2023 at 9:00 a.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 11/28/2023) |
| 11/27/2023 | [198](#) | ELECTRONIC EXHIBIT List for Bench Trial dated 11/27/2023 to 12/5/2023. (SWE) (Additional attachment(s) added on 2/20/2024: # [1](#) Legislative Defendants Exhibit 42, # [2](#) Legislative Defendants Exhibit 43, # [3](#) Legislative Defendants Exhibit 44, # [4](#) Legislative Defendants Exhibit 45, # [5](#) Legislative Defendants Exhibit 46, # [6](#) Legislative Defendants Exhibit 47, # [7](#) Legislative Defendants Exhibit 48, # [8](#) Legislative Defendants Exhibit 49, # [9](#) Legislative Defendants Exhibit 50, # [10](#) Legislative Defendants Exhibit 51, # [11](#) Legislative Defendants Exhibit 51 part 2, # [12](#) Legislative Defendants Exhibit 52, # [13](#) Legislative Defendants Exhibit 53, # [14](#) Legislative Defendants Exhibit 54, # [15](#) Legislative Defendants Exhibit 58, # [16](#) Legislative Defendants Exhibit 58 part 2, # [17](#) Legislative Defendants Exhibit 59, # [18](#) Legislative Defendants Exhibit 62, # [19](#) Defendant Exhibit 1, # [20](#) Defendant Exhibit 2, # [21](#) Defendant Exhibit 3, # [22](#) Defendant Exhibit 4, # [23](#) Defendant Exhibit 5, # [24](#) Defendant Exhibit 6, # [25](#) Defendant Exhibit 39, # [26](#) Joint Exhibit 1, # [27](#) Joint Exhibit 2, # [28](#) Joint Exhibit 3, # [29](#) Joint Exhibit 4, # [30](#) Joint Exhibit 5, # [31](#) Joint Exhibit 6, # [32](#) Joint Exhibit 7, # [33](#) Joint Exhibit 8, # [34](#) Joint Exhibit 9, # [35](#) Joint Exhibit 10, # [36](#) Joint Exhibit 11, # [37](#) Joint Exhibit 12, # [38](#) Joint Exhibit 13, # [39](#) Joint Exhibit 14, # [40](#) Joint Exhibit 15, # [41](#) Joint Exhibit 16, # [42](#) Joint Exhibit 17, # [43](#) Joint Exhibit 18, # [44](#) Joint Exhibit 19, # [45](#) Joint Exhibit 20, # [46](#) Joint Exhibit 21, # [47](#) Joint Exhibit 22, # [48](#) Joint Exhibit 23, # [49](#) Joint Exhibit 24, # [50](#) Joint Exhibit 25, # [51](#) Joint Exhibit 26, # [52](#) Joint Exhibit 27, # [53](#) Joint Exhibit 28, # [54](#) Joint Exhibit 29, # [55](#) Joint Exhibit 30, # [56](#) Joint Exhibit 31, # [57](#) Joint Exhibit 32, # [58](#) Joint Exhibit 33, # [59](#) Joint Exhibit 34, # [60](#) Joint Exhibit 35) (NLT). (Additional attachment(s) added on 2/20/2024: # [61](#) Joint Exhibit 36, # [62](#) Joint Exhibit 37, # [63](#) Joint Exhibit 38, # [64](#) Joint Exhibit 39, # [65](#) Joint Exhibit 40, # [66](#) Joint Exhibit 41, # [67](#) Joint Exhibit 42, # [68](#) Joint Exhibit 43, # [70](#) Joint Exhibit 44, # [71](#) Joint Exhibit 45, # [72](#) Joint Exhibit 46, # |

73 Joint Exhibit 47, # 74 Joint Exhibit 48, # 75 Joint Exhibit 49, # 76 Joint Exhibit 50, # 77 Joint Exhibit 51, # 78 Joint Exhibit 52, # 79 Joint Exhibit 53, # 80 Joint Exhibit 54, # 81 Joint Exhibit 55, # 82 Joint Exhibit 56, # 83 Plaintiff Exhibit 1, # 84 Plaintiff Exhibit 2, # 85 Plaintiff Exhibit 3, # 86 Plaintiff Exhibit 4, # 87 Plaintiff Exhibit 5, # 88 Plaintiff Exhibit 6, # 89 Plaintiff Exhibit 7, # 90 Plaintiff Exhibit 8, # 91 Plaintiff Exhibit 9, # 92 Plaintiff Exhibit 10, # 93 Plaintiff Exhibit 11, # 94 Plaintiff Exhibit 12, # 95 Plaintiff Exhibit 13, # 96 Plaintiff Exhibit 14, # 97 Plaintiff Exhibit 15, # 98 Plaintiff Exhibit 16, # 99 Plaintiff Exhibit 17, # 100 Plaintiff Exhibit 18, # 101 Plaintiff Exhibit 19, # 102 Plaintiff Exhibit 20, # 103 Plaintiff Exhibit 21, # 104 Plaintiff Exhibit 22, # 105 Plaintiff Exhibit 23, # 106 Plaintiff Exhibit 24, # 107 Plaintiff Exhibit 25, # 108 Plaintiff Exhibit 26, # 109 Plaintiff Exhibit 27, # 110 Plaintiff Exhibit 28, # 111 Plaintiff Exhibit 29, # 112 Plaintiff Exhibit 30, # 113 Plaintiff Exhibit 31, # 114 Plaintiff Exhibit 32, # 115 Plaintiff Exhibit 33, # 116 Plaintiff Exhibit 34, # 117 Plaintiff Exhibit 35, # 118 Plaintiff Exhibit 36, # 119 Plaintiff Exhibit 37, # 120 Plaintiff Exhibit 38, # 121 Plaintiff Exhibit 39, # 122 Plaintiff Exhibit 40, # 123 Plaintiff Exhibit 41, # 124 Plaintiff Exhibit 42, # 125 Plaintiff Exhibit 43, # 126 Plaintiff Exhibit 44, # 127 Plaintiff Exhibit 45, # 128 Plaintiff Exhibit 46, # 129 Plaintiff Exhibit 47, # 130 Plaintiff Exhibit 48, # 131 Plaintiff Exhibit 49, # 132 Plaintiff Exhibit 50, # 133 Plaintiff Exhibit 51, # 135 Plaintiff Exhibit 53, # 136 Plaintiff Exhibit 54, # 137 Plaintiff Exhibit 55, # 138 Plaintiff Exhibit 56, # 139 Plaintiff Exhibit 57, # 140 Plaintiff Exhibit 58, # 141 Plaintiff Exhibit 52, # 142 Plaintiff Exhibit 59, # 143 Plaintiff Exhibit 60, # 144 Plaintiff Exhibit 61, # 145 Plaintiff Exhibit 62, # 146 Plaintiff Exhibit 63, # 147 Plaintiff Exhibit 64, # 148 Plaintiff Exhibit 65, # 149 Plaintiff Exhibit 66, # 150 Plaintiff Exhibit 57, # 151 Plaintiff Exhibit 68, # 152 Plaintiff Exhibit 69, # 153 Plaintiff Exhibit 70, # 154 Plaintiff Exhibit 71, # 155 Plaintiff Exhibit 72, # 156 Plaintiff Exhibit 73, # 157 Plaintiff Exhibit 74, # 158 Plaintiff Exhibit 75, # 159 Plaintiff Exhibit 76, # 160 Plaintiff Exhibit 77, # 161 Plaintiff Exhibit 78, # 162 Plaintiff Exhibit 79, # 163 Plaintiff Exhibit 80, # 164 Plaintiff Exhibit 81, # 165 Plaintiff Exhibit 82, # 166 Plaintiff Exhibit 83, # 167 Plaintiff Exhibit 84, # 168 Plaintiff Exhibit 85, # 169 Plaintiff Exhibit 86) (NLT). (Additional attachment(s) added on 2/20/2024: # 170 Plaintiff Exhibit 87, # 171 Plaintiff Exhibit 88, # 172 Plaintiff Exhibit 89, # 173 Plaintiff Exhibit 90, # 174 Plaintiff Exhibit 91, # 175 Plaintiff Exhibit 92, # 176 Plaintiff Exhibit 93, # 177 Plaintiff Exhibit 94, # 178 Plaintiff Exhibit 95, # 179 Plaintiff Exhibit 96, # 180 Plaintiff Exhibit 97, # 181 Plaintiff Exhibit 98, # 182 Plaintiff Exhibit 99, # 183 Plaintiff Exhibit 100, # 184 Plaintiff Exhibit 101, # 185 Plaintiff Exhibit 102, # 186 Plaintiff Exhibit 103, # 187 Plaintiff Exhibit 104, # 188 Plaintiff Exhibit 105, # 189 Plaintiff Exhibit 106, # 191 Plaintiff Exhibit 107, # 192 Plaintiff Exhibit 108, # 193 Plaintiff Exhibit 109, # 194 Plaintiff Exhibit 110, # 195 Plaintiff Exhibit 111, # 196 Plaintiff Exhibit 112, # 197 Plaintiff Exhibit 113, # 198 Plaintiff Exhibit 114, # 199 Plaintiff Exhibit 115, # 200 Plaintiff Exhibit 120, # 201 Plaintiff Exhibit 122, # 202 Plaintiff Exhibit 124, # 203 Plaintiff Exhibit 125, # 204 Plaintiff Exhibit 116, # 205 Plaintiff Exhibit 126, # 206 Plaintiff Exhibit 127, # 207 Plaintiff Exhibit 128, # 208 Plaintiff Exhibit 129, # 209 Plaintiff Exhibit 130, # 210 Plaintiff Exhibit 131, # 211 Plaintiff Exhibit 132, # 212 Plaintiff Exhibit 133, # 213 Plaintiff Exhibit 134, # 214 Plaintiff Exhibit 135, # 215 Plaintiff Exhibit 163a, # 216 Plaintiff Exhibit 163b, # 217 Plaintiff Exhibit 117, # 218 Plaintiff Exhibit 164, # 219 Plaintiff Exhibit 165, # 220 Plaintiff Exhibit 166, # 221 Plaintiff Exhibit 167, # 222 Plaintiff Exhibit 168, # 223 Plaintiff Exhibit 169, # 225 Plaintiff Exhibit 170, # 226 Plaintiff Exhibit 171, # 227 Plaintiff Exhibit 172, # 228 Plaintiff Exhibit 173, # 229 Plaintiff Exhibit 174, # 230 Plaintiff Exhibit 175, # 231 Plaintiff Exhibit 176, # 232 Plaintiff Exhibit 177, # 233 Plaintiff Exhibit 178, # 234 Plaintiff Exhibit 179, # 235 Plaintiff Exhibit 180, # 237 Plaintiff Exhibit 184, # 238 Plaintiff Exhibit 185, # 239 Plaintiff Exhibit 187, # 240 Plaintiff Exhibit 201, # 241 Plaintiff Exhibit 204, # 242 Plaintiff Exhibit 249, # 243 Plaintiff Exhibit 249a, # 244 Plaintiff Exhibit 250, # 245 Plaintiff Exhibit 250a, # 246 Plaintiff Exhibit 251, # 247

| | | |
|---|---|---|
| | | Plaintiff Exhibit 251a, # 248 Plaintiff Exhibit 252, # 249 Plaintiff Exhibit 252a, # 250 Plaintiff Exhibit 253, # 251 Plaintiff Exhibit 253a, # 252 Plaintiff Exhibit 254, # 253 Plaintiff Exhibit 254a, # 254 Plaintiff Exhibit 255, # 255 Plaintiff Exhibit 255a, # 256 Plaintiff Exhibit 256, # 257 Plaintiff Exhibit 256a, # 258 Plaintiff Exhibit 257) (NLT). (Entered: 12/07/2023) |
| 11/28/2023 | 189 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/28/2023. Witnesses sworn and testified; exhibits filed. Court recesses until Wednesday, November 29, 2023, at 9:00 a.m. (Court Reporter Gina Delatte-Richard and Natalie Breaux.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 11/29/2023) |
| 11/29/2023 | | MOTION(S) REFERRED: 183 MOTION to Enroll Charlton J. Meginley as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 11/29/2023) |
| 11/29/2023 | 187 | Joint MOTION to Dismiss by R. Kyle Ardoin (Attachments: # 1 Attachment Memorandum ISO Motion to Dismiss)(Strach, Phillip) (Entered: 11/29/2023) |
| 11/29/2023 | 188 | ORDER granting 183 Motion to Enroll Additional Attorney. Added attorney Charlton J Meginley for R. Kyle Ardoin. Signed by Magistrate Judge Scott D. Johnson on 11/29/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 11/29/2023) |
| 11/29/2023 | 190 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/29/2023. Witnesses sworn and testified. Exhibits filed. Court recessed until Thursday, 11/30/2023. (Court Reporter S. Thompson and N. Breaux.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 11/30/2023) |
| 11/29/2023 | 191 | Amended Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/29/2023. Witnesses sworn and testified. Plaintiffs rested. Court recessed until Thursday, November 30, 2023, at 9:00 a.m. (Court Reporter S. Thompson and N. Breaux.) (SWE) (Entered: 11/30/2023) |
| 11/30/2023 | 192 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/30/2023. Parties present argument relative to 187 Joint MOTION to Dismiss. Court takes under advisement until the close of evidence. Witnesses sworn and testified. Exhibits filed. Court recesses until Friday, December 1, 2023, at 9:00 a.m. (Court Reporter T. Norton.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) Modified on 12/1/2023 to edit file date (SWE). (Entered: 12/01/2023) |
| 11/30/2023 | 202 | Amended Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 11/30/2023. Counsel present argument relative to Defendants' Rule 52 c Motion. Court takes under advisement until close of evidence. Witnesses sworn and testified. Exhibits filed. Court recessed until Friday, 12/1/2023, at 9:00 a.m. (Court Reporter T. Norton.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 12/11/2023) |
| 12/01/2023 | 193 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 12/1/2023. Witnesses sworn and testified. Exhibits filed. Court recessed until Monday, December 4, 2023, at 9:00 a.m. (Court Reporter S. Thompson and G. Delatte-Richard.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 12/04/2023) |
| 12/04/2023 | 195 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 12/4/2023. Witnesses sworn and testified. Exhibits filed. Court recesses until Tuesday, December 5, 2023, at 10:00 a.m. (Court Reporter S. Thompson and G. Delatte-Richard.) |

| | | |
|---|---|---|
| | | Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 12/05/2023) |
| 12/05/2023 | 194 | Ex Parte MOTION for Garrett Muscatel to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2678970) by All Plaintiffs (Attachments: # 1 Exhibit 1- Declaration of Applicant, # 2 Exhibit 2 - Certificate of Good Standing)(Adcock, John) (Entered: 12/05/2023) |
| 12/05/2023 | 203 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial completed on 12/5/2023. Witnesses sworn and testified on rebuttal. The Court advised the parties that no argument at the close of hearing will be necessary but will allow the parties to submit simultaneous briefs with citations, not to exceed 40 pages. Briefing shall be submitted by close of business on 12/19/2023. Defendants renew their Rule 52c Motion. Court takes matter under advisement. (Court Reporter N. Breaux.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 12/11/2023) |
| 12/06/2023 | | MOTION(S) REFERRED: 194 Ex Parte MOTION for Garrett Muscatel to Appear Pro Hac Vice *for Plaintiffs* (Filing fee $100.00, Receipt Number ALAMDC-2678970). This motion is now pending before the USMJ. (ELW) (Entered: 12/06/2023) |
| 12/06/2023 | 196 | ORDER granting 194 Motion for Garrett Muscatel to Appear Pro Hac Vice. Signed by Magistrate Judge Scott D. Johnson on 12/6/2023.<br><br>ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 12/06/2023) |
| 12/07/2023 | 197 | TRANSCRIPT REQUEST by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington for proceedings held on 11/27/2023-12/05/2023 before Judge Hon. Shelly D. Dick.. (Naifeh, Stuart) (Entered: 12/07/2023) |
| 12/07/2023 | 199 | NOTICE of Intervention Pursuant to 28 U.S.C. § 2403(a) by United States of America (Jack, Justin) (Entered: 12/07/2023) |
| 12/07/2023 | 200 | NOTICE of Appearance of Attorney Representing the United States of America by United States of America (Jack, Justin) (Entered: 12/07/2023) |
| 12/07/2023 | 201 | Certificate of Interested Persons by United States of America identifying Affiliate/Interested Person Louisiana State Conference of the NAACP, Affiliate/Interested Person Dorothy Nairne, Affiliate/Interested Person Black Voters Matter Capacity Building Institute, Affiliate/Interested Person Rose Thompson, Affiliate/Interested Person Steven Harris, Affiliate/Interested Person Nora Ahmed, Affiliate/Interested Person American Civil Liberties Union Foundation of Louisiana, Affiliate/Interested Person Nelson Mullins Riley & Scarborough LLP, Affiliate/Interested Person Clee E. Lowe, Affiliate/Interested Person Adcock Law LLC, Affiliate/Interested Person John Adcock, Affiliate/Interested Person Ronald Lawrence Wilson, Affiliate/Interested Person Sarah E. Brannon, Affiliate/Interested Person Megan C. Keenan, Affiliate/Interested Person Sophia Lin Lakin, Affiliate/Interested Person Dayton Campbell-Harris, Affiliate/Interested Person Luis Manuel Rico Roman, Affiliate/Interested Person the ACLU Foundation of Louisiana, Affiliate/Interested Person Stephanie Legros, Affiliate/Interested Person Cozen O'Connor, Affiliate/Interested Person Michael de Leeuw, Affiliate/Interested Person |

| | | |
|---|---|---|
| | | Amanda Giglio, Affiliate/Interested Person Josephine Bahn, Affiliate/Interested Person Robert S. Clark, Affiliate/Interested Person NAACP Legal Defense & Educational Fund, Affiliate/Interested Person NAACP Legal Defense & Educational Fund, Inc., Affiliate/Interested Person Jared Evans, Affiliate/Interested Person Kathryn C. Sadasivan, Affiliate/Interested Person Leah C. Aden, Affiliate/Interested Person Stuart C. Naifeh, Affiliate/Interested Person Victoria Wenger, Affiliate/Interested Person I. Sara Rohani, Affiliate/Interested Person National Association for the Advancement of Colored People, Affiliate/Interested Person Daniel J. Hessel, Affiliate/Interested Person Tiffany Alora Thomas, Affiliate/Interested Person R. Kyle Ardoin, Affiliate/Interested Person Shows, Cali & Walsh LLP, Affiliate/Interested Person John Carroll Walsh, Affiliate/Interested Person John Clifton Conine, Jr., Affiliate/Interested Person Baker & Hostetler LLP, Affiliate/Interested Person Michael W. Mengis, Affiliate/Interested Person Michael W. Mengis, Affiliate/Interested Person Efrem Mark Braden, Affiliate/Interested Person Erika Dackin Prouty, Affiliate/Interested Person Katherine L. McKnight, Affiliate/Interested Person Patrick T. Lewis, Affiliate/Interested Person Richard B. Raile, Affiliate/Interested Person Robert J. Tucker, Affiliate/Interested Person Alyssa Riggins, Affiliate/Interested Person Cassie Holt, Affiliate/Interested Person Phillip J. Strach, Affiliate/Interested Person Thomas A. Farr, Affiliate/Interested Person Charlton J. Meginley, Affiliate/Interested Person John E. Branch, III, Affiliate/Interested Person Patrick Page Cortez, Affiliate/Interested Person Office of the Louisiana Attorney General, Affiliate/Interested Person Elizabeth Baker Murrill, Affiliate/Interested Person Amanda Marie LaGrone, Affiliate/Interested Person Andrew B. Pardue, Affiliate/Interested Person Angelique Duhon Freel, Affiliate/Interested Person Holtzman Vogel Josefiak Torchinsky PLLC, Affiliate/Interested Person U.S. Attorney's Office, Affiliate/Interested Person MDLA, Affiliate/Interested Person Brennan Bowen, Affiliate/Interested Person Carey T. Jones, Affiliate/Interested Person Jason Brett Torchinsky, Affiliate/Interested Person Jeffrey Michael Wade, Affiliate/Interested Person Phillip Michael Gordon, Affiliate/Interested Person U.S. Department of Justice, Affiliate/Interested Person Alice Washington, Affiliate/Interested Person United States of America, Affiliate/Interested Person State of Louisiana, Affiliate/Interested Person Clay Schexnayder for United States of America. (Jack, Justin) (Entered: 12/07/2023) |
| 12/12/2023 | 204 | TRANSCRIPT REQUEST by R. Kyle Ardoin for proceedings held on 11/27/2023-12/5/2023 before Judge Shelly D. Dick.. (Conine, John) (Main Document 204 replaced on 12/13/2023) (ELW). (Entered: 12/12/2023) |
| 12/19/2023 | 205 | BRIEF regarding *the Constitutionality of Section 2 of the Voting Rights Act*. (Freeman, Daniel) (Entered: 12/19/2023) |
| 12/19/2023 | 206 | Post-Trial Memorandum by R. Kyle Ardoin. (Attachments: # 1 Attachment 1 - Day 1 Trial Transcript, # 2 Attachment 2 - Day 2 Trial Transcript, # 3 Attachment 3A - Day 3 A.M. Trial Transcript, # 4 Attachment 3B - Day 3 P.M. Trial Transcript, # 5 Attachment 4 - Day 4 Trial Transcript, # 6 Attachment 5 - Day 5 Trial Transcript, # 7 Attachment 6 - Day 6 Trial Transcript, # 8 Attachment 7 - Day 7 Trial Transcript, # 9 Exhibit 1 - Trende Figures 5 and 6)(Strach, Phillip) (Entered: 12/19/2023) |
| 12/19/2023 | 207 | TRIAL BRIEF by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Keenan, Megan) (Entered: 12/19/2023) |
| 12/20/2023 | 208 | Joint MOTION to Strike by R. Kyle Ardoin (Attachments: # 1 Attachment Memorandum in Support, # 2 Exhibit 1 - Day 6 AM Transcript Excerpt)(Strach, Phillip) (Entered: 12/20/2023) |
| 12/20/2023 | 209 | |

| | | |
|---|---|---|
| | | RESPONSE in Opposition to 208 Joint MOTION to Strike *Plaintiffs' Trial Brief* filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Attachments: # 1 Pls.' Mem. in Opp. to Mot. to Strike, # 2 Pls.' Trial Br. (corrected signature block))(Keenan, Megan) (Entered: 12/20/2023) |
| 12/20/2023 | 210 | MEMORANDUM in Opposition to 187 Joint MOTION to Dismiss filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. (Keenan, Megan) (Entered: 12/20/2023) |
| 12/21/2023 | 211 | ORDER denying 208 Joint MOTION to Strike . Signed by Chief Judge Shelly D. Dick on 12/21/2023. (LLH) (Entered: 12/21/2023) |
| 12/29/2023 | 212 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 2 (afternoon session) before Chief Judge Shelly D. Dick held on November 28, 2023. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/19/2024. Redacted Transcript Deadline set for 1/29/2024. Release of Transcript Restriction set for 3/28/2024. (Breaux, Natalie) (Entered: 12/29/2023) |
| 12/29/2023 | 213 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 3 (afternoon session) before Chief Judge Shelly D. Dick held on November 29, 2023. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/19/2024. Redacted Transcript Deadline set for 1/29/2024. Release of Transcript Restriction set for 3/28/2024. (Breaux, Natalie) (Entered: 12/29/2023) |
| 12/29/2023 | 214 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 7 before Chief Judge Shelly D. Dick held on December 5, 2023. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at |

| | | |
|---|---|---|
| | | www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/19/2024. Redacted Transcript Deadline set for 1/29/2024. Release of Transcript Restriction set for 3/28/2024. (Breaux, Natalie) (Entered: 12/29/2023) |
| 01/03/2024 | 215 | First MOTION for Angelique Freel to Withdraw as Attorney by State of Louisiana (Attachments: # 1 Proposed Pleading; Proposed Order)(Wale, Jeffrey) (Entered: 01/03/2024) |
| 01/03/2024 | 216 | First MOTION for Jeffrey Wale to Withdraw as Attorney by State of Louisiana (Attachments: # 1 Proposed Pleading; Proposed Order)(Wale, Jeffrey) (Entered: 01/03/2024) |
| 01/03/2024 | 217 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 2 (morning Session) before Chief Judge Shelly D. Dick held on November 28th, 2023. Court Reporter: Gina Delatte-Richard. Phone Number: 225-389-3564.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/24/2024. Redacted Transcript Deadline set for 2/5/2024. Release of Transcript Restriction set for 4/2/2024. (Delatte-Richard, Gina) (Entered: 01/03/2024) |
| 01/03/2024 | 218 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 6 (afternoon session) before Chief Judge Shelly D. Dick held on December 4, 2023. Court Reporter: Gina Delatte-Richard. Phone Number: 225-389-3564.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/24/2024. Redacted Transcript Deadline set for 2/5/2024. Release of Transcript Restriction set for 4/2/2024. (Delatte-Richard, Gina) (Entered: 01/03/2024) |
| 01/04/2024 | | MOTION(S) REFERRED: 216 First MOTION for Jeffrey Wale to Withdraw as Attorney , 215 First MOTION for Angelique Freel to Withdraw as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 01/04/2024) |
| 01/04/2024 | 219 | ORDER granting 216 Motion to Withdraw Jeffrey Wale as Attorney. Signed by Magistrate Judge Scott D. Johnson on 1/4/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: |

| | | |
|---|---|---|
| | | 01/04/2024) |
| 01/09/2024 | 220 | MOTION for Charlton J. Meginley to Withdraw as Attorney by R. Kyle Ardoin (Attachments: # 1 Proposed Pleading; Proposed Order)(Walsh, John) Modified on 1/17/2024 to replace document as per Order # 231 (LLH). (Entered: 01/09/2024) |
| 01/09/2024 | 221 | NOTICE of Substitution by R. Kyle Ardoin (Strach, Phillip) (Entered: 01/09/2024) |
| 01/10/2024 | 222 | ORDER granting 215 Motion to Withdraw Angelique Freel as Attorney. Signed by Magistrate Judge Scott D. Johnson on 1/10/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 01/10/2024) |
| 01/10/2024 | 223 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 11/27/2023. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | 225 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 11/29/2023. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | 226 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 12/4/2023. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | <u>227</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial - Proffered testimony of Michael Barber, Ph.D. before Judge Shelly D. Dick held on 12/4/2023. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | <u>228</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 11/30/2023. Court Reporter: Teri Norton. Phone Number: (601)608-4186. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | <u>229</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Bench Trial before Judge Shelly D. Dick held on 12/01/2023. Court Reporter: Teri Norton. Phone Number: (601)608-4186. <br><br> <span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span> <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/31/2024. Redacted Transcript Deadline set for 2/12/2024. Release of Transcript Restriction set for 4/9/2024. (Thompson, Shannon) (Entered: 01/10/2024) |
| 01/10/2024 | | |

| | | MOTION(S) REFERRED: 220 MOTION for Charlton J. Meginley to Withdraw as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 01/10/2024) |
|---|---|---|
| 01/11/2024 | 230 | MOTION to Substitute 220 Motion to Withdraw Counsel of Record by R. Kyle Ardoin (Attachments: # 1 Proposed Pleading; Motion to Withdraw Counsel of Record, # 2 Proposed Pleading; Proposed Order)(Walsh, John) Modified on 1/17/2024 to create motion linkage (ELW). (Entered: 01/11/2024) |
| 01/17/2024 | | MOTION(S) REFERRED: 230 MOTION to Substitute Motion to Withdraw Counsel of Record . This motion is now pending before the USMJ. (ELW) (Entered: 01/17/2024) |
| 01/17/2024 | 231 | ORDER granting 230 MOTION to Substitute Motion to Withdraw Counsel of Record filed by R. Kyle Ardoin. Signed by Magistrate Judge Scott D. Johnson on 1/17/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 01/17/2024) |
| 01/18/2024 | 232 | ORDER granting 220 Motion to Withdraw Charlton J. Meginley as Attorney. Signed by Magistrate Judge Scott D. Johnson on 1/18/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 01/18/2024) |
| 02/08/2024 | 233 | RULING AND ORDER: The Court finds that the State House and Senate electoral maps enacted by the Louisiana legislature (S.B. 1 and H.B. 14) violate § 2 of the Voting Rights Act. Elections under S.B. 1 and H.B. 14 be and are hereby ENJOINED. The State is hereby permitted a reasonable period of time, to be determined by the Court following submittals by the parties, to address the Court's findings and implement State House and Senate election maps that comply with § 2 of the Voting Rights Act. Signed by Chief Judge Shelly D. Dick on 2/8/2024. (DCB) (Entered: 02/08/2024) |
| 02/08/2024 | 234 | Appendix to 233 Ruling and Order. Signed by Chief Judge Shelly D. Dick on 2/8/2024. (DCB) (Entered: 02/08/2024) |
| 02/12/2024 | 235 | MOTION to Set Schedule for Remedial Proceedings by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Proposed Scheduling Order)(Keenan, Megan) (Entered: 02/12/2024) |
| 02/12/2024 | 236 | MOTION for Scheduling Conference by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Keenan, Megan) (Entered: 02/12/2024) |
| 02/13/2024 | 237 | MOTION for Special Election and Expedited Briefing Schedule by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Memorandum in Support, # 2 Proposed Order Granting Expedited Briefing, # 3 Proposed Order Granting Special Election)(Keenan, Megan). Added MOTION for Expedited Briefing Schedule on 2/14/2024 (ELW). (Entered: 02/13/2024) |
| 02/14/2024 | 238 | ORDER: Defendants and Intervenors are hereby ORDERED to file responses to Plaintiffs Motion to Set Schedule for Remedial Proceedings 235 and Motion for Special Election 237 on or before 10 AM on Tuesday, February 20, 2024. The Court hereby sets this matter for a Scheduling Conference at 2pm on February 21, 2024, in Courtroom 3. Enrolled Counsel only. Set Hearings: Scheduling Conference set for 2/21/2024 at 02:00 PM in Courtroom 3 before Chief Judge Shelly D. Dick. Enrolled Counsel only. Counsel may participate by telephone upon seeking leave of Court. Signed by Chief Judge Shelly |

| | | |
|---|---|---|
| | | D. Dick on 02/14/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(ELW) Modified on 2/14/2024 to edit text (ELW). (Entered: 02/14/2024) |
| 02/15/2024 | 239 | Consent MOTION for Leave to Appear by Videoconference by United States of America (Attachments: # 1 Attachment Proposed Order)(Freeman, Daniel) (Entered: 02/15/2024) |
| 02/16/2024 | 240 | Ex Parte MOTION for Leave to Participate Remotely by Phillip DeVillier, Cameron Henry (Attachments: # 1 Proposed Pleading; proposed Order)(Mengis, Michael) (Entered: 02/16/2024) |
| 02/19/2024 | 241 | NOTICE OF APPEAL to the USCA for the 5th Circuit by R. Kyle Ardoin. Filing fee $ 605, receipt number ALAMDC-2714527. The transcript request form for appeal cases is located at www.lamd.uscourts.gov/local-forms/all-local-forms. (Strach, Phillip) (Entered: 02/19/2024) |
| 02/19/2024 | 242 | NOTICE OF APPEAL to the USCA for the 5th Circuit of 233 Order,, by State of Louisiana. Filing fee $ 605, receipt number BLAMDC-2714637. The transcript request form for appeal cases is located at www.lamd.uscourts.gov/local-forms/all-local-forms. (Jones, Carey) (Entered: 02/19/2024) |
| 02/19/2024 | 243 | Ex Parte MOTION for Leave to Permit Some Plaintiffs' Counsel to Participate Remotely in Scheduling Conference by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Proposed Order)(Keenan, Megan) (Entered: 02/19/2024) |
| 02/20/2024 | 244 | MEMORANDUM in Opposition to 237 MOTION for Special Election and Expedited Briefing Schedule MOTION for Expedited Hearing filed by State of Louisiana. (Jones, Carey) (Entered: 02/20/2024) |
| 02/20/2024 | 245 | ORDER granting 239 MOTION filed by United States of America for Leave to Appear at the status conference remotely. Counsel for the United States be is hereby granted leave to participate by Telephone.. Signed by Chief Judge Shelly D. Dick on 2/20/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 02/20/2024) |
| 02/20/2024 | 246 | ORDER granting 240 Ex Parte MOTION for Leave to Participate Remotely filed by Phillip DeVillier, Cameron Henry. Movants are hereby granted leave to participant in the status conference scheduled on 2/21/2024 by telephone.Signed by Chief Judge Shelly D. Dick on 2/20/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 02/20/2024) |
| 02/20/2024 | 247 | ORDER granting 243 Ex Parte MOTION for Leave to Permit Some Plaintiffs' Counsel to Participate Remotely in Scheduling Conference filed by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington. Movants are hereby granted leave to participate in the Status Conference scheduled on 2/21/2024 by telephone.. Signed by Chief Judge Shelly D. Dick on 2/21/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 02/20/2024) |
| 02/21/2024 | 248 | ORDER: The Scheduling Conference set for February 21, 2024, at 2:00 pm in Courtroom 3 is CANCELLED. Signed by Chief Judge Shelly D. Dick on 2/21/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 02/21/2024) |

| 02/22/2024 | 249 | MOTION for Leave to File Reply Motion in Support of Special Elections by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Keenan, Megan) (Entered: 02/22/2024) |
|---|---|---|
| 02/26/2024 | 250 | USCA Case Number 24-30115 for 241 Notice of Appeal to the USCA for the 5th Circuit, filed by R. Kyle Ardoin, 242 Notice of Appeal to the USCA for the 5th Circuit, filed by State of Louisiana. (NLT) (Entered: 02/26/2024) |
| 02/29/2024 | 251 | MOTION for John E. Branch, III to Withdraw as Attorney by R. Kyle Ardoin (Attachments: # 1 Attachment - Proposed Order)(Branch, John) (Entered: 02/29/2024) |
| 03/01/2024 | 252 | TRANSCRIPT REQUEST by State of Louisiana re 242 Notice of Appeal to the USCA for the 5th Circuit, (Torchinsky, Jason) (Entered: 03/01/2024) |
| 03/01/2024 | | MOTION(S) REFERRED: 251 MOTION for John E. Branch, III to Withdraw as Attorney . This motion is now pending before the USMJ. (NLT) (Entered: 03/01/2024) |
| 03/01/2024 | 253 | ORDER granting 251 Motion to Withdraw John E. Branch, III as Attorney. Signed by Magistrate Judge Scott D. Johnson on 3/1/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (KAH) (Entered: 03/01/2024) |
| 03/05/2024 | 254 | MOTION for Scheduling Conference by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Alice Washington (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Proposed Order Granting Alternative Remedial Schedule)(Keenan, Megan) (Entered: 03/05/2024) |
| 03/06/2024 | 255 | NOTICE OF APPEAL to the USCA for the 5th Circuit of 233 Order,, 234 Order by Phillip DeVillier, Cameron Henry. Filing fee $ 605, receipt number ALAMDC-2723066. The transcript request form for appeal cases is located at www.lamd.uscourts.gov/local-forms/all-local-forms. (Mengis, Michael) (Entered: 03/06/2024) |
| 03/06/2024 | 256 | NOTICE of Briefing Schedule on 254 MOTION for Scheduling Conference : Opposition to the motion shall be filed BY 3/13/2024. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/06/2024) |
| 03/06/2024 | 257 | MOTION for Colin Burke to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2723483) by Black Voters Matter Capacity Building Institute, Steven Harris, Louisiana State Conference of the NAACP, Clee E. Lowe, Dorothy Nairne, Rose Thompson, Alice Washington (Attachments: # 1 Certificate of Good Standing, # 2 Declaration/Oath, # 3 Proposed Order)(Adcock, John) (Entered: 03/06/2024) |
| 03/11/2024 | 258 | TRANSCRIPT REQUEST by R. Kyle Ardoin re 241 Notice of Appeal to the USCA for the 5th Circuit, (Strach, Phillip) (Entered: 03/11/2024) |
| 03/11/2024 | 259 | TRANSCRIPT REQUEST by R. Kyle Ardoin re 241 Notice of Appeal to the USCA for the 5th Circuit, (Strach, Phillip) (Entered: 03/11/2024) |
| 03/11/2024 | 260 | TRANSCRIPT REQUEST by R. Kyle Ardoin re 241 Notice of Appeal to the USCA for the 5th Circuit, (Strach, Phillip) (Entered: 03/11/2024) |
| 03/11/2024 | 261 | TRANSCRIPT REQUEST by R. Kyle Ardoin re 241 Notice of Appeal to the USCA for the 5th Circuit, (Strach, Phillip) (Entered: 03/11/2024) |
| 03/11/2024 | 262 | |

| | | |
|---|---|---|
| | | TRANSCRIPT REQUEST by R. Kyle Ardoin re 241 Notice of Appeal to the USCA for the 5th Circuit, (Strach, Phillip) (Entered: 03/11/2024) |
| 03/11/2024 | 263 | MOTION to Substitute Transcript Order Form by State of Louisiana (Attachments: # 1 Proposed Pleading; Transcript Order Form, # 2 Proposed Pleading; Order to Allow Substitution)(Jones, Carey) (Entered: 03/11/2024) |

**Case #: 3:22-cv-00178-SDD-SDJ**

# TAB 2

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**DR. DOROTHY NAIRNE, et al.**                    **CIVIL ACTION**

**VERSUS**                                        **NO. 22-178-SDD-SDJ**

**R. KYLE ARDOIN, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF STATE**

---

### ORDER DENYING DEFENDANT'S MOTION TO COMPEL

---

Before the Court is Defendant Kyle Ardoin's Motion to Compel (R. Doc. 132) the

Louisiana NAACP's supplemental response to Interrogatory No. 3, which seeks the following

information:

> **Interrogatory No. 3:**
> As to each Louisiana State House and State Senate District at issue in the
> Complaint, and for each Organizational Plaintiff, state the following identifying to
> which district the response relates:
>
> (a)     Identify the members of your organization living in each challenged district
> . . . .

(R. Doc. 119-3 at 12). Defendant's discovery requests elsewhere explain that to "identify" an

individual, the responding party should provide: "his or her full name, present or last known

address and telephone number, date of birth, and present or last known job classification or

position." (R. Doc. 119-3 at 5). Defendant argues that, because the NAACP must establish that it

has associational standing to bring its claim of vote dilution on behalf of its members, it must

therefore provide a list of all its members in each challenged district.

In support of its position, Defendant references the Court's prior citation to *LULAC v. Abbott*, 2022 WL 2806850, at *7 (W.D. Tex. July 18, 2022), emphasizing that in *LULAC*, the organization disclosed the identities of certain members under seal in order to establish standing. (R. Doc. 132-1 at 8). But Defendant ignores that the organization in *LULAC* only provided that information under seal because its standing was being challenged. And even in the face of that challenge, the Court still did everything possible to protect the identities of the organization's members, highlighting the importance of the First Amendment's associational privilege.

Here, there has been no challenge to the NAACP's associational standing by any of its opponents, and the Court has not requested additional information from the NAACP on standing. Under similar circumstances, the Supreme Court has found an organization's statements — that it was a "statewide political caucus" with the "purpose" of "endorsing candidates . . . responsible to the needs" of "Blacks and other minorities and poor people" — taken together with the testimony of its representative — that the organization "has members in almost every county in Alabama" — was "sufficient to meet the [organization's] burden of establishing standing." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 269-70 (2015) ("That is to say, it seems highly likely that a 'statewide' organization with members in 'almost every county,' the purpose of which is to help 'blacks and other minorities and poor people,' will have members in each majority-minority district."). The Supreme Court went on to find the organization "reasonably believed that, in the absence of a state challenge or a court request for more detailed information, it need not provide additional information such as a specific membership list." *Alabama Legislative Black Caucus*, 575 U.S. at 270.

Here, there has been no challenge to the NAACP's associational standing. The Court finds this critical. Indeed, it narrows the amount of information reasonably necessary to establish

standing and makes the additional information sought by Defendant disproportionate to the needs of this case. What's more, the NAACP intends to establish its associational standing with evidence similar to that described by the Supreme Court as "sufficient" in *Alabama Legislative Black Caucus*, 575 U.S. at 270. The NAACP also maintains that it has produced all evidence it intends to rely on for associational standing. And so, given both the absence of any standing challenge and the evidence on which the NAACP intends to rely, the Court finds any additional information concerning the identities of the NAACP's members is not proportional to the needs of this case and therefore beyond the scope of permissible discovery.[1]

As a final matter, even if Defendant had made some showing to overcome Plaintiff's First Amendment objections, the Court's conclusion would remain the same based on the request, as written. Defendant has not provided any reason to justify its request for the name, address, age, phone number, and occupation of every single member in every challenged district.[2] Simply put, Interrogatory No. 3 if overly broad, and the Court would not compel a response to the request, as written. Therefore,

**IT IS ORDERED** that Defendant's Motion to Compel (R. Doc. 132) is **DENIED**. Despite its refusal to compel any supplemental answer to Interrogatory No. 3, the Court still reminds the

---

[1] The Court has defined the scope of discovery relating the NAACP's members based on this litigation's current posture. Indeed, were the NAACP's standing to later be challenged by any party or even sua sponte, that would seemingly alter the posture of the litigation and the scope of discovery. In that situation, "elementary principles of procedural fairness" would likely "require[]" that the NAACP have "an opportunity to provide evidence of member residence." *Alabama Legislative Black Caucus*, 575 U.S. at 271. This may warrant some amount of additional discovery, as well.

[2] In their Motion to Compel, Defendant states: "It is noteworthy that Louisiana NAACP's proposed supplemental interrogatory response reveals otherwise—that their members reside only in a third of the challenged districts in Louisiana. (R. Doc. 132-1 at 5). But this statement seems to imply that all 39 Senate Districts and all 105 House Districts are being challenged, which is not the case. Instead, the Court has reviewed the proposed supplemental response, and it makes clear that a member has been identified in each of the challenged district, listing out each challenged district to be sure. (R. Doc. 132-2 at 2); (R. Doc. 135 at 2). As a final matter, this Order (or any past Order by the undersigned related to this discovery issue) should not be construed as the Court rendering any opinion on the number or types of districts relevant to standing inquiry.

parties of their ongoing obligations to not only disclose the information on which they intend to rely at trial, Fed. R. Civ. P. 26(a)(1), but to timely update any prior disclosures or discovery responses that may be incomplete, Fed. R. Civ. P. 26(e)(1)(A). The Court also reminds the parties that the Federal Rules of Civil Procedure and Evidence are designed to ensure fairness and have built-in mechanisms aimed at preventing trial by ambush. *See* Fed. R. Civ. P. 37(c)(1).

Signed in Baton Rouge, Louisiana, on September 8, 2023.

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

# TAB 3

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**DR. DOROTHY NAIRNE, et al.**                          **CIVIL ACTION**

**VERSUS**                                             **NO. 22-178-SDD-SDJ**

**R. KYLE ARDOIN, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF STATE**

---

## ORDER

The issue before the Court for reconsideration[1] concerns the scope of discovery related to the Louisiana NAACP's associational standing, including the discoverability of its members' identities. (R. Doc. 158). On September 8, 2023, this Court issued an Order (R. Doc. 136) denying Defendant Kyle Ardoin's Motion to Compel (R. Doc. 132) the Louisiana NAACP's supplemental response to Interrogatory No. 3, which sought the identities of the NAACP's members "living in each challenged district." (R. Doc. 119-3 at 12).

"[C]ritical" to the Court's decision on September 8, 2023, was the lack of any formal challenge[2] — in any responsive pleading or dispositive motion — to the NAACP's associational standing. (R. Doc. 136 at 2). Indeed, the Court's Order explained:

---

[1] The district judge granted Defendant's Objection (R. Doc. 144) to the Court's September 8, 2023 discovery Order (R. Doc. 136) denying Defendant's Motion to Compel (R. Doc. 132) and referred the issue for reconsideration based on Defendant's recent challenge to the Louisiana NAACP's associational standing (R. Doc. 149).

[2] The Court is aware that Defendant disagrees on this point. In its Objection to the prior Order, Defendant summarily claims it has continuously challenged the NAACP's associational standing throughout this litigation. (R. Doc. 144-1 at 8) ("Defendant has continuously challenged and attempted to probe Plaintiffs' representations that Louisiana NAACP has identified members in each challenged district in the Amended Complaint—first in the Answer, Rec. Doc. 32, and most recently at the 30(b)(6) deposition of Mr. McClanahan."). It has not.

The Court previously reviewed the responsive pleadings and any dispositive motions in connection with September 8, 2023 Order and has again reviewed those filings in connection with this reconsideration. It has found no formal challenge to the NAACP's associational standing prior to September 8, 2023.

> The Court has defined the scope of discovery relating the NAACP's members based on this litigation's current posture. Indeed, were the NAACP's standing to later be challenged by any party or even sua sponte, that would seemingly alter the posture of the litigation and the scope of discovery. In that situation, 'elementary principles of procedural fairness' would likely 'require' that the NAACP have 'an opportunity to provide evidence of member residence.' This may warrant some amount of additional discovery, as well.

(R. Doc. 136 at 3 n.1) (quoting *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015)). The Court also found that Interrogatory No. 3 was overly broad as written, which independently warranted denial of the Motion to Compel, regardless of the associational standing issue.

On October 6, 2023, however, the posture of this litigation changed. On that day, Defendant filed a dispositive motion that for the first time challenged the NAACP's associational standing. (R. Doc. 149-1) (Defendant's Motion for Summary Judgment). In light of this formal challenge, the district judge referred this matter for reconsideration of discovery related to the NAACP's associational standing, including the identities of any of its members. (R. Doc. 158).

As the Court previously explained, "elementary principles of procedural fairness" would likely require that the NAACP have an opportunity to provide additional evidence if their associational standing were challenged, which may also "warrant some amount of additional discovery." (R. Doc. 136 at 3 n.1). Now, given Defendant's dispositive motion (R. Doc. 149) and the district judge's referral for reconsideration, additional discovery related to the NAACP's associational standing now seems warranted. However, Interrogatory No. 3, which focuses on this very issue, remains overbroad, and the Court will not compel the NACCP to respond the interrogatory, as written.

Instead, the Court will **discuss** and **resolve** this **discovery issue** — i.e., the scope, extent and timing of additional discovery that may be warranted as to the NAACP's associational standing[3] — with the parties at a Zoom **Video Conference** on **November 2, 2023, at 11:00 a.m.**

The parties are additionally **ORDERED** to meaningfully **confer** by **phone** or **in-person** ahead of the Conference and should make every possible effort to **resolve** this issue and reach an **agreement** ahead of the Conference **without the Court's involvement**.

If the parties **reach an agreement** ahead of the Conference, and the Court is confident that they will, the parties **must** either: (1) file a joint **Motion to Cancel** the Conference, which should include details of their agreement (i.e., scope, extent and timing of any additional discovery); or (2) **attend** the Conference in order to provide details of their agreement to the Court.

Signed in Baton Rouge, Louisiana, on October 26, 2023.

_[signature]_

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[3] *See generally, Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) ("An association has standing to bring claims on behalf of its members when (1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation."); *United States v. Hays*, 515 U.S. 737, 744-45 (1995) ("Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action.").

# TAB 4

Case: 24-30115    Document: 199    Page: 78    Date Filed: 07/17/2024

24-30115.6900

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

DOROTHY NAIRNE, *et al*

           CIVIL ACTION

*versus*

           22-178-SDD-SDJ

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

## <u>RULING</u>

Before the Court is Plaintiffs' *Omnibus Motion in Limine* to exclude opinion testimony from Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky.[1] Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, and Intervenor-Defendants, the State of Louisiana, through Louisiana Attorney General Jeff Landry, and Patrick Page Cortez and Clay Schexnayder, in their respective official capacities as President of the Louisiana Senate and Speaker of the Louisiana House of Representatives ("Legislative Defendant-Intervenors") (collectively, "Defendants") jointly oppose the Motion.[2]

## LAW AND ANALYSIS

The Court's analysis is guided by Federal Rules of Evidence 702 and 703, as well as *Daubert*[3] and its progeny. *Daubert* instructs district courts to ensure expert testimony is "both reliable and relevant."[4] Even if the expert's methodology for developing an opinion is reliable, that methodology must also have been correctly applied to the facts in order for the testimony to be relevant.[5] The Court incorporates by reference its discussion of

---

[1] Rec. Doc. 156.
[2] Rec. Doc. 160.
[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).
[4] *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 597).
[5] *See Daubert*, 509 U.S. at 593.

the applicable legal framework in its *Ruling* denying the *Motion in Limine* as to Dr. Lisa Handley.[6]

## I.    MOTION TO EXCLUDE SEAN TRENDE

Defendant Ardoin engaged Mr. Trende to provide opinion testimony on the compactness of the minority populations within Mr. Cooper's illustrative majority-minority districts. Trende used two algorithms to draw BVAP groupings within a district, stopping once the algorithm grouped together enough BVAP to constitute a majority within the district. Namely, Trende employed a moment of inertia ("MOI") analysis and "an areal variation of the Chen & Rodden method."[7] Trende reaches the conclusion that the minority populations in the illustrative districts proposed by Mr. Cooper are not derived from compact minority populations of sufficient numerosity to constitute a majority of the illustrative districts. [8]

Plaintiffs argue that Trende's methods are irrelevant, unreliable, have no support in the political science community, and have not been accepted by any Court.[9]

### A.  Relevance

The first *Gingles* precondition requires that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district."[10] The "compactness" precondition "focuse[s] on geographical compactness and

---

[6] Rec. Doc. 171.
[7] Rec. Doc. 160, p. 3; Rec. Doc. 16-2.
[8] Rec. Doc. 162-2.
[9] Rec. Doc. 156-1.
[10] *Allen v. Milligan*, 599 US 1 (2023), citing *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248, 595 U.S. 398, 402 (2022).

Case: 24-30115    Document: 199    Page: 79    Date Filed: 07/17/2024

24-30115.6901

numerosity, [] 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'"[11]

The VRA §2 compactness inquiry looks to compactness of the minority population.

> [I]n the equal protection context, [] compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller v. Johnson*, 515 U.S. 900, 916–917, 115 S.Ct. 2475, 132 L.Ed.2d 762. Under § 2, by contrast, the injury is vote dilution, so the compactness inquiry considers "the compactness of the minority population, not ... the compactness of the contested district." *Vera*, 517 U.S., at 997, 116 S.Ct. 1941. A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *Id.*, at 979, 116 S.Ct. 1941.[12]

Hence, the opinions that Trende proposes to offer are relevant. The question is whether his opinions are based on sufficient facts or data, the product of reliable principles and methodology, and whether the conclusions reached reflect a reliable application of the principles and methods to the facts of the case. [13]

## B. Reliability

"Trende uses two algorithms to draw BVAP groupings within a district, stopping once the algorithm has grouped together enough BVAP to constitute a majority within a district."[14] Plaintiffs argue that using the MOI algorithm in this manner goes against the scientific norms of political science because MOI should be used to generate or measure whole districts as opposed to pockets or clusters of minority votes within a district.[15] Plaintiffs argue that this methodology ignores "other redistricting criteria that might inform a whole district, such as equal population, contiguity, and communities of interest."[16]

---

[11] *Allen v. Milligan*, 143 S. Ct. 1487, 1503, 599 U.S. 1, 18, citing, *Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed.2d 388 (1993).

[12] *League of United Latin American Citizens v. Perry,* 126 S. Ct. 2594, 2600, 548 U.S. 399, 402 (2006).

[13] Fed. R. of Evid. 702, considering imminent revisions and the comments associated therewith.

[14] Rec. Doc. 156-1.

[15] Rec. Doc. 156-1, n.1.

[16] Rec. Doc. 156-1, p.4.

Case: 24-30115    Document: 199    Page: 80    Date Filed: 07/17/2024

24-30115.6902

Trende was engaged for the limited purpose "to determine whether the populations in the districts were compact -- the minority populations in the districts were compact,"[17] and to identify "a compact population within a district that's already been drawn."[18] He did not consider other traditional redistricting criteria.[19] Plaintiffs do not argue that the use of MOI for this limited purpose yields unreliable results. Rather, the argument is that MOI is most often applied to measure compactness district wide. While the use of MOI to measure compactness within a proposed district may be unconventional, the Court finds Trende's opinions are based on sufficient facts or data, are the product of reliable principles and methodology, and the conclusions reached, while narrow in scope, reflect a reliable application of the principles and methods to the facts of the case. The *Daubert*/FRE 702 inquiry is not concerned with which party is right. The scope of Trende's findings and the interplay of other redistricting criteria can be aptly explored in cross-examination at trial.

Plaintiffs further argue that Trende's second method of analyzing compactness of populations within the illustrative districts, the *Chen and Rodden* algorithm, was improvidently employed and thus unreliable. Plaintiffs argue that the *Chen and Rodden* methodology "focus[es] on whole districts and create[s] statewide maps" and "controls for both equal population and contiguity."[20] Trende admits that his use of the *Chen and Rodden* algorithm does not control for contiguity and does not equalize populations.[21] The Plaintiffs maintain that Trende's methodology deviates from the *Chen and Rodden* model in weighing district size and population, which results in an over emphasis on urban

---

[17] Rec. Doc. 156-3, pp. 58-59.
[18] *Id.* at p. 85.
[19] *Id.* at p. 59.
[20] Rec. Doc. 156-1, p. 8.
[21] Rec. Doc. 156-3, pp. 83, 100.

populations. Again, the *Daubert*/FRE 702 inquiry is not concerned with which party is right. Trende's deviation from *Chen and Rodden's* accepted methodology, may render it less useful and less probative but it does not make his limited analysis unreliable.  The failure to control for contiguity and population parity can be aptly explored in cross-examination at trial.

The Court finds that Secretary Ardoin, the proponent of Trende's opinions, has demonstrated that the opinions are relevant to the compactness inquiry and the methodologies used reliably measure compactness of minority populations within districts. The relative weight to be accorded to Trende's compactness methodology as compared to Mr. Cooper's methodology and the ultimate value of each in establishing or rebutting *Gingles I* is an issue for trial. The *Motion* to exclude Mr. Trende is DENIED.

## II.    MOTION TO EXCLUDE DR. DOUGLAS JOHNSON

Dr. Johnson was retained by the Legislative Intervenors to analyze the illustrative maps prepared by William Cooper. By his Declaration,[22] he states that he will offer opinions:

- on "whether race appears to be the predominate consideration used in drawing those maps,"

- to "identify the scope of changes between" the "the 2022 Illustrative Maps and the 2023 Illustrative Maps," and

- to identify whether there is sufficient evidence to support "Key Regions" referenced in the 2023 illustrative maps.

---

[22] Rec. Doc. 156-7.

Case: 24-30115    Document: 199    Page: 82    Date Filed: 07/17/2024

24-30115.6904

## A. RACIAL PREDOMINANCE

When it comes to considering race in the context of districting, we have made clear that there is a difference "between being aware of racial considerations and being motivated by them." Miller, 515 U.S. at 916, 115 S.Ct. 2475; see also North Carolina v. Covington, 585 U. S. ——, ——, 138 S.Ct. 2548, 2553, 201 L.Ed.2d 993 (2018) (*per curiam*). The former is permissible; the latter is usually not. That is because "[r]edistricting legislatures will ... almost always be aware of racial demographics," Miller, 515 U.S. at 916, 115 S.Ct. 2475, but such "race consciousness does not lead inevitably to impermissible race discrimination," Shaw, 509 U.S. at 646, 113 S.Ct. 2816. *Section 2 itself "demands consideration of race."* *31 Abbott, 581 U. S., at ——, 138 S.Ct., at 2315. *The question whether additional majority-minority districts can be drawn, after all, involves a "quintessentially race-conscious calculus."* De Grandy, 512 U.S. at 1020, 114 S.Ct. 2647.[23]

Plaintiffs persuasively argue that Dr. Johnson should not be permitted to opine as to Mr. Cooper's subjective intent in drawing the illustrative map in this case. The Court agrees. The Defendants do not contend that Dr. Johnson has a specialty, discipline or expertise in discerning a person's subjective intent in decision making. Dr. Johnson is simply unqualified[24] to opine on Cooper's subjective intent. Furthermore, the question of what considerations drove the mapmaking is ultimately a question for the trier of fact.

Citing *Cooper v. Harris*, Defendants argue that *"[t]he plaintiff may make* the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both."[25] Defendants argue that Johnson may "draw inferences from 'circumstantial' idicia of intent'" to opine that Mr.

---

[23] *Allen v. Milligan*, 599 US 1, 30-31 (2023) (emphasis added)
[24] *Moyer v. Siemens Vai Services, LLC*, 2013 WL 12231281, at *2 (E.D.La., 2013) (FRE 702 requires an opinion witness to be qualified "by knowledge, skill, experience, training or education" in the field "in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." citing, *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). . . . "'A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.'" *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).).
[25] *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

Cooper's map drawing was racially motivated.[26] The *Cooper v. Harris* case presented challenges to *legislatively enacted plans* on the grounds that the State-enacted plans were the result of racial gerrymandering in violation of the Fourteenth Amendment.[27] A key distinction between the illustrative maps advanced by the Plaintiffs and the maps at issue in *Cooper* and *Bethune-Hill* are that the latter involve State action.[28] The purpose of illustrative maps is to demonstrate that it is possible to draw additional majority-minority State House and Senate districts, while minding other redistricting criteria. Mr. Cooper, the map drawer, is not an arm of the State, and thus reliance on the Fourteenth Amendment is misplaced. The Court does not read Section 2 VRA precedent as requiring that the Fourteenth Amendment Equal Protection analysis be piggybacked onto the *Gingles I* analysis. Rather, the question is whether Mr. Cooper's maps respect the Section 2 proportionality proviso. The Supreme Court instructs that "properly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality."[29] Thus, as it relates to criticisms of Cooper's maps, the relevant inquiry is his respect and adherence to the *Gingles I* and redistricting criteria. The Court will not permit Dr. Johnson to testify about his subjective beliefs or opinions of Mr. Cooper's motives when drawing the illustrative maps. The Court will permit opinion testimony from Dr. Johnson regarding how the majority-minority districts[30] proposed in Cooper's 2023 illustrative maps compare to the enacted plan on the relevant metrics, such as compactness and numerosity, and relevant redistricting criteria.

---

[26] Rec. Doc. 160, p. 18.
[27] *Cooper v. Harris*, 581 U.S. 285, 291 (2017). Likewise, *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S.178 (2017) relied upon by defendants also presented a 14th Amendment challenge to legislature enacted maps.
[28] *Id.*
[29] *Allen v. Milligan*, 599 US 1, 26 (2023).
[30] Senate Districts 39, 17 and 19 and House Districts 1, 23, 60, 65 and 68. Rec. Doc. 156-3.

### B. COMPARISON OF 2022 AND 2023 ILLUSTRATIVE MAPS

In July 2022, Mr. Cooper submitted illustrative maps.[31] This case was stayed by Order of this Court pending the United States Supreme Court's decision in *Allen v. Milligan*.[32] After this case was re-opened in 2023, Cooper submitted new illustrative maps[33] with what he describes reflect "minor changes."[34] Dr. Johnson spills much ink comparing Cooper's 2022 illustrative maps with his 2023 illustrative maps and implying racial motive for the changes.[35] The Court will exclude any testimony that compares the illustrative maps prepared in 2022 with those prepared in 2023. It is irrelevant and not helpful to the Court as the trier of fact to spend precious trial time comparing various versions of illustrative maps. The issue before the Court is whether the totality of circumstances show that the "political processes leading to nomination or election" of State House and Senate members "are not equally open to participation" to voters who are "any part black" so that these voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[36] A comparison of illustrative maps offers nothing probative on this question, is unhelpful, and is a waste of judicial and party resources. Dr. Johnson will not be permitted to offer opinion testimony on the differences between Mr. Cooper's 2022 and 2023 illustrative maps. The *Motion in Limine* is GRANTED in this respect.

---

[31] Rec. Doc. 156-7, p. 3.
[32] Rec. Doc. 79.
[33] Rec. Doc. 156-7, p. 3.
[34] Rec. Doc. 159.
[35] Rec. Doc. 156-7.
[36] 52 USC 10301.

### C. THE ENACTED PLAN

Dr. Johnson dedicates 10 pages of his report pointing out that Mr. Cooper did not use the actual 2022 enacted plan for his analysis.[37] Mr. Cooper candidly concedes that "my initial declarations mistakenly relied on plans that were developed in legislative committees during the 2022 redistricting process rather than the final plans enacted by the Legislature and signed into law by Governor Edwards."[38] Upon learning of his error, he updated his "June 29, 2023 Declaration to accurately reflect the Enacted Plan."[39]

Dr. Johnson will not be permitted to offer opinion testimony critical of the initial error in Mr. Cooper's assumptions. It is unhelpful, irrelevant, and a waste of judicial and party resources.

### D. KEY REGIONS OPINIONS

As stated, the Court will not permit Dr. Johnson to testify about Mr. Cooper's subjective intent. Conclusory statements like if he "actually considered" key communities he "would not have drawn a map in that way" are pejorative and unnecessary.[40] Johnson may testify as to municipal and regional splits data but will not be permitted to draw subjective conclusions as to Mr. Cooper's state of mind. Johnson concedes that "correlation itself, does not indicate causation."[41] What, if anything, the data suggests about the map maker's intent is a question for the trier of fact.

---

[37] Rec. Doc. 156-7 ¶¶ 47 -67.
[38] Rec. Doc. 156-9.
[39] Id.
[40] Rec. Doc. 156-7 ¶¶ 36, 38, 40, 45.
[41] Rec. Doc. 156-8.

### E. RELIABILITY

In *Common Cause v. Lewis*,[42] Johnson "was accepted by the Court as an expert in the fields of political science, political geography, [and] redistricting," but joining at least four other Courts, the court in *Lewis* rejected his opinions as unreliable.[43] In *Covington v. North Carolina*,[44] as in this case, Johnson used the BVAP thresholds in the proposed majority-minority districts to fuel his subjective conclusion that the mapmaker "impermissibly pursued racial targets." The district court in *Covington* afforded virtually no weight to Dr. Johnson's opinions. In summary, Dr. Johnson was not excluded pre-trial, but his opinions garnered little respect from the courts, sitting as fact finders.

The Court finds that because of the procedural posture of this case, pretrial exclusion of Dr. Johnson is unsound. This case is scheduled for a trial on the merits. If the plaintiffs prove liability, *i.e.,* a violation of § 2 of the Voting Rights Act, a remedy will have to be addressed. Stated another way, if there is § 2 liability, the illustrative maps may become, or at a minimum inform, remedial maps. Whether remedial maps are the product of legislation or court order that State action must withstand Equal Protection scrutiny. Hence, in this case, the Court will permit Dr. Johnson to give opinion testimony regarding redistricting criteria and data underlying the 2023 illustrative maps.

---

[42] *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *95 (N.C. Super., Wake County Sep. 03, 2019); Rec. Doc. 156-10, p. 269 (¶ 645).

[43] Rec. Doc. 156-10, p. 270 (¶ 648) ("Dr. Johnson has testified as a live expert witness in four cases previously, and the courts in all four cases have rejected his analysis. Tr. 1886:21-1891:14; *see Covington*, 283 F. Supp. 3d at 450 (finding 'Dr. Johnson's analysis and opinion . . .unreliable and not persuasive'); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1137 (E.D.Cal. 2018) (holding that defendants' argument based on Dr. Johnson's analysis 'lacks merits'); *Garrett v. City of Highland*, 2016 WL 3693498, at *2 (Cal. Super. Apr. 06, 2016) (finding  Dr. Johnson's methodology 'inappropriate'); *Jauregui v. City of Palmdale*, No.BC483039, 2013 WL 7018375, at *2 (Cal. Super. Dec. 23, 2013) (describing Dr. Johnson's work in the case was 'unsuitable' and 'troubling'). This Court joins these other courts in rejecting Dr. Johnson's methodologies, analyses, and conclusions.").

[44] 283 F. Supp. 3d 410, 449 (M.D.N.C, 2018).

Case: 24-30115    Document: 199    Page: 87    Date Filed: 07/17/2024

24-30115.6909

For the forgoing reasons the Plaintiffs' *Motion in Limine* to exclude opinion testimony by Dr. Johnson is GRANTED IN PART AND DENIED IN PART, as set forth above.

## III.    MOTION TO EXCLUDE DR. TUMULESH K.S. SOLANKY

Dr. Solanky, a mathematician from University of New Orleans, was retained by Secretary of State Ardoin to rebut the *Gingles II and III* opinions of Dr. Lisa Handley.[45] Plaintiffs move for pretrial exclusion of Dr. Solanky's opinions on the grounds that his methodology is unreliable, and his conclusions are unsubstantiated and irrelevant.

In a nutshell, Dr. Solanky crunches data and concludes that voting in Louisiana is becoming increasingly more polarized along party lines and that voters in urban areas prefer democratic candidates. First, he evaluates party affiliation trends,[46] which he opines reveal an upward trend of voters registering republican and a downward trend of voters registering democrat. "[T]he percentage of registered democrats voting in state-wide elections in Louisiana has decreased over the years while the percentage of registered republicans voting has increased."[47] In other words, voter turnout is stronger among republicans. Then, Solanky analyzes race and party affiliation, concluding that "[t]he percentage of registered white democrats has somewhat steadily decreased, [whereas] [t]he percentage of registered white republicans has steadily increased."[48] He opines that the voter turnout among white democrats has steadily decreased, whereas

---

[45] Defendants submit that "Dr. Solanky did not opine on Mr. Cooper's report directly, he did directly opine on Dr. Handley's analyses which purportedly were on the "areas of interest" in which Mr. Cooper's illustrative majority-minority districts were drawn." Rec. Doc. 160, n.15.
[46] Dr. Solanky analyzes 12 Statewide elections, including 3 that had no minority (Black) candidate at the State-wide and precinct levels. Rec. Doc. 148-5.
[47] Rec. Doc. 148-5, p. 8.
[48] *Id.* at p. 10.

Case: 24-30115    Document: 199    Page: 88    Date Filed: 07/17/2024

24-30115.610

the turnout among white republicans has steadily increased while turnout among black democrats has remained steady.[49]

Plaintiffs argue that "voter partisan preference" has no bearing on the inquiry of whether voting is racially polarized. The Court agrees. There is no explanation of how or why statewide or precinct specific party affiliation trends are probative of racially polarized voting. The implied, but unstated assumption is that black voters vote democrat. This is at best an unsupported assumption and at worst a gross generalization.[50]

Next, using ecological inference (EI) on five selected parishes[51] and twelve elections, three of which featured no black candidate, he opines that "there is significant variation from parish to parish in the percentage of white and black voters voting for a democrat or republican candidate."[52] The *Gingles II and III* inquiry is not advanced by analyzing outcomes in elections where there is no black candidate.  An opinion which ascribes preferences between black and white voters to party affiliation is a red herring.

Finally, looking at 2020 and 2022 statewide election returns in four parishes, EBR, Caddo, Iberville, and Point Coupee,[53] he concludes that "the percentage of white voters who voted for a republican . . . steadily decreases [in more] densely populated [areas]" and conversely "the percentage of white voters who voted for a democrat . . . steadily increases [in more] densely populated [areas]."[54] Presumably, this is an attempt to

---

[49] *Id.* at p. 11.
[50] In fact, in his report, Dr. Solanky acknowledges that the statistics from election numbers 7, 8 and 11 (1/4 of the elections evaluated) do not support the proposition that black voters vote for the democrat. Rec. Doc. 148-5, ¶26.
[51] EBR, WBR, East Carroll, Natchitoches and Orleans.
[52] Rec. Doc. 148-5, ¶31.
[53] The Parishes in "Area of Interest 3" in the Handley report.
[54] Rec. Doc. 148-5, ¶ IV, pp. 17-27.

Case: 24-30115    Document: 199    Page: 89    Date Filed: 07/17/2024

24-30115

demonstrate white cross-over voting. The Court finds that data set is so limited that the conclusions reached are unreliable.

Dr. Solanky disclosed no scientific method for his data selection in picking the five parishes he evaluated or for limiting his data set to two elections. Furthermore, his conclusions do not reflect a reliable application of his methods to the facts of the case. Furthermore, the confidence intervals were so wide as to render his conclusions meaningless.[55] Furthermore, Dr. Solanky's density analysis relies upon data from only two elections. An expert's conclusions must be based on "sufficient facts or data."[56] The Court finds these are insufficient facts or data from which to draw such far reaching conclusions about the correlation, if any, between population density and voter behavior. On this point, the Defendants urge this Court to let this go to the weight and not admissibility. Defendants argue that "as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[57] This is the practice that is expressly disapproved by the imminent rules' changes. "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)."[58] The Court declines the invitation to punt this to the "weight" of the evidence.

---

[55] For example, "in the "most dense" areas of East Baton Rouge, Dr. Solanky estimated that somewhere between 18.4% and 60.7% of white voters voted for a Republican in the 2022 Senate election." Rec. Doc. 156-1 citing to Rec. Doc. 148-5, p 53.
[56] FRE 702(b).
[57] Rec. Doc. 160, p. 30, citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).
[58] COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, REPORT OF THE JUDICIAL CONFERENCE COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, E-11 (Sept. 2022) (accessible at https://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments).

Case: 24-30115    Document: 199    Page: 90    Date Filed: 07/17/2024

24-30115.6912

Finally, the Court finds that Dr. Solanky's opinions are irrelevant. The Court has no doubt that Dr. Solanky is a skilled and qualified mathematician and statistician, but his expertise is an "imprecise match" for the legal question at issue: Whether "the minority group . . . is politically cohesive" and "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."[59] Dr. Solanky offers utterly no opinion on racially polarized voting. The sum and substance of his opinion is that voting behavior can be explained by or correlates to partisan preference, turnout by party affiliation, and population density. While interesting, it is simply not the *Gingles II and III* inquiry. The Plaintiffs' *Motion in Limine* to exclude Dr. Solanky is GRANTED.

## CONCLUSION

For the above-stated reasons, The Plaintiffs' *Motion in Limine* (Rec. Doc. 156) is hereby:

DENIED as to Sean Trende,

GRANTED in part, and DENIED in part as to Dr. Douglas Johnson, and

GRANTED as to Dr. Tumulesh K.S. Solanky.

**IT IS ORDERED.**

Baton Rouge, Louisiana, this 8th day of November 8th, 2023.

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[59] *Allen v. Milligan*, 599 U.S. 1, 18 (quoting *Gingles*, 478 U.S. at 51).

# TAB 5

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

DOROTHY NAIRNE, *et al*

*versus*

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

CIVIL ACTION

22-178-SDD-SDJ

## RULING

Before the Court is a *Joint Motion for Summary Judgment*[1] filed by Defendants, R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana; Attorney General Jeff Landry on behalf of the State of Louisiana; and by the Legislative Intervenors Clay Schexnayder and Patrick Page Cortez (collectively, "Defendants").[2] Plaintiffs, Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris, the Louisiana State Conference of the NAACP, and the Black Voters Matter Capacity Building Institute (collectively, "Plaintiffs"), filed an *Opposition*,[3] and Defendants filed a *Reply*.[4] The parties also submitted supplemental briefing.[5] For the reasons that follow, the Court finds that the Defendants' *Motion* shall be DENIED.

## I.     BACKGROUND

Plaintiffs, a group of Black Louisianans and Louisiana nonprofit organizations, filed the instant action on March 14, 2022, alleging that the 2022 redistricting plans for the Louisiana House of Representatives and State Senate unlawfully diluted their votes in

---

[1] Rec. Doc. 149.
[2] Although Defendant Secretary of State Ardoin did not join in the *Motion to Stay*, the movants aver that he was consulted and "consent[s] to the relief sought herein." Rec. Doc. 61, p. 2.
[3] Rec. Doc. 163.
[4] Rec. Doc. 180.
[5] Rec. Doc. 172; Rec. Doc. 173.

24-30115.7191

violation of § 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301. Four Individual Plaintiffs and two Entity Plaintiffs remain in this matter. The four Individual Plaintiffs, Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris, reside in House Districts 25, 60, 66, and 69 and Senate Districts 2, 16, and 29.[6]

Black Voters Matter Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP" or "NAACP") (collectively, the "Entity Plaintiffs") serve as the two Entity Plaintiffs to this matter. The Entity Plaintiffs describe themselves as "non-profit civic engagement organizations working to empower Black political participation."[7] Defendants move for summary judgment, arguing that the Entity Plaintiffs are unable to establish standing to bring this suit.

Prior to filing the *Motion for Summary Judgment,* Defendants propounded discovery on Plaintiffs, requesting the personal identifying information of the Louisiana NAACP's members. Plaintiffs objected to Defendants' Interrogatory No. 3 for several reasons, including that it sought "information protected by Plaintiff's and its members' First Amendment rights."[8] Defendants filed a *Motion to Compel* production of the information, which was denied by Magistrate Judge Scott D. Johnson.[9] Thereafter, Defendants moved the Court for a review of the decision, claiming that the requested membership information was relevant to the determination of whether the NAACP had associational standing to pursue its claims.[10] The Court agreed that associational

---

[6] Rec. Doc. 163-1, pp. 2–3.
[7] Rec. Doc. 163, p. 4.
[8] Rec. Doc. 119-4, p. 9.
[9] Rec. Doc. 132; Rec. Doc. 136.
[10] Rec. Doc. 144.

24-30115.7192

standing had been challenged by Defendants and referred the Defendants' *Motion to Compel* a response to Interrogatory No. 3 back to the Magistrate Judge for reconsideration.[11] Plaintiffs were ordered to supplement the Answer to Interrogatory No. 3 by "providing both the name and address of the individual member(s) from the challenged districts that the NAACP intends to offer at trial to establish associational standing, or any other part of its claim."[12]

After Plaintiffs provided the information as ordered, the parties were permitted to file supplemental briefs relating to the associational standing issue in support or in opposition to the *Motion for Summary Judgment*.[13] Therein, Defendants argue that Plaintiffs' supplemental response to Interrogatory No. 3 is untimely, prejudicial to Defendants, and would be inappropriately considered by the Court.[14] However, given the history stated above, Defendants' insistence on supplementation of this information, and the Court's *Order* compelling disclosure of the information, the Court rejects Defendants' argument. Plaintiffs' Supplemental Response to Interrogatory No. 3 will be considered on summary judgment.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15] "When assessing whether a dispute to any material fact exists, we consider all

---

[11] Rec. Doc. 158; Rec. Doc. 159.
[12] Rec. Doc. 169, p. 2.
[13] Rec. Doc. 170.
[14] Rec. Doc. 172.
[15] Fed. R. Civ. P. 56(a).

3

of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[16] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[17] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[18] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[19]

Notably, "[a] genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[20] All reasonable factual inferences are drawn in favor of the nonmoving party.[21] However, "[t]he court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[22] "Conclusory allegations unsupported by specific facts . . . will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his

---

[16] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[17] *Guerin v. Pointe Coupee Par. Nursing Home*, 246 F. Supp. 2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986)).

[18] *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[19] *Willis v. Roche Biomedical Labs.*, *Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

[20] *Pylant v. Hartford Life & Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[21] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[22] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (internal citations omitted).

4

allegations . . . to get to a jury without "any significant probative evidence tending to support the complaint.""[23]

## B. Article III Standing

"Article III standing is a jurisdictional prerequisite."[24] If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim.[25] The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[26] Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[27] "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue."[28] The United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements":[29]

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before

---

[23] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

[24] *Crenshaw-Logal v. City of Abilene, Tex.*, 436 F. App'x. 306, 308 (5th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)).

[25] *Whitmore v. Ark.*, 495 U.S. 149, 154–55 (1990); *Chair King, Inc. v. Hous. Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997), *abrogated by Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012).

[26] *The M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).

[27] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted)). *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 492–493 (2009).

[28] *Raines*, 521 U.S. at 818. *See also Summers*, 555 U.S. at 492–493; *DaimlerChrysler Corp.*, 547 U.S. at 342; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[29] *Lujan*, 504 U.S. at 560.

the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[30]

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent."[31] A particularized injury is one which "affect[s] the plaintiff in a personal and individual way."[32] "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[33] "Allegations of *possible* future injury" do not suffice.[34]

When standing is challenged at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" because on a motion to dismiss, it is presumed that "general allegations embrace those specific facts that are necessary to support the claim."[35] "When the defendant moves for summary judgment because of lack of standing, however, the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue."[36]

### C. Standing of Parties

Defendants question whether the four Individual Plaintiffs will be able to prove their standing at trial but do not move for summary dismissal of the Individual Plaintiffs' claims.[37] Instead, Defendants concede that the Individual Plaintiffs may proceed to trial on their claims, where they will be put to their burden of proof.[38] The question for summary

---

[30] *Id.* at 560–61 (internal citations and quotation marks omitted).
[31] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).
[32] *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560 n.1).
[33] *Lujan*, 504 U.S. at 564 n.2 (internal quotation marks omitted).
[34] *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (emphasis added).
[35] *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (quoting *Meadowbriar Home for Child., Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996); *Lujan*, 504 U.S. at 561).
[36] *Id.* (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991)).
[37] Rec. Doc. 149-1, p. 17.
[38] *Id.*

judgment, therefore, is whether the Entity Plaintiffs, BVM and the NAACP, have standing to proceed.

When a plaintiff is an organization, "the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"[39] Organizational and associational standing are alternative paths for the plaintiff organization to satisfy Article III standing. For example, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."[40] A plaintiff's specific claims determine which one type of standing must be satisfied, as it depends on who suffered the injury alleged and what relief is sought.[41] Here, Plaintiffs concede that BVM does not have associational standing. Therefore, the Court will begin its analysis by assessing the associational standing of the NAACP.

### a. *Associational Standing of NAACP*

An organization has the associational standing necessary to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[42] Because the organization's members should

---

[39] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).
[40] *Warth v. Seldin*, 422 U.S. 490, 511 (1975).
[41] *Warth*, 422 U.S. at 515 ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.").
[42] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

otherwise have standing to sue in their own right, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."[43] The relief sought, such as a declaration, injunction, or other form of prospective relief, also must be for "the benefit of those members of the association actually injured."[44] Defendants do not challenge the second and third elements of associational standing, and the Court finds that the Louisiana NAACP satisfies those elements.[45]

Turning to the first element, Defendants claim the NAACP is unable to prove that its members would have standing to sue because the NACCP does not have "individual members." Rather, Defendants claim the Louisiana NAACP's members are local NAACP affiliate branches, which are separate legal entities.[46] In response, Plaintiffs point to the testimony and declaration of Louisiana NAACP President Michael McClanahan to explain that individuals join a local NAACP affiliate branch, and, in turn, the local branches make up the Louisiana NAACP.[47] Plaintiffs further claim that per the NAACP's bylaws, individuals become national NAACP members when they join a local branch.[48]

---

[43] *Hunt*, 432 U.S. at 342 (quoting *Warth*, 422 U.S. at 511).
[44] *Warth*, 422 U.S. at 515.
[45] *See Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x. 189, 197 (5th Cir. 2012) ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission."). *See also Consumer Data Indus. Ass'n v. Tex. through Paxton*, 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023) ("Participation of individual members generally is not required when the association seeks prospective or injunctive relief, as opposed to damages.").
[46] Rec. Doc. 149-1, p. 7.
[47] Rec. Doc. 163-1, p. 11.
[48] Rec. Doc. 163-1, p. 11.

24-30115.7198

The Fifth Circuit has expressed that courts should "not exalt form over substance" when assessing membership for associational standing.[49] Accordingly, the individuals who make up the branches of the Louisiana NAACP can be said to be "members" of the NAACP for purposes of associational standing. This leaves the question of whether the members would otherwise have standing to sue in their own right.

The injury-in-fact inquiry requires the Plaintiffs to show the existence of at least one NAACP member who is a black registered voter residing in each dilutive district that could be redrawn into a new majority-black district. At the time the *Motion for Summary Judgment* was filed, Plaintiffs had not disclosed the personally identifiable information of the individual members to confirm they suffered a cognizable injury-in-fact as a result of the challenged maps. However, they have since disclosed such information for ten NAACP members.[50] Defendants argue the disclosures are insufficient because, as they aver, Plaintiffs are essentially challenging all 105 state House and 39 state Senate Districts, yet "no evidence demonstrates that at least one identified member can claim vote dilution in each challenged district."[51] Defendants are laboring under a misapprehension of the law.

In the context of a vote dilution claim under Section 2, the relevant standing inquiry is not whether Plaintiffs represent every single district in the challenged map but whether Plaintiffs have made "supported allegations that [they] reside in a reasonably compact area that could support additional [majority-minority districts]."[52] The Fifth Circuit in

---

[49] *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (citing *Hunt*, 432 U.S. at 345.

[50] Rec. Doc. 173-1.

[51] Rec. Doc. 149-1, p. 6.

[52] *Pope v. Cnty. of Albany*, 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *5 (N.D.N.Y. Jan. 28, 2014). *See also Perez v. Abbott*, 267 F. Supp. 3d 750, 775 (W.D. Tex. 2017), *aff'd in part, rev'd in part and remanded*, 138 S. Ct. 2305 (2018) (three-judge panel holding that "plaintiffs who reside in a reasonably compact area

9

*Harding v. County of Dallas, Texas*, explained that, "[i]n vote dilution cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district.'"[53] Plaintiffs herein have pled such harm and supported the claims with summary judgment evidence. Eight of the individuals identified in the Plainitffs' Supplemental Response (those residing in HD 1, 25, 60, 65, and 68 and in SD 8, 17, and 38) reside in districts in which the Black population has allegedly been "cracked" by being dispersed "into districts in which they constitute an ineffective minority," while two (those residing in HD 34 and 101) reside in districts in which the black population has allegedly been "packed" by being "concentrat[ed] into districts where they constitute an excessive majority."[54] Either form of vote dilution is an injury sufficient to establish standing.

As the Fifth Circuit counsels, "[t]hat is enough."[55] Accordingly, the Court rejects Defendants' argument that the members of the NAACP, and therefore the organization itself, lacks standing. Having found that the Plaintiffs have sufficiently shown standing exists as to the NAACP, the Court turns to whether BVM has standing to proceed.

### b. *Organizational Standing of BVM*

An organization "can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"[56] The organizational Plaintiffs must demonstrate the same "injury-in-fact," traceability, and redressability required of individual plaintiffs. The Fifth Circuit has held that nonprofit organizations can suffer an Article III injury when

---

that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district").

[53] *Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 307 (5th Cir. 2020).

[54] Rec. Doc. 173, p. 4. *See Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

[55] *Harding*, 948 F.3d at 307.

[56] *OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Fowler*, 178 F.3d at 356).

24-30115.7200

a defendant's actions frustrate their missions and force them to "divert [ ] significant resources to counteract the defendant's conduct."[57] Organizational standing based on resource diversion arises when "the defendant's conduct significantly and 'perceptibly impair[s]' the organization's ability to [conduct] its 'activities—with the consequent drain on the organization's resources . . . .' Such injury must be 'concrete and demonstrable.'"[58] "Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[59]

BVM's Senior State Organizer Omari Ho-Sang submitted a declaration explaining that BVM's "core mission is to expand Black voter engagement and increase power in marginalized, predominantly Black communities."[60] BVM "works primarily in Black communities and other communities of color that face unique barriers to voting" and "focuses on removing those barriers and increasing voter registration and turnout."[61] The organization seeks to accomplish its "core mission" by "providing voter education and encouragement, advocating for policies to expand voting rights and access, and providing assistance and financial grants that enable its partner organizations to engage in on-the-ground efforts to mobilize voters."[62]

Ho-Sang submits that when the Legislature first introduced the challenged maps, "BVM shifted its efforts from educating and mobilizing voters and building capacity in its community partners toward redistricting education and advocacy around S.B. 1 and H.B. 14."[63] Defendants argue that the harm suffered by BVM in the form of its "redistricting

---

[57] *N.A.A.C.P. v. City of Kyle, Texas*, <u>626 F.3d 233, 238</u> (5th Cir. 2010).
[58] *Id.* (internal citations omitted).
[59] *Id.*
[60] Rec. <u>Doc. 163-4, p. 2</u>.
[61] Rec. <u>Doc. 163-4, pp. 2</u>–3.
[62] *Id.* at 3.
[63] Rec. <u>Doc. 163-4, p. 6</u>.

takeover and mobilization" efforts only occurred when the Louisiana legislature was deliberating over the redistricting plans of S.B. 1 and H.B. 14, but before the challenged plans were adopted.[64] In other words, Defendants argue that BVM cannot show the harm it suffered resulted from the enactment of the allegedly unlawful maps because the same costs would have been expended had the legislature ultimately selected BVM's desired plans instead of the plans it now challenges.

However, BVM alleges that the harm it suffers is ongoing. Specifically, the non-profit organization claims that as long as the allegedly unlawful maps remain in place, BVM will need to continue diverting resources away from its core activities. The organization claims that it will instead need to focus its efforts on engaging with elected officials that represent black voters in the allegedly packed and cracked districts and convincing black voters who believe the maps dilute their voting power that their votes still matter. While the enactment of S.B. 1 and H.B. 14 are undeniably at odds with the mission of BVM, "the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary—though not alone sufficient—to establish standing."[65]

The Fifth Circuit instructs that "concrete evidence" is required to show an organization's diversion of resources is a direct response to a defendant's challenged actions in order to satisfy the injury, traceability, and redressability prongs of Article III standing.[66] For instance, the organizational plaintiff in *Association of Community Organizations for Reform v. Fowler* challenged Louisiana's alleged lack of compliance

---

[64] Rec. Doc. 149-1, p. 13.
[65] *Fowler*, 178 F.3d at 361.
[66] *Tex. State LULAC v. Elfant*, 52 F.4th 248, 255 (5th Cir. 2022), *cert. denied sub nom. Tex. State Lulac v. Torres*, 22-809, 2023 WL 6377790 (U.S. Oct. 2, 2023).

with the National Voter Registration Act ("NVRA"), which required the state to facilitate voter registration at public aid offices.[67] Concrete evidence was presented showing that the organization had to concentrate its efforts in areas where households had low rates of voter registration by regularly conducting registration drives in "welfare waiting rooms, unemployment offices, and on Food Stamp lines."[68] The court found that this detailed showing was sufficient evidence that the organization had "expended resources registering voters in low registration areas who would have already been registered if [Louisiana] had complied with the [public aid] requirement under the NVRA."[69]

Notably, the Fifth Circuit also counsels that, "[n]ot every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[70] The court explained that "[t]he mere fact that an organization redirects some of its resources," for instance, to litigation and legal counseling, in response to actions or inactions of another party "is insufficient to impart standing upon the organization."[71] In *NAACP v. City of Kyle, Tex.*, the Fifth Circuit found that the Home Builders Association of Greater Austin ("HBA") did not have organizational standing in a Fair Housing Act case where it alleged injury based on a new city housing ordinance because the HBA failed to allege how the activities it undertook in response to the challenged ordinance "differ[ed] from the HBA's routine lobbying activities."[72]

The allegations here, however, assert a significant redirection of the organization's routine and customary operational efforts. BVM's declaration explains that now that the

---

[67] *Ass'n of Cmty. Orgs. for Reform v. Fowler*, 178 F.3d 350, 360 (5th Cir.1999).
[68] *Id.* at 361.
[69] *Id.*
[70] *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir.2010).
[71] *Id.*
[72] *Id.*

13

maps have taken effect, BVM has had to shift its efforts "toward fighting against the effects of voter dilution" in the parishes where the maps dilute the voting strength of black voters.[73] It also claims that it will devote time and resources to educating people on the redistricting process and will have to "redouble its efforts to engage Black voters and convince them that their vote matters."[74] BVM gives the specific example of diverting its resources away from its core activities and toward developing an "accountability strategy" to hold elected officials accountable, hosting a virtual freedom school to train BVM's partner organizations about how their representatives impact the community, and pushing back on harmful changes made by elected officials who do not represent BVM's communities.[75]

BVM has presented evidence demonstrating how the diversion of resources from its broader voter registration and community empowerment initiatives and toward protecting the representation and interests of its constituents "perceptibly impairs" its "mission to achieve equitable political representation for Black voters across the entire state."[76] As argued by BVM, "[i]t is the specific dedication of substantial resources to activities that were not planned and that would not be conducted but for the challenged redistricting plan that constitutes the injury, [which] is sufficient to establish injury-in-fact for standing purposes."[77] Based on the summary judgment evidence presented, BVM has raised a genuine issue of material fact that its purpose is in direct conflict with the allegedly

---

[73] Rec. Doc. 163-4, p. 7.

[74] Rec. Doc. 163-4, p. 8.

[75] Id.

[76] N.A.A.C.P. v. City of Kyle, Tex., 626 F.3d 233, 238 (5th Cir. 2010). Rec. Doc. 163-4, p. 8–9.

[77] Rec. Doc. 163, p. 21 (internal citations omitted).

14

unlawful maps. Accordingly, BVM has met the constitutional standing requirements for purposes of defeating Defendants' summary judgment *Motion*.

### c. *Statutory Standing*

Defendants claim the Entity Plaintiffs lack statutory standing to bring a challenge under § 2 of the VRA because § 2's private right of action does not extend to organizations. However, Defendants fail to cite any case in support of this position.[78] Contrary to Defendants' assertion, organizations and private parties have historically been permitted to enforce § 2 of the VRA.[79] Accordingly, Defendants' argument is without merit.

## III.   CONCLUSION

For the above-stated reasons, the *Motion for Summary Judgment*[80] is hereby DENIED.

**IT IS ORDERED.**

Baton Rouge, Louisiana, this 14th day of November, 2023.

*Shelly D. Dick*

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[78] Rather, Defendants rely on cases brought by candidates or local governments to argue that organizational plaintiffs are not "aggrieved persons" within the meaning of the VRA. Such cases are inapposite to the instant matter. *See* Rec. Doc. 149-1, pp. 13–17.

[79] *Veasey v. Perry*, 29 F. Supp. 3d 896, 906–07 (S.D. Tex. 2014) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Indianapolis Branch of the NAACP and the Marion County Democratic Central Committee, among other organizations, were parties to the § 2 challenge of a photo identification law); *LULAC v. Perry*, 548 U.S. 399 (2006) (LULAC challenged Texas redistricting plan under § 2); *Johnson v. DeGrandy*, 512 U.S. 997 (1994) (The State Conference of NAACP Branches sued on a voter dilution challenge under § 2); *Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (the Louisiana Voter Registration/Education Crusade challenged voter dilution under § 2); *LULAC v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012) (LULAC challenged voter dilution under § 2)).

[80] Rec. Doc. 149.

24-30115.7205

# TAB 6

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

MINUTE ENTRY:
NOVEMBER 14, 2023
CHIEF DISTRICT JUDGE SHELLY D. DICK

DOROTHY NAIRNE, et al

versus

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

CIVIL ACTION

22-178-SDD-SDJ

     This matter came on this day for a *Pretrial Conference*.

     PRESENT:   All counsel listed on attached Sign-in Sheet.

     The Court provided additional days for trial.  November 27 - December 7, 2023, and December 11-12, 2023, beginning at 9:00 a.m.

     Defendants discussed a proffer of Dr. Solanky opinion testimony. The parties will come to an agreement on whether it will be a proffer of his reports and/or a testimonial proffer.

     Defendants expressed a desire to depose the individual NAACP members disclosed in discovery relative to the question of NAACP associational standing. The Plaintiffs represented that the individual, non-party NAACP members will not be called as witnesses. The plaintiffs offered to make Dr. Michael McClanahan, the President of the NAACP, available pre-trial for additional deposition by the Defendants regarding facts pertaining to associational standing of the NAACP.

     The Parties stipulated to the authenticity and admissibility of expert reports of any expert called to testify at trial.

The parties stipulated to the authenticity and admissibility of materials from the Legislative record on State and House redistricting.

The Court does not require Pretrial Memoranda.

The Court does not require and will not entertain Opening Statements.

The deadline to upload exhibits into the Judicial Exhibit Recording System (JERS) is Monday November 20, 2023.

The deadline to file deposition extracts is Friday November 24th, 2023.

* * * * *

CV 38c; 30 mins.

Case: 24-30115    Document: 199    Page: 110    Date Filed: 07/17/2024

24-30115.7207

**CV 22-178-SDD-SDJ**
**Nairne v. Ardoin, et al.**
**TUESDAY, November 14, 2023**
**Pretrial Conference**

**Sign-In Sheet:**

Please sign and print your name and the name of the party you represent.

| Signature | Name (Please Print Legibly) | Party Represented |
|---|---|---|
| *[signature]* | Megan Keenan | Plaintiffs |
| *[signature]* | STUART NAIFEH | Plaintiffs |
| *[signature]* | Amanda Giglio | Plaintiffs |
| *[signature]* | John Adcock | Plaintiffs |
| *[signature]* | Sarah Brannon | Plaintiffs |
| *[signature]* | MICHAEL MENGIS | Leg. Intervenors |
| *[signature]* | Robert Tucker | Leg. Intervenors |
| *[signature]* | Phil Strach | Defendant |
| *[signature]* | Angelique Freel | Defendant - Int., State AG |
| *[signature]* | CAREY JONES | D-Intervenor, State |
| | | |
| | | |
| | | |
| | | |
| | | |

24-30115.7208

# TAB 7

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

DOROTHY NAIRNE, *et al*

versus

CIVIL ACTION

22-178-SDD-SDJ

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

## **RULING AND ORDER**

Plaintiffs, a group of Black Louisianans and two nonprofit organizations, brought this suit against Kyle Ardoin, the Louisiana Secretary of State in his official capacity, alleging that the 2022 redistricting plans for the Louisiana House of Representatives and State Senate unlawfully dilute Black voting strength in violation of § 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301.[1] Patrick Page Cortez, the President of the Louisiana State Senate, and Clay Schexnayder, the Speaker of the Louisiana House of Representatives, intervened in the suit as Defendants, as did Louisiana Attorney General Jeff Landry (collectively, "the Intervenor Defendants").[2]

This matter came before the Court for a seven-day non-jury trial on the merits beginning November 27, 2023 and ending December 5, 2023. Thereafter, Plaintiffs and Defendants (along with the Intervenor Defendants) filed post-hearing briefs.[3] The Court has considered the Parties' pre-trial and post-trial submissions, the evidence admitted at trial, and the arguments presented, and the Court finds that Plaintiffs have satisfied their burden of proving that the Louisiana State House and Senate electoral maps enacted by the Louisiana Legislature (S.B. 1 and H.B. 14) violate § 2 of the VRA.

---

[1] Rec. Doc. 14.
[2] Rec. Doc. 13; Rec. Doc. 33.
[3] Rec. Doc. 206; Rec. Doc. 207.

24-30115.9122

Throughout the reasons that follow, the Court makes credibility findings, findings of fact, and conclusions of law. In fidelity to Rule 52(a) and for ease of review, the Court appends separately enumerated findings of facts and conclusions of law to its opinion.

## I.   FACTUAL BACKGROUND

The Louisiana State Legislature is responsible for drawing the boundaries of the state legislative districts. The number of state legislative districts is set by the Louisiana State Constitution. Pursuant to La. Const. art. III, § 3, there are 39 State Senate districts and 105 State House districts. In 2021, the Legislature adopted Joint Rule 21, which sets forth the criteria that any redistricting plan submitted for consideration by the Legislature must satisfy. Each redistricting plan must comply with the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution; § 2 of the VRA, and all other applicable federal and state laws.[4] Joint Rule 21 also requires that each legislative redistricting plan: (1) provide for single-member districts; (2) comprise districts that have a population as nearly equal to the ideal district population as practicable; and (3) be a whole plan which assigns all of the geography of the State.[5] Additionally, "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable."[6]

Plaintiffs, a group of Black Louisianans and Louisiana nonprofit organizations, filed this suit seeking a preliminary injunction on March 14, 2022, alleging that the 2022 redistricting plans for the Louisiana House of Representatives and State Senate

---

[4] Joint-56, Joint Rule 21.
[5] *Id.*, § D.
[6] *Id.*, § H.

2

unlawfully diluted their votes in violation of § 2 of the VRA.[7] The Court converted the matter to a trial on the merits on June 21, 2023.[8]

## II.  APPLICABLE LAW

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[9] *Thornburg v. Gingles* sets forth three threshold conditions for a claim of vote dilution under § 2: "first, that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."[10]

"The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population."[11] "Unless these points are established, there neither has been a wrong nor can [there] be a remedy."[12] Consequently, if Plaintiffs fail to establish any one of these three conditions, the Court need not consider the other two.[13]

---

[7] Rec. Doc. 14.
[8] Rec. Doc. 93.
[9] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).
[10] *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citing *Gingles*, 478 U.S. at 50–51).
[11] *Id.* (citations omitted).
[12] *Id.* at 40–41.
[13] *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

3

Under the first prong of *Gingles*, "a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."[14] Because "only eligible voters affect a group's opportunity to elect candidates,"[15] this requirement is analyzed in terms of Black voting-age population (or "BVAP"). Proving the existence of a sufficiently *large* minority population does not end the inquiry; compactness is also required. If the minority population is dispersed such that a reasonably compact majority-minority district cannot be drawn, "§ 2 does not require a majority-minority district...."[16]

"While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries."[17] "Community of interest" is a term of art that has no universal definition in the districting context. Visual assessments are appropriate when assessing compactness. "[B]izarre shaping of" a district that, for example, "cut[s] across pre-existing precinct lines and other natural or traditional divisions," suggests "a level of racial manipulation that exceeds what § 2 could justify."[18]

Other traditional districting principles that should be considered are contiguity and protecting of incumbents. "Contiguity as a traditional redistricting principle does not mean that that the concentrations of [Black] voters in the proposed district must be contiguous. Rather, it means that the illustrative district be connected in one piece."[19] Regarding the

---

[14] *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009).

[15] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).

[16] *Bush v. Vera*, 517 U.S. 952, 979 (1996).

[17] *LULAC*, 548 U.S. at 433 (internal quotation marks omitted).

[18] *Vera*, 517 U.S. at 980–81.

[19] *See Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Ala.*, 612 F. Supp. 3d 1232, 1263 (M.D. Ala. 2020) (quoting *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 424 (M.D. La. 2017)).

4

24-30115.9125

protection of incumbents, the redistricting process should "avoid contests between incumbent officer-holders."[20]

To determine whether Plaintiffs satisfy the first *Gingles* requirement, the Court compares the Enacted Map with Plaintiffs' Illustrative Plan.[21] The Court's comparison is for the limited purpose of evaluating *Gingles I*, which requires a district that is "*reasonably compact and regular*";[22] compactness is not a "beauty contest[]"[23] where the most attractively shaped district carries the day.

The second and third requirements of *Gingles* require Plaintiffs to establish that voting in the challenged districts is racially polarized.[24] As the Supreme Court has explained, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters."[25]

If Plaintiffs establish all three *Gingles* requirements, the Court then analyzes whether a § 2 violation has occurred based on the "totality of the circumstances." At this step, the Court considers the Senate Factors, which include:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political

---

[20] *See id*. at 1263 (citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)).

[21] *LULAC*, 548 U.S. at 430 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994) (requiring "a comparison between a challenger's proposal and the 'existing number of reasonably compact districts'")).

[22] *Vera*, 517 U.S. at 977 (emphasis in original).

[23] *Id.*

[24] *See, e.g., LULAC*, 548 U.S. at 427.

[25] *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n.15).

24-30115.9126

campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.[26]

Supreme Court precedent also dictates that the Court must consider whether the number of majority-Black districts in the Enacted Map is roughly proportional to the Black share of the population in Louisiana.[27]

Not relevant to the Court's inquiry is whether the Louisiana Legislature *intended* to dilute the votes of Black Louisianans. The Court's § 2 analysis "assess[es] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors."[28] The Legislature's intent is therefore "the wrong question."[29] "The 'right question . . . is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'"[30]

Prior to analyzing the substantive merits of Plaintiffs' claim under the applicable law, the Court will address procedural/preliminary matters raised by Defendants.

## III.   PRELIMINARY MATTERS

### A. Standing

Defendants moved for summary dismissal of Plaintiffs' claims prior to trial by alleging that Plaintiffs lacked the requisite standing to proceed.[31] Four Individual Plaintiffs remain in this matter: Dr. Dorothy Nairne, Reverend Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris. There are also two entity Plaintiffs: Black Voters Matter

---

[26] *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *20 (N.D. Ala. Jan. 24, 2022) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9 (1994)).
[27] *See LULAC*, 548 U.S. at 426; *De Grandy*, 512 U.S. at 1000.
[28] *Gingles*, 478 U.S. at 44 (internal quotation marks and citation omitted).
[29] *Id*. (internal quotation marks and citation omitted).
[30] *Id*. (internal citation omitted).
[31] Rec. Doc. 149.

6

Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP" or "NAACP").

The Court denied Defendants' *Motion for Summary Judgment*.[32] In its *Ruling*, the Court found that based on the summary judgment evidence presented, Plaintiffs met the constitutional standing requirements for purposes of defeating Defendants' summary judgment *Motion*.[33] Additional evidence has since been introduced at trial proving that all Plaintiffs have standing.

"Article III standing is a jurisdictional prerequisite."[34] If the plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim.[35] The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[36] Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[37] "One element of the case-or-controversy requirement" is that Plaintiffs "must establish that they have standing to

---

[32] Rec. Doc. 181.
[33] *Id.*
[34] *Crenshaw-Logal v. City of Abilene, Tex.*, 436 F. App'x. 306, 308 (5th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)).
[35] *See Whitmore v. Ark.*, 495 U.S. 149, 154–55 (1990); *Chair King, Inc. v. Hous. Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997), *abrogated by Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012).
[36] *See Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001); *The M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001).
[37] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted)). *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 492–493 (2009).

7

sue."[38] The United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements":[39]

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[40]

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent."[41] A particularized injury is one which "affect[s] the plaintiff in a personal and individual way."[42] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[43] "Allegations of *possible* future injury" do not suffice.[44]

### i.    **Standing of Individual Plaintiffs**

To have standing, the Individual Plaintiffs must allege that they are Black, registered voters who reside in a cracked or packed voting district under the Enacted Map. "In vote dilution cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight

---

[38] *Raines*, 521 U.S. at 818. *See also Summers*, 555 U.S. at 492–493; *DaimlerChrysler Corp.*, 547 U.S. at 342; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).
[39] *Lujan*, 504 U.S. at 560.
[40] *Id.* at 560–61 (internal citations and quotation marks omitted).
[41] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).
[42] *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560 n.1).
[43] *Lujan*, 504 U.S. at 564 n.2 (internal quotation marks omitted).
[44] *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (emphasis added).

8

than it would carry in another, hypothetical district.'"[45] The Plaintiffs alleged and the trial evidence established that:

Dr. Dorothy Nairne is a Black registered voter and NAACP member who resides in Assumption Parish and House District 60. Under the Illustrative House Plan created by Plaintiffs' expert William Cooper and introduced into evidence at trial, Dr. Nairne would reside within the boundaries of Illustrative House District 58.[46]

Reverend Clee Earnest Lowe is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[47]

Dr. Alice Washington is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[48]

Steven Harris is a Black registered voter and NAACP member who resides in Natchitoches Parish and House District 25, but who would reside within the boundaries of Illustrative House District 23.[49]

The Plaintiffs allege and the record establishes that each Individual Plaintiff currently lives in a packed or cracked district in the Enacted Map and would live in a majority-Black district under the Illustrative Plan. The Individual Plaintiffs alleged that cracked and packed legislative districts effectively denied them an equal opportunity to

---

[45] *Anne Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 307 (5th Cir. 2020).
[46] Rec. Doc. 225, p. 52, line 17–p. 53, line 11.
[47] *Id.* at p. 58, line 25–p. 59, line 14.
[48] *Id.*
[49] *Id.* at p. 49, lines 10–20.

elect a candidate of their choice. The Court finds that individual Plaintiffs have standing to challenge the alleged vote dilution.

### ii. <u>Standing of Organizational Plaintiffs</u>

When a plaintiff is an organization, "the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"[50] Organizational and associational standing are alternative paths for the plaintiff organization to satisfy Article III standing. For example, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."[51] A plaintiff's specific claims determine which one type of standing must be satisfied, as it depends on who suffered the injury alleged and what relief is sought.[52]

The Plaintiffs' alleged and the trial evidence established the standing of both BVM and the Louisiana NAACP.

#### a. *Associational Standing of the NAACP*

An organization has associational standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

---

[50] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, <u>600 U.S. 181, 199</u> (2023) (quoting *Warth v. Seldin*, <u>422 U.S. 490, 511</u> (1975)).
[51] *Warth v. Seldin*, <u>422 U.S. at 511</u>.
[52] *Id.* at 515 ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.").

members in the lawsuit."[53] Because the organization's members should otherwise have standing to sue in their own right, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."[54] The relief sought, such as a declaration, injunction, or other form of prospective relief, also must be for "the benefit of those members of the association actually injured."[55]

At trial, the Louisiana NAACP presented evidence of members who would have standing in their own right. Plaintiffs identified Louisiana NAACP members who are Black registered voters whose vote is allegedly diluted by the district where they live. The Louisiana NAACP's president Michael McClanahan testified under seal to the names and addresses of those individuals.[56] Redressability was demonstrated by the testimony of William Cooper, who testified to the unpacked or uncracked majority-Black illustrative districts in which the identified members would reside under the Illustrative Plan.[57]

Contrary to Defendants' assertions, the NAACP's membership structure does not preclude it from demonstrating associational standing. Testimony was introduced at trial demonstrating that members of the NAACP are simultaneously members of the local NAACP branch in their area, the Louisiana NAACP, and the national NAACP.[58] The Fifth Circuit has instructs that courts should not "exalt form over substance" when assessing

---

[53] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).
[54] *Id.* at 432 U.S. at 342 (quoting *Warth*, 422 U.S. at 511).
[55] *Warth*, 422 U.S. at 515.
[56] Rec. Doc. 224 (SEALED), p. 5, line 22–p. 31, line 12.
[57] Rec. Doc. 225, p. 38, line 23–p. 59, line 14.
[58] Rec. Doc. 223, p. 120, lines 2–7.

membership for associational standing.[59] Accordingly, the individuals who make up the branches of the Louisiana NAACP can be said to be "members" of the NAACP for purposes of associational standing.

The remaining elements for associational standing were also demonstrated. As the Fifth Circuit has previously held, "protecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission" at all levels of the organization.[60] Finally, because the Louisiana NAACP seeks prospective and injunctive relief instead of individualized damages, participation of individual members is not required.[61] Plaintiffs established the associational standing of the Louisiana NAACP.

### b. Organizational Standing of NAACP and BVM

An organization "can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"[62] An organizational Plaintiff must demonstrate the same "injury-in-fact," traceability, and redressability required of individual plaintiffs. The Fifth Circuit has held that nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert [] significant resources to counteract the defendant's conduct."[63] Organizational standing based on resource diversion arises when "the defendant's conduct significantly and 'perceptibly impair[s]' the organization's ability to [conduct] its 'activities—with the consequent drain

---

[59] *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (citing *Hunt*, 432 U.S. at 345).

[60] *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012) ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission.").

[61] *Consumer Data Indus. Ass'n v. Tex. ex rel Paxton*, 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023) ("Participation of individual members generally is not required when the association seeks prospective or injunctive relief, as opposed to damages.").

[62] *OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Fowler*, 178 F.3d at 356).

[63] *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010).

on the organization's resources . . . .' Such injury must be 'concrete and demonstrable.'"[64]

"Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[65]

At trial, the Court was presented with testimony that, in response to the Enacted Map, BVM diverted resources away from its core mission of expanding Black voter engagement and building capacity in partner organizations.[66] Instead, BVM launched new accountability initiatives to hold elected officials accountable to Black voters in order to counteract the map's dilutive effect.[67] The Court also heard testimony that the Enacted Map caused voter apathy, requiring BVM to devote additional staff time and resources toward convincing Black voters that their votes matter.[68] The Court finds that Black registered voters were discouraged by what they perceived as deafness to their appeals at the redistricting roadshows. This voter frustration manifested in increased voter apathy, causing BVM to divert mission-specific resources to voter retention efforts.

Following the passage of the Enacted Maps, the Louisiana NAACP also undertook additional organization and mobilization efforts to counteract the effects of the Enacted Maps on voter disillusionment, potential candidates, and funders' willingness to invest resources into Black communities in Louisiana.[69]

Plaintiffs presented testimony proving that in an effort to counteract the Enacted Maps' dilutive effect, the organizational Plaintiffs diverted resources from their core

---

[64] *Id.* (internal citations omitted).
[65] *Id.*
[66] Rec. Doc. 223, p. 164, line 22–p. 165, line 3; p. 167, line 8–p. 186, line 13; p. 201, line 20–p. 202, line 5.
[67] Rec. Doc. 223, p. 177, line 2–p. 179, line 19; Pla-207; Pla-208.
[68] Rec. Doc. 223, p. 175, lines 7–17; p. 179, line 20–p. 183, line 5.
[69] Rec. Doc. 223, p. 128, line 9–p. 131, line 20.

13

activities toward previously unplanned response strategies.[70] Additionally, the core missions of BVM and the Louisiana NAACP—to increase power in marginalized, predominantly Black communities—are impaired by the Enacted Maps' dilutive effects.[71]

The Court concludes that the NAACP and BVM established standing at trial.

### B.  Defendants' Motion to Dismiss

During trial, Defendants jointly moved to dismiss this case pursuant to Rule 12(b)(1), or alternatively, Rule 12(b)(6) of the Federal Rules of Civil Procedure.[72] Prior to this, Defendants filed a *Joint Motion to Stay Proceedings*[73] "pending resolution by the Supreme Court or the Fifth Circuit of whether Section 2 [of the Voting Rights Act] grants a private right of action and, thus, whether Plaintiffs have standing to pursue their VRA claim."[74] The Defendants brought this motion because in the separate, but related case, *Robinson v. Ardoin*, the Fifth Circuit granted Defendant, the State of Louisiana an extension of time to file a Petition for En Banc Rehearing.[75] However, the Fifth Circuit ultimately denied this petition.[76] In the petition, the State addressed whether Section 2 of the VRA confers a private right of action.[77] At trial, this Court orally denied the Motion to Stay Proceedings, but took the Motion to Dismiss under advisement until the close of evidence.[78]

---

[70] Rec. Doc. 223, p. 172, line 3–p. 173, line 7; p. 174, line 17–p. 177, line 19; p. 181, line 15–p. 183, line 5 (BVM is prevented from engaging in get-out-the-vote efforts and capacity building work with its partners in order to focus its resources on its accountability strategy and 365 voter engagement strategy); p. 131, lines 8–14 (NAACP has to pull members from working on health, education, and other projects in order to focus their efforts on combating the dilutive effects of the Enacted Maps).

[71] Rec. Doc. 223, p. 113, line 3–p. 114, line 1; p. 164, line 25–p. 165, line 3.

[72] Rec. Doc. 187.

[73] Rec. Doc. 184.

[74] Rec. Doc. 187-1, p. 3.

[75] *Id.* at p. 2.

[76] *Id.*; Rec. Doc. 210, p. 2.

[77] Rec. Doc. 187-1, p. 2.

[78] Rec. Doc. 186; Rec. Doc. 192.

24-30115.9135

In Defendants' 12(b)(1) Motion to Dismiss, Defendants argue the Court lacks subject matter jurisdiction over Plaintiffs' claims because Section 2 of the VRA does not provide a private right of action, and, as such, Plaintiffs "do not have authority to bring their Section 2 claim."[79] On a Rule 12(b)(1) motion, the party asserting the jurisdiction bears the burden of proving that jurisdiction exists.[80] Moreover, a party may challenge the Court's subject matter jurisdiction at any stage of the proceedings.[81]

Defendants rely on the Eighth Circuit's recent ruling in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, where the Circuit Court found that § 2 of the Voting Rights Act does not confer a private right of action. The Eighth Circuit wrote, "[e]veryone agrees that § 2 itself contains no private enforcement mechanism" and the section does not state "*who* can enforce it."[82] Analyzing § 2 in conjunction with § 12 of the VRA, the Eighth Circuit discerned that § 2 of the Voting Rights Act empowers the Attorney General to "bring 'an action for preventive relief....for a temporary or permanent injunction restraining order, or other order.'"[83] Therefore, the Circuit Court concluded that Congress intended to limit the enforcement power of § 2 to the Attorney General and not extend this right to private parties.

---

[79] Rec. Doc. 187-1, p. 3.

[80] *Cell Sci. Sys. Corp. v. La.Health Serv.*, 804 F. App'x 260, 262 (5th Cir. 2020) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

[81] *See id.* ("A 'factual attack' [sic] challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. Moreover, a 'factual attack' under 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.") (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)) (citation omitted.)

[82] *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1210 (8th Cir. 2023).

[83] *See id.* ("We must look elsewhere for the who. Another provision, § 12, empowers the Attorney General to bring 'an action for preventive relief....for a temporary or permanent injunction, restraining order, or other order.'") (citing 52 U.S.C. § 10308(d)).

Although Defendants seek to use this case and task the Court with a thorough analysis of previous Supreme Court decisions and the intentions of Congress, the Court finds these steps unnecessary as the Fifth Circuit has already addressed this issue and reached a different conclusion from the Eighth Circuit, a point acknowledged by the Defendants and the Plaintiffs.[84] Defendants concede that the Fifth Circuit has addressed this issue, but argue the appellate court "did not thoroughly analyze [it]."[85]

In *Robinson v. Ardoin*, the Fifth Circuit concluded that § 2 of the Voting Rights Act confers a private right of action. The Circuit Court acknowledged that "[t]here is no cause of action expressly created in the text of Section 2" but explained that a plurality of the Supreme Court "stated that 'the existence of the private right of action under Section 2. . . has been clearly intended by Congress since 1965.'"[86] Moreover, the Fifth Circuit pointed to the Eleventh Circuit and the Sixth Circuit, both of which analyzed this issue and concluded that § 2 conveys a private right of action.[87] Finally, the Court of Appeals also relied on its precedent in *OCA-Greater Houston v. Texas*, under which it held that "the Voting Rights Act abrogated the state sovereign immunity anchored in the Eleventh Amendment."[88] The *Robinson* Court concluded that Congress "should not be accused of abrogating sovereign immunity without some purpose. The purpose surely is to allow the States to be sued by someone."[89] Unlike the Eighth Circuit decision, the Fifth Circuit turned to 52 U.S.C § 10302 of the VRA and determined that "proceedings to enforce voting guarantees in any state or political subdivision can be brought by the Attorney

---

[84] Rec. Doc. 187-1, p. 4–5; Rec. Doc. 210, p. 2.
[85] Rec. Doc. 187-1, p. 5.
[86] *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023).
[87] *Id.*
[88] *Id.* (discussing *OCA-Greater Houst. v. Tex.*, 867 F.3d 604 (5th Cir. 2017)).
[89] *Id.*

16

general or by an 'aggrieved person.'"[90] From here, the Court concluded the plaintiffs in *Robinson* were "aggrieved persons" and therefore had a right to bring their claims.[91]

District courts are bound by their circuit's decisions unless a decision is overturned by an en banc decision of their circuit court or the Supreme Court.[92] As the Fifth Circuit has already concluded that Section 2 provides a right of action to private plaintiffs, this Court is bound to this decision and will not rule counter to its precedent. Especially so because the Plaintiffs in this case are almost identical to the plaintiffs in *Robinson*.[93] For these reasons, Defendants' 12(b)(1) motion is denied.

In the alternative, Defendants move to dismiss for the same reasons, but pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A 12(b)(6) motion must be filed before filing an answer.[94] However, pursuant to Rule 12(h)(2)(C) of the Federal Rules of Civil Procedure, a party may move to dismiss at trial for "[f]ailure to state a claim upon which relief can be granted."[95] Plaintiffs argue that Rule 12(h)(2) "does not supersede this Court's inherent power to manage its own affairs and set deadlines for motions asserting that claim."[96] The Court agrees and points out that the motion deadline in this matter was October 6, 2023.[97] However, the Court recognizes that the Defendants rely on an Eighth

---

[90] *Id.*

[91] *Id.*

[92] *In re ASARCO LLC*, 477 B.R. 661, 670 (S.D. Tex. 2012) ("District courts are bound by the law of their circuit.") (citing *Campbell v. Sonat Offshore Drilling Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992); *Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798, 800 (5th Cir.1983)). *See also La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 501 (W.D. Tex. 2022) (The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court.") (quoting *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

[93] Dr. Dorothy Nairne and Dr. Alice Washington are individual plaintiffs in *Robinson* and are plaintiffs in this case. Additionally, the Louisiana State Conference of the NAACP is a plaintiff in *Robinson* and is one in this case.

[94] Fed. Rul. Civ. P. 12(b)(6).

[95] Fed. Rul. Civ. P. 12(h)(2)(C).

[96] Rec. Doc. 210, p. 6.

[97] Rec. Doc. 110, p. 10.

24-30115.9138

Circuit case, which was decided in November 2023 after the Court's deadlines had passed. Under these circumstances, the Court will consider the Defendants' out of time Motion. But, as the Court has stated with respect to the 12(b)(1) motion, the Fifth Circuit has already addressed this issue. Accordingly, for the same reasons the Court denies Defendants' 12(b)(1) motion, the Court denies Defendants' 12(b)(6) motion.

Having dismissed Defendants' Rule 12 motions, Defendants request that the Court certify the private right of action challenge for interlocutory appeal.[98] "Title 28, § 1292(b) of the United States Code permits a court to certify an interlocutory appeal where (1) a controlling question of law is involved, (2) there is substantial ground for difference of opinion about the question of law, and (3) immediate appeal will materially advance the ultimate termination of the litigation."[99] "A district court cannot certify an order for interlocutory appeal unless all three criteria are present."[100] Moreover, "[i]nterlocutory appeals are generally disfavored, and statutes permitting them must be strictly construed."[101] "An interlocutory appeal should be granted pursuant to 1292(b) only in exceptional cases that meet the statutory criteria."[102] The Fifth Circuit cautions that interlocutory appeals "'do not lie simply to determine the correctness' of an order."[103]

---

[98] Rec. Doc. 187-1, p. 8 ("In the event this Court denies Defendants' motion to dismiss Plaintiffs' amended complaint (including on the basis that the Court deems itself bound by *Robinson* or *OCA-Houston*), Defendants respectfully request that the Court certify its order denying the motion to dismiss for immediate appeal pursuant to 28 U.S.C. § 1292(b).")

[99] *La. State Conf. of Nat'l Ass'n for the Advancement of Colored People v. La.*, 495 F. Supp. 3d 400, 409 (M.D. La. 2020) (citing *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007)).

[100] *Id.* at 410 (citing *Gruver v. La. Through Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 18-772, 2019 WL 6245421, at *1 (M.D. La. Nov. 22, 2019) (citing *Aparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981))).

[101] *Id.* (citing *Fannie Mae v. Hurst*, 613 F. App'x 314, 318 (5th Cir. 2015) (quoting *Allen v. Okam Holdings, Inc.*, 116 F.3d 153, 154 (5th Cir. 1997))).

[102] *Id.* (citing *U.S. v. Garner*, 749 F.2d 281, 286 (5th Cir. 1985), *opinion supplemented*, 752 F.2d 116 (5th Cir. 1985); *U.S. v. Bear Marine Servs.*, 696 F.2d 1117, 1119 (5th Cir. 1983).

[103] *Johnson v. Ardoin*, No. 18-625, 2019 WL 4318487 at *1 (M.D. La. Sept. 12, 2019) (quoting *Clark–Dietz & Associates–Engineers, Inc. v. Basic Constr. Co.*, 702 F.2d 67, 67–69 (5th Cir. 1983); *Tolson v. U.S.*, 732 F.2d 998, 1002 (D.C. Cir. 1984)).

To determine if an issue is a controlling question of law, the Court asks where the issue has "potential to have some impact on the course of the litigation."[104] It is not disputed that whether § 2 confers a private right of action is a controlling question of law. The answer determines whether this Court has jurisdiction to hear Plaintiffs' claims; this certainly "ha[s] some impact on the course of the litigation."

A substantial ground for difference of opinion exists where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.[105]

Defendants argue that this question is "novel," "difficult," and "of first impression" and the Eighth Circuit's decision has resulted in a circuit split.[106] Defendants contend that the Supreme Court will have to weigh in on this "unsettled law."[107] While a circuit split does exist, the Fifth Circuit Court of Appeals *has* spoken on the point. The Fifth Circuit concluded that § 2 confers a private right of action and analyzed this issue through some of the very same plaintiffs in this case. Although Defendants are critical of the Circuit's resolution in *Robinson*, an interlocutory appeal is not meant to "determine the correctness" of this decision or this Court's abidance to it.[108] A "[d]isagreement with the

---

[104] *La. State Conf. of Nat'l Ass'n for the Advancement of Colored People*, 495 F. Supp. 3d at 409 (M.D. La. 2020) (citing *U.S. v. La. Generating LLC*, No. 09-100, 2012 WL 4588437, at *1 (M.D. La. Oct. 2, 2012) (quoting *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 766 (S.D. Tex. 2010))).

[105] *Johnson*, No. 18-625, 2019 WL 4318487, at *1 (M.D. La. Sept. 12, 2019) (citing *Mitchell v. Hood*, No. 13-5875, 2014 WL 1764779, at *5 (E.D. La. May 2, 2014) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010))).

[106] Rec. Doc. 187-1, p. 10.

[107] *Id.*

[108] *Johnson*, No. 18-625, 2019 WL 4318487 at *1 (M.D. La. Sept. 12, 2019) (quoting *Clark–Dietz & Associates–Engineers, Inc. v. Basic Constr. Co.*, 702 F.2d 67, 67–69 (5th Cir. 1983); *Tolson v. U.S.*, 732 F.2d 998, 1002 (D.C. Cir. 1984)).

Court's ruling is insufficient to establish a substantial ground for a difference of opinion."[109]

Consequently because Defendants cannot satisfy the second requirement, the Court

denies Defendants' request[110] to certify this order to the Court of Appeals.[111]

### C. Notice of Constitutional Question

Defendants filed a *Notice of Constitutional Question* pursuant to Federal Rule of

Civil Procedure 5.1(a), asserting that "finding for Plaintiffs requires interpreting the Voting

Rights Act in a way that calls its constitutionality into question."[112] Defendants claim that

"[t]o grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way

that violates the U.S. Constitution."[113] Thereafter, the United States intervened in this

case to defend the constitutionality of § 2 and submitted a brief to that end for the Court's

consideration.[114]

The Court rejects Defendants' arguments, which do not facially challenge the

constitutionality of § 2 itself. Instead, Defendants argue that any interpretation of § 2 that

would support finding liability would necessarily call the constitutionality of § 2 into

question, and any interpretation supporting a remedy in favor of Plaintiffs would violate

the Constitution. In doing so, Defendants misapply the canon of constitutional avoidance,

which is a means for differentiating between two competing plausible statutory

---

[109] *Id. at* \*4 (quoting *June Med. Services LLC v. Gee*, No 16-00444 2018 WL 1041301, at \*2 (M.D. La. Feb. 23, 2018) (citing *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 724 (N.D. Tex. 2006))).
[110] Rec. Doc. 187.
[111] The Court finds that Defendants can satisfy the third prong of § 1292(b) because "[a]voidance of a post-trial appeal is sufficient to satisfy the third prong." *See La. State Conf. of Nat'l Ass'n for the Advancement of Colored People*, 495 F. Supp. 3d at 416 (M.D. La. 2020) (citing *Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 548 (5th Cir. 2016)). However, all three requirements must be met for an interlocutory appeal to be granted. *See id.* at 410 ("A district court cannot certify an order for interlocutory appeal unless all three criteria are present.") (citing *Gruver*, 2019 WL 6245421, at \*1 (M.D. La. Nov. 22, 2019) (citing *Aparicio*, 643 F.2d at 1110 n.2 (5th Cir. 1981))).
[112] Rec. Doc. 178, p.1.
[113] *Id.* at p. 2.
[114] Rec. Doc. 205.

20

interpretations.[115] There is no such challenge here. Defendants assert an argument that was recently rejected by the Supreme Court in *Allen v. Milligan*.[116] There, the Court reiterated that the third *Gingles* precondition does not require proof of racial causation and reaffirmed the constitutionality of race sensitive remedies for § 2 violations.[117]

### D. Defendants' Rule 52(c) Motion

At the conclusion of the Plaintiffs' case, the Defendants orally moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The Court took that motion under advisement. Defendants re-urged the motion at the conclusion of trial. The Court took the motion under advisement and set a post-trial briefing schedule for the parties. For the following reasons the Defendants 52(c) Motion is Denied and the Court will enter judgment in favor of the Plaintiffs.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. *Gingles* I

The first precondition requires Plaintiffs to establish that a "'minority group [is] sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district."[118] Satisfying this precondition is necessary to show that "the minority has the potential to elect a representative of its own choice in some single-member district."[119] In a vote dilution claim, as here, *Gingles I* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.[120] This does not

---

[115] *Clark v. Martinez*, 543 U.S. 371, 385 (2005).
[116] 599 U.S. at 25–26.
[117] *Id.*
[118] *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)).
[119] *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009) (quoting *Grove v. Emison*, 507 U.S. 25, 40 (1993)).
[120] *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994).

24-30115.9142

mean that a minority group must have the "most potential, or [even] the best potential" to elect their chosen candidate.[121] *Gingles I* does not require such a high standard. Relatedly, establishing a "minority group is sufficiently large" does not require a showing that a group is overwhelmingly populating a district, but merely that a minority group is greater than 50 percent of a district's population.[122] This requirement is analyzed in terms of Black voting-age population ("BVAP") because "only eligible voters affect a group's opportunity to elect candidates."[123]

Under the compactness inquiry, the Court should examine whether an illustrative plan abides traditional districting principles such as respecting communities of interest, including reasonably shaped districts, ensuring districts are contiguous, and avoiding pairing incumbents.[124]

Redistricting in Louisiana is further guided by Joint Rule 21.[125] Joint Rule 21 codifies traditional redistricting criteria, such as contiguity, protecting communities of interest, and respecting the traditional boundaries. Joint Rule 21 additionally requires that "districts are substantially equal in population," prohibiting "an absolution deviation of population which exceeds plus or minus five percent of the ideal district population."[126] Additionally, "[t]o the extent practicable, each district within a redistricting plan submitted

---

[121] *Bartlett*, 556 U.S. at 15.
[122] *See Id.* at 19–20 ("It remains the rule, [sic] that a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent.")
[123] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).
[124] *See supra* notes 16–18.
[125] Joint-56, Enacted by the Louisiana Legislature in 2021 in anticipation of the 2022 redistricting cycle. Testimony of former Senate President Page Cortez, Rec. Doc. 228, pp. 22-23.
[126] Joint-56; Joint Rule 21(D)(2) H.C.R 90, 2021 R.S. (June 11, 2021).

24-30115.9143

for consideration shall contain whole election precincts" also known as "Voting Tabulation Districts" ("VTDs").[127]

To satisfy the first precondition, Plaintiffs offered Mr. William S. Cooper. The parties stipulated and the Court accepted Mr. Cooper to give opinion testimony in the fields of demographics, census data, and redistricting.[128] Cooper provided an Illustrative Plan to show "whether the African American population in Louisiana is 'sufficiently large and geographically compact' to allow for the creation of additional majority-Black State House and State Senate districts beyond those [created in the Enacted Map]."[129] Cooper has testified in approximately 55 cases at trial and 55 cases through deposition and declaration, and "probably 95 percent of [these] cases have related to redistricting" and Section 2 cases."[130] Additionally, as of 2023, he prepared illustrative election plans for Section 2 litigation in 23 states, including Louisiana prior to this case.[131]

Cooper used data from the U.S. Census Bureau as well as socioeconomic data reported in the American Community Survey ("ACS") on African Americans and non-Hispanic Whites.[132] Using Maptitude software and shape files produced from the U.S. Census Data and the Louisiana Legislature, Cooper created an Illustrative Plan for the State House and the State Senate.[133] According to Cooper, Maptitude is "probably the primary software used for redistricting purposes at the state legislative level and is also [sic] used by many local governments around the country. . . ."[134] Cooper determined that

---

[127] Joint-56; Joint Rule 21(G)(1) H.C.R 90, 2021 R.S. (June 11, 2021).
[128] Rec. Doc. 212, p. 113; Pla-21. The parties stipulated to the admission of Mr. Cooper's report and rebuttal report. Pla-20; Pla-89.
[129] Pla-20, p. 4.
[130] Rec. Doc. 212, p. 107.
[131] Pla-21, p. 1.
[132] Rec. Doc. 212, p. 114, line 9–p. 116, line 10.
[133] Rec. Doc. 212, p. 119, lines 13–22.
[134] Rec. Doc. 225, p. 17, lines 11–15.

23

three additional reasonably configured majority-Black districts could be created for the State Senate and an additional six majority-Black districts could be created for the State House.[135] The Court found Coopers testimony credible and persuasive, his methodology sound and the resulting conclusions reliable.

    i.    **Demographic and Socioeconomic Changes in Population**

Cooper testified, and the data established, that between 2000 and 2020 Louisianas White population declined and Louisiana's Black population increased.  According to U.S. Census data in 2000 African Americans comprised 32.86 percent of the state's population but as of 2020, that segment of the population increased to 33.13 percent of the state population.[136] This is the "second highest proportion [of African Americans] of any state in the nation."[137] U.S. Census data shows that the African American population is somewhat dispersed across the state, with higher concentrations in urban areas.[138]

As of 2020, Non-Hispanic Whites comprised 55.75 percent of Louisiana's population.[139] While Non-Hispanic Whites remain the largest ethnic group within the state, this percentage significantly decreased from the Non-Hispanic White population in 2000.[140]  In 2000, Non-Hispanic Whites comprised 60.33 percent of the state population.[141]

---

[135] Rec. Doc. 212, p. 119, lines 16–22.
[136] Pla-20, p. 9.
[137] *Id*. at p. 10.
[138] *Id*. ("Black Louisianans are present in substantial numbers in every region and sub-region").
[139] *Id*. at p. 9.
[140] *Id*.
[141] *Id*.

The 2020 census data indicates that the Non-Hispanic White Voting Age Population ("WVAP") was 58.31 percent whereas the BVAP was 31.25 percent.[142] In 2000, the WVAP was 65.51 percent and the BVAP was 29.95 percent.[143]

Considering population change by metropolitan statistical area ("MSA"), Cooper observed a pattern of white exodus from MSAs between 2000 and 2020. Cooper found that in six of the nine MSAs in the state, the White population decreased.[144] Cooper reported that the total Non-Hispanic White population decreased by over 200,000 between 2000 to 2020.[145] In contrast, in eight of the nine MSAs, the Black population increased.[146] In his direct testimony, Cooper pointed to the Baton Rouge MSA as an example of the significant increase in the Black population in an MSA. Between 2000 and 2020, the Baton Rouge MSA saw an increase in the Black population by slightly more than 60,000. Cooper concluded that the "growth in the Baton Rouge MSA would amount to almost two House districts."[147] The population statistics cited by Cooper were undisputed. The Court credits Cooper's population testimony and adopts the population statistics cited by Cooper as findings of fact.

### ii.    Illustrative Districts

In the Enacted Senate Map, there are 11 majority-Black senate districts.[148] Cooper opines that three additional reasonably configured majority-Black districts can be created

---

[142] *Id*. at p. 15.
[143] *Id*. at p. 14.
[144] *Id*. at p. 19.
[145] *Id*. at p. 20.
[146] *Id*. at p. 18.
[147] Rec. Doc. 225, p. 15.
[148] Pla-33. District 5 (50.24 BVAP percentage); District 24 (53.09 BVAP percentage); District 29 (56.56 BVAP percentage); District 4 (57.2 BVAP percentage); District 3 (57.27 BVAP percentage); District 2 (57.75 BVAP percentage); District 14 (58 BVAP percentage); District 7 (59.46 BVAP percentage); District 34 (63.74 BVAP percentage); District 39 (63.75 BVAP percentage); District 15 (73.87 BVAP percentage); *see*

24-30115.9146

for a total of 14 majority-Black districts.[149] Cooper's Illustrative Senate Plan creates Senate District 28 covering Shreveport and Bossier City MSA; Illustrative Senate District 17 covering the Baton Rouge MSA; and Illustrative Senate District 19 covering the New Orleans MSA.[150]

In the Enacted House Map, there are 29 majority-Black districts.[151] Cooper opines that six additional reasonably configured majority-Black districts can be created for a total 35 majority-Black house districts.[152] The Illustrative House Plan creates Illustrative House District 1 covering the Shreveport and Bossier City MSA; Illustrative House District 23 covering the Natchitoches area and Shreveport-Bossier City MSA; Illustrative House District 38 covering the Lake Charles MSA; and Illustrative House Districts 60, 65, and 68 which cover the Baton Rouge MSA.[153] Figures 13 and 24[154] of Cooper's report illustrate the location of these additional majority-Black districts.

---

[149] *also Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced in Pla-20, p. 31).

[149] Pla-20, p. 6.

[150] *Id.* at p. 6–7.

[151] Pla-40. District 23 (50.86 BVAP percentage); District 67 (51.85 BVAP percentage); District 72 (52.67 BVAP percentage); District 83 (54.57 BVAP percentage); District 40 (54.58 BVAP percentage); District 62 (55.08 BVAP percentage); District 96 (55.13 BVAP percentage); District 21 (55.09 BVAP percentage); District 11 (56.4 BVAP percentage); District 93 (56.6 BVAP percentage); District 58 (56.76 BVAP percentage); District 57 (57.86 BVAP percentage); District 87 (59.07 BVAP percentage); District 44 (59.45 BVAP percentage); District 101 (60.22 BVAP percentage); District 16 (62.5 BVAP percentage); District 17 (63.26 BVAP percentage); District 26 (64.33 BVAP percentage); District 102 (65.58 BVAP percentage); District 2 (67.38 BVAP percentage); District 63 (69.65 BVAP percentage); District 4 (72.07 BVAP percentage); District 97 (72.34 BVAP percentage); District 34 (72.57 BVAP percentage); District 29 (73.56 BVAP percentage); District 3 (73.86 BVAP percentage); District 61 (75.29 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage); *see also Statistics*, https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (referenced in Pla-20, p. 45).

[152] Pla-20, p. 6.

[153] *Id.*

[154] In Figures 13 and 24, additional majority-Black districts are shaded in red and labeled by a blue district number. In Figure 24, which shows the Illustrative House Map, House Districts 65 and 68 are too small to completely display their entire shapes and show they are shaded in red. The Court can decipher that these two districts are additional majority-Black districts from Cooper's expert report, where he writes "[t]he map in Figure 24 displays six additional majority-Black districts (in red with small blue labels) in the Illustrative House: Illustrative HD 1—Shreveport-Bossier City MSA, Illustrative HD 23—Natchitoches area and

26



Figure 13: Location of 3 Additional Majority-Black Districts in Illustrative Senate Plan



Figure 24: Location of 6 Additional Majority-Black Districts
in Illustrative House

### a. *Numerosity*

Cooper's Illustrative Senate Plan contains 14 majority-Black districts with a BVAP greater than 50 percent. The majority-Black districts in Cooper's Illustrative Senate Plan contain the following BVAP populations: District 2 (51.73%); District 3 (51.3%); District 4 (58.15%); District 7 (52.29%); District 14 (58.08%); District 15 (54.45%); District 17

---

Shreveport-Bossier City MSA, Illustrative HD 38—Lake Charles MSA, and Illustrative HDs 60, 65, and 68—Baton Rouge MSA." Pla-20, p. 43.

27

(52.48); District 19 (50.97%); District 24 (52.05%); District 29 (50.93%); District 34 (63.02%); District 38 (53.17%); and District 39 (52.46%).[155] Cooper used the Enacted Senate Map as a starting point for the Illustrative Senate Plan. The Illustrative Senate Plan makes no changes to Senate Districts 11, 12, 16, and 37.[156] Overall, 74 percent of the state's core population[157] was undisturbed from the Enacted Senate Map.

To create new majority Black districts, Cooper "unpacked"[158] and "uncracked"[159] a number of the districts in the Enacted Senate Map. In the Enacted Senate Map, Senate District 39 has a BVAP of 63.75 percent.[160] Cooper "unpacked" this district and incorporated populations of Enacted Senate Districts 31 and 36 into Illustrative Senate District 38, resulting in Illustrative Senate Districts 38 and 39 both being majority Black.[161] Similarly, when drawing Illustrative Senate District 17, which covers Pointe Coupee, Iberville, West Baton Rouge, and part of East Baton Rouge, Cooper "unpacked" Senate District 15 of the Enacted Senate Map and derived population in part from Senate District 14.[162] In the Enacted Senate Map, Senate District 15 has a BVAP of 73.9 percent and Senate District 14 has a BVAP of 58 percent.[163] This resulted in Districts 14, 15, and 17

---

[155] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

[156] Pla-20, p. 30.

[157] Cooper defined "core population" as the "largest district-level subset of a population that is kept together in the shift from one plan to another (without taking into account changes in district number or changes in incumbent representation)." Pla-20, p. 30, n.35.

[158] "Packing" is a term of art describing "election districts where a minority population is unnecessarily concentrated, resulting in an overall dilution of minority voting strength in the voting plan." *Id.* at p. 26, n.32.

[159] "Cracking" is a term of art describing "election districts that fragment or divide the minority population, resulting in an overall dilution of minority voting strength in the voting plan." *Id.* at n.31.

[160] Pla-20, p. 37; *see also* "Statistics" https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).

[161] Pla-20, p. 37; *see also Statistics*,
Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

[162] Pla-20, p. 39.

[163] Pla-20, p. 39; *see also Statistics*,
Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).

24-30115.9149

becoming majority-Black districts in the Illustrative Senate Plan, while also decreasing, or unpacking, the BVAP in Illustrative Senate District 15 to 54.45 percent.[164] Cooper explained that in creating Illustrative Senate District 19 in the New Orleans-Metairie MSA he "uncrack[ed]" Senate Districts 5, 7,8, 10, and 19 of the Enacted Senate Map.[165] Cooper indicates that a majority-Black district could be created because Senate District 19 of the Enacted Senate Map "cuts across parts of the parishes of Lafourche, St[.]John the Baptist, St. Charles, and Jefferson – in the process submerging a large Black population in a majority-White District."[166] Cooper's Illustrative Senate Plan transforms the BVAP of Senate District 19 from 28.69 percent to 51 percent.[167] The Court credits Cooper's testimony and finds that Enacted Senate Districts 5, 7, 8, 10, 15, 19, and 39 were packed with BVAP or that BVAP was cracked among the identified Enacted Senate Districts. The Court finds that BVAP in Enacted Senate Districts 5, 7, 8, 10, 15, 19, and 39 were packed or cracked and that reassignment of BVAP resulted in three additional reasonably configured majority BVAP Senate Districts, namely Illustrative Senate Districts 28, 17 and 19.

Turning to the Illustrative House Plan, the majority-Black districts in Cooper's Illustrative House Plan contain the following populations: Illustrative House District 1 (55.33%); Illustrative House District 2 (67.34%); Illustrative House District 3 (58.85%); Illustrative House District 4 (57.53%); Illustrative House District 5 (50.86%); Illustrative House District 11 (55.55%); Illustrative House District 16 (59.76%); Illustrative House

---

[164] Pla-20, p. 39.; *see also* "Statistics", https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

[165] Pla-20, p. 41.

[166] *Id.* at p. 42.

[167] *Id.*; *see* also *Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

District 17 (54.48%); Illustrative House District 21 (54.28%); Illustrative House District 23 (50.56%); Illustrative House District 26 (63.38%); Illustrative House District 29 (57.77%); Illustrative House District 34 (50.03%); Illustrative House District 38 (50.84%); Illustrative House District 40 (54.88%); Illustrative House District 44 (60.92%); Illustrative House District 57 (53.43%); Illustrative House District 58 (51.27%); Illustrative House District 60 (52.83%); Illustrative House District 61 (50.2%); Illustrative House District 63 (57.2%); Illustrative House District 65 (56.03%); Illustrative House District 67 (51.58%); Illustrative House District 68 (54.21%); Illustrative House District 69 (50.2%); Illustrative House District 72 (50.6%); Illustrative House District 83 (54.57%); Illustrative House District 87 (59.07%); Illustrative House District 93 (56.6%); Illustrative House District 96 (55.55%) Illustrative House District 97 (72.34%); Illustrative House District 99 (78.11%); Illustrative House District 100 (80.78%); Illustrative House District 101 (50.75%); and Illustrative House District 102 (65.58%).[168] Cooper points out and the Court finds that 78.5 percent of the core population in the Enacted House Map remains in the same districts in the Illustrative House Plan.[169]

Cooper identified several Enacted House districts with packed and cracked BVAPs. By unpacking and uncracking Enacted House districts Cooper illustrated that six additional reasonably configured majority BVAP House districts could be drawn. With Illustrative House District 1, Cooper "unpacked" House District 2 and 4 in the Enacted House Map. As a result, these districts in the Illustrative House Plan have BVAPs of 67.34

---

[168] *See* "Statistics", https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).
[169] Pla-20, p. 44.

percent and 57.53 percent, respectively.[170] For comparison, the BVAPs for these two districts in the Enacted House Map are 67.4 percent and 72.1 percent.[171] With respect to Illustrative House District 23, another majority-Black district, Cooper testified that this majority-Black district existed under the 2011 Benchmark Plan, but "for reasons that [he] still [doesn't] know, it was eliminated in the adopted plan."[172] On Illustrative House District 38, Cooper concluded that a second majority-Black district could be created in this area due to the "growing Black population since 2000 in the Lake Charles MSA ([an increase of] 14,322), coupled with no growth in the White population ([a decrease of] 676)."[173] Cooper found that he had to "unpack" Enacted House District 34 and "uncrack" Enacted House Districts 35 and 37 to create Illustrative House District 38. In the Illustrative House Plan District 34 holds a BVAP of 50.3 percent compared to 72.6 percent in the Enacted House Map.[174] House Districts 35 and 37 contain BVAPs of 8.71 percent and 18.65 percent compared to 12.5 percent and 17.6 percent in the Enacted House Map.[175] Finally, Cooper concluded that three additional majority-Black districts could be created in the Baton Rouge MSA. Cooper created Illustrative House Districts 60, 65, and 68 majority-Black districts. Again, Cooper found if several of the house districts in the Enacted House

---

[170] *Id*. at p. 50; *See also* https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at pla-20, p. 45).

[171] Pla-20, p. 50.

[172] Rec. Doc. 225, p. 48, lines 20–21.

[173] Pla-20, p. 53.

[174] *Id*. at p. 54; *see also Statistics,*
Dave's Redistricting, https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).

[175] Pla-20, p. 54*; see also Statistics,*
Dave's Redistricting, https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).

24-30115.9152

Map were "unpacked" and "uncracked," these additional majority-Black districts could be created.[176]

The Court credits Cooper's testimony and finds that Enacted House Districts 2, 4, 5, 7, 13, 22, 25, 29, 34, 35, 37, 60, 61, 63, 65, 68, 69, and 70 were packed with BVAP or that BVAP was cracked among the enacted House districts. The Court finds that unpacking and uncracking in those House districts results in six additional reasonably configured majority BVAP House districts as illustrated by Mr. Cooper.

On cross-examination, Cooper acknowledged that in order to create additional majority-Black districts he was required to "lower the BVAP in many other existing majority-Black districts."[177] He explains this is "reduc[ing] packing" because "some of [the] districts [in the Enacted Maps] are in the 70s or higher in Black voting-age population."[178] Cooper compares the 2020 BVAP in majority-Black districts to the 2020 Non-Hispanic WVAP in majority-White districts in both the Enacted Maps and the Illustrative Plan. As shown below, there is a wider range between the percentage of the BVAP in majority-Black Districts and the Non-Hispanic WVAP in majority-White districts in the Enacted Maps as compared to the Illustrative Plan.[179] Cooper observed that "in some ways this [wider range in the Enacted Maps] is sort of a preliminary indicator, a prima facia indicator of cracking and packing. . . . [T]his huge gap—while it doesn't prove that there's packing or cracking, it draws one's attention to it."[180] The Court finds that the data captured in

---

[176] Rec. Doc. 225, p. 54, lines 1–6 (Cooper explains he drew three new districts in East Baton Rouge); *see also* Pla-20, pp. 55-61.

[177] Rec. Doc. 225, p. 66, lines 9–10.

[178] *Id.* at p. 66, lines 11–12.

[179] Pla-20, pp. 35, 48.

[180] Rec. Doc. 225, p. 37, lines 11–14.

Figures 16 and 27 below are probative evidence of cracking and packing BVAP in enacted districts.

**Figure 16: Same Race VAP in Majority-Black and Majority-White Districts Statewide 2022 Senate and Illustrative Senate**

| Legislative Plan | 2020 Black VAP in Majority Black Senate Districts | 2020 NH White VAP in Majority White Senate Districts | Statewide Difference |
|---|---|---|---|
| 2022 Senate | 53.6% | 84.4% | -30.8% |
| Illustrative Senate | 60.6% | 77.9% | -17.3% |

**Figure 27: Same Race VAP in Majority-Black and Majority-White Districts Statewide – 2022 House and Illustrative House**

| Legislative Plan | 2020 Black VAP in Majority Black House Districts | 2020 NH White VAP in Majority White House Districts | Statewide Difference |
|---|---|---|---|
| 2022 House | 55.6% | 83.4% | -27.8% |
| Illustrative House | 61.1% | 77.4% | -16.3% |

Cooper testified that in the process of unpacking and uncracking BVAP he was "positive [he] could have drawn districts with much higher Black VAPs, but [sic] [he was] taking into account other factors."[181]

### b. Compactness

The inquiry of compactness requires the map drawer to consider traditional redistricting principles. Relative to the Illustrative Plan Cooper's considerations of each are summarized below.

---

[181] *Id.* at p. 66, lines 9–11.

24-30115.9154

### 1. District Shapes

As mentioned, the shape of a district is relevant as "bizarre shap[es]" that "cut []
across precinct lines . . . or [other] traditional divisions" can suggest racial manipulation.[182]
Cooper testified as part of the "general inquiry" of *Gingles* I, that he "made a point of trying
to draw reasonably shaped compact districts. . . ."[183] Further, he explained that while
some illustrative districts may appear "odd shaped," these shapes result from "following
the Mississippi River or following a municipal boundary."[184] On cross-examination, he
pointed to Enacted Senate District 29, calling it a "bizarre shaped district" [which he
addressed in his Illustrative Senate Plan]."[185] The Court finds the shapes of the districts
in the Illustrative Plan are reasonable considering geographic vagaries created by
waterways and considering the respect given to traditional boundaries such as VTDs and
parish lines.

### 2. Contiguity

Cooper testified that he understood contiguity to be another traditional redistricting
principle.[186] A district is considered contiguous if it is "connected into one piece."[187]
Cooper accounted for contiguity in his map drawing through Maptitude. He testified,
"Maptitude has a check, a little module that you just press a button [and] it'll tell you if
there's not a contiguous district in front of you."[188] The Court finds that the districts in the
Illustrative Plan are contiguous.

---

[182] *Vera*, 517 U.S. at 980–81.
[183] Rec. Doc. 225, p. 61, lines 18–19.
[184] *See id.* at p. 22, lines 3–4.
[185] *Id.* at p. 69, line 2.
[186] *Id.* at p. 29, lines 2–3.
[187] *Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People*, 612 F. Supp. 3d at 1263 (M.D. Ala. 2020) (quoting *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 424 (M.D. La. 2017)).
[188] Rec. Doc. 225, p. 29, lines 9–11.

24-30115.9155

### 3. Preservation of Communities of Interest

Turning to the next principle, the preservation of communities of interest, Cooper observed that the state does not define the term "community of interest."[189] Joint Rule 21 does not provide a definition and the term has no universal definition. The Brennan Center for Justice defines "communities of interest" as "groups of individuals who are likely to have similar legislative concerns, and who might therefore benefit from cohesive representation in the legislature."[190] Cooper relied on this definition in drawing his illustrative maps. Cooper testified that he "looked at the cultural regions like Acadiana which is [sic] defined by the State Legislature. . . [and a] definition for the river parishes and a tighter definition for [sic] what is called the Cajun Heartland and [sic] the Florida parishes."[191] He also "looked at. . .planning districts that encompass all of the parishes in Caddo."[192] He determined that he "should try to keep together [these regions] to the extent possible."[193] Further, Cooper testified that he reviewed socioeconomic characteristics at parish and municipal levels to provide a contextual background when considering communities of interest.[194]

Plaintiffs offered expert witness Dr. Craig Colten to provide opinion testimony on the historical geography of Louisiana and address the communities of interest inquiry. Dr. Colten is a retired tenured professor from Louisiana State University's Department of Geography and Anthropology.[195] He holds a Bachelor of Arts, Master of Arts, and Ph.D.

---

[189] Id. at p. 83, lines 21–22.
[190] Pla-20, pp. 7–8 n.13.
[191] Rec. Doc. 225, p. 32, lines 13–21.
[192] *Id.* at p. 32, lines 24–25.
[193] *Id.* at p. 32, lines 21–22.
[194] Pla-20, pp. 30, 44.
[195] Pla-130, p. 1.

24-30115.9156

in Geography.[196] Dr. Colten has experience in analyzing community formation as he worked in conjunction with the State's Department of Mineral Management Service completing a series of studies on environment justice.[197] As part of this series, he analyzed both racial and low income communities in the state.[198] Dr. Colten has 20-plus years of experience researching and writing about the historical geography of Louisiana.[199] Dr. Colten has provided deposition testimony 24 times and court testimony three times in state and federal cases.[200] However, he has not provided expert testimony in a redistricting case prior to this case.[201] The Defendants stipulated to Dr. Colten's expertise in the historical geography of Louisiana and the Court admitted his opinion testimony in this field [202]

Dr. Colten was asked to provide quantitative and qualitative evidence of "the historical and current status of communities of interest" in the Red River Parishes, Caddo/Bossier Parishes, Acadiana, and the River Parishes, or that is, the areas addressed by Mr. Cooper in his Illustrative Plan.[203] Dr. Colten was also asked to "review the Legislative Senate and House districts and compare the boundaries of those districts in terms of their geographic correspondence to historical communities of interest."[204] Dr. Colten relied on "methods common in [his] specialty" such as reviewing books, academic

---

[196] *Id.* at p. 2
[197] Rec. Doc. 212, p. 11, lines 17–23.
[198] *Id.*
[199] Pla-129, p. 3.
[200] Pla-130, pp. 11–12.
[201] Rec. Doc. 212, p. 17, lines 2–4.
[202] Dr. Colten's expert, supplemental, and rebuttal reports were admitted into evidence by stipulation of the parties. Pla-129; Pla-131; Pl-132.
[203] Pla-129, p. 2.
[204] Rec. Doc. 212, p. 19, lines 19–22.

publications, reports, news, and scholarly work to draw conclusions about the "cultur[al] histories of each area and the communities of interest there."[205]

Under Dr. Colten's analysis he defined community of interest as a "group of people with comparable, similar social, cultural, economic, [and] political interests within a given territory."[206] Dr. Colten provided opinion evidence of the settlement history, economic landscapes, and cultural identifiers for the Red River Parishes, Acadiana region, River Parishes, and Jefferson Parishes.

Starting with the Red River Parishes, Dr. Colten examined the Natchitoches and Cane River territory. In his expert report, he notes the community is influenced by French colonialism because early French settlement resulted in French being the dominant language and Catholicism becoming the dominant faith in the territory among White and Black people. A particular rural region of the state, this territory was known for significant cotton cultivation. Additionally, a growing population of freed Black people at Isle Brevelle, an area downstream from Natchitoches, led to increased Black wealth in this territory and the formation of business relationships between freed Black people and White Creoles.[207] However, following the Civil War, the area was plagued with racial tensions and violence. As an example, Dr. Colten pointed out that between 1865 and 1878, the murder rate in Red River valley was "four times that of the second most violent area in Louisiana."[208] Dr. Colten observed that "[w]ith the exception of Grant Parish, the parishes [in this territory]

---

[205] Pla-129, p. 3.
[206] Rec. Doc. 212, p. 20, lines 9–11.
[207] Pla-129, pp. 7–8.
[208] *Id.* at p. 9.

are near or above the state average for African American population (33%) and [the] percent of [the state] population living in poverty (17.8%)."[209]

Dr. Colten also reviewed the cultural and historical developments in Caddo and Bossier Parishes. Finding parallels to the Natchitoches and Cane River territory, this area also saw expanding cotton cultivation, especially so after the "clearing of the 'Great Raft,'" which removed a log jam in Shreveport and increased movement of settlers through Shreveport's riverport.[210] The area was also plagued with intense racial violence throughout Reconstruction, so much so that Caddo Parish was labeled "Bloody Caddo."[211] Dr. Colten notes that in Reconstruction, Caddo held the highest number of homicides in Louisiana, which is "a notoriously violent state."[212] Dr. Colten expands on the cultural and social effects following Bossier becoming a major Air Force base. The parish saw massive growth in adult entertainment and night clubs, and as segregation remained the norm of the time, segregated entertainment districts grew.[213] Dr. Colten concluded that Shreveport's majority-Black population compared to Bossier's low suburban Black population today "reflect[s] [W]hite flight."[214] Dr. Colten determined that this white flight had its genesis following a 1970 court order requiring desegregation, which prompted White families from the city of Shreveport to migrate to Bossier Parish and more distant suburbs.[215]

Moving to the Acadiana region, Dr. Colten discussed the settlement history of the Acadians, which originated from a "singular diaspora of families from Acadie (or Nova

---

[209] *Id.* at p. 6.
[210] *Id.* at p. 12.
[211] *Id.*
[212] *Id.*
[213] *Id.* at p. 13.
[214] *Id.* at p. 12.
[215] *Id.* at p. 13.

38

Scotia, Canada) in the 18th century."[216] Dr. Colten provided insight on the economic diversity of this region. For example, the economy was supported by the extraction of oil and gas as well as marine fisheries. Additionally, in the east, sugar cane cultivation dominated, whereas in the west, rice growing bolstered the economy.[217] There was in-migration into this region following the discovery of oil and the sugar cane cultivation. Dr. Colten discussed the different cultural groups in the region: Cajuns or White residents, and "Creoles of color" or residents with African heritage who were identified by their French language history.[218] Dr. Colten found that Creoles of color "identified as a separate social class, neither Black nor [W]hite."[219] Creoles of color populated St. Landry Parish within the Acadiana region.

Through his research on the River Parishes,[220] Dr. Colten concluded that the colonization along the Mississippi River led to the River Parishes retaining "a mix of European residents" including Acadians, French Creoles, the Spanish, and Germans.[221] And as planters moved into the region, cotton cultivation dominated more in West Feliciana and East Baton Rouge Parishes, whereas parishes such as Pointe Coupee and St. John the Baptist saw much more sugar cane cultivation.[222] These differentiations were exhibited also culturally, as West Feliciana and East Baton Rouge saw much more Anglo

---

[216] *Id.* at p. 14.

[217] *Id.*

[218] *Id.* at p. 17.

[219] *Id.*

[220] The River Parishes, or those that are "adjacent to the Mississippi River" are Pointe Coupee, West Baton Rouge, Iberville, Assumption, Ascension, St. James, St. John the Baptist, St. Charles, and Jefferson on the west bank. On the east bank of the river, West Feliciana, East Feliciana, East Baton Rouge, and Livingston are culturally considered the Florida Parishes, but Dr. Colten discusses West Feliciana and East Baton Rouge when discussing the River Parishes as a comparison. With respect to Jefferson Parish, Dr. Colten proposes that the parish is "an anomaly among the parishes along the lower Mississippi River and deserves separate consideration." *Id.* at pp. 18–23.

[221] *Id.* at p. 20.

[222] *Id.* at pp. 18–19.

24-30115.9160

settlers, in contrast to the rest of the River Parishes which were strongly influenced by French settlers and culture.[223] West Feliciana and East Baton Rouge were "culturally part of the Florida Parishes."[224] As both cotton and sugar cane cultivation relied on slave labor, there were Black workers in this region, but as a demand for farm labor decreased, many Black people began to migrate further south in the region, especially so into Baton Rouge.[225] Dr. Colten explains that these communities became "the sites of environmental justice struggles" when the large-scale petrochemical industry developed in the 20th century, leading to African American-led environment justice campaigns in these communities.[226]

With Jefferson Parish, Dr. Colten concluded that the parish "is an anomaly among the parishes along the lower Mississippi River and deserves separate consideration."[227] Colten contends that "[d]espite its proximity, Jefferson Parish is separate from New Orleans in many ways."[228] Dr. Colten found that the parish is significantly segregated, as the east bank of the Mississippi River, which runs through the parish, is highly populated by White and Hispanic people whereas the west bank is heavily populated by Black people.[229] Dr. Colten found similar segregation of economic activities, as ship-building and petrochemical industries clustered on the west bank whereas retail and commercial activity dominated the east bank.[230] "Superior flood protection on the east bank and flood prone neighborhoods in the west bank further reinforced racial segregation."[231] Dr. Colten

---

[223] *Id.*
[224] *Id.* at p. 19.
[225] *Id.* at p. 21.
[226] *Id.* at p. 22.
[227] *Id.* at p. 23.
[228] *Id.* at p. 24.
[229] *Id.*
[230] *Id.*
[231] *Id.* at p. 25.

concluded that "[s]egregation has contributed to community formation and group identity" in Jefferson Parish.[232]

Dr. Colten concluded that the Illustrative Plan preserved communities of interest, whereas some of the communities of interest were not maintained in the Enacted Maps. For example, addressing Illustrative House District 23, Dr. Colten found that the Illustrative Plan "keeps Natchitoches basically together within one effective municipality."[233] However, in this same region in the Enacted Maps, the districts "[create] a stark boundary" between DeSoto Parish and the Red River Parishes although "in many respects [they] had a comparable sort of history."[234] Moreover, he concluded that in the Enacted Maps, "the city [of Natchitoches] is basically taken out from Natchitoches Parish and put into Grant."[235] Similarly, when discussing Illustrative Senate District 19 and comparing it to its counterpart in the Enacted Senate Map, Dr. Colten concluded that the "strong sense of identity" of Jefferson Parish was retained in the illustrative district, but "discontinuity" existed in the enacted counterpart. Dr. Colten discerned that the district in the Enacted Senate Map lost a "big chunk of its territory" to a neighboring district.[236]

The Court found Dr. Colten's testimony credible and well supported by his research. The Court credits Dr. Colten's testimony regarding communities of interest and finds that Shreveport and Bossier form a community of interest; Natchitoches and the Red River Parishes, including DeSoto Parish, form a community of interest; the River Parishes

---

[232] *Id.*
[233] Rec. Doc. 212, p. 41, lines 21–22.
[234] *Id.* at p. 42, lines 10–12.
[235] *Id.* at p. 42, lines 19–21.
[236] *Id.* at pp. 42, 63.

41

comprise a community of interests; and Jefferson Parish is a community of interest distinct from Orleans.

### 4. Compactness Measures

For measuring compactness, Mr. Cooper "visually looked at the districts" but also cross-checked this "eye test" with traditional compactness measures such as the Reock, Polsby-Popper, and Area/Convex Hull tests.[237] Each test provides a score "between 0 and 1, with 1 being the most compact"[238] and are measured in Maptitude. Cooper testified that a compactness score of 1 would produce an area that is a "perfect circle."[239] But, because districts are usually not perfect circles, it is common for districts that are reasonably compact to be in a range of .20 and .40.[240] With the Polsby-Popper test, he testified that because of the "nature of the calculation," this test usually produces a lower compactness score than the Reock test, and the Area/Convex Hull test "typically" results in a higher score because "it discounts for [sic] odd shaped districts."[241] He continued, "[the Area/Convex Hull test provides] a way to take into account some areas that appear to have very low scores under Polsby-Popper, but perhaps for a good reason if you are following the Mississippi River or following a municipal boundary, which oftentimes can be odd shaped."[242]

Cooper's conclusions that the Illustrative Senate Plan was "unquestionably more compact" than the Enacted Senate Map and that the house districts in the Enacted House

---

[237] Rec. Doc. 225, p. 20 line 5–p. 22, line 4.
[238] Id. at p. 21, lines 1–3; Pla-120, p. 32 at n.37.
[239] Rec. Doc. 225, p. 21, line 2.
[240] Id. at p. 21, lines 3–4.
[241] Id. at p. 21, lines 11–12, 19–25.
[242] Id. at p. 22, line 25–p. 22, line 4.

24-30115.9163

Map and the Illustrative Plan are "about the same in terms of compactness" were supported by the record.[243]

Figures 25 and 14 provide the lowest, highest, and mean compactness scores under the Polsby-Popper and Reock Tests:[244]

**Figure 25: Compactness Scores – 2022 House vs. Illustrative House**

| | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
| | Mean | Low | High | | Mean | Low | High |
| **2022 House** | | | | | | | |
| All Districts (mean avg.) | .40 | .13 | .63 | | .29 | .05 | .63 |
| 29 Majority-Black Districts | .38 | .13 | .51 | | .27 | ..15 | .46 |
| **Illustrative House** | | | | | | | |
| All Districts (mean avg.) | .40 | **.16** | **.65** | | .29 | **.12** | **.71** |
| 35 Majority-Black Districts | .38 | **.21** | .51 | | **.28** | **.12** | **.50** |

**Figure 14: Compactness Scores – 2022 Senate vs. Illustrative Senate Plan**

| | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
| | Mean | Low | High | | Mean | Low | High |
| **2022 Senate** | | | | | | | |
| All Districts | .36 | .11 | .59 | | .18 | .05 | .35 |
| 11 Majority-Black Districts | .28 | .11 | .37 | | .14 | .05 | .29 |
| **Illustrative Senate Plan** | | | | | | | |
| All Districts | 37 | **.19** | .59 | | **.22** | **.07** | .36 |
| 14 Majority-Black Districts | 32 | **.19** | **.43** | | **.20** | **.07** | **.36** |

These compactness scores were undisputed. The Court finds that both the Illustrative Plan and the Enacted Maps include reasonably compact districts.

---

[243] *Id*. at p. 22, lines 14–18.

[244] Cooper provides the compactness scores for the Illustrative Plan and Enacted Maps under all 12 compactness tests available in Maptitude. However, he provides the lowest, highest, and mean compactness scores under Polsby-Popper and Reock tests because those are the most routinely used tests. Pla-89; Pla-90; Pla-92; Pla-93; Pla-94; Pla-95.

24-30115.9164

### 5. Joint Rule 21 Considerations

Cooper testified that he considered Louisiana's Joint Rule 21 when creating the Illustrative Plan. He explained that "Rule 21 on the whole basically encompasses all of what [he] would consider to be the traditional redistricting principles."[245] As mentioned, Joint Rule 21 requires that "districts. . . are substantially equal in population" such that a districting plan cannot have "an absolute deviation of population which exceeds plus or minus five percent of the ideal district population."[246] On direct examination, Cooper stated that this is a "typical range for a typical stage legislative plan" and that he employed "the plus or minus 5 percent" population equalization requirement when drawing his maps.[247] Cooper followed the guidance of Joint Rule 21 requiring that, "[t]o the extent possible, precincts. . . be kept whole" and "to the extent possible, municipalities, boundaries . . . be kept whole."[248]

Cooper affirmed that he adhered to the traditional redistricting principles listed above, complied with Joint Rule 21, and made slight modifications to his Illustrative Senate and House Plans following Dr. Colten's considerations of communities of interest.[249]

The Defendants argue that Plaintiffs have failed to satisfy the *Gingles* I inquiry in part because the districts in the Illustrative Plan produced by Cooper are not sufficiently compact. At trial, Defendants offered Dr. Sean Trende to support this argument. Dr.

---

[245] Rec. Doc. 225, p. 31, line 24–p. 32, line 1.
[246] Joint-56; Joint Rule 21(D)(2), H.. R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).
[247] Rec. Doc. 225, p. 29, lines 17–24.
[248] *Id.* at p. 31, lines 6–8.
[249] *See* Rec. Doc. 225, p. 78 (Cooper explains that he did not directly speak to Dr. Colten about his considerations of communities of interest. However, Plaintiffs' counsel informed Cooper that Dr. Colten suggested he make some "minor changes" with respect to the Baton Rouge area. But outside of this, the two experts did not communicate).

44

Trende suggests that the minority populations in the Illustrative Plans are not geographically compact, but instead, the minority populations are dispersed and Plaintiffs merely cobbled together small pockets of minority populations in order to artificially create compactness. Dr. Trende relies on a novel approach referred to as the "moment of inertia"[250] and asserts the compactness should be measured using this approach.

The Court finds Trende's "moment of inertia" algorithm to be fundamentally flawed and completely useless in evaluating *Gingles* I compactness. First, the "moment of inertia" methodology has never been used in a VRA § 2 case, was not utilized by Trende when he was engaged to draw VRA compliant maps in Arizona and Virginia, nor has Trende employed the methodology in his own research.[251] Trende's "moment of inertia" methodology also fails to consider communities of interest and traditional boundaries. Most glaringly it ignores the legislature's mandate of equal populations among districts.[252] The drawing of a VRA compliant map balances multiple criteria and is considerably more complicated and nuanced than suggested by the oversimplistic and unhelpful compactness measure advanced by Trende.

---

[250] The Defendants suggest that the "moment of inertia" is one of the oldest redistricting metrics. Rec. Doc 206, p. 18, n. 7. However, Trende admits that the "moment of inertia" has never been employed in a redistricting case and that the methodology does not produce entire districts or maps and does not consider traditional districting principles. Rec. Doc. 229, p. 5, line 15–p. 6, line 6; p. 6, line 14–p. 7, line 5; p. 18, line 8–p. 23, line 21. Dr. Murray testified that "moment of inertia" has been peer reviewed and commonly used in the field of Geography, but he is unaware of the "moment of inertia" being used as a compactness measure in any redistricting cases. Rec. Doc. 218, pp. 52, 92.

[251] Rec. Doc. 229, pp. 7, 19–22. Trende admits that when he served as a *Gingles* I expert he relied on the Polsby-Popper and Reock measures for compactness. *Id.*

[252] Figure 6 of Trende's report illustrates with a blue line the point at which BVAP reaches 50 percent plus 1 within Plaintiff's Illustrative District 1. Def-3, p. 17. However, if the illustrative boundary stopped at Trende's blue line, the district would be insufficiently populated. Trende's analysis gave no effect to § D(2) of Joint Rule 21, which forbids the configuration of districts with "an absolute deviation of population which exceeds plus or minus five percent of the ideal district population." Joint-56; Joint Rule 21(D)(2), H.R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).

Trende also used a spin-off of a statistical model first developed by noted researchers Chen and Rodden, which Trende coined the "areal/Chen & Rodden" compactness measure.[253] Trende's degradation of the Chen and Rodden statistical model is untested, not peer reviewed, and never before used.[254] It is unhelpful and unpersuasive as a *Gingles* I compactness measure.[255] Like his "moment or inertia" theory, this "areal" method fails to control for the mandate of equal populations and fails to consider precinct lines, political subdivision boundaries, geographic features, or communities of interest. Existing law does not require a granular analysis of the distribution of minority populations within an illustrative district to the exclusion of other criteria and priorities. "[T]he purpose of illustrative maps is to *illustrate* that creating another majority [B]lack district is possible, consistent with other requirements under Section 2 caselaw."[256]

Accordingly, the Court rejects Dr. Trende's approach to addressing compactness and accepts Cooper's approach. On the issue of compactness, Cooper employed Reock and Polsby-Popper to evaluate the compactness of his Illustrative Plan. It is undisputed that these tests are the gold standard for evaluating the compactness in the context of

---

[253] *See* Def-3, p. 16 (Trende cites Jowei Chen & Jonathan Rodden in his expert report); Rec. Doc. 228, p. 180–81. Rather than using the BVAP to evaluate compactness, he instead utilized the area of precincts. Notably, Trende concedes that this modified Chen & Rodden "approach sometimes produces 'holes' on the map." *See* Def-3, p. 16.

[254] Rec. Doc. 229, pp. 6–7 (Trende admits that neither algorithm he employed has been peer reviewed).

[255] Dr. Murray noted that the "moment of inertia" is peer reviewed in Geography literature but there was no evidence of its peer reviewed use in political redistricting as a compactness measure. Rec. Doc. 218, p. 52.

[256] *Robinson v. Ardoin*, 86 F.4th 574, 593 (5th Cir. 2023).

redistricting.[257] Even Trende admitted that "if you are looking at the compactness of the district, Reock and Polsby-Popper are the proper tools."[258]

    Turning to Defendants' next argument, Defendants argue that Plaintiffs failed to satisfy *Gingles* I because race predominated the configurations of the Illustrative Plan. Defendants offered Dr. Alan Murray in support of this argument.

    Dr. Alan Murray is a Professor of Geography at the University of California, Santa Barbara.[259] He was offered and accepted by the parties to provide opinion testimony in the fields of Geography, Demographic Analysis, and Spatial Analytics as it relates to race and statistics.[260]

    Murray did not conduct any analysis of and offered no opinions on racially polarized voting.[261] Dr. Murray offers a forensic analysis of the Illustrative Plan to reach the opinion that the Illustrative House and Senate Districts advanced by the Plaintiffs were configured predominately based on race.[262] Dr. Murray specifically analyzed compactness, core retention, spatial autocorrelation, and communities of interest. For the following reasons, the Court rejects Dr. Murray's opinions.

---

[257] Defense expert witness Dr. Murray referred to the Reock and Polsby-Popper compactness measures utilized by Mr. Cooper as the "industry de facto" used by state legislatures and experts. Rec. Doc. 160-1, p. 9, line 24; Rec. Doc. 218, p. 106, lines 5–7.

[258] Rec. Doc. 229, p. 18, lines 24–25.

[259] Interv-42, p. 35.

[260] Rec. Doc. 218, p. 41, lines 14–1.

[261] *Id.* at p. 89, lines 16–20.

[262] Interv-42, p. 32. Much of Dr. Murray's report relates to Mr. Cooper's use of incorrect boundaries for the Enacted Maps in his initial report. Cooper candidly admitted that in drawing his initial illustrative districts he "mistakenly relied on plans that were developed in legislative committees during the 2022 redistricting process rather than the final plans enacted by the Legislature and signed into law by Governor Edwards." Pla-89, p. 2. Cooper supplemented his June 29, 2023 Declaration to accurately reflect the Enacted Maps. Dr. Murray offered no criticism or opinion in response to the Amended Illustrative Plan. Rec. Doc. 218, p. 98, line 25–p. 95, line 1

24-30115.9168

First, Dr. Murray compares compactness of the House and Senate districts in the Enacted Maps to the House and Senate districts in the Illustrative Plan. He uses the familiar Polsby-Popper and Reock tests, the Convex Hull method, and the method dujour, the "moment of inertia." After laboring through numerous charts, graphs, and explanations in his report and over an hour of testimony about the results of the various compactness metrics, he agreed that regardless of the metric used to evaluate compactness, the "illustrative plans are on average as compact as or more compact than the corresponding [enacted] plans."[263]

The Court concludes, as a matter of fact, that compactness of the districts in the Illustrative Plans as compared to the Enacted Maps is not reasonably disputed.[264] The Illustrative Senate Plan is more compact than the Enacted Senate Map and the Illustrative House Plan and the Enacted House Map are substantially equivalent in compactness. In short, Dr. Murray's compactness analysis offers no support for his racial predominance opinion.

Next Dr. Murray compares parish splits and voter tabulation district ("VTD") splits of the Enacted Maps and the Illustrative Plans. Dr. Murray contends that the parish and voting district splits are not correct in Cooper's analysis. He asserts Cooper's analysis is flawed and "some nuanced accounting [must have been] employed."[265] However, in

---

[263]Rec. Doc. 218, p. 98 lines 17–19. Using the conventional measures of compactness (Polsby-Popper and Reock), Dr. Murray opines that the Illustrative Plan scored slightly higher in compactness than the Enacted Maps. Even using the arguably more controversial "moment of inertia" metric, the Enacted House and Illustrative House score almost exactly the same. Rec. Doc. 218, p. 98.

[264] *See id.* (Murray was asked on cross examination, "whether you are looking at Polsby-Popper or Reock or Moment of Inertia, Mr. Cooper's illustrative plans are on average as compact as or more compact than the corresponding enrolled plans, right?" Dr. Murray answered: "I would agree with that."). On direct examination, Cooper states, "the point is there's really no meaningful dispute between myself and [sic] Dr. Murray, on compactness." Rec. Doc. 225, p. 25, lines 20–21.

[265] Interv-42, p. 6.

48

making these assertions, Murray confuses the concepts of "splits in parishes" and "parish splits." Parish splits refer to "unique parish/district combinations"[266] whereas splits in parishes refers to the number of parishes that are split.[267]

Murray states that Cooper found that there are 81 parish splits in the Enacted Senate Map and 65 parish splits in the Illustrative Senate Plan. But, Murray found that there are 116 parish splits in the Enacted Senate Map and 90 parish splits in the Illustrative Senate Plan.[268] However, it is unclear how Murray calculated these numbers. He offers no computation or exhibits, nor does he cite to any source for his assertion. Instead, he merely concludes that "his analysis" found these split counts. In his expert report, Murray also uses the terms "splits in parishes" and "parish splits" interchangeably, even though they refer to different metrics.[269] Thus, the Court finds his findings on this point conclusory and unreliable.

Moreover, even if Murray's findings were reliable, the Court finds that the Illustrative Senate and House Plan are superior to the Enacted Maps on this metric. Joint Rule 21(H) provides the relevant guidance on parish splits in redistricting plans. It directs that "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable."[270] Accordingly, a lower number of splits in parishes is ideal. Per Murray, there are 116 "splits in parishes" in the Enacted Senate Plan compared to 90 "splits in parishes" in the Senate Illustrative Plan.[271] Using Murray's conclusions, the

---

[266] Pla-89, p. 10.
[267] *Id.*
[268] Interv-42, p. 11.
[269] Interv-42, p. 11.
[270] Joint-56; Joint Rule 21(H), H.R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).
[271] Interv-42, p. 11.

Illustrative Senate Plan is superior. Again, offering no support for Murray's racial predominance theory.

With respect to splitting VTDs, Murray candidly admits that the Illustrative House and Senate districts "generally maintain Voting District boundaries and recognized places of interest."[272] But he contends that the Illustrative Districts split more VTDs compared to the Enacted Districts. However, Murray formed his analysis using the VTD boundaries issued by the Louisiana Legislature. In contrast, Cooper reported VTD splits in the Illustrative Plan based on U.S. Census VTD boundaries. Cooper's approach is consistent with Joint Rule 21(G) which speaks to minimizing splits in *census* voter tabulation districts. Murray was unaware of this distinction until trial.[273] Murray again showed his unfamiliarity with and misunderstanding of Joint Rule 21. Consequently, his VTD split comparison resulted in ill-founded conclusions.[274] Thus, Murray's opinions regarding the VTD splits in the Illustrative Plan as compared to the Enacted Maps are unreliable and untrustworthy and the Court affords them no credit.

Murray also criticizes the Illustrative Plan for splitting census blocks[275], which he equates to "neighborhoods" which he contends are a proxy for "communities of interests."[276] He asserts Cooper drew the Illustrative Plan without "respect to localized

---

[272] Interv-42, p. 21; Rec. Doc. 218, p. 100, lines 19–22.

[273] Rec. Doc. 218, p. 95, lines 6–12 (Dr. Murray was asked, "[a]re you aware that the Louisiana Legislature periodically issues new boundary files for voter tabulation districts?" Murray answered, "[n]ow I am." Dr. Murray was asked, "[a]re you aware that those are different than the VTD boundaries issued by the Census?" Murray answered, "[i]f what you're saying is true, I guess now I am.").

[274] *See id*. at lines 13–18 (Dr. Murray explained that he used the legislature's updated VTD boundaries in his analysis of VTD splits, and Plaintiffs' counsel informed him that Cooper reported splits based on census VTD boundaries).

[275] *Id*. at p. 74, lines 6–11 (Dr. Murray finds that there are 4,291 block groups in the state and he finds that in the Illustrative Senate Districts, 375 blocks are split by the district boundaries).

[276] *Id*. at p. 69, lines 1–3.

communities of interest."[277] The Court rejects Dr. Murray's conclusion. It is mere *ipsi dixit* reasoning. Throughout his testimony, Murray uses the term "communities of interest" and neighborhood interchangeably, yet he offers no data or evidence to support the assumption that these terms are one in the same. Murray also offers no data or evidence to support his assumption that census blocks serve as a proxy for either term. Even if the Court accepted the unsupported premise that census block groups are a reasonable proxy for communities of interest, Murray did no analysis of how many census blocks are split in the Enacted Maps.[278] Without this comparison, Murray's census block analysis is devoid of probative value.

Finally, Murray crunches a great deal of data to come to the unremarkable conclusion that the BVAP is concentrated in urban areas and the WVAP is concentrated in rural areas.[279] He concedes that property values are a factor in where people can afford to live. He also concedes that educational attainment also drives where people can afford to live. He admits that Louisiana's population is highly racially segregated[280] and admits that patterns of racial segregation, rather than race, is an explanatory factor in where people live.[281]

The Court concludes that Dr. Murray's testimony offered no support for the Defendants' theory that the illustrative districts were configured predominately based on race.

---

[277] *Id.* at p. 82, lines 24–28.
[278] *Id.* at p. 91, lines 17–19.
[279] *Id.* at p. 73, lines 15–21.
[280] *Id.* at p. 107, lines 3–8; Interv-42, p. 19 (looking at Figure 28).
[281] Rec. Doc. 218, p. 103, lines 13–16.

51

Dr. Michael Barber was offered by the Defendant Secretary of State also in support of the argument that race was the predominate factor in configuring the Illustrative Plan. Dr. Barber is an Associate Professor of Political Science at Brigham Young University and the Director for the Center for the Study of Elections and Democracy.[282] Dr. Barber earned his Ph.D. in Political Science, with emphasis in American politics and quantitative methods/statistical analyses, from Princeton in 2014.[283] He was accepted by the Court as an expert in the fields of political science, American politics, voting behavior and patterns, and simulated maps.[284]

Dr. Barber used a computer algorithm to generate 100,000 simulated random redistricting plans that he compared to the Illustrative Plan. He performed a regional analysis[285] to further compare the computer-generated simulated districts to the Illustrative Plan and Enacted Maps. Dr. Barber used the Redist software developed by Plaintiff's expert Dr. Cory McCartan.[286]

---

[282] Def-1, p. 124.

[283] Id.

[284] Rec. Doc. 229, p. 180, lines 17–23.

[285] Dr. Barber ran 100,000 State Senate simulations using districting criteria, not including race. His comparator simulations yielded no additional majority-Black districts in the areas of the Shreveport, Baton Rouge, and Orleans where the Illustrative Plan draws majority minority Senate districts. Dr. Barber reached the same general conclusions when conducting an analysis that compared the Illustrative House Districts with race neutral simulated comparator maps. Def-1, pp. 11–14.

[286] Plaintiffs' expert witness, Dr. McCartan, developed the simulation algorithm, known as the "SMC algorithm," which can generate randomly sampled redistricting plans and "can be applied to measure and evaluate existing redistricting plans along a variety of dimensions, while accounting for local variation in geography and voting patterns." Pla-135, p. 3. Additionally, he developed software packages for using census data. This package includes a tool known as Redist, which includes his SMC algorithm. Dr. Barber employed Dr. McCartan's algorithm when drafting his expert report. Id. at p. 4. Dr. McCartan concluded that Dr. Barber did not "follow best practices" when using the algorithm. He contends that Dr. Barber failed to check standard diagnostics. Id. at p. 5. When reviewing 2,593 lines of Dr. Barber's computer code, McCartan did not see the instructions to run the software's diagnostic routines. If used, these instructions ensure that the results are "trustworthy." Id. at pp. 11-12. Additionally, he asserts that Dr. Barber failed to properly account for "core retention" as his approach did not "take into account the degree of population overlap between old and new districts...." Id. at p. 10. Dr. McCartan also found that Dr. Barber failed to perform multiple parallel independent runs of the algorithm in his first set of simulations, as such the conclusions Dr. Barber introduced in his expert report did not provide for margins of error. Id. at p. 15. On

24-30115.9173

Dr. Barber ran simulations to compare splits in parishes, municipal splits, and core retention between the Illustrative Plan and the Enacted Maps.[287] Barber concluded that neither the Enacted House Map or the Illustrative House Plan do "especially well at minimizing parish or municipal splits compared to the simulations."[288] Barber finds that the reason for this under the Enacted House Map is due to the map's retention of the 2011 House district cores.[289] But, he concludes that the Illustrative Plan has a low core retention score. Barber deduces the same under the Enacted Senate Map and the Illustrative Senate Plan. Thus, Dr. Barber suggests that "adherence to [sic] race-neutral criteria does not explain the [sic] Illustrative [sic] map's boundaries."[290]

Defendants contend that Barber's simulations are evidence that in drawing the illustrative districts, Cooper sought to maximize the number of majority-Black districts in urban regions to not only equal, but exceed proportionality.[291] In apparent recognition that that simulations were expressly rejected by the Supreme Court in *Milligan* in the context of a VRA § 2 vote dilution case, Defendants state that they "offer these opinions, not in the context of examining effects, but to prove intent."[292] The Court finds that the illustrative map drawer's intent has no probative value in the context of the VRA § 2 vote dilution case presented here. In *Milligan* the Supreme Court reiterated that § 2 "itself 'demands

---

cross-examination, Dr. McCartan admitted that Dr. Barber performed independent runs of the algorithm in his second set of simulation. Rec. Doc. 214, p. 161, lines 2–5. Because of irregularities in his method, the reliability of his conclusions is questionable. However, the Court does not reject Dr. Barber's opinions as unreliable because, for reasons *infra*, the Court rejects Dr. Barber's opinions as irrelevant.

[287] Def-1, pp. 20, 24.

[288] *Id.* at p. 66.

[289] *Id.* Dr. Barber does not define "cores" in his expert report, but the Court presumes he is referring to core populations.

[290] Def-1, pp. 28, 67.

[291] Rec. Doc. 177, p. 34.

[292] *Id.* (citing Amicus Brief of Jowei Chen *et al.*, *Alexander v. S.C. State Conf. of the NAACP*, 143 S. Ct. 2456 (2023)).

consideration of race'", because "the question whether additional majority-minority districts can be drawn . . . involves a 'quintessentially race-conscious calculus.'"[293]

In *Milligan*,[294] Alabama argued that computer generated maps should be used as a "race-neutral benchmark" against which to measure illustrative maps in a § 2 vote dilution case. The Supreme Court rejected the use of computer-generated maps offered as benchmarks because liability in a VRA § 2 case "turns on the presence of discriminatory effects, not discriminatory intent."[295] Illustrative maps, in the context of a statutory voting rights case, like this one, are offered "to show, as [sic] cases require, that an additional majority-minority district could be drawn."[296] Illustrative maps are "created with an express [racial] target in mind."[297] Indeed, Chief Justice Roberts observed, "[t]hat is the whole point of the enterprise."[298] Concluding that in a VRA § 2 case "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in case law."[299] The illustrative map-makers intent is irrelevant in a statutory § 2 vote dilution case, such as this one.

Computer generated maps may be probative of a state's intent in map-drawing in the context of a Fourteenth Amendment racial gerrymandering case,[300] but that case is not before the Court and the Court declines to reach that constitutional question.[301]

---

[293] *Milligan,* 599 U.S. 1, 30–31 (2023) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

[294] *Id.* at 33.

[295] *Id.* at 25.

[296] *Id.* at 33.

[297] *Id.*

[298] *Id.*

[299] *Id.*

[300] *See Milligan*, 599 U.S. at 44 (Kavanaugh, J. concurring) ("[C]omputer simulations might help detect the presence or absence of *intentional* discrimination.")

[301] "[C]onsistent with the longstanding canon of constitutional avoidance," the Alabama district court in *Singleton* declined to decide the Fourteenth Amendment racial-gerrymandering claims. *See Singleton v. Merrill,* 582 F. Supp. 3d 924 (N.D. Ala. 2022), *order clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), and *appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, No. 22-

---

24-30115.9175

A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them. This principle required the courts below to determine, before addressing the constitutional issue, whether a decision on that question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims. If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate.[302]

Scholars point out that "[t]he racial-gerrymandering context is [] materially different from the racial vote-dilution context."[303] Unlike statutory VRA § 2 claims, racial gerrymandering claims require proof of intent. In a case alleging unconstitutional gerrymander, the plaintiff must prove that "race was the predominant factor motivating the *legislature's* decision to place a significant number of voters within or without a particular district."[304] If the plaintiff proves that the district boundaries drawn by the *Legislature w*ere motivated predominately by race, then the disputed district is subject to strict scrutiny.[305] The Illustrative Plan offered by the Plaintiffs demonstrates that additional reasonably configured majority minority districts can be created. It is not a legislative map. There is no state action and thus a Fourteenth Amendment analysis is not triggered. For these reasons the Court finds Dr. Barber's opinions irrelevant.

Finally, Defendants presented Dr. Alan Johnson. Dr. Johnson was accepted by the Court on stipulation of the parties as an expert in the fields of political science, political

---

10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), and *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

[302] *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988) (internal citations omitted).

[303] Amicus Brief of Professors Stephanopoulos and Chen at 19, *Alexander v. S.C. State Conf. of the NAACP*, 143 S. Ct. 2456 (2023) (No. 22-807).

[304] *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added); *see also Cooper v. Harris,* 581 U.S. 285, 291 (2017); *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999).

[305] *See Cooper*, 581 U.S. at 292 ("[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny.")

geography, redistricting, and the Maptitude software.[306] Dr. Johnson was critical of Mr. Cooper's methodology and came to the general conclusion that the Illustrative House and Senate Plans were drawn predominantly for reasons of race. The Court finds Dr. Johnson's opinions unpersuasive.

Dr. Johnson's opinions were based on a visual inspection of the Illustrative Plan without any comparison to the Enacted Maps. He opines that from 2000 to 2022 the number of majority-Black House and Senate Districts has increased more than the increase in the BVAP. This observation is meaningless as he concedes that he did not do a proportionality analysis and admits that he did not consider the decline in WVAP during the time period.

On the communities of interest inquiry, Dr. Johnson was critical of Cooper's aggregation of voter socioeconomic data.[307] However, Cooper's rebuttal report establishes that the Illustrative Plan's majority-Black districts keep low and moderate income neighborhoods together.[308] Dr. Johnson also critiqued Cooper's analysis of splits of MSAs, municipal boundaries, and planning district boundaries, and what he called "zigs and zags" of illustrative district boundaries.[309] Though, he conceded that the illustrative districts followed precinct lines and do follow some major roadways. On cross

---

[306] Rec Doc. 229, p. 30, lines 19–25. Dr. Johnson's reports were admitted into evidence by stipulation of the parties. *See* Interv- 51 and Interv-58. The reports were redacted by the parties in compliance with the Court's Ruling on Plaintiffs' Motion in Limine, Rec. Doc. 174. A separate proffer was made by the Defendants of the excluded portions of Dr. Johnson's reports.

[307] Cooper relied on socioeconomic data aggregated at the Parish and City levels. Dr. Johnson testified that this "tells [him] nothing about where people—or how much money people in each individual section of the parish earn." *See* Rec. Doc. 229, p. 50, lines 6–12.

[308] *See* Pla-89 at p. 12 ("[T]he Illustrative Plan generally keep together low- and moderate-income neighborhoods—independent of race.")

[309] Rec. Doc. 229, p. 53, line 1–p. 60, line 19, line ; Interv-58, p. 88.

56

examination, when asked to compare the Illustrative districts to the Enacted districts in the Calcasieu Parish area, he admitted that the Illustrative Plan split fewer parishes.[310]

Based on the BVAP percentage in the Illustrative majority-Black districts, Dr. Johnson opines that the Illustrative districts were achieved by removing Black voting-age populations from other majority-Black districts. [311] This is unremarkable and not probative. "Section 2 itself demands consideration of race" because "the question whether additional majority-*minority* districts can be drawn . . . involves a quintessentially race-conscious calculus." [312]

Finally, Dr. Johnson hinted that the census data relied upon to configure the Illustrative Plan may be unreliable due to "differential privacy" protocols employed by the Census Bureau. He explained that to protect census respondent privacy, the Census Bureau "blur[s] the census data" at the block levels to prevent data miners from determining the identities of census respondents.[313] "Differential privacy" is a red herring. Dr. Johnson does not know the margin of data error associated with this blurring but guesses that an illustrative district with a 50.2 percent BVAP may not be over 50 percent BVAP considering the "differential privacy" factor.[314] First, Dr. Johnson has no basis for this conclusion. He admittedly does not know what, if any, margin of error results from "differential privacy."[315] Second, he offers no alternative to the use of official census data

---

[310] *See* Rec. Doc. 229, p. 131, lines 11–15 (Dr. Johnson admitted that keeping districts within parish boundaries is one of the traditional redistricting factors).

[311] *See* Rec. Doc. 229, p. 87, lines 1–20 (Dr. Johnson observed that 11 of the Illustrative Plan's minority House districts are under 53 percent BVAP—eight more than the Enacted Map; 11 of the 16 Illustrative Plan's minority Senate districts are between 50 – 53 percent BVAP. He commented that Illustrative House District 69 had a "very precise" BVAP of 50.2 percent.)

[312] *Milligan,* 599 U.S. at 31 (internal quotations omitted) (emphasis in original).

[313] Rec. Doc. 229, p. 89, lines 7–13; Interv-51, p. 38.

[314] Rec. Doc. 229, p. 93, lines 11–14; p. 152, lines 16–19.

[315] *Id.* at p. 152, line 20–p. 153, line 8.

24-30115.9178

relied upon by virtually every expert in the redistricting field. Finally, he admitted that concerns about the effect of "differential privacy" have nothing to do with the effectiveness of the proposed district. Dr. Johnson admitted that the possibility that "differential privacy" may introduce a small margin of error in the raw census data is not correlated to effectiveness.[316] Dr. Johnson asserts that there is a "sensitivity analysis to consider" to test the effectiveness of the illustrative minority districts, though he admits he performed no such analysis.[317]

Dr. Johnson's analysis does nothing to advance Defendants' argument that race predominated the Illustrative Plan.

Finally, Defendants seek to superimpose an equal protection analysis into the *Gingles* inquiry. The equal protection clause invites examination of a state enacted map,[318] to discern whether the "State, without sufficient justification, [] separat[ed] its citizens into different voting districts on the basis of race."[319] An Equal Protection analysis is premature at this stage. As recognized by the Fifth Circuit, "a Section 2 *Gingles*[320] claim [] is distinct from an Equal Protection racial gerrymander violation."[321]

Section 2 expressly condemns districting solely on the basis of demographic proportionality, and evidence of proportional redistricting may be probative of racial

---

[316] Effectiveness analyzes whether the proposed minority district will provide a reasonable opportunity for the minority voter to elect a preferred candidate. *See* Rec. Doc. 229, p. 161, lines 21–24 (Dr. Johnson agrees that the "differential privacy concept…doesn't have any effect on election returns data.")

[317] Interv-51, p. 28; *See* Rec. Doc. 229, p. 156, lines 15–25 (Dr. Johnson admits that he "did not attempt to calculate the effectiveness level of any district.")

[318] The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by government entities, not private parties. Therefore, state action is a prerequisite to bringing an equal protection claim under the Fourteenth Amendment. *See Shelley v. Kraemer*, 334 U.S. 1 (1948) ("[T]he action inhibited by [] the Fourteenth Amendment is only such action as may fairly be said to be that of the States.")

[319] *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (citing *Miller v. Johnson,* 515 U.S. 900, 911 (1995)).

[320] *Gingles*, 478 U.S. 30 (1986).

[321] *Robinson v. Ardoin,* 86 F.4th 574, 595 (5th Cir. 2023).

58

gerrymandering but it is not dispositive. Moreover, the district maps being advanced by the Plaintiffs are illustrative, offered to show that Black voters could constitute a majority in reasonably configured illustrative districts whilst also abiding traditional redistricting considerations such as equal populations; contiguity; respect for existing political subdivisions; such as precincts, parishes, cities, and towns; and communities of interest. The Section 2 analysis considers whether race predominated in the drawing of the illustrative map. The Court finds that the Plaintiffs established by a preponderance of the evidence that race did not predominate in the configuration of the Illustrative Plan.

In conclusion, the Court finds that between 2000 through 2020, Louisiana experienced significant population change, notably an increase in its Black population, and simultaneously a decrease in White population, particularly in the New Orleans-Metairie MSA. The Court finds Cooper to be a credible witness and is persuaded by his method to "uncrack" and "unpack" districts in the Enacted Maps to form additional Black-majority districts. As mentioned above, Cooper's reduction of BVAP in other districts to create additional Black-majority districts is obvious and does nothing to move the needle in Defendants' favor.

Therefore, the Court finds that in the Enacted Senate Map, the Black population is unnecessarily concentrated in Districts 15 and 39. Both these districts contain BVAPs well over 50 percent. The Court also finds that the BVAP is unjustifiably fragmented across Senate Districts 5, 7, 8, 10, and 19, which cover the New Orleans-Metairie MSA.[322] While population trends indicate that this area has seen significant increase in its Black

---

[322] "*Statistics,*" Dave's Redistricting, [https://davesredistricting.org/maps#viewmap::12eedba5-68de-4ab4-a3bb-7f59d9268041] (Referenced at Pla-20, p. 31) (Statistics list the percentages of the population by district and race).

24-30115.9180

population and decrease in its Non-Hispanic White population between 2000 and 2020, only Districts 5 and 7 are majority-Black districts whereas Districts 8, 10, and 19 are each well below the 50 percent threshold.[323] Notably, the Court finds as fact that in Enacted Senate Districts 8 and 10 Black voters constitute less than a quarter of the VAP.[324] The Court finds that there are similar examples of packed and cracked districts in the Enacted House Map. BVAP is heavily concentrated in Enacted House Districts 2 and 4, which covers Caddo Parish, in the Enacted House Map. Both districts contain BVAPs in the 60s and 70s. There is certainly an opportunity to disperse the Black population into at least one additional district in this region. Moreover, the Court finds that the Black population is fragmented in House Districts 5, 7, 13, 22, and 25 in the Natchitoches Area of the Enacted House Map. None of the districts contain a BVAP over 30 percent, yet in the 2011 Benchmark Plan, a majority-Black district similar to the one proposed by Mr. Cooper existed in this region.[325] The Court finds the Enacted House Map packs and cracks districts in the Lake Charles MSA. House District 34 contains a BVAP of 72.6 percent, but neighboring districts 35 and 37 contain BVAPs of merely 12.5 percent and 17.6 percent.[326] The Court finds that the Enacted House Map unnecessarily concentrates the Black population into one district while dividing the rest of the Black population into smaller districts.

The Court finds as fact that the Black population in the Baton Rouge MSA grew between 2000 and 2020. As such, the Enacted House Map should properly reflect this

---

[323] *See id.*

[324] *See id* (District 8 possesses a BVAP of 25.84 percent and District 10 possesses a BVAP of 12.22 percent).

[325] "*Statistics*," Dave's Redistricting, [https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5] (Referenced at Pla-20, p. 45) (District 2 holds a BVAP of 67. 38 percent and District 4 holds a BVAP of 72.07 percent).

[326] *See id.*

growth. However, the Court finds that the BVAP is diluted in this region because of cracking and packing. The African American population is greatly concentrated in House Districts 29 and 63. Enacted House District 29 contains a BVAP of 73.6 percent and Enacted House District 63 contains a BVAP of 69.7 percent.[327] But, neighboring district 65 contains a BVAP of slightly under 22 percent.[328] The Court finds that there is an opportunity to create at least one additional district in this area covering the cities of Central and Baton Rouge. Enacted House District 60 is also located in the Baton Rouge MSA and surrounds Iberville and Ascension Parishes. The Black population in Ascension Parish has doubled from 15,684 to 32,216 between 2000 and 2020, but Enacted House District 60 holds a BVAP of only 37.7 percent.[329] The Court finds that this low percentage is the result of fragmenting the significant Black population across these parishes. Finally, the Court finds that Enacted House Map cracks and packs the Black population in Districts 61, 68, 69, and 70. While District 61 possesses a BVAP of 75.29 percent, close districts 68, 69, and 70 all possess BVAPs below 25 percent.[330] The Court finds that the Black population in Baton Rouge has grown by 25 percent between 2000 and 2020, and the Enacted House Map does not properly account for this significant growth.[331]

As such, the Court finds the Black population is "sufficiently large" in Louisiana such that the Black population can comprise 50 percent or more of the population for many state house and senate districts. The Court also finds that the Illustrative Plan

---

[327] *See id.*

[328] *See id.* (Enacted House District 63 contains a BVAP of 21.89 percent).

[329] *See id.*; Pla-20, p. 55–56.

[330] "Statistics", https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (Referenced at Pla-20, p. 45) (Enacted House District 68 contains a BVAP of 20.18 percent, Enacted House District 69 contains a BVAP of 23.75 percent, and Enacted House District 70 contains a BVAP of 21.21 percent).

[331] Rec. Doc. 225, p. 15, lines 2–4 ("[T]he Baton Rouge Area has seen a 25 percent increase in Black population. In absolute terms, almost 64,000 people.")

"generally maintain[s] Voting District boundaries and recognized places of interest" as set forth in Joint Rule 21.[332] Cooper adhered to traditional redistricting principles when developing the Illustrative Plan. Furthermore, the Court finds Dr. Colten to be a credible witness. His assertions concerning the communities of interest and their preservation within the Illustrative Plan are persuasive. As such, the Court finds that Plaintiffs have satisfied *Gingles* I and the Black voting age population is "sufficiently large and geographically compact" to constitute a majority in several reasonably shaped legislative districts as demonstrated by the Illustrative House and Senate Plans offered by the Plaintiffs.

### B. *Gingles* II and III

To satisfy the second and third *Gingles* requirements, namely that Black voters are "politically cohesive" and "that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate,"[333] Plaintiffs offered the opinions of Dr. Lisa Handley.[334]

Defendants stipulated to Dr. Handley's expertise in the area of redistricting and minority vote dilution.[335] Employing 35 years of experience as a voting rights and redistricting expert, Dr. Handley analyzed the racial voting patterns in several areas of the State of Louisiana to determine whether voting in these areas is racially polarized.[336] Dr. Handley employed three separate localized analyses of voting patterns in the seven areas of Louisiana where Mr. Cooper's Illustrative House and Senate Plans create more

---

[332] Interv-42, p. 21 (Dr. Murray affirming this point); Joint-56.
[333] *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citing *Gingles*, 478 U.S. 30, at 50–51 (1986)).
[334] Rec. Doc. 217, p. 10, lines 5–7.
[335] Rec. Doc. 217, p. 10, line 9.
[336] Pla-1, p. 2.

majority BVAP districts than the Enacted House and Senate Maps.[337] The "seven areas of interest" include parishes that overlap geographically with the new proposed majority-Black districts in Cooper's Illustrative Plan such that they contain the areas where the potential voters for the new districts live.[338]

Dr. Handley used the statistical methods of homogenous precinct ("HP") analysis, ecological regression ("ER"), and ecological inference ("EI") to calculate estimates of the percentage of Black and White voters who voted for candidates in recent statewide general elections and state legislative elections.[339] Experts agree and courts recognize that EI produces the most reliable estimates, and Dr. Handley used homogenous precinct analysis and ecological regression to check the estimates produced by her EI analysis. These analyses constitute the district-specific analyses required by *Gingles*.[340]

Employing this methodology, Dr. Handley analyzed sixteen recent statewide election contests that included Black candidates. Dr. Handley opines that election contests which include minority candidates are more probative than contests with only White candidates.[341] This Court finds—and both Defendants' expert and additional courts agree—that biracial statewide elections are the "most probative" for determining racial polarization.[342]

Dr. Handley opined on the election results by stating that "Black voters are very cohesive in the seven areas."[343] Her report denotes that, "Black and White voters

---

[337] Rec. Doc. 217, p. 10–11; Pla-1, p. 4.
[338] Rec. Doc. 217, p. 11–12; p. 50, lines 2–14; p. 91, line 25–p. 92, line 13.
[339] Rec. Doc. 217, p. 13, line 23–p. 14, line 11; Pla-1, p. 4. HP and ER were used and accepted by the Supreme Court as far back as *Gingles*, she stated. EI, which was developed later, has since become a widely accepted technique, as well.
[340] *Gingles*, 478 U.S. at 103 (O'Connor, J., concurring).
[341] Pla-1, p. 6, n. 9.
[342] Rec. Doc. 217, p. 19, lines 11–15; Rec. Doc. 228, p. 145, lines 15–18.
[343] Rec. Doc. 217, p. 12, lines 23–24.

supported different candidates in nearly every election contest analyzed, with Black voters cohesive in support of their preferred candidates and the White voters bloc voting against these candidates."[344] Black-preferred candidates received an average of 82.7% of the Black vote in statewide elections in these areas and only an average of 12.2% of the White vote.[345] When limited to only two-candidate contests, Black-preferred candidates received an average 93.2% of the Black vote in statewide races in these areas and an average of 15.6% of the White vote.[346] "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district."[347] The analyses conducted by Dr. Handley clearly demonstrate high levels of cohesiveness among Black Louisianans in supporting their preferred candidates in the areas where Mr. Cooper has proposed to draw additional majority-Black districts.[348]

---

[344] Pla-1, p. 9

[345] Pla-1, p. 10.

[346] Pla-1, p. 10.

[347] *Gingles*, 478 U.S. at 68.

[348] In Area 1, the percentage of support from Black voters for the Black-preferred candidate ranges from 98.1% to 44.8%, with the support being over 50% in all the elections analyzed but one, and over 60% in all elections analyzed but three. *See* Pla-3.

In Area 2, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.3% to 50.4%, with the support being over 50% in all the elections analyzed and over 60% in all elections analyzed but two. *See* Pla-4.

In Area 3, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.7% to 39.5%, with the support being over 50% in all but two of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-5.

In Area 4, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.2% to 36.7%, with the support being over 50% in all but two of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-6.

In Area 5, the percentage of support from Black voters for the Black-preferred candidate ranges from 96.5% to 50.7%, with the support being over 50% in all of the elections analyzed and over 60% in all of the elections analyzed but three. *See* Pla-7.

In Area 6, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.5 % to 44.9%, with the support being over 50% in all but one of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-8.

In Area 7, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.4% to 36.8%, with the support being over 50% in all but one of the elections analyzed and over 60% in all elections analyzed but two. *See* Pla-9.

Plaintiffs also presented evidence through Dr. Handley's testimony that White voters typically vote as a bloc to defeat Black voters' preferred candidate.[349] In every election that Dr. Handley analyzed within each of the seven areas of interest, White voters consistently bloc voted to defeat the candidates supported by Black voters. Across the 16 elections, a scant 12.2% of White voters supported the Black preferred candidate in multi candidate races, rising to only 15.6% in two-candidate contests.[350] Dr. Handley found that due to this low level of White support for Black-preferred candidates, blocs of White voters were able to consistently defeat Black-preferred candidates.[351] She also analyzed 21 state legislative elections overlapping with the seven areas of interest and found racially polarized voting occurred in all but one of these elections.[352] Dr. Handley concluded that "[r]acially polarized voting substantially impedes the ability of Black voters to elect candidates of their choice to the Louisiana state legislature in these areas unless districts are drawn to provide Black voters with this opportunity."[353]

Dr. Handley also analyzed whether the Legislature's Enacted Maps provide opportunities for Black voters to elect the candidate of their choice by conducting a district-specific recompiled elections analysis.[354] Comparing the majority-Black districts in Plaintiffs' Illustrative Plans and the corresponding districts in the Enacted Maps, Handley selected three "clusters" of Senate districts and five "clusters" of House districts.[355] She

---

[349] Rec. Doc. 217, p. 13, lines 1–4.
[350] Pla-1, p. 10.
[351] Pla-1, p. 33.
[352] Pla-1, p. 11. Ten of the 11 state senate elections she evaluated were racially polarized. *Id*. All of the ten state house elections she analyzed were racially polarized. *Id.*
[353] Pla-1, p. 33.
[354] Pla-1, p. 12.
[355] State Senate Cluster 1 contains three districts in Bossier and Caddo Parishes; State Senate Cluster 2 contains four districts in Jefferson and St. Charles Parishes; and State Senate Cluster 3 contains four districts in East Baton Rouge, West Baton Rouge, Iberville, and Point Coupee Parishes. Pla-1, p. 14. State

24-30115.9186

then calculated two effectiveness scores for each cluster: The first score, the All-Elections Effectiveness Score, "demonstrates the percentage of election contests (out of the total 16 statewide contests) that the Black-preferred candidate would have won or advanced to a runoff in the district."[356] The second score, the Two-Candidate Effectiveness Score, "reports the percentage of two-candidate elections (out of the eight two-candidate contests) that the Black-preferred candidate would have won in the district."[357]

Notably, Dr. Handley concluded that only the clusters with at least a 50% BVAP provided Black voters with an opportunity to elect the candidate of their choice. She testified that, "with one exception, no districts were effective that were under 50% [BVAP]."[358] In each of the clusters, the Illustrative Plans drawn by Mr. Cooper provided at least one additional district that would give Black voters an opportunity to elect candidates of their choice as compared to those in the existing Enacted Maps.[359]

---

House Cluster 1 contains several districts in De Soto, Natchitoches, and Red River Parishes; State House Cluster 2 contains five districts from Calcasieu Parish; State House Cluster 3 contains eight districts from Bossier and Caddo Parishes; State House Cluster 4 contains three districts from Ascension and Iberville Parishes; and State House Cluster 5 contains ten districts from East Baton Rouge and East Feliciana Parishes. Pla-1, p. 15.

[356] Pla-1, p. 12.

[357] Pla-1, p. 12.

[358] Rec. Doc. 217, p. 41, lines 2–3.

[359] State Senate Cluster 1 has three districts. Pla-1, p. 16. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SD 38 and 39—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 16–17. By contrast, Enacted SD 38 does not provide an opportunity to elect Black-preferred candidates, with an All-Elections Effectiveness Score of only 18.8% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 17.

In Senate Cluster 1, therefore, the Illustrative Senate Plan has two effective Black-majority districts, Illustrative SD 38 and 39, while the Enacted Senate Plan has only one effective Black-majority district, Enacted SD 39. Pla-1, p. 16.

State Senate Cluster 2 has four districts. Pla-1, p. 19. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative Senate Plan in this area—Illustrative SD 19—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 19. By contrast, Enacted SD 8, 9, 10, and 19 do not provide an opportunity to elect Black-preferred candidates, all with an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 19.

66

In Senate Cluster 2, therefore, the Illustrative Senate Plan has one effective Black-majority district, Illustrative SD 19; while the Enacted Senate Plan does not have any effective Black-majority district. Pla-1, p. 19.

State Senate Cluster 3 has four districts. Pla-1, p. 21. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SD 14, 15, and 17—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 21. By contrast, Enacted SD 6 and 16 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 21.

In Senate Cluster 3, therefore, the Illustrative Senate Plan has three effective Black-majority districts, Illustrative SD 14, 15, and 17; while the Enacted Senate Plan has only two effective Black-majority districts, Enacted SD 14 and 15. Pla-1, p. 21.

State House Cluster 1 has three districts. Pla-1, p. 23. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative House Plan in this area—Illustrative HD 23—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 23.

By contrast, Enacted HD 7, 22, and 25 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 23.

In House Cluster 1, therefore, the Illustrative House Plan has one effective Black-majority district, Illustrative HD 23; while the Enacted House Plan does not have any effective Black-majority districts. Pla-1, p. 23.

State House Cluster 2 has five districts. Pla-1, p. 25. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 34 and 38—had effectiveness scores well over 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 25. By contrast, Enacted HD 33, 35, and 36 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 25.

In House Cluster 3, therefore, the Illustrative House Plan has two effective Black-majority districts, Illustrative HD 34 and 38, while the Enacted House Plan has one only effective Black-majority district, Enacted HD 34. Pla-1, p. 23.

State House Cluster 3 has eight districts. Pla-1, p. 27. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the four Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 1, 2, 3, and 4—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 27. By contrast, Enacted HD 1, 5, 6, 8, and 9 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 27.

In House Cluster 3, therefore, the Illustrative House Plan has four effective Black-majority districts, Illustrative HD 1, 2, 3, and 4; while the Enacted House Plan has only three effective Black-majority districts, Enacted HD 2, 3, and 4. Pla-1, p. 27.

State House Cluster 4 has three districts. Pla-1, p. 29. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative House Plan in this area—Illustrative HD 60—had an effectiveness score of 100%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 29. By contrast, Enacted HD 59, 60, and 88 do not provide an opportunity to elect Black-preferred candidates. Enacted HD 59 and 88 have an All-Elections Effectiveness Score of 6.3% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 29. Enacted HD 60 has an All-Elections Effectiveness Score of 43.8% and a Two-Candidate Effectiveness Score of 25%. Pla-1, p. 29.

24-30115.9188

Based on her analysis of the data, Dr. Handley concluded that because of the clearly racially polarized voting in Louisiana, Black voters can only elect their candidate of choice if a district is drawn that gives them that opportunity.[360]

Defendants challenged the testimony and evidence presented by Plaintiffs by arguing that Dr. Handley's analysis was flawed and by presenting their own theories as to why the *Gingles* II and III preconditions are not satisfied. Defendants first take issue with Dr. Handley's opinion because they say "she did not adequately account for high levels of absentee and early voting."[361] Dr. Handley explained that to perform her RPV analysis, she was required to take candidate-specific early and absentee votes reported at the parish-wide level by the Louisiana Secretary of State website and disaggregate that data down to the precinct level.[362] Accordingly, Dr. Handley used an allocation method to assign the early and absentee votes to particular precincts within a parish "proportionally based on the votes received by each of the candidates on Election Day" in each area she studied.[363] Defendants claim Dr. Handley's method did not cap the number of early or absentee votes assigned to each precinct by the total number of voters

---

In House Cluster 4, therefore, the Illustrative House Plan has one effective Black-majority district, Illustrative HD 60, while the Enacted House Plan does not have any effective Black-majority districts. Pla-1, p. 29.

State House Cluster 5 has ten districts. Pla-1, p. 31. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the seven Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 61, 63, 65, 67, 68, 69, and 101—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 31. By contrast, Enacted HD 65, 66, 68, 69, and 70 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score under 12.5%. Pla-1, p. 31.

In House Cluster 5, therefore, the Illustrative House Plan has seven effective Black-majority districts, Illustrative HD 61, 63, 65, 67, 68, 69, and 101, while the Enacted House Plan has only five effective Black-majority districts, Enacted HD 61, 62, 63, 67, and 101. Pla-1, p. 31.

[360] *See* Pla-1, p. 33.
[361] Rec. Doc. 206, p. 25.
[362] Rec. Doc. 217, p. 15, line 19–p. 16, line 25; p. 89, lines 14–24.
[363] Pla-1, p. 6.

who turned out in a particular election.[364] They claim this amounts to a misallocation of candidate vote shares to precincts underlying the database upon which she then runs her statistical analyses, making her opinions unreliable.[365]

The Court already addressed Defendants' contentions on this point prior to trial. As the Court addressed in its *Ruling*[366] on the *Joint Motion in Limine to Exclude Dr. Lisa Handley's Testimony and Reports*,[367] "[e]arly and absentee votes are reported only at the parish level in Louisiana—they are not allocated back to the precinct where the voter resides. Rather than simply ignore these votes, they have been allocated to the parish precincts proportionally based on the votes received by each of the candidates on Election Day."[368] "The simple fact is that early voting in Louisiana represents a statistically significant percentage of the total vote which must be accounted for, and "the scientifically accepted method for analyzing whether there is racially polarized voting ("RPV") is the ecological inference analysis ("EI"), which requires precinct-level voting data."[369] As elicited during trial, the Louisiana Secretary of State *only* reports candidate-specific early and absentee votes at the parish-wide level.[370] Other states report this information at the precinct level.[371] Accordingly, Dr. Handley assumed the same percentage allocation of election day votes per candidate per precinct to allocate the early votes per candidate per precinct to perform the requisite analysis.[372]

---

[364] Rec. Doc. 206, p. 27.
[365] *Id.; See also* Rec. Doc. 148-1, p. 2.
[366] Rec. Doc. 171.
[367] Rec. Doc. 148.
[368] Rec. Doc. 171, p. 4; Rec. Doc. 165-1, p. 7.
[369] Rec. Doc. 171, p. 4–5.
[370] Rec. Doc. 217, p. 16, line 15–p. 17, line 1.
[371] Rec. Doc. 217, p. 16, line 22–p. 17, line 1.
[372] Rec. Doc. 217, p. 17, lines 2–6.

69

Defendants do not dispute that precinct-level data is necessary to run the EI analysis, but challenge how to best de-aggregate or allocate the available parish-wide data down to usable precinct-level data. Dr. Handley testified at trial that the methods she employed did not introduce any bias into her EI analysis.[373] The Court is persuaded that the slight over and underestimate of votes per precinct resulting from the subject allocation method is statistically insignificant and thus does not render the conclusions unreliable. "EI analysis is done using proportions of the vote share that each candidate received, . . . not raw total numbers that are input into the EI algorithm."[374] The Court does not find that the method employed by Dr. Handley to de-aggregate parish-wide numbers was the result of bias, and there is no evidence that it rendered the analysis infirm or the conclusions unreliable. The Court finds Dr. Handley's allocation and analysis of the early votes reliable and her conclusions credible.

Defendants further challenge Dr. Handley's opinion by arguing that the only district-specific information reported by Dr. Handley classifies districts as either "effective" or not, without opining as to the level of BVAP needed to be effective. Per Defendants, Handley's analysis has limited value because it does not inform the Court whether a majority-Black district is actually necessary in order for the Black-preferred candidate to be elected.

Instead, Defendants claim that a functional analysis shows that additional majority-Black districts are not needed in the "areas of interest" due to sufficient White crossover voting. To support this proposition, Defendants retained Dr. Jeffrey B. Lewis to analyze and estimate "the degree of Black voter cohesion and white voter crossover" included in

---

[373] Rec. Doc. 217, p. 42, lines 16–25.
[374] Rec. Doc. 165, p. 4 (citing Dr. Handley's deposition, Rec. Doc. 165-3).

Dr. Handley's clusters."[375] By stipulation of the parties, Dr. Lewis was admitted as an expert in political science, quantitative methods, and racially polarized voting analysis.[376] To perform his analysis, Dr. Lewis used the ecological inference method to analyze election data from 2015 to 2021 and consider "how each contest would have turned out if only the votes of those residing in each enacted and illustrative State House and State Senate had participated."[377] He concluded that White crossover voting ranged from 18 percent to 27 percent on average in two-candidate election contests in the challenged districts, and that less than a 50 percent BVAP is actually necessary for a 50 percent win rate in the specific illustrative districts drawn by Mr. Cooper.[378] Defendants argue that because almost all of the House and Senate clusters identified by Dr. Handley would all "perform" at BVAP levels less than 50 percent, none of the metrics warrant a redrawing of the 2022 House and Senate maps to create new majority-Black districts.

However, as held by the Fifth Circuit, "[i]llustrative districts that could perform with a BVAP of less than 50 percent with white crossover voting are not the focus of the third *Gingles* precondition analysis."[379] "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature."[380] Further, Defendants' claims that there are additional opportunity districts in the areas of interest identified in the Enacted Maps are unsupported by evidence. These claims are based solely on Dr. Lewis' opinion that the Black-preferred candidates could advance (not ultimately win) in a few districts

---

[375] Interv-52, p. 3.
[376] Rec. Doc. 218, p. 112, lines 2–10.
[377] Interv-52, p. 2.
[378] Interv-54, p. 3.
[379] *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023).
[380] *Id.* at 596.

24-30115.9192

without a majority BVAP.[381] An examination of what Dr. Lewis identifies as "win rates" in his reference districts reveals that the Black-preferred candidate does not usually prevail in the final election.[382] There is no evidence that Black-preferred candidates will consistently prevail in election districts that are less than 50 percent BVAP.

When comparing the effectiveness scores in Dr. Handley's report to the win rates from Dr. Lewis' report, the Court finds that Dr. Handley presented clear evidence that, save for the one exception in Enacted House District 91, no districts in the Enacted Maps provide Black voters the opportunity to elect their candidate of their choice other than those districts with a majority BVAP.[383]

Finally, Defendants offered the expert testimony of Dr. John R. Alford, who Plaintiffs stipulated, and the Court accepted, to provide expertise in the areas of voting behavior and redistricting.[384] Dr. Alford reviewed the voting results in Louisiana from the past three presidential elections and concluded that the predominate factor causing polarization in these elections was party and not race.[385] Dr. Alford first challenged Dr. Handley's finding that the Black vote was cohesive by examining the elections used in Dr. Handley's RPV analysis. He opined that "Black voters tend to provide cohesive support to Democratic candidates, often in the 80 to 90 percent range, and that White voters in turn support Republican candidates, with White votes for the Republican candidates typical in the 80 to 90 percent range."[386] However, he conceded that when

---

[381] Rec. Doc. 214, p. 29, line 18–p. 31, line 9.
[382] Rec. Doc. 214, p. 34, line 1–p. 35, line 13.
[383] Enacted HD 91 is the only current legislative district in the state without a majority BVAP where Black-preferred candidates can get elected. *See* Pla-1, p. 16, n.18. Enacted HD 91 is not within Plaintiffs' areas of interest and is not majority-White.
[384] Rec. Doc. 228, p. 99, lines 4–8.
[385] Rec. Doc. 228, p.104, line 7–p. 109, line 2.
[386] Interv-53, p. 10.

multiple Black Democratic candidates were eligible for election, the Black vote was divided.[387]

Dr. Alford also analyzed additional statewide races that did not feature a Black candidate and concluded that Black voters tend to support Democratic candidates, White voters tend to support Republican candidates, and that these support levels remain relatively constant regardless of the race of candidates involved.[388] Dr. Alford relied on the elections of Louisiana's Governor John Bel Edwards (a White Democratic candidate) as further evidence that partisan, not racial considerations, drive voting choices, as Black Democratic candidates were also on the ballot in both the October 2015 and October 2019 elections but received almost no Black support.[389] Dr. Alford concluded that the "high cohesion demonstrated by Black voters in these elections is not a function of Black voters coalescing around Black candidates, but rather is a function of cohesive Black voter preferences for Democratic party candidates."[390]

However, the Court does not credit Dr. Alford's opinion as helpful, as it appears to answer a question that *Gingles* II does not ask and in fact squarely rejects,[391] namely, *why* Black voters in Louisiana are politically cohesive. "It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter

---

[387] Interv-53, p. 10–11.
[388] Interv-53, p. 9–13.
[389] Interv-53, p. 11–13.
[390] Interv-53, p. 17.
[391] *Gingles*, 478 U.S. 30, 63 (1986) ("The first reason we reject appellants' argument that racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*, is that the reasons black and white voters vote differently have no relevance to the central inquiry of § 2").

24-30115.9194

and selection of certain candidates, not the causes of the correlation, matters."[392] The relevant inquiry in determining whether voting is racially polarized is whether Black and White voters consistently support different candidates—that is, whether Black voters are cohesive in their support of their candidates of choice, and whether the candidates supported by Black voters are usually defeated by the candidates supported by White voters.

To the extent party preference is relevant to the § 2 inquiry, it is appropriately assessed when analyzing the "totality of the circumstances," not in the assessment of racially polarized voting under *Gingles* II and III.[393] Importantly, both Dr. Handley and Dr. Alford agree that Louisiana's Black and White voters "are voting differently,"[394] with Dr. Alford further testifying, "[i]f that's what you want to call racially polarized voting, then it's racially polarized voting."[395]

Dr. Handley presented consistent evidence establishing that co-partisan voters are voting differently depending on the race of the candidate. Looking at Dr. Alford's own data, Dr. Handley concluded that "very consistent[ly] . . . white voters gave more support to white Democrats than the Black Democrats."[396] The Court finds Dr. Handley credible and her conclusions reliable and well supported. The Court rejects Defendants' attempt to append an additional requirement to *Gingles* II & III, namely, that Black voters' cohesion

---

[392] *Id.*

[393] *Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996) ("A defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors under the totality of the circumstances standard.") (cleaned up).

[394] Rec. Doc. 228, p. 151, line 12. *See* Rec. Doc. 217, p. 13.

[395] Rec. Doc. 228, p. 151, lines 12–14.

[396] Rec. Doc. 214, p. 180, line 9–p. 181, line 12; p. 182, line 9–p. 183, line 8.

must be shown to be caused by or attributable to race instead of something else, like partisanship. The Court finds no basis for this requirement in the law.[397]

*Gingles* II asks whether Black voters are "politically cohesive,"[398] – in other words, whether Black voters usually support the same candidate in elections. *Gingles* III asks whether White voters vote "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate."[399] Based on the testimony and reports of expert witnesses presented at trial, the Court finds that the Plaintiffs have proven both preconditions.

### C. The Totality of the Circumstances: The Senate Factors

A Section 2 violation is established:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial minority group] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[400]

"[I]t [is] only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."[401]

### i.    <u>Senate Factor 1: The Historical Context</u>

This inquiry considers "[t]he extent of any history of official discrimination in the state ... that touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process." In other words,

---

[397] For further discussion of the evidence that polarized voting in Louisiana is race-related, *see* Section IV(C)(ii) *infra* on Senate Factor 2.
[398] *Cooper*, <u>581 U.S. 285, 301-02</u> (2017).
[399] *Id.*
[400] *Gingles*, <u>478 U.S. at 36</u>.
[401] *Clark v. Calhoun Cnty.*, <u>21 F.3d 92, 97</u> (5th Cir. 1994).

"the history of voting-related discrimination in the State or political subdivision."[402] On this factor there is no meaningful dispute.

For over 40 years, Louisiana's courts have recognized the state's history of official discrimination.[403] The Eastern District of Louisiana noted that "Louisiana's history of racial discrimination, both *de jure* and *de facto*, continues to have an adverse effect on the ability of its black residents to participate fully in the political process."[404] "[I]t would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process."[405] Defending a Congressional map enacted by the Legislature, the State of Louisiana advanced the argument that past injustices that were clearly unconstitutional were the State's primary motivation for reinforcing black representation.[406]

Recently, this Court has found it "indisputable that Louisiana has a long history of discriminating against black citizens" such that there is no "sincere dispute regarding Senate factor 1."[407] The unchallenged expert historian in this case, Dr. Gilpin, recounted the sordid history of Louisiana's discriminatory practices, including disenfranchisement of Black voters through poll taxes, property ownership requirements, and literacy tests that were first implemented before Black Louisianans had the right to vote.

Although these disenfranchisement mechanisms were heavy-handed, they were not initially successful. Black Louisianans proved resilient and Black voters made up

---

[402] *Gingles*, 478 U.S. at 44.
[403] *See Major v. Treen*, 574 F. Supp. 325, 339–40 (E.D. La. 1983); *see also Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1116 (E.D. La. 1986).
[404] *Treen*, 574 F. Supp. at 339–40.
[405] *Gretna*, 636 F. Supp. at 1116.
[406] *Hays v. State of La.*, 862 F. Supp. 119, 128 (W.D. La. 1994). The legislatively enacted congressional maps were ultimately found violative of the 14th Amendment as impermissibly racially gerrymandered.
[407] *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017); *Robinson v. Ardoin*, 605 F.Supp. 3d 759 (M.D. La. 2022).

almost 45 percent of registered voters in 1896.[408] In response to this increase in Black engagement, the State implemented increasingly burdensome restrictions which suppressed the Black vote.[409] For example, Louisiana implemented the Grandfather Clause in 1898 which prohibited a Black citizen from voting unless they could establish that their father or grandfather had voted before January 1, 1867.[410] The result of the extensive disenfranchisement efforts employed by the Louisiana government resulted in Black voting plummeting drastically.[411] Between 1910 and 1948, fewer than one percent of Black Louisianans were able to register to vote.[412] When the Voting Rights Act was passed in 1965, only approximately one-third of Black Louisianans were registered to vote.[413]

The Voting Rights Act and federal oversight did not end Louisiana's disenfranchisement efforts.[414] The U.S. Attorney General issued 66 objection letters to more than 200 voting changes in Louisiana from 1965 to 1999.[415] Between 1982 and 2003, there were 13 instances of parishes simply resubmitting objected-to proposals with either cosmetic changes or simply no changes.[416] Recently, in 2021, the City of West Monroe entered into a consent decree with the DOJ regarding its use of solely at-large districts for election to the Board of Aldermen.[417] As explained by Dr. Gilpin, it is commonly recognized that at-large elections result in the dilution of minority votes.[418]

---

[408] Pla-124, p. 21.
[409] *Id.*
[410] *Id.*
[411] *Id.* at p. 24.
[412] *Id.* at p. 25.
[413] *Id.* at p. 27.
[414] *See id.* at pp. 29–30.
[415] *Id.* at p. 30.
[416] *Id.* at p. 39.
[417] *Id.* at p. 49.
[418] *Id.* at p. 39.

Black voter suppression continues in the form of closing polling places, restricting access to polling places, restricting access to early voting, and limiting mail-in voting.[419] For example, Dr. Gilpin reports that "the State does not merely de-prioritize widening access to voting, particularly for Black voters, [but] many Louisiana politicians continue to actively work against that increased access."[420] The effect of closing polling places which serve primarily Black voters was manifest in the 2020 election when many Black voters in Jefferson Parish experienced five-hour waiting times to cast a ballot.[421] Precinct consolidation in St. Landry Parish resulted in some Black voters having to drive 25 miles to cast a ballot.[422] There is no evidence that violations of the VRA are less prevalent than they were in the past decade. Instead, they may be less visible now with the elimination of federal oversight.[423] The Court finds the expert testimony of Dr. Gilpin both persuasive and credible. The Court finds that Senate Factor 1 weighs strongly in favor of the Plaintiffs.

### ii.    Senate Factor 2: Extent of Racial Polarization

Senate Factor 2 examines "the extent to which voting in the elections of the state or political subdivision is racially polarized."[424] When deciding whether race rather than partisanship explains polarization, courts compare the strength of the evidence presented on racial bias with that of partisan politics.[425] After all, § 2 of the VRA "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats."[426]

---

[419] *Id.* at p. 31.
[420] *Id.* at p. 46.
[421] *Id.*
[422] *Id.*
[423] *See Shelby County*, 570 U.S. 529.
[424] *Gingles*, 478 U.S. at 37.
[425] *Lopez*, 339 F. Supp. 3d at 604.
[426] *League of the United Latin Am. Citizens Council*, 999 F.2d 831, 854 (5th Cir. 1993) (en banc).

Defendants relied on the testimony of Dr. John Alford to demonstrate that voting in Louisiana is politically, not racially, polarized.[427] However, Plaintiffs rebutted this testimony with that of Dr. Lisa Handley, who, as previously addressed by the Court, presented evidence that voting in Louisiana is racially polarized. In the elections she analyzed, Dr. Handley found no examples of an election where White voters who were voting for a Democrat supported Black and White Democrats equally.[428] Rather, "very consistent[ly] . . . White voters gave more support to the White Democrats than the Black Democrats."[429] Plaintiffs further rebutted Dr. Alford's theories of partisan polarization with the expert testimony of Dr. Marvin P. King, Jr., who was accepted as an expert in political science, voting behavior and racially polarized voting.[430] Dr. King conducted an EI analysis on Louisiana's 2022 U.S. Senate Election and provided an opinion specifically rebutting Dr. Alford's opinion.[431] Dr. King's EI analysis revealed that White registered Democrats tended to vote for the White Democratic candidate (Luke Mixon) and Black registered Democrats tended to vote for the Black Democratic candidate (Gary Chambers) at a nearly 2:1 ratio.[432] He also reviewed Dr. Alford's data, which analyzed the votes cast by all voters (not just Democrats) and found they supported the conclusion that voting is racially polarized.[433] Dr. King testified that, based on his EI analysis and his review of Dr. Alford's analysis, "party polarization is only part of the story . . . racial polarization also exists even among copartisans."[434] Dr. King ultimately opined that in the

---

[427] Rec. Doc. 228, p. 153–155.
[428] Rec. Doc. 214, p. 181, lines 9–12.
[429] Rec. Doc. 214, p. 180, line 15–p. 181, line 12; p. 182, line 9–p. 183, line 8.
[430] Rec. Doc. 214, p. 59, lines 11–21.
[431] Rec. Doc. 214, p. 60.
[432] Rec. Doc. 214, p. 66.
[433] Rec. Doc. 214, p. 66–69.
[434] Rec. Doc. 214, p. 70, lines 16–22.

absence of additional majority-minority districts, Black voters cannot count on White copartisans to elect the Black voters' preferred candidate.[435]

Defendants did not rebut Dr. King's EI analysis or testimony. The Court credits Dr. King's findings over the conclusions of Dr. Alford and finds Dr. King's testimony more credible. The historical realignment of Black voters from voting Republican to voting Democrat undercuts the argument that the vote is polarized along party lines and not racial lines.

The Court finds that Senate Factor 2 weighs heavily in favor of Plaintiffs.

### iii.    **Senate Factor 3**

This factor inquires into "[t]he extent to which the state . . . has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[436] The Supreme Court counsels examination of "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[437]

Louisiana has a majority vote requirement for its primaries and general elections. Some states have moved away from this. There was evidence of voter confusion that results from repeated and voluminous decentralized elections.[438] Many state elections are conducted in odd-years with October primaries and November runoff elections. This is at odds with federal elections held in even-years with November primaries and

---

[435] Rec. Doc. 214, p. 71.
[436] *Gingles,* 478 U.S. at 37.
[437] *Id.*
[438] Rec. Doc. 223, p. 31, line–p. 32, line 13.

December runoffs.[439] The State held seven elections in 2023 and as many as twelve elections have been held in a single year.[440] The Court finds, consistent with the testimony of voters,[441] this type of calendar of elections breeds voter fatigue and confusion, which is amplified in poor and under educated communities. The Court finds Senate Factor 3 favors the Plaintiffs.

### iv.    Senate Factor 4: Candidate Slating

There is no slating process for Louisiana's State Legislative elections, so this factor is not relevant and the Court makes no finding.

### v.    Senate Factor 5

Factor 5 concerns "the extent to which members of the minority group in the state . . . bear the effects of discrimination in such areas as education, employment [,] and health, which hinder their ability to participate effectively in the political process."[442] The preponderance of the evidence proved that Black voters' participation in the political process is impaired by historic and continuing socio-economic disparities in education, employment, housing, health and criminal justice. Dr. Traci Burch was accepted by the Court and stipulated by the parties as an expert in in the field of racial discrimination, political participation, and barriers to voting.[443] She is well-respected and well qualified in

---

[439] Rec. Doc. 218, p. 30, line 14–p. 31, line 8.

[440] *Id.*

[441] Rec. Doc. 223 (Ho-Sang and Nairne).

[442] *Gingles*, 478 U.S. at 37

[443] Rec. Doc. 213, p. 10, line 16–p. 11, line 3. Dr. Burch is an associate professor of political science at Northwestern University and a research professor at the American Bar Foundation since 2007. Pla-127, p. 1. Dr. Burch received her Ph.D. in government and social policy from Harvard University, and her undergraduate degree in politics from Princeton University. *Id.* Dr. Burch has published numerous peer-reviewed publications and a book on political participation, and she teaches several courses related to voting and political participation. *Id.*  Dr. Burch has garnered several prizes and awards, including national prizes, for her book and her dissertation. *Id.* She has also served as a peer reviewer for flagship scholarly journals in her field of political science. *Id.* She is widely regarded as an expert on political behavior, barriers to voting, and political participation and has previously served as an expert witness in at least seven other

her fields of discipline, and the Court finds her opinions credible, well supported by data, and the result of reliable methodology. The Court credits Dr. Burch's testimony. In formulating her opinions, Dr. Burch relied on sources and methodologies recognized in the field and consistent with her work as a political scientist.[444] Dr. Burch cited compelling data that supports the conclusion that Black Louisianans experience social and economic disparities that negatively impact voter registration and participation.[445]

Louisiana has endured de facto segregated public schools.[446] Predominately Black public schools are resource challenged and Black people are underrepresented in higher education.[447] The underfunding of HBCUs reveals that disparities persist into higher education.[448]

Dr. Burch persuasively testified, supported by data, that there are employment disparities because of discrimination, revealed by several measures.[449] The objective evidence of employment disparities presented by Dr. Burch was again buttressed by the

---

[444] cases, including voting rights cases where she offered expert testimony relating to certain Senate Factors. Pla-126 , pp. 1–2.

[444] Pla-126; Pla-128

[445] Rec. Doc. 213, pp. 14,19, 105–107. Dr. Burch's opinions were substantiated and buttressed by the fact testimony. *See* Testimony of Dr. Dorothy Nairne, Rec. Doc. 223, pp. 22–23; Testimony of Pastor Steven Harris, Rec. Doc. 223, p. 71.

[446] The ProPublica's *Miseducation* Project discerns that as of 2017, "half of traditional school districts in Louisiana that were available demonstrated high levels of racial segregation within the district. [T]here are "nine of the 68 traditional school districts in Louisiana that are more than 87 percent non-white." Rec. Doc. 213, p. 17, lines 7–13. In East Baton Rouge, there is "kind of a parity between Black people and White people . . . But "in the school system [in East Baton Rouge] it's over. . . 70 percent Black." *Id.* at p. 17, line 25–p. 18, line 3. This is likely due to white families "abandon[ing] East Baton Rouge for a different school district." *Id.* at p. 18, lines 7–9. Math and reading test scores across Black and White students indicate that White students perform better by about 22–25 points. *Id.* at p. 19, lines 1–10. A 2019 American Community Survey indicates that of Louisiana adults aged 25 and older, over 25 percent of White Louisianans have earned a bachelor's degree or higher compared to a little over 15 percent of Black Louisianans. Pla-126, p. 7.

[447] Pla-126, p. 7.

[448] Rec. Doc. 223, p. 151.

[449] Rec. Doc. 213, p. 20, line 23–p. 24, line 24;Pla-126, p. 9.

firsthand experiences of several of the Plaintiffs' fact witnesses.[450] Economic hardships caused by under-employment are directly manifested in a lack of transportation.[451] Transportation barriers adversely affect access to voter registration and polling sites.[452] Black Louisianans are underrepresented in white collar occupations which provide the security to "time to take off of work without losing or risking your pay," to vote.[453]

The Court credits Dr. Burch's opinions and the supporting testimony of fact witnesses and finds that the marginal educational and employment opportunities available to Black Louisianans hinders and impairs meaningful access to the political process.

The Court also finds that segregated and disparate housing persists in part due to historic public policies and government sanctioned lending practices.[454] This further impairs and frustrates access to polling places and participation in the political process.

A preponderance of the evidence established that the prevalence of disease and mortality rates are higher for Black Louisianans as compared to White Louisianans, and

---

[450] Pastor Harris testified that his community had a high poverty rate because of the lack of access to jobs in the area. Rec. Doc. 223, p. 71, lines 5–7. Dr. Nairne testified to the challenges she faced securing funding for her start-up businesses while less qualified White applicants secured these opportunities. *Id.* at p. 34, lines 3–20.

[451] Data from the 2019 American Community Survey showed that a significant portion of Black households do not have access to a vehicle and that Black property "is more than double, almost triple that of White poverty." Rec. Doc. 213, p. 22, line 16–p. 23, line 8.

[452] *Id.* Again the opinion testimony of Dr. Burch was substantiated by the fact testimony. See testimony of Dr. Washington and Dr. Nairne, Rec. Doc. 223, p. 20, line 22–p. 24, line 24; p. 32, line 14–p. 33, line 7; p. 104, line 10–p. 105, line 4.

[453] Rec. Doc. 213, p. 24, lines 15–17.

[454] Black Louisianans face more difficulty with securing financial relief to rebuild homes and business following natural disasters. Pla-126, p. 10. The Louisiana Survey found 72 percent of Black respondents believe Black people are treated less fairly when applying for a loan or mortgagee. *Id.* The Federal Housing Administration considered race when evaluating "the trajectory" of a city or neighborhoods. This led to Black and racially mixed neighborhoods being "deemed hazardous for lending." *Id.* at p. 13. The FHA also encouraged the use of racially restrictive covenants and racial zoning. These policies were not abandoned until 1949. *Id.* at pp. 12–13. The FHA would rely on Residential Security Maps produced by the Home Owners Loan Corporation to "prevent lending to places Black people lived. *See id.* at p. 13; Rec. Doc. 213, p. 24, line 25–p. 28, line 18.

Black Louisianans have less access to health insurance and healthcare.[455] The Court finds that these health disparities adversely impact voter engagement and participation.[456]

It is a well-known and often cited fact that Louisiana's incarceration rates lead the nation.[457] Black Louisianans are disproportionately jailed as compared to White Louisianans. Dr. Burch persuasively and credibly opined that this disparity is the result of historical discrimination in policing, sentencing, and other stages of the justice system dating back to the Reconstruction Era.[458] "[A]pproximately 80% of the parolees/probationers currently ineligible to vote are African American, compared with about 32% of the population of the state."[459] Nearly 48,000 Black Louisianans were unable to vote in 2020 due to their felony convictions, twice the number of White Louisianans.[460] Studies show that perceived unfair law enforcement tends to "demobilize voting and make people shy away from participating in politics".[461]

The Court finds that Senate Factor 5 weighs decidedly in favor of the Plaintiffs.

### vi.   **Senate Factor 6**

Senate Factor 6 analyzes "whether political campaigns have been characterized by overt or subtle racial appeals."[462] Dr. Burch cited multiple instances of subtle and overt

---

[455] Rec. Doc. 213, p. 29, line 17–p. 31, line 14.
[456] Dr. Burch testified that health is an "important predictor of voter [turnout]" because "healthy people are more likely to vote," and sick people have less "time and [sic] money to go vote or engage in politics." Rec. Doc. 213, p. 32, line 9–p. 33, line 11. Health disparities "shaped by government and market policy" have a direct impact on voter participation. *Id.*
[457] Rec. Doc. 213, p. 33, line 13–p. 38, line 3.
[458] *Id.*; *see also* Pla-126 at pp. 19-22.
[459] Pla-124, p. 50.
[460] Rec. Doc. 213, p. 35, lines 22–24.
[461] *Id.* at p. 38, lines 2–3. Dr. Washington pointed out the subliminal message of the Sheriff's Office being housed on the same floor as her Registrar of Voter's Office. Rec. Doc 223, p. 102, lines 6–14.
[462] *Gingles*, 478 U.S. at 37

84

racial appeals in political advertising in recent elections.[463] Plaintiffs Nairne and Ho-Sang testified about the disparaging nature of the messaging by Senator Kennedy's re-election campaign that depicted images of Black Lives Matter protests alongside the comment suggesting that critics of the police should "call a crackhead."[464] They also testified about racially suggestive campaign ads aired in the latest gubernatorial election.[465] Reverend Clee Lowe persuasively explained how subtle racial appeals send a clear signal that particular elected officials are "not going to represent our interests."[466]

The Court finds that Senate Factor 6 weighs in favor of the Plaintiffs.

### vii.    Senate Factor 7

This factor assesses "the extent to which members of the minority group have been elected to public office in the jurisdiction."[467] It is undisputed that Black Louisianans are underrepresented in public office. No Black candidates have been elected as Governor or Lieutenant Governor in Louisiana since the end of Reconstruction.[468] Never in history has Louisiana elected a Black U.S. Senator.[469] Since 1991, only four Black Louisianans have been elected to Congress, and then only from majority-Black districts.[470]

This underrepresentation persists at other levels of state and local government as well. While the state is roughly one-third Black, Black legislators held only 36 out of 144 total State House seats in 2023 and Black senators held only 10 out of 39 total State

---

[463] Campaign messaging used by candidates for governor, U.S. Senate, and the state legislature. Rec. Doc. 213, p. 38, lines 5–p. 47, line 11; Pla-126, pp. 22–25.
[464] Rec. Doc. 223, p. 26, line 25–p. 40, line 11; p. 190, line 24–p. 191, line 25.
[465] Rec. Doc. 223, p. 36, line 25-p. 39, line 3; p. 190, line 24–p. 191, line 25.
[466] Rec. Doc. 223, p. 62, lines 19–24.
[467] *Gingles*, 478 U.S. at 37.
[468] Pla-126, p. 25.
[469] *Id.*
[470] Before 1991, there was one Black Congressperson elected, and that was during Reconstruction. *Id.*

Senate seats.[471] Less than 25 percent of Louisiana mayors are Black, and only 26.1 percent of Louisiana state court judges are Black.[472] Two of the eight elected Board of Elementary and Secondary Education members are Black, both elected from majority-Black districts.[473] And only one Associate Justice on the Louisiana Supreme Court, who was elected from the State's sole majority-Black Supreme Court district, is Black.[474]

The effect of the Senate factors previously discussed become manifest in these sobering statistics. The Court finds that Senate Factor 7 weighs heavily in favor of Plaintiffs.

### viii.  Senate Factor 8

Senate Factor 8 invites inquiry related to "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[475] The demonstrated disparities across socioeconomic indicators discussed above are evidence of the lack of responsiveness of State government to the needs of Black Louisianans. Nearly 70 percent of Black survey respondents indicated that "most elected officials in Louisiana don't care what people like me think."[476] The redistricting roadshows are further evidence of the non-responsiveness of state elected officials. The roadshows were robustly attended across the state. Time and again Black citizens expressed to their elected representatives that they wanted more minority representation in the State House and Senate.[477] Several proposed maps were advanced

---

[471] *Id.*
[472] *Id.*
[473] *Id.*
[474] *Id.*
[475] *Gingles*, 478 U.S. at 37.
[476] Pla-126, p.26.
[477] State Representative Glover testified that while he was at one of the roadshows "heard folks asking for fair maps that they represent the actual demographics of the state and adhere to the provisions of the

by various stakeholders that accomplished this objective.[478] Instead the Legislature eliminated a majority-Black district in north Louisiana[479] and the President of the Senate unequivocally expressed a notion of incumbency protection as paramount over other redistricting criteria.[480]

A considered review of the cumulative evidence which support Senate Factors 1, 2, 3 and 5 lead to the inevitable conclusion that the State Legislature has been historically unresponsive and remains unresponsive to the needs of the Black communities in Louisiana. The Court finds that Senate Factor 8 weighs in favor of the Plaintiffs.

### ix.      Senate Factor 9

Lastly, in considering the totality of the circumstances, the Court assesses "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."[481] The

---

Voting Rights Act." Rec. Doc. 223, p. 149, lines 14–20. Ho-Sang testified at the road show hearing to address the "many concerns that were coming" from the Black community. *Id.* at p. 168, lines 15–21. "[D]uring the redistricting road shows…several Black Louisianans from across the state offered opinions on the redistricting process and criticized current official for being unresponsive to their needs. The speakers often explicitly linked officials' lack of responsiveness to race." Pla-126, p. 27. "The committee heard overwhelmingly from the public that they wanted increase minority in their senate maps." *Id.* at p. 28.

[478] State Representative Glover presented the House with several plans that would create at least 30 majority-minority districts as Black legislatures were worried that H.B. 14 "packed Black voters into as few districts as possible, particularly in northwest Louisiana." Pla-126, pp. 35, 42.   One senator "argued vehemently that the people of the West Bank of Jefferson Parish constituted a community of interest that deserved representation…" Pla-126, p. 39.

[479] "H.B. 14 eliminates an existing majority-minority district in the northern part of Louisiana, HD23…" Pla-126, p. 33.

[480] Joint Rule 21 (Pla-53) makes no express reference to "continuity of representation" but Senator Cortez testified that he reads Joint Rule 21, section D(4) which refers to "maintain district alignment" as prioritizing incumbency. Rec. Doc. 228, p. 27, line 24–p. 31, line 4. "It means that if your district elected you and you've done a good job, they also have a right to reelect you." *Id.* at p. 29, lines 18–19. Dr. Nairne, Rev. Lowe, Dr. Washington, and Ms. Ho-Sang testified about the dilutive districts in which they reside, which have resulted in noncompetitive and little interest and attention from candidates in the Black community. Rec Doc. 223, p. 26, line 22–p. 29, line 9; p. 59, lines 2–9; p. 60, lines 6–11; p. 62, lines 25–p. 63, line 7; p. 105, line 5–p. 106, line 17; p. 179, line 25–p. 180, line 20. Ms. Ho-Sang testified that elected officials' unresponsiveness is "evidenced in the conditions in our community," and the failure to initiate and implement policies that would improve Black people's lives, including the failure to streamline elections or address issues like Black maternal health and criminal justice. *Id.* at p. 192, line 19–p. 193, line 6.

[481] *Gingles,* 478 U.S. at 37

evidence supporting Senate Factors 3 and 5 demonstrates the use of voting practices and procedures is tenuous to anything other than disenfranchising Black voter participation in the political process. This factor likewise favors the Plaintiffs.

The Court notes that the Defendants did not meaningfully contest any of the Senate Factors evidence.[482] In conclusion, the Court has evaluated the totality of the circumstances with a "functional view of the political process'" and "[a] searching and practical review of electoral conditions"[483] and finds that all of the Senate Factors relevant to the Court's consideration in this case favor the Plaintiffs.

### x. Proportionality

Section 2 expressly provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." "[P]roperly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality."[484] Defendants advance the argument that "Plaintiffs' § 2 claim lacks merit because it demands the creation of more majority-Black districts than the proportion of Black voting-age persons in the regions Plaintiffs challenge and in Louisiana [and] Plaintiffs have not shown that § 2 mandates more than proportionality."[485] Defendants argue that "vote dilution will ordinarily not be found where minority voters in the relevant 'area would enjoy substantial proportionality,' such as where the *districting plan* offers 'majority-minority districts in substantial proportion to the minority's share of voting-age population.'"[486] The Defendants reliance on *Johnson v. De Grandy*[487] is

---

[482] Rec. Docs. 177 and 206
[483] *Fusilier,* 963 F.3d at 456, 462.
[484] *Milligan,* 599 U.S. at 26.
[485] Rec. Doc. 206, pp. 34–35.
[486] Rec. Doc. 206, p. 35 (citing *Johnson v. DeGrandy,* 512 U.S. 997, 1013–14 and *LULAC v Perry,* 548 U.S. 399, 436 (2006) (citations omitted) (emphasis added).
[487] 512 U.S. 997 (1994).

misplaced. Unlike *Johnson,* the enacted plan challenged in this case does not reflect proportionality.[488] Certainly if a challenged plan effectuates proportionality (which the Enacted Maps challenged herein do not) that may be probative of whether the challenged map provides minority voters with an opportunity to elect candidates of their choice.[489] *Johnson* makes clear that proportionality is but one consideration in the totality of the circumstances of whether an enacted map denies minority voters equal political opportunity.[490] This case presents the "more complex side of the divide, requiring [the] court to determine whether provision for somewhat fewer majority-minority districts than the number sought by the plaintiffs was dilution of the minority votes." [491] The Court finds that the answer to that question is yes.

Defendants argue that the Illustrative House and Senate Plans "demand a political feast where the *challenged plans afford more than equal opportunity*."[492] To the contrary, the Enacted Maps do not afford an equal opportunity for Black voters to elect preferred candidates. Careful analysis of the *Gingles* preconditions and the totality of the circumstances led this Court to conclude that the Enacted State House and Senate Maps,

---

[488] 40 of the 144 districts (28 percent) in the Enacted Plans are majority-minority. Rec. Doc. 206, pp. 38–39 ("The [E]nacted [S]enate [P]lan includes 11 majority-Black districts….The [E]nacted [H]ouse Plan has 29 majority-Black districts…"). The Defendants have conveniently re-coined "substantial proportionality." *Id.* at p. 37.

[489] See *Johnson,* 512 U.S. at 1014, 1020-1021 ("[t]reating equal political opportunity as the focus of the enquiry . . . proportionality [may be] an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice' (citing 42 U.S.C. § 1973(b), [but] the degree of probative value assigned to proportionality may vary with other facts. No single statistic provides courts with a shortcut to determine whether a set of single member districts unlawfully dilutes minority voting strength.")

[490] *See Id.* at 998 ("[P]roportionality is not dispositive, it is a relevant fact in the totality of circumstances to be analyzed when determining whether minority voters have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice' (citing 42 U.S.C. § 1973)).

[491] *Id.* at 1013

[492] Rec. Doc. 206, p. 35 (emphasis added). Notably, the Enacted Maps are not proportional. Of Louisiana's 105 House districts, 29 are majority BVAP, and of Louisiana's 39 Senate districts 11 have a majority BVAP.

in the areas of the illustrative districts, are dilutive of Black voting strength and violative of Section 2 of the Voting Rights Act.

Defendants maintain that where, as here, the Plaintiffs have challenged specific districts in specific areas, the proportionality analysis must be conducted by region.[493] The Defendants erroneously seek to import the localized appraisal required in the *Gingles* I analysis with the proportionality analysis required as part of the totality of circumstances analysis. As part of its *Gingles* I analysis, the Court undertook "an intensely local appraisal"[494] of the boundaries in the Enacted Maps in the regions where the illustrative districts were proposed. The Defendants regional proportionality defense is unsupported and directly at odds with Supreme Court precedent which holds that proportionality is a statewide inquiry.[495] Furthermore, the Supreme Court makes clear that proportionality is neither a defense nor safe harbor.[496]

Defendants argue that "the only way to achieve the maximization Plaintiffs demand is by the intentional and intensive use of race in drawing districts specifically combine non-compact minority populations into districts a smidgen above 50 [percent] BVAP—in a nutshell: aggressive racial gerrymandering."[497] The Defendants put the cart before the horse. The Illustrative Plan offered by the Plaintiffs is precisely that; *illustrative.* It does not carry the force of law and is not state action, thus the invitation to strictly scrutinize the Illustrative Plan at this stage is misplaced.

---

[493] Defendants argue that "'the relevant population'" for the proportionality analysis is the BVAP population in the geographic areas Plaintiffs identified as the locus of vote dilution." Rec. Doc. 206, p. 36 (brief, p. 29) (citing *Johnson,* 512 U.S. at 1017).
[494] *Milligan*, 599 U.S. at 15 (quoting *Gingles*, 478 U.S. at 79).
[495] *See LULAC,* 548 U.S. at 437 ("We conclude the answer in these cases is to look at proportionality statewide.").
[496] *Johnson*, 512 U.S. at 1019.
[497] Rec. Doc. 206, p. 40.

24-30115.9211

The Court holds that the preponderance of the evidence establishes that the Enacted State House and Senate Maps crack or pack large and geographically compact minority populations such that Black voters in the challenged districts "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,"[498] and the Illustrative Plan offered by the Plaintiffs show that additional opportunity districts can be "reasonably configured."[499]

## V.    CONCLUSION

The Court finds that the State House and Senate electoral maps enacted by the Louisiana legislature (S.B. 1 and H.B. 14) violate § 2 of the Voting Rights Act.

**It is ORDERED** that elections under S.B. 1 and H.B. 14 be and are hereby ENJOINED. The State is hereby permitted a reasonable period of time, to be determined by the Court following submittals by the parties, to address the Court's findings and implement State House and Senate election maps that comply with § 2 of the Voting Rights Act.

Signed in Baton Rouge, Louisiana, on February 8, 2024.


**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[498] 52 U.S.C § 10301 (2024).
[499] *Milligan*, 599 U.S at 43 (Kavanaugh, J., concurring).

# TAB 8

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

DOROTHY NAIRNE, *et al*

versus

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

CIVIL ACTION

22-178-SDD-SDJ

## APPENDIX

In fidelity to Rule 52(a) and for ease of review, the Court appends the following separately enumerated findings of facts and conclusions of law to its *Ruling and Order* in the above-captioned matter. The following are not intended as an exhaustive recapitulation of the Court's reasoning, findings, or conclusions.

## I.    FINDINGS OF FACT

Standing

1. Dr. Dorothy Nairne is a Black registered voter and NAACP member who resides in Assumption Parish and House District 60, but who would reside within the boundaries of Illustrative House District 58.[1]

2. Reverend Clee Earnest Lowe is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[2]

---

[1] Rec. Doc. 225, p. 52, line 17–p. 53, line 11.
[2] Rec. Doc. 225, p. 58, line 25–p. 59, line 14.

24-30115.9213

3. Dr. Alice Washington is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[3]

4. Steven Harris is a Black registered voter and NAACP member who resides in Natchitoches Parish and House District 25, but who would reside within the boundaries of Illustrative House District 23.[4]

5. Each Individual Plaintiff currently lives in a packed or cracked district in the Enacted Map and would live in a majority-Black district in the Illustrative Plan.

6. Members of the NAACP are simultaneously members of the local NAACP branch in their area, the Louisiana NAACP, and the national NAACP.[5]

7. Louisiana NAACP members include Black registered voters whose votes are diluted in the districts in which they vote and thus have standing in their own right.[6]

8. In response to the Enacted Map, Black Voters Matter ("BVM") diverted resources away from its core mission of expanding Black voter engagement and building capacity in partner organizations.[7] BVM launched new accountability initiative to hold elected officials accountable to Black voters in order to counteract the enacted map's dilutive effect.[8]

9. Black registered voters were discouraged by what they perceived as deafness to their appeals at the redistricting roadshows. This voter frustration manifested in

---

[3] Rec. Doc. 225, p. 58, line 25–p. 59, line 14.
[4] Rec. Doc. 225, p. 49, lines 10–20.
[5] Rec. Doc. 223, p. 120, lines 2-7.
[6] Rec Doc. 224 (SEALED), p. 5, line 22–p. 31, line 12.
[7] Rec. Doc. 223, p. 164, line 22–p. 165, line 3; p. 167, line 8–p. 186, line 13; p. 201, line 20–p. 202, line 5.
[8] Rec. Doc. 223, p. 177, line 2–p. 179, line 19; Pla-207; Pla-208.

24-30115.9214

increased voter apathy, causing BVM to divert core mission resources to voter retention efforts.[9]

10. The Enacted Map caused voter apathy, requiring BVM to devote additional staff time and resources toward convincing Black voters that their votes matter.[10]

11. Following the passage of the Enacted Maps, the Louisiana NAACP implemented organization and mobilization efforts to counteract the effects of the Enacted Maps on voter disillusionment, potential candidates, and funders' willingness to invest resources into Black communities in Louisiana.[11]

12. To counteract the Enacted Maps' dilutive effect, the organizational Plaintiffs diverted resources from their core activities toward previously unplanned response strategies.[12]

13. The core missions of BVM and the Louisiana NAACP—to increase power in marginalized, predominantly Black communities—are impaired by the Enacted Maps' dilutive effects.[13]

Population Statistics

14. In 2000, African Americans comprised 32.86 percent of the state's population and Non-Hispanic Whites comprised 62.53 percent of the state population.[14]

---

[9] Rec. Doc. 223, p. 180, line 21–p. 135, line 5.
[10] *Id.* at p. 175, lines 7–17; p. 179, line 20–p. 183, line 5.
[11] *Id.* at p. 128, line 9–p. 131, line 20.
[12] *Id.* at p. 172, line 3–p. 173, line 7; p. 174, line 17–p. 177, line 19; p. 181, line 15–p. 183, line 5 (BVM is prevented from engaging in get-out-the-vote efforts and capacity building work with its partners in order to focus its resources on its accountability strategy and 365 voter engagement delays); p. 131, lines 8–20 (NAACP has to pull members from working on health, education, and other projects in order to focus their efforts on combating the dilutive effects of the Enacted Maps).
[13] *Id.* at p. 113, line 3–p. 114, line 1; p. 164, line 25–p. 165, line 3.
[14] Pla-20, p. 9.

24-30115.9215

15. In 2020, African Americans comprised 33.13 percent of the state population and Non-Hispanic Whites comprised 55.75 percent of Louisiana's population.[15]

16. Louisiana has the second highest proportion of African American population of any state in the nation.[16]

17. In 2000, the White Voting Age Population ("WVAP") in Louisiana was 65.51 percent and the Black Voting Age Population ("BVAP") was 29.95 percent.[17]

18. In 2020, the WVAP in Louisiana was 58.31 percent and the BVAP was 31.25 percent.[18]

19. From 2000 to 2020, the White population decreased by over 200,000 persons, with decreases in six of the state's nine metropolitan statistical areas ("MSA").[19]

20. The Black population increased in eight of the state's nine MSAs.[20]

21. The Black population in the Baton Rouge MSA increased by over 60,000 persons from 2000 to 2020.[21]

22. The Black population growth in the Baton Rouge MSA is equivalent to the population required for two House districts.[22]

Enacted Map

23. In the Enacted Senate Map, there are 11 majority Black Senate districts.[23]

---

[15] *Id.*
[16] *Id.* at p. 10.
[17] *Id.* at p. 14.
[18] *Id.*
[19] *Id.* at p. 20.
[20] *Id.* at p. 18.
[21] Rec. Doc. 225, p. 15, lines 3–6.
[22] *Id.*
[23] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced in Pla-20, p. 31).

4

24. The BVAP populations in these Senate districts are as follows: District 5 (50.24 BVAP percentage); District 24 (53.09 BVAP percentage); District 29 (56.56 BVAP percentage); District 4 (57.2 BVAP percentage); District 3 (57.27 BVAP percentage); District 2 (57.75 BVAP percentage); District 14 (58 BVAP percentage); District 7 (59.46 BVAP percentage); District 34 (63.74 BVAP percentage); District 39 (63.75 BVAP percentage); District 15 (73.87 BVAP percentage).[24]

25. In the Enacted House Map, there are 29 majority Black House districts.[25]

26. The BVAP populations in these House districts are as follows: District 23 (50.86 BVAP percentage); District 67 (51.85 BVAP percentage); District 72 (52.67 BVAP percentage); District 83 (54.57 BVAP percentage); District 40 (54.68 BVAP percentage); District 62 (55.08 BVAP percentage); District 96 (55.13 BVAP percentage); District 21 (55.42 BVAP percentage); District 11 (56.4 BVAP percentage); District 93 (56.6 BVAP percentage); District 58 (56.76 BVAP percentage); District 57 (57.86 BVAP percentage); District 87 (59.07 BVAP percentage); District 44 (59.45 BVAP percentage); District 101 (60.22 BVAP percentage); District 16 (62.5 BVAP percentage); District 17 (63.26 BVAP percentage); District 26 (64.33 BVAP percentage); District 102 (65.58 BVAP percentage); District 2 (67.38 BVAP percentage); District 63 (69.65 BVAP percentage); District 4 (72.07 BVAP percentage); District 97 (72.34 BVAP percentage); District 34 (72.57 BVAP percentage); District 29 (73.56 BVAP

---

[24] *Id.*

[25] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (referenced in Pla-20, p. 45).

percentage); District 3 (73.86 BVAP percentage); District 61 (75.29 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage).[26]

27. The Enacted House Map unjustifiably concentrates or fragments the BVAP in the districts discussed on pages 29 through 33 of the Court's opinion.[27]

28. The Enacted Senate Map unjustifiably concentrates or fragments the BVAP in the districts discussed on pages 27 through 33 of the Court's opinion.[28]

<u>Illustrative Plan</u>

29. The Illustrative Senate Plan contains 14 majority minority districts with the following BVAP populations: District 2 (51.73 BVAP percentage); District 3 (51.3 BVAP percentage); District 4 (58.15 BVAP percentage); District 7 (52.29 BVAP percentage); District 14 (58.08 BVAP percentage); District 15 (54.45 BVAP percentage); District 17 (52.48 BVAP percentage); District 19 (50.97 BVAP percentage); District 24 (52.05 BVAP percentage); District 29 (50.93 BVAP percentage); District 5 (51.8 BVAP percentage); District 34 (63.02 BVAP percentage); District 38 (53.17 BVAP percentage); and District 39 (52.46 BVAP percentage).[29]

---

[26] *Id.*

[27] Pla-20, pp. 44, 48, 50, 53–54, 55–61; *see also* Rec. <u>Doc. 225, p. 54</u> lines 1–4 (referencing the new house districts in the Baton Rouge MSA); *see also Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).

[28] Pla-20, pp. 37, 39, 41–42; *See* also "Statistics", https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31); *see also Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).

[29] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

24-30115.9218

30. The Illustrative House Plan contains 35 majority minority districts with the following BVAP populations: District 1 (55.33 BVAP percentage); District 2 (67.34 BVAP percentage); District 3 (58.85 BVAP percentage); District 4 (57.53 BVAP percentage); District 5 (50.86 BVAP percentage); District 11 (55.55 BVAP percentage); District 16 (59.76 BVAP percentage); District 17 (54.48 BVAP percentage); District 21 (54.28 BVAP percentage); District 23 (50.56 BVAP percentage); District 26 (63.38 BVAP percentage); District 29 (57.77 BVAP percentage); District 34 (50.03 BVAP percentage); District 38 (50.84 BVAP percentage); District 40 (54.88 BVAP percentage); District 44 (60.92 BVAP percentage); District 57 (53.43 BVAP percentage); District 58 (51.27 BVAP percentage); District 60 (52.83 BVAP percentage); District 61 (50.2 BVAP percentage); District 96 (55.55 BVAP percentage); District 63 (57.2 BVAP percentage); District 65 (56.03 BVAP percentage); District 67 (51.58 BVAP percentage); District 68 (54.21 BVAP percentage); District 69 (50.2 BVAP percentage); District 72 (50.6 BVAP percentage); District 83 (54.57 BVAP percentage); District 87 (59.07 BVAP percentage); District 93 (56.6 BVAP percentage); District 97 (72.34 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage); District 101 (50.75 BVAP percentage); and District 102 (65.58 BVAP percentage).[30]

31. The BVAP was lowered in some Enacted majority-Black districts to create additional majority-Black districts in the Illustrative Plan.[31]

---

[30] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).
[31] Rec. Doc. 225, p. 66, lines 8–12.

7

32. 74 percent of the state's core population remained in the same Senate districts in the Illustrative Senate plan as compared to the Enacted Senate Map.[32]

33. 78.5 percent of the state's core population remained in the same House districts in the Illustrative House Plan as compared to the Enacted House Map.[33]

34. The Illustrative Plan adheres to and respects traditional redistricting principles.

35. The shapes of the districts in the Illustrative Plan are reasonable considering geographic vagaries created by waterways and the respect afforded traditional boundaries such as Voting Tabulation Districts ("VTDs") and parish lines.

36. The districts in the Illustrative Plan are contiguous.[34]

37. The districts in the Illustrative Plan were drawn with sensitivity to communities of interest, including Acadiana, the Mississippi River parishes, the Cajun Heartland, the Florida parishes, and the planning districts in Caddo and neighboring parishes.[35]

38. The Red River parish area, including Natchitoches and the Cane River area, discussed by Dr. Colten, can be considered a community of interest and Illustrative House District 23 respects that community of interest.[36]

39. The Shreveport and Bossier MSA's share historical, social, and cultural roots and Illustrative House District 1 respects that area as a community of interest.[37]

---

[32] Pla-20, p. 30.
[33] *Id*. at p. 44.
[34] Rec. Doc. 225, p. 29, lines 7–11.
[35] Rec. Doc. 225, p. 32, line 10– p. 33, line 3; Pla-20, pp. 30, 44.
[36] Rec. Doc. 212, p. 37, line 11–p. 40, line 20; Pla-129, p. 12.
[37] Rec. Doc. 212, p. 29, line 4–p. 36, line 24; Pla-129, pp. 12–14.

24-30115.9220

40. The distinctiveness of the two major cultural groups in the Cajun Heartland subset of the Acadiana region, Cajuns, and Creoles of Color, are considered and respected in the Enacted Maps and the Illustrative Plan.[38]

41. The segregation of housing and economic activities in Jefferson Parish contribute to a group identity analogous to a community of interest, which is respected by the boundaries of Illustrative Senate District 19.[39]

42. The Illustrative majority-Black districts keep like socioeconomic communities together.[40]

43. The Illustrative Plan is more considerate of communities of interest than the Enacted Maps.[41]

44. Mr. Cooper employed compactness measures uniformly utilized in the redistricting field.[42]

45. The Illustrative Senate Plan is more compact than the Enacted Senate Map, and the Illustrative House Plan is virtually as compact as the Enacted House Map. There is no relevant or meaningful difference in the compactness of the Illustrative Plan as compared to the Enacted Map.[43]

46. The Illustrative Plan abides by Louisiana's Joint Rule 21.[44]

47. The illustrative districts are substantially equal in population.[45]

---

[38] Pla-129, pp. 14–18.
[39] Rec. Doc. 212, p. 57, line 10–p. 62, line 6.
[40] Pla-89, p. 12.
[41] Rec. Doc. 212, p. 41, line 1–p. 42, line 22; p. 61, line 3–p. 63, line 14.
[42] Rec. Doc. 218, p. 106, lines 5–7; Rec. Doc. 229, p. 18, line 8–p. 19, line 1.
[43] Rec. Doc. 218, p. 98, lines 15–20; Rec. Doc. 225, p. 25, lines 17–24.
[44] Rec. Doc. 225, p. 28, line 18–p. 31, line 20.
[45] *Id.* at p. 29, lines 12–24.

24-30115.9221

48. The Illustrative Plan limits precinct, municipality, and district boundary splits where possible.

49. Fewer parishes were split in the Illustrative Plan than the Enacted Maps.[46]

50. U.S. Census Data is reliable and appropriate to rely on in redistricting.[47]

51. The Court rejects the contention that the Illustrative Plan advanced by the Plaintiffs can only be viewed as a racial gerrymander.

52. Plaintiffs proved by a preponderance of the evidence that the district boundaries in the Illustrative Plan were not predominately motivated by race.

   Racially Polarized Voting

53. Voting in Louisiana breaks down along racial lines.

54. Black voters are highly cohesive in their support of their preferred candidates and White voters consistently bloc vote against the Black-preferred candidates in the seven areas of interest, which include the proposed new minority-majority districts in the Illustrative House and Senate Plans.

55. Blocs of White voters have been successful in consistently defeating Black-preferred candidates.

56. Biracial statewide elections are the most probative for evaluating racial polarization.[48]

57. Districts with a majority BVAP provide a realistic opportunity for Black voters to elect the candidate of their choice.

---

[46] Pla-89, p. 10; Interv-42, p. 11.
[47] Rec. Doc. 229, p. 154, lines 5–15.
[48] Rec. Doc. 217, p. 19, lines 11–15; Rec. Doc. 228, p. 145, lines 15–18.

58. There is no reliable basis upon which it can be concluded that a Black-preferred candidate will consistently prevail in election districts that are less than 50 percent BVAP.

<u>Totality of the Circumstances Facts</u>

59. Although disenfranchisement mechanisms such as poll taxes and literacy tests have been outlawed, Black voter suppression in Louisiana persists today through, closing polling places, restricting access to early voting, polling places, and limiting mail-in voting.

60. Black voters cohesively support candidates who are aligned on issues connected to race.

61. Among other things, the election calendar, and the sheer number of elections in Louisiana has produced voter fatigue and confusion, which is amplified in poor and undereducated communities.

62. Black voters' participation in the elections is negatively affected by historic and continuing socio-economic disparities in education, employment, housing, health, and criminal justice.

63. Black voters in Louisiana experience social and economic disparities that negatively impact voter registration and election participation.

64. Educational and employment opportunities are comparatively lacking for Black Louisianans which impairs meaningful access to the political process.

65. Health disparities between Louisiana's Black and White citizens adversely impact voter engagement and participation.

66. Felony disenfranchisement disproportionality affects Louisiana's Black population.

67. White candidates in recent elections in Louisiana employed overt and subtle racial appeals in their advertising and messaging.

68. Black Louisianans are underrepresented, as compared to their percentage of the population, in elected public offices at all levels.

69. Louisiana's elected officials have been and remain unresponsive to the particularized needs of Black Louisianans.

70. In the redistricting process, the Louisiana legislature favored incumbency protection above other redistricting criteria.

71. There is a history of persistent discrimination against Black citizens in Louisiana.

72. The disenfranchisement of Black voters is highly correlated with the political procedures and practices in Louisiana.

73. The Illustrative Plan offered by the Plaintiffs, if enacted by the State legislature, would result in more than proportionality, unlike the Enacted Maps.

74. The district lines in the Enacted Map do not provide political effectiveness in proportion to BVAP.

75. Louisiana's history of persistent discrimination, the impacts of which persist to the present day, and White bloc voting behavior dilute the Black vote and deny minority voters equal political opportunity.

## II.   CONCLUSIONS OF LAW

Standing

1. The Individual Plaintiffs are Black, registered voters who reside in a cracked or packed voting district under the Enacted Map and have standing.

24-30115.9224

2. The Individual Plaintiffs established that the Enacted Map's vote dilution denies the four Individual Plaintiffs an equal opportunity to elect a candidate of their choice, thus the Individual Plaintiffs have standing to challenge the vote dilution.

3. The individuals who make up the branches of the Louisiana NAACP are "members" of the NAACP for purposes of associational standing.

4. "[P]rotecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission" at all levels of the organization."[49]

5. The Louisiana NAACP seeks prospective and injunctive relief instead of individualized damages, thus direct participation by individual members is not required.[50]

6. The Louisiana NAACP has associational standing.

7. BVM and the Louisiana NAACP have organizational standing.

_Gingles_ + Totality of the Circumstances

1. The Plaintiffs have a right of action under § 2 of the VRA.

2. Plaintiffs proved by a preponderance of the evidence that the BVAP is sufficiently large and geographically compact to constitute a majority in several reasonably shaped districts.

3. Plaintiffs satisfied _Gingles_ I.

4. The Illustrative Plans do not trigger the Equal Protection Clause of the Fourteenth Amendment because there is no state action.

---

[49] _Hancock Cnty. Bd. of Sup'rs v. Ruhr_, 487 F. App'x 189, 197 (5th Cir. 2012) ) ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission.").

[50] _Consumer Data Indus. Ass'n v. Paxton_, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023) ("Participation of individual members generally is not required when the association seeks prospective or injunctive relief, as opposed to damages.").

5. *Gingles* II asks whether Black voters are "politically cohesive,"[51] – in other words, whether Black voters usually support the same candidate in elections. *Gingles* III asks whether White voters vote "sufficiently as a bloc to usually defeat the [Black voters'] preferred candidate."[52] The Plaintiffs proved both.

6. "Illustrative districts that could perform with a BVAP of less than 50 percent with White crossover voting are not the focus of the third *Gingles* precondition analysis."[53]

7. "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature."[54]

8. "[U]nder the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters."[55]

9. Plaintiffs have proven the *Gingles* II and III requirements.

10. Partisan preference is not properly the subject of the *Gingles* II and III inquiry but may be analyzed as part of the totality of the circumstances inquiry.

11. Voting in Louisiana is racially polarized.

12. Based on the totality of the circumstances, if the Enacted Maps are used, Black Louisianans will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

---

[51] *Cooper v. Harris*, 581 U.S. 285, 302 (2017) (citing *Thornbrug v. Gingles*, 478 U.S. 30, 51 (1986)).
[52] *Id.*
[53] *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023).
[54] *Id.* at 596
[55] *Thornburg v. Gingles*, 478 U.S. 30, 63 (1986).

24-30115.9226

13. The Enacted House and Senate Maps, in the areas where illustrative districts are proposed, are dilutive of Black voting strength and violative of § 2 of the Voting Rights Act.

Signed in Baton Rouge, Louisiana, on <u>February 8, 2024</u>.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

# TAB 9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| *Plaintiffs,* | |
| v. | Chief Judge Shelly D. Dick |
| R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |

## <u>NOTICE OF APPEAL</u>

Defendant Nancy Landry, in her official capacity as Secretary of State of Louisiana, hereby gives notice of appeal from the Court's February 8, 2024 Order [Rec. Docs. 233 and 234] and all other orders ancillary, related, and precedent thereto, to the United States Court of Appeals for the Fifth Circuit. *See Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1102 (5th Cir. 1983). This appeal is brought pursuant to 28 U.S.C. § 1291 and § 1292(a)(1).

Respectfully submitted, this the 19th day of February, 2024.

*/s/ Phillip J. Strach*
Phillip J. Strach*
    *Lead Counsel*
Thomas A. Farr*
John E. Branch, III*
Alyssa M. Riggins*
Cassie A. Holt*
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com

john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

*/s/ John C. Walsh*
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
**SHOWS, CALL & WALSH, L.L.P.**
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com

* *Admitted pro hac vice*

*Counsel for Defendant NANCY LANDRY, in her*
*official capacity as Secretary of State of Louisiana*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 19th day of February, 2024, the foregoing has been filed with

the Clerk via the CM/ECF system that has sent a notice of electronic filing to all counsel of record.

*/s/ Phillip J. Strach*

Phillip J. Strach*

# TAB 10

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana, | |
| *Defendant.* | |

## NOTICE OF APPEAL

Notice is hereby given that the State of Louisiana, by and through Elizabeth B. Murrill, the

Attorney General of Louisiana, hereby appeals this Court's February 8, 2024 Order, (ECFs No.

233 and 234) and all other orders ancillary, related, and precedent thereto, to the United States

Court of Appeals for the Fifth Circuit. This appeal is brought pursuant to 28 U.S.C. § 1291 and

§ 1292(a)(1).

Respectfully submitted, this the 19th day of February, 2024.

Elizabeth B. Murrill
Louisiana Attorney General

By: */s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (LSBA No. 20685)
Morgan Brungard (LSBA No. 40298)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax

murrille@ag.louisiana.gov
jonescar@ag.louisiana.gov
brungardm@ag.louisiana.gov
lagrouea@ag.louisiana.gov


Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com


Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com

Brennan A.R. Bowen (AZ 036639)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2575 East Camelback Rd, Ste 860
Phoenix, AZ 85016
602-388-1262
Email: bbowen@holtzmanvogel.com


*Admitted pro hac vice

2

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on this 19th day of February 2024, the foregoing has been filed with the Clerk via the CM/ECF system that has sent a Notice of Electronic filing to all counsel of record.

*/s/ Carey T. Jones*
Carey T. Jones

# TAB 11

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, *et al.*,

     *Plaintiffs,*

v.

NANCY LANDRY, in her official capacity as
Secretary of State of Louisiana,

     *Defendant.*

Civil Action No. 3:22-cv-00178-SDD-SDJ

Chief Judge Shelly D. Dick

Magistrate Judge Scott D. Johnson

## LEGISLATIVE INTERVENORS' NOTICE OF APPEAL

Notice is hereby given that Legislative Intervenors Phillip DeVillier, Speaker of the Louisiana House of Representatives, and Cameron Henry, President of the Louisiana Senate, in their respective official capacities,[1] appeal to the United States Court of Appeals for the Fifth Circuit from the February 8, 2024, Ruling and Order, Docs. 233 & 234, granting an injunction, and all orders related to, or forming the basis of, that Ruling and Order.

Respectfully submitted,

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*/s/ Michael W. Mengis*
Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

---

[1] Former Speaker of the Louisiana House of Representatives, Clay Schexnayder, and former President of the Louisiana Senate no longer hold their respective offices and were replaced "automatically" by their successors Speaker DeVillier and President Henry under Federal Rule of Civil Procedure 25(d).

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

Erika Dackin Prouty*
Robert J. Tucker*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

* *Admitted pro hac vice*

*Counsel for Legislative Intervenors, Phillip*
*DeVillier, in his Official Capacity as Speaker*
*of the Louisiana House of Representatives, and*
*of Cameron Henry in his Official Capacity as*
*President of the Louisiana Senate*

## CERTIFICATE OF SERVICE

I certify that on March 6, 2024, this document was filed electronically on the Court's

electronic case filing system. Notice of the filing will be served on all counsel of record through

the Court's system. Copies of the filing are available on the Court's system.

/s/ *Michael W. Mengis*
Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Phillip*
*DeVillier, in his Official Capacity as Speaker*
*of the Louisiana House of Representatives,*
*and of Cameron Henry, in his Official*
*Capacity as President of the Louisiana Senate*

2

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

Dated: July 17, 2024　　　　　　　　*/s/ Richard B. Raile*

　　　　　　　　　　　　　　　　RICHARD B. RAILE