No. 24-30115

# In the United States Court of Appeals for the Fifth Circuit

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,

*Plaintiffs-Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,

*Defendant-Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,

*Intervenors-Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor-Appellee*

_____

On Appeal from the United States District Court
for the Middle District of Louisiana, No. 3:22-CV-178

_____

## THE STATE OF LOUISIANA'S OPENING BRIEF

_____

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY
GENERAL
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6705
BrungardM@ag.louisiana.gov

J. BENJAMIN AGUIÑAGA
Solicitor General

MORGAN BRUNGARD*
    *Counsel of Record
Deputy Solicitor General

*Counsel for the State of Louisiana*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, the State of Louisiana is a "governmental" party and therefore need not provide a certificate of interested persons.

*/s/ Morgan Brungard*
MORGAN BRUNGARD

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................ii

TABLE OF AUTHORITIES .....................................................................iv

INTRODUCTION, ISSUES PRESENTED, AND SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT ............................................................................................. 4

   I.    SECTION 2 DOES NOT CONTAIN A PRIVATE RIGHT OF ACTION. ......... 4

   II.   SECTION 2'S RACE-BASED REDISTRICTING MANDATE IS UNCONSTITUTIONAL AS APPLIED HERE. ........................................ 14

CONCLUSION ........................................................................................ 23

CERTIFICATE OF SERVICE ................................................................ 25

CERTIFICATE OF COMPLIANCE ....................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*,
  647 S.W.3d 681 (Tex. 2022) ................................................... 10

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) .......................................................... 6

*Ala. State Conf. of NAACP v. Alabama*,
  949 F.3d 647 (11th Cir. 2020) ............................................... 10

*Allen v. Milligan*,
  599 U.S. 1 (2023) .......................................................... passim

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
  86 F.4th 1204 (8th Cir. 2023) ............................... 4, 7, 11, 13

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ...................................................... 16, 20

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) .............................................................. 21

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980) ................................................................ 16

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) .............................................................. 20

*City of Rome v. United States*,
  446 U.S. 156 (1980) ...................................................... passim

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
  527 U.S. 627 (1999) .............................................................. 21

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) .............................................................. 20

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ...................................................................5

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985) ...................................................................8

*Morse v. Republican Party of Va.*,
  517 U.S. 186 (1996) .................................................................11

*Nestle USA, Inc. v. Doe*,
  593 U.S. 628 (2021) ...................................................................8

*Nixon v. Kent Cnty.*,
  76 F.3d 1381 (6th Cir. 1996) ....................................................20

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ...........................................................19, 20

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ...................................................................8

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ......................................................6

*Planned Parenthood of Greater Tex. Family Planning & Preventative
  Health Servs., Inc. v. Kauffman*,
  981 F.3d 347 (5th Cir. 2020) ......................................................5

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
  876 F.3d 699 (5th Cir. 2017) ....................................................12

*Rapanos v. United States*,
  547 U.S. 715 (2006) ...................................................................6

*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023) ...............................................2, 4, 9

v

*Seminole Tribe of Fla. v. Florida,*
   517 U.S. 44 (1996) ................................................................ 6

*Shelby Cnty. v. Holder,*
   570 U.S. 529 (2013) .................................... 6, 17, 19, 20, 21, 23

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966) ....................................................... 15, 19

*Whitman v. Am. Trucking. Ass'n,*
   531 U.S. 457 (2001) ............................................................ 13

**Statutes**

42 U.S.C. § 1973 ................................................................... 16

42 U.S.C. § 1988(b) ............................................................... 9

52 U.S.C. § 10301 ................................................................ 18

52 U.S.C. § 10302 .................................................... 7, 9, 11, 12

52 U.S.C. § 10308(d) .......................................................... 7, 12

52 U.S.C. § 10310 ................................................................. 7

**Other Authorities**

2 Hearings before the Subcommittee on the Constitution of the Senate
   Committee on the Judiciary, 97th Cong., 2d Sess., pt. 1, p. 1 (1982).. 17

Dept. of Commerce, Census Bureau, Reported Voting and Registration,
   by Sex, Race and Hispanic Origin, for States (Nov. 2012) .................. 22

H. R. 3112, 97th Cong., 1st Sess., 2 ......................................... 17

N. Y. Times, Mar. 27, 1982, p. 23 ............................................ 17

S. Rep. No. 97–417, 97th Cong. 2nd Sess. 28 (1982) ............................ 20

U.S. Code Cong. & Admin. News 1982, p. 192 ........................................ 20

**Rules**

Fed. R. App. 28(i) ...................................................................................... 1

**Constitutional Provisions**

U.S. Const. amend. XV, § 1 ...................................................................... 14

U.S. Const. amend. XV, § 2 ...................................................................... 23

## INTRODUCTION, ISSUES PRESENTED, AND SUMMARY OF ARGUMENT[1]

The district court's decision in this case is wrong. Louisiana's House and Senate redistricting plans provide more majority-Black voting age population (BVAP) districts than did any prior plans in Louisiana history. Yet Plaintiffs—four individuals and two advocacy groups—demand even more majority-BVAP legislative districts. In their view, Section 2 of the Voting Rights Act (VRA) entitles them to representation on par with the Louisiana statewide BVAP of approximately thirty-one percent. Put simply, they seek proportional representation.

"Forcing proportional representation," however, "is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen v. Milligan*, 599 U.S. 1, 28 (2023). But the district court was unfazed. Not content with actual proportional representation (which itself is an unlawful aim), the district court enjoined *all* 144 of Louisiana's House and Senate districts and mandated disproportionate *over-*

---

[1] The State agrees with—and adopts by reference—the Legislative Leaders' and Secretary of State's opening briefs. *See* Fed. R. App. 28(i). Accordingly, to streamline the briefing, the State's brief omits those traditional portions of the brief that would be unnecessarily duplicative, including the jurisdictional statement and statement of the case.

representation (which itself necessarily is a doubly unlawful aim). The sheer magnitude of the district court's decision is difficult to comprehend—and the decision is wrong for any number of reasons detailed in the Secretary of State's and the Legislative Leaders' opening briefs. Accordingly, the State joins those briefs in full and urges this Court to reverse.

In this brief, the State adds only two legal issues presented, each of which independently requires reversal:

1. Did Congress authorize private individuals, in addition to the U.S. Attorney General, to enforce Section 2 of the VRA?

2. Is Section 2 unconstitutional as applied here given the absence of current needs justifying Section 2?

The answer to the *first* question is no. Section 2 plainly vests enforcement authority in the U.S. Attorney General alone. And it is silent as to whether it creates a right, or even a remedy, for private individuals. That forecloses an implied private right of action. Now, to be clear, the State recognizes that the rule of orderliness requires a Panel to hold otherwise under *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023). The State nonetheless briefs this issue for preservation purposes because (a) this issue evenly divided the full Court (with one Member not participating) at the beginning of the case, *see* ECF No. 176-1, (b) in light

of the voluminous briefing and issues in this case, the Panel may on its own motion wish to revisit the prospect of initial en banc review of this discrete, dispositive issue, and (c) in all events, a separate writing on the issue would significantly aid the state of the law, potential en banc review, and the Supreme Court's review.

The answer to the *second* question is yes, Section 2 is unconstitutional as applied here. As Justice Kavanaugh's and Justice Thomas's writings in *Allen* suggest, Section 2 cannot be sustained on evidence of discrimination from bygone years. It must be justified, at least on an as-applied basis, by *current* needs. And there is no evidence in this record of a current need for Section 2 in Louisiana. To the contrary, Black representation in the Louisiana House and Senate is higher than it has ever been. In fact, significant numbers of *White* voters vote for *Black* candidates. Section 2 is unconstitutional as applied here.

For these reasons, there is no doubt that this Court should reverse. The only question is on which ground(s).

# ARGUMENT

## I.    SECTION 2 DOES NOT CONTAIN A PRIVATE RIGHT OF ACTION.

A prior Panel of this Court held "that there is a right for [private] Plaintiffs to bring [Section 2] claims," *Robinson*, 86 F.4th at 588, and the rule of orderliness requires this Panel to follow that holding. For purposes of en banc or Supreme Court review, however, the State briefs this issue both to preserve it and to assist any Member of the Court who wishes to write separately on it.[2]

**A.** As the Eighth Circuit held post-*Robinson* in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), there is no implied private right of action in Section 2. This is so for multiple reasons.

Start *first* with a straightforward implied-right-of-action analysis. As the Eighth Circuit observed, "[u]nder the modern test for implied rights of action, Congress must have *both* created an individual right *and* given private plaintiffs the ability to enforce it." *Id.* at 1209. But Congress did neither in the VRA.

---

[2] The State preserved this argument below, *see* ROA.7319, which the district court rejected, *see* ROA.9135–39.

On the private-right question, it is, at best, "unclear whether § 2 creates an individual right" because Section 2's text cuts in opposite directions—by both outlining "a 'general proscription' of 'discriminatory conduct'" (which suggests no individual right) and focusing on a class of individuals "subject to discrimination in voting" (which might *imply*, but does not actually create, a right). *Id.* at 1209–10. Section 2's text thus lacks "'the sort of *rights-creating language* needed to imply a private right of action.'" *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 374 (5th Cir. 2020) (Elrod, J., concurring) (emphasizing that "'where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action'" (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285–86 (2002))).

If there were any doubt that Section 2 does not create a new right, moreover, basic federalism concerns and rules of statutory interpretation would eliminate that doubt. Indeed, if Congress intended to authorize a whole host of individuals to disrupt States' redistricting processes through private lawsuits, that would mark an extraordinary intrusion

upon States' traditional authority to regulate elections. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (reaffirming States' "broad powers to determine the conditions under which the right of suffrage may be exercised" (citation omitted)). Where Congress attempts to invade such areas of "quintessential" State power, however, "[w]e ordinarily expect a 'clear and manifest' statement" of Congress's intent. *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality op.); *see also Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021). No such clear statement exists on the private-right question.

Consider also the longstanding requirement that "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996). As discussed further below, this Court has summarily stated that the VRA "validly abrogated state sovereign immunity." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). But that cannot be true as to private actions because, again, no requisite clear statement exists. At bottom, therefore, this analysis should end at step one with the private-right question.

In all events, these principles and others apply with equal (and perhaps more) force at step two because even "[g]reater clarity exists on the private-remedy question." *Ark. State Conf. NAACP*, 86 F.4th at 1210. This is because Section 2 "itself contains no private enforcement mechanism." *Id.* And "[a]ny mention of private plaintiffs or private remedies . . . is missing." *Id.* In fact, "[t]he Voting Rights Act lists only one plaintiff who can enforce § 2: the Attorney General." *Id.* at 1208 (citing 52 U.S.C. § 10308(d)). That is "all the text provides." *Id.* at 1210. "Congress not only created a method of enforcing § 2 that does not involve private parties, but it also allowed someone else to bring lawsuits in their place." *Id.* at 1211. It naturally follows, then, that, "[i]f the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'" *Id.*

All this is especially so given that the VRA is a complex statute with interrelated parts. Indeed, its substantive provisions—which have bedeviled the courts for decades—are backed up by detailed enforcement provisions. *See* 52 U.S.C. §§ 10302, 10308, 10310. And that implicates a corollary to the presumption that Congress's express provision of one

remedy suggests the exclusion of others, namely: The "presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). Just so here: Congress's express placement of Section 2's detailed enforcement scheme in the Attorney General's hands "strong[ly]" signals that Congress "deliberately omitted" a private right of action. *Id.*

Finally, it bears noting that "judicial creation of a cause of action is an extraordinary act that places great stress on the separation of powers." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 636 (2021) (plurality op.). It likewise strains our federalism, which is "necessarily overridden" when courts "regulate state and local voting through the provisions of the Voting Rights Act." *City of Rome v. United States*, 446 U.S. 156, 179–80 (1980), *superseded by statue on other grounds*. "Under the Constitution, judges have power to say what the law is, not what it should be." *Obergefell v. Hodge*s, 576 U.S. 644, 686 (2015) (Roberts, C.J., joined by

Scalia, J., and Thomas, J., dissenting). And the law here—Section 2—contains no private right of action.[3]

**B.** *Robinson* reached the opposite conclusion, but respectfully, its reasoning is mistaken. There, the Court said that "[w]e consider most of the work on this issue to have been done by our *OCA-Greater Houston*, holding that the Voting Rights Act abrogated the state sovereign immunity anchored in the Eleventh Amendment." *Robinson*, 86 F.4th at 588. *Robinson* reasoned that "Congress should not be accused of abrogating sovereign immunity without some purpose"—and "[t]he purpose surely is to allow the States to be sued by someone." *Id. Robinson* observed that Section 3 of the Act "provides that proceedings to enforce voting guarantees in any state or political subdivision can be brought by the Attorney General or by an 'aggrieved person.'" *Id.* (quoting 52 U.S.C. § 10302). *Robinson* thus concluded that "the Plaintiffs here are aggrieved persons, that our *OCA-Houston* decision has already held that sovereign

---

[3] Notably, restoring the original design under the VRA—by homing enforcement solely in the U.S. Attorney General—would have the ancillary benefit of saving judicial and taxpayer resources devoted to attorney fee claims in Section 2 cases. *See* 42 U.S.C. § 1988(b) (authorizing attorney fee awards to "the prevailing party, other than the United States").

immunity has been waived, and that there is a right for these Plaintiffs to bring these claims." *Id.* Respectfully, that reasoning is mistaken in several respects.

To start, the "work" *OCA-Houston* does here is virtually non-existent: It is a single sentence that summarily says, "The VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity." 867 F.3d at 614. In fact, other courts have declined to follow *OCA-Greater Houston* on different issues because of the "conclusory nature" and "bare[ness]" of its analysis. *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 698 (Tex. 2022).

*OCA-Houston*'s unelaborated sentence is also incorrect. *See Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 662 (11th Cir. 2020) (Branch, J., dissenting) (explaining, in the context of a later-vacated decision, that *OCA-Greater Houston* is profoundly wrong because "nothing" in the VRA's text "abrogates state sovereign immunity such that private individuals can sue the State in federal court"). With that mistaken premise omitted, the paragraph in *Robinson* collapses.

More fundamentally, *Robinson*'s reasoning based on the "aggrieved person" language—that the inclusion of this language in Section 3 creates a private right of action—is mistaken, as the Eighth Circuit recognized. Section 3 refers to a "proceeding instituted by the Attorney General or an aggrieved person," though it originally referenced only the Attorney General. 52 U.S.C. § 10302(c). When Congress "added the reference to 'aggrieved person[s],'" "'[t]he most logical deduction from' this change 'is that Congress meant to address those cases brought pursuant to the private right[s] of action that' already existed or that would be created in the future"—*not* that Congress meant to create a new private right of action altogether. *Ark. State Conf. NAACP*, 86 F.4th at 1211 (quoting *Morse v. Republican Party of Va.*, 517 U.S. 186, 289 (1996) (Thomas, J., dissenting)). That is so for numerous reasons.

Consider, for example, the text: "The next phrase after 'aggrieved person' mentions 'a proceeding under any statute,' which most reasonably refers to statutes that already allow for private lawsuits." *Id.* (quoting 52 U.S.C. § 10302(a)). "An already existing proceeding, in other words, not a new one created by § 3"—"[a]fter all, 'institut[ing] a

proceeding' requires the underlying cause of action to exist first." *Id.* (quoting 52 U.S.C. § 10302(a)).

Consider also the history and structure: "In 1965, no one would have thought that § 3 created a cause of action in favor of the Attorney General, the only person listed in the original version"—because Section 12 of the Act "already gave the Attorney General the ability to bring one." *Id.* (citing § 10308(d)). "[A] second, duplicate authorization for the Attorney General to sue" would make zero sense. *Id.* And it would be stranger still to think that, when Congress "add[ed] 'or an aggrieved person' to a provision that created *no right of action*," that addition magically "transform[ed] [the provision] into one that creates *many*." *Id.* at 1211–12 (emphases added).

In short, this Section 3 argument depends on "the idea that Congress decided to transform the enforcement of 'one of the most substantial' statutes in history by the subtlest of implications." *Id.* at 1213. That is "[i]mplausible, to say the least, when measured against the explicit enforcement mechanisms found elsewhere in the Voting Rights Act." *Id.*; *see also Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 701 & n.1 (5th Cir. 2017) (Elrod, J., dissenting from the denial of

rehearing en banc) (emphasizing that, on the "the issue of whether there [is] any private right of action in the statute," "'Congress . . . does not . . . hide elephants in mouseholes'" (quoting *Whitman v. Am. Trucking. Ass'n*, 531 U.S. 457, 468 (2001))). "'Congress . . . knows how to create a cause of action,' and it did not do so here." *Ark. State Conf. NAACP*, 86 F.4th at 1213.

**C.** To be clear, the State's position is not that individuals like Plaintiffs have no protection from alleged VRA violations. As Congress envisioned, the U.S. Attorney General is the proper enforcer under Section 2. And Congress plainly thought the U.S. Attorney General was up to the task. Indeed, until *Shelby County*, the Attorney General wore not only that Section 2 hat but also his preclearance hat under Section 5 of the VRA. Having now been relieved of his Section 5 preclearance duties, therefore, the Attorney General is more than capable of prosecuting any perceived Section 2 violations.

II.    SECTION 2'S RACE-BASED REDISTRICTING MANDATE IS UNCONSTITUTIONAL AS APPLIED HERE.

In all events, Section 2 is unconstitutional as applied here because no current needs justify it.[4]

**A.** "The Fifteenth Amendment was ratified in 1870, in the wake of the Civil War." *Shelby Cnty. v. Holder*, 570 U.S. 529, 536 (2013). Section 1 of that Amendment prohibits States from "den[ying] or abridg[ing]" the right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Section 2 of that Amendment gives Congress the "power to enforce" Section 1 "by appropriate legislation." *Id.* § 2. The Supreme Court has interpreted Section 1's prohibition more narrowly than it has Congress's enforcement power under Section 2 of that Amendment. Whereas Section 1 "prohibits only purposeful discrimination," Section 2 of that Amendment gives Congress power to "outlaw voting practices that are discriminatory in effect." *Allen*, 599 U.S. at 41 (quoting *City of Rome*, 446 U.S. at 173).

In 1965, Congress enacted the VRA under Section 2 of the Fifteenth Amendment "to banish the blight of racial discrimination in voting"

---

[4] The State preserved this argument below, *see* ROA.7346–50, which the district court rejected, *see* ROA.9141–42.

through "stringent new remedies for voting discrimination." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). In so doing, Congress created a "voluminous legislative history." *Id.* "Before enacting the [VRA], Congress explored with great care the problem of racial discrimination in voting," including "nine days" of committee hearings and "testimony from a total of 67 witnesses." *Id.* at 308–09. The House heard "[m]ore than three full days" of floor debate, and the Senate heard "26 days in all." *Id.* at 309. "At the close of these deliberations, the verdict of both chambers was overwhelming," passing by 328 to 74 in the House and 79 to 18 in the Senate. *Id.*

The next year, a Fifteenth Amendment challenge to "portions" (but not Section 2) of the VRA arrived at the Supreme Court. *Id.* at 316. The Supreme Court upheld those portions as "appropriate means for carrying out Congress' constitutional responsibilities." *Id.* at 308. In 1980, the Supreme Court reaffirmed that decision. *See City of Rome,* 446 U.S. at 177 (upholding the VRA's "ban on electoral changes that are discriminatory in effect [as] an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting").

Also in 1980, Section 2 of the VRA had its turn for Fifteenth Amendment review. *See City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality op.). Section 2 of the VRA, as originally enacted, prohibited States from "impos[ing] or apply[ing]" any voting practice "to deny or abridge" the right to vote "on account of race or color." 42 U.S.C. § 1973 (1970 ed.). Because VRA Section 2 "'closely tracked the language of [Section 1 of the Fifteenth] Amendment,'" the Supreme Court took a different approach than it had with other VRA sections. *Allen*, 599 at 10–11 (alteration added) (quoting *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 656 (2021)). The Supreme Court held that Section 1 of the Fifteenth Amendment—and so also the very-similar VRA Section 2—prohibited States from acting with "invidious purpose" to discriminate or "racially discriminatory motivation." *City of Mobile*, 446 U.S. at 61–65. States, however, were not prohibited from taking actions that resulted in a discriminatory effect. *See id.* To succeed under VRA Section 2, plaintiffs would have to show that a state had "purposeful[ly] exclu[ded]" them "from participati[ng] in the election process." *Id.* at 64.

That decision spurred a "sharp debate" that "arrived at Congress's doorstep in 1981." *Allen*, 599 U.S. at 11–12 (collecting sources from both

sides of the debate). The disagreement centered on "whether to broaden [VRA] § 2 or keep it as is"—billed by some as "one of the most substantial constitutional issues ever to come before this body." *Id.* at 12 (quoting 2 Hearings before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess., pt. 1, p. 1 (1982)). Those in favor of broadening VRA Section 2 backed an amendment to prohibit States from passing election laws "in a manner which results in a denial or abridgment" of any citizen's right to vote "on account or race or color." *Id.* at 12–13 (quoting H. R. 3112, 97th Cong., 1st Sess., 2). Those who opposed that "effects test" argued that liability "would be triggered whenever election results did not mirror the population mix of a particular community." *Id.* at 13 (quoting N. Y. Times, Mar. 27, 1982, p. 23). The two sides eventually reached a compromise: "the effects test" plus "a robust disclaimer against proportionality." *Id.*

In 1982, Congress passed that compromise (the 1982 Amendment), and the President signed it into law. *Id.* The 1982 Amendment, which is still in effect today, has two parts. Subsection (a) prohibits States from "impos[ing] or appl[ying]" any voting practice "in a manner which results in a denial or abridgement of the right . . . to vote on account of race or

17

color . . . as provided in subsection (b)." 52 U.S.C. § 10301(a). Subsection (b) provides that plaintiffs establish "[a] violation of subjection (a)" when "the totality of the circumstances" show that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). "[N]othing in this section," however, "establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

Last year, the Supreme Court rejected a Fifteenth Amendment challenge against the 1982 Amendment "as applied to redistricting." *Allen*, 599 U.S. at 41. In *Allen*, the Supreme Court emphasized its *City of Rome* holding from "over 40 years ago 'that, even if § 1 of the [Fifteenth] Amendment prohibits only purposeful discrimination, the prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2 [of the Fifteenth Amendment], outlaw voting practices that are discriminatory in effect." *Id.* (quoting *City of Rome*, 446 U.S. at 173). Thus, [t]he VRA's 'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment'"—"the very same conclusion" the Court "had

reached" in 1966 in *Katzenbach*. *Id.* (quoting *City of Rome*, 446 U.S. at 177).

But here is the key point: "[E]ven if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Id.* at 45 (Kavanaugh, J., concurring); *accord id.* at 86–89 (Thomas, J., dissenting). The "current burdens" that the VRA imposes on States "must be justified by current needs." *Shelby Cnty.*, 570 U.S. at 536 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). This has been the law since the VRA first came into existence. *See Katzenbach*, 383 U.S. at 308 ("The constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects."); *id.* at 334 ("[E]xceptional conditions can justify legislative measures not otherwise appropriate.").

**B.** Today, the 1982 Amendment still lives. Yet Congress's Fifteenth Amendment authority for imposing the 1982 Amendment on States remains in the past. Put otherwise, the 1982 Amendment's "current burdens" are "justified by" 1982 needs, not "current [2024] needs." *Shelby*

19

*Cnty.*, 570 U.S. at 536 (quoting *Nw. Austin Mun. Util. Dist. No. One*, 557 U.S. at 203). In 1982, when Congress extended VRA Section 2 to reach beyond constitutional prohibitions, *see Brnovich*, 594 U.S. at 658–59, Congress made "'findings' that each of the protected minorities is, or has been, the subject of pervasive discrimination and exclusion from the electoral process," *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1390 (6th Cir. 1996) (en banc). There were current and "extensive congressional findings of voting discrimination," S. Rep. No. 97–417, 97th Cong. 2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982, p. 192, including findings from the 1970s when Congress passed other amendments, *see, e.g.*, S. Rep. No. 94-295 at 28–30.

Congress made those findings because its authority for legislation that uses "racial or ethnic criteria" (like the 1982 Amendment) requires "abundant evidence from which it could conclude" that such criteria are necessary. *Fullilove v. Klutznick*, 448 U.S. 448, 472, 477–78 (1980) (plurality op.); *accord City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 503–05 (1989) ("[I]t is especially important that the reasons for any [racial] classification be clearly identified and unquestionably legitimate." (quoting *Fullilove*, 448 U.S. at 533 (Stevens, J., dissenting)).

20

That evidence is what allows courts to conduct the requisite "close examination" of that criteria. *Id.* at 472. While the evidence need not be "the kind of 'record' appropriate with respect to judicial or administrative proceedings," *id.* at 478, there must be evidence of some kind, *see Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 640–41 (1999) ("Congress came up with little evidence of infringing conduct on the part of the States."); *City of Boerne v. Flores*, 521 U.S. 507, 530–31 (1997) ("The history of persecution in this country detailed in the hearings mentions no episodes occurring in the past 40 years.").

Since 1982, however, Congress has made zero findings to justify keeping the 1982 Amendment in place for forty years (with no end in sight) and zero attempts to tailor the 1982 Amendment to current (or even recent) conditions. *See Shelby Cnty.*, 570 U.S. at 553–54 (discussing deficiencies in most recent findings of 2006).

**C.** That brings us to this case. Even assuming the Constitution allowed Congress to keep the 1982 Amendment in place as long as the conditions that existed in 1982 continued to exist, conditions have vastly changed. "There is no denying" that, for more than a decade, "the conditions that originally justified [the VRA] no longer characterize

voting in [Louisiana]." *Id.* at 535 (citing Dept. of Commerce, Census Bureau, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Nov. 2012) (Table 4b) showing Louisiana as one of five States where Black voters voted more than White voters).[5]

This is even truer for the Louisiana House and Senate today. The Legislature has created the highest number of majority-Black districts for the Louisiana House and Senate that Louisiana has ever seen. *See* ROA.11442. This means there are now *more* majority-Black districts than there were in 2011 when the Obama Administration pre-cleared that map under VRA Section 5. *See id.* And even before the map was passed, the number of minority legislators serving in the Louisiana legislature was the highest it had ever been, *see id.*, and a substantial number of White voters were voting for Black candidates, *see* ROA.11363 (illustrating that White crossover voting is high, ranging from eighteen to twenty-seven percent on average).

Add to these improvements the fact that Plaintiffs have no evidence of current racial discrimination. Their evidence stops at 1975, seven

---

[5] Table 4b is available at:
https://www.census.gov/data/tables/2012/demo/voting-and-registration/p20-568.html.

years before the 1982 Amendment. ROA.19757–64. And the unrebutted expert testimony shows that any current polarization that may exist is political, not racial. *See* ROA.11319–27.

The country is now forty-plus years on from the 1982 Amendment, and current conditions in Louisiana no longer justify race-based redistricting. "[Louisiana] has changed, and while any racial discrimination in voting is too much, Congress must ensure that the [1982 Amendment] it pass[ed] to remedy that problem speaks to current conditions." *Shelby Cnty.*, 570 U.S. at 557. Because Congress has not done so—and because the record in this case plainly shows that current conditions in Louisiana do not, in fact, justify Section 2—the 1982 Amendment is no longer "appropriate legislation" within Congress' Fifteenth Amendment enforcement "power" as applied. U.S. Const. amend. XV, § 2.

## CONCLUSION

For these reasons, the Court should reverse the district court's decision concluding that the Louisiana House and Senate electoral maps violate VRA Section 2 and permanently enjoining elections under those maps, and render decision in favor of Defendants.

Date: July 17, 2024                    Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

*/s/ Morgan Brungard*
MORGAN BRUNGARD
Deputy Solicitor General

OFFICE OF THE ATTORNEY
GENERAL
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6705
BrungardM@ag.louisiana.gov

*Counsel for the State of
Louisiana*

24

## CERTIFICATE OF SERVICE

I certify that on July 17, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Morgan Brungard*
MORGAN BRUNGARD

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) because it contains 4,596 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Morgan Brungard*
MORGAN BRUNGARD

Date: July 17, 2024

26