No. 24-30115

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,
*Plaintiffs-Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,
*Defendant-Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVES; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,
*Intervenors-Appellants*

v.

UNITED STATES OF AMERICA,
*Intervenor-Appellee*

On Appeal from the United States District Court for the Middle District of Louisiana, No. 3:22-CV-178

## BRIEF OF ALABAMA AND 13 OTHER STATES AS
*AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Soren Geiger
  *Assistant Solicitor General*

  *Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................i

TABLE OF AUTHORITIES.......................................................................ii

INTEREST OF *AMICI CURIAE* ..............................................................1

SUMMARY OF ARGUMENT...................................................................3

ARGUMENT .............................................................................................5

   I.   The District Court's Interpretation of Section 2 Ignores the Statute's Text. .................................................................................5

   II.  The District Court's Interpretation of Section 2 Is Hopelessly Indeterminate. ............................................................................16

   III. The District Court's Interpretation of Section 2 Is Unconstitutional. .........................................................................21

CONCLUSION ........................................................................................26

CERTIFICATE OF COMPLIANCE.........................................................29

CERTIFICATE OF SERVICE..................................................................30

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................... 1

*Alexander v. South Carolina State Conf. of the NAACP,*
144 S. Ct. 1221, 1236 (2024) .............................................................. 25

*Allen v. Milligan,*
599 U.S. 1 (2023) ...................................................................... 5, 21, 26

*Baird v. Consol. City of Indianapolis,*
1991 WL 557613 (S.D. Ind. Apr. 25, 1991) ......................................... 15

*Chisom v. Roemer,*
501 U.S. 380 (1991) ........................................................................ 7, 16

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) ...................................................................... 21, 22

*Dilliard v. City of Greensboro,*
213 F.3d 1347 (11th Cir. 2000) ........................................................... 22

*Grutter v. Bollinger,*
539 U.S. 306 (2003) ............................................................................ 21

*Johnson v. De Grandy,*
512 U.S. 997 (1994) .............................................................................. 7

*Johnson v. United States,*
576 U.S. 591 (2015) ...................................................................... 19, 20

*Ketchum v. Byrne,*
740 F.2d 1398 (7th Cir. 1984) ....................................................... 22, 23

*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993).........................................1, 5-8, 12-15, 25

*McBoyle v. United States*,
  283 U.S. 25 (1931)..............................................................................18

*McDonnell v. United States*,
  579 U.S. 550 (2016)............................................................................19

*Miller v. Johnson*,
  515 U.S. 900 (1995)......................................................................17, 25

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009)............................................................................23

*Rucho v. Common Cause*,
  588 U.S. 684 (2019)............................................................................17

*Sackett v. Env't Prot. Agency*,
  598 U.S. 651 (2023)......................................................................17-19

*SFFA v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)......................................................................21, 26

*Shaw v. Hunt*,
  517 U.S. 899 (1996)............................................................................26

*Shaw v. Reno*,
  509 U.S. 630 (1993)..............................................................................3

*Shelby County v. Holder*,
  570 U.S. 529 (2013)......................................................................20, 23

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966)............................................................................23

*Taggart v. Lorenzen*,
  587 U.S. 554 (2019)..............................................................................8

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)..........................................................................3, 7, 8

*United States ex rel. Martin v. Hathaway*,
    63 F.4th 1043 (6th Cir. 2023) ............................................................17

*United States v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020)................................................................3

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala. 1992)....................................................22

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971)......................................................7-10, 13-17, 20

*White v. Regester*,
    412 U.S. 755 (1973).............................................7, 8, 10, 11, 15-17, 20

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986)..........................................................................25

## Statutes

18 U.S.C. §924(e)(2)(B)..............................................................................19

52 U.S.C. §10301(b)..............................................................................3, 5

52 U.S.C. §10302(c) ...................................................................................20

52 U.S.C. §10308(a) .............................................................................17, 20

## Other Authorities

HENRY J. FRIENDLY, *Benchmarks* 202 (1967)..........................................3

iv

## INTEREST OF *AMICI CURIAE*

The States of Alabama, Arkansas, Georgia, Indiana, Iowa, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Carolina, Texas, Utah, and West Virginia, respectfully submit this brief under Federal Rule of Appellate Procedure 29(a) as *amici curiae* in support of Appellants. "Redistricting is never easy." *Abbott v. Perez*, 585 U.S. 579, 585 (2018). And litigation-free redistricting will be virtually impossible for many States under the endlessly malleable approach to the Voting Rights Act adopted by the court below. That interpretation contravenes numerous principles of statutory interpretation and results in an unconstitutional expansion of the VRA that, having succeeded in "cutting away … obstacles to full participation," has been hijacked to satisfy "demands for outcomes." *LULAC v. Clements*, 999 F.2d 831, 837 (5th Cir. 1993) (en banc).

*Amici* States deserve fair notice regarding how to draft redistricting laws that comply with federal law. Yet under the District Court's free-wheeling approach, members of the Louisiana Legislature could never guess ahead of time what facts might—in a court's view—trigger a VRA

1

violation and thus might justify presumptively unconstitutional race-based districting.

In this case, however, a few simple and crucial facts about voting rights are beyond dispute: In 2020s Louisiana, voters of all races are allowed to register, vote, and engage with their preferred political party on equal footing. And if §2 of the VRA is read as it was originally understood when revised in 1982, those facts should resolve this case. Reading the statute like a statute confirms that there is equal "opportunity" to "participate in the political process" in Louisiana today and that Louisiana's legislative districting laws do not violate the VRA.

Still, the District Court found vote dilution and ordered race-based districting in part because a parish in Louisiana puts its sheriff's office on the same floor as the registrar, which sends the "subliminal message" that black Louisianans should stay away. That makes little sense, particularly as a matter of statutory interpretation. Only by blowing past the text could the court create such a capacious gap between the original meaning of §2 and the modern ends to which it has been repurposed. Left unchecked, this atextual jurisprudence will saddle States with hopeless indeterminacy each time they consider redistricting laws. Worse still,

this approach "carr[ies] us further from the goal of a political system in which race no longer matters." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

## SUMMARY OF ARGUMENT

This case turns on the meaning of the phrase "less opportunity … to participate in the political process" as it appears in §2 of the Voting Rights Act. 52 U.S.C. §10301(b). "In statutory interpretation, [the court] has three obligations: '(1) Read the statute; (2) read the statute; (3) read the statute!'" *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (quoting HENRY J. FRIENDLY, *Benchmarks* 202 (1967)). The District Court ignored that "treble commandment," *id.*, assuming instead that if Plaintiffs satisfy the three preconditions to a vote dilution claim created by *Thornburg v. Gingles* and then tap the bases of the so-called "Senate Factors" with a smattering of evidence, then they've proven under §2 that black Louisianans have "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. §10301(b). The court leaped to this conclusion over a record devoid of any evidence or finding that black voters are prohibited from participating in political life to the same extent as their white neighbors. The decision below represents statutory mission creep, not statutory interpretation.

3

The text of §2 and the Supreme Court decisions from which it was taken impose a more discernible and sensible standard: there is no vote dilution unless a racial group faces serious barriers to registering to vote, voting, and engaging with their preferred political party. Under that test, adopted by Congress in 1982, Louisiana's political system is open to all and its redistricting laws comply with §2.

This standard provides legislators with fair notice on how to craft districting legislation that complies with both the VRA and the Constitution. In contrast, the District Court's atextual approach is standardless, making it impossible to know when a political process becomes unequal and illegal. No statute that authorizes preclearance for racial gerrymanders and prison time for §2 violations should remain so inscrutable. Indeed, basic principles of due process make the District Court's reading of §2 untenable.

If the States are stuck with trying to obey a federal law that can demand race-based districting whenever the architecture of city hall sends the wrong "subliminal messages," then §2 is no longer constitutional because the demands for "race-based districting" will "extend in-

4

definitely into the future." *Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring). To avoid that constitutional problem, this Court need only interpret §2 like any other statute, just like the Court did in *LULAC v. Clements*, 999 F.2d 831, 837 (5th Cir. 1993) (en banc). In doing so, the Court should reverse.

## ARGUMENT

## I.  The District Court's Interpretation of Section 2 Ignores the Statute's Text.

**A.** To prove that a voting "standard, practice, or procedure" dilutes minority voting strength in violation of §2, Plaintiffs needed to show that black Louisianans "have less opportunity than other members of the electorate [1] to participate in the political process *and* [2] to elect representatives of their choice." 52 U.S.C. §10301(b) (emphasis added). This Court, sitting en banc, recognized three decades ago that "cutting away the obstacles" to "full participation" in the political process facing minorities was the original aim of §2. *Clements*, 999 F.2d at 837. Now achieved, that goal has been supplanted by efforts to "rearrang[e] state structures to alter election outcomes" and to overcome "majority rule at the ballot box and even in legislative halls." *Id.* In short, "the demands have changed," but the text has not. *Id.*

5

When holding that Louisiana's 2022 House and Senate Plans violate §2, the District Court paid little attention to the statute's text, never looking for "proof that minority voters *in this case* failed to participate equally in the political processes." *Clements*, 999 F.2d at 867. The result is an opinion that strays unthinkingly from the original meaning of the law and renders it utterly unpredictable for any Legislature trying to determine whether race-based districting is required or whether race-neutral districting will do. Congress did not write a law that arbitrary, *see* Part II, and unconstitutional, *see* Part III.

If this Court treats §2 like other statutes, reading it in light of Supreme Court and Fifth Circuit guidance, then it becomes plain that the District Court "employed the wrong legal standard" and "Plaintiffs have offered no evidence … tending to show that past discrimination" or any modern hardship "has affected their ability to participate in the political process." *Clements*, 999 F.2d at 867.

In *Chisom v. Roemer*, the Supreme Court clarified that proving only less opportunity to elect "is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the mem-

bers of the protected class have less opportunity to participate in the po-

litical process." 501 U.S. 380, 397 (1991). A few years earlier, in *Thorn-*

*burg v. Gingles*, the Court established a threshold showing every §2

plaintiff must overcome. 478 U.S. 30, 50-51 (1986). These three prerequi-

sites, known as the *Gingles* preconditions, speak to opportunity to elect.

*See Johnson v. De Grandy*, 512 U.S. 997, 1011-13 (1994).[1] But to fully

assess §2 liability, "courts must also examine … the extent of the oppor-

tunities minority voters enjoy to participate in the political processes."

*Id.* at 1011-12.

When examining whether black Louisianans and other members of

the Louisiana electorate today enjoy an equal "opportunity … to partici-

pate in the political process," it is of first importance to determine what

that statutory phrase means. *Clements* points to the answer. "[T]he 1982

amendments to § 2 were intended to 'codify' the results test as employed

in" *White v. Regester*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*,

403 U.S. 124 (1971), the two decisions that supplied §2's key language.

---

[1] *See also Gingles*, 478 U.S. at 50 n.15 ("It is obvious that unless mi-
nority group members experience substantial difficulty electing repre-
sentatives of their choice, they cannot prove that a challenged electoral
mechanism impairs their ability 'to elect.'"); *id.* at 50 ("inability to elect");
*id.* at 51 ("ability to elect").

7

*Clements*, 999 F.2d at 851.[2] Because §2's operative text "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (internal quotation marks omitted). Thus, "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Clements*, 999 F.2d at 851 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 97 (1986) (O'Connor, J., concurring)).

**B.** *Whitcomb* makes clear what is *not* enough to establish a "vote dilution" claim. The plaintiffs there challenged a multimember district in Marion County, Indiana, represented by "eight senators and 15 members of the house," alleging the system diluted the voting strength of a heavily black and poor part of the county "termed 'the ghetto area.'" 403 U.S. at 128-29. For "the period 1960 through 1968," that area made up "17.8% of

---

[2] *See, e.g.*, *Whitcomb*, 403 U.S. at 149 ("less opportunity … to participate in the political processes and to elect legislators of their choice"); *White*, 412 U.S. at 767 ("The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.").

the population" of Marion County but was home to only "4.75% of the senators and 5.97% of the representatives." *Id.* at 133. The voters there "voted heavily Democratic," but "the Republican Party won four of the five elections from 1960 to 1968." *Id.* at 150. The district court found vote dilution and ordered single-member districting. *Id.* at 129.

The Supreme Court reversed, emphasizing the absence of "evidence and findings that [black] residents had less" "opportunity to participate in and influence the selection of candidates and legislators." *Id.* at 149, 153. The Court made clear what these words meant by describing what plaintiffs failed to prove:

> We have discovered nothing in the record or in the court's findings indicating that poor [blacks] were not allowed [1] to register or vote, [2] to choose the political party they desired to support, [3] to participate in its affairs or [4] to be equally represented on those occasions when legislative candidates were chosen. Nor did the evidence purport to show or the court find that inhabitants of the ghetto were [5] regularly excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats.

*Id.* at 149-50.

This is what equal "opportunity … to participate in the political process" means. One has "opportunity" if he is "allowed" to register and vote, choose his preferred party, participate in its affairs, and have an

9

equal vote when the party's candidates are chosen. "Strong differences" in socioeconomic status between black residents of Marion County and their white suburban neighbors provided no evidence of unequal "access to the political system." *Id.* at 132, 155. And it made no difference that the Democratic Party in Marion County had lost all 23 seats in "four of the five elections from 1960 to 1968." *Id.* at 150. The record suggested that "had the Democrats won all of the elections or even most of them," plaintiffs "would have had no justifiable complaints about representation." *Id.* at 152. That the area did not "have legislative seats in proportion to its populations emerge[d] more as a function of losing elections," not built-in racial bias. *Id.* at 153. The plaintiffs' alleged denial of equal opportunity was "a mere euphemism for political defeat at the polls." *Id.*

*White v. Regester* shows what *is* enough to prove vote dilution. There, black residents of Dallas County, Texas, also favored the Democratic Party, but at-large elections and "a white-dominated organization that [was] in effective control of Democratic Party candidate slating" combined to stymie political participation by black voters. 412 U.S. at 766-67. The Democratic Party "did not need the support of the [black] community to win elections in the county, and it did not therefore exhibit

10

good-faith concern for the political and other needs and aspirations of the [black] community." *Id.* at 767. Because "the black community" was "effectively excluded from participation in the Democratic primary selection process," it "was therefore generally not permitted to enter into the political process in a reliable and meaningful manner." *Id.* Similarly, the "poll tax" and "the most restrictive voter registration procedures in the nation" kept Mexican-American residents of Bexar County, Texas, from accessing the political process on an equal footing with their white neighbors. *Id.* at 768-69. This was sufficient to establish illegal vote dilution.

**C.** All three minority groups—black voters in Dallas County, Mexican-American voters in Bexar County, and black voters in Marion County—experienced socioeconomic hardship, the lingering effects of historical discrimination, and persistent political defeat. But the political process was closed to two and open to one. The key difference was that residents in Marion County had access to those traditional means of political participation like registering, voting, and engaging with their preferred party, while their Texas counterparts did not. Thus, at the very

11

least, a §2 plaintiff must show that the minority group faces *more inequality* in terms of those traditional methods of participation than did black Indianians in 1960s Marion County.

Here, both thankfully and unsurprisingly, the evidence comes nowhere close. Nothing in the record suggests that black Louisianans today are not allowed to register to vote, exercise their right to vote, choose the political party they desire to support, or participate equally in its affairs. That should have been the end of it. *See Clements*, 999 F.2d at 853 ("Absent evidence that minorities have been excluded from the political process, a lack of success at the polls is not sufficient to trigger judicial intervention.") (internal quotation marks omitted). Instead, the District Court relied on "Senate Factor" evidence like socioeconomic disparities between black and white Louisianans, including a 2% gap in unemployment (4.5% black to 2.5% white); a 7% gap in diabetes diagnoses (17.7% black to 10.8% white); a 10% gap in obesity rates (42.9% black to 32.4% white); and a disproportionate percentage of black neighborhoods damaged by Hurricane Katrina versus white neighborhoods. ROA.19768.

None of this is legally significant because the same or worse could certainly be said for poor black residents of Marion County in the 1960s.

12

*Whitcomb*, 403 U.S. at 132-33. Whether they exercised it or not, they had "equal *opportunity* to participate in and influence the selection of candidates and legislators," *id.* at 153 (emphasis added), because they were "*allowed* to register [and] vote, to choose the political party they desired to support, to participate in its affairs [and] to be equally represented on those occasions when legislative candidates were chosen," *id.* at 149 (emphasis added). As in *Whitcomb*, there is no evidence here that differences in employment, healthcare, education, and wealth "actually hamper the ability of minorities to participate" in the political process. *Clements*, 999 F.2d at 866.

"Plaintiffs have offered no evidence of reduced levels of black voter registration, lower turnout among black voters, or any other factor tending to show that past discrimination has affected their ability to participate in the political process." *Id.* at 867. To the contrary, Plaintiffs' own evidence shows that black turnout in 2020 was higher than white turnout among voters with a bachelor's degree (76% to 74%), and *significantly* higher among voters with no high school diploma (46% to 30%).

ROA.19759. Further, the majority of black Louisianans support the Democratic Party and are not "overlook[ed]" by it; they are "critical to Democratic Party success." *Whitcomb*, 403 U.S. at 150.

The District Court's "generalized armchair speculation," *Clements* 999 F.2d at 867, that "the marginal education and employment opportunities available to Black Louisianans hinders and impairs meaningful access to the political process," ROA.9204, is "not so much a finding as a prediction or hypothesis about what one might expect to find among minorities who still bore the scars of past discrimination." *Clements*, 999 F.2d at 866, 867; *see also* ROA.9204-05 (making the same conclusory statements about the effects of transportation barriers, disparate housing, health disparities, and "unfair law enforcement" on political participation). But these "musings" are no substitute for the required showing that black Louisianans do "not *in fact* participate to the same extent as other citizens." *Clements*, 999 F.2d at 866, 867 (emphasis added). The District Court's narrative contains nothing more than "the common sense proposition that depressed participation typically accompanies poverty and the lack of education." *Id.* at 867. Missing is any "proof that minority

voters *in this case* failed to participate equally in the political process." *Id.*

Here, "had the Democrats won all of the elections or even most of them," black voters "would have had no justifiable complaints about representation." *Whitcomb*, 403 U.S. at 152. Accordingly, under *Whitcomb*, *White*, and thus §2, Plaintiffs' claim fails because losing in the political process is not the same as being excluded from it. The District Court's contrary approach of identifying a "sordid" history of discrimination (which surely existed in 1960s Indiana too[3]), a few socioeconomic disparities (which defined the plaintiff group in *Whitcomb*), and elections that didn't go the "right" way "enough" proves nothing about whether black Louisianans have an equal "opportunity … to participate in the political process." Indeed, it's not clear what the District Court's test proves, much less how it could justify race-based remedies. The court's finding of vote dilution on this record "becomes plausible only if *Whitcomb* is purged from … voting rights jurisprudence." *Clements*, 999 F.2d at 862.

---

[3] *See, e.g.*, *Baird v. Consol. City of Indianapolis*, 1991 WL 557613, at \*6 (S.D. Ind. Apr. 25, 1991) ("Dr. Moore testified about the history of race discrimination in Indiana generally and in Marion County in particular.").

15

\*    \*    \*

In short, the opinion below represents a zombified jurisprudence, wandering aimlessly away from the original meaning of §2. But in every statutory case, the text matters. *Chisom* and *Clements* already told courts to read §2 in light of *Whitcomb* and *White*. This Court should follow that command, and it should conclude that in Louisiana in the 2020s, all voters have an equal opportunity to participate in the political process and to elect representatives of their choice.

## II.   The District Court's Interpretation of Section 2 Is Hopelessly Indeterminate.

The decision below reveals the utter indeterminacy of a vote dilution claim if the "clear lines" articulated in *Whitcomb* and *White* are "purged from … voting rights jurisprudence." *Clements*, 999 F.2d at 837, 862. This critical problem triggers several interpretative principles that point toward adopting the textualist approach to §2 outlined above rather than the elastic approach embraced by the District Court.

First, federalism requires a more disciplined reading of §2. "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915

16

(1995). In "such circumstances," courts must "act only in accord with es-

pecially clear standards," lest they "risk assuming political, not legal, re-

sponsibility for a process that often produces ill will and distrust." *Rucho*

*v. Common Cause*, 588 U.S. 684, 704 (2019). And the Supreme Court "re-

quires Congress to enact exceedingly clear language if it wishes to signif-

icantly alter the balance between federal and state power…." *Sackett v.*

*Env't Prot. Agency*, 598 U.S. 651, 679 (2023) (cleaned up). If the 1982

amendments to §2 enshrine the test from *Whitcomb* and *White*, §2 may

speak clearly enough to comport with these principles. But Congress

must speak more clearly if it is going to greenlight federal intrusion into

redistricting based on observations from the District Court that "healthy

people are more likely to vote, and sick people have less time and money

to go vote or engage in politics." ROA.9205 n.456.

Second, it must not be forgotten that §12 of the VRA authorizes

criminal penalties for §2 violations. *See* 52 U.S.C. 10308(a) ("Whoever

shall deprive or attempt to deprive any person of any right secured by

section 2 … shall be fined … or imprisoned."). In other words, the "same

language creates civil *and* criminal liability." *United States ex rel. Martin*

*v. Hathaway*, 63 F.4th 1043, 1050 (6th Cir. 2023). This is an additional

17

reason why state and local government officials are owed "fair warning …
of what the law intends to do if a certain line is passed." *McBoyle v.
United States*, 283 U.S. 25, 27 (1931). Even if a court could read §2 as
turning on whether "state elections are conducted in odd-years with Oc-
tober primaries and November runoff elections," surely an election offi-
cial in Louisiana couldn't be sent to prison for failing to account for "voter
fatigue" before implementing the State's House and Senate plans.
ROA.9201-02.

The District Court's interpretation of §2 clearly "gives rise to seri-
ous vagueness concerns in light of the [statute]'s criminal penalties."
*Sackett*, 598 U.S. at 680. Consider that in finding that Louisiana's redis-
tricting laws violated §2, the court relied in part on the fact that one of
the plaintiffs "pointed out the subliminal message of the Sheriff's Office
being housed on the same floor as her Registrar of Voter's Office."
ROA.9205 n.461. That is, potential civil and criminal penalties turned in
part on "subliminal messages" from a public building.

Perhaps if those walls could literally talk, the District Court's in-
terpretation would not be "hopelessly indeterminate." *Sackett*, 598 U.S.
at 681. But bad vibes cannot be the test for vote dilution. The District

Court's approach to §2 falls far short of providing "sufficient definiteness" such "that ordinary people can understand what conduct is prohibited" and "in a manner that does not encourage arbitrary and discriminatory enforcement." *Sackett*, 598 U.S. at 680-81 (quoting *McDonnell v. United States*, 579 U.S. 550, 576 (2016)).

Recall that in *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court considered the Armed Career Criminal Act's sentencing enhancement for prior convictions for a felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B). The Court deemed the enhancement unconstitutional because of "the indeterminacy of the wide-ranging inquiry required by" that clause. 576 U.S. 591, 597 (2015). And to be sure, it was a daunting task for a defendant to predict whether the "ordinary burglar" or "typical extortionist" was engaged in conduct that creates a "serious potential risk of physical injury." *Id.* at 597-98. But that's a cakewalk compared to trying to guess how the District Court's view of §2 will cash out. You might think that seeing fewer VRA violations is a sign of more equal opportunity to participate in politics. In front of the court below, you'd be wrong. Violations, in its view, are probably just "less visible now with the

19

elimination of federal oversight" because defendants didn't provide "evidence that violations of the VRA are [now] less prevalent." ROA.9199. Whether the court is right about that assertion, the court's approach to §2 is "shapeless" and should be rejected. *Johnson*, 576 U.S. at 602.

\*   \*   \*

The stakes are high. If the States cross the line from race-neutral districting to racial gerrymandering without good enough reasons, then §3 of the VRA may put preclearance back on the table, and if States don't gerrymander enough, state officials could face jail time for violating §2. *See* 52 U.S.C. §§10302(c); 10308(a). When federal courts are citing "subliminal messages," odd-year elections, and invisible VRA violations as evidence of §2 violations, at least two things are clear: (1) "things have changed dramatically" for the better, *Shelby County v. Holder*, 570 U.S. 529, 547 (2013), and (2) it may be harder than ever to predict whether redistricting laws will comply with §2 and the Constitution. The way forward is to read §2 like any other statute. The text, drawn from *Whitcomb* and *White*, shows that the Voting Rights Act is concerned with the right to register, vote, and participate in politics—win or lose—not on whispers from parish buildings.

20

## III.    The District Court's Interpretation of Section 2 Is Unconstitutional.

The District Court ordered race-based redistricting after critiquing parish courthouse architecture and assuming that VRA violations abound in Louisiana but lie hidden "now with the elimination of federal oversight." ROA.9199. If that's right, then §2 will impose "race-based redistricting … indefinitely into the future," *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring), and "no end is in sight," *SFFA v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 213 (2023). In other words, if the District Court's reading of §2 is correct, the statute "must … be invalidated under the Equal Protection Clause of the Fourteenth Amendment." *Id.*

Every racial classification by the government is either unconstitutional or on its way to that end. Those that are not outright prohibited are allowed only to the degree "necessary" "to further compelling governmental interests." *Id.* at 207. That is because even the race-based actions our Constitution permits are "dangerous," *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003), and "the deviation from the norm of equal treatment"; as such, they *must* be limited "in scope and duration." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498, 510 (1989) (plurality opinion).

21

The VRA has required race-based districting since §2 was amended in 1982, but in the intervening decades, "things have changed dramatically" in the South. *Id.* at 547. For example, in 1992 litigation in Alabama, all parties assumed that an "opportunity district" in the State's congressional map would need a black population of at least 65%. *See Wesch v. Hunt*, 785 F. Supp. 1491, 1495-97 (S.D. Ala. 1992) (three-judge court). In that challenge, one proposed plan included two districts with black populations of 59% and 62% respectively, but even the party who submitted the plan doubted that black Alabamians would have an "opportunity to elect candidates of their choice in these districts." *Id.* at 1496.

Likewise, in *Dilliard v. City of Greensboro*, a proposed district in a city council map in Alabama in the early 1990s with a "*bare black supermajority* in the voting-age population" was decried as preserving "white hegemony." 213 F.3d 1347, 1351 (11th Cir. 2000) (emphasis added). Plaintiffs, in turn, proposed an 83% black "swing district." *Id.* at 1351.

Similarly, in the 1980s, it was "widely accepted … that minorities must have something more than a mere majority even of voting age population in order to have a reasonable" chance of electoral success. *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir. 1984). Back then, a DOJ

"guideline of 65% of total population" was "adopted and maintained for years … to ensure minorities a fair opportunity to elect a candidate of their choice." *Id.* at 1415.

Compare those figures with today, and it becomes apparent that the "stringent new remedies" of the VRA worked. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). "Voter turnout and registration rates now approach parity," blatant "discriminatory evasions of federal decrees are rare," and "minority candidates hold office at unprecedented levels." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009).

Modern-day Louisiana is no exception. When the VRA was enacted, black voter registration in Louisiana sat at a meager 31.6% compared to a white registration rate of 80.5%—a 49% gap. *Shelby County*, 570 U.S. at 546. As of 2004, that gap had narrowed to just 4% (75.5% white to 71.1% black). *Id.* In 1971, only one black legislator served in the Louisiana House. ROA.16683. Today, black legislators hold "25% of state legislative seats." ROA.19777. "There is no doubt that these improvements are in large part *because of* the Voting Rights Act." *Shelby County*, 570 U.S. at 546. House District 23, for example, is represented by a black legislator and is reliably Democrat but has a black voting-age population

23

of just 50.86%. ROA.11550.[4] No "bare super-majority" is needed because everyone has the opportunity to register and vote. And as noted earlier, *supra* Section I.C., black Louisianans across the educational spectrum turned out to vote in 2020 at higher rates than white voters. ROA.19759.

Thus, when the District Court looked for "Senate Factor" material to support its finding of vote dilution, it had to rely on an evidentiary veneer so thin as to underscore the constitutional problems with its approach. Apparently relying on Plaintiffs' expert in the "history of voting-related racial discrimination," the District Court declared that there "is no evidence that violations of the VRA are less prevalent than they were in the past decade. Instead, they may be less visible now with the elimination of federal oversight." ROA.9199; *compare with* ROA.16676. So in the District Court's pessimistic view, the only things that have changed in the South are the number of federal overseers monitoring the States and the quantity of preclearance requests filling DOJ's inbox.

The fear that the States are secretly getting away with VRA violations might lead a court to throw caution to the wind before intruding "on

---

[4] Also, House Districts 60, 91, and 98 are reliably Democrat but have black voting-age populations well under 50% (37.73%, 40.73%, and 17.78% respectively). ROA.11551-52.

the most vital of local functions" and ordering race-based districting. *Miller*, 515 U.S. at 915. That fear might even cause a court to hear "subliminal messages" of racism emanating from the walls of city hall. ROA.9205 n.461. State Legislatures deserve greater respect and clarity than this ever-expanding approach to §2 affords. *See Alexander v. South Carolina State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024).

Worse still, hidden, inscrutable, and supposed VRA violations cannot, by definition, constitute "particularized findings" that members of the minority group are excluded from effective political participation. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986). But without such "particularized findings," the "racial classifications" ordered by the District Court will be "ageless in their reach into the past, and timeless in their ability to affect the future." *Id.*[5] A so-called "Senate Factors" expert will always be able to identity at least some "race-based gaps … with

---

[5] The District Court also cited as evidence of recent discrimination a 2021 consent decree between DOJ and the City of West Monroe regarding the city's "use of solely at-large districts for election to the Board of Aldermen." ROA.9198. Ouchita Parish, home to West Monroe, is located far away from any portion of the state where Plaintiffs allege the political process is not open to black voters. The "intensely local appraisal" required by the §2 inquiry renders this consent decree irrelevant. *Clements*, 999 F.2d at 867 ("A district court's findings under § 2 must rest on an

respect to the health, wealth, [or] well-being of American citizens." *SFFA*, 600 U.S. at 384 (Jackson, J., dissenting). This will allow §2 to function as "an affirmative-action program" for race-based districting in perpetuity. *Shaw v. Hunt*, 517 U.S. 899, 910 (1996).

But the Supreme Court's "precedents make clear that" even "narrowly tailored race-based affirmative action in higher education" may not "extend indefinitely into the future." *SFFA*, 600 U.S. at 316 (Kavanaugh, J., concurring). Likewise, "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring). If §2 allows courts to "pick[] winners and losers based on the color of their skin," *SFFA*, 600 U.S. at 229, it is time to get out of that sordid business.

## CONCLUSION

This Court should reverse.

---

'intensely local appraisal' of the social and political climate of the cities and counties in which such suits are brought ….").

Respectfully submitted,

Steve Marshall
  *Attorney General*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
  *Solicitor General*

Soren Geiger
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici *States*

## ADDITIONAL COUNSEL

TIM GRIFFIN
Attorney General
State of Arkansas

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Fed. R. App. P. 29(a)(4), (b)(4) because it contains 5,336 words as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: <u>July 30, 2024</u>                 *s/ Edmund G. LaCour Jr.*
                                             Edmund G. LaCour Jr.
                                             *Counsel for State of Alabama*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2024, I electronically filed the fore-going document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Parties in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

s/ *Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
*Counsel for State of Alabama*