No. 24-30115

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE
WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY
BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE
NAACP; STEVEN HARRIS, REVEREND,

Plaintiffs-Appellees

v.

NANCY LANDRY, in her official capacity as Secretary of State of Louisiana,

Defendant-Appellant

(*See inside cover for continuation of caption*)

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

*(Continuation of Caption)*

STATE OF LOUISIANA, by and through ATTORNEY GENERAL ELIZABETH
B. MURRILL; PHILLIP DEVILLIER, in his official capacity as Speaker of the
Louisiana House of Representative; CAMERON HENRY, in his official capacity
as President of the Louisiana Senate,

Intervenors-Appellants

v.

UNITED STATES OF AMERICA,

Intervenor-Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The United States agrees oral argument will aid in the Court's disposition of the appeal as to any issues properly before the court.

**TABLE OF CONTENTS**

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF THE CASE.................................................................. 1

    A.   Statutory Background......................................................... 1

    B.   Factual Background............................................................ 5

SUMMARY OF ARGUMENT................................................................. 7

ARGUMENT

    I.   Neither the passage of time nor the State's assertions about
        conditions in Louisiana render Section 2 unconstitutional. ................ 9

        A.   The State has waived its constitutional arguments. ................... 9

        B.   Section 2's results test and race-conscious remedies
            comport with Congress's Fifteenth Amendment authority. ......11

        C.   Section 2's liability and remedial regime remains a
            rational means of enforcing the Fifteenth Amendment. .......... 13

            1.   The Secretary waived its temporal challenge................ 14

            2.   Congress does not need to continuously renew
                Section 2 for the statute to be constitutional. ................ 17

                a.   Congress need not continuously update
                     Reconstruction Amendment laws and their
                     supporting evidence to anticipate
                     new lawsuits. ...................................................... 18

**TABLE OF CONTENTS (continued):**                           **PAGE**

        b.    *Shelby County* does not alter Congress's duties with respect to Section 2............................ 23

        c.    A continuous "updating" requirement would unduly burden Congress and undermine the rule of law. ............................................................. 27

    D.    The State's disagreement with the district court's ruling does not render Section 2 unconstitutional. .................. 29

II.    The question whether private plaintiffs may enforce Section 2 of the VRA is not properly before this Court. .................................... 32

CONCLUSION ..................................................................................... 34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                               **PAGE**

*Allen v. Milligan*, 599 U.S. 1 (2023)................................................................... *passim*

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023), *reh'g en banc denied*,
    91 F.4th 967 (8th Cir. 2024) ..................................................................... 32-33

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021)......................... 2, 7, 23

*Central Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, Nat'l Ass'n*,
    780 F.3d 296 (5th Cir. 2015) ........................................................................14

*Chisom v. Roemer*, 501 U.S. 380 (1991) ...............................................................2

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................ 18, 20-22

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) .......................................................2

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ..................................20

*City of Rome v. United States*, 446 U.S. 156 (1980) .............................................12

*Croft v. Perry*, 624 F.3d 157 (5th Cir. 2010) .......................................................31

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
    76 F.4th 425 (5th Cir. 2023), *cert. denied*,
    144 S. Ct. 820 (2024)............................................................................. 14, 17

*Florida Prepaid Postsecondary Educ. Expense Bd. v.*
    *College Sav. Bank*, 527 U.S. 627 (1999)....................................................20

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) .......................................................20

*Jackson v. Widnall*, 99 F.3d 710 (5th Cir. 1996) .................................................11

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .......................................................10

**CASES (continued):**                                                    **PAGE**

*Johnson v. De Grandy*, 512 U.S. 997 (1994)......................................................31-32

*Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984)...........................................12

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .....................32

*Lopez v. Monterey Cnty.*, 525 U.S. 266 (1999) ....................................................19

*LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394 (5th Cir. 2014)............................17

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ......................................18

*Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984)................12

*Mississippi State Conf. of NAACP v. State Bd. of Election Comm'rs*,
    No. 3:22-CV-734, 2024 WL 3275965 (S.D. Miss. July 2, 2024) ................32

*National Ass'n of the Deaf v. Florida*, 980 F.3d 763 (11th Cir. 2020) . 19, 22-23, 27

*Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003) ...................................27

*NewCSI, Inc. v. Staffing 360 Sols., Inc.*, 865 F.3d 251 (5th Cir. 2017)............. 14-15

*Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) ..........18

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) ..................................................32

*Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023).......................9

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .................................................. *passim*

*Siler-Khodr v. University of Tex. Health Sci. Ctr. San Antonio*,
    261 F.3d 542 (5th Cir. 2001) ............................................................ 19, 22-23

*Simon v. United States*, 891 F.2d 1154 (5th Cir. 1990)..........................................15

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ....................................... 19-21

**CASES (continued):** **PAGE**

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)......................................................................27

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...................................... 23, 27-28

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015)......................................................................27

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ...................................... 3-4, 22

*United States v. Blaine Cnty.*, 363 F.3d 897 (9th Cir. 2004)...................................25

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) .........................................18

*United States v. Diggins*, 36 F.4th 302 (1st Cir.), *cert. denied*,
    143 S. Ct. 383 (2022)......................................................................25

*United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008) ..........................................11

*United States v. Texas Tech Univ.*, 171 F.3d 279 (5th Cir. 1999) ...........................7

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) ....................................12

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)......................................................................31

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)................................................19

**CONSTITUTION:**

U.S. Const. Amend. XV, § 2.....................................................................28

**STATUTES:**

Voting Rights Act
    52 U.S.C 10301................................................................ 1, 5, 26
    52 U.S.C. 10301(a) ..............................................................2
    52 U.S.C. 10301(b) ..........................................................3, 22

**STATUTES (continued):**                                                               **PAGE**

    52 U.S.C. 10308(f) ...............................................................................1

    Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965) ...................................2

28 U.S.C. 1292(a)(1) .............................................................................1

28 U.S.C. 1331 ......................................................................................1

28 U.S.C. 1343(a)(4) ............................................................................1

28 U.S.C. 1357 ......................................................................................1

42 U.S.C. 1983 ....................................................................................33

**LEGISLATIVE HISTORY:**

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ..........................4, 9, 22, 32

## JURISDICTIONAL STATEMENT

This is an appeal is from the district court's issuance of a permanent injunction upon finding that Louisiana's State House and Senate maps violate Section 2 of the Voting Rights Act (VRA), 52 U.S.C 10301. ROA.9212. The district court exercised jurisdiction pursuant to 28 U.S.C. 1331, 1343(a)(4), 1357 and 52 U.S.C. 10308(f). This Court has jurisdiction pursuant to 28 U.S.C. 1292(a)(1).

## STATEMENT OF THE ISSUES

The United States addresses the following issues and takes no position on the ultimate merits of plaintiffs' claims under Section 2 of the VRA, 52 U.S.C. 10301:

1. Whether Section 2's results test is valid Fifteenth Amendment enforcement legislation as applied to Louisiana in this case.

2. Whether the State improperly seeks to revisit the ability of private plaintiffs to enforce Section 2 where binding precedent forecloses the question and this Court denied initial en banc hearing on the issue.

## STATEMENT OF THE CASE

**A.    Statutory Background**

1. Section 2 of the VRA imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). The

statute as originally enacted in 1965 prohibited voting practices or procedures that "deny or abridge the right of any citizen of the United States to vote on account of race or color." Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965). In *City of Mobile v. Bolden*, 446 U.S. 55 (1980), a plurality of the Supreme Court held that Section 2 "simply restated the prohibitions already contained in the Fifteenth Amendment" and therefore reached only "purposefully discriminatory" government actions. *Id.* at 61, 65.[1]

Congress amended Section 2 in 1982 to "repudiate" *Bolden*'s interpretation of the statute. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 658 (2021). By its text, Section 2 now prohibits States from imposing or applying voting practices or procedures "in a manner which *results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. 10301(a) (emphasis added). That is, a plaintiff need not show discriminatory intent to establish a Section 2 violation. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

A "results" violation is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in [a] State or political subdivision are not equally open to participation by

---

[1] The *Bolden* plurality did not subject Section 2 to "Fifteenth Amendment review." State Br. 16. It merely interpreted Section 2's coverage as being coterminous with the Fifteenth Amendment's protections. *Bolden*, 446 U.S. at 61.

members of a class of citizens protected by" Section 2, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. 10301(b).

2.  The Supreme Court first construed Section 2, as amended, in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  The Court explained that the "essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [racial minority] and [racial majority] voters to elect their preferred representatives." *Id.* at 47.

*Gingles* concerned a claim that a districting scheme "dilutes the[] votes" of a protected class of minority voters by "submerging them in a white majority."  478 U.S. at 46.  The Court identified three "necessary preconditions" for a vote dilution claim.  *Id.* at 50.  First, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Ibid.*  Second, "the minority group must be able to show that it is politically cohesive." *Id.* at 51.  Third, "the minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc" to allow it "usually to defeat the minority's preferred candidate." *Ibid.*

If those preconditions are satisfied, a court must determine whether, considering "the totality of the circumstances," the districting scheme leaves

minority voters with "less opportunity than white voters to elect representatives of their choice." *Gingles*, 478 U.S. at 80.  In conducting that analysis, courts may consider factors identified in the Senate Report accompanying the 1982 amendments, *see* S. Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982) (1982 Senate Report); *Gingles*, 478 U.S. at 44-45, but "other factors may also be relevant and may be considered," *Gingles*, 478 U.S. at 45.

3.  Last year, the Supreme Court reaffirmed the *Gingles* test and upheld the constitutionality of Section 2's results test as applied to redistricting.  *See Allen v. Milligan*, 599 U.S. 1 (2023).  In affirming a finding that Alabama's congressional map likely violated Section 2, *id.* at 17, the Court noted that "[e]ach *Gingles* precondition serves a different purpose," *id.* at 18.  While the first precondition is designed to show that a minority group has the *potential* to elect a representative of its choice in a single-member district, "[t]he second, concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected" in that district.  *Id.* at 18-19.  "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."  *Id.* at 19 (alteration in original; citation omitted).

Alabama urged the Supreme Court to require Section 2 plaintiffs to prove, either under the *Gingles* preconditions or as part of the totality-of-circumstances

analysis, that a "race-neutral" districting process would have led to the same number of majority-minority districts the plaintiffs alleged were required. *Milligan*, 599 U.S. at 23-24.  But the Court "decline[d]" Alabama's invitation "to adopt an interpretation of § 2 that would 'revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our § 2 jurisprudence' for nearly forty years." *Id.* at 26 (citation omitted).  The Court also reaffirmed Section 2's constitutionality, rejecting Alabama's arguments that Section 2 could not constitutionally apply to redistricting because the Fifteenth Amendment "does not authorize" either "the effects test" or "race-based redistricting as a remedy." *Id.* at 41.

### B.    Factual Background

Plaintiffs, several Black voters and nonprofit groups, sued the Louisiana Secretary of State under Section 2 of the VRA, 52 U.S.C. 10301, alleging that Louisiana's 2022 state legislative maps impermissibly diluted the votes of Black Louisianans.  ROA.251-254.[2]  The district court allowed the Speaker of the Louisiana House, the President of the Louisiana Senate, and the State of Louisiana to intervene as defendants.  ROA.627-268.  The court later stayed proceedings

---

[2] "ROA.__" refers to the corresponding page number of the electronic Record on Appeal.  "State Br. __" refers to the corresponding page number in intervenor-appellant State of Louisiana's Opening Brief.

pending the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. 1 (2023).

ROA.990.

After the Supreme Court issued its decision in *Milligan*, the district court

lifted the stay and proceeded toward trial.  ROA.40.  For the first time, in its

pretrial motion Louisiana asserted that:

> [F]inding for Plaintiffs requires interpreting the Voting Rights Act in a way
> that calls its constitutionality into question because the Voting Rights Act's
> inherently race-based remedies, as applied to the facts in this matter and at
> this time, are not justified by present conditions, and are not congruent and
> proportional to the exercise of congressional power under the Fourteenth and
> Fifteenth Amendments to authorize race-based redistricting indefinitely."

ROA.6997.  Louisiana also asserted that, "[t]o grant the relief Plaintiffs seek, the

Court must interpret the Voting Rights Act in a way that violates the United States

Constitution."  ROA.6998.  Because these arguments called into question Section

2's constitutionality, Louisiana provided requisite notice to the Attorney General to

allow for the United States' intervention in the case.  ROA.7052.  The United

States intervened in the litigation to defend Section 2's constitutionality

(ROA.7270) and filed a brief addressing the availability of constitutional

avoidance to interpret Section 2, along with resulting constitutional questions

(ROA.7282).

After a seven-day bench trial, the district court ruled that private plaintiffs

had proven that the Louisiana State House and Senate maps violate Section 2.

ROA.9122.  As part of its ruling, the court rejected Louisiana's motion to dismiss

the case based on its assertion that private plaintiffs may not enforce Section 2. ROA.9135-9139.[3]  The district court also rejected Louisiana's constitutional arguments as misapplication of the canon of constitutional avoidance where no statutory ambiguity exists.  ROA.9141-9142.  The court noted that appellants "d[id] not facially challenge the constitutionality of § 2 itself."  ROA.9141.

Appellants appealed the district court's judgment to this Court.  ROA.9271, 9274, 9317.  On April 23, 2024, appellants sought initial hearing en banc on the question whether Section 2 contains an implied private right of action.  ECF No. 125-1.  This Court denied appellants' petition on June 24, 2024.  ECF No. 176-1.

## SUMMARY OF ARGUMENT

Twice over, to try to avoid liability in this case, the State asks this Court to depart from longstanding precedent.  The State asks this Court to declare Section 2 unconstitutional as applied to Louisiana and, failing that, to hold that private parties cannot enforce Section 2.  This Court should reject both arguments.

---

[3]  Appellants moved to dismiss under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ROA.9135-9139.  However, "[a] determination that the relevant statute creates no cause of action under which the plaintiff may proceed says nothing about a court's subject-matter jurisdiction over the suit."  *United States v. Texas Tech Univ.*, 171 F.3d 279, 288 (5th Cir. 1999); *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 690 (2021) (Gorsuch, J., concurring) (stating that Court need not address whether Section 2 creates private right of action for this reason).  Whether private parties may enforce Section 2 is thus a merits question properly analyzed under Rule 12(b)(6), *not* a jurisdictional issue.

1.  The constitutionality of Section 2 is not an open issue.  The Supreme Court has decided it, and this Court has, too.  Section 2's results test and remedial scheme are rational means of enforcing the Fifteenth Amendment.   This Court cannot, and should not, revisit the issue now, especially given that the State has waived its constitutional arguments because it failed to raise any of them below, focusing instead on a constitutional avoidance argument that it has abandoned on appeal.  Regardless, the Supreme Court's recent decision in *Allen v. Milligan*, 599 U.S. 1 (2023), forecloses any argument that Section 2 strays too far from the Fifteenth Amendment's ban on intentional discrimination.  The State has similarly waived its fact-intensive argument that Section 2 has outlived its constitutionality by failing to even hint at such a defense until the eve of trial.  Nor would this defense succeed on the merits:  Nothing in the Constitution or Supreme Court jurisprudence requires Congress to regularly revisit and update findings for prophylactic statutes passed under the Reconstruction Amendments.  The State's final argument—that Section 2 is unconstitutional as applied to Louisiana—is likewise waived, and it is foreclosed by *Milligan* in any event.

2.  As the State acknowledges, this Court already has held that Section 2 is privately enforceable.  And this Court already has decided not to revisit this issue when it denied the State's petition for initial hearing en banc.  Accordingly, while the State may preserve its argument for later review, the private enforceability of

Section 2 is not properly before the merits panel in this case. The State's

arguments are also incorrect for reasons the United States has explained elsewhere.

The panel should reject the State's attempts to elicit separate opinions on the issue.

## ARGUMENT

### I.    Neither the passage of time nor the State's assertions about conditions in Louisiana render Section 2 unconstitutional.

The State raises various constitutional defenses to liability. State Br. 14-23.

The State has waived each of these defenses, and each is unpersuasive in any

event. Section 2's case-by-case inquiry focuses on up-to-date considerations,

authorizing race-conscious districting remedies only to the extent required to

respond to the "regrettable reality" of excessive racial politics. 1982 Senate Report

34. Section 2's "exacting requirements" also are self-limiting: As Americans stop

voting along racial lines, and "as residential segregation decreases—as it has

'sharply' done since the 1970s—satisfying" the statutory standard "becomes more

difficult." *Allen v. Milligan*, 599 U.S. 1, 28-29 (2023) (citation omitted).

### A.    The State has waived its constitutional arguments.

None of the State's constitutional arguments are properly before this Court

because the State did not make them below. "[A]rguments not raised before the

district court are waived and cannot be raised for the first time on appeal."

*Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 422 n.6 (5th Cir. 2023)

(alteration in original; citation omitted). Here, the State raised only constitutional

avoidance arguments in its proposed findings of fact and conclusions of law, asserting that ruling for the plaintiffs or granting them relief "requires interpreting the [VRA] in a way that calls its constitutionality into question." ROA.6997; *see* ROA.6998. The United States understood the State to be making a constitutional avoidance argument and responded in kind. ROA.7294-7296.

The State's post-trial brief, filed the same day as the United States' intervention brief, reinforced this framing of its argument. The State captioned its argument "*Plaintiffs' construction* of Section 2 violates the Constitution as applied." ROA.7346 (emphasis added). It began by stating that "*if*" the district court adopted a "construction" of Section 2 and the *Gingles* preconditions that the State deemed incorrect, *then* Section 2 "*would*" be unconstitutional—or at least would "invite[] severe doubts as to whether that statutory provision can be constitutionally applied in that manner." ROA.7346-7347 (emphases added). The State therefore exhorted the district court to "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." ROA.7347 (citation omitted). The brief bookended its argument with quotations from the Supreme Court's discussion of constitutional avoidance in *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). *See* ROA.7347, 7350. The district court, like the United States, understood the State to be making a constitutional avoidance argument rather than to be "facially challeng[ing] the constitutionality of § 2

- 10 -

itself." ROA.9141.  It rejected the State's assertions, holding that the State "assert[ed] an argument that was recently rejected by the Supreme Court" in *Milligan* and that constitutional avoidance does not apply when the defendant does not advance a plausible alternative reading of the statute at issue.  ROA.9141-9142.

The State has abandoned its constitutional avoidance argument on appeal, nowhere mentioning that argument in its opening brief.  *See United States v. Elashyi*, 554 F.3d 480, 494 n.6 (5th Cir. 2008) ("An appellant that fails to adequately brief an issue in his opening brief waives that issue.").  Instead, it has replaced that argument with facial and as-applied challenges to Section (State Br. 14-23)—the very challenges that the district court recognized the State as *not* having made below (ROA.9141).  But "[c]onstitutional claims not raised in the district court are deemed waived and may not be asserted for the first time on appeal." *Jackson v. Widnall*, 99 F.3d 710, 716 n.9 (5th Cir. 1996).  This Court therefore should not pass upon the State's late-breaking constitutional challenges.

### B.    Section 2's results test and race-conscious remedies comport with Congress's Fifteenth Amendment authority.

Even if the State had timely raised its constitutional arguments, they fail. Forty years of binding precedent confirms that Section 2 is appropriate Fifteenth Amendment legislation.  As the State recognizes (Br. 18), the Supreme Court just last year rejected a renewed constitutional attack on Section 2 and upheld its results test. *See Allen v. Milligan*, 599 U.S. at 38, 41; *see also Mississippi Republican*

*Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) (affirming three-judge court decision despite appellants' assertion that Section 2's results test exceeded Congress's Fifteenth Amendment powers). This Court, too, has rejected arguments that Section 2 exceeds Congress's powers. *See Veasey v. Abbott*, 830 F.3d 216, 253 n.47 (5th Cir. 2016) (en banc); *Jones v. City of Lubbock*, 727 F.2d 364, 373-375 (5th Cir. 1984).

In *Milligan*, Alabama asserted that Section 2, "as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's remedial or preventive authority under the Fourteenth and Fifteenth Amendments." *Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring in part); *see id.* at 41 (majority opinion). The Supreme Court roundly rejected this claim. It rebuffed the idea that application of *Gingles* gives minority groups outsized political influence, noting that "the *Gingles* framework itself imposes meaningful constraints on proportionality." *Id.* at 26 (majority opinion); *contra* State Br. 1-2, 22. It reiterated prior precedent holding that Congress may, "pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect," and that "[t]he VRA's 'ban on [such] electoral changes . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment." *Milligan*, 599 U.S. at 41 (first alteration in original) (quoting *City of Rome v. United States*, 446 U.S. 156, 173, 177 (1980)). And it pointed to the four decades of cases that had

applied *Gingles* and "authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Ibid.*; *see id.* at 44 (Kavanaugh, J., concurring in part).

**C.　Section 2's liability and remedial regime remains a rational means of enforcing the Fifteenth Amendment.**

Because binding Supreme Court precedent from only last year bars a straightforward constitutional challenge, the State instead suggests that Section 2 has outlived its constitutionality. As the State tells it, the conditions that justified Section 2's passage in 1982—and that sufficed for the Supreme Court to uphold Section 2 only last year—"no longer justify race-based redistricting," and Congress has failed to update its legislative findings to support Section 2's continued existence given changed factual circumstances. State Br. 21, 23. To support this notion, the State cites Justice Kavanaugh's concurring opinion in *Milligan*, which noted but declined to address the dissent's "temporal argument" that "the authority to conduct race-based redistricting cannot extend indefinitely into the future." 599 U.S. at 45; *see* State Br. 19. The State also relies on the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which struck down Section 4(b) of the VRA as invalid given changed conditions. This new argument, not adequately raised below, cannot avail the State.

### 1. The Secretary waived its temporal challenge.

While the State has waived all its current constitutional arguments, the
State's new temporal challenge is particularly inappropriate to raise on appeal,
because it is far from a pure legal issue and the State's "arguments in the district
court were insufficient to put the court and [the other parties] on notice of the
defense." *See Central Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, Nat'l
Ass'n*, 780 F.3d 296, 301 (5th Cir. 2015). "Federal Rule of Civil Procedure 8(c)
indicates that affirmative defenses must be raised in the first responsive pleading,
which here would have been the answer." *Crown Castle Fiber, L.L.C. v. City of
Pasadena*, 76 F.4th 425, 438 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024).
While "technical failure to comply precisely with Rule 8(c) is not fatal," this Court
"do[es] not permit litigants to be able to 'lie behind a log' and 'ambush a plaintiff'"
with a new defense on appeal. *Id.* at 439 (citation omitted). This is particularly so
when an argument requires factual development, because "failure to raise the
defense until after trial prevent[s] [the plaintiff] from developing facts that could
have aided in contesting the defense." *NewCSI, Inc. v. Staffing 360 Sols., Inc.*, 865
F.3d 251, 260 (5th Cir. 2017) (holding affirmative defense waived).

The State's constitutional defense falls into this category. Any temporal
constitutional argument depends on proving that the conditions on the ground have
changed so drastically, either statewide or nationwide, as to render Section 2

facially unconstitutional.  Those arguments involve quintessential factual issues.

Such issues must be developed through the crucible of expert discovery and trial,

not raised for the first time on appeal—or at best, after trial—without the benefit of

any record.  *See, e.g.*, *NewCSI, Inc.*, 865 F.3d at 260; *Simon v. United States*, 891

F.2d 1154, 1159 (5th Cir. 1990) (holding that government did not raise defense "at

a 'pragmatically sufficient time'" because the defense implicated the

constitutionality of a state law, which required analyzing "the facts and premises

the legislature considered before enacting" the law and thus "depend[ed] upon

resolution of factual issues which were not presented at trial" (citation omitted)).

The State has affirmatively waived, both below and on appeal, any *facial*

temporal challenge to Section 2.  *See* ROA.6997 (arguing that the court must

interpret Section 2 in a manner that precludes liability to avoid imposing a remedy

that would be unconstitutional "in this matter and at this time"); State Br. 14

("Section 2 is unconstitutional *as applied here*." (emphasis added)); *see also*

ROA.9141 (noting court's understanding that the State "do[es] not facially

challenge the constitutionality of § 2 itself").  To the extent its temporal argument

could be construed as an as-applied affirmative defense, the State did not raise the

argument—or any other constitutional defense—in its answer, as Rule 8(c)

requires.  *See* ROA.658-659.  This, even though *Shelby County* long predated this

case.  *See* 570 U.S. 529.  Nor did the State raise constitutional avoidance

arguments in its summary judgment motion, which only addressed standing.  *See* ROA.1696-1713.

Instead, the State waited until the eve of trial, in its proposed findings of fact and conclusions of law, to mention *any* constitutional argument.  ROA.6997-6998.  And even then, the State did not develop its temporal defense.  It merely cited Justice Kavanaugh's *Milligan* concurrence and asserted, without elaboration, that "finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question because the Voting Rights Act's inherently race-based remedies, as applied to the facts in this matter and at this time, are not justified by present conditions."  ROA.6997.  Then, when the State moved to dismiss the case in the middle of trial, it did so solely on other legal grounds.  *See* ROA.7237-7247 (arguing that Section 2 does not contain a private right of action).

It was not until the State's post-trial brief—filed simultaneously with plaintiffs' and the United States' post-trial briefs—that the State made anything more than a conclusory hint at its *Shelby County*-based argument.  ROA.7346-7350.  And even then, it couched its argument in terms of constitutional avoidance, not as a direct constitutional attack.  *See* Part I.A, *supra*.  The State thus waived this affirmative defense by failing to raise even a constitutional avoidance argument—much less the constitutional defense itself—until so late in the process, when no party could develop a factual basis for opposing the defense at trial or

properly respond to the argument as articulated in the State's brief.  *See, e.g.*, *Crown Castle Fiber*, 76 F.4th at 439 ("A failure timely to answer or raise an affirmative defense before springing it on plaintiffs at summary judgment almost always constitutes an 'unfair surprise.'"); *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 402 (5th Cir. 2014) (affirming finding that affirmative defense was waived where "the claim would require proof of additional facts beyond the face of the complaint, the general allegations in [defendant's] answer failed to provide any notice that defenses might be raised as the case progressed," and "all of the critical pretrial deadlines had passed or were about to expire").

> ### 2.    Congress does not need to continuously renew Section 2 for the statute to be constitutional.

Even if the State had properly preserved its temporal argument, that argument would fail.  Nothing in the Reconstruction Amendments' text or the Supreme Court's jurisprudence requires Congress to periodically re-justify its statutes with new findings.  *Shelby County* represents a narrow exception to that rule; none of its rationales for imposing a temporality requirement on Section 5's unique preclearance regime applies to the far more prosaic Section 2.  Universalizing *Shelby County*'s rule, as the State requests, would impose intolerable burdens on the legislative branch.

       a.    **Congress need not continuously update Reconstruction Amendment laws and their supporting evidence to anticipate new lawsuits.**

To the extent Justice Kavanaugh's concurrence in *Milligan* left any room to argue the point, the answer is clear:  Congress need not continually compile new evidence to support Section 2.

Section 2, like other Fifteenth Amendment legislation, remains subject to the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819), as the Supreme Court and this Court have consistently held.  *See Milligan*, 599 U.S. at 41 (upholding Section 2 as "appropriate" legislation based on cases applying *McCulloch* standard); *Shelby Cnty.*, 570 U.S. at 556 (invalidating VRA's coverage formula after finding Congress's justification "irrational"); *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (declining to address argument that congruence and proportionality standard adopted for Fourteenth Amendment legislation in *City of Boerne v. Flores*, 521 U.S. 507 (1997), supplants the rationality standard for Fifteenth Amendment legislation); *see also United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014) (stating that *City of Boerne* "did not hold that the 'congruence and proportionality' standard was applicable beyond the Fourteenth Amendment").

Under this deferential test, Congress is "chiefly responsible for implementing the rights created" by the Fifteenth Amendment, and it "may use any

rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324, 326 (1966). These means may extend beyond bans on intentional discrimination. *See Milligan*, 599 U.S. at 41; *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282-283 (1999); *cf.* State Br. 15. Apart from the unique preclearance context at issue in *Shelby County*, which Congress itself recognized by statute necessitated updated findings to support each reauthorization, the Supreme Court has never required continued updating of legislative evidence under the rationality standard—a standard that applies to nearly all congressional legislation. *See* pp. 23-27, *infra* (discussing the specific concerns animating the decision in *Shelby County*).

Nothing in the Reconstruction Amendments' text or history causes statutes to lapse if not continually tended to by Congress. To the contrary, courts routinely have upheld decades-old statutes based on the scope of the problem at the time of enactment, relying on the enacting Congress's legislative record and the plaintiff's showing of a statutory violation (or lack thereof) based on the specific facts of the case. *See, e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 486-487 & n.11 (5th Cir. 2023) (1964 statute); *National Ass'n of the Deaf v. Florida*, 980 F.3d 763, 773-774 (11th Cir. 2020) (1990 statute); *Siler-Khodr v. University of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 550-551 (5th Cir. 2001) (1974 amendment).

Section 2's use of race-conscious remedies does not alter this standard, nor does it trigger a need for legislative reauthorization. *Contra* State Br. 20-21. None of the cases upon which the State relies stand for such a proposition. *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), dealt only with the VRA's preclearance regime, which, unlike Section 2, "prescribes remedies for voting discrimination which go into effect without any need for prior adjudication," *id.* at 327-328, 334; *contra* State Br. 19. The Court in *Fullilove v. Klutznick*, 448 U.S. 448 (1980) (plurality opinion), recognized that it must give "close examination" to statutes that use racial criteria (State Br. 21 (citation omitted)), but it stressed that it must appropriately defer and "accord[] 'great weight to the decisions of Congress' even . . . . when a congressional program raises equal protection concerns," *Fullilove*, 448 U.S. at 472 (plurality opinion). *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504-505 (1989), required more specific, "clearly identified" reasons (State Br. 20) for race-based classifications in a municipal program because the municipality impermissibly attempted to rely on the same congressional findings about *nationwide* discrimination that underlay the statute upheld in *Fullilove*. *Florida Prepaid Postsecondary Educational Expense Board v. College Savings Bank*, 527 U.S. 627, 640-641 (1999), simply found a lack of identifiable constitutional violations at the time of a statute's passage. And while *City of Boerne v. Flores*, 521 U.S. 507 (1997), did note the staleness of the

constitutional violations that Congress had found to support the Religious Freedom Restoration Act (RFRA) (State Br. 21), the Court did not strike down the law on that basis, *see id.* at 531-532.[4]

Moreover, each of these cases analyzed new provisions soon after their passage. None suggested that federal statutes—even ones employing race-conscious remedies—must be continually updated with new legislative findings. *Contra* State Br. 21. The closest suggestion any of the State's cited cases made to a requirement like the one the State proposes was *City of Boerne*'s statement that the RFRA lacked a "termination date or termination mechanism." 521 U.S. at 532. But even there, the Court expressly disclaimed any notion "that § 5 legislation requires termination dates." *Id.* at 533. While those and other limits "tend to ensure Congress' means are proportionate," *ibid.*, they are far from the only means of doing so. And the Court raised termination dates only when discussing

---

[4] Indeed, some of the State's quotations are so selective as to risk misleading the Court. For instance, far from adopting a rule of strict and never-ending reexamination of the legislative record (*cf.* State Br. 19), the *Katzenbach* Court applied rational basis review, 383 U.S. at 324, and it referenced "the historical experience" leading to the VRA only to better explain "the essential justification for" the Act, *id.* at 308, 315 (citation omitted); *contra* State Br. 19. Likewise, the Court in *Fullilove* did not hold that statutes using "racial criteria" "require[] 'abundant evidence'" in the legislative record. State Br. 20 (quoting *Fullilove*, 448 U.S. at 477). It merely noted that Congress happened to *have* "abundant evidence" supporting the specific statute at issue. *Fullilove*, 448 U.S. at 477.

Congress's power to enact laws that "*pervasively prohibit*[] *constitutional state*

*action* in an effort to remedy or to prevent unconstitutional state action." *Ibid.*

(emphasis added).

Section 2 is no such statute. The provision requires case-by-case evaluation

of a particular law. *See* 52 U.S.C. 10301(b). It requires courts to evaluate "the

totality of circumstances," *ibid.*, to determine whether "a certain electoral law,

practice, or structure interacts with social and historical conditions [in the

defendant jurisdiction] to cause an inequality in the opportunities enjoyed by

[minority] and [majority] voters to elect their preferred representatives,"

*Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Far from "pervasively prohibit[ing]

constitutional state action," *City of Boerne*, 521 U.S. at 533, Section 2's "exacting

requirements, instead, limit judicial intervention to 'those instances of intensive

racial politics' where the 'excessive role [of race] in the electoral process . . .

den[ies] minority voters equal opportunity to participate,'" *Milligan*, 599 U.S. at 30

(alterations in original) (quoting 1982 Senate Report 33-34).

Furthermore, Section 2 helps enforce the Fifteenth Amendment's right to be

free of race discrimination in voting. When protecting such rights, violations of

which are "reviewed under a stricter test," *Siler-Khodr*, 261 F.3d at 550 n.6,

"Congress has greater latitude to abrogate immunity pursuant to its Section 5

powers," *National Ass'n of the Deaf*, 980 F.3d at 772. It need not "create an

elaborate legislative record and find a pattern of unconstitutional state conduct,"
*ibid.*, as it would if Section 2 involved classifications "reviewed under rational
basis," *Siler-Khodr*, 261 F.3d at 550 n.6; *accord Tennessee v. Lane*, 541 U.S. 509,
529 (2004).  And because "the historical record clearly documents state
discrimination on the basis of" race—in voting and otherwise—any "lack of
further Congressional findings regarding [race] discrimination by the [S]tates is
less significant in importance." *Siler-Khodr*, 261 F.3d at 550 n.6.  The record
Congress compiled in 1982 is more than enough.  *See Brnovich v. Democratic
Nat'l Comm.*, 594 U.S. 647, 659-660 (2021) (noting "the Senate Judiciary
Committee's extensive survey of what it regarded as Fifteenth Amendment
violations that called out for legislative redress").

> **b.**      ***Shelby County* does not alter Congress's duties with
> respect to Section 2.**

The Supreme Court's decision in *Shelby County*, striking down the coverage
formula governing the VRA's preclearance regime, does not affect the analysis of
Section 2.  *Contra* State Br. 19-20, 23.  As the Supreme Court itself stated in
*Shelby County*, that decision "in no way affects the permanent, nationwide ban on
racial discrimination in voting found in § 2."  570 U.S. at 557.  And even if this
Court were to follow the State's lead and ignore the Supreme Court's express
statements, the decision's core reasoning is inapplicable to Section 2.

*Shelby County* relied on two primary principles. First, the preclearance regime imposed extraordinary burdens on States by requiring advance permission from the federal government "to implement laws that they would otherwise have the right to enact and execute on their own" regarding "sensitive areas of state and local policymaking." *Shelby Cnty.*, 570 U.S. at 544-545. This was "a drastic departure from basic principles of federalism," *id.* at 535, that conflicted with the Framers' decision to reject a proposed federal "authority to 'negative' state laws" before they take effect, *id.* at 542.

Indeed, Congress itself recognized the extraordinary nature of the preclearance regime. Unlike Section 2, which was designed as a "permanent, nationwide ban on racial discrimination in voting," *Shelby Cnty.*, 570 U.S. at 557, the VRA's preclearance provisions "were intended to be temporary," *id.* at 538. Congress repeatedly set end dates for Section 5, so that preclearance would sunset unless reauthorized within a given window—first 5 years, then another 5, then 7, then 25. *See ibid.* The Supreme Court "upheld each of these reauthorizations against constitutional challenge." *Id.* at 539. The Court ultimately struck down the VRA's preclearance coverage formula because the 2006 Congress—which reauthorized Section 5 for another 25 years—focused not on developing a new formula but rather on confirming the same formula "based on 40-year-old facts having no logical relation to the present day." *Id.* at 554.

- 24 -

Second, the Supreme Court emphasized that preclearance implicated a
separate structural limitation in the Constitution:  the "'principle of *equal
sovereignty*' among the States."  *Shelby Cnty.*, 570 U.S. at 544 (citation omitted).
The Court held that, when legislating to enforce the Fifteenth Amendment,
"Congress—*if it is to divide the States*—must identify those jurisdictions to be
singled out on a basis that makes sense in light of current conditions."  *Id.* at 553
(emphasis added).  The Court nowhere suggested that the same requirement would
"apply to different exercises of legislative authority under the Fourteenth and
Fifteenth Amendments."  *United States v. Diggins*, 36 F.4th 302, 315-316 (1st
Cir.), *cert. denied*, 143 S. Ct. 383 (2022).

Neither *Shelby County* rationale applies to Section 2.  First, in contrast to
Section 5, Section 2 does not automatically stay voting-related enactments or
reverse the usual burden for a plaintiff to establish an actual or likely statutory
violation.  "This burden is significant," requiring plaintiffs to satisfy both the
*Gingles* preconditions and the totality-of-circumstances test rather than relying on
the more relaxed standard of proof under Section 5.  *United States v. Blaine Cnty.*,
363 F.3d 897, 906 (9th Cir. 2004); *see Shelby Cnty.*, 570 U.S. at 545 (noting the
"important differences" between Section 2 suits "and preclearance proceedings").
In recognition of the lesser burden Section 2 places on States, Congress never

imposed a sunset provision on Section 2 as it did on Section 5.  *See* 52 U.S.C. 10301; *Shelby Cnty.*, 570 U.S. at 537 ("Section 2 is permanent.").

Second, Section 2 applies to all jurisdictions.  *Shelby County* focused heavily on Section 5's differential treatment of States and, thus, equal sovereignty concerns.  The Court emphasized that Section 5 forced covered States to "wait[] months or years and expend[] funds to implement a validly enacted law" while other states "can typically put the same law into effect immediately," and reasoned that this "'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'"  570 U.S. at 544, 550-551 (citations omitted); *see id.* at 535-536, 550, 552-553 (reiterating equal sovereignty concerns).  By contrast, *Shelby County* repeatedly invoked Section 2's "nationwide" application to "all 50 States."  *Id.* at 536-537, 557.

Section 2's case-by-case approach assuages any lingering concern about calibrating the statute to "current conditions," *Shelby Cnty.*, 570 U.S. at 553.  That is because, "as residential segregation decreases—as it has 'sharply' done since the 1970s—satisfying traditional districting criteria such as the compactness requirement 'becomes more difficult.'"  *Milligan*, 599 U.S. at 28-29 (citation omitted).  So too, when the effects of earlier discrimination and the use of racial appeals diminish in a jurisdiction, plaintiffs will have a harder time proving, under the totality of circumstances, that it is a place in which the "excessive role [of race]

in the electoral process . . . den[ies] minority voters equal opportunity to participate." *Id.* at 30 (citation omitted; alterations in original).  In these ways, Section 2 provides its own "logical end point." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221 (2023) (citation omitted); *see also Milligan*, 599 U.S. at 29 (noting decline in successful Section 2 challenges over time).

### c.    A continuous "updating" requirement would unduly burden Congress and undermine the rule of law.

The form of analysis the State urges on this Court is legally inapposite and boundless.  It would require continuous legislative updating not only of the Voting Rights Act, but of myriad statutes passed under the Reconstruction Amendments— even if the Supreme Court or other courts have already rejected challenges to them. Statutes as varied as the Family and Medical Leave Act, *see Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 740 (2003), Title II of the Americans with Disabilities Act, *see Lane*, 541 U.S. at 533-534; *National Ass'n of the Deaf*, 980 F.3d at 773-774, and the disparate impact provisions of the Fair Housing Act, *see Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540, 545-546 (2015), would become subject to reexamination.  Such a regime would severely undermine the finality of court decisions and eviscerate *stare decisis*.

Nor does the State provide any guidance on how "recent" legislative findings must be to pass muster under its proposed test.  State Br. 21.  Do such

statutes presumptively sunset after 20 years? Ten? Five? The State does not say. After every election, jurisdictions could point to fresh data and suggest that it changes the constitutional equation enough to invalidate even recently compiled evidence. Indeed, the State asks this Court to declare Section 2 unconstitutional only one year after the Supreme Court upheld the same statute against Alabama's similar attack, based on the same legislative record. *See Milligan*, 599 U.S. at 41.

Justice Scalia's two-decade-old critique of *City of Boerne* applies even more strongly to the State's proposed regime: It "casts this Court in the role of Congress's taskmaster. Under it, the courts (and ultimately this Court) must regularly check Congress's homework to make sure that it has identified sufficient constitutional violations to make its remedy congruent and proportional." *Lane*, 541 U.S. at 558 (Scalia, J., dissenting). This Court is "ill advised to adopt or adhere to constitutional rules that bring [it] into constant conflict with a coequal branch of Government." *Ibid.* Litigants could force courts into new conflicts far faster than Congress could keep updating its legislative findings, with any on-the-ground difference being cited as a reason to declare a law unconstitutional. Nothing in the Constitution's grant of power to "enforce" the Fifteenth Amendment, U.S. Const. Amend. XV, § 2, imposes such a regime.

**D. The State's disagreement with the district court's ruling does not render Section 2 unconstitutional.**

Finally, the State asserts (Br. 21-23) that the district court's application of Section 2 to Louisiana under the facts of this case renders the statute unconstitutional. Again, this argument has been waived. *See* Part I.A, *supra*. Regardless, the State never explains how imposing liability here would, by itself, show that Section 2's race-conscious remedies are no longer constitutional anywhere. Indeed, the State professes to make only an as-applied defense, even while feinting at a facial challenge elsewhere. *See* State Br. 14.

The State asserts (Br. 23) that, if this Court were to find a Section 2 violation under "current conditions in Louisiana," then Section 2 must be unconstitutional. But that merely reflects the State's disagreement over whether this case presents one of "those instances of intensive racial politics" severe enough to violate Section 2 in the first place. *Milligan*, 599 U.S. at 30 (citations omitted). The State thus seeks to bootstrap a statutory argument into a constitutional one.

Alabama made a similar unconstitutional-if-it-can-reach-me argument in *Milligan*. Alabama asserted that Section 2 "is unconstitutional as the District Court applied it here." *Milligan*, 599 U.S. at 38. Alabama claimed that the district court ordered it to replace a "race-neutral, least-changes congressional map" with "a racial gerrymander," that the district court read Section 2 to "guarantee political 'feast'" to one group, and that the district court's ruling meant that "a State with

racially polarized voting can violate §2 by failing to create another majority-minority district wherever one is possible."  Br. of Appellants at 73-74, *Milligan*, 599 U.S. 1 (Nos. 21-1086 & 21-1087); *see id.* at 75-79 (making similar arguments under Fourteenth Amendment).  The Supreme Court rejected these arguments, *see Milligan*, 599 U.S. at 41, and this Court should do the same.

The State argues that recent Black electoral success in Louisiana indicates that "race-based redistricting" under § 2 is "no longer justif[ied]."  State Br. 23. The State's evidence, however, falls far short of showing that Section 2 is invalid. It often cites statewide statistics to prove the success of "Black candidates" and "minority legislators" in Louisiana.  State Br. 22.  But Section 2 itself is more nuanced:  As the Supreme Court has repeatedly admonished, it requires an "intensely local appraisal" to determine whether "intensive racial politics" still infects particular areas.  *Milligan*, 599 U.S. at 19, 30 (citations omitted).  And here, as the district court recognized, these successful candidates have usually been elected from majority-minority seats.  ROA.7106-7107, 9187-9189, 9206-9207. The district court also found that Black voters were not proportionally represented, even statewide.  ROA.9206-9207, 9209-9211.[5]  The State's evidence also focuses

---

[5]  The State similarly attempts (Br. 23) to elevate into a constitutional dispute its disagreement with the district court's factual finding that race, rather than partisanship, drove racially polarized voting in Louisiana (*see* ROA.9199-9201).

solely on Black voters (*see* State Br. 21-22), and so cannot prove that Louisiana's

(or America's) elections are equally open to *every* group covered by the statute, as

would be required to hold Section 2 entirely invalid either in Louisiana or

nationwide (*ibid.*); *see, e.g.*, *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

While the State's evidence is relevant to the statutory question in this case—

whether the challenged maps deny an equal opportunity for Black voters to elect

candidates of their choice—it is far too limited to justify a finding that Section 2

has outlived its constitutional validity.

More fundamentally, however, the State's argument misunderstands how

Section 2 probes for "intensive racial politics." *Milligan*, 599 U.S. at 30 (citation

omitted). While minority electoral success plays an important role in the analysis,

"the ultimate conclusions about equality or inequality of opportunity were intended

by Congress to be judgments resting on comprehensive, not limited, canvassing of

relevant facts." *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994); *cf. Village of

Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (for

discriminatory purpose claims, likewise requiring "a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available"). Thus, while a

minority group's success in electing preferred candidates roughly in proportion to

their percentage of the population "is 'a relevant fact in the totality of

circumstances,'" it is not "a 'safe harbor' for States in complying with § 2."

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006) (citation omitted).

In some jurisdictions, "racial politics do dominate the electoral process," and a district map perpetuates the ongoing effects of discrimination to prevent minority voters from fully translating their numbers into political power. 1982 Senate Report 33. In such circumstances, the district map will still "deny minority voters equal opportunity" and justify a race-conscious remedy. *Ibid.*; *accord Milligan*, 599 U.S. at 30; *De Grandy*, 512 U.S. at 1018-1019 & n.16. So understood, Section 2's results test remains valid legislation to enforce the Fifteenth Amendment's ban on race discrimination in voting, both in Louisiana and elsewhere.

## II. The question whether private plaintiffs may enforce Section 2 of the VRA is not properly before this Court.

The State also argues (Br. 4-13) that private plaintiffs cannot enforce Section 2 of the VRA. But as the State acknowledges (Br. 2, 4), this panel is bound by a prior decision of this Court holding that Section 2 creates a private right of action. *See Robinson v. Ardoin*, 86 F.4th 574, 587-588 (5th Cir. 2023); *see also Mississippi State Conf. of NAACP v. State Bd. of Election Comm'rs*, No. 3:22-CV-734, 2024 WL 3275965, at *9-11 (S.D. Miss. July 2, 2024) (three-judge court) (providing "additional analysis" buttressing *Robinson*'s right-of-action holding). This Court denied en banc review in *Robinson*—after the Eighth Circuit issued its decision in *Arkansas State Conference NAACP v. Arkansas Board of*

*Apportionment*, 86 F.4th 1204 (8th Cir. 2023) (*Arkansas NAACP*), *reh'g en banc denied*, 91 F.4th 967 (8th Cir. 2024), the out-of-circuit precedent the State invokes here.  *See* Order on Pet. for Reh'g En Banc at 2, *Robinson*, *supra* (No. 22-30333).  And as the State also acknowledges (Br. 2), this Court denied initial en banc review of the right-of-action issue in *this* appeal.  *See* ECF No. 176-1.

Simply put, this issue is not properly before the merits panel.  For this reason, the United States does not address the issue here—even though the State chose to spend half of its brief on private enforceability, despite binding precedent and a court order rejecting initial en banc consideration of this same issue in this very appeal.  Nor should this Court embrace the State's arguments, which not only are incorrect as to any implied private right of action but also fail to mention, let alone address, private enforcement of Section 2 through 42 U.S.C. 1983, which plaintiffs invoked in their amended complaint (ROA.255, 306) and briefing below (*e.g.*, ROA.9095-9096 n.3).  The United States adheres to its decades-long position, reiterated post-*Arkansas NAACP*, that Section 2 is enforceable by private plaintiffs.  *See, e.g.*, U.S. Br. as Appellee at 39-55, *Alpha Phi Alpha Fraternity, Inc. v. Secretary, State of Ga.*, No. 23-13914 (11th Cir. Apr. 8, 2024), https://perma.cc/3M3N-44P3; U.S. Br. as Amicus Curiae in Support of Pls.-Appellees at 5-28, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-

3655 (8th Cir. Mar. 25, 2024), https://perma.cc/W7A8-S7RA; U.S. Opp. to Pet. for

Initial Hr'g En Banc, ECF No. 132.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 7791 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
  Attorney

Date:  August 16, 2024