## No. 24-30115

## In the United States Court of Appeals for the Fifth Circuit

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,
*Plaintiffs-Appellees*

*v.*

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,
*Defendant-Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,
*Intervenors-Appellants*

*v.*

UNITED STATES OF AMERICA,
*Intervenor-Appellee.*

Appeal from the United States District Court for the Middle District of Louisiana, No. 3:22-cv-00178 (C.J. Shelly D. Dick)

## BRIEF OF PLAINTIFFS-APPELLEES DR. DOROTHY NAIRNE, REV. CLEE EARNEST LOWE, DR. ALICE WASHINGTON, STEVEN HARRIS, LOUISIANA STATE CONFERENCE OF THE NAACP, AND BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE

Stuart Naifeh
Victoria Wenger
Colin Burke
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

R. Jared Evans
I. Sara Rohani
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Michael de Leeuw
Amanda Giglio
COZEN O'CONNOR
3 WTC, 175 Greenwich St.,
55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn
COZEN O'CONNOR
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

Robert S. Clark
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
robertclark@cozen.com

Megan C. Keenan
Sarah Brannon
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th St., NW
Washington, DC 20005
(740) 632-0671
mkeenan@aclu.org

Sophia Lin Lakin
Dayton Campbell-Harris
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
dcampbell-harris@aclu.org

T. Alora Thomas-Lundborg
Daniel J. Hessel
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

Nora Ahmed
Stephanie Willis
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
(504) 522-0628
nahmed@laaclu.org
swillis@laaclu.org

John Adcock
ADCOCK LAW LLC
3110 Canal Street
New Orleans, LA 70119
(504) 233-3125
jnadcock@gmail.com

*Counsel for Plaintiffs-Appellees*

i

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fifth Cir. R. 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

**Appellants**: State of Louisiana, by and through Attorney General Elizabeth B. Murrill, represented by Louisiana's Office of the Attorney General attorney Elizabeth Baker Murrill; and Holtzman Vogel Baran Torchinsky & Josefiak PLLC attorneys Jason B. Torchinsky, Edward M. Wenger, Phillip Michael Gordon, and Brennan Bowen. Nancy Landry, in her official capacity as Secretary of State for Louisiana, represented by Shows, Cali & Walsh, LLP attorney John Carroll Walsh; Nelson Mullins Riley & Scarborough LLP attorneys Alyssa Riggins, Phillip Strach, and Thomas A. Farr; and Baker & Hostetler LLP attorney Michael Warren Mengis. Clay Schexnayder and Patrick Page Cortez, in their official capacities as Speaker of the Louisiana House of Representatives and President of the Louisiana Senate, succeeded by Phillip DeVillier and Cameron Henry, in their official capacities as Speaker of the Louisiana House of Representatives and President of the Louisiana Senate, in accordance with Fed. R. Civ. P. 25(d), represented by Baker & Hostetler LLP attorneys Richard B. Raile, Katherine L. McKnight, E. Mark

Braden, Michael W. Mengis, Patrick T. Lewis, Erika Dackin Prouty, and Robert J. Tucker.

**Appellees**: Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris, Black Voters Matter Capacity Building Institute, and Louisiana State Conference of the NAACP, represented by American Civil Liberties Union Foundation attorneys Megan C. Keenan, Sarah Brannon, Sophia Lin Lakin, and Dayton Campbell-Harris; Legal Defense Fund attorneys Stuart C. Naifeh, Victoria Wenger, Jared Evans, I. Sara Rohani, and Colin Burke; Harvard Law School Election Law Clinic attorneys Tiffany Alora Thomas-Lundborg and Daniel Hessel; ACLU of Louisiana attorneys Nora Ahmed and Stephanie Willis; Cozen O'Connor attorneys Michael de Leeuw, Amanda Giglio, Josephine Bahn, and Robert Clark; and attorneys John Nelson Adcock and Ron Wilson.

**Intervenors**: United States of America, represented by U.S. Department of Justice attorneys Noah Bokat-Lindell and Erin Flynn.

**Amici**: The States of Alabama, Arkansas, Georgia, Indiana, Iowa, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Carolina, Texas, Utah, and West Virginia, represented by Alabama's Office of the Attorney General attorneys Steve Marshall, Edmund G. LaCour Jr., and Soren Geiger; Arkansas Attorney General Tim Griffin; Georgia Attorney General Chris Carr; Indiana Attorney General Theodore E. Rokita; Iowa Attorney General Brenna Bird; Mississippi Attorney General Lynn Fitch; Missouri Attorney General Andrew Bailey;

Montana Attorney General Austin Knudsen; Nebraska Attorney General Michael T. Hilgers; North Dakota Attorney General Drew H. Wrigley; South Carolina Attorney General Alan Wilson; Texas Attorney General Ken Paxton; Utah Attorney General Sean D. Reyes; West Virginia Attorney General Patrick Morrisey.


Date: August 16, 2024          */s/ Megan C. Keenan*
                               Megan C. Keenan
                               *Counsel for Plaintiffs-Appellees*

## **STATEMENT REGARDING ORAL ARGUMENT**

Given the complex nature of the evidence submitted in Voting Rights Act cases and the significant issues at stake, Plaintiffs-Appellants agree that oral argument could assist the court in resolving this appeal.

# TABLE OF CONTENTS

COUNTER-STATEMENT ON JURISDICTION .......................................1

COUNTER-STATEMENT OF THE ISSUES...........................................1

COUNTER-STATEMENT OF THE CASE ............................................1

SUMMARY OF THE ARGUMENT .......................................................8

ARGUMENT ......................................................................................10

I.   The District Court Properly Exercised Jurisdiction. .........................10

  A.   Plaintiffs Have Article III Standing. ...........................................10

    1.   Each individual plaintiff has standing.......................................13

    2.   Louisiana NAACP has associational standing. ........................14

    3.   BVM and Louisiana NAACP established organizational standing. ..................................................................................23

    4.   Section 2284 does not require a three-judge panel because Plaintiffs brought only statutory redistricting claims.....................28

II.   The District Court Did Not Clearly Err in Concluding Plaintiffs Proved All Three *Gingles* Preconditions.................................................31

  B.   *Gingles* I ......................................................................................32

    1.   The district court applied the correct legal standard in finding Plaintiffs satisfied *Gingles* I. ...........................................32

    2.   The district court did not clearly err in finding based on an extensive trial record and credibility determinations that Plaintiffs satisfied *Gingles* I......................................................................36

    3.   The district court's findings that race did not predominate in the illustrative maps were substantially supported by the trial record and were not clearly erroneous..........................................43

  C.   *Gingles* II & III ...........................................................................51

    1.   The district court applied the correct legal standard in finding Plaintiffs satisfied *Gingles* II and III. ................................51

    2.   The district court's *Gingles* II and III findings were supported by the record and were not clearly erroneous. .......................54

3.    The district court did not clearly err in crediting Dr. Handley's method for allocating early and absentee votes. ............................... 62

4.    The district court did not abuse its discretion in excluding expert reports and testimony from Dr. Solanky. .......................... 65

III.    The District Court's Totality-of-Circumstances Findings Were Not Clearly Erroneous. ................................................. 73

A.    Senate Factor 1 ............................................................... 75

B.    Senate Factor 2 ............................................................... 76

C.    Senate Factor 3 ............................................................... 79

D.    Senate Factor 5 ............................................................... 80

E.    Senate Factor 6 ............................................................... 81

F.    Senate Factor 7 ............................................................... 82

G.    Senate Factor 8 ............................................................... 84

H.    Senate Factor 9 ............................................................... 85

IV.    Private Plaintiffs Have a Right of Action to Enforce Section 2 of the Voting Rights Act. ............................................... 86

V.    Section 2 of the Voting Rights Act Remains Constitutional. ........ 88

VI.    The District Court Did Not Abuse Its Discretion in Scheduling a Modestly Expedited Trial. ................................................. 95

CONCLUSION ............................................................. 100

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................... 35

*Alabama Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ................................................... 16, 17, 88

*Alabama State Conference of the NAACP v. Alabama*, 612
F.Supp.3d 1232 (M.D. Ala. 2020) ......................................... 56

*Allen v. Milligan,*
144 S. Ct. 476 (2023) ............................................................ 89

*Allen v. Milligan,*
599 U.S. 1 (2023) ......................................................... *passim*

*Allen v. State Board of Elections*,
393 U.S. 544 (1969) .............................................................. 29

*Alpha Phi Alpha Fraternity v. Raffensperger,*
No. 1:21-CV-5337-SCJ, 2022 WL 20690354 (N.D. Ga. Jan. 28,
2022) ..................................................................................... 30

*Alpha Phi Alpha Fraternity v. Raffensperger,*
587 F.Supp.3d 1222 (N.D. Ga. 2022).................................... 56

*Alpha Phi Alpha Fraternity v. Raffensperger,*
No. 1:21-CV-5337-SCJ, 2023 WL 5674599 (N.D. Ga. July 17,
2023) ..................................................................................... 90

*Anderson v. Bessemer City,*
470 U.S. 564 (1985) ................................................. 31, 77, 78

*Arkansas State Conference NAACP v. Arkansas Board of
Apportionment,*
86 F.4th 1204 (8th Cir. 2023) ................................................. 5

*Association of Community Organizations for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999) ............................................................... 87

*Avivla Sports v. Fingerhut Direct Marketing*,
  829 F.Supp.2d 802 (D. Minn. 2011) ................................................... 69

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ........................................................................... 32, 52

*Bell v. Fowler*,
  99 F.3d 262 (8th Cir. 1996) ................................................................. 21

*Bethune-Hill v. Virginia State Board Of Elections*,
  368 F.Supp.3d 872 (E.D. Va. 2019) .................................................... 12

*Bethune-Hill v. Virginia State Board of Elections*,
  580 U.S. 178 (2017) ............................................................................ 53

*Bone Shirt v. Hazeltine*,
  336 F.Supp.2d 976 (D.S.D. 2004) ................................................. 30, 56

*Cerda v. Blue Cube Operations*,
  95 F.4th 996 (5th Cir. 2024) ............................................................... 21

*Chestnut v. Merrill*,
  356 F.Supp.3d 1351 (N.D. Ala. 2019) ................................................. 30

*Citizens for a Better Gretna v. City of Gretna*,
  834 F.2d 496 (5th Cir. 1987) ......................................................... 56, 61

*Clark v. Calhoun County*,
  88 F.3d 1393 (5th Cir. 1996) ................................................... 45, 56, 84

*Clark v. Roemer*,
  777 F.Supp.471 (M.D. La. 1991) ......................................................... 96

*Cooper v. Harris*,
  581 U.S. 285 (2017) ................................................................... *passim*

*Covington v. North Carolina*,
  270 F.Supp.3d 881 (M.D.N.C. 2017) ................................................... 96

*Covington v. North Carolina,*
   316 F.R.D. 117 (M.D.N.C. 2016) ..................................................... 53, 54

*Diggs v. Citigroup,*
   551 Fed. App'x. 762 (5th Cir. 2014) ..................................................... 66

*East Jefferson Coalition for Leadership and Development v.*
   *Jefferson Parish,*
   691 F.Supp.991 (E.D. La. 1988) ......................................................... 61

*Federal Drug Administration v. Alliance for Hippocratic Medicine*
   602 U.S. 367 (2024) ............................................................................ 23

*Federal Election Commission v. Akins,*
   524 U.S. 11 (1998) ............................................................................. 87

*Fisher v. R.D. Werner Co.,*
   1 F.3d 1236 (5th Cir. 1993) ................................................................. 71

*Fusilier v. Landry,*
   963 F.3d 447 (5th Cir. 2020) ............................................................... 74

*FW/PBS v. City of Dallas,*
   493 U.S. 215 (1990) ........................................................................... 17

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.,*
   99 F.4th 770 (5th Cir. 2024) ............................................................... 67

*Gill v. Whitford,*
   585 U.S. 48 (2018) ............................................................................. 13

*Gonzalez v. Automatic Employees Credit Union,*
   419 U.S. 90 (1974) ............................................................................. 29

*Greater Birmingham Ministries v. Secretary of State for the State*
   *of Alabama,*
   992 F.3d 1299 (11th Cir. 2021) ........................................................... 17

*Growe v. Emison,*
   507 U.S. 25 (1993) ......................................................................... 32, 92

*Hancock County Board of Supervisors v. Ruhr*,
    487 F. App'x 189 (5th Cir. 2012) ........................................ 16

*Harding v. County of Dallas*,
    948 F.3d 302 (5th Cir. 2020) .............................................. 13

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007) .............................................. 46

*Houston Lawyers' Association v. Attorney General of Texas*,
    501 U.S. 1991 (1991) ....................................................... 88

*Hunt v. Washingt. State Apple Advertising Commission*,
    432 U.S. 333 (1977) ......................................................... 14

*Huss v. Gayden*,
    571 F.3d 442 (5th Cir. 2009) .............................................. 70

*Ilyia v. Khoury*,
    671 F. App'x 510 (9th Cir. 2016) ......................................... 71

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices
    and Products Liability Litigation*,
    174 F.Supp.3d 911 (D.S.C. 2016) ........................................ 51

*Johnson v. Ardoin*,
    No. 18-cv-625-SDD-EWD, 2019 WL 2329319 (M.D. La. May 31,
    2019) .......................................................................... 30

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ............................................. 13, 50, 83

*Kopf v. Skyrm*,
    993 F.2d 374 (4th Cir. 1993) .............................................. 48

*Landis v. North American Co.*,
    299 U.S. 248 (1936) ......................................................... 95

*Lawyer v. Department of Justice*,
    521 U.S. 567 (1997) ......................................................... 45

*Lopez v. Abbott,*
　339 F.Supp. 3d 589 (S.D. Tex. 2018) ................................................... 98

*Louisiana State Conference of NAACP v. Louisiana,*
　490 F.Supp.3d 982 (M.D. La. 2020) ..................................................... 10

*Lujan v. Defenders of Wildlife,*
　504 U.S. 555 (1992) ............................................................................. 10

*LULAC v. Clements,*
　999 F.2d 831 (5th Cir. 1993) ............................................................... 81

*LULAC v. Perry,*
　548 U.S. 399 (2006) ................................................................... *passim*

*Luttrell v. United States,*
　320 F.2d 462 (5th Cir. 1963) ............................................................... 71

*Luv n' care, v. Laurain,*
　Civ. No. 3:16-00777, 2021 WL 7907283 (W.D. La. Mar. 29,
　2021) ..................................................................................................... 71

*Magnolia Bar Association v. Lee,*
　994 F.2d 1143 (5th Cir. 1993) ............................................................. 56

*McAllen Grace Brethren Church v. Salazar,*
　764 F.3d 465 (5th Cir. 2014) ............................................................... 23

*McIntosh v. Partridge,*
　540 F.3d 315 (5th Cir. 2008) ............................................................... 76

*Miller v. Johnson,*
　515 U.S. 900 (1995) ............................................................................. 45

*Mississippi State Conference of the NAACP v. State Board of
Election Commissioners,*
　2024 WL 3275965 (N.D. Miss. July 2, 2024) ............................. *passim*

*Missouri State Conference of the NAACP v. Ferguson-Florissant
School District,* 201 F.Supp.3d 1006 (E.D. Mo. 2016) ................. 57, 98

*Moore v. Hernandez,*
    No. 2:17-CV-00531-JRG, 2018 WL 2670403 (E.D. Tex. Mar. 6,
    2018) ................................................................................................ 70

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) ............................................................ 19

*NAACP v. Fordice,*
    252 F.3d 361 (5th Cir. 2001) ............................................................ 77

*Nguyen v. Excel Corp.,*
    197 F.3d 200 (5th Cir. 1999) ............................................................ 20

*Northeast Ohio Coalition for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ............................................................ 88

*Parents Involved in Community School v. Seattle School District
    No. 1,*
    551 U.S. 701 (2007) .................................................................... 16, 17

*Patino v. City of Pasadena,*
    230 F.Supp.3d 667 (S.D. Tex. 2017) ................................................ 56

*Perry v. Perez,*
    565 U.S. 388 (2012) .......................................................................... 12

*Petteway v. Galveston County,*
    698 F.Supp.3d 952 (S.D. Tex.) .......................................................... 90

*Petteway v. Galveston County,*
    No. 3:22-CV-57, 2023 WL 6786025 (S.D. Tex. Oct. 13, 2023) ............ 63

*Phillips v. United States,*
    312 U.S. 246 (1941) .......................................................................... 29

*Robinson v. Ardoin,*
    37 F.4th 208 (5th Cir. 2022) ............................................. 6, 39, 44, 53

*Robinson v. Ardoin,*
    86 F.4th 574 (5th Cir. 2023) ..................................................... *passim*

*Robinson v. Ardoin,*
   No. 22-30333, 2023 U.S. App. LEXIS 34113 (5th Cir. Dec. 15,
   2023) ........................................................................................ 88

*Robinson v. Ardoin,*
   No. 3:22-cv-00211 (M.D. La. May 3, 2022) ........................................ 30

*Rural W. Tennessee African-American Affairs Council v.
   Sundquist,*
   209 F.3d 835 (6th Cir. 2000) ................................................................ 29

*Seigler v. Wal-Mart Stores Texas,*
   30 F.4th 472 (5th Cir. 2022) ................................................................ 73

*Sensley v. Albritton,*
   385 F.3d 591 (5th Cir. 2004) ................................................................ 35

*Shelby County v. Holder,*
   679 F.3d 848 (D.C. Cir. 2012) ........................................................ 90, 91

*Singleton v. Allen,*
   2024 WL 3384840 (N.D. Ala. July 11, 2024) ..................................... 95

*Singleton v. Allen,*
   690 F.Supp.3d 1226 (N.D. Ala. 2023) ................................................. 90

*Singleton v. Merrill,*
   582 F.Supp.3d 924 (N.D. Ala. 2022) .......................................... *passim*

*Singleton v. Merrill,*
   No. 2:21-cv-01530-AMM, 2021 WL 5979497 (N.D. Ala. Nov. 23,
   2021) ........................................................................................ 30

*Stone v. Allen,*
   2024 WL 578578 (N.D. Ala. Feb. 13, 2024) ....................................... 95

*Stone v. Allen,*
   No. 2:21-cv-01531 (N.D. Ala. Dec. 7, 2023) ...................................... 30

*Students for Fair Admissions v. President & Fellows of Harvard College*,
  600 U.S. 181 (2023) ................................................................. 17, 22

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ........................................................................ 15

*Teague v. Attala County*,
  92 F.3d 283 (5th Cir. 1996) .................................................. 78, 79, 98

*Texas v. EPA*,
  91 F.4th 280 (5th Cir. 2024) ......................................................... 18

*Thomas v. Reeves*,
  961 F.3d 800 (5th Cir. 2020) ......................................................... 29

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) .............................................................. *passim*

*Topalian v. Ehrman*,
  954 F.2d 1125 (5th Cir. 1992) ....................................................... 95

*Tucker v. Buford*,
  603 F.Supp.276 (N.D. Miss. 1985) ................................................ 96

*United Food & Commercial Workers Union Local 751 v. Brown Group*,
  517 U.S. 544 (1996) ....................................................................... 18

*United States v. Barnes*,
  979 F.3d 283 (5th Cir. 2020) ......................................................... 49

*United States v. Lara*,
  23 F.4th 459 (5th Cir. 2022) ......................................................... 20

*United States v. Licausi*,
  413 F.2d 1118 (5th Cir. 1969)); ..................................................... 71

*United States v. Perry*,
  35 F.4th 293 (5th Cir. 2022) ......................................................... 66

*United States v. Seale,*
   600 F.3d 473 (5th Cir. 2010) .................................................................. 18

*United States v. Thunder Horse,*
   370 F.3d 745 (8th Cir. 2004) .................................................................. 18

*United States v. Village of Port Chester,*
   704 F.Supp.2d 411 (S.D.N.Y. 2010) ....................................................... 56

*Watkins v. Telsmith, Inc.,*
   121 F.3d 984 (5th Cir. 1997) .................................................................. 31

*Weathersby v. One Source Manufacturing Technology,*
   378 F. App'x 463 (5th Cir. 2010) ........................................................... 76

*Westwego Citizens for Better Government v. City of Westwego,*
   872 F.2d 1201 (5th Cir. 1989) ......................................................... 61, 99

*Williams v. City of Dallas,*
   734 F.Supp.1317 (N.D. Tex. 1990) ........................................................ 96

*Willy v. Administrative Review Board,*
   423 F.3d 483 (5th Cir. 2005) .................................................................. 20

**Statutes**

1 U.S.C. §1 ................................................................................................ 85

28 U.S.C. §1291 ......................................................................................... 1

28 U.S.C. §1331 ......................................................................................... 1

28 U.S.C. §2284 ....................................................................................... 28

42 U.S.C. §1983 ......................................................................................... 1

52 U.S.C. §10301(b) ............................................................................ 1, 3, 9

**Other Authorities**

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting
   Rights Act Reauthorization and Amendments Act of 2006,
   Pub. L. No. 109-246, 120 Stat. 578 §2(b)(1-9) .................................... 87

Fed. R. App. P. 10(a) ........................................................ 74

Fed. R. Civ. P. 52(a)(6) .................................................... 30

Fed. R. Evid. 702(a)-(d) ................................................... 64

Guidance Concerning Redistricting Under Section 5 of the Voting
    Rights Act,
    76 Fed. Reg. 7471 (2011) ........................................... 52

Pamela S. Karlan, *Two Section Twos and Two Section Fives:*
    *Voting Rights and Remedies After Flores,*
    39 WM. & MARY L. REV. 725 (1998) ........................... 90

T. Crum, *Reconstructing Racially Polarized Voting,*
    70 DUKE L. J. 261 (2020) ............................................ 89

## **COUNTER-STATEMENT ON JURISDICTION**

The district court had jurisdiction over Plaintiffs' federal statutory claim. 28 U.S.C. §1331; *see also* 52 U.S.C. §10301(b); 42 U.S.C. §1983. This Court has jurisdiction over the instant appeal. 28 U.S.C. §1291.

## **COUNTER-STATEMENT OF THE ISSUES**

1. Did the district court have jurisdiction to render its decision that Louisiana's state legislative maps violated Section 2 of the Voting Rights Act?

2. Did the district court err in applying this Court's precedent that a private right of action exists under Section 2 of the Voting Rights Act?

3. Did the district court err in applying the legal framework for Section 2 claims that the Supreme Court reaffirmed in *Allen v. Milligan*?

4. Did the district court clearly err in finding, based on its thorough review of the extensive evidence and credibility and factual findings, that Louisiana's state legislative maps violated Section 2?

## **COUNTER-STATEMENT OF THE CASE**

In 2022, the Louisiana legislature enacted maps to redistrict their own seats in the State House and Senate that ignored the calls of Black Louisianians for more responsive representation, failed to account for the increase in Louisiana's Black population, and perpetuated a legacy of political subordination endured by Black Louisianians for generations. Plaintiffs brought a straightforward challenge to the enacted House and Senate maps for violating Section 2 of the Voting Rights Act, under the same legal framework the Supreme Court upheld in *Allen v. Milligan*, 599 U.S. 1, 17 (2023). Exercising clear and proper jurisdiction, the district

court engaged in thorough fact finding during a seven-day trial involving almost two dozen witnesses and thousands of pages of pleadings and evidence. Based on this record, the court ruled in Plaintiffs' favor, finding evidence of vote dilution that supports the enactment of an additional six House districts and three Senate districts where Black voters have an opportunity to elect their candidates of choice.

On appeal, Defendants now aim to reintroduce tried-and-failed legal theories to undermine Plaintiffs' entitlement to pursue and obtain relief under the clear Section 2 standard and relitigate the district court's findings of fact, which were supported by the record and turned on credibility assessments based on close observation of the witnesses. Defendants' legal arguments are foreclosed by longstanding precedent, which has been regularly and recently affirmed, and their evidentiary arguments fail to expose any clear error in the district court's factual findings. This Court should affirm.

## **Procedural History**

Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris ("Individual Plaintiffs") are Black Louisiana voters living in packed or cracked Louisiana state legislative districts that dilute their votes. ROA.9213-9214; *infra* Argument.I.A.1. Black Voters Matter Capacity Building Institute ("BVM") and the Louisiana State Conference of the NAACP ("Louisiana NAACP"—and, together with BVM, "Organizational Plaintiffs") are organizations dedicated to expanding

Black voter engagement in Louisiana. ROA.9214-9215; *infra* Argument.I.A.2-3. Louisiana NAACP also has members who are Black registered voters living in districts that dilute their votes, including nine individuals identified by name in sealed testimony at trial who each live in an area in which Plaintiffs' illustrative maps create a new majority-Black district that would redress the alleged vote dilution. ROA.9214, ROA.10940-ROA.10972; *infra* Argument.I.A.2.

In March 2022, Plaintiffs commenced the instant action against the Louisiana Secretary of State (the "Secretary"). ROA.64-143, ROA.251-311. Plaintiffs alleged that S.B.1 and H.B.14—the Louisiana state senate and house maps—violate Section 2 of the Voting Rights Act ("VRA"). 52 U.S.C. §10301(b). The President of the Louisiana Senate and Speaker of the Louisiana House ("Legislative-Intervenors"), the State of Louisiana, and the United States later intervened in the case. ROA.627-632, ROA.7270-7272.

The Secretary moved for a three-judge panel to preside over this case, ROA.496-506, and the district court denied her motion. ROA.6914-6916.

In June 2022, the district court set trial in this matter to begin in January 2023, approximately ten months after the initial complaint. ROA.846. That order called for Plaintiffs to exchange their expert reports by July 22, 2022, ROA.845, which Plaintiffs did. On July 18, 2022, Defendants jointly moved to stay the action pending the Supreme Court's

adjudications of *Allen v. Milligan* and *Robinson v. Ardoin*, Section 2 cases challenging Alabama's and Louisiana's congressional maps. ROA.793-807. On August 30, 2022—ten days before Defendants' expert reports were due, ROA.973—the district court stayed proceedings. ROA.990-994.

On June 8, 2023, the Supreme Court issued its decision in *Milligan*, 599 U.S. at 17, affirming the order enjoining Alabama's congressional maps under Section 2 and upholding the framework established in *Thornburg v. Gingles*, 478 U.S. 30 (1986). The next day, June 9, 2023, Plaintiffs moved to vacate the district court's stay, ROA.997-1002, and moved for an expedited hearing on Plaintiffs' anticipated motion for a preliminary injunction, ROA.1004-1012. On June 22, 2023, the district court granted Plaintiffs' motion to vacate, denied Plaintiffs' motion for expedited consideration of its anticipated preliminary-injunction motion as moot, and set trial to begin November 27, 2023. ROA.40 (ECF Nos. 95-97). In July 2022, Defendants twice moved to continue the trial dates. ROA.1100-1118, ROA.1202-1215. The district court denied both motions to continue. ROA.46 (ECF Nos. 145, 146).

In October 2023, Defendants moved to exclude reports and testimony proffered by Plaintiffs' expert, Dr. Lisa Handley. ROA.1504-1621. Plaintiffs moved to exclude reports and testimony of three of Defendants' proffered experts—Mr. Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky. ROA.4633-5989. The district court denied Defendants' motion to exclude Dr. Handley's testimony,

4

ROA.6869-6876, and the district court denied Plaintiffs' motion as to Mr. Trende, limited Dr. Johnson's testimony, and excluded Dr. Solanky's testimony altogether, ROA.6900-6913. On November 2, 2023, following a discovery dispute,[1] the magistrate judge ordered Louisiana NAACP to provide "both the name and address of the individual member(s) from the challenged districts that the NAACP intends to offer at trial to establish associational standing, or any other part of its claim." ROA.6868. Louisiana NAACP complied with this order, disclosed the names of those members impacted by the ruling, and made Louisiana NAACP's president available for an additional deposition following that disclosure. ROA.7206.

Defendants also moved for summary judgment seeking dismissal of Organizational Plaintiffs' claims on standing grounds. ROA.1692-1889; ROA.6877-6891. The court denied the motion, finding genuine disputes of material fact regarding Organizational Plaintiffs' standing. ROA.7191-7205.

Five days before trial began, Defendants moved to stay the action in light of the Eighth Circuit's outlier decision in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), and Defendants' desire to submit a petition for rehearing *en banc* before this Court in *Robinson v. Ardoin*, 37 F.4th 208 (5th Cir.

---

[1] *See* ROA.1236-1333, ROA.1396-1412, ROA.1426-1446, ROA.1447-1450, ROA.1481-1503.

2022) ("*Robinson II*"). ROA.7212-7223. The district court denied Defendants' motion. ROA.9448-9450. Midway through trial, Defendants again moved to dismiss Plaintiffs' claims, arguing no private right of action exists under Section 2. ROA.7234-7249. The court denied this motion in light of this Court's precedent holding that Section 2 contains a private right of action. ROA.9138-9141.

At trial, Plaintiffs presented testimony from seven fact witnesses—the four Individual Plaintiffs; Michael McClanahan, Louisiana NAACP's president; Omari Ho-Sang, BVM's senior state organizing manager; and Cedric Glover, then-State Representative and former Mayor of Shreveport. ROA.9440-9642. Plaintiffs also presented testimony from seven expert witnesses—Mr. William S. Cooper; Dr. Craig Colten; Dr. Traci Burch; Dr. Robert Blakeslee Gilpin; Dr. Lisa Handley (affirmative and rebuttal); Dr. Cory McCarten (rebuttal only), and Dr. Marvin P. King (rebuttal only). ROA.9643-10101, ROA.10725-10939. Defendants presented testimony from two fact witnesses—Patrick Page Cortez, then-President of the Louisiana Senate; and Sherri Hadskey, the Louisiana Commissioner of Elections—and six expert witnesses—Dr. John Alford, Mr. Sean Trende, Dr. Douglas Johnson, Dr. Michael Barber, Dr. Alan Murray, and Dr. Jeffrey Lewis. ROA.10121-10768. The district court also heard proffers from Defendants regarding Dr. Solanky's excluded testimony and the excluded portions of Dr. Johnson's testimony.

ROA.10769-10774. Plaintiffs renewed their objections to this testimony. ROA.10770-10773.

In February 2024, the district court issued its opinion. It found that S.B.1 and H.B.14 violated Section 2, enjoined their use, and granted the Louisiana legislature "a reasonable period of time" to implement new, compliant maps. ROA.9212; *see generally* ROA.9122-9227. The district court made detailed factual findings about the various harms that the enacted maps inflicted on each of the Plaintiffs and concluded that Individual Plaintiffs, Louisiana NAACP, and BVM all had standing to sue the Secretary. ROA.9129-9135, ROA.9213-9215; *infra* Argument.I.A. The district court then made factual findings about how Louisiana's racially polarized voting prevents Black voters from electing candidates of their choice in certain packed and cracked districts[2] within the enacted maps, and how the additional majority-minority districts[3] in Plaintiffs' illustrative maps were compact, complied with traditional redistricting factors, and would be effective in providing Black voters an opportunity to elect the candidate of their choice. ROA.9142-9196, ROA.9215-9223; *infra* Argument.II.A-B. The district court also made thorough factual findings about historic and ongoing discrimination in Louisiana that

---

[2] ROA.9180-9183 (enacted Senate Districts 5, 7, 8, 10, 13, 15, and 19, and enacted House Districts 2, 4, 5, 7, 13, 22, 25, 29, 35, 37, 60, 61, 63, 65, 68, 69, and 70).

[3] ROA.9146-9147 (illustrative Senate Districts 17, 19, and 38, and illustrative House Districts 1, 65, 68, 69, 60, 38, and 23).

provides Black Louisianians less of an opportunity to participate in the political process. ROA.9196-9209, ROA.9223-9224; *infra* Argument.III. Having heard the direct testimony and vigorous cross examination of the expert witnesses, the district court repeatedly credited Plaintiffs' experts and discredited Defendants' experts. *Compare, e.g.*, ROA.9180, ROA.9183, ROA.9191, ROA.9199, ROA.9201, ROA.9203, *with* ROA.9166, ROA.9172, ROA.9177. Based on these extensive and rigorous factual findings, the district court concluded that Plaintiffs' evidence satisfied the three *Gingles* preconditions, that each of the eight applicable Senate Factors favored Plaintiffs, and—accordingly—that under the totality of circumstances, the enacted maps violated Section 2. ROA.9180-9183, ROA.9196, ROA.9209, ROA.9212.

## <u>SUMMARY OF THE ARGUMENT</u>

For nearly forty years, individual plaintiffs and civil society organizations have enforced Section 2, and the Supreme Court and this Court have evaluated Section 2 claims using the framework developed in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Last year, the Supreme Court reaffirmed this standard's applicability. *Milligan*, 599 U.S. at 17-19 (collecting cases). This year, the district court in this case followed suit.

In evaluating Louisiana's state legislative maps, the district court found that the enacted maps cracked and packed the Black population in the areas surrounding Shreveport, Natchitoches, Lake Charles, Baton Rouge, and New Orleans—the very places where the largest population

shifts have taken place since the 2020 Census, and where Black populations are sufficiently large to comprise additional majority-minority districts. The court found that districts within the same areas of Plaintiffs' illustrative map unpacked and uncracked those populations while preserving communities of interest, respecting other traditional redistricting criteria, and following Louisiana's own redistricting guidelines. The district court also made factual findings that voting in these areas is highly racially polarized, that Black voters have been unable to elect their preferred candidates in these areas unless they reside in a majority-Black district, and that historic and present conditions discriminate against Black Louisianians in voting and other related areas. Given these findings, the district court concluded that the enacted maps deny Black Louisianians equal opportunity "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Against the weight of this comprehensive record, Defendants' arguments ignore the facts and misstate the law. They urge this Court to reverse on standing grounds, despite the district court's findings of fact that Individual Plaintiffs and Louisiana NAACP members were Black registered voters living in districts that dilute their votes, and that the enacted maps' dilutive effects impaired BVM's and Louisiana NAACP's core services. They urge the Court to reverse for lack of a private right of action, ignoring this Court's binding precedent foreclosing such a

conclusion. And they ask this Court to deem Section 2 unconstitutional, just one year after the Supreme Court reaffirmed its viability, despite the district court's findings that the largely uncontested record demonstrates discrimination is alive and well in Louisiana. This court should reject their invitations and affirm.

## ARGUMENT

## I.   The District Court Properly Exercised Jurisdiction.

### A.   Plaintiffs Have Article III Standing.

To establish Article III standing, Plaintiffs must demonstrate: (1) an "injury in fact," (2) that is "fairly traceable" to the defendant's conduct, and (3) that is likely to be redressed by favorable judicial intervention. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On the record established at trial, the district court correctly determined Plaintiffs have standing.[4]

Defendants erroneously claim that Plaintiffs' standing is premised on a "theory of statewide harm," ECF No. 198 [hereinafter "Leg. Br."] 12-14, and that Plaintiffs "lack standing to challenge all 144 legislative districts," Leg. Br. 9. Defendants are wrong. Plaintiffs did not challenge

---

[4] It is undisputed that the injuries at issue are traceable to and redressable by Defendant Landry. *See La. State Conf. of NAACP v. Louisiana*, 490 F.Supp.3d 982, 1027-32 (M.D. La. 2020), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) (collecting cases and explaining why injury resulting from Section 2 violation "is traceable to and redressable by the Secretary"). Accordingly, Plaintiffs focus their briefing on each plaintiff's injury in fact.

every district in the enacted state legislative maps. Rather, Plaintiffs challenged the failure to create additional Black-opportunity House and Senate districts in specific areas of the state where the enacted maps packed and cracked Black Louisianians among districts, diluting their votes. ROA.285-289, ROA.6137, ROA.9146-9147. In the Senate, Plaintiffs proved that Black Louisianians' votes have been diluted in districts in Jefferson Parish, the Shreveport area, and the Baton Rouge area. ROA.9146-9150, ROA.9180-9182. Plaintiffs sought to create one new Senate district in each of these areas: Senate Districts ("SD") 38, 19, and 17 in Plaintiffs' illustrative plan. ROA.9146-9147. Likewise, in the House map, Plaintiffs proved that Black Louisianians' votes have been diluted in districts in the areas around Shreveport, Baton Rouge, Lake Charles, and Natchitoches. ROA.9146-9153, ROA.9180-9182. Plaintiffs seek to create one additional district in each of the Shreveport, Natchitoches, and Lake Charles areas, and three additional[5] districts in the Baton Rouge area: House Districts ("HD") 1, 23, 38, 60, 65, 68, and 69 in Plaintiffs' illustrative plan. ROA.287-289. Plaintiffs identified at least one Individual Plaintiff or Louisiana NAACP member who resides in a packed or cracked district in each of these areas whose injury would be

---

[5] Mr. Cooper's reconfiguration of the Baton Rouge area created four illustrative majority-Black districts in this area (illustrative-HD 60, 65, 68, and 69) but eliminated one enacted majority-Black district (enacted-HD 62) in the process—so, three of those illustrative districts count toward the *additional* majority-Black districts. *See* ROA.9152-53, ROA.10038.

redressed by the creation of one of the new illustrative majority-Black districts. Far from embracing a generalized theory of statewide harm, the district court's findings reflect this same level of specificity. ROA.9146-9150, ROA.9217.

Nor does enjoining the use of S.B.1 and H.B.14—the statutes that enacted the dilutive districts—in future elections transform the court's careful, district-by-district analysis into a finding of statewide harm. Leg. Br. 13-14; ROA.9212. Enjoining *only* the specific dilutive districts would not redress Plaintiffs' harm: Unpacking and uncracking those districts "will, at a minimum, impact an immediately adjacent district and could impact numerous other districts, both invalidated and non-challenged." *Bethune-Hill v. Va. State Bd. of Elections*, 368 F.Supp.3d 872, 878 (E.D. Va. 2019). Moreover, remedying the vote dilution found by the district court need not involve a reconfiguration of the entire map: In crafting a remedial map, the State has the initial prerogative to decide how and which districts to alter. *See Perry v. Perez*, 565 U.S. 388, 393 (2012). The court's remedial instructions "to address the Court's findings and implement State House and Senate maps that comply with §2 of the Voting Rights Act" merely reflect that reality. ROA.9212. *See, e.g.*, *Singleton v. Merrill*, 582 F.Supp.3d 924, 936 (N.D. Ala. 2022) (enjoining entire state electoral map in Section 2 challenge), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

## 1. Each individual plaintiff has standing.

To have standing, Individual Plaintiffs must prove that they are Black registered voters who reside in a "packed or cracked" district that could be redrawn into a new majority-Black district. *Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020) (quoting *Gill v. Whitford*, 585 U.S. 48, 67, 69 (2018)); *accord Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994) (explaining that Section 2 can be violated either through "fragmenting the minority voters among several districts" or "packing [minority voters] into one or a small number of districts"). The district court applied the correct legal standard. ROA.9129-9130.

The district court then made factual findings that Individual Plaintiffs are all Black registered voters in Louisiana, based on their undisputed testimony. ROA.9457-9459, ROA.9494-9495, ROA.9506-9508, ROA.9515; *see also* ROA.9130. The district court likewise made factual findings about the enacted and illustrative district in which each Individual Plaintiff resides: Dr. Nairne lives in enacted-HD 60 and would live in illustrative-HD 58, ROA.9465, ROA.9469, ROA.10034-10035; Dr. Washington lives in enacted-HD 66 and would live in illustrative-HD 101, ROA.9544, ROA.9546, ROA.10040-10041; Rev. Lowe lives in enacted-HD 66 and would live in illustrative-HD 101, ROA.9496, ROA.10040-10041; and Pastor Harris lives in enacted-HD 25 and would live in illustrative-HD 23, ROA.9515, ROA.9520-9521, ROA.15817, ROA.10031. And—comparing these factual findings with additional

13

findings about Plaintiffs' various experts' analysis—the district court made a factual finding that "[e]ach Individual Plaintiff currently lives in a packed or cracked district in the Enacted Map and would live in a majority-Black district in the Illustrative Plan." ROA.9214; *see also* ROA.9181-9182, ROA.9187-9189 n.359 (additional factual findings that Black voters could not elect a candidate of their choice in the cracked enacted districts where each Individual Plaintiff resides). Thus, the district court did not clearly err in finding that Individual Plaintiffs have standing to challenge vote dilution in their own districts.

### 2. Louisiana NAACP has associational standing.

#### a. Louisiana NAACP's evidence satisfied the applicable legal standard.

A membership organization has associational standing where: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Louisiana NAACP establishes each of these factors.

Here, Plaintiffs identified nine individual Louisiana NAACP members and proved that each would have standing in their own right. ROA.10944-10970. Each identified member is a Black registered voter. ROA.10944-10970. And based on Louisiana NAACP president

McClanahan's testimony, corroborated by the Secretary's own voter registration records, Plaintiffs established each member's name, race, and address, and the district in which they reside, ROA.10944-10970 (enacted-SD 8, 17, and 38, and enacted-HD 1, 34, 60, 65, 68, and 101), while expert testimony showed "the unpacked or uncracked majority-Black illustrative districts in which the identified members would reside under the illustrative plan," ROA.9132; ROA.10020-10040 (illustrative-SD 17, 19, 38, and illustrative-HD 1, 38, 58, 65, 68, 69). Based on that evidence, the district court made a factual finding that Louisiana NAACP's members include "Black registered voters whose votes are diluted in the districts in which they vote and thus have standing in their own right." ROA.9214; *see also* ROA.9148-9153, ROA.9181-9182, ROA.9188-9189 n.359, ROA.10024-10040 (additional factual findings and record cites about relevant enacted districts either packing Black voters such that they constitute an excessive majority, or cracking Black voters into majority-white districts such that they could not elect a candidate of their choice).

Legislative-Intervenors (at Br.18) misplace reliance on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), where the Supreme Court held that associational standing could not be established merely by showing that, "accepting the organization's self-description of the *activities* of its members, there is a *statistical probability* that some of those members are threatened with concrete injury." *Id.* at 497 (emphasis

added). This holding is irrelevant here. Louisiana NAACP did not rely on statistical arguments. Rather, Louisiana NAACP's president offered uncontradicted testimony about the identities, including names and addresses, of specific members harmed by the challenged districts and their characteristics necessary to establish the members' standing, which is exactly the type of evidence that was lacking in *Summers* and that has been found sufficient to establish associational standing in other cases. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 271 (2015) (accepting organizational leader's affidavit that identified those members impacted by a challenged plan as sufficient proof of standing); *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F.App'x 189, 198 (5th Cir. 2012) (holding that a local NAACP's allegations that its members in fact lived in malapportioned districts—as opposed to merely alleging that such members "might" be impacted—was sufficient to show standing); *cf. also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007).

While *Summers* holds that an organization cannot rely on broad generalizations about probable member injury, *Summers* did not overrule the longstanding legal standard governing associational standing. 555 U.S. at 497-99. Defendants suggest that a single reference to "individual affidavits" somehow changed well-established law that associational standing may be proven without the participation of individual members of the association. *Id.* at 499. It did not. Indeed,

*Summers* relied heavily on *FW/PBS v. City of Dallas*, 493 U.S. 215, 235 (1990), which it characterized as noting "that the affidavit provided by the city to establish standing would be insufficient *because it did not name the individuals who were harmed*," not because it did not come from the individuals themselves. *Summers*, 555 U.S. at 498 (emphasis added). In context, the single reference to "individual affidavits" merely referred to the need to present evidence about individualized members, not a new requirement to present evidence *from* the individuals themselves. *Id.* at 499. Such a requirement would conflict with later precedent that accepted affidavits *solely* from organizational leaders as sufficient to prove standing, *ALBC*, 575 U.S. at 271; *see also Parents Involved*, 551 U.S. at 718, and would defy a core element of associational standing: that "neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Students for Fair Admissions v. President & Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 199 (2023).

Louisiana NAACP has also met the other two elements of the associational standing test. As this Court previously held, "protecting the strength of votes ... [is] surely germane to the NAACP's expansive mission" at all levels of the organization. *Ruhr*, 487 F.App'x at 197; *accord Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). Moreover, participation of individual members is not required because Louisiana NAACP seeks prospective and injunctive relief, not damages or other individualized

forms of relief. *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996).

### b. Defendants' sword-and-shield argument fails.

Legislative-Intervenors argue that the district court abused its discretion by overruling Defendants' objections to evidence about Louisiana NAACP's members based on the sword-and-shield doctrine. Leg. Br. 9. This, too, is incorrect.

As an initial matter: Defendants failed to timely make this objection at trial. Louisiana NAACP's president's testimony to the identities of two of the nine members identified drew no objection whatsoever. ROA.10946, ROA.10950. When the president was asked for the third member's identity, Defendants requested a standing objection, but solely on hearsay grounds. ROA.10951-52 ("I think we need to assert a standing objection to all of the information in the supplemental response to the extent it's being used to assert the truth of the matter.");[6] *see United States v. Seale*, 600 F.3d 473, 486 (5th Cir. 2010) ("[T]he

---

[6] Defendants have not argued that the district court's hearsay ruling was reversible error in their opening briefs on appeal, and any argument that Mr. McClanahan's testimony should have been excluded on that ground is therefore waived. *See Texas v. EPA*, 91 F.4th 280, 298 (5th Cir. 2024) (citation omitted). Even if not waived, the district court correctly invoked the residual hearsay exception in permitting this testimony. Fed. R. Evid. 807; *United States v. Thunder Horse*, 370 F.3d 745, 747 (8th Cir. 2004) ("The district court is entitled to some deference in deciding whether to admit hearsay evidence under Fed. R. Evid. 807[,] and we will affirm the court's ruling unless the court abused its discretion.").

'specific ground' for the stated objection must be the correct one."). Louisiana NAACP's president testified to all facts supporting each member's standing before drawing any sword-and-shield objection. ROA.10946-10958. Defendants' sole sword-and-shield objection was untimely, ROA.10962-10963, and this Court's review is therefore limited to plain error. Fed. R. Evid. 103(a)(1).

In any event, whether reviewed for plain error or any other standard, the district court's decision to allow Mr. McClanahan to testify regarding Louisiana NAACP's members emerges unscathed. The sword-and-shield doctrine simply does not apply here because no privileged information was ultimately shielded. Legislative-Intervenors ignore that the district court *overruled* Louisiana NAACP's good-faith argument that its members' names were protected from discovery by First Amendment associational privilege and were unnecessary to establish associational standing.[7] When the district court rejected Louisiana NAACP's good-faith arguments and ordered it to identify "the name and address of the individual member(s) from the challenged districts," ROA.6867-6868, Louisiana NAACP timely complied and provided that information to Defendants, ROA.6877, ROA.6886.

---

[7] This Court has not yet addressed whether *Summers* requires an associational plaintiff to prove the names of specific members with standing. 555 U.S. at 488. Rather, this Court has only held that there must be "evidence in the record showing that a specific member of the NAACP" had been injured, not that such member must be identified by name. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010).

19

Legislative-Intervenors' own cases hold that the sword-and-shield doctrine "only prohibits a party from *simultaneously* using confidential information as both a shield and a sword." *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); Leg. Br. 16. When privilege is unsuccessfully invoked, nothing bars the party who attempted to assert the privilege from subsequently relying on the information they sought to protect. Defendants cannot compel discovery of information over which a privilege has been asserted, only to seek its exclusion because Defendants do not like what they found. It is telling that Defendants do not cite a single case in which the sword-and-shield doctrine was applied after an *unsuccessful* attempt to assert privilege. Defendants' unsupported arguments cannot support concluding that the district court abused its discretion in admitting Mr. McClanahan's testimony, and they fall far short of demonstrating "clear or obvious error," *United States v. Lara*, 23 F.4th 459, 477 (5th Cir. 2022).

Legislative-Intervenors' reference to the denial of their request to depose individual Louisiana NAACP members fares no better in supporting a sword-and-shield argument or establishing any error on the district court's part. The sword-and-shield doctrine is only relevant when *privilege* is used "as both a sword and a shield," not when, as here, the district court denies additional discovery for other reasons. *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999). In denying Defendants' request to depose "individual NAACP members," the district

court noted only that they would "not be called as witnesses." ROA.7206.[8]
This court's decision fell squarely in line with its ability to limit discovery
that is not "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1),
and that is "unreasonably cumulative or duplicative," particularly when
such information "can be obtained from some other source that is more
convenient, less burdensome, or less expensive," Fed. R. Civ. P.
26(b)(2)(C)(i).

"A trial court enjoys wide discretion in determining the scope and
effect of discovery, and it is therefore unusual to find an abuse of
discretion in discovery matters." *Cerda v. Blue Cube Operations*, 95 F.4th
996, 1004 (5th Cir. 2024) (citation omitted). The district court's wide
discretion certainly extends to denying a request to conduct ***nine***
cumulative third-party depositions that would have imposed
unwarranted burden and cost on Plaintiffs and Louisiana NAACP's
individual members, who were not themselves parties to the litigation.
*See, e.g.*, *Bell v. Fowler*, 99 F.3d 262, 271 (8th Cir. 1996) (no abuse of
discretion in denying depositions that would have been cumulative).

Defendants have identified no information they would have been
able to obtain through depositions of the individual members that they

---

[8] The district court's minutes nowhere indicate that it denied Defendants'
request to depose the members based on privilege, ROA.7206, and
granting Defendants' request to depose Louisiana NAACP's president
about the individual members' personal information is entirely
inconsistent with the notion that the district court's order was grounded
in privilege, ROA.7206, ROA.10951-10952.

could not get through Louisiana NAACP's president or other sources. Defendants were permitted to depose Louisiana NAACP's president twice. ROA.7206, ROA.10951. He testified that the individuals identified were Louisiana NAACP members and testified to their race and addresses. ROA.10946-10958. And the Secretary's own voter registration records—which Defendants plainly had a "practical way to vet," *contra* Leg. Br. 16—were used to confirm the identified members' zip codes and prove their legislative districts and registration status. ROA.10946-10970; ROA.26459-26474. Defendants' position—that it is necessary to *further* "vet" the facts relevant to a member's standing by deposing each individual member, even where those facts were ascertainable and admitted through other sources—suggests no organization could satisfy the third *Hunt* factor: that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *SFFA*, 600 U.S. at 199 (citation omitted). This conflict between Defendants' position and foundational associational-standing principles only further confirms that the district court neither committed plain error nor abused its broad discretion over discovery matters to disallow unreasonably cumulative and burdensome depositions of Louisiana NAACP's members.

### 3. BVM and Louisiana NAACP established organizational standing.

Because Plaintiffs established standing to seek all their requested relief through Individual Plaintiffs and NAACP members, this Court need not assess whether Organizational Plaintiffs have standing on their own behalf. *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

Nevertheless, the district court correctly found that BVM and Louisiana NAACP have organizational standing. An organization can show organizational standing on its own behalf by establishing that it devoted resources "toward mitigating [the] real-world impact" of the challenged conduct, and that doing so "consumed its time and resources in a way they would not have been spent absent the [challenged] law." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); ROA.7200-7205. Here, as the district court properly concluded, each organizational plaintiff's core activities were impaired by the enacted maps' dilutive effects. ROA.9134-9135 ("[I]n an effort to counteract the Enacted Maps' dilutive effect, the organizational Plaintiffs diverted resources from their core activities toward previously unplanned response strategies.").

Defendants misconstrue *FDA v. Alliance for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367 (2024), arguing that it negates the district court's

conclusion that Organizational Plaintiffs have established a cognizable injury in fact. Contrary to Defendants' suggestion, in *AHM*, the Supreme Court reaffirmed that *Havens* governs whether organizations have standing "to sue on their own behalf for injuries they have sustained," and reiterated that, when a defendant's actions have "directly affected and interfered with [the plaintiff organization's] core business activities," that is a cognizable injury. *Id.* at 393 (quoting *Havens*, 455 U.S. at 379 n.19), 395.

In *Havens*, an organization that provided housing-counseling services ("HOME") had standing to sue an apartment-complex owner engaged in "racial steering"—providing Black individuals with false information about the availability of rental units. 455 U.S. at 366-68, 378-79. HOME alleged "its efforts to assist equal access to housing through counseling and other referral services" had been frustrated because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379. The Court concluded that, if the "steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home-seekers," that "concrete and demonstrable injury to the organization's activities … with the consequent drain on the organization's resources" was a cognizable injury in fact and "more than simply a setback to the organization's abstract social interests." *Id.*

*AHM* applied the *Havens* standard and concluded that the organizational plaintiffs in *AHM* fell short of meeting it. The *AHM* plaintiffs failed to show that any defendant's action caused any impediment to their preexisting business activities; instead, they claimed only that that they chose to expend resources "engaging in public advocacy and public education" to "oppose [the defendant's] actions." 602 U.S. at 394-95. Consistent with *Havens*, the Court held that an organization that has not otherwise suffered a concrete injury cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. As Legislative-Intervenors argue, an organization "cannot manufacture its own standing in that way." *Id.*; Leg. Br. 20.

This case, in contrast, is squarely in line with *Havens*. Here, the enacted maps' dilutive effects directly interfere with Organizational Plaintiffs' preexisting activities. As in *Havens*, Organizational Plaintiffs here are not just "issue-advocacy organization[s]," *AHM*, 602 U.S. at 395; they provide voter engagement, registration, and education services. ROA.9552, ROA.9603-9604, ROA.9607-9608; *see also* ROA.7201, ROA.9134-9135.

In particular: BVM's core activities—expanding Black voter engagement and building capacity in partner organizations to increase power in Black communities, ROA.9603-9604, ROA.9613-9622—were impaired by Louisiana's enacted maps. Here, unlike in *AHM*, BVM

demonstrated that it was harmed by the real-world impact of the maps *after* they took effect. ROA.9612-9622. For example, instead of expending its limited resources on capacity building efforts, BVM launched a new accountability strategy to counteract the maps' dilutive effect and suppression of Black voters' power, by finding new ways to hold elected officials accountable to Black voters in districts where their electoral influence has been diluted. ROA.9616-9618. The dilutive maps have also deepened voter apathy, requiring BVM to devote even more staff time and resources toward engaging Black Louisianians and persuading them that their votes matter. ROA.9614, ROA.9618-9622. This included changing BVM's practice of expending resources on voter engagement close in time to *election day* to a "365"-day, year-round voter engagement approach, rather than concentrating its phone banking and canvassing efforts closer in time to each election. ROA.9619-9622. It was precisely these *post-enactment* harms, wrought by the enacted maps' dilutive effect, on which the district court relied. ROA.9134-9135, ROA.9214-9215.[9]

Louisiana NAACP made a similar showing about its efforts to mitigate the effects of the challenged maps after they were enacted.

---

[9] Defendants' reliance on evidence that BVM devoted resources to opposing the maps while the legislature was considering them thus does not amount to clear error. Leg. Br. 19-22. That was not the basis for the district court's finding on organizational standing. ROA.9215 n.12 (explaining "BVM is prevented from engaging in get-out-the-vote efforts and capacity building work with its partners in order to focus its resources on *its accountability strategy and 365 voter engagement delays*," both of which took place *after* the maps were enacted).

Following the maps' passage, Louisiana NAACP undertook additional organizing and mobilization efforts to counteract the disillusionment in Black communities created by uncompetitive and uncontested elections and the absence of candidates they believed in in the challenged areas of the map. Louisiana NAACP also devoted resources to fill the vacuum created by the enacted maps' detrimental effect on other organizations', candidates', and funders' willingness to invest resources in voter mobilization efforts in Black communities. ROA.9567-9570, ROA.9134.

Just as the provision of false information to renters required a housing-counseling services provider to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices," *Havens*, 455 U.S. at 379, the implementation of discriminatory maps requires providers of voter-engagement and voter-education services to devote significant resources towards overcoming the resulting dilution of their constituents' votes. And as the district court found, each concrete step Organizational Plaintiffs took to counteract Defendants' conduct directly impaired their ability to carry out their other activities and consumed their time and resources in ways they would not have been spent had the legislature adopted non-dilutive maps. *See OCA*, 867 F.3d at 612-13. Specifically, the court found that pouring BVM's efforts and resources into its accountability strategy and 365 voter engagement delayed and prevented BVM from engaging in get-out-the-vote efforts and capacity building work with its partners. ROA.9134, ROA.9214-

27

9215, ROA.9613-9622. Similarly, the court found that to combat the effects of the dilutive maps, Louisiana NAACP has had to pull people back from doing work on health, education, and other projects. ROA.9134-9135 & n.70, ROA.9215, ROA.9570.

Organizational Plaintiffs cannot avoid this resource drain without simply abandoning their preexisting mission to engage Black Louisianians in the political process. The challenged conduct thus directly interferes with their core activities, just as the district court found. ROA.9134-9135.

Finally, the enacted maps' dilutive effect on Organizational Plaintiffs' members and constituents also frustrates and fundamentally impairs their core missions to increase power in marginalized, predominantly Black communities, ROA.9135, ROA.9552, ROA.9567-9570, ROA.9603-9604, ROA.9618-9622, further reinforcing the organizations' standing. *See OCA*, 867 F.3d at 610-12; *Havens*, 455 U.S. at 379.

### 4. Section 2284 does not require a three-judge panel because Plaintiffs brought only statutory redistricting claims.

The district court correctly concluded that Section 2284 does not require a three-judge panel, because Plaintiffs brought only a statutory claim under Section 2 of the VRA. Section 2284(a) provides that a "district court of three judges shall be convened" when "an action is filed challenging the constitutionality of the apportionment of congressional

districts or the apportionment of any statewide legislative body." 28
U.S.C. §2284(a). While Section 2284 requires plaintiffs challenging the
apportionment of a statewide legislative body under *constitutional* claims
to request a three-judge court, the rule's plain text does not extend to
*statutory* challenges to redistricting maps. *Id.*; *see also Thomas v. Reeves*,
961 F.3d 800, 802 (5th Cir. 2020) (Costa, J., concurring) ("It doesn't take
30 pages to figure out what [§2284] says. A person on the street would
read it as requiring a three-judge court only for constitutional
challenges.").

The clear statutory text should be the start and the end of this
discussion—particularly because "congressional enactments providing
for the convening of three-judge courts must be strictly construed." *Allen
v. State Bd. of Elections*, 393 U.S. 544, 561 (1969). The "three-judge-court
procedure is not 'a measure of broad social policy to be construed with
great liberality,'" *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90,
98 (1974) (quoting *Phillips v. United States*, 312 U.S. 246, 251 (1941)).

Consistent with this mandate, federal courts have declined to
construe Section 2284 more broadly than its plain text permits.[10] *See,
e.g.*, *Rural W. Tenn. Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835,
838 (6th Cir. 2000) (noting reassignment of case to single judge after

---

[10] Circuit courts also regularly consider appeals from single judges in
statutory challenges to statewide plans. *See, e.g., Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006); *Old Pers. v. Brown*, 312 F.3d 1036 (9th Cir.
2002); *Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996).

dismissal of constitutional and Section 5 claims); *Bone Shirt v. Hazeltine*, 336 F.Supp.2d 976, 980 (D.S.D. 2004) (noting the same situation as *Rural West*); *Singleton v. Merrill*, No. 2:21-cv-01530-AMM, 2021 WL 5979497, at *3 (N.D. Ala. Nov. 23, 2021) (three-judge court declining to consolidate statutory challenge to congressional maps with multiple constitutional challenges); *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337-SCJ, 2022 WL 20690354, at *10 (N.D. Ga. Jan. 28, 2022) ("Section 2284(a) does not require or authorize a three-judge court to hear this purely statutory challenge to the apportionment of a statewide legislative body."); *Chestnut v. Merrill*, 356 F.Supp.3d 1351, 1357 (N.D. Ala. 2019) (same); *see also* Order, *Stone v. Allen*, No. 2:21-cv-01531 (N.D. Ala. Dec. 7, 2023), ECF No. 127 (dissolving, *sua sponte*, a three-judge court once plaintiffs dropped constitutional claim).   Similarly, purely statutory challenges do not require a three-judge court simply because defendants raised constitutional defenses in *response* to plaintiffs' solely statutory claims. *See Johnson v. Ardoin*, No. 18-cv-625-SDD-EWD, 2019 WL 2329319, at *1-3 (M.D. La. May 31, 2019); Order, *Robinson v. Ardoin*, No. 3:22-cv-00211 (M.D. La. May 3, 2022), ECF No. 137.

The district court correctly concluded that "no binding authority" from this Court supports Defendants' "strained interpretation of §2284," ROA.6914, and it did not err in interpreting the statutory text and available precedent.

## II.    The District Court Did Not Clearly Err in Concluding Plaintiffs Proved All Three *Gingles* Preconditions.

The district court's detailed factual findings that Louisiana violated Section 2 are subject to clear error review. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023) ("*Robinson III*"). This Court must "affirm the [trial] court's finding so long as it is 'plausible,'" even if another finding is "equally or more" plausible. *Cooper v. Harris*, 581 U.S. 285, 293, 309 (2017). This Court must also "give singular deference to a trial court's judgments about the credibility of witnesses." *Id.* at 309 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)); *see also* Fed. R. Civ. P. 52(a)(6). This deference is necessary because the "various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record." *Cooper*, 581 U.S. at 309 (quoting *Anderson*, 470 U.S. at 575). District courts similarly "enjoy wide latitude in determining the admissibility of expert testimony, and 'the discretion of the trial judge and his or her decision will not be disturbed on appeal unless 'manifestly erroneous.'" *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (citation omitted).

While legal conclusions are subject to *de novo* review, *Gingles*, 478 U.S. at 78, here, the district court faithfully and correctly applied *Milligan*, wherein the Court recently rejected nearly identical arguments to Louisiana's here and declined to alter the Section 2 standard. 599 U.S.

at 30; *see also Robinson III*, 86 F.4th at 593 (rejecting similar arguments post-*Milligan*).

## B. *Gingles* I

### 1. The district court applied the correct legal standard in finding Plaintiffs satisfied *Gingles* I.

The first *Gingles* precondition "focuse[s] on geographical compactness and numerosity" and "is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). As the district court correctly recognized, this inquiry "does not require a showing that a group is overwhelmingly populating a district, but merely that a minority group is greater than 50 percent of a district's population." ROA.9143 (citing *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009)). *Gingles* I is satisfied by showing that "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.*

In an attempt to dress up a complaint about the district court's factual findings as legal error, Defendants contend that Plaintiffs and the district court "misunderstood the legal standards" for compactness. ECF No. 193 [hereinafter "SOS Br."] at 21. There is no dispute about the relevant legal standard, however. All agree that the *Gingles* I compactness inquiry focuses on "the compactness of the minority population, not the compactness of the contested district." *LULAC v.*

*Perry*, 548 U.S. 399, 433 (2006) (citations omitted). The question Defendants' argument actually raises is whether the district court clearly erred in its finding that Plaintiffs satisfied that standard and in its weighing of Defendants' expert evidence.

Put differently, the question is: how do plaintiffs prove (and courts assess) the compactness of the minority population? And the answer, as every case since *Gingles* has reaffirmed and as Plaintiffs did here, is by offering an illustrative map that contains more than the existing number of reasonably configured majority-Black districts. If a mapdrawer cannot craft a reasonably configured district in which a majority of the voting-age population is Black, then that Black population is not sufficiently compact for purposes of *Gingles* I. *See, e.g.*, *Milligan*, 599 U.S. 18, 19-21; *Robinson III*, 86 F.4th at 590.

The standards for determining a whether a district is reasonably configured—and whether, therefore, the minority population it contains is geographically compact—are similarly well recognized and were correctly applied by the district court: "A district will be reasonably configured … if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Milligan*, 599 U.S. 18, 20 (collecting cases).

Under this framework, courts have routinely determined that a minority population is sufficiently compact by seeing if it can be drawn

into a district that balances various factors: among them, contiguity; adherence to existing boundary lines; lack of tentacles, appendages, bizarre shapes, or any other obvious irregularities; and compactness as assessed under commonly accepted mathematical measures such as Reock and Polsby-Popper. *E.g.*, *id.* at 19-20; *Singleton*, 582 F.Supp.3d at 979 (*Milligan* three-judge court relying on similar analysis as the district court here). This Court has also instructed that "maintaining communities of interest" should also be considered in assessing whether a minority population is sufficiently compact. *Robinson III*, 86 F.4th at 590. *See* ROA.9143, ROA9154-9168 (assessing each of these factors).

Legislative-Intervenors invoke *LULAC* for the proposition that *Gingles* is not satisfied by illustrative districts that draw different minority communities together when the distance between them exceeds some unspecified threshold, or when there is a predominantly white community interspersed between them. Leg. Br. 33-34 (citing *LULAC*, 548 U.S. at 433). *LULAC* does no such thing: the Court "accept[ed] that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *Id.* at 435. This Court has since confirmed that reasonably configured districts containing more than a single Black community are considered compact as long as those Black populations vote cohesively and share interests. *Robinson III*, 86 F.4th at 592 ("urban and rural

communities can reasonably be configured into a compact district if they share similar interests"); *see also Milligan*, 599 U.S. at 21; *cf. Abbott v. Perez*, 585 U.S. 579, 615-16 (2018) (Section 2 case upholding district that joins parts of San Antonio and Austin based on cohesive voting patterns).

Nor does this Court's decision in *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004), change the requisite *Gingles* I showing. SOS Br. 31-32; Leg. Br. 33-34. To be sure, *Sensley* noted that the non-compact district at issue contained "two areas of highly-concentrated African-American population, which are roughly 15 miles apart from one another." 385 F.3d at 597. But this Court's compactness analysis centered the same traditional criteria as each of the other cases discussed *supra*— specifically, the fact that those two areas were "linked together by a narrow corridor of land" into one "irregularly-drawn" district with an "extended and distorted shape" that "ignore[d] traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.*; *see also id.* at 598 (describing the "shape of the proposed districts" and the failure to consider "traditional districting principles" as the factors suggesting the Black population is "insufficiently compact to support three majority-minority electoral districts").

In sum, the district court understood the *Gingles* I compactness standard and applied it correctly, ultimately finding that Plaintiffs demonstrated the Black population in Louisiana is sufficiently large and compact to form a voting majority in nine additional reasonably

configured districts: three in the Senate, and six in the House. ROA.9144-9145. In making this finding, the district court relied on the same evidence recently countenanced by both this Court and the Supreme Court. This was not error.

### 2. The district court did not clearly err in finding based on an extensive trial record and credibility determinations that Plaintiffs satisfied *Gingles* I.

Having listened to the live testimony and sifted through the substantial trial evidence, the district court concluded that Plaintiffs satisfied *Gingles* I based on ample factual findings about Louisiana's population shifts in certain areas of the state; the numerosity of the Black population in those areas; and expert testimony showing that Plaintiffs' illustrative districts are reasonably configured, including evidence of their mathematical compactness, contiguity, adherence to boundary lines, preservation of communities of interest, and unpacking and uncracking of areas in the enacted maps. ROA.9142-9183, ROA.9215-9223. The district court's factual findings and credibility determinations were supported by the evidence and were not clear error. ROA.9154-9165, ROA.9181-9183, ROA.9220-9223.

In assessing Plaintiffs' compliance with *Gingles* I, the district court relied heavily on Plaintiffs' expert, Mr. Cooper, who developed illustrative maps to assess whether a sufficiently large and geographically compact Black population exists to support additional

majority-Black House and Senate districts in Louisiana. ROA.9761; *see Milligan*, 599 U.S. at 18. The district court found that Mr. Cooper was undisputedly an expert in "demographics, census data, and redistricting": he "has testified in approximately 55 cases at trial and 55 cases through deposition and declaration," ROA.9144, including as an expert witness in *Milligan*, wherein the Supreme Court credited the district court findings that Mr. Cooper is "'highly credible' and commended Cooper for 'work[ing] hard to give equal weight[]' to all traditional redistricting criteria." *Milligan*, 599 U.S. at 31. Here, too, the district court credited Mr. Cooper's methodology, which was consistent with these prior cases, as sound. ROA.9145.

In addition, the district court credited Mr. Cooper's testimony about Louisiana's population statistics and shifts since the 2000 Census. ROA.9146. In analyzing the relevant Census data, Mr. Cooper studied Louisiana's large metropolitan areas (as organized by Metropolitan Statistical Areas, or "MSAs") and determined that "in six of the nine MSAs in the state, the White population decreased [and] the total Non-Hispanic White population decreased by over 200,000 between 2000 to 2020," while "in eight of the nine MSAs, the Black population increased." ROA.9146, ROA.15816.

The district court also credited Mr. Cooper's determination that those population statistics and his illustrative maps demonstrated that the Black population in the Shreveport, Orleans, Baton Rouge, and Lake

Charles MSAs was sufficiently numerous to support three additional majority-Black Senate districts and six majority-Black House districts in those areas. ROA.9148-9154, ROA.9180-9183, ROA.10009-10010, ROA.15817-15818.

The district court next analyzed those illustrative maps in detail, making further factual findings about their adherence to traditional redistricting principles. The court found the illustrative districts were contiguous and their shapes were reasonable, crediting Mr. Cooper's demonstration of their respect for geographic features (*e.g.*, waterways) and traditional boundaries (*e.g.*, VTDs and parish lines). ROA.9155, ROA.9180-9183, ROA.15843-15844, ROA.15856-15857. The district court specifically rejected Defendants' assertions that Mr. Cooper's districts were oddly shaped, finding that "while some illustrative districts may appear 'odd shaped,' these shapes result from 'following the Mississippi River or following a municipal boundary.'" ROA.9155 (quoting ROA.10004).

The district court found that both visual inspections and district-by-district mathematical compactness measures indicated the illustrative districts were reasonably compact. ROA.9163-9164. ROA.9180-9183, ROA.10000-10005, ROA.10009-10018, ROA.15839-15844, ROA.15854, ROA.15856-15857, ROA.16408-16411. The district court also found that Mr. Cooper employed "the most routinely used

tests" (Polsby-Popper and Reock, ROA.9164[11]) for mathematical compactness and credited his conclusions that Plaintiffs' illustrative districts were similarly compact or more compact than the districts in Louisiana's enacted maps. ROA.9163-9164, ROA.9180-9183, ROA.10000-10005, ROA.10009-10018, *see also* ROA.15839-15844, ROA.15854-15857, ROA.16408-16411.

The district court also made findings about the Black populations within the illustrative districts. The court found that districts within Plaintiffs' illustrative map unpacked and uncracked Black populations that were unnecessarily concentrated or fragmented in districts in the enacted maps. ROA.9149-9153, ROA.9180-9183. And the district court found that communities of interest exist across Plaintiffs' illustrative districts. ROA.9156-9183. The court credited the testimony of Dr. Colten, an expert in Louisiana's historical geography, about the common thread that binds Black voters who reside in illustrative districts. ROA.9156-9163. The court relied on Dr. Colten's analysis of evidence of the longstanding historical and cultural connections between specific communities of interest that are respected by the illustrative plans, including: Black residents of Shreveport whose communities were shaped by shared experiences of racial violence and white flight; communities that extend outward in either direction from the Red River with

---

[11] *See also Cooper*, 581 U.S. at 311 (discussing Reock scores)*; Robinson II*, 37 F.4th at 218 (discussing Reock and Polsby-Popper scores).

historically shared economic pursuits; communities with distinctive historical and cultural identities in Natchitoches and the Cane River colony; Acadiana residents with shared historical economic development dominated by sugar cane cultivation; Black Jefferson Parish residents with shared working-class industrial economic pursuits and exposure to negative environmental externalities; the community upstream from Orleans Parish that resides in the site of the 1811 Slave Insurrection and brutal response; and suburban communities that have formed around the city of Baton Rouge. ROA.9157-9163, ROA.9220-9221.

The Court credited Dr. Colten's findings as "well supported by his research," and found that these longstanding communities were preserved in Plaintiffs' illustrative districts, including within illustrative-HD 1, 2, 23, 61, 65, 68, 69, and 101, and illustrative-SD 2, 17, 19, and 38. ROA.9157-9163, ROA.9660-9705, ROA.19833-19862, ROA.19876-19881. The district court also recognized that Mr. Cooper received feedback on his maps, through counsel, on Dr. Colten's considerations of communities of interest. ROA.9165; *see also* ROA.9993-9994, ROA.16398. The district court did not err in finding Mr. Cooper's and Dr. Colten's testimony on communities of interest credible and crediting their testimony. ROA.9156-9163.

Finally, the court found that the illustrative districts comply with Louisiana's Joint Rule 21, which "codifies traditional redistricting criteria" to be considered by the Louisiana legislature in redistricting.

ROA.9143. These include requirements that districts are substantially equal in population and that, to the extent practicable, precincts, municipalities, and boundaries are kept whole. ROA.9165, ROA.9171, ROA.9180-9183, ROA.9221, ROA.10010-10011.

In an attempt to unsettle these comprehensive findings, Defendants argue that the district court erred in giving little weight to Mr. Trende's contrary opinion and in finding his novel use of the moment of inertia to assess compactness "to be fundamentally flawed and completely useless in evaluating *Gingles* I compactness." ROA.9166. The district court's according little weight to Mr. Trende's testimony was well-supported and does not render its *Gingles* I findings clearly erroneous.

Defendants offered Mr. Trende as an expert witness to rebut Mr. Cooper's findings that his illustrative map satisfied *Gingles* I's compactness requirement. Mr. Trende did not dispute any of Mr. Cooper's visual assessments or mathematical measures of compactness, nor did he offer any basis to dispute the district court's extensive findings that the illustrative districts respected longstanding communities of interest and respected other traditional redistricting principles. Instead, Mr. Trende used two algorithms "to identify compact population clusters" and purported to find "the most compact Black population" within each of Mr. Cooper's illustrative districts. *See* ROA.11635-11636.

The district correctly rejected Mr. Trende's methodology as flawed and unreliable. First, the court found that—as Mr. Trende conceded—his

"moment of inertia" algorithm had never been used in a Section 2 case or even employed in Mr. Trende's own research, despite the necessary technology being in existence for 20 years, ROA.9166, ROA.10320, and his "areal" methodology was "untested, not peer reviewed, and never before used," ROA.9167-9168.

Second, the district court determined that Mr. Trende's "granular analysis of the distribution of minority populations within an illustrative district to the exclusion of other criteria and priorities" was inconsistent with governing case law, ROA.9167, which establishes that "traditional districting principles like maintaining communities of interest and traditional boundaries should be considered" in assessing compactness. *Robinson III*, 86 F.4th at 590; *supra* Argument.II.A.1. The court found Mr. Trende's analysis failed to contend with traditional redistricting criteria in evaluating Mr. Cooper's illustrative plans—ignoring "communities of interest and traditional boundaries" and, "[m]ost glaringly," "the legislature's mandate of equal populations among districts." ROA.9166. Mr. Trende admitted to these holes in his methodology: he conceded both that neither of his two algorithms took into consideration traditional redistricting criteria and that he had drastically modified one of the algorithms by *removing* controls that would require the creation of whole districts and respect for traditional redistricting criteria such as one-person-one vote, contiguity, and

compactness. ROA.10313-10316. Mr. Trende had no idea what effect considering these criteria would have on his analysis. ROA.10310-10311.

Accordingly, the district court correctly found that Mr. Trende's analysis failed to rebut Plaintiffs' compactness evidence establishing their illustrative districts are reasonably configured. Mr. Trende's untested approach wrote out the bedrock criteria that Joint Rule 21 and Section 2 precedent demand that *Gingles* I experts consider in drawing their maps. *See supra* Argument.II.A.1; ROA.10309-10310. The district court did not err in declining to follow Mr. Trende down his uncharted path, and rightly determined that "[t]he drawing of a VRA compliant map balances multiple criteria and is considerably more complicated and nuanced than suggested by the oversimplistic and unhelpful compactness measure advanced by Trende." ROA.9166.

### 3. The district court's findings that race did not predominate in the illustrative maps were substantially supported by the trial record and were not clearly erroneous.

The district court correctly found by "a preponderance of the evidence that race did not predominate in the configuration of the Illustrative Plan." ROA.9180. *Milligan* reaffirms that it is permissible to consider race when developing illustrative maps to satisfy the first *Gingles* precondition. 599 U.S. at 24 (rejecting argument that "the illustrative plan that plaintiffs adduce for the first *Gingles* precondition cannot have been 'based' on race"). Indeed, "[t]he very reason a plaintiff

adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." *Id.* at 34 n.7; *see also id.* at 41 ("[T]his Court and the lower federal courts ... have authorized race-based redistricting as a remedy for state districting maps that violate §2."). For this reason, this Court has "rejected the proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose." *Robinson II*, 37 F.4th at 223. In line with this precedent, the district court correctly acknowledged that Section 2 claims are distinct from Fourteenth Amendment claims. ROA.9176, 9179-9180.

In this case, the district court found that Mr. Cooper had not crossed the line from awareness of race to racial predominance. Just as he did in *Milligan*, Mr. Cooper testified that he was aware of race when drawing illustrative districts, but that he did not maximize or prioritize race in his map-drawing process. ROA.10000-01, 10010-18; *see also* ROA.15839-40. As the district court's intensive factual findings make clear, Mr. Cooper drew new majority-Black districts while adhering to and balancing traditional nonracial redistricting criteria. *Supra* Argument.II.A.2. Moreover, Mr. Cooper followed Louisiana's own criteria for drawing maps—Joint Rule 21—such that his map could have been passed by the Louisiana legislature. *Id.* And as Dr. Colten testified and the district court found, the illustrative maps respect communities of interest. *Id.* The court's factual findings—including findings that

geographical features and boundary lines account for the few unusual district shapes and that the districts keep together communities of interest that are divided in the enacted plan—mirror findings in other cases in which courts have rejected race-predominance arguments. *Compare, e.g.*, ROA.9168-ROA.9183, *with Law. v. Dep't of Just.*, 521 U.S. 567, 580-81 (1997) (no race predominance where seemingly oddly shaped districts had merely accounted for geography and a body of water); *Miller v. Johnson*, 515 U.S. 900, 920 (1995) (map drawer is "free to recognize communities that have a particular racial makeup" so long as they share "some common thread of relevant interests"). The district court's findings in this case are well-supported by the record and are not clearly erroneous.

In contesting the district court's findings, Defendants rehash their failed effort to import the Fourteenth Amendment's racial gerrymandering standard into Section 2 cases. SOS Br. 18-19; Leg. Br. 36. In determining that Plaintiffs satisfied the first *Gingles* precondition, the district court declined Defendants' invitation to change the *Gingles* I standard, just as this Court has repeatedly foreclosed that effort in decades-old and brand-new cases. *See Clark v. Calhoun Cnty.,* 88 F.3d 1393, 1406-07 (5th Cir. 1996) (holding that "the first *Gingles* factor is an inquiry into causation that necessarily classifies voters by their race"); *Robinson III*, 86 F.4th at 592-95 (rejecting State's attempt "to equate an Equal Protection racial gerrymandering claim to its [Section 2] claim to

overcome the racial awareness that *Gingles* allows," and reaffirming that "racial consciousness as a factor in the drawing of illustrative maps does not … defeat a Section 2 *Gingles* claim" where race was "properly considered").

Defendants next argue that the district court erred in excluding portions of their *Gingles* I experts' testimony on the issue of racial predominance. But in excluding proposed testimony from both Dr. Johnson and Dr. Barber on Mr. Cooper's subjective intent in drawing specific lines in his illustrative maps, the district court correctly determined that Defendants' experts made fundamental methodological errors such that their opinions were not reliable or credible. In ruling on Plaintiffs' *Daubert* motion, the district court excluded testimony as to Dr. Johnson's "subjective beliefs or opinions of Mr. Cooper's motives when drawing the illustrative maps," concluding Dr. Johnson was "simply unqualified to opine on Cooper's subjective intent." ROA.6905-6906. The district court correctly determined that Rule 702 precludes Dr. Johnson's speculative and conclusory assertions about Mr. Cooper's subjective motivations. *See Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory. [W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). Indeed, the district court was not alone in discrediting Dr. Johnson's testimony on this basis: Courts have repeatedly rejected Dr. Johnson's opinions, and

he did nothing in this case to assuage concerns about his methodology and conclusions concerning the intent of other mapdrawers.[12] In fact, Defendants could not identify a single court that had accepted Dr. Johnson's racial predominance analysis.

The court excluded Dr. Barber's testimony concerning Mr. Cooper's intent for similar reasons. ROA.10473. Although the Secretary now complains that Dr. Barber was not permitted to "opine on Cooper's subjective intent," SOS Br. 45, in proffering Dr. Barber as an expert, the Secretary expressly disclaimed that he was qualified to offer or would be offering testimony concerning Mr. Cooper's subjective intent in creating his maps. ROA.10473 ("Your honor, it's not our intention to have Dr. Barber testify to Mr. Cooper's subjective intent."); ROA.10477-ROA.10478 ("[Dr. Barber]'s not qualified to say what Mr. Cooper was thinking"). Accordingly, the district court appropriately sustained objections that called for Dr. Barber's opinions concerning Mr. Cooper's

---

[12] *E.g.*, ROA.5385, ROA.5227 (collecting cases that called Dr. Johnson's expert testimony "unreliable and not persuasive," and his analysis or methodology as "unsuitable," "troubling," "lack[ing] merit" or "inappropriate," and rejecting Dr. Johnson's "alternative explanations" for district configuration as "purely speculative"); *compare* ROA.5546-5548 (M.D.N.C. court rejecting Dr. Johnson's race predominance analysis as "unreliable and not persuasive" because it lacked any empirical basis or controlled statistical analysis), with ROA.5039 (Dr. Johnson admitting that, in this case, he had not "provide[d] any empirical basis for comparing the BVAPs in these districts from a statistical perspective" or "offered any controlled statistical analysis ruling out nondiscriminatory explanations for the BVAP percentages," and resorting to the conclusory assertion that "[i]t just doesn't happen").

intent in drawing specific district lines and limited his testimony to whether those lines comported with traditional redistricting principles. *E.g.*, ROA.10645 (sustaining objection to question asking Dr. Barber's opinion on whether Mr. Cooper "had prioritized traditional redistricting principles").

Even if Dr. Johnson and Dr. Barber had the relevant expertise to support the testimony Defendants proffered on the ultimate issue of whether race predominated in Mr. Cooper's maps (and they did not), the district court was well within its discretion in excluding such opinions. Though an expert's "opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact ... such an opinion may be excluded if it is not helpful to the trier of fact under Rule 702." *Kopf v. Skyrm*, 993 F.2d 374, 377–78 (4th Cir. 1993) (cleaned up).

The Secretary contends that in excluding this opinion testimony on Mr. Cooper's intent, the district court excluded "evidence of racial predominance." SOS Br. 45. That is false. The district court admitted *evidence* of racial predominance in the form of Dr. Johnson's and Dr. Barber's opinions on how well the illustrative plans adhered to traditional redistricting principles, ROA.6906,[13] and how closely district lines tracked certain precinct boundaries with high Black voting-age

---

[13] *See also* ROA.11252-11260 (redacting Dr. Johnson's assertions about Mr. Cooper's subjective motivations and otherwise admitting his opinions about illustrative districts' compliance with traditional redistricting principles).

populations ("BVAP"). ROA.10665-10667. What the court excluded was the experts' opinions on which inferences to draw from that evidence: namely, whether the evidence supported the conclusion that race predominated in the illustrative plans. *E.g.*, ROA.6905-6906, ROA.10476.

The Secretary, misleadingly citing this Court's decision in *United States v. Barnes*, 979 F.3d 283 (5th Cir. 2020), contends that their experts should have been permitted to draw inferences concerning Mr. Cooper's intent from the circumstantial evidence. SOS Br. 44, 46. But *Barnes* simply held that circumstantial evidence was admissible to prove intent. The case did not involve expert testimony concerning the inferences to be drawn from that evidence. *Barnes* simply stands for the uncontroversial proposition that a *court* may properly draw inferences concerning intent based solely on circumstantial evidence. That the district court in this case declined to draw the inference Defendants urged from Dr. Barber's and Dr. Johnson's testimony is neither an evidentiary error nor an abuse of discretion.

Defendants next argue that the district court gave too little weight to the circumstantial evidence their experts were permitted to offer. *See* SOS Br. 18-19, 43-46. But the district court appropriately considered that evidence and found nearly all of it was marginally relevant. ROA.9173-9179. For example, the district court considered district court considered Dr. Johnson's testimony that it was unlikely for Mr. Cooper to have

created illustrative districts slightly above 50% BVAP "by chance." ROA.10385, ROA.9178 (citing ROA.10385). Likewise, the district court considered Dr. Barber simulations, his opinion that race-neutral criteria alone did not explain the illustrative map's boundaries, and his opinion that Mr. Cooper's maps included more majority-Black districts than maps that he purported would be produced by a map-drawer who did not consider race at all. ROA.11462, ROA.11501, ROA.9174 (citing ROA.11462, ROA.11501). The district court found that such expert testimony about whether Mr. Cooper intended to create illustrative districts that were majority-Black—as *Gingles* requires, *Bartlett*, 556 U.S. at 19-20—failed to establish that race improperly predominated in Mr. Cooper's plans. ROA.9173-9179. Because "the question whether additional majority-minority districts can be drawn ... involves a 'quintessentially race-conscious calculus,'" ROA.9175 (quoting *Milligan,* 599 U.S. at 30-31 (citing *De Grandy*, 512 U.S. at 1020)); *Milligan*, 599 U.S. at 34 n.7, 41, the district court correctly found that Defendants' showing that race was a factor in the illustrative maps failed to overcome Plaintiffs' evidence that race was only one factor among many that Mr. Cooper considered.

Finally, Dr. Johnson's opinion that Mr. Cooper's illustrative districts did not comport with traditional redistricting principles—grounded in his assertion that the only "visible" feature that the districts followed in the figures provided in Dr. Johnson's report was race

(ROA.11252; SOS Br. 44)—fell apart when Dr. Johnson admitted he repeatedly omitted key visible features from his figures that are consistent with Mr. Cooper's maps. The omitted features included (but were not limited to[14]) precinct lines, which Dr. Johnson admitted *did line up with* Mr. Cooper's plans. ROA.9177, ROA.10419-10421. *See In re Lipitor Litig.*, 174 F.Supp.3d 911, 932 (D.S.C. 2016) (collecting cases holding methodology is "not reliable or scientifically sound" if it "fail[s] to adequately account for contrary evidence").

At bottom: The district court did not clearly err in finding—based on Plaintiffs' credited evidence and the court's determination that defendants' *Gingles* I expert testimony merited little weight—that Mr. Cooper appropriately considered race without allowing it to predominate in creating his illustrative maps.

## C. *Gingles* II & III

### 1. The district court applied the correct legal standard in finding Plaintiffs satisfied *Gingles* II and III.

The district court applied the correct legal standards in analyzing *Gingles* II and III, which address whether voting is racially polarized. *See Gingles*, 478 U.S. at 52-56; *Milligan*, 599 U.S. at 18-19. The second *Gingles* precondition requires that "the minority group [] be able to show that it is politically cohesive," *Gingles*, 478 U.S. at 51, such that "a

---

[14] Other examples abound. ROA.9064-9065 (collecting examples).

representative of its choice would in fact be elected," *Milligan*, 599 U.S. at 18-19. The third *Gingles* precondition requires that "the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate," such that "the challenged districting thwarts a distinctive minority vote." *Id.*[6] The district court faithfully applied these standards. *See* ROA.9183, ROA.9195-9196.

In addressing whether the third *Gingles* precondition was satisfied, the Secretary regurgitates an argument about the legal standard that this Court has already decisively rejected: that Plaintiffs were required to provide a "threshold level of BVAP required for when the district provides an opportunity for Black voters to elect their candidate of choice." SOS Br. 48. As this Court has already concluded, this argument improperly conflates the *Gingles* III analysis with the population threshold established in *Bartlett* as part of the *Gingles* I analysis. *Robinson III*, 86 F.4th at 597 ("*Bartlett* established the 50 percent BVAP threshold for the first *Gingles* precondition, but it did not change the third precondition analysis."); *Bartlett,* 556 U.S. at 6, 12, 16. Moreover, the threshold-BVAP-level argument that the Secretary presses would require engaging with hypothetical illustrative districts, which is not relevant to the *Gingles* III analysis. "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature." *Robinson III*, 86 F.4th at 596 (citing *Robinson II*, 37

F.4th at 226). Thus, the proper question is: "[i]f the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated'?" *Robinson II*, 37 F.4th at 224 (citing *Covington v. North Carolina*, 316 F.R.D. 117, 168-69 (M.D.N.C. 2016)). The district court correctly rejected the hypothetical framework Defendants proposed and applied this Court's precedent in focusing on whether Black voters' preferred candidate would usually be defeated in the challenged plan itself. ROA.9191-9193.

The Secretary next argues that a "functional analysis of electoral behavior within a particular election district" is required to establish the *Gingles* III precondition. SOS Br. 47 (emphasis added). As an initial matter, this "functional analysis" directive originates from the Justice Department's guidance concerning redistricting under Section 5, not Section 2. *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 194 (2017) (quoting Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7471 (2011)). In any event, that guidance explains that a "functional analysis" should look not only to Census data, but to "election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information"—which the analysis provided by Plaintiffs' expert, Dr. Handley, did. ROA.15713-15716.

Likewise, Dr. Handley's analysis resembles the "district effectiveness analysis" credited in Covington (and touted by the Secretary as "the correct analysis," SOS Br. 47). In *Covington*, the court credited an "district effectiveness analysis" from Dr. Alan Lichtman, 316 F.R.D. at 168-69 & n.46, which used "actual results of elections" from past elections to calculate a "win rate" for Black-preferred candidates in districts with less than 50% BVAP, ROA.6833. So, too, here: among other things, Dr. Handley used the recompiled results of actual elections to calculate win rates for Black-preferred candidates in various districts with less than 50% BVAP, ROA.15720-15740, and concluded that, with one exception, Black voters were not successful in electing their candidates of choice in any districts with BVAPs under 50%. ROA.9187 (citing ROA.9808). The district court appropriately credited that analysis. ROA.9186 (citing ROA.15724), ROA.9195. Defendants' attempts to misconstrue the relevant evidentiary requirement should be rejected.

### 2. The district court's *Gingles* II and III findings were supported by the record and were not clearly erroneous.

After weighing the live testimony and record evidence, the district court made factual findings that "voting in Louisiana breaks down along racial lines," "Black voters are highly cohesive in their support of their preferred candidates," and "White voters consistently bloc vote against the Black-preferred candidates in the seven areas of interest, which

include the proposed new minority-majority districts in the Illustrative House and Senate Plans." ROA.9222. The court also made factual findings that "blocs of White voters have been successful in consistently defeating Black-preferred candidates," and conversely, that there is "no reliable basis upon which it can be concluded that a Black-preferred candidate will consistently prevail in election districts that are less than 50 percent BVAP." ROA.9222-9223. Finally, the district court found that "[d]istricts with a majority BVAP provide a realistic opportunity for Black voters to elect the candidate of their choice." ROA.9222.

The record supported each of these findings. In particular, the district court relied on the testimony of Dr. Handley, who performed localized, "district-specific analyses" of voting patterns by race to determine whether voting in Louisiana is racially polarized. ROA.9184; *see also Gingles*, 478 U.S. 30, 59 n.28 (describing vote-dilution inquiry as "district specific"). Dr. Handley conducted her analyses in the seven different areas of the state where Plaintiffs' vote dilution claims were focused (referred to as the "areas of interest"). ROA.9183-9184. These seven areas of interest included parishes that overlap geographically with the challenged districts in the enacted maps and the new proposed majority-Black districts in Mr. Cooper's illustrative maps. ROA.15715-15717; ROA.9183-9184.

As the district court recognized, Dr. Handley "employed three separate localized analyses of voting patterns in the seven areas of

Louisiana where Mr. Cooper's Illustrative House and Senate Plans create more majority BVAP districts than the Enacted House and Senate Maps." ROA.9183.

First, Dr. Handley used ecological inference ("EI")[15] to analyze 21 recent elections in state legislative districts overlapping these seven areas of interest. ROA.9186 n.352; ROA.15719, ROA.15770-15773 (analyzing 11 state senate elections and ten state house elections ranging from 2015 through 2022). No party disputes that courts have routinely held that "elections involving the particular office at issue"—often called 'endogenous' elections—"will be more relevant than elections involving other offices." *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993). *See* SOS Br. 16 (citing same case).[16] Contrary to the Secretary's

---

[15] Courts routinely rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate, *see, e.g.*, *Gingles*, 478 U.S. at 52-54; *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 500-03 (5th Cir. 1987), and courts have recognized EI as an appropriate analysis for determining whether a plaintiff has satisfied *Gingles* II and III, *see, e.g.*, *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F.Supp.3d 1222, 1305-07 (N.D. Ga. 2022); *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 691 (S.D. Tex. 2017); *Bone Shirt*, 336 F.Supp.2d at 1003; *see also United States v. Vill. of Port Chester*, 704 F.Supp.2d 411, 427, 441 (S.D.N.Y. 2010) (noting that "[t]he methods employed by Dr. Handley" including EI analysis "have been accepted by numerous courts in voting rights cases").

[16] *See also, e.g.*, *Clark*, 88 F.3d at 1397 ("elections involving the specific office that is subject of the litigation" are more probative); *Ala. State Conf. of the NAACP v. Alabama*, 612 F.Supp.3d 1232, 1273 (M.D. Ala. 2020) (in "hierarchy of probative elections for proving minority cohesion and white bloc voting, the Eleventh Circuit has favored ... endogenous elections— contests for the particular office that is at issue"); *Mo. State Conf. of the NAACP v. Ferguson-Florissant School Dist.*, 201 F.Supp.3d 1006, 1040

assertions, however, this first analysis did examine endogenous elections: these 21 elections were for state legislators, which is the office at issue. The Secretary's assertion that the 2023 legislative elections were "the only endogenous elections available" (SOS Br. 7) ignores the many elections Dr. Handley was able to examine for the office of state legislature, ROA.9186, and the district court's adoption of Dr. Handley's conclusion that these other recent state legislative elections established that "[r]acially polarized voting substantially impedes the ability of Black voters to elect candidates of their choice to the Louisiana state legislature in these areas unless districts are drawn to provide Black voters with this opportunity." ROA.9186 (cleaned up), 9195; *see also* ROA.15741; ROA.9790, ROA.9808.

Second, Dr. Handley analyzed 16 different statewide elections. ROA.15718. In evaluating these statewide elections, Dr. Handley ensured that she was still conducting a sufficiently localized appraisal by confining her EI analysis to the election data for the voters who live within each of the seven areas of interest. ROA.15718; ROA.9781. Based on this analysis, the district court credited Dr. Handley's testimony that "nearly every single contest that [she] looked at was racially polarized," ROA.9780, ROA.15717-15718, ROA.15749-15769, and that "Black voters are very cohesive in the seven areas." ROA.9779, ROA.15718. Dr.

---

(E.D. Mo. 2016) ("'endogenous elections–*i.e.*, those elections for the offices at issue … are more probative").

Handley also presented evidence that white voters typically vote as a bloc to defeat the Black-preferred candidate, including her findings that average white voter support for Black-preferred candidates is only 12.2% across 16 elections. ROA.9186 (citing ROA.15718); *see also* ROA.9780. *See, e.g.*, *Gingles,* 478 U.S. at 56 (holding no specific threshold percentage is required to demonstrate bloc voting); *Milligan*, 599 U.S. at 22 (affirming *Gingles* III satisfied where, on average, "white voters supported Black-preferred candidates with 15.4% of the vote"). The district court found that these analyses "clearly demonstrate high levels of cohesiveness among Black Louisianans in supporting their preferred candidates in the areas where Mr. Cooper has proposed to draw additional majority-Black districts." ROA.9185.

Third, Dr. Handley conducted a district-specific recompiled elections analysis to evaluate the effectiveness of whether districts in the enacted and illustrative maps would provide Black voters an opportunity to elect their candidates of choice. ROA.9794; ROA.15720-15724. The effectiveness scores Dr. Handley calculated are district-specific analysis: they examine voting patterns of only the voters that reside in the specific districts being evaluated. ROA.9817.

For her recompiled elections analysis, Dr. Handley selected specific districts to be evaluated from the overlapping geographic areas of new majority-Black districts in the illustrative plans and the corresponding districts in the enacted maps. ROA.9794-9795; ROA.15722-15723. Using

this method, she identified districts in three "clusters" of Senate districts and five "clusters" of House districts.   ROA.15722-15723. Within her clusters, Dr. Handley evaluated the recompiled election results for eight Senate districts that are not majority-Black districts and found that none of these districts would allow Black voters to elect their candidate of choice. *See id*. Similarly, Dr. Handley evaluated 19 House districts that are not majority-Black districts and found that none of these districts would allow Black voters to elect their candidate of choice. *See id*.

She then looked individually at the performance of each district in the cluster in the enacted and illustrative maps. ROA.15724-15739. In each cluster, the illustrative maps provided at least one additional district, as compared to the enacted maps, that provided Black voters an opportunity to elect their candidates of choice. ROA.9800-9807. Dr. Handley concluded that, in each of the eight clusters, the only districts that provided Black voters with an opportunity to elect their chosen candidates were districts with at least a 50% BVAP. ROA.9808; ROA.15724.

Ultimately, Dr. Handley found that "[i]n the seven areas of interest that [she] evaluated for this case, [with one] exception a majority-Black district is necessary to elect Black preferred candidates to the state legislature." ROA.9808. Based on these effectiveness scores, the district court found Dr. Handley "presented clear evidence that, save for the one exception"—*i.e.*, in enacted-HD 91, which is "not within Plaintiffs' areas

of interest and is not majority-White"—"no districts in the Enacted Maps provide Black voters the opportunity to elect their candidate of their choice other than those districts with a majority BVAP." ROA.9193.

None of Defendants' arguments supports concluding that these well-supported findings are clearly erroneous. Despite the district court's clear and many findings to the contrary, the Secretary insists that Dr. Handley's analyses of geographic areas of interest were not district-specific. *Compare* SOS Br. 47-49, *with* ROA.9184 (finding Dr. Handley's analyses *were* "district-specific"); ROA.10930 (Dr. Handley testifying that she did a "district-specific" analysis). At the time Dr. Handley conducted her analysis and wrote her report, no state legislative elections with the new enacted districts had yet taken place for her to analyze. ROA.9854. And so Dr. Handley used different tools—creating areas of interest that track the districts at issues, recompiling election results to conform to the borders of the districts at issue, and calculating effectiveness scores for each district at issue—to ensure her analysis was sufficiently local and district-specific. ROA.15709-15741. The use of those different analyses is not fatal, nor is it unique to this case: Courts have relied on the exact type of analysis employed here by Dr. Handley in other Section 2 cases. *E.g., Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 2024 WL 3275965, at *29-30, *32, *41 (N.D. Miss. July 2, 2024) (holding that Dr. Handley's data from her "seven illustrative district areas" was "useful" and crediting "Dr. Handley's testimony regarding 'stark'

60

polarization across varied local and statewide elections," including her testimony about "votes in areas of interest during statewide elections").

Defendants cite no case that supports the proposition that plaintiffs must wait for an election to occur under an allegedly dilutive map before they can challenge it. Indeed, this Court has acknowledged that *Gingles* permits flexibility in the type and nature of racially polarized voting analysis ("RPV analysis"), particularly to accommodate sparse or lacking data. *Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201, 1208-09 (5th Cir. 1989) (citing *Gretna*, 834 F.2d at 502). For example, under Section 2's flexible standard, "a court may consider other relevant factors" when "elections from the challenged district do not provide sufficient evidence to determine if polarized voting exists." *See E. Jefferson Coal. for Leadership and Dev. v. Jefferson Par.*, 691 F.Supp. 991, 999 (E.D. La. 1988); *see also Gretna*, 834 F.2d at 502-03. The fact that no election results from the enacted maps yet existed when Dr. Handley submitted her report suggests only that the flexible option envisioned by the *Gingles* Court is proper here. The district court did not err in concluding that Dr. Handley's creation and analysis of seven areas of interest from multiple statistical perspectives was a sufficiently local analysis of the challenged districts.

The Secretary's next argument—that Dr. Handley's analysis did not include areas with existing majority-Black districts that Mr. Cooper also re-drew in his illustrative maps (SOS Br. 48-49)—further

misunderstands Plaintiffs' Section 2 claims. Plaintiffs have never asserted there are Section 2 violations in the entire state legislative maps, *supra* Argument.I.A, and are not required to demonstrate racially polarized voting in the areas of Louisiana outside the areas where they allege vote dilution and seek to add majority-minority districts. Moreover, it is not accurate that Dr. Handley did not evaluate areas with existing majority-Black districts outside her areas of interest. .In addition to her district-specific analysis, Dr. Handley also calculated effectiveness scores for every district in either set of maps with a BVAP greater than 25%. ROA.9808, ROA.15724 & n.18. She concluded that "with one exception, no districts were effective that were under 50 percent [BVAP]." ROA.9193 n.383 (citing ROA.15724 n.18); ROA.9808.

### 3. The district court did not clearly err in crediting Dr. Handley's method for allocating early and absentee votes.

Defendants argue that the district court erred in crediting Dr. Handley's RPV analysis, claiming it was unreliable because of the method she used to allocate early and absentee votes in her EI analysis. SOS Br. 52-55; Leg. Br. 37-40. Here, too, the district court's factual and credibility findings were not error.

As the district court explained in its findings: To analyze whether voting in Louisiana is racially polarized in the areas of the state where Plaintiffs bring vote dilution claims, experts use a version of EI analysis

that is conducted using voting data at the precinct level.[17] ROA.9190 (citing ROA.6872-6873), ROA.9783, ROA.15713. In contrast to most states, which report early-and absentee-vote totals at the precinct level, Louisiana reports early and absentee votes only at the parish level. ROA.9190 (citing ROA.9783). Therefore, before Dr. Handley could include the voting data from the early and absentee data in the EI RxC analysis, the data had to be disaggregated to the precinct level. ROA.9189 (citing ROA.9782-9783, ROA.9856). The district court found that Dr. Handley used the "scientifically accepted method" for such allocation, ROA.9190, which allocates each candidate's early- and absentee-vote totals reported from the parish level to the precincts within that parish proportionally, based on the percentage of Election Day votes the candidates received from each precinct. ROA.9189 (citing ROA.15714, ROA.16714 at n.8).

Defendants do not dispute that Dr. Handley should have included the early and absentee votes in Louisiana in her EI analysis. ROA.9191; SOS Br. 52-55; Leg. Br. 37-40. Nor do they dispute her conclusion that the elections she analyzed were racially polarized in the clusters of parishes she studied. Rather, they dispute the way Dr. Handley allocated

---

[17] This method is called "EI RxC," ROA.15712-15713, and has been uniformly accepted by courts. *E.g.*, *Petteway v. Galveston Cnty.*, No. 3:22-cv-57, 2023 WL 6786025, at *47 (S.D. Tex. Oct. 13, 2023), *amended*, 2023 WL 6812289 (S.D. Tex. Oct. 15, 2023) (noting that all experts in the case agreed that "RxC ecological inference is an appropriate method for analyzing the voting patterns of different demographic groups").

the early and absentee votes from the parish level down to the precinct level. SOS Br. 52; Leg. Br. 38. All parties agreed that the proportional disaggregation process would cause some over- and underestimation of vote totals: for example, candidate vote-total numbers for some precincts will not always align with the total voter-turnout numbers for the precinct, and in some precincts, the proportional allocation of the early and absentee votes led to a higher number of total candidate votes than turnout. ROA.1619. Defendants contend, though, that in light of this over- and under-allocation of certain votes in Dr. Handley's database, the district court erred in admitting Dr. Handley's opinions. SOS Br. 52-53.

The district court resolved the dispute by making a factual finding that any "slight over and underestimate of votes per precinct" resulting from Dr. Handley's allocation method is "statistically insignificant" and did not render her conclusions unreliable, particularly as EI analysis is done using "proportions of the vote share that each candidate received ... not raw number totals." ROA.9191; *see also* ROA.6872-6875 (reaching same conclusion in denying Defendants' pre-trial motion in limine).[18]

---

[18] Because the EI analysis is conducted using proportions rather than raw numbers (*i.e.*, the proportion of votes cast for each of the candidates and the proportion of turnout that was Black or white), the actual number of early votes allocated to each precinct is irrelevant—what matters is the candidate breakdown of these numbers once they are allocated. ROA.9860. Therefore, any under- or over-votes at the precinct level are not a methodological problem for the EI algorithm; these discrepancies do not impact the ability of EI to generate estimates of voting patterns by race. ROA.9860.

That finding was supported by the evidence. To confirm that this allocation method was the best approach for including the early and absentee votes, Dr. Handley ran regression analyses to evaluate whether her allocation method caused any bias in her EI analysis, and she demonstrated that no bias resulted from her allocation method. ROA.9811-9813; ROA.15798-15811. The district court found that "[t]hese additional evaluations were consistent with and provided further support to [Dr. Handley's] RPV conclusions," and did "not find that the method employed by Dr. Handley to de-aggregate parish-wide numbers was the result of bias." ROA.6875.

At bottom, the district court thoroughly considered the allocation method that Dr. Handley used and made credibility and factual findings that Dr. Handley's method to disaggregate parish-wide numbers did not result in bias and "there is no evidence that it rendered the analysis infirm or conclusions unreliable." ROA.9189-9191. Defendants' disagreement with those findings do not transform them into clear error. The district court did not err in concluding that Dr. Handley's analysis, including her allocation of early and absentee votes, was "reliable and her conclusions credible." *Id.*

### 4. The district court did not abuse its discretion in excluding expert reports and testimony from Dr. Solanky.

The Secretary's and Legislative-Intervenors' respective arguments that the district court abused its discretion in excluding the reports and

testimony of Dr. Solanky under Federal Rule of Evidence 702 are meritless. This Court reviews the exclusion of expert testimony for abuse of discretion. *Supra* Argument.I.A.4; *Diggs v. Citigroup*, 551 F. App'x 762, 764-65 (5th Cir. 2014) (confirming abuse of discretion standard and affirming pre-trial exclusion of unreliable, irrelevant expert report).

Under Rule 702, expert testimony is admissible only where "the proponent demonstrates to the court that it is more likely than not" that the proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). Last year, Rule 702 was amended "to clarify and emphasize that expert testimony *may not be admitted* unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory comm. notes (2023).[19] The district court's findings that Dr. Solanky's expert testimony was *both* unreliable and irrelevant are sound, and Defendants' arguments otherwise fail.

---

[19] Rule 702's recent amendment supersedes the position (cited at Leg. Br. 40) that the "rejection of expert testimony is the exception rather than the rule" (which originates from the advisory committee notes to Rule 702's 2000 amendment). *See United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (quoting Fed. R. Evid. 702 advisory comm. notes (2000)).

*First*, Defendants' argument that the district court "applied the wrong rule" in assessing the relevance and reliability of Dr. Solanky's purported "rebuttal" reports fails. Proponents of *any* expert testimony—rebuttal or otherwise—must show that such testimony complies with Rule 702. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 775 (5th Cir. 2024) (reversing admission of rebuttal expert testimony and remanding for fuller *Daubert* consideration).[20] And to comply with both Rule 702, expert testimony must be relevant, use reliable methodologies, and apply those methodologies reliably—the very factors assessed and found wanting by the district court. ROA.6910-6913.

*Second*, the district court did not abuse its discretion in finding Dr. Solanky's opinions were irrelevant to the *Gingles* II and III inquiries. As the district court correctly observed, Dr. Solanky's conclusions—affirmative and rebuttal—were premised on his observations of alleged ties between race and "statewide or precinct party affiliation" as measured by voter registration trends. ROA.6910-6911. The latter has no bearing on the existence of racially polarized voting, which looks at actual voting patterns. ROA.6911; *see also Gingles*, 478 U.S. at 63 ("under the 'results test' of Section 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation,

---

[20] Moreover, Dr. Solanky's expert reports offered affirmative testimony: all but one of his conclusions present *affirmative* observations about voting trends in Louisiana. ROA.6747-6748.

matters"). Similarly, the district court correctly observed that Dr. Solanky's EI analysis premised on elections that *did not include* a Black candidate did not "advance" the *Gingle*s II or III inquiry and presented nothing more than an irrelevant "red herring." ROA.6911. At bottom, the district court correctly reasoned that whether "voting behavior can be explained by or correlates to partisan preference, turnout by party affiliation, and population density" is "simply not the *Gingles* II and III inquiry." ROA.6913.

*Third*, the district court similarly did not abuse its discretion in finding Dr. Solanky's opinions were fundamentally unreliable. Dr. Solanky reached his (irrelevant) conclusions that "the percentage of white voters who voted for a republican ... steadily decreases [in more] densely populated [areas]" and that "the percentage of white voters who voted for a democrat ... steadily increases [in more] densely populated [areas]" by examining results from just *two* statewide elections in just *four* parishes. ROA.6912. Dr. Solanky "disclosed *no* scientific method" behind analyzing just four parishes or for limiting his data set to two elections, let alone a "reliable" method that could be credited by the district court.[21] Moreover, the district court determined that analysis of

---

[21] Legislative-Intervenors cite only representations made in their *own briefing*—not portions of Dr. Solanky's proffered reports—in support of their argument that Dr. Solanky disclosed his underlying methodologies. Dr. Solanky did not, in fact, disclose his underlying methodologies for the above-referenced choices in his reports.

just two elections from just four parishes did not constitute "sufficient facts or data" on which to base Dr. Solanky's "far reaching conclusions about the correlation, if any, between population density and voter behavior." ROA.6912.

Even if Dr. Solanky's methodology had been credited as reliable (it was not), and even if his analysis had been based on "sufficient facts or data" (it was not), the district court *also* acted well within its discretion in finding that Dr. Solanky's *application* of his methodology to the facts at bar was unreliable in light of the results presented. As the district court observed, Dr. Solanky's data presented confidence intervals that were "so wide as to render his conclusions meaningless." ROA.6912. For instance, Dr. Solanky premised his conclusions that population density is correlated to voter behavior on data sets with confidence intervals ranging from 16.0 to 49.3, and more staggeringly from 11.6 to 83.9. ROA.6773.

Despite Defendants' repeated attempts, recasting Dr. Solanky as solely a "rebuttal" expert and his testimony as "rebuttal" testimony cannot morph his irrelevant testimony into relevant testimony or his unreliable testimony into reliable testimony.[22] Defendants' argument

---

[22] None of the cases Defendants cite support treating rebuttal experts differently when evaluating the *Daubert* requirements. *See Avivla Sports v. Fingerhut Direct Mktg.*, 829 F.Supp.2d 802, 834-35 (D. Minn. 2011) (conducting Rule 702 gatekeeping analysis of rebuttal expert reports and finding they "sufficiently applied their expertise to the facts and methodologies used by" the affirmative experts); *Huss v. Gayden*, 571

that Dr. Solanky "did not have to demonstrate any affirmative theory" does not change the fact that Dr. Solanky *did* offer affirmative theories, and the district court acted well within its discretion when it deemed those affirmative theories—and the conclusions arising from them— irrelevant and inadmissible under Rule 702.

Defendants' arguments that Plaintiffs "opened the door" to Dr. Solanky's excluded testimony by presenting testimony at trial from Dr. Handley on the allocation methods *she* utilized when analyzing early and absentee voting (and the impact that had on her analysis) also fail. SOS Br. 54; Leg. Br. 44. Plaintiffs presented testimony and evidence from Dr. Handley's supplemental report, which addressed whether her method of allocating early and absentee votes created any bias in her RPV analysis. ROA.15798-15805; ROA.9815. The report *only* contained analysis that Dr. Handley conducted to further bolster the opinion in her initial report that her allocation method was reliable; it did not address any of the affirmative opinions expressed in Dr. Solanky's reports. ROA.15798-15801. Admission of the supplemental report was therefore justified because it "provides important information that relates directly to several elements of Plaintiff's … case." *Moore v. Hernandez*, No. 2:17-cv-00531-JRG, 2018 WL 2670403, at *3 (E.D. Tex. Mar. 6, 2018); ROA.9815

---

F.3d 442, 455 (5th Cir. 2009) (assessing whether rebuttal expert testimony was "reliable" in assessing decision to exclude rebuttal expert and concluding there was "sufficient indicia" to support finding that rebuttal expert would provide a reliable opinion).

(admitting supplemental report because it went "directly to" the reliability of the moving party's expert opinion, and the burden to show the reliability of that opinion rests with the movant). The district court did not err in admitting Dr. Handley's supplemental report "in the interest of the court's full understanding and the ability of the court to make the analysis of the reliability of the opinion testimony." ROA.9815.

To be sure, Defendants had the opportunity to—and did—cross Dr. Handley on her allocation method. ROA.9847-9852. But the notion that Dr. Handley's testimony opened the door to Dr. Solanky's testimony overlooks the critical finding that Dr. Solanky's testimony—including his efforts to rebut testimony offered by Dr. Handley—was excluded as irrelevant *and unreliable*. Reliable expert testimony does not open the door to unreliable expert testimony, even if it focuses on the same topic. *E.g.*, *Ilyia v. Khoury*, 671 F.App'x 510, 511 (9th Cir. 2016) (mem.) (opening-the-door doctrine "does not allow [a litigant] to disregard the rules and introduce evidence that is ... unreliable"); ROA.9853-9854. Defendants' "anything goes" approach to competing expert testimony is not envisioned by Rule 702 or the opening-the-door doctrine.[23]

---

[23] No cases Defendants cite stand for the proposition that a party can open the door to expert testimony that had been excluded as unreliable. *See* SOS Br. 55 (citing *Fisher v. R.D. Werner Co.*, 1 F.3d 1236 (5th Cir. 1993); *United States v. Licausi*, 413 F.2d 1118, 1120-21 (5th Cir. 1969)); Leg. Int. Br. 44-45 (citing *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir. 1963); *Luv n' care, v. Laurain*, No. 3:16-cv-00777, 2021 WL 7907283, at *3 (W.D. La. Mar. 29, 2021)).

The Secretary's narrower argument—that the district court erred in excluding Dr. Solanky's discussion of Dr. Handley's allocation method, discussed *supra* Argument.II.B.3—also fails. SOS Br. 54. To start: Dr. Solanky's discussion of Dr. Handley's allocation method comprised 1.5 pages of his initial 30-page report, ROA.11575-11576, as a preface to his analysis of a set of elections that did not include Black candidates, which the district court ultimately excluded as an irrelevant "red herring" (ROA.6911). As discussed, the district court did not err in excluding this portion of Dr. Solanky's report.

Moreover, the Secretary's argument that the district court "fail[ed] to take note of substantial contrary evidence" (SOS Br. 54) overlooks that the district court addressed that Dr. Solanky's reports "point[ed] out that this allocation method results in over and underestimating the number of votes in some precincts" in a pre-trial order. ROA.6873. The district court found Dr. Handley's regression analyses proved the impact of her allocation method was "statistically insignificant," ROA.6874, and Defendants had offered no evidence that showed Dr. Handley's allocation method "rendered the analysis infirm or the conclusions unreliable," ROA.6875. This finding did not overlook Dr. Solanky's opinions: Dr. Solanky never analyzed the statistical significance of Dr. Handley's allocation methods on her findings, *see* ROA.11575-11576, ROA.5915-5920, ROA.11805-11810—leaving Dr. Handley's regression analyses uncontested, ROA.15799-15811. At bottom, then, Dr. Solanky's

discussion of Dr. Handley's allocation method identifies a feature of Dr. Handley's analysis that (a) no party contests, and (b) Dr. Handley proved did not have any statistically significant impact on her findings. *Supra* Argument.II.B.3. Because Dr. Solanky's reports did not address the statistical significance of Dr. Handley's allocation method, admitting Dr. Solanky's testimony could not have unsettled the district court's findings or affected the outcome of the case. *Seigler v. Wal-Mart Stores Texas*, 30 F.4th 472, 476 (5th Cir. 2022) (exclusion of evidence reviewed "'for an abuse of discretion,' subject to harmless-error review").

## III.    The District Court's Totality-of-Circumstances Findings Were Not Clearly Erroneous.

Defendants "did not meaningfully contest any of the Senate Factors evidence" at trial. ROA.9209. Yet now, Defendants aim to rehash failed arguments and introduce extra-record evidence to relitigate findings they lost at trial. Neither tactic is an acceptable ground for finding clear error, particularly where the district court's findings here were supported by Plaintiffs' plausible and unrebutted evidence. *See Cooper*, 581 U.S. at 299 (noting that under the applicable "clear error" standard, a finding must be affirmed so long as it is "plausible.").

The district court, after conducting a fact-intensive local inquiry, found that under the "totality of the circumstances," Black Louisiana voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their

choice." ROA.9212 (citing 52 U.S.C §10301), ROA.9226; *see Milligan*, 599 U.S. at 14, 25; *LULAC*, 548 U.S. 399, 400-01. There was no clear error in the court's factual findings or determination that, in the areas at issue, Black voters do not have an equal opportunity to participate in the political process and elect candidates of choice in state legislative elections under the enacted plans.

To understand how sociopolitical factors in Louisiana hinder Black voters' access to the political process, the district court conducted a thorough and "intensely local appraisal of the electoral mechanism," *Milligan*, 599 U.S. at 19, informed by a robust trial record—including written reports and the testimony of multiple experts and fact witnesses. ROA.9196-9209, ROA.9223-9224; *see also, e.g.,* ROA.16643-16711, ROA.19791-19823, ROA.9726-44, ROA.9872-9970, ROA.9461-9479; ROA.9500-9502, ROA.9510, ROA.9543-9544, ROA.9588-9590, ROA.9607, ROA.9628-9630. Taking a "'functional view of the political process' and '[a] searching and practical review of electoral conditions,'" ROA.9209 (citing *Fusilier v. Landry,* 963 F.3d 447, 456, 462 (5th Cir. 2020)), the court correctly found in Plaintiffs' favor on eight of the nine Senate Factors ("SF"). ROA.9196-9209.[24]

The district court found that SF2 and SF7, the two most important indicia of a Section 2 violation, *Gingles*, 478 U.S. at 49 n.15, both weighed

---

[24] Plaintiffs did not present evidence on Senate Factor 4, regarding the prevalence of candidate slating practices.

"heavily" in favor of Plaintiffs. ROA.9199-9201, ROA.9206-9207. Though "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other," *Gingles*, 478 U.S. at 45, the court went on to conduct thorough fact finding and conclude the remaining six pertinent factors also favored Plaintiffs. ROA.9196-9209.

### A.    Senate Factor 1

SF1 considers "the history of voting-related discrimination in the State or political subdivision." *Gingles*, 478 U.S. at 44. The Secretary incorrectly asserts the district court did not rely on any evidence of Louisiana's voting-related discrimination "post-1982." SOS Br. 59. This willfully ignores record evidence, including credited testimony from Dr. Blakeslee Gilpin and multiple fact witnesses, supporting the district court's factual finding that "Black voter suppression in Louisiana persists *today* through, [sic] closing polling places, restricting access to early voting, polling places, and limiting mail-in voting." ROA.9223 (emphasis added); *see also* ROA.16679-16696; ROA.9470-9472, ROA.9537-9544.

Ignoring these facts, the Secretary improperly aims to obscure the degree of access Black voters have to the *democratic process* by conflating it with their representation in the *Democratic Party*, citing an excluded expert report and, worse yet, extra-record website links (some broken, at that). SOS Br. 60 n.20-21. Influence within a major political party does not equate to an equal opportunity to elect candidates of choice. *See Miss.*

*State Conf.*, 2024 WL 3275965, at *50 (noting that "in recent elections, the Democratic Party has had some black nominees for statewide office, including for the United States Senate and Governor, but all have been defeated," in totality-of-circumstances analysis favoring plaintiffs' vote dilution claims).

Not only does the Secretary's new argument about representation within one political party pose the wrong inquiry, it improperly asks this Court to overturn a factual finding based on evidence that was not presented—let alone admitted—during trial and is therefore not part of the evidentiary record before the panel. Fed. R. App. P. 10(a); *Weathersby v. One Source Mfg. Tech.*, 378 F. App'x 463, 466 (5th Cir. 2010); *McIntosh v. Partridge,* 540 F.3d 315, 327 (5th Cir. 2008). The district court cannot be faulted for weighing evidence properly admitted over extraneous data neither offered at trial nor dispositive of a SF1 inquiry.

## B.    Senate Factor 2

Regarding SF2, which expands upon the *Gingles* II/III inquiry to assess "the extent to which voting in the elections of the state or political subdivision is racially polarized," *Gingles*, 478 U.S. at 36-37, the district court found, based on extensive witness testimony and expert analysis concerning how race drives voting patterns, that the extent of racial polarization favored Section 2 liability. As discussed *supra* Argument.II.B.2, Plaintiffs' expert, Dr. Handley, provided testimony of three different types of analysis to establish racially polarized voting in

Louisiana state legislative elections, including EI analysis of 21 recent endogenous elections and election data from 16 statewide elections configured for the relevant areas of interest.[25] Dr. Handley's analysis revealed that white crossover voting is also very low in Louisiana, at only 12.2%. ROA.15718; *see also Miss. State Conf.*, 2024 WL 3275965, at *41 (noting that white crossover voting was very low and finding that "as a factual matter the extent of the polarization between races across Mississippi provides at least circumstantial evidence that the divide is based on race").

The district court found Plaintiffs' experts' testimony "more credible" and their findings substantively probative of RPV. ROA.9199-9201. Credibility findings are owed "singular deference" for good reason. *Cooper*, 581 U.S. at 309. The "various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost" on appeal, "sifting through a paper record." *Id.* (quoting *Anderson*, 470 U.S. at 575).

---

[25] The Secretary cites *NAACP v. Fordice* for the proposition that "'some' evidence of RPV is insufficient" to satisfy Senate Factor 2. SOS Br. 56 (citing *Fordice*, 252 F.3d 361, 368 (5th Cir. 2001)). Specifically, *Fordice* stated that, although plaintiffs established "that racially polarized voting exists to some extent in the state of Mississippi," Black Mississippians "have enjoyed substantial success in elections for positions in the districts at issue," 252 F.3d at 368, and plaintiffs "failed to marshal the quality of evidence needed to" prove that Black Mississippians' votes were diluted in the districts at issue, *id.* at 370. In contrast, Plaintiffs provided evidence from 21 recent state legislative elections demonstrating that "racially polarized voting substantially impedes the ability of Black voters to elect candidates of their choice to the Louisiana state legislature." ROA.9186.

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's finding[s]." *Anderson*, 470 U.S. at 565.

The district court's credibility determinations in favor of Plaintiffs' experts, Dr. Handley and Dr. King, over Defendant's expert Dr. Alford engage no clear error. Indeed, response to similar testimony from Dr. Alford, a court in Mississippi likewise concluded:

> [Dr. Alford] offered similar testimony in Robinson, where the court found his "opinions are unsupported by meaningful substantive analysis" and "border on ipse dixit." We share those concerns. While we accepted Dr. Alford as an expert and find that some of his opinions are plausible, he has not overcome Dr. Handley's testimony.

*Miss. State Conf.*, 2024 WL 3275965, at *44 (citation omitted).

A defendant can attempt to rebut the inference of racially infused politics established with the *Gingles* preconditions by bringing forward evidence of non-racial causes of racial polarization. *E.g.*, *Teague v. Attala County*, 92 F.3d 283, 290 (5th Cir. 1996). But they must actually present evidence. Defendants cite no record evidence of Dr. Alford rebutting Plaintiffs' experts because none exists. SOS Br. 56-57. Dr. Alford *agreed* with Dr. Handley that Louisiana's Black and White voters "are voting differently." ROA.10252. His attempt to frame polarization as political instead of racial focuses on the identity of the candidates, not the race of the voters. But RPV analysis focuses on the voting patterns of Black and white *voters*, not the political party of Black and white *candidates*.

*Gingles*, 478 U.S. at 67-68. And focusing on the partisan *result* of these racially polarized voting patterns does nothing on its own to explain their *cause*. *See Teague*, 92 F.3d at 290. Dr. Alford offers no account of the causes of Black and white voters' support for candidates of different parties.

Moreover, Dr. Alford had no response to Dr. King's analysis of racial polarization reflected within voting of patterns of registered Democrats in Louisiana. ROA.10784-10794. Nor could Dr. Alford dispute Dr. Handley's testimony about the racially polarized voting behaviors of Black and white voters with shared party affiliation: indeed, his own data reflected the same finding. ROA.10903-10905. Registered white Democrats in Louisiana elections strongly prefer white candidates over Black candidates, while Black Democrats show the opposite pattern. ROA.10784-10794. Based on this data, Dr. Handley concluded that "very consistently ... white voters gave more support to white Democrats than to Black Democrat." ROA.9195 (citing ROA.10904-10907). The court found these conclusions from Dr. Handley were "reliable and well supported." ROA.9195. Defendants did not meet their burden to rebut Plaintiffs' showing and identify no clear error now in the district court's findings on this fact-intensive question.

## C.    Senate Factor 3

The district court favored Plaintiffs on SF3, ROA.9201-9202, which measures "the extent to which the state or political subdivision has used

unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group," *Gingles*, 478 U.S. at 37. The court cited mechanisms including Louisiana's majority vote requirement and "repeated and voluminous decentralized elections," bolstered by the testimony of voters regarding the burdens of these practices. ROA.9201-9202. Again, the Secretary misrepresents the powerful evidentiary basis for the district court's findings. For example, the district court credited the testimony of fact witnesses who have directly experienced or observed the concentrated impact of "voter fatigue and confusion" in Black communities caused by decentralized elections. *See* ROA.9202 (citing testimony of Omari Ho-Sang and Dr. Dorothy Nairne). Defendants failed to discredit these witnesses' accounting of SF3 burdens at trial and offered no countervailing evidence. Defendants cannot make this evidence disappear simply by asserting it does not exist or claiming it was not credible. The finder of fact has authority to weigh and credit fact testimony, as the district court did here. This Court is bound to defer to these plausible and probative findings on SF3. *See Cooper*, 581 U.S. at 299.

### D.    Senate Factor 5

The district court did not err in finding SF5—which concerns the extent to which Black Louisianians "bear the effects of discrimination in such areas as education, employment and health, which hinder their

ability to participate effectively in the political process," *Gingles*, 478 U.S. at 37—weighed "decidedly" in favor of Plaintiffs.  ROA.9202-9205. This court relied on testimony from Dr. Traci Burch, a political scientist, and multiple fact witnesses in finding evidence of discrimination in education, employment, housing, health, and criminal law enforcement in Louisiana.  ROA.9202-9205.  Contrary to the Secretary's representation, the court credited Dr. Burch's and other witnesses' testimony directly linking forms of discrimination and depressed political participation of Black voters, finding that discrimination in these other areas of life "hinders and impairs meaningful access to the political process." ROA.9204. The ample evidence in the record of the nexuses between socioeconomic discrimination and depleted Black political participation more than satisfied Plaintiffs' burden. *See LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (citation omitted). The Secretary's assertion that this evidence should be disregarded because "Black voters effectively control the Democratic party," SOS Br. 61, is unsupported by any record evidence, irrelevant, and does not support a finding of clear error.

### E.    Senate Factor 6

SF6 considers "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. The district court found "multiple instances of subtle and overt racial appeals" in political advertising based on the testimony of Dr. Burch and

three fact witnesses, who spoke to the instances *and* depressive impact of these appeals on Black voter participation in Louisiana. ROA.9205-9206. The Secretary misconstrues this evidence as merely "anecdotal" and argues that it was not overt enough "to amount to a denial or abridgment of the right to vote." SOS Br. 61-62. This claim does not reflect the record. The evidentiary showing credited by the court matches, if not exceeds, findings in multiple other cases where SF6 weighed in favor of plaintiffs. *See, e.g., Miss. State Conf.*, 2024 WL 3275965 at *50 (finding SF6 weighed for plaintiffs based on discrete instances of implicit and explicit appeals in both endogenous and exogenous elections); *Singleton*, 582 F.Supp.3d at 1023 (relying on three examples of appeals in finding SF6 favored plaintiffs, including borderline evidence that "a reasonable viewer might have perceived" as a racial appeal). The court's finding that SF6 weighed in Plaintiffs' favor was not clearly erroneous.

## F.   Senate Factor 7

SF7 looks at "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. The Secretary falsely claims that the district court "erred by equating SF7 to a need for strict proportionality." SOS Br. 58. Rather, the district court correctly found that it was uncontested that Louisiana exhibits a striking void of political representation for Black Louisianians in multiple levels of public office—and indeed, addressed the distinct

concept of proportionality in a wholly separate section of its order. *Compare* ROA.9206-9207, *with* ROA.9209-9211.

The Secretary contends SF7 is not satisfied because Black people make up "[n]early 30% of the Legislature." SOS Br. 58. That is a gross misrepresentation (in fact, 36 of the legislature's 144 members, or 25%, are Black), and it ignores that the Black representatives in the legislature have been elected only from majority-Black districts—which supports rather than undermines the district court's assessment that SF7 weighs in favor of finding a Section 2 violation. *See, e.g.*, *Singleton*, 582 F.Supp.3d at 1019-20 (noting "little difficulty finding that [SF7] weighs heavily in favor of ... plaintiffs" where "[t]he overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts" (alteration in original)); *Miss. State Conf.*, 2024 WL 3275965, at *50-51 (noting the "unbreachable limits" of Black candidates' success beyond majority-Black districts in favoring SF7 for plaintiffs).

The district court also properly assessed the distinct question of whether the enacted plans underrepresent Black voters in the state legislature elsewhere in its totality-of-circumstances analysis. ROA.9209-9211; *see, e.g.*, *De Grandy*, 512 U.S. at 1000; *LULAC*, 548 U.S. at 438 (cleaned up) (inquiry into proportionality "provides some evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a

83

minority group). In Louisiana, Black voters make up approximately 33.1% of the state's population, but only 29 of 105 (about 27.6%) of House districts and 11 of 39 (about 28.2%) of Senate districts are majority-Black. The district court did not err in finding that "the enacted plan challenged in this case does not reflect proportionality," and that this underrepresentation weighed in Plaintiffs' favor in assessing the totality of the circumstances. ROA.9209-9210.

### G.    Senate Factor 8

The district court found that SF8—elected officials' "significant lack of responsiveness" to Black voters' "particularized needs," *Gingles*, 478 U.S. at 37—weighed in Plaintiffs' favor based on fact-witness testimony showing that elected officials in non-competitive districts rarely visit their communities; Dr. Burch's survey data demonstrating that Black voters across the state do not believe their elected officials are responsive to their concerns; legislative records; and ample evidence of policy outcomes that drive racial inequality in access to voting, education employment, housing, and public safety. ROA.9207-9208.

The Secretary again disregards the evidence and falsely asserts that the court's review "was limited in time and scope." SOS Br. 62. Based on that distortion of the record, the Secretary claims that the evidence was insufficient to show that the "lack of responsiveness is comprehensive and systematic." *Id.* (citing *Clark*, 88 F.3d at 1400-01). But the evidence comprehensively described officials' past and present

policy choices and actions, and the court found that evidence led to the "inevitable conclusion that the State Legislature has been historically unresponsive and remains unresponsive to the needs of the Black communities in Louisiana." ROA.9208. The Secretary cannot manufacture clear error by simply ignoring the bulk of the evidence on which the court relied.

### H.    Senate Factor 9

SF9 concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. The Court found no credible justification to substantiate the legislature's enactment of the challenged maps—finding the lawmakers' policies "tenuous to anything other than disenfranchising Black voter participation in the political process." ROA.9208-9209. Rather than offer any evidence to counter Dr. Burch's comprehensive testimony regarding the lack of plausible justification for the State's enacted districts over VRA-compliant alternatives, the Secretary critiques the court (at SOS Br. 62-63) for not doing that work for them and instead highlighting the Legislature's pattern of abusing election policies to disenfranchise Black voters, in keeping with disparities evidenced in the other Senate Factors. ROA.9208-9209, ROA.9205-9206.

In sum, the Secretary fails to establish clear error in even one of the court's findings on the totality of the circumstances, much less enough to

permit reversal of the court's overall finding that S.B.1 and H.B.14 dilute the votes of Black Louisianians. This Court should accordingly affirm.

## IV.     Private Plaintiffs Have a Right of Action to Enforce Section 2 of the Voting Rights Act.

The VRA's text and binding precedent correctly foreclose Defendants and Amici's argument that the VRA lacks a private right of action. ROA.9135-9138. The parties have briefed this issue extensively before both this Court and the district court. ROA.7212-7231, ROA.7234-7249, ROA.9093-9101; ECF No. 125, 132, 134. Although Plaintiffs' claim does not turn on whether Section 2 contains a private right of action—as Plaintiffs also brought their claim under 42 U.S.C. § 1983, ROA.255, ROA.306—this Court's precedent makes it unnecessary to proceed past Section 2 to conclude a right of action exists.

Last November, this Court reaffirmed that the VRA contains a private right of action. *Robinson III*, 86 F.4th at 588 ("We conclude that the Plaintiffs here are aggrieved persons, that our *OCA-Greater Houston* decision has already held that sovereign immunity has been waived, and that there is a right for these Plaintiffs to bring these claims."). And *Robinson III* postdates the outlier Eighth Circuit decision on which the State heavily relies. ECF No. 200 [hereinafter "State Br."] 4, 7, 11, 13. A three-judge panel in Mississippi also expressly rejected the Eighth Circuit panel majority's analysis last month, "find[ing] Chief Judge Smith's dissent in that case to express the more persuasive analysis."

*Miss. State Conf.*, 2024 WL 3275965, at \*9-11. No other court has adopted the Eighth Circuit's flawed interpretation of the VRA, and precedent forecloses this argument.

Legislative-Intervenors' narrower argument—that, categorically, organizations cannot be aggrieved persons under Section 2—likewise fails. "History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly," beyond "the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998) (collecting cases). And the Dictionary Act defines "person" to include organizations. *See* 1 U.S.C. §1 ("the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). In line with this default definition of "person," the legislative history of other federal voting laws makes clear that the word "person" is not limited to individuals. *E.g.*, *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 364 (5th Cir. 1999) (National Voter Registration Act was amended to change "individual" to "person" so that "the modification will permit organizations as well as individuals, and the Attorney General to bring suits under the act").

Organizational plaintiffs have regularly served as plaintiffs in Section 2 cases. *See Robinson III*, 86 F.4th at 588 (concluding that "the Plaintiffs here are aggrieved persons," when the plaintiffs included

organizations); *see also Singleton*, 582 F.Supp.3d at 1031; *LULAC*, 548 U.S. 399; *ALBC*, 575 U.S. 254; *Houston Lawyers' Ass'n v. Attorney General of Texas*, 501 U.S. 419 (1991); *OCA*, 867 F.3d at 614. These decisions treating organizational plaintiffs as "aggrieved persons" are also consistent with Sixth Circuit precedent concluding that organizations have a cause of action to bring suit in VRA claims. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623-24 (6th Cir. 2016) (citing *ALBC*, 575 U.S. 254). And just last year, this Court upheld a preliminary injunction in a case brought by individual and organizational plaintiffs, and denied the state defendants' request to consider *en banc* whether those plaintiffs had a private right of action. *Robinson v. Ardoin*, No. 22-30333, 2023 U.S. App. LEXIS 34113 (5th Cir. Dec. 15, 2023); *see also* ECF No. 186 (declining, again, to consider the question *en banc*). The statute's text, legal precedent, and longstanding practice all support the district court's determination that all Plaintiffs here have a cause of action under Section 2.

## V. Section 2 of the Voting Rights Act Remains Constitutional.

The State and Amici ask this Court to disregard recent Supreme Court precedent and the voluminous record established below to strike down Section 2 as unconstitutional. This Court should decline.

The State contends that Section 2 exceeds the authority of the Fifteenth Amendment's enforcement clause "because no current needs justify it" and "Congress has made zero findings to justify keeping the

1982 Amendment in place" since 1982. State Br. 14, 21; *see also* ECF No. 215 [hereinafter "Ala. Br."] 21-26. As the district court recognized in rejecting this argument, the Supreme Court rejected Alabama's argument that Section 2 is unconstitutional just last year. ROA.9142. In *Milligan*, the Supreme Court reaffirmed that Section 2 as applied to redistricting is constitutional under the Fifteenth Amendment as an appropriate measure to remedy identified instances of racial discrimination in voting. *See Milligan*, 599 U.S. at 41-42. The Court rejected Alabama's "argument[] that §2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Id.* at 41. After the Supreme Court remanded that case and the district court enjoined the map Alabama enacted in 2023, Alabama seized on Justice Kavanaugh's concurrence in their stay application to argue that the district court's construction of Section 2 "has no logical endpoint" and that while congressionally specified findings of discrimination "may have justified race-based redistricting in 1982[,] the authority to conduct race-based redistricting cannot extend indefinitely into the future." Stay Application (23A231) at 38, *Allen v. Milligan*, 144 S. Ct. 476 (2023) (citing *Milligan*, 599 U.S. at 454 (Kavanaugh, J., concurring). The Supreme Court rejected Alabama's stay application with no noted dissents. 144 S. Ct. 476.

Since the Court's decision in *Milligan*, several courts, including courts in this circuit, have refused to revisit the constitutionality of Section 2. *E.g.*, *Singleton v. Allen*, 690 F.Supp.3d 1226, 1317 (N.D. Ala.

2023); *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337-SCJ, 2023 WL 5674599, at *20 (N.D. Ga. July 17, 2023); *Petteway v. Galveston Cnty.*, 698 F.Supp.3d 952, 1016 (S.D. Tex.), *rev'd and remanded on other grounds*, No. 23-40582, 2024 WL 3617145 (5th Cir. Aug. 1, 2024).

As a factual matter, the State's assertion that Congress has "made zero findings to justify keeping the 1982 Amendment in place for forty years" is inaccurate. State Br. 21. In 2006, Congress reauthorized and amended the VRA and included findings of discrimination in voting practices throughout the nation. *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 578 §2(b)(1-9) ("[T]he evidence before Congress reveals that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment and to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution."). In making its findings, Congress relied on a legislative record that was over "15,000 pages in length[,]" *Shelby Cnty. v. Holder*, 679 F.3d 848, 856 (D.C. Cir. 2012), *rev'd on other grounds*, *Shelby Cnty.*, 570 U.S. 529 (2013), with "thousands of pages of testimony, reports, and data regarding racial disparities in voter registration, voter turnout, and electoral success; the nature and number of section 5 objections; judicial preclearance suits and section 5 enforcement actions; *successful section 2*

*litigation*; the use of 'more information requests' and federal election observers; racially polarized voting; and section 5's deterrent effect," *id.* at 857 (emphasis added). Not only did Congress make findings sufficient to justify the continuance of Section 2, it did so on the basis of an extensive legislative record.

The State urges this Court to ignore the 2006 congressional findings by insinuating that the Supreme Court found "deficiencies in [the] most recent findings of 2006." State Br. 21 (citing *Shelby Cnty.*, 570 U.S. at 553-54). But the Court never cast doubt on the findings themselves. Rather, it found that the findings were insufficient to justify the disparate application of Section 5 to a subset of states and that the legislative record played "no role in shaping the statutory formula" in Section 4(b) of the VRA. *Shelby Cnty.*, 570 U.S. at 554. Those issues were specific to the preclearance-coverage formula, and they do not undermine the sufficiency of the findings to justify the continuation of Section 2: indeed, the Court described Section 2 as a "permanent, nationwide ban on racial discrimination in voting," *id.* at 537, and found that "voting discrimination still exists; no one doubts that," *id.* at 536.

The State's contention that "Congress has made … zero attempts to tailor the 1982 Amendment to current (or even recent) conditions" also misses the mark. State Br. 21. The *Gingles* framework is inherently tied to current conditions, requiring a contemporary and "local appraisal" of the claims, *Gingles*, 478 U.S. at 79, and requiring challengers to prove in

each case that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters," *id*. at 47. For example, as part of the *Gingles* I inquiry, plaintiffs must produce illustrative plans using the most-recent census data to show that the minority group "has the potential to elect a representative of its own choice in some single-member district." *Milligan*, 599 U.S. at 18 (quoting *Growe*, 507 U.S. at 40). "[A]s residential segregation decreases—as it has 'sharply' done since the 1970s—satisfying traditional districting criteria such as the compactness requirement 'becomes more difficult.'" *Id*. at 28-29 (citing T. Crum, *Reconstructing Racially Polarized Voting*, 70 Duke L. J. 261, 279, & n.105 (2020)). Similarly, to prove *Gingles* II and III, plaintiffs must show that recent elections are racially polarized. As society becomes less racially polarized, minority groups' "ability and need to bring claims under Section 2 will subside[.]" Pamela S. Karlan, *Two Section Twos and Two Section Fives: Voting Rights and Remedies After Flores*, 39 Wm. & Mary L. Rev. 725, 741 (1998). Likewise, the totality of the circumstances looks at, among other factors, current social and economic disparities and their impact on voter participation, racial appeals that characterize current elections, the current success of minority candidates, and current laws and practices that impair the ability of minority voters to participate in the political process. *Gingles*, 478 U.S. at 36-43; *Milligan*, 599 U.S. at 22. Without current conditions sufficient to show a Section 2 violation, *cf.*

*Milligan*, 599 U.S. at 29 (detailing the low number of successful Section 2 cases), plaintiffs could never prove a claim under *Gingles*. Consistent with the Supreme Court's description of Section 2 as "permanent," 570 U.S. at 537, there is no need for this Court to impose an arbitrary and artificial expiration date: Section 2 will sunset on its own whenever and wherever current conditions no longer allow plaintiffs to satisfy the *Gingles* framework.

The State's assertion that "Plaintiffs have no evidence of current racial discrimination" and "[t]heir evidence stops at 1975" (State Br. 22) is simply false. The State distorts the record beyond recognition and contradicts the district court's explicit findings. The district court repeatedly credited testimony and record evidence showing that Black voters lack equal access *now* to the elect the candidates of their choice in Louisiana because of *current* political and socioeconomic conditions existent in present-day Louisiana. *E.g.*, ROA.9199 ("Black voter suppression continues in the form of closing polling places, restricting access to polling places, restricting access to early voting, and limiting mail-in voting"); ROA.9205 ("It is a well-known and often cited fact that Louisiana's incarceration rates lead the nation. Black Louisianans are disproportionately jailed as compared to White Louisianans."); ROA.9205 ("[A]pproximately 80% of the parolees/probationers *currently* ineligible to vote are African American, compared with about 32% of the population of the state.") (emphasis added); ROA.9205 ("Nearly 48,000 Black

Louisianans were unable to vote *in 2020* due to their felony convictions, twice the number of White Louisianans. Studies show that perceived unfair law enforcement tends to 'demobilize voting and make people shy away from participating in politics'.") (emphasis added); ROA.9205-9206 ("Dr. Burch cited multiple instances of subtle and overt racial appeals in political advertising in *recent* elections.") (emphasis added); ROA.9206 ("Plaintiffs Nairne and Ho-Sang testified about the disparaging nature of the messaging by Senator Kennedy's [2022] re-election campaign that depicted images of Black Lives Matter protests alongside the comment suggesting that critics of police misconduct toward Black citizens should 'call a crackhead.' They also testified about racially suggestive campaign ads aired in the latest gubernatorial election.").

While Defendants cite "the number of minority legislators" and that "there are now more majority-Black districts than there were in 2011," State Br. 22, they simply ignore the fact that "the enacted plan challenged in this case does not reflect proportionality," and that all of the Black state legislators are elected from majority-Black districts. ROA.9210; *see also* ROA.9210 n.488 ("40 of the 144 districts (28 percent) in the Enacted Plans are majority-minority").

Finally, Amici wrongly claim that the governing totality-of-circumstances framework is "hopelessly indeterminate." Ala. Br. 16-20. Section 2 jurisprudence has outlined a clear test that has been readily interpreted by courts since 1986. *Gingles*, 478 U.S. at 43-45, 80. Just last

summer, the Supreme Court reaffirmed that framework and specifically affirmed the Alabama court's similar totality-of-circumstances findings under the Senate Factors as having "faithfully applied" the Court's precedent. *Milligan*, 599 U.S. at 23; *see also id.* at 19 ("*Gingles* has governed our [VRA] jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of §2 as *Gingles* construed it."). Since then, other courts have considered Amici's argument and squarely rejected it. *Singleton v. Allen*, 2024 WL 3384840, at *22-23 (N.D. Ala. July 11, 2024); *Stone v. Allen*, 2024 WL 578578, at *7-8 (N.D. Ala. Feb. 13, 2024). This Court should follow suit.

## VI.    The District Court Did Not Abuse Its Discretion in Scheduling a Modestly Expedited Trial.

The district court did not abuse its discretion in setting the trial date in this case. Few matters are as firmly committed to a district court's discretion as the management of its own docket. It is black letter law that there is "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A district court's exercise of that power requires an "exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* at 254-55. "District courts generally are afforded great discretion regarding trial procedure applications (including control of the docket and parties)." *Topalian v. Ehrman*, 954 F.2d 1125, 1139 (5th Cir. 1992).

The district court had good reason to expedite the trial schedule, contrary to the Secretary's assertion. SOS Br. 16. In a motion to vacate the stay filed the day after the Supreme Court issued its decision in *Milligan*, Plaintiffs initially requested a pretrial schedule that would permit them to seek a preliminary injunction, allowing for relief in advance of the 2023 legislative elections. ROA.1007-1012. In an exercise of judicial restraint, the district court denied that request. ROA.1052. Because Plaintiffs' efforts to seek pre-election relief were rejected, Plaintiffs next sought to expedite the trial schedule to ensure that, if warranted, it would be possible to hold special elections as part of the remedy in this case. ROA.1040, ROA.1125, ROA.1232. Special elections have been ordered in cases where the pendency of a Supreme Court decision interfered with a plaintiff's ability to seek pre-election relief, *Clark v. Roemer*, 777 F.Supp. 471, 484-85 (M.D. La. 1991), particularly where Plaintiffs first sought and were denied pre-election relief, *Williams v. City of Dallas*, 734 F.Supp. 1317, 1415 (N.D. Tex. 1990); *see also Tucker v. Buford*, 603 F.Supp. 276, 277-78 (N.D. Miss. 1985). The district court's "exercise of judicial restraint in allowing the State to use the [unlawful] districting plans in the [2023] elections" also "weighs heavily in favor of ordering a special election." *Covington v. North Carolina*, 270 F.Supp.3d 881, 897-98 (M.D.N.C. 2017). Given the severity of Plaintiffs' allegations of vote dilution, the risk of serious prejudice to their right to vote, and the district court's restraint in not rushing to enjoin the maps in advance of

the 2023 elections, the district court did not abuse its discretion in expediting the trial to preserve the possibility of this form of relief.

Neither of the Secretary's arguments demonstrate that the district court abused its broad discretion in setting the trial to begin a full five months after lifting the stay. To begin, the claim that the expedited schedule "*undisputedly* gave Defendants' insufficient time to prepare expert reports" is false. SOS Br. 16. Plaintiffs specifically disputed Defendants' arguments about the time needed to prepare their expert reports, ROA.1065, ROA.1070, ROA.1080-1082, and more broadly disputed each of Defendants' six attempts to delay the proceedings below. *See* ROA.1042-1051, ROA.1058-1063, ROA.1072-1078, ROA.1100-1118, ROA.1202-1215, ROA.7212-7223 (Defendants' various efforts at delay); ROA.1053-1057, ROA.1064-1071, ROA.1079-1086, ROA.1119-1192, ROA.1229-1235, ROA.7224-7231 (Plaintiffs' oppositions to each).

That Defendants ultimately prepared and submitted *thirteen* expert reports on behalf of its seven experts further undermines the seriousness of this claim. ROA.10979-11856. What's more, multiple of Defendants' own experts admitted that they had finalized their initial round of reports before the proceeding was even stayed. *E.g.*, ROA.4820, ROA.4212.

Furthermore, the district court did not abuse its discretion by proceeding to trial without waiting for the data from the Louisiana 2023 legislature elections to be available for the RPV analysis presented at

trial. Again, contrary to the Secretary's assertion, Plaintiffs' expert Dr. Handley presented evidence of 21 endogenous state legislative elections that occurred in districts overlapping the areas of interest to Plaintiffs' Section 2 claims. *Supra* Argument.II.B.2. Defendants have cited no case suggesting Dr. Handley's analysis of endogenous elections was not sufficient or that courts or experts must wait for *future* election results.

There is no magic number or type of elections that must be available before a voting rights case may go to trial. *Gingles* itself acknowledges that "[t]he number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." *Gingles*, 478 U.S. at 57 n.25. And Fifth Circuit precedent confirms the case-specific nature of this inquiry: "How many elections must be studied to make this determination depends on the particular circumstances of the locale." *Teague*, 92 F.3d at 289. For instance, the Eastern District of Missouri discarded exogenous election data where endogenous election data from only five elections for the same office was "sufficient ... to discern typical voting behavior and usual results." *Mo. State Conf.*, 201 F.Supp.3d at 1041. This Court has also credited expert testimony on vote dilution that considers far fewer endogenous elections than were presented in this case. *Teague*, 92 F.3d at 289-90 (favorably citing experts who analyzed eight and six elections, respectively); *see also Lopez v. Abbott*, 339 F.Supp.3d 589, 609 (S.D. Tex. 2018) (crediting expert testimony based on "13 relevant electoral contests"). In light of the

extensive nature of the RPV analysis conducted using the data available before trial—including, but not limited to, 21 endogenous state legislative elections in the relevant geographic areas—the district court did not err in assessing that additional election data from the upcoming elections was unnecessary.

Defendants' invocation of *Westwego Citizens for Better Gov't v. City of Westwego* for the proposition that failure to consider certain election data constitute reversable error misses the mark. 906 F.2d 1042, 1045 (5th Cir. 1990). When that case challenging Westwego's aldermanic redistricting first went to trial, no Black candidate had ever run for alderman. *Id.* at 1044. This Court *reversed* the district court's conclusory determination that the lack of endogenous elections precluded a finding of vote dilution, concluding the plaintiff "could make out its claim of vote dilution based solely on exogenous elections" and remanding for further proceedings. *Id.* Even though a Black candidate ran for alderman for the first time in the two years between the initial trial and the remand, the district court entered its supplemental findings without considering that new endogenous election. *Id.* at 1043. At that stage, this Court held the district court "erred in refusing to consider this highly relevant evidence" and instead issuing finding "based upon what we had already found to be an unclear record." *Id.* at 1045, 1047. *Westwego* differs significantly from this case, where the record already contains substantial analysis of

election data from 21 other state legislative elections involving Black candidates. ROA.9186 n.352 (citing ROA.15719).

## CONCLUSION

This Court should affirm.

Date: August 16, 2024                    Respectfully submitted,

                                         */s/ Megan C. Keenan*
Stuart Naifeh                            Megan C. Keenan
Victoria Wenger                          Sarah Brannon
Colin Burke                              American Civil Liberties Union
NAACP Legal Defense &                    Foundation
Educational Fund                         915 15th St. NW
40 Rector Street, 5th Floor              Washington, DC 20005
New York, NY 10006                       sbrannon@aclu.org
laden@naacpldf.org                       mkeenan@aclu.org
snaifeh@naacpldf.org
vwenger@naacpldf.org                     Sophia Lin Lakin
cburke@naacpldf.org                      Dayton Campbell-Harris*
                                         American Civil Liberties Union
R. Jared Evans                           Foundation
I. Sara Rohani                           125 Broad Street, 18th Floor
NAACP Legal Defense &                    New York, NY 10004
Educational Fund                         slakin@aclu.org
700 14th Street, Suite 600               dcampbell-harris@aclu.org
Washington, DC 20005
jevans@naacpldf.org                      T. Alora Thomas-Lundborg
srohani@naacpldf.org                     Daniel J. Hessel
                                         Election Law Clinic
John Adcock                              Harvard Law School
Adcock Law LLC                           6 Everett Street, Ste. 4105
Louisiana Bar No. 30372                  Cambridge, MA 02138
3110 Canal Street                        tthomaslundborg@law.harvard.edu
New Orleans, LA 701119                   dhessel@law.harvard.edu
jnadcock@gmail.com
                                         Nora Ahmed
Michael de Leeuw                         ACLU Foundation of Louisiana
Amanda Giglio                            1340 Poydras St, Ste. 2160
Cozen O'Connor                           New York, LA 70112
                                         Tel: (504) 522-0628

3 WTC, 175 Greenwich St., 55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn
Cozen O'Connor
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

Robert S. Clark
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
robertclark@cozen.com

nahmed@laaclu.org

Ron Wilson (La. Bar No. 13575)
701 Poydras Street, Suite 4100
New Orleans, LA 70139
cabral2@aol.com

*Practice is limited to federal court.*

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Date: August 16, 2024          */s/ Megan C. Keenan*
                               Megan C. Keenan
                               *Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 22,975 words, in line with this Court's order granting Plaintiffs' motion to file a brief in excess of the word count limitation in Fed. R. App. P. 32(a)(7)(A) but not to exceed 23,000 words. ECF No. 214. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size in Century Schoolbook.

Date: August 16, 2024          */s/ Megan C. Keenan*
                               Megan C. Keenan
                               *Counsel for Plaintiffs-Appellees*