No. 24-30115

# In The United States Court of Appeals for the Fifth Circuit

DOROTHY NAIRNE, et al.,

*Plaintiffs-Appellees*,

v.

NANCY LANDRY,

*Defendant-Appellant*,

STATE OF LOUISIANA, et al.,

*Intervenors-Appellants*,

v.

UNITED STATES OF AMERICA,

*Intervenor-Appellee*.

*On Appeal from the United States District Court
for the Middle District of Louisiana*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: August 23, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS..... i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF CONTENTS.......................................................... iii

TABLE OF AUTHORITIES .................................................... iv

INTEREST OF *AMICUS CURIAE*.......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 1

ARGUMENT ...................................................................... 5

I.    The Fifteenth Amendment Gives Congress Sweeping Power to Enforce the Amendment's Ban on Racial Discrimination in Voting ..................................................................... 5

II.   Congress Constitutionally Used Its Fifteenth Amendment Enforcement Power to Enact Section 2's Prohibition of Vote Dilution..................................................................... 13

III.  Section 2's Application to Present Circumstances Does Not Exceed Congress's Fifteenth Amendment Power to Prohibit Redistricting Maps that Dilute Black Voters' Electoral Strength..................................................................... 20

CONCLUSION..................................................................... 27

CERTIFICATE OF SERVICE ................................................ 1A

CERTIFICATE OF COMPLIANCE ........................................ 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Allen v. Milligan,*
    599 U.S. 1 (2023).......................................................... 2, 4, 13, 17, 18, 20, 23, 27

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)............................................................................ 22

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021)........................................................................ 16

*Bush v. Vera,*
    517 U.S. 952 (1996)............................................................................ 19

*Chisolm v. Roemer,*
    501 U.S. 380 (1991)............................................................................ 15

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)........................................................................ 24, 25

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980)............................................................................. 15

*City of Rome v. United States,*
    446 U.S. 156 (1980)...................................................................... 8, 17, 21, 24

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960)............................................................................ 14

*Johnson v. De Grandy,*
    512 U.S. 997 (1994)............................................................................ 18

*Jones v. City of Lubbock,*
    727 F.2d 364 (5th Cir. 1984).......................................................... 4, 19, 22, 24, 26

**Page(s)**

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62 (2000) ............................................................................. 25

*Knox v. Lee*,
   79 U.S. (12 Wall.) 457 (1871) ............................................................ 9

*Lane v. Wilson*,
   307 U.S. 268 (1939) .......................................................................... 5, 13

*League of Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ........................................................................... 18

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ............................................................ 8, 9, 22

*Nw. Austin Mun. Util. Dist. No. 1 v. Holder*,
   557 U.S. 193 (2009) ........................................................................... 22

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ........................................................................... 20

*Reno v. Bossier Par. Sch. Bd.*,
   528 U.S. 320 (2000) ........................................................................... 6

*Rice v. Cayetano*,
   528 U.S. 495 (2000) .......................................................................... 5, 6

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ........................................................................... 26

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ....................................................... 7, 8, 13, 24, 25

*Tennessee v. Lane*,
   541 U.S. 509 (2004) ........................................................................... 25

**Page(s)**

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
576 U.S. 519 (2015)............................................................................... 18

*Thornburg v. Gingles*,
478 U.S. 30 (1986)............................................................................... 1, 18, 23

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ............................................................... 4, 19

*Wesberry v. Sanders*,
376 U.S. 1 (19 ...................................................................................... 6

*White v. Regester*,
412 U.S. 755 (1973)............................................................................. 14, 15

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)............................................................................. 6

## STATUTES AND LEGISLATIVE MATERIALS

52 U.S.C. § 10301(b) ........................................................................... 1, 13, 16

Cong. Globe, 39th Cong., 1st Sess. (1866)........................................... 6

Cong. Globe, 40th Cong., 3d Sess. (1869) ........................................... 5, 6, 10

Cong. Globe, 41st Cong., 2d Sess. (1870)............................................ 2-4, 10-12

Cong. Globe, 42d Cong., 2d Sess. (1872)............................................. 7

2 Cong. Rec. (1874)............................................................................. 11

S. Rep. No. 97-417 (1982).................................................................... 16, 17, 20

**Page(s)**

CONSTITUTIONAL MATERIALS

U.S. Const. amend. XV .......................................................................... 5, 7, 8

OTHER AUTHORITIES

Vikram David Amar & Alan Brownstein, *The Hybrid Nature of Political Rights*, 50 Stan. L. Rev. 915 (1998) .................................................... 3, 12

Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801 (2010) ...................................................................................................... 8, 10

Chandler Davidson, *White Gerrymandering of Black Voters: A Response to Professor Everett*, 79 N.C. L. Rev. 1333 (2001) ............................ 3, 13

J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (1999) .................................... 13

Douglas Laycock, *Conceptual Gulfs in* City of Boerne v. Flores, 39 Wm. & Mary L. Rev. 743 (1998) ................................................................. 8

Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 Harv. L. Rev. 153 (1997) ...................................................................................................... 7, 8, 9

John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* (2002) ................................................................. 8

Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991 (2008) ............................................................... 8

*Webster's New International Dictionary* (2d ed. 1950) ......................... 6

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC accordingly has a strong interest in this case and the questions it raises about the scope of the Fifteenth Amendment's protections, Congress's power to enforce those protections, and the Voting Rights Act.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

After a seven-day trial, the district court in this case held that Louisiana's legislative maps (the "Legislative Maps") diluted the voting strength of Black voters and therefore violated Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. ROA.9122. In reaching this result, the district court conducted a searching factual review under the longstanding vote dilution framework set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986), which the Supreme Court reaffirmed

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. Plaintiffs-Appellees, Intervenor-Appellee, the Legislative Intervenor-Appellants, and the State of Louisiana consent to the filing of this *amicus* brief. Defendant-Appellant Secretary of State Nancy Landry takes no position on the filing of this *amicus* brief.

just last year in *Allen v. Milligan*, 599 U.S. 1 (2023), ROA.9124-27.  Based on that review, the district court concluded that "Black voters in the challenged districts 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"  *Id.* at 9212 (quoting *Milligan*, 599 U.S. at 43 (Kavanaugh, J., concurring)).

In this appeal, the State of Louisiana ("Louisiana") argues that the district court's application of Section 2 to the Legislative Maps was unconstitutional because, in its view, Section 2 is no longer necessary to enforce the Fifteenth Amendment in Louisiana.  Contrary to decades of this Court's and the Supreme Court's precedents, Louisiana contends that statutes enacted under Congress's Fifteenth Amendment enforcement authority must be justified by Congress with present-day evidence and that Section 2, which was last amended in 1982, therefore cannot be applied today.  Louisiana Br. 23.  Louisiana's arguments cannot be squared with the text and history of either the Fifteenth Amendment or the Voting Rights Act.

Ratified in 1870, the Fifteenth Amendment gave Congress the "power of conferring upon the colored man the full enjoyment of his right" and "enable[d] Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights."  Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).  Against the backdrop of a political system divided by race, the Framers of the

Fifteenth Amendment recognized that "the black populations in the South would be under siege" and that "political influence and voting power would be their sole means of defense." Vikram David Amar & Alan Brownstein, *The Hybrid Nature of Political Rights*, 50 Stan. L. Rev. 915, 939 (1998). They drafted the Fifteenth Amendment to give Congress broad power—no less sweeping than Congress's Article I powers—to stamp out every conceivable attempt by the states to deny or abridge the right to vote on account of race.

Congress thus has broad authority under the Fifteenth Amendment to set aside dilutive practices that exploit racially polarized voting in order to minimize the voting strength of communities of color. And it also has broad authority to redress the tragic fact that "whites have ruthlessly, systematically, and pretty much without hindrance gerrymandered African-American voters in this country from Reconstruction to the modern era." Chandler Davidson, *White Gerrymandering of Black Voters: A Response to Professor Everett*, 79 N.C. L. Rev. 1333, 1334 (2001). This authority includes the power to protect the right to vote against all forms of racial discrimination—both heavy-handed and subtle—to ensure "the colored man the full enjoyment of his right," Cong. Globe, 41st Cong., 2d Sess. 3670 (1870), and to "prevent any state from discriminating against a voter on account of race," *id.* at 3663.

A broad power to legislate prophylactically to safeguard the right to vote from state denials or abridgements was deemed "necessary to neutralize the deep-rooted prejudice of the white race there against the negro." *Id.* at app. 392. Given the intransigence of white-dominated state legislatures, the Framers of the Fifteenth Amendment understood that the "only means" for Black people "to secure [their] dearest privileges are to be found in national legislation." *Id.*

Congress used these express powers to enact Section 2 of the Voting Rights Act and then to amend it in 1982. By prohibiting maps that dilute the voting strength of communities of color, Section 2 enforces the Fifteenth Amendment's ban on racial discrimination in voting and thereby strengthens our nation's multiracial democracy. Consistent with this history, this Court and the Supreme Court have repeatedly affirmed that Section 2's prohibition of discriminatory results is a constitutional exercise of Congress's Fifteenth Amendment enforcement powers. *See, e.g.*, *Jones v. City of Lubbock*, 727 F.2d 364, 373-74 (5th Cir. 1984); *Veasey v. Abbott*, 830 F.3d 216, 253 & n.47 (5th Cir. 2016); *Milligan*, 599 U.S. at 41.

If this Court were to conclude that Section 2 and *Gingles*—which have been applied to redistricting maps for decades, *see id.* at 19 (collecting cases)—cannot be constitutionally applied to the Legislative Maps, it would undermine Congress's constitutional prerogative to enforce the Fifteenth Amendment by empowering

courts—not Congress—to determine what remedy is necessary to enforce the Fifteenth Amendment. That result would be fundamentally at odds with the text and history of the Fifteenth Amendment. This Court should reject Louisiana's argument and affirm the judgment of the district court.

## ARGUMENT

### I. The Fifteenth Amendment Gives Congress Sweeping Power to Enforce the Amendment's Ban on Racial Discrimination in Voting.

In language "as simple in command as it [is] comprehensive in reach," *Rice v. Cayetano*, 528 U.S. 495, 512 (2000), the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. "Fundamental in purpose and effect . . . , the Amendment prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race," *Rice*, 528 U.S. at 512, and "nullifies sophisticated as well as simple-minded modes of discrimination," *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

Recognizing that "[i]t is difficult by any language to provide against every imaginary wrong or evil which may arise in the administration of the law of suffrage in the several States," Cong. Globe, 40th Cong., 3d Sess. 725 (1869), the Framers of the Fifteenth Amendment chose sweeping language requiring "the equality of races at the most basic level of the democratic process, the exercise of

5

the voting franchise," *Rice*, 528 U.S. at 512. The Fifteenth Amendment equally forbids laws that deny the right to vote outright on account of race, as well as those that abridge the right by diluting the voting strength of citizens of color and nullifying the effectiveness of their votes. *See Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 333-34 (2000) (explaining that the "core meaning" of "'abridge'" is "'shorten'" (quoting *Webster's New International Dictionary* 7 (2d ed. 1950))).

A constitutional prohibition on state denial and abridgement of the right to vote on account of race was necessary because "[t]he ballot is as much the bulwark of liberty to the black man as it is to the white," Cong. Globe, 40th Cong., 3d Sess. 983 (1869), and because "[n]o man is safe in his person or his property in a community where he has no voice in the protection of either," *id.* at 693. The right to vote, the Framers of the Fifteenth Amendment understood, was "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). In this respect, the Framers viewed the right to vote as "kindred to that which belongs under natural law to the right of self-defense." Cong. Globe, 39th Cong., 1st Sess. 174 (1866). The Fifteenth Amendment thus gave Black citizens a critical weapon to protect themselves from white-dominated legislatures seeking to roll back their rights.

To make the Fifteenth Amendment's guarantee a reality, the Framers explicitly invested Congress with a central role in protecting the right to vote against all forms of racial discrimination. They did so by providing that "Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XV, § 2. By adding this language, "the Framers indicated that Congress was to be chiefly responsible for implementing the rights created" by the Amendment and that Congress would have "full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966). As the Framers of the Fifteenth Amendment recognized, "the remedy for the violation" of the Fifteenth Amendment, like the remedies for the violation of the other Reconstruction Amendments, "was expressly not left to the courts. The remedy was legislative, because . . . the amendment itself provided that it shall be enforced by legislation on the part of Congress." Cong. Globe, 42d Cong., 2d Sess. 525 (1872). The enforcement power "was born of the conviction that Congress—no less than the courts—has the duty and the authority to interpret the Constitution." Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 Harv. L. Rev. 153, 183 (1997). And Congress refused to leave the right to vote "to the unchecked discretion of the Supreme Court that

decided" *Dred Scott v. Sandford*. Douglas Laycock, *Conceptual Gulfs in* City of Boerne v. Flores, 39 Wm. & Mary L. Rev. 743, 765 (1998).

The Fifteenth Amendment's express grant of power to enact "appropriate legislation" gives Congress wide discretion to enact whatever measures it deems "appropriate" for achieving the Amendment's objective of ensuring that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . by any State on account of race." U.S. Const. amend. XV. By authorizing Congress to enact "appropriate legislation," the Framers granted Congress the sweeping authority of Article I's "necessary and proper" powers as interpreted by the Supreme Court in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), a seminal case well known to the Reconstruction Framers. *See, e.g.*, John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* 29-31 (2002); Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801, 1810-15 (2010); Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991, 1002-03 (2008); McConnell, *supra*, at 188. As history shows, "Congress' authority under § 2 of the Fifteenth Amendment . . . [is] no less broad than its authority under the Necessary and Proper Clause." *City of Rome v. United States*, 446 U.S. 156, 175 (1980); *see Katzenbach*, 383 U.S. at 326 (explaining that *McCulloch*'s "classic formulation"

8

provides "[t]he basic test to be applied in a case involving [Section] 2 of the Fifteenth Amendment").

   In *McCulloch*, Chief Justice Marshall laid down the fundamental principle defining the scope of Congress's powers under the Necessary and Proper Clause: "Let the end be legitimate, let it be within the scope of the constitution, and *all means which are appropriate*, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. at 421 (emphasis added); *see Knox v. Lee*, 79 U.S. (12 Wall.) 457, 542 (1871) ("Is it our province to decide that the means selected were beyond the constitutional power of Congress, because we may think that other means to the same ends would have been more appropriate and equally efficient? That would be to assume legislative power, and to disregard the accepted rules for construing the Constitution."); McConnell, *supra*, at 178 n.153 ("In *McCulloch v. Maryland*, the terms 'appropriate' and 'necessary and proper' were used interchangeably." (citation omitted)). Indeed, in *McCulloch*, Chief Justice Marshall used the word "appropriate" to describe the scope of congressional power no fewer than six times. *McCulloch*, 17 U.S. at 408, 410, 415, 421, 422, 423. Thus, by giving Congress the power to enforce the constitutional prohibition on denying or abridging the right to vote on account of

9

race by "appropriate legislation," the Framers "actually *embedded in the text*" the "language of *McCulloch*." Balkin, *supra*, at 1815 (emphasis in original).

As the text and history of the Fifteenth Amendment demonstrate, the Enforcement Clause gives Congress a broad "affirmative power" to secure the right to vote. Cong. Globe, 40th Cong., 3d Sess. 727 (1869); *see id.* at 1625 ("Congress . . . under the second clause of this amendment" has the power to "impart by direct congressional legislation to the colored man his right to vote. No one can dispute this."). The Framers of the Fifteenth Amendment feared that without a broad enforcement power the constitutional guarantee of equal voting rights would not be fully realized. "Who is to stand as the champion of the individual and enforce the guarantees of the Constitution in his behalf as against the so-called sovereignty of the States? Clearly no power but that of the central Government is or can be competent for their adjustment . . . ." *Id.* at 984.

In 1870, the same year the Fifteenth Amendment was ratified, Congress employed the Amendment's Enforcement Clause to enact federal voting rights legislation. As the debates over the Enforcement Act of 1870 reflect, the Fifteenth Amendment "clothes Congress with all power to secure the end which it declares shall be accomplished." Cong. Globe, 41st Cong., 2d Sess. 3563 (1870). The Amendment's Enforcement Clause, Senator Oliver Morton explained, was "intended to give to Congress the power of conferring upon the colored man the

full enjoyment of his right. We so understood it when we passed it." *Id.* at 3670.

"[T]he second section was put there," he went on to explain, "for the purpose of enabling Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights." *Id.* Thus, "the colored man, so far as voting is concerned, shall be placed on the same level and footing with the white man and . . . Congress shall have the power to secure him that right." *Id.*; *see id.* at 3655 (explaining that the "intention and purpose" of the Fifteenth Amendment's Enforcement Clause was to "secure to the colored man by proper legislation the right to go to the polls and quietly and peacefully deposit his ballot there"); *id.* at 3663 ("Congress has a right by appropriate legislation to prevent any State from discriminating against a voter on account of his race . . . ."); *see also* 2 Cong. Rec. 4085 (1874) (observing that the Enforcement Clause of the Fifteenth Amendment was added to allow Congress "to act affirmatively" and ensure that "the right to vote, should be enjoyed"). The Framers of the Fifteenth Amendment specifically recognized that a broad legislative power to protect the right to vote against all forms of racial discrimination—both denials and abridgements—was critical to ensuring "the colored man the full enjoyment of his right." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).

In the months following ratification of the Fifteenth Amendment, "[l]egislators anticipated that the majority of whites, who harbored virulent ill-will

toward their former slaves, would engage in racial bloc voting; only the votes of the black masses could offset this white political aggression." Amar & Brownstein, *supra*, at 941. The grim reality that "[t]he States can invent just as many requirements [for voting] as you have fingers and toes" made it essential to provide "proper machinery . . . for enforcing the fifteenth amendment." Cong. Globe, 41st Cong., 2d Sess. 3658 (1870). Congressmen insisted that "it is our imperative duty . . . to pass suitable laws to enforce the fifteenth amendment" because, without them, "the fifteenth amendment will be practically disregarded in every community where there is a strong prejudice against negro voting." *Id.* at 3568. The only means to safeguard equal political opportunities and ensure the multiracial democracy the Fifteenth Amendment promised, Congressmen insisted, "are to be found in national legislation. This security cannot be obtained through State legislation," where "the laws are made by an oppressing race." *Id.* at app. 392. Stringent national safeguards were needed to "neutralize the deep-rooted prejudice of the white race there against the negro" and "secure his dearest privileges" at the ballot box. *Id.*

The Fifteenth Amendment thus gave Congress a significant new power. As the next Section shows, Congress used this power to pass the Voting Rights Act and thereby prohibit dilutive electoral practices that undercut the Fifteenth Amendment's guarantee of equal political opportunity.

**II.     Congress Constitutionally Used Its Fifteenth Amendment Enforcement Power to Enact Section 2's Prohibition of Vote Dilution.**

Tragically, the Fifteenth Amendment "proved little more than a parchment promise." *Milligan*, 599 U.S. at 10. The passage of the Voting Rights Act—after nearly a century of efforts to undermine the Fifteenth Amendment's mandate—was necessary precisely because the Fifteenth Amendment alone was insufficient to ensure that citizens of color in fact enjoyed equal opportunity "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). With the Voting Rights Act, Congress evinced its "firm intention to rid the country of racial discrimination in voting." *Katzenbach*, 383 U.S. at 315.

**A.** After the enactment of the Fifteenth Amendment, "[g]errymanders were the paradigm of the dilution strategy" in the South. J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* 26 (1999). State governments packed and cracked Black voters into gerrymandered districts to undercut the Fifteenth Amendment's guarantee of equal political opportunity. *See* Davidson, *supra*, at 1334 ("Briefly put, whites have ruthlessly, systematically, and pretty much without hindrance gerrymandered African-American voters in this country from Reconstruction to the modern era.").

The Supreme Court subsequently made clear that the Fifteenth Amendment prohibits any "contrivances by a state to thwart equality in the enjoyment of the right to vote by citizens of the United States regardless of race or color." *Lane*,

307 U.S. at 275.  In *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the Court struck down racial gerrymandering by the City of Tuskegee, Alabama as a violation of the Fifteenth Amendment's commands.  The city had attempted to redefine its boundaries "from a square to an uncouth twenty-eight-sided figure" for the purpose of "segregating white and colored voters."  *Id.* at 340, 341.  The Court concluded that "the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights."  *Id.* at 347.  *Gomillion* held that "[w]hen a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment."  *Id.* at 346.

And in other cases, the Supreme Court has held that the Fourteenth Amendment's more general guarantee of equal protection also limits states' ability to put in place districting schemes that function "to cancel out or minimize the voting strength of racial groups."  *White v. Regester*, 412 U.S. 755, 765 (1973).  In *White*, the Court held that plaintiffs bringing vote dilution claims must show that "the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity . . . to participate in the political processes and to elect legislators of their choice."  *Id.* at 766.  Taking into account "the history of official racial discrimination," racially polarized voting, and other characteristics of the electoral

system that "enhanced the opportunity for racial discrimination," the Court affirmed a lower court's finding of racial vote dilution. *Id.*

**B.** In *City of Mobile v. Bolden*, 446 U.S. 55 (1980), a plurality of the Supreme Court stated that a challenge to a municipality's at-large election system, whether brought under the Fourteenth or Fifteenth Amendment, failed absent proof of a "racially discriminatory motivation," which the plurality insisted was a "necessary ingredient of a Fifteenth Amendment violation." *Id.* at 62; *id.* at 66 (stressing "the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment"). And because the national prohibition on racial discrimination in voting contained in Section 2 of the Voting Rights Act "no more than elaborates upon . . . the Fifteenth Amendment," the plurality insisted that "it was intended to have an effect no different than the Fifteenth Amendment itself." *Id.* at 60, 61.

Congress responded by amending Section 2 of the Voting Rights Act, employing its express power to enforce the right to vote free from racial discrimination "to make clear that certain practices and procedures that *result* in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." *Chisolm v. Roemer*, 501 U.S. 380, 383-84 (1991) (emphasis in original). Congress recognized that "the right to vote can be affected by a dilution

of voting power as well as by an absolute prohibition on casting a ballot" and acted to eliminate all "discriminatory election systems or practices which operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness of minority groups." S. Rep. No. 97-417, at 6, 28 (1982); *see id.* at 19 ("There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have . . . the vote counted at full value without dilution or discount."). Significantly, state practices, including districting schemes, that exploited racially polarized voting to dilute the voting strength of communities of color and nullify the effectiveness of their votes were paradigmatic examples of state practices that *resulted* in the denial or abridgment of the right to vote.

To effectuate its goal of prohibiting state practices that resulted in the denial or abridgment of the right to vote, Congress chose language "taken almost verbatim from *White*," *see Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321, 2333 (2021). This language was designed to enforce the constitutional guarantee of equal political opportunities for all citizens regardless of race and strike at the full range of state practices that limit the ability of citizens of color "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). As the Supreme Court has made clear, it covers instances in which state mapmakers exploit racially polarized voting by packing and cracking

16

communities of color to dilute the effectiveness of their votes. *See Milligan*, 599 U.S. at 18.

Congress thus used its power to enforce the Fifteenth Amendment to "prohibit voting practices that have only a discriminatory effect," particularly when those practices create a "risk of purposeful discrimination." *City of Rome*, 446 U.S. at 175, 177. That is certainly the case with vote dilutive practices, which, as Congress well knew when amending the Voting Rights Act, had long been employed to gut the Fifteenth Amendment's promise of equal political opportunities for all citizens regardless of race. A strict test for purposeful discrimination, Congress reasonably feared, would ratify, not rein in, vote dilutive practices by the states. *See* S. Rep. No. 97-417, at 40 (finding that "the difficulties faced by plaintiffs forced to prove discriminatory intent through case-by-case adjudication create a substantial risk that intentional discrimination . . . will go undetected, uncorrected and undeterred"). The "right" question, Congress concluded, was not whether state practices were adopted or maintained with discriminatory intent, but whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 28.

**C.** Courts have applied Section 2 to districting maps "in an unbroken line of decisions stretching four decades," *Milligan*, 599 U.S. at 38, using the framework

17

the Supreme Court established in *Gingles*, *see id.* at 17; *see also id.* at 19 (collecting cases). *Gingles* demands "'an intensely local appraisal' of the electoral mechanism at issue," *id.* at 19 (quoting *Gingles*, 478 U.S. at 79), and it requires that close attention be paid to whether the "effect of the[] [State's] choices" is to "deny[] equal opportunity" to voters of color, *League of Latin Am. Citizens v. Perry*, 548 U.S. 399, 441-42 (2006); *see Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994) (explaining that "[t]he need for such 'totality' review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power"). In this respect, the results test "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 540 (2015).

**D.** The Supreme Court has consistently recognized that Section 2's results test is constitutional. Just last year, in *Milligan*, the Supreme Court used the *Gingles* test and affirmed a district court's ruling that Alabama's 2021 congressional maps violated Section 2. *See* 599 U.S. at 23. In so doing, the Court rejected the state's arguments against Section 2's constitutionality. *See id.* at 41 ("We . . . reject [the State's] argument that § 2 as applied to redistricting is unconstitutional under the Fifteenth Amendment."); *id.* ("[W]e are not persuaded

by [the State's] arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress.").

Any other result in *Milligan* would have been unfaithful to the text and history of the Fifteenth Amendment and Section 2. Indeed, as this Court observed in *City of Lubbock*, "Congressional power to adopt prophylactic measures to vindicate the purposes of the . . . fifteenth amendment[] is unquestioned." 727 F.2d at 373. When Congress amended Section 2 in 1982, it "heard extensive testimony showing that the full exercise of the franchise by American minorities still suffered from the effects of electoral systems that hinder minority input into the nation's decision-making." *Id.* at 374. "Acting on this record, Congress . . . could appropriately determine that a 'results' test was necessary to enforce the fourteenth and fifteenth amendments." *Id.* at 375; *see also id.* ("Where Congress, on the basis of a factual investigation, perceives that a facially neutral measure carries forward the effects of past discrimination, Congress may even enact blanket prohibitions against such rules."). Since *City of Lubbock*, this Court has upheld Section 2 against challenges to its constitutionality. *See Veasey*, 830 F.3d at 253.

* * *

In sum, Section 2's results test "is an important part of the apparatus chosen by Congress to effectuate this Nation's commitment 'to confront its conscience and fulfill the guarantee of the Constitution' with respect to equality in voting." *Bush*

19

*v. Vera*, 517 U.S. 952, 992 (1996) (O'Connor, J., concurring) (quoting S. Rep. No.

97-417, at 4).  Section 2 falls squarely within the broad scope of Congress's power

to enforce the Fifteenth Amendment's ban on electoral practices, such as packing

and cracking communities of color, that have long been used to gut the Fifteenth

Amendment's promise of an inclusive, multiracial democracy open to all citizens

regardless of race.  *See Oregon v. Mitchell*, 400 U.S. 112, 132 (1970) (opinion of

Black, J.) (upholding congressional ban on literacy tests to enforce the Fifteenth

Amendment in light of the "long history of the discriminatory use of literacy tests

to disfranchise voters on account of their race").

## III.  Section 2's Application to Present Circumstances Does Not Exceed Congress's Fifteenth Amendment Power to Prohibit Redistricting Maps that Dilute Black Voters' Electoral Strength.

Notwithstanding the Supreme Court's and this Court's precedents, Louisiana

argues that Section 2 cannot be applied to the Legislative Maps.  Critically,

Louisiana does not assert that Section 2 exceeded Congress's remedial powers

when it was enacted in 1965 or amended in 1982.  Louisiana also does not argue

that Section 2 impermissibly infringes on states' authority over redistricting or that

Section 2 violates equal protection principles.  Understandably so, as the Supreme

Court rejected each of these arguments in *Milligan*.  *See* 599 U.S. at 41, 29-30, 31-

32 (plurality opinion).

Instead, Louisiana argues that Congress has exceeded its Fifteenth

Amendment enforcement power simply because, in Louisiana's view, Section 2 is

no longer necessary in Louisiana today. Louisiana asserts that legislation enacted

pursuant to Congress's Fifteenth Amendment enforcement power must be justified

by Congress with present-day evidence. *See* Louisiana Br. 23. Absent that,

Louisiana posits, such legislation exceeds Congress's enforcement authority and

cannot be constitutionally applied against states today. *Id.*

Louisiana's arguments suffer from at least two fundamental flaws.

*First*, Louisiana ignores that it is Congress, not the courts, that the

Constitution empowers to determine how best to enforce the Fifteenth

Amendment. As previously described, the Fifteenth Amendment gave Congress

sweeping authority to ensure that Black voters were fully able to realize their

constitutional right to vote. *See supra* Section I. The Framers of the Fifteenth

Amendment repeatedly emphasized the need for national legislation to guard

against states' efforts to disenfranchise communities of color. By leaving the

Amendment's enforcement to Congress and not the courts, the Framers made clear

that it was up to Congress to determine how best to promote the Amendment's

promise of a multiracial democracy free from discrimination.

Consistent with that history, the Supreme Court has recognized that "so long

as the prohibitions attacking racial discrimination in voting are appropriate," *City*

*of Rome*, 446 U.S. at 177 (internal quotation marks omitted), Congress's chosen means to make the Fifteenth Amendment's promise of voting equality real are constitutional exercises of its Fifteenth Amendment enforcement authority. *See McCulloch*, 17 U.S. at 421 ("the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people"); *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 205 (2009) ("The Fifteenth Amendment empowers 'Congress,' not the Court, to determine . . . what legislation is needed to enforce it."); *City of Lubbock*, 727 F.2d at 374.

Louisiana seeks to subvert Congress's constitutional prerogative to enforce the Fifteenth Amendment by asking this Court to find that Congress's chosen remedy, Section 2, is no longer needed. Louisiana Br. 22-23. But, again, that is not this Court's role. *See City of Lubbock*, 727 F.2d at 374 ("Even if the judiciary may deem the congressional course as unwise, the courts must acknowledge the nature of the limits that circumscribe congressional power . . . ."); *cf. Bostock v. Clayton County*, 590 U.S. 644, 680-81 (2020) ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.").

Moreover, the district court was keenly aware of present-day circumstances in Louisiana. Section 2 and the *Gingles* inquiry require courts to conduct a

22

"searching practical evaluation of the 'past and present reality,'" *Milligan*, 599

U.S. at 19 (quoting *Gingles*, 478 U.S. at 79), and the district court did just that.

*See* ROA.9196-99, 9202-05, 9206-7. Reviewing the relevant factors, the district

court concluded that the totality of the circumstances weighed in favor of finding

that the political process was not equally open to Black voters under the

Legislative Maps. *See id.* at 9212. Louisiana can, and does, challenge the factual

findings and legal conclusions in the district court's totality of the circumstances

analysis. *See* Louisiana Br. 1 n.1 (adopting by reference the Secretary of State's

briefing challenging the district court's analysis under the Senate Factors). But

Louisiana's disagreements with the district court's *Gingles* analysis have no

bearing on Section 2's constitutionality.

*Second*, Louisiana argues that Supreme Court precedent requires this Court

to hold that Section 2 is unconstitutional as applied here. This too is wrong. As an

initial matter, Louisiana's assertion that the Supreme Court has always required

Fifteenth Amendment legislation to be "justified by current needs," *see* Louisiana

Br. 19; *id.* (claiming that "[t]his has been the law since the VRA first came into

existence"), misrepresents Supreme Court precedent upholding the

constitutionality of the Voting Rights Act under the Fifteenth Amendment.

When assessing whether the Voting Rights Act is a constitutional exercise of

Congress's Fifteenth Amendment authority, the Supreme Court and this Court

have evaluated the extensive historical record of racial discrimination in voting that motivated the enactment or amendment of the Act. *See Katzenbach*, 383 U.S. at 308-15; *City of Lubbock*, 727 F.2d at 374; *see also City of Rome*, 446 U.S. at 180-82 (upholding the Voting Rights Act's 1975 amendments in light of the legislative history of those amendments). Contrary to Louisiana's assertions, the Court has never looked at "current" conditions of racial discrimination to decide whether the Voting Rights Act is appropriate Fifteenth Amendment legislation. Instead, the Court has focused on the harms that motivated Congress at the time it enacted or amended the Act. Because the Voting Rights Act has consistently been held to be a rational means of enforcing the Fifteenth Amendment in light of that record, the inquiry ends there.

Compounding its errors, Louisiana points to cases implicating Congress's remedial authority under the Fourteenth Amendment, including *City of Boerne v. Flores*, 521 U.S. 507 (1997), to support its crabbed understanding of Congress's Fifteenth Amendment enforcement power. *See* Louisiana Br. 21. Putting aside that the Fourteenth Amendment congruence and proportionality standard applied in those cases is distinct from the Fifteenth Amendment's rational-means test, *City of Boerne* and its progeny do not suggest that Congress must continually justify its Fourteenth Amendment legislation with updated findings for that legislation to remain within Congress's remedial authority. Instead, the legislation's

constitutionality is assessed only with respect to the congressional record

motivating the statute at the time of its enactment. *See, e.g.*, *City of Boerne*, 521

U.S. at 530 (examining the legislative record for the Religious Freedom

Restoration Act); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 89 (2000) ("Our

examination of the ADEA's legislative record confirms that Congress' 1974

extension of the Act to the States was an unwarranted response to a perhaps

inconsequential problem."); *Tennessee v. Lane*, 541 U.S. 509, 522 (2004)

("Whether [the statute] validly enforces these constitutional rights is a question that

'must be judged with reference to the historical experience which it reflects.'"

(quoting *Katzenbach*, 383 U.S. at 308)). None of these cases indicate that

Congress's remedial authority, whether under the Fourteenth Amendment or the

Fifteenth Amendment, is time-limited.

Finally, Louisiana's contention that under *Shelby County*, Section 2 must be

supported by "current [2024] needs," and that therefore Congress must justify

Section 2's application to states today with present-day data of racial

discrimination in voting, Louisiana Br. 19-20, 23, grossly misconstrues *Shelby*

*County*.

There, the Supreme Court struck down the Voting Rights Act's coverage

formula as an impermissible infringement of states' equal sovereignty because the

statutory formula used state action from the 1960s and 1970s to determine which

states were subject to preclearance in 2013. *Shelby County*, 570 U.S. at 551, 557. Put differently, the Court held that the statutory formula—that is, the formula included in the statute's text—must be "based on current conditions" to comply with the Constitution's mandate of equal sovereignty. *Id.* at 557. *Shelby County* only applies to the statutory formula and has no bearing on Section 2's constitutionality, as Chief Justice Roberts, writing for the majority, expressly stated. *See id.* at 557 ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."). This makes sense. In *Shelby County*, the Court was troubled by two unique aspects of the coverage formula: its unequal treatment of states, *see id.* at 544, and its use of decades-old data to define the coverage formula enshrined in the statute itself, *see id.* at 551. Section 2 does not raise either of these concerns.

\* \* \*

As this Court has observed, Congress's power "to adopt prophylactic measures" to enforce the Fifteenth Amendment's promise of an inclusive multiracial democracy "is unquestioned." *City of Lubbock*, 727 F.2d at 373. With Section 2, Congress took the "modest step of shifting to states and municipalities the burden of accommodating their political systems when that system seriously prejudices minority groups." *Id.* at 375. For over forty years, Congress has kept Section 2 on the books. As *Milligan* makes clear, there is nothing constitutionally

suspect about *Gingles*'s continued application today. *See Milligan*, 599 U.S. at 23

(applying *Gingles* to a congressional map enacted in 2021). This Court should

reject Louisiana's attempts to evade its obligations under the Voting Rights Act.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 23, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on August 23, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 23rd day of August, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,232 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 23rd day of August, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*