No. 24-30115

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE
WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING
INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN
HARRIS, REVEREND,

*Plaintiffs - Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF
LOUISIANA,

*Defendant - Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH
B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER
OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,

*Intervenors - Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor - Appellee.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:22-cv-00178-SDD-SDJ

---

**REPLY BRIEF OF LEGISLATIVE INTERVENOR-APPELLANTS**

Richard B. Raile
Katherine L. McKnight
E. Mark Braden
BAKER HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Telephone: 202.861.1711
Email: rraile@bakerlaw.com

Michael W. Mengis
BAKER HOSTETLER LLP
811 Main Street
Suite 1100
Houston, TX 77002

Patrick T. Lewis
BAKER HOSTETLER LLP
127 Public Square
Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
Robert J. Tucker
BAKER HOSTETLER LLP
200 Civic Center Drive
Suite 1200
Columbus, OH 43215

*Attorneys for Intervenor-Appellants, Phillip DeVillier, in his official capacity as Speaker of the Louisiana House of Representatives, and Cameron Henry, in his official capacity as President of the Louisiana Senate*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 1

ARGUMENT ............................................................................... 2

    I.    Plaintiffs Lack Standing for Most Relief Issued .......................... 2

        A.    The Individual Plaintiffs May Challenge Only Three Districts ............................................................................. 2

        B.    Organizational Standing Is Unavailable ............................. 8

    II.    Plaintiffs' Section 2 Claim Fails ............................................. 14

        A.    Plaintiffs' Demand for More Than Proportionality Is Unfounded ...................................................................... 14

        B.    The District Court Erred on the First Precondition ........... 16

        C.    The District Court Erred on the Second and Third Preconditions .................................................................. 20

CONCLUSION ........................................................................... 26

CERTIFICATE OF SERVICE ...................................................... 27

CERTIFICATE OF COMPLIANCE .............................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. Fowler,*
178 F.3d 350 (5th Cir. 1999) .................................................................. 14

*Agee v. Benson,*
2023 WL 10947213 (W.D. Mich. Aug. 29, 2023)................................... 23

*All. of Auto. Mfrs., Inc. v. Jones,*
2013 WL 4838764 (N.D. Fla. Sept. 11, 2013) ......................................... 5

*Allen v. Milligan,*
599 U.S. 1 (2023)............................................................................*passim*

*Anderson v. City of Bessemer,*
470 U.S. 564 (1985) ............................................................................... 20

*Ardoin v. Robinson,*
142 S.Ct. 2892 (2022) ........................................................................... 18

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.,*
829 F. Supp. 2d 802 (D. Minn. 2011) ................................................... 24

*Barrett Comput. Servs., Inc. v. PDA, Inc.,*
884 F.2d 214 (5th Cir. 1989) .................................................................. 3

*Benedict v. United States,*
822 F.2d 1426 (6th Cir. 1987)................................................................ 24

*Bethune-Hill v. Va. State Bd. of Elections,*
3:14-cv-00852, (E.D. Va. June 26, 2018)................................................ 4

*Bethune-Hill v. Va. State Bd. of Elections,*
368 F. Supp. 3d 872 (E.D. Va. 2019) ...................................................... 4

*Carlson v. Bioremedi Therapeutic Sys., Inc.,*
822 F.3d 194 (5th Cir. 2016) ................................................................. 25

*Clark v. Calhoun Cnty.*,
  88 F.3d 1393 (5th Cir. 1996) .................................................. 20

*Dodge v. Cotter Corp.*,
  328 F.3d 1212 (10th Cir. 2003) ............................................ 25

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. &*
  *Antitrust Litig.*,
  2020 WL 1164869 (D. Kan. Mar. 10, 2020) .......................... 24

*Fairley v. Hattiesburg*,
  662 F. App'x 291 (5th Cir. 2016) ......................................... 14

*Fairley v. Hattiesburg*,
  584 F.3d 660 (5th Cir. 2009) ................................................ 25

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................... 9, 10, 11

*FEC v. Akins*,
  524 U.S. 11 (1998) ................................................................ 13

*Ga. Firefighters' Pension Fund v. Anadarko Petrol. Corp.*,
  99 F.4th 770 (5th Cir. 2024) ................................................ 25

*Gill v. Whitford*,
  585 U.S. 48 (2018) ...................................................... 2, 3, 4, 9

*Grand Council of Crees (of Quebec) v. FERC*,
  198 F.3d 950 (D.C. Cir. 2000) ......................................... 13, 14

*Harding v. Cnty. of Dallas*,
  948 F.3d 302 (5th Cir. 2020) .................................................. 2

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................. 9, 10, 11

*Houston Laws.' Ass'n v. Att'y Gen. of Tex.*,
  501 U.S. 419 (1991) ............................................................... 12

*Houston v. Lafayette Cnty.*,
  56 F.3d 606 (5th Cir. 1995) ................................................... 17

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ..................................................... 14, 15, 16

*Laborers' Pension Fund v. Surface Dimensions, Inc.*,
    2011 WL 841515 (N.D. Ill. Mar. 8, 2011) ................................. 5

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ...........................................................*passim*

*Levy v. Lexington Cnty.*,
    589 F.3d 708 (4th Cir. 2009) .............................................. 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................ 12

*Lundeen v. Mineta*,
    291 F.3d 300 (5th Cir. 2002) .............................................. 13

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)...................................................8, 12

*Nguyen v. Excel Corp.*,
    197 F.3d 200 (5th Cir. 1999) ............................................... 5

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) .............................................. 12

*Roberts v. Wamser*,
    883 F.2d 617 (8th Cir. 1989) ...........................................12, 13

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022) ...........................................17, 18

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023) ....................................2, 12, 19, 20

*Rodriguez v. Bexar Cnty.*,
    385 F.3d 853 (5th Cir. 2004) .............................................. 22

*Sensley v. Albritton*,
    385 F.3d 591 (5th Cir. 2004) ...........................................17, 18

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ................................................................ 4

*Spivey v. United States*,
  912 F.2d 80 (4th Cir. 1990) .................................................... 8

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ......................................................... 13, 14

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) .................................................... *passim*

*Trafficante v. Metro. Life Ins.*,
  409 U.S. 205 (1972) .............................................................. 14

*United States v. Adejumo*,
  772 F.3d 513 (8th Cir. 2014) .................................................. 8

*United States v. Hays*,
  515 U.S. 737 (1995) ............................................................... 4

*United States v. One (1) 1963, Hatteras Yacht Ann Marie*,
  584 F.2d 72 (5th Cir. 1978) .................................................... 8

*White-Battle v. Democratic Party of Va.*,
  323 F. Supp. 2d 696 (E.D. Va. 2004) ..................................... 13

**Statutes**

52 U.S.C. § 10301 ..................................................................... 13

52 U.S.C. § 10302 ..................................................................... 13

**Rules**

Fed. R. Civ. P. 52 ....................................................................... 8

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs and their amici cite no § 2 ruling as expansive as the district court's order, which demands 49 majority-Black districts where Louisiana already provided 40, the most in its history. Plaintiffs fail to justify that unprecedented ruling as either a proper exercise of jurisdiction or a sound application of § 2.

On jurisdiction, Plaintiffs admit the district court enjoined every district in two plans, including dozens where no Individual Plaintiff resides. They are wrong to deny that ruling presupposes a theory of statewide harm—it does—and to contend individuals may challenge neighboring districts as well as their own—they may not. Plaintiffs' reliance on associational standing is too little, too late: disclosed NAACP members do not bridge the gap between Individual Plaintiffs' limited standing and the injunction's sweeping reach, and evidence of these individuals was inadmissible where Plaintiffs refused disclosure of information they later presented at trial. And Plaintiffs' contention that organizations can spend their way into standing by speech is precisely the contention the Supreme Court recently rejected.

On the merits, the Supreme Court has cautioned that § 2 typically does not require more majority-minority districts than a minority group's proportion of the voting-age population where those districts are sought. Plaintiffs say next to nothing about that rule, and they are mistaken in treating *Allen v. Milligan*, 599 U.S. 1 (2023), as the first in an endless string of dominoes. *Milligan* ratified one new majority-Black district in Alabama, this Court ratified one new majority-

Black Louisiana congressional district, *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) (*Robinson II*), so Plaintiffs say *nine* new majority-Black districts must be forced out of Louisiana's legislative plans. But *Milligan* warned against this: § 2 imposes "exacting requirements" to prevent runaway trains like this case. 599 U.S. at 29-30. A 0.78% growth in the State's Black voting age population (BVAP) since 2010, ROA.15826, does not justify this expansion of race-based redistricting. Nor does Plaintiffs' reference to population "shifts," Plaintiffs-Appellees' Brief (Br.) 37, where the challenged plans already provide proportionality in every region where Plaintiffs demand new majority-Black districts. Legislative-Intervenors' Opening Brief (LD Br.) 49-50.

Plaintiffs' quantity-over-quality approach does not validate the decision below. The Court should reverse.

## ARGUMENT

## I.     Plaintiffs Lack Standing for Most Relief Issued

### A.     The Individual Plaintiffs May Challenge Only Three Districts

The district court erred by enjoining all "elections under S.B. 1 and H.B. 14," ROA.9212, in a suit by four Individual Plaintiffs. LD Br. 12-14. Because a vote-dilution "burden arises through a voter's placement in a 'cracked' or 'packed' district," an individual may challenge only "the particular district in which he resides." *Gill v. Whitford*, 585 U.S. 48, 66, 69 (2018); *Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020). Standing cannot rest on alleged "statewide harm" or justify "statewide remedies." *Gill*, 585 U.S. at 68.

1.     Plaintiffs respond with misdirection. They deny that the district court employed "a theory of statewide harm," Br. 10 (quotation marks omitted), but admit the district court fully "enjoin[ed] the use of S.B.1 and H.B.14," the challenged plans, *id*. at 12, as it expressly did, *see* ROA.9212. That is a "statewide remed[y]." *Gill*, 585 U.S. at 68. The assertion that "*Plaintiffs* did not challenge every district in the enacted state legislative maps," Br. 10-11 (emphasis added), only underscores the error of an injunction against every district. While Plaintiffs seek support for the injunction in the "specificity" in the "district court's findings," *id*. at 12 (citing ROA.9146-50, 9217), they cite merits findings under the first precondition of *Thornburg v. Gingles*, 478 U.S. 30 (1986). ROA.9146-50. Standing presents "a separate inquiry from whether the party should prevail," *Barrett Comput. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989) (citation omitted), and no findings establish residency in any district but HD60, HD66, and HD25. That leaves the entire Senate plan, and at least 102 House districts, beyond the district court's jurisdiction.[1]

Plaintiffs effectively confess error in the statewide injunction by admitting that "remedying the vote dilution found by the district court need not involve a reconfiguration of the entire map." Br. 12. Thus, the parties seem to agree that the injunction goes too far. Yet Plaintiffs advocate an injunction reaching

---

[1] The district court did not find HD66 to be cracked or packed. ROA.9153. Plaintiffs suggest liability against HD66 can be inferred from "additional findings about Plaintiffs' various experts' analysis," Br. 13-14, but that evidence shows the district affords Black opportunity in neither the challenged plan nor in Plaintiffs' illustrative plan. *See* ROA.15739.

(vaguely) beyond districts where Individual Plaintiffs reside, insisting that "[e]njoining *only* the specific dilutive districts would not redress Plaintiffs' harm" because reconfiguring one district has an "impact [on] an immediately adjacent district," *id*. at 12 (citation omitted). But governing precedent holds that "the remedy that is proper and *sufficient*" in a vote-dilution case "lies in the revision of the boundaries of the individual's own district." *Gill*, 585 U.S. at 66 (emphasis added). Nearly 30 years of precedent rejects the argument that the interaction of neighboring districts entitles a resident of one district to challenge adjacent districts. *See United States v. Hays*, 515 U.S. 737, 746 (1995); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996). Instead, this "reality," Br. 12, justifies "revising only such districts as are necessary to reshape *the voter's* district." *Gill*, 585 U.S. at 67 (emphasis added). The incidental effect of redrawing one district does not establish jurisdiction over adjacent districts in their own right.

*Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872 (E.D. Va. 2019) (three-judge court), which Plaintiffs cite, Br. 12, confirms their error. Its injunction reached enumerated districts where challengers resided. *Bethune-Hill v. Va. State Bd. of Elections*, 3:14-cv-00852, Doc. 235 at 1-2 (¶¶ 1, 2) (E.D. Va. June 26, 2018). Plaintiffs cite the remedial ruling, which did not enjoin adjacent districts or say anything of statewide injunctions.

2.     Plaintiffs look to Louisiana NAACP members for the remainder of the relief afforded. Br. 14-22. But Plaintiffs refused discovery into membership on grounds of privilege and may not rely on withheld evidence now.

Plaintiffs do not dispute the rule forbidding employment of privilege "as both a sword and a shield." *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999); *see* Br. 19-20. They propose no sword-and-shield problem arose because they were not "*simultaneously*" protecting and using privileged material. Br. 20 (citation omitted). But the doctrine equally forbids raising privilege and later using privileged material. *Laborers' Pension Fund v. Surface Dimensions, Inc.*, 2011 WL 841515, at *5 (N.D. Ill. Mar. 8, 2011); *All. of Auto. Mfrs., Inc. v. Jones*, 2013 WL 4838764, at *5 n.9 (N.D. Fla. Sept. 11, 2013) ("[T]he 'sword and shield doctrine' does not permit withholding discovery on the basis of privilege and then using the information later."). Here, Plaintiffs refused disclosure throughout the discovery period on privilege grounds and then introduced privileged information at trial. *See* LD Br. 15-17.

Plaintiffs pin their own gamesmanship on Defendants, who moved to compel production, and propose the order directing disclosure of member names absolves Plaintiffs' discovery failings. Br. 20. It does not. Defendants actively sought more than that information well before the discovery period closed to ensure produced information could be vetted, *see, e.g.*, ROA.1336 (Aug. 16, 2023); ROA.1396 (Sept. 1, 2023), which the district court made impossible. The court in September 2023 denied the motion to compel, ROA.1447 (Sep. 8, 2023), and the court reversed itself only after discovery ended,

ROA.6868 (Nov. 2, 2023). By then, it was too late for Defendants to verify the limited disclosure. Plaintiffs' trial witness testified that he verified voter registration status of the disclosed members by entering their "NAMES, DATE OF BIRTH, AND ZIP CODE" into the Secretary of State's website and obtained birthdates by having "SPOKE[N] WITH" disclosed members. ROA.10963-64. But Defendants could not do the same because birth dates (which were originally requested, ROA.1257) were never produced (due to the privilege assertion), and the district court denied member depositions, where counsel might verify what Plaintiffs' witness purported to learn from his unilateral access. *See* ROA.10951-52, 10961-63. Moreover, Plaintiffs' witness testified to the race of members and their consent to be involved in the litigation, *see, e.g.*, ROA.10948, 10954, but this also could not be verified before trial, due to the privilege assertion. ROA.10951-52. Thus, Plaintiffs are wrong to say "no privileged information was ultimately shielded." Br. 19. They relied at trial on evidence withheld on privilege grounds.

The court denied Defendants' multiple requests that it cure its own error by additional discovery. ROA.7206, 10951-52, 10961-63. While Plaintiffs deem that choice within the district court's discretion, Br. 20, they forget Defendants would have needed no permission to take discovery had the disclosure been timely. Plaintiffs also ignore that the district court effectively conceded error in its September 8 order denying the motion to compel disclosure when, on November 2, it partially granted the request. *Compare* ROA.1447 *with* ROA.6868. Having admitted error in November, the district court should have restored

6

Defendants to their position had no error occurred in September. It abused its discretion in rushing the case to trial and denying every opportunity to mitigate its own damage through appropriate discovery.

3.     Plaintiffs next make the baffling contention that Defendants "failed to timely make this objection at trial." Br. 18. That assertion would astound the trial judge, who stated on the page where Plaintiffs admit the objection was raised, *see id.* at 19 (citing ROA.10962-63), that "I'VE ALREADY TOLD YOU" the requested cure to "THE SWORD AND SHIELD" problem is "NOT GOING TO HAPPEN," ROA.10962. As the district court and Plaintiffs knew, Defendants raised the sword-and-shield objection *before* that moment, including at the pretrial conference, where Defendants requested that the sword-and-shield prejudice be cured by additional discovery. *See* ROA.7206. Thus, the trial judge twice stated:

> AND YOU WERE ALREADY DENIED THAT. SO
> YOUR OBJECTION IS ON THE RECORD.
> ROA.10962;
> THESE PEOPLE HAVE A PRIVILEGE AND THE
> COURT HAS ALREADY RULED ON THAT PRIV-
> ILEGE. YOUR OBJECTION IS NOTED FOR THE
> RECORD. IT'S OVERRULED. ROA.10963; *see also*
> ROA.10951-52.

Where a trial judge recognizes an objection was long ago preserved, and expresses exasperation with its reassertion, a waiver argument is baseless. Besides,

even if the objection had first been raised where Plaintiffs allege, it would still be timely, since it was raised "at trial," *United States v. One (1) 1963, Hatteras Yacht Ann Marie*, 584 F.2d 72, 75 (5th Cir. 1978); *see United States v. Adejumo*, 772 F.3d 513, 524 (8th Cir. 2014) (deeming timely objection raised "moments" after objectionable evidence presented); *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990) (same for objection made nine days later).

4.    Plaintiffs' associational-standing assertion does not in any event justify the injunction or findings. LD Br. 18-19. Member standing affords Plaintiffs arguable relief in only four districts (beyond those where Individual Plaintiffs reside) that the district court deemed cracked or packed (HD34, HD65, HD68, and SD8). Plaintiffs cite nine districts, Br. 15, but one member they rely on appears to be the Individual Plaintiff challenging HD25, and four reside in districts not found to be cracked or packed (HD1, HD101, SD17, and SD38). ROA.9130; ROA.9150; ROA.9153. While Plaintiffs point to their own evidence in deeming more of these districts cracked or packed, Br. 15, the district court's findings control, *see* Fed. R. Civ. P. 52(a)(1), and do not include them, ROA.9150; ROA.9153. Besides, Plaintiffs' approach leaves 19 districts where liability was found—and dozens of enjoined districts—with no Individual Plaintiff or disclosed Louisiana NAACP member.

## B.    Organizational Standing Is Unavailable

Because the standing of Individual Plaintiffs and Louisiana NAACP members can justify a fraction of the statewide injunction, Plaintiffs must rely on organizational standing. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024)

(requiring standing for "each form of relief") (citation omitted). Plaintiffs' contrary contention that this form of standing is unnecessary, Br. 23, falls with their flawed view that standing can be dispensed for districts neighboring those where a challenger resides, *see* § I.A.1, *supra*.

### 1.    The Entities Lack Article III Standing

To show standing, an entity must meet the standard "that appl[ies] to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). But no entity can show residency in an allegedly dilutive district. *Gill*, 585 U.S. at 66-67. To permit entity standing in vote-dilution cases would erroneously afford entities greater rights than individuals. The Supreme Court has doubted this concept, *see id.* at 68-69, and Plaintiffs ignore Legislative-Intervenors' argument against such a doctrine, *compare* LD Br. 19-20 *with* Br. 23-30.

That aside, the district court erred in applying the organizational-standing test. *Alliance for Hippocratic Medicine* rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. The plaintiffs there could not claim standing on the basis that government acts made their abortion-related speech more expensive. *Id.* at 394-96. The decision defeats the Entity Plaintiffs' claim to standing on the ground that "engagement," "education," "organization," and "mobilization" are more expensive because of Louisiana's redistricting plans. Br. 25-27.

Plaintiffs (at 24-28) focus on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), but ignore what the Supreme Court said about this decision: "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding

beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. *Havens* involved "an informational injury" that is "not dissimilar to" the case of "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. In *Havens*, an apartment owner lied to Black prospective renters about the availability of units, which stifled the plaintiff's truthful referral services. *Id.* (discussing *Havens*). But no informational injury exists here. Plaintiffs do not allege that Louisiana is lying to anyone about anything.

Plaintiffs' miscellaneous efforts to invoke *Havens* and differentiate *Alliance for Hippocratic Medicine* are unpersuasive. They first contend *Alliance for Hippocratic Medicine* cannot apply because of "the real-world impact of the maps *after* they took effect." Br. 26. But the decision draws no before-and-after distinction: abortion-related speech in that case occurred both before and after the challenged action of the FDA. *See* 602 U.S. at 394-95. And the speech was materially identical to BVM's "accountability strategy." Br. 26. Just as the Entity Plaintiffs advocated "to hold elected officials accountable to Black voters," *id.*, the entities in *Alliance for Hippocratic Medicine* advocated to hold FDA accountable for its regulation, 602 U.S. at 394. But the Supreme Court held that a plaintiff may not "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* Anybody could challenge every district in a state by one dollar of spending to "hold elected officials accountable," as BVM claims to have done. Br. 26.

Next, Plaintiffs suggest their speech differs from that in *Alliance for Hippocratic Medicine* because theirs goes beyond "opposing the maps" themselves.

Br. 26 n.9. But the plaintiffs in *Alliance for Hippocratic Medicine* would not have fared better by describing a broader array of activities, such as engaging the community about the harms of abortion, educating women about the dangers of abortion-inducing drugs, working to achieve pro-life justice for the unborn, and so forth. The problem was that FDA did not "require or forbid some action by the plaintiff," as would occur if it prohibited or set conditions on speech. 602 U.S. at 382. That is equally the case here.

Then, Plaintiffs attempt to analogize alleged "disillusionment" of voters to "false information." Br. 27. That erroneously "extend[s] the *Havens* holding beyond its context." 602 U.S. at 396. The injury Plaintiffs claim lacks directness. In *Havens*, the plaintiff told home-seekers: a unit is open at X. But the defendant lied to them: a unit is not open at X. The lies "directly affected and interfered with" truthful counseling. *Id.* at 395. Here, the Entity Plaintiffs may say whatever they please to Black voters, and Louisiana's maps will not interfere with that speech. Plaintiffs' theory that maps' "resulting dilution" injures voter-engagement efforts, Br. 27, would (if adopted) establish an unworkable doctrine that organizations may direct government affairs to make their speech as efficient and effective as they desire.

Besides, Plaintiffs ignore that there is no causal connection between the alleged voter apathy and the redistricting plans. LD Br. 22. Plaintiffs' trial evidence showed that Black voter engagement peaked at a time when Louisiana had *fewer* majority-Black districts than it does today and has fallen because of comparatively weak statewide Democratic candidates. ROA.9568. The district

court clearly erred in finding a causal relationship between the maps and voter engagement. *See Murthy*, 144 S. Ct. at 1988-89.

### 2.    The Entities Lack Statutory Standing

The Entity Plaintiffs possess no right of action to enforce § 2, even assuming a cause of action exists for "voters" alleging "infringement of the right to vote on account of race." *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989).

To begin, this panel has authority to adjudicate what Plaintiffs call "Legislative-Intervenors' narrower argument." Br. 87. The precedents Plaintiffs cite for their contrary suggestion, *id*. at 87-88, do not address whether entities are within a right of action to enforce § 2. In the only binding precedent addressing statutory standing, entity standing was neither raised nor addressed because nine individuals had standing sufficient to challenge one congressional district. *Robinson II*, 86 F.4th at 587-89. The other governing decisions did not address statutory standing under § 2. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 409 (2006) (*LULAC*) (voters' standing apparently sufficient); *Houston Laws.' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 421-22 (1991) (no discussion of standing); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) (no discussion of statutory standing or VRA § 2). While the United States asserts "that Section 2 creates a right of action," and that this Court lacks power to revisit that question, it does not address whether entities are within a § 2 right of action. United States Br. 32-33.

To interpret a right of action, the Court must examine its text, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014), which

affords a claim only to "an aggrieved person," 52 U.S.C. § 10302(a). The Supreme Court has consistently read this terminology to incorporate a "zone of interests" test. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177-78 (2011). Plaintiffs do not even attempt to say how their cost-cutting interests are within the interests § 2 protects. *See Lundeen v. Mineta*, 291 F.3d 300, 311 (5th Cir. 2002) (describing the "relatively heavy burden" of establishing statutory standing (citation omitted)). The statute protects the "right to vote" from impingements "on account of race or color," 52 U.S.C. § 10301(a), and is unconcerned with cost-cutting objectives.

Plaintiffs are unpersuasive in denying that "aggrieved person" incorporates a zone-of-interest test. While the term "person" might "include organizations," Br. 87, the word "aggrieved" is Plaintiffs' problem. *Roberts* rejected a § 2 claim by an *individual* candidate for office, even though he was obviously a "person," because he was not "aggrieved": "*his* right to vote has [not] been infringed because of his race." 883 F.2d at 621 (emphasis added). Even if the Entity Plaintiffs are persons, they have no right to vote that could be infringed. *Roberts* announced "well-settled" law, *see, e.g., White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 702 (E.D. Va. 2004), that Plaintiffs do not effectively address.

Plaintiffs also misread *FEC v. Akins*, 524 U.S. 11 (1998), which treated the word "aggrieved" under the Federal Election Campaign Act as meriting the scope of standing under the Administrative Procedure Act, *id.* at 19-20, which incorporates a zone of interests test, *see Thompson*, 562 U.S. at 177; *see also Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 954-55 (D.C. Cir. 2000)

(explaining this point). Meanwhile, *ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999), did not address § 2, and it applied dictum in *Trafficante v. Metropolitan Life Ins.*, 409 U.S. 205 (1972), which *Thompson* later deemed "ill-considered." 562 U.S. at 176. This is no time to extend a rejected rationale.

## II.    Plaintiffs' Section 2 Claim Fails

### A.    Plaintiffs' Demand for More Than Proportionality Is Unfounded

On the merits, Plaintiffs' brief says more by omission than by assertion. Legislative-Intervenors explained (at 45-55) that § 2 does not countenance Plaintiffs' request for more than proportionality at the statewide and regional levels. In *Johnson v. De Grandy*, 512 U.S. 997 (1994), the Supreme Court reversed a § 2 liability ruling because of the substantial proportionality of majority-Hispanic districts to Hispanic voting-age population in Miami-Dade County, reasoning that "one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017.

Plaintiffs say next to nothing about *Johnson* or the proportionality inquiry, despite its "great weight." *Fairley v. Hattiesburg*, 662 F. App'x 291, 301 (5th Cir. 2016). Buried in discussion of a distinct factor, Plaintiffs note Louisiana's statewide BVAP and majority-Black district percentages and offer the conclusory view that "[t]he district court did not err" in its proportionality analysis. Br. 84 (citation omitted). This is inadequate.

First, Plaintiffs ignore Legislative-Intervenors' contention (at 46-50) that proportionality must be addressed at the regional level. *Johnson* applied a regional test because the challengers declined "to frame their dilution claim in

statewide terms," but rather focused "in the Dade County area." 512 U.S. at 1022. By contrast, a statewide approach was proper where challengers "alleged statewide vote dilution based on a statewide plan." *LULAC*, 548 U.S. at 438. Plaintiffs' brief confirms a regional analysis is proper here. Plaintiffs admit they "did not challenge every district" in the plans, but focused on "specific areas of the state"—"Jefferson Parish, the Shreveport area, and the Baton Rouge area" in the Senate plan, and "the areas around Shreveport, Baton Rouge, Lake Charles, and Natchitoches" in the House plan. Br. 10-11. Their requested remedy "need not involve a reconfiguration of the entire map[s]." *Id.* at 12. Plaintiffs' brief does not deny that this case is like *Johnson*, not *LULAC*. Nor does it deny that Louisiana's plans satisfy the proportionality standard in each region of Plaintiffs' focus. *See* LD Br. 49-50.

Second, Plaintiffs' analysis is infirm even under a statewide calculus. They simply recite numbers—that "33.1%" of the State's total population is Black, "but only 29 of 105 (about 27.6%) of House districts and 11 of 39 (about 28.2%) of Senate districts are majority-Black." Br. 84. But, as Legislative-Intervenors explained (at 51), these numbers are close to those in *Johnson*, where about 45% of House districts were majority-Hispanic in an area where the Hispanic voting-age population was about 47%. 512 U.S. at 1013-14. The standard is "rough proportionality," *id.* at 1023, and Louisiana's plans satisfy it. On this point, too, Plaintiffs are silent.

Third, even if the plans fell short of the proportionality standard, Plaintiffs do not deny that their request for nine additional majority-Black districts exceeds it. LD Br. 51. Plaintiffs do not justify that outcome.

Finally, Legislative-Intervenors acknowledged that *Johnson* does not establish a safe harbor and demonstrated that this case does not present circumstances where liability can be found despite substantial proportionality. *Id*. at 52-55. Once again, Plaintiffs have no response.

Rarely is an appellate court's task in a § 2 case so straightforward. *Johnson* controls in every particular, and Plaintiffs can muster no defense of the decision below, even in an oversized brief, *see* ECF No. 214-1. The Court should faithfully apply *Johnson* and reverse.

## B.    The District Court Erred on the First Precondition

Plaintiffs also do not adequately defend the district court's treatment of the three *Gingles* preconditions. The first precondition imposes "exacting requirements." *Milligan*, 599 U.S. at 30. The district court did not apply them, and Plaintiffs actively resist them.

1.    Plaintiffs challenge governing precedent. "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (citation omitted). Plaintiffs say "[a]ll agree" with this test, Br. 32, but their expert did not, ROA.10071, nor did the district court, ROA.9167, and Plaintiffs defy it in application, Br. 33-51.

They propose the way to implement a test that looks to "the minority population, *not* to … the contested district," *LULAC*, 548 U.S. at 433 (citation omitted; emphasis added), is to look only to the contested districts and ignore minority-population compactness, Br. 33-36. That approach is backwards, and *LULAC* rejected it, reversing an analysis of "the contours of district lines" as "inapposite." 548 U.S. at 432-33. This Court forecasted that ruling in a decision rejecting an inquiry into "some aesthetic ideal of compactness" in favor of one examining whether "the black population [is] sufficiently compact," *Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (citation omitted), a point it reiterated more recently, *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (*Robinson I*) ("Importantly, that requirement relates to the compactness of the *minority population* in the proposed district, not the proposed district itself.").

Though district lines might be "one factor" as "a reasonable proxy for" minority-group compactness, *id.* at 221 n.4, the district court applied no such "refined approach." *Milligan*, 599 U.S. at 26. It rejected any "granular analysis of the distribution of minority populations within an illustrative district," ROA.9167, in favor of an "aesthetic" review, *Houston*, 56 F.3d at 611 (citation omitted). Any district meets its test, no matter how dispersed the minority group, so long as a skilled cartographer can achieve "smoothness of the district lines." *LULAC*, 548 U.S. at 432. Plaintiffs do not dispute the minority residential patterns of illustrative districts depicted in Legislative-Intervenors' opening brief (at 30-33), and do not deny that the Black communities are discrete and "separated by considerable distance." *Sensley v. Albritton*, 385 F.3d 591, 598

17

(5th Cir. 2004). But Plaintiffs call this legally irrelevant because their illustrative districts are supposedly more regularly shaped than those in *Sensley*. Br. 35. Governing precedent treats minority-group compactness as the focal point of the inquiry. *Sensley*, 385 F.3d at 598; *LULAC*, 548 U.S. at 433; *see Gingles*, 478 U.S. at 50 (stating that the first condition will not be met in "in a substantially integrated district").[2]

2.    Having misconstrued the law, Plaintiffs defend the decision below with quantity, not quality. *See* Br. 32-43. Presented with direct evidence of "the compactness of the minority population," as well as evidence of "the compactness of the contested [illustrative] district," *LULAC*, 548 U.S. at 433 (citation omitted), the district court should have focused on the former. The latter was either "inapposite," *id.* at 432, or a "proxy" with subordinate value, *Robinson I*, 37 F.4th at 221 n.4. In disregarding minority-group compactness, the district court's ruling was "predicated on a misunderstanding of the governing rule of law" and clearly erroneous. *Gingles*, 478 U.S. at 79 (citation omitted).[3]

---

[2] Plaintiffs rest on *Milligan* and other precedents where the compactness of the minority population was not meaningfully contested. *See* 599 U.S. at 20-21. These cases did not *sub silentio* overrule precedents that directly addressed minority-group compactness.

[3] Notably, this Court in *Robinson I*, in a preliminary-injunction stay ruling—where the Supreme Court later granted the stay this Court refused, *Ardoin v. Robinson*, 142 S.Ct. 2892 (2022)—explained that a first-precondition showing like Plaintiffs' here "has weaknesses." 37 F.4th at 220. However, it denied relief because the state defendants did not present evidence concerning compactness. *See id.* The defense here presented evidence of compactness, only to see it deemed legally irrelevant.

Plaintiffs' defense of that error is unpersuasive. Addressing the district court's grounds for discounting portions of Dr. Trende's opinions, Plaintiffs discuss only his statistical method called moment-of-inertia, Br. 41-42, which is beside the main point: Dr. Trende also produced dot-density maps that depicted where Black and white voters live. LD Br. 30-33. Those maps in no way depend on a moment-of-inertia analysis, and Plaintiffs do not deny that they accurately depict minority-group compactness. The court had only to look at the depictions to evaluate compactness, and its only discernable basis for declining was its view that "the distribution of minority populations" is legally irrelevant. ROA.9167.

Plaintiffs' remaining discussion of evidence focuses primarily on proxies that cannot substitute for a proper analysis of all relevant evidence. While they say the court "made findings about the Black populations within the illustrative districts," Br. 39, the district court, as noted, deemed that irrelevant and disregarded evidence on that point, ROA.9167. One set of pages Plaintiffs cite examined numerosity, not minority-group compactness, ROA.9148-54, and the second considered district lines, not whether Black residents in illustrative districts are separated by a considerable distance. ROA.9180-82. Meanwhile, Plaintiffs' discussion of communities of interest and socio-economic data, Br. 38-43, is non-responsive to Legislative-Intervenors' point that the information existed at too high of a level to inform legislative district line-drawing. *See* LD Br. 33-34.

3.     The district court erroneously held that a "map drawer's intent has no probative value in the context of the VRA § 2 vote dilution case presented here." ROA.9174. But this Court held that it does, *Robinson II*, 86 F.4th at 595

& n.4, as did the *Milligan* plurality, 599 U.S. at 30-33. Plaintiffs only briefly defend this holding, and they misconstrue *Robinson II*, which did not deem racial intent irrelevant, but rather applied the predominant-intent standard directed by precedent, *see* 86 F.4th at 594-95. Meanwhile, *Clark v. Calhoun Cnty.*, 88 F.3d 1393 (5th Cir. 1996), is outmoded in light of *Milligan* and did not bind the panel in *Robinson II*.

Plaintiffs direct most of their attention to another portion of the district court's opinion, where it stated: "The Section 2 analysis considers whether race predominated in the drawing of the illustrative map." ROA.9810. This outright contradiction only proves reversible error. *See Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (indicating that findings are erroneous if "internally inconsistent"). Because the district court excluded evidence of predominance as having "no probative value," ROA.9174, Plaintiffs' argument that race did not predominate, Br. 43-51, does not add up: the district court could not reach the right result without the right evidence. At a minimum, the Court must remand for an internally consistent analysis based on a record developed under the right test.

## C.   The District Court Erred on the Second and Third Preconditions

Legislative-Intervenors demonstrated (at 36-45) the district court's clear error in addressing racial voting patterns under the second and third *Gingles* preconditions. The court improperly credited Dr. Handley's unreliable opinions and excluded Dr. Solanky's admissible opinions. Plaintiffs' arguments do not salvage these erroneous rulings. Br. 62-73.

### 1. Dr. Handley

Plaintiffs concede that Dr. Handley's estimation method requires "voting data at the precinct level," and that "Louisiana reports early and absentee votes only at the parish level." Br. 63. They also agree that Dr. Handley allocated early votes to precincts proportionally based on the votes received by each candidate in the election-day precinct totals. *Id.* They admit further that this caused "some over- and underestimation of vote totals," and "in some precincts" it "led to a higher number of total candidate votes than turnout." *Id.* at 64. Plaintiffs call this discrepancy "statistically insignificant," *id.* at 72 (citation omitted), but this misses the plot.

The method's central defect is in erasing absentee votes. *See* LD Br. 39. To assign absentee votes based on in-person voting choices is the same as to ignore them. Where the choices of 10 people are known and those of 10 are unknown, attributing the choices of the former 10 to the latter 10 reaches the same result as excluding the latter 10: either way, the choices of the former 10 are the only choices actually considered. Here, Dr. Handley assigned absentee votes to precincts based on candidate choices of the in-person voters in those precincts, but that produces the same result as ignoring the absentee votes: either way, the candidate vote totals by precinct are proportionally the same. While Plaintiffs assert that "the actual *number* of early votes allocated to each precinct is irrelevant," because Dr. Handley's method estimates from "proportions rather than raw numbers," Br. 64 n.18 (emphasis added), that does not justify Dr. Handley's choice of *which* votes to allocate to *which* precincts. It only confirms

that, by matching the absentee vote proportionally with the in-person vote, Dr. Handley rendered the absentee vote irrelevant to the outcome. In effect, Dr. Handley "presumed" how about one-third of Louisianans "actually vote." *Rodriguez v. Bexar Cnty.*, 385 F.3d 853, 867 (5th Cir. 2004). But § 2 "does not assume the existence of racial bloc voting; plaintiffs must prove it." *Gingles*, 478 U.S. at 46. Dr. Handley did not.

Plaintiffs cite Dr. Handley's supplemental rebuttal report (responding to Dr. Solanky), Br. 65, where Dr. Handley claimed her method creates no "bias," ROA.15799. But Dr. Handley tested her allocation method against early voting data at the *statewide* and *parish* levels. *See* ROA.15800. Dr. Handley performed no *precinct*-level check. These tests, then, could not justify her improper assumption that in-person and absentee voting preferences match in precincts. These tests bootstrapped Dr. Handley's improbable assumption that the voting preferences she measured were uniform within parishes and throughout Louisiana.

Moreover, Dr. Handley showed meaningful differences between in-person and absentee preferences. She analyzed the rates at which Republicans and Democrats use early-voting procedures—in the State—and found differences not only in rates, but in rates by election: sometimes Republicans were more likely to vote early, sometimes Democrats, but the rates never matched, and differences could be large. ROA.15800; ROA.15802-04. Dr. Handley also compared polarization rates and again uncovered differences. At trial, she testified about the 2022 Senate contest, asserting there was "essentially no difference between … the degree of polarization among the early voters and the election day

voters" for Black Democratic candidate Gary Chambers. ROA.9813. But her report estimated that 54.5% of election-day Black voters supported Chambers, but only 46.3% of absentee Black voters did. ROA.15805. That difference is legally significant, as the absentee Black vote lacks cohesion and is evidence against Plaintiffs on the second *Gingles* precondition. *See Agee v. Benson,* 2023 WL 10947213, at *5 (W.D. Mich. Aug. 29, 2023) (three-judge court); *Levy v. Lexington Cnty.*, 589 F.3d 708, 720 (4th Cir. 2009). These and other differences, diluted at the statewide level, must be more pronounced in some precincts. Even where Dr. Handley viewed a difference as small, her approach masks large differences at the precinct level.

### 2. Dr. Solanky

Plaintiffs also do not adequately defend the district court's exclusion of Dr. Solanky. Plaintiffs repeat the district court's misunderstanding of his first report.[4] Dr. Solanky did not offer "affirmative" conclusions about "voting patterns" in Louisiana, Br. 67-68 & n.20, but evaluated Dr. Handley's method. LD Br. 42-44. Dr. Solanky undermined the assumption that voting patterns in Louisiana are uniform across regions and within regions. *See e.g.*, ROA.11575, 11592.

---

[4] Plaintiffs also criticize Legislative-Intervenors' citation to a brief to show disclosure of Dr. Solanky's method for selecting, Br. 68, but the brief cited Dr. Solanky's deposition, ROA.6023-25 (quoting ROA.5651-53, 5658-59, 5675, 5695), which was the record for the *Daubert* ruling.

The point here is not that Rule 702 is inapplicable to rebuttal experts, Br. 67, but that its standards—especially its relevance and fit standards—must be applied to permit criticism of "other experts' theories and calculations without offering alternatives," *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011) (collecting cases), recognizing that "proper rebuttal" includes analysis "directed to disproving the accuracy of [another expert's] methodology and data." *Benedict v. United States*, 822 F.2d 1426, 1429 (6th Cir. 1987). The district court applied *Daubert* in a way that deems all rebuttal opinions—which show flaws without proving case elements—inadmissible. So too do Plaintiffs' arguments that Dr. Solanky had to prove or disprove the *Gingles* preconditions to present relevant opinions, Br. 67, or utilize a broader sample set to establish racial voting patterns, *id.* at 68-69. Dr. Solanky's refutation of Dr. Handley's polarized-voting showing was relevant to the second and third *Gingles* conditions, which Plaintiffs must prove, and no larger sample size was needed because even a few showings that an assumption fails undermines all its iterations. Meanwhile, arguments about "confidence intervals," *id.* at 69, "go to weight, but not the admissibility," of evidence. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1164869, at *31 (D. Kan. Mar. 10, 2020) (collecting cases). And only two confidence intervals in Dr. Solanky's many showings were large enough to raise colorable concerns. ROA.6771-73.

Plaintiffs also ignore that the district court excluded Dr. Solanky's second report without analysis. LD Br. 41. Plaintiffs imply this was harmless error,

claiming Dr. Solanky "never analyzed the statistical significance of Dr. Handley's allocation method on her findings," leaving the "regression analyses" she conducted "uncontested." Br. 72. That is an odd criticism given that Dr. Handley's "regression analyses" appeared in her supplemental rebuttal report responding to Dr. Solanky's second (and final) report. Dr. Solanky could only have responded at trial, so the exclusion of his testimony was prejudicial, not harmless.

In all events, a district court must document a *Daubert* ruling by "making findings" and "articulat[ing] its basis for admitting [or excluding] expert testimony." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016) (citation omitted); *see also Ga. Firefighters' Pension Fund v. Anadarko Petrol. Corp.*, 99 F.4th 770, 775 (5th Cir. 2024) (finding reversible error where district court failed to "perform a full *Daubert* analysis"); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). The district court's "failure to take note of substantial contrary evidence" in Dr. Solanky's second report requires, at minimum, "remand[ing] the case for further findings." *Fairley v. Hattiesburg*, 584 F.3d 660, 668 (5th Cir. 2009) (citation omitted).

Finally, the district court should have admitted Dr. Solanky's opinions after it allowed Dr. Handley to respond to them at trial. LD Br. 44-45. Plaintiffs say opening the door to unreliable expert opinion does not render it admissible. Br. 70. Even if that were correct, the district court found Dr. Solanky's opinions irrelevant—a ruling Plaintiffs defend, *see id.* at 67-68—and Dr. Handley rendered them relevant by addressing them on the stand.

## CONCLUSION

The district court's injunction should be reversed or vacated.

Dated: September 18, 2024                    Respectfully submitted,

*/s/ Richard B. Raile*

Michael W. Mengis                    Richard B. Raile
BAKER & HOSTETLER LLP                Katherine L. McKnight
811 Main Street                      E. Mark Braden
Suite 1100                           BAKER & HOSTETLER LLP
Houston, TX 77002                    1050 Connecticut Ave., N.W.
                                     Suite 1100
Patrick T. Lewis                     Washington, D.C. 20036
BAKER & HOSTETLER LLP                Telephone: 202.861.1711
127 Public Square                    Email: rraile@bakerlaw.com
Suite 2000
Cleveland, OH 44114

Erika Dackin Prouty
Robert J. Tucker
BAKER & HOSTETLER LLP
200 Civic Center Dr.
Suite 1200
Columbus, OH 43215

# CERTIFICATE OF SERVICE

I certify that on September 18, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.


Dated:  September 18, 2024                    Respectfully submitted,


                                               */s/ Richard B. Raile*
                                               Richard B. Raile
                                               BAKER & HOSTETLER LLP
                                               1050 Connecticut Ave., N.W.
                                               Suite 1100
                                               Washington, DC 20036
                                               Telephone: 202.861.1711
                                               Email: rraile@bakerlaw.com

                                               *Attorney for Phillip DeVillier and*
                                               *Cameron Henry*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 5th Cir. R. 32.2 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 6,411 words.

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2308 in 14-point Calisto MT font.

Dated:  September 18, 2024                    Respectfully submitted,

                                             */s/ Richard B. Raile*
                                             Richard B. Raile
                                             BAKER & HOSTETLER LLP
                                             1050 Connecticut Ave., N.W.
                                             Suite 1100
                                             Washington, DC 20036
                                             Telephone: 202.861.1711
                                             Email: rraile@bakerlaw.com

                                             *Attorney for Phillip DeVillier and*
                                             *Cameron Henry*