# 24-30115

# In The United States Court Of Appeals For The Fifth Circuit

**DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,**

*Plaintiffs - Appellees*,

v.

**NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,**

*Defendant – Appellant,*

**STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,**

*Intervenors – Appellants,*

v.

**UNITED STATES OF AMERICA,**

*Intervenor – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA, BATON ROUGE THE HONORABLE SHELLY DECKERT DICK, U.S. DISTRICT JUDGE 053N-3: 3:22-CV-178

———————————

## APPELLANT'S REPLY BRIEF

———————————

Phillip Strach
Cassie Holt
Alyssa Riggins
NELSON MULLINS RILEY & SCARBOROUGH, L.L.P.
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
(919) 329-3812
phil.strach@nelsonmullins.com
cassie.holt@nelsonmullins.com
alyssa.riggins@nelsonmullins.com

John C. Conine, Jr.
John C. Walsh
SHOWS, CALI & WALSH, L.L.P.
628 Saint Louis Street
Baton Rouge, LA 70802
(225) 346-1461
coninej@scwllp.com
john@scwllp.com

*Counsel for Appellant Nancy Landry*          *Counsel for Appellant Nancy Landry*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ...................................................................................................1

    I.    The Court Erred in Finding Plaintiffs Proved *Gingles* I ...........................2

        A.    The District Court Utterly Failed to Consider Population Compactness.......................................................................................3

        B.    The Illustrative Districts Are Not Reasonably Configured............12

    II.    The Court Erred in its *Gingles* II and III Analysis ..................................16

        A.    Handley Failed to Conduct the Required Analysis Under *Gingles* II and III .............................................................................16

        B.    The Court Erred in Excluding Solanky, and Compounded the Error by Refusing to Reverse Course When Plaintiffs' Counsel Opened the Door .............................................................20

        C.    Failure to Consider Endogenous Elections Requires Reversal .......28

    III.    The District Court's Totality Findings Were Clearly Erroneous..............29

CONCLUSION .....................................................................................................33

CERTIFICATE OF SERVICE ..............................................................................34

CERTIFICATE OF COMPLIANCE......................................................................35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)....................................................................20

*Abrams v. Johnson*,
521 U.S. 74 (1997)........................................................................17

*Alexander v. S.C. State Conf. of the NAACP*,
144 S. Ct. 1221 (2024)..............................................1, 2, 12, 16

*Allen v. Milligan*,
599 U.S. 1 (2023).....................................................................13, 29

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
829 F.Supp.2d 802 (D. Minn. 2011) ...............................................23

*Bartlett v. Strickland*,
556 U.S. 1 (2009).........................................................................17

*Bethune-Hill v. Virginia St. Bd. of Elections*,
580 U.S. 178 (2017)..................................................................16, 17

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021)...................................................................22

*Bush v. Vera*,
517 U.S. 952 (1996) ........................................................................2

*Chisom v. Roemer*,
501 U.S. 380 (1991)......................................................................30

*Cooper v. Harris*,
581 U.S. 285 (2017).................................................................13, 14

*Counts v. Gen. Motors, LLC*,
606 F. Supp. 3d 547 (E.D. Mich. 2022) ..........................................23

*Covington v. North Carolina*,
    316 F.R.D. 117 (M.D.N.C. 2016)............................................................17, 18

*Covington v. North Carolina*,
    No.1:15CV399, 270 F.Supp.3d 881 (M.D.N.C. 2017) .................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)....................................................................................21

*Fairley v. Hattiesburg, Miss.*,
    584 F.3d 660 (5th Cir 2009) .........................................................................5

*Houston v. Lafayette Cnty.*,
    56 F.3d 606 (5th Cir. 1995) ............................................................1, 3, 4, 16

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) ................................................................23, 24

*Johnson v. De Grandy*,
    512 U.S. 997 (1994).....................................................................18, 31, 32, 33

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006).........................................................................2, 3, 16, 32

*Magnolia Bar Ass'n, Inc. v. Lee*,
    994 F.2d 1143 (5th Cir. 1993) .....................................................................28

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*,
    441 F.Supp.3d 745 (S.D. Iowa 2019)..........................................................23

*Miller v. Johnson*,
    515 U.S. 900 (1995)....................................................................................16

*Moss v. Ole S. Real. Est., Inc.*,
    933 F.2d 1300 (5th Cir. 1991) .....................................................................20

*N.A.A.C.P. v. Fordice*,
    252 F.2d 361 (5th Cir. 2001) .......................................................................29

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) .....................................................................6

*Petteway v. Galveston Cnty.*,
　　111 F.4th 596 (5th Cir. 2024) ...........................................................12, 17, 19

*Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*,
　　2022 WL 1014139 (W.D. Tex. Apr. 5, 2022) ...............................................23

*Robinson v. Ardoin*,
　　86 F.4th 574 (5th Cir. 2023) ........................................................................12

*Rodriguez v. Harris Cnty.*,
　　964 F.Supp.2d 686 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v.*
　　*Harris Cnty.*, 601 F.App'x 255 (5th Cir. 2015) ...........................................28

*Sensley v. Albritton*,
　　385 F.3d 951 (2004) ...........................................................................*passim*

*Teague v. Attala County*,
　　92 F.3d 283 (5th Cir. 1996) ........................................................................31

*United States v. Barnes*,
　　979 F.3d 283 (5th Cir 2020) ........................................................................13

*Veasey v. Abbott*,
　　830 F.3d 216 (5th Cir. 2016) ......................................................................29

*Voinovich v. Quilter*,
　　507 U.S. 146 (1993)....................................................................................20

*Westwego Citizens for Better Gov't v. City of Westwego*,
　　906 F.2d 1042 (5th Cir. 1990) ....................................................................29

## Statutes

La. Stat. § 18:533 ................................................................................................30

Voting Right Act § 2 .......................................................................................*passim*

**Rules**

Fed. R. Evid. 702 ................................................................................21, 23

**Other Authorities**

Lublin, et al., *Minority Success in Non-Majority Minority Districts:*
  *Finding the "Sweet Spot"* ..............................................................22

# INTRODUCTION

When reviewing the entire evidence in this case, one "is left with the definite and firm conviction that a mistake has been made." *Sensley v. Albritton,* 385 F.3d 951, 595 (2004) (quoting *Houston v. Lafayette Cnty.*, 56 F.3d 606, 610 (5th Cir. 1995)).[1] Plaintiffs' brief reinforces that conviction. Plaintiffs concede that the appropriate *Gingles* I compactness measure tests not district shape, but the population of the minority group (30). This admission is glaring, as the district court not only failed to conduct any inquiry into the compactness of the minority population within Plaintiffs' Illustrative Districts, but also affirmatively endorsed testimony that the compactness of the minority population was irrelevant under *Gingles* I. Next, Plaintiffs fail to rebut that under *Alexander,* if a factual finding was infected with legal error, this Court may review that finding de novo. Given the cornucopia of factual findings infected with legal error, this admission dooms the district court's opinion. And finally, (and perhaps most shockingly) Plaintiffs claim that they never alleged there were statewide §2 violations under H.B.14 and S.B.1 (the "Enacted Plans"), which begs the question, on what basis did the court below

---

[1] This is the clearly erroneous standard. However, as stated in Defendant's opening brief, many of the district court's findings are based on misapprehensions of the law. For that reason, these findings should be reviewed de novo. *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1240–41 (2024). However, because the errors in most instances were so grave, reversal is appropriate even under the clear error standard.

enjoin the entirety of Enacted Plans? These examples are just a few of the definitive errors made by the district court. For all the reasons stated herein, those in Defendant's opening brief, as well as the State's and the Legislative-Intervenors' briefs, this Court should vacate or reverse the opinion below.

## I.    The Court Erred in Finding Plaintiffs Proved *Gingles* I.

All parties agree that *Gingles* I requires §2 Plaintiffs to prove that the minority group is: (1) sufficiently large and geographically compact to make up a majority of a (2) reasonably configured district. (SOS Br. 18; Plts. Br. 32). The parties further agree that the *Gingles* I compactness inquiry refers to the compactness of the minority population, not the compactness of the contested district. SOS Br. 21; Plts. Br. 32 (citing *League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 433 (2006) ("LULAC")); *see also Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J. concurring). But the agreements end there. In their attempt to support the district court's error-riddled findings and legal conclusions, Plaintiffs propose tests unsupported by case law that ignore the basic tenants of §2. A proper application of the law to the facts reveals that the district court erred in its *Gingles* I analysis. Moreover, Plaintiffs do not acknowledge Defendant's argument that under *Alexander*, the court's factual findings on this issue are reviewed de novo because of its misunderstanding of the legal requirements of *Gingles* I. Nor can they. Only a misunderstanding of the applicable legal principles could result in the district court's opinion.

### A. The District Court Utterly Failed to Consider Population Compactness.

Despite acknowledging that geographic compactness of the minority *population* not the *district* is required, Plaintiffs, like the district court, fail to grapple with testing population compactness. Instead, Plaintiffs claim (33) that districts only need to be reasonably configured, and if the district is reasonably configured, then the population must be compact. This circular logic fails. Under Plaintiffs' flawed logic, circular districts themselves could be perfectly compact, ROA.10002-04, but also connect far-flung populations *within* the district for the purpose of meeting the numerosity requirement. But precedent is clear, those districts do not pass muster. *Sensley,* 385 F.3d at 598 (connecting Black communities 18 miles apart fails *Gingles* I); *LULAC*, 548 U.S. at 433 (districts that combine two far-flung segments of a racial group fail *Gingles* I).

Precedent is equally clear that, contrary to Plaintiffs' position, courts may not focus only on district shape, but instead must "focus[] on the size and *concentration* of the minority population, rather than only on the shape of the districts." *Houston,* 56 F.3d at 611; *Sensley*, 385 F.3d at 596-98. That is not to say that district compactness cannot be considered, but it may be considered "only insofar as it was indicative of the non-compactness of the minority population in those proposed districts" and in conjunction with other factors, including an examination of the communities within the districts themselves. *Sensley,* 385 F.3d at 597.

3

A cursory read of the opinion below shows that the district court utterly failed to heed the requirements of *Houston* and *Sensley*:

- The district court reported and relied upon *only* district compactness scores, ROA.9155, devoting an entire section of the opinion to "District Shapes."
- The district court made specific findings that both the "Illustrative Plan and the Enacted Maps include reasonably compact districts." ROA.9164. The court made no findings as to the compactness of the minority population within any district.
- The District Court "accept[ed]" Mr. Cooper's approach to *Gingles* I compactness, and rejected Dr. Trende's approach, which is detailed below. ROA.9166-68. In fact, Cooper specifically eschewed that population compactness was relevant, stating that it was "not necessary" and "something one does not need to do to answer the *Gingles* I inquiry." ROA.10071. Cooper further testified that it didn't matter if the Black population was dispersed across different parts of the district. ROA.10072. The district court "accept[ed]" this erroneous view of *Gingles* I without reservation. ROA.9167-68.

Finally, the district court doubled-down on its erroneous single-minded consideration of district compactness by rejecting Trende's population compactness tests. ROA.9165-9167. Specifically, the district court erred in rejecting Trende's Moment of Inertia and areal approaches (the "Population Compactness Tests" or "PCT"), which were designed to test the compactness of the population. To be clear, the district court excluded the only attempt by any expert to quantify population compactness because it found it to be "unhelpful and unpersuasive as a *Gingles* I compactness measure." ROA.9167. The court doubled-down again, holding "if you are looking at the compactness of the district, Reock

and Polsby Popper are the proper tools,"[2] a stark statement that the district court believed that compactness of the district, not the population, was the only appropriate measure for *Gingles* I. These erroneous findings based on incorrect legal analysis cannot stand.

Notwithstanding the above, the district court's rejection of the PCT is independently erroneous because the rationale for discrediting these methods effectively shifted the burden of proof to Defendants. As discussed in more detail in Defendant's opening brief (33-34), the findings by the district court (echoed by Plaintiffs 41-43) that the PCT failed to consider other traditional districting criteria, puts the burden to draw illustrative plans on Defendant.[3] It is objectively <u>not</u> Defendant's burden to produce a VRA-compliant illustrative plan. *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir 2009). Nor does it make sense that these population compactness measures would take into account traditional districting criteria. Compactness *itself* is a traditional districting criterion. So how can a criterion itself fail to take into account traditional districting criteria? It cannot. Moreover, district-specific compactness measures like Reock, do not take into

---

[2] In making this criticism, the district court cherry-picked from Trende's testimony where he explained the difference between compactness measures for defined shapes, like rooms or districts, and population compactness. *Compare* ROA.10279 *and* ROA.10316-17 *with* ROA.9168.

[3] These might be valid criticisms if these approaches were used to draw districts, but they were not.

account communities of interest or equal population, because they simply test district shape. ROA.10002-4, 10317-19.

But, the error doesn't end with the rejection of the PCT. Despite acknowledging that "visual assessments are appropriate when assessing compactness" (ROA.9125) the district court also failed to conduct a visual inspection of population compactness. A visual inspection of Trende's dotplots and chloropleth maps[4] reveal that Plaintiffs' Illustrative Districts do not contain compact minority populations. For example, IHD1 (depicted below) stitches together disparate Black populations across Caddo Parish, cracking Black voters out of Shreveport, stretching out 20-plus miles from Shreveport to Belcher, Mooringsport, and Caddo Lake to pick up isolated groups of Black voters, and continuing northwest to the Arkansas border to pick up Black Voting Age Population ("BVAP"). ROA.16641-42.[5]

---

[4] Trende also produced dotplot and chloropleth maps without overlays for the PCT.
[5] If the block equivalency files are unreadable to the Court, it may take judicial notice of the distance between two cities using Google Maps. *Pahls v. Thomas,* 718 F.3d 1210, 1216 n.1 (10th Cir. 2013).



Figure 3: Percent BVAP in census blocks contained in Cooper Illustrative Map, District 1. White areas indicate empty blocks. Dashed blue lines reflect Parish boundaries.



Figure 5: Location of Black and White populations in Cooper Illustrative District 1. One blue dot represents 10 Black residents of voting age. One orange 'x' represents 10 White residents of voting age. Dashed blue lines reflect Parish boundaries.

The same issues are present in ISD39. (ROA.11726):



IHD23 is worse. Here, a visual inspection shows three distinct BVAP clusters within the district. IHD23 crosses parish boundaries, combining Black populations in Mansfield, Natchitoches, Campti, and Edgefield. ROA.11654. Mansfield is 48 miles from Natchitoches, 42 miles from Campti, and 27.5 miles from Edgefield. ROA.16641-42.

Figure 21:  Location of Black and White populations in Cooper Illustrative District 23.
One blue dot represents 10 Black residents of voting age.  One orange 'x' represents 10
White residents of voting age. Dashed blue lines reflect Parish boundaries.



Finally, ISD3, which resembles a galloping horse, strides across parish lines and suburban towns to pick up isolated blocks of BVAP. The depiction below shows how the blue dots cluster along the edge of the district line, which in places

deviates from otherwise straight street lines to pick up small enclaves of Black voters.[6]



Figure 90:  Location of Black population in Cooper Illustrative District 3.  One blue dot represents 10 Black residents of voting age.  Dashed blue lines reflect Parish boundaries.

Notably, these depictions are merely representative samples of the population compactness problem present throughout the Illustrative Plans.  For example, ISD17 combines Black populations from four different parishes and the cities of New Roads and Plaquemine with urban portions of Baton Rouge to create a majority-Black district. ROA.11732-33. New Roads and Plaquemine are in different parishes and separated by 43.6 miles. *Id.*; ROA.16641-42. As shown below, IHD60 cobbles

---

[6] Apart from non-compact populations, ISD3 hardly appears "reasonably configured."

together minority populations from dispersed portions of the region, including Gonzales, White Castle, and Plaquemine, into a squirrel shaped district that is not even functionally contiguous. ROA.11689-93. In order to get from one side of IHD60 to the other, residents must go outside the district to cross the Mississippi River. *Id.* Illustrating the absurdity of this, residents of this House district would travel 30.5 miles from Gonzales to White Castle, and 22 miles from Gonzales to Plaquemine (but only if they were willing to take a ferry), otherwise this journey takes 40 miles. *See* ROA.16641-42.

Figure 48: Location of Black and White populations in Cooper Illustrative District 60. One blue dot represents 10 Black residents of voting age. One orange 'x' represents 10 White residents of voting age. Dashed blue lines reflect Parish boundaries.



ROA.11691.

Plaintiffs' evidence is in all respects, like (or worse than) the evidence brought in *Sensley*. As noted by Plaintiffs (35), this Court in *Sensley* affirmed that illustrative plans that combined "three distinct locations" of Black population, including "two areas of highly-concentrated African-American population . . . roughly 15 miles apart from one another" and portions of two towns approximately 18 miles from one another, violated the *Gingles* I geographic compactness requirement. *Sensley,* 385 F.3d at 597-98. As shown above, at every turn, the minority populations within Plaintiffs' Illustrative Districts are equally as non-compact as those in *Sensley*. Most involve combining discrete Black populations dozens of miles away, and in some instances nearly 50 miles away.  ROA.16641-42. Like in *Sensley,* the Illustrative Districts are often "extended and distorted" in shape (ISD39, IHD1) or contain "irregularly-drawn" pockets to pick up additional BVAP (IHD23, ISD3).  Worse than *Sensley*, Plaintiffs' Illustrative Plans often cross parish lines, and/or require transversal of the Mississippi River. ROA.11454-56, 11474-75. Moreover, as shown in Defendant's brief (40), Plaintiffs often over-divide cities, like Shreveport, to achieve impermissible extra-proportionality in the region. ROA.11466-68.

Nor, as Plaintiffs claim (33-35), does *Sensley* support their circular interpretation of *Gingles* I that districts are compact if they are reasonably configured by comporting with traditional redistricting criteria. In fact, the court in *Sensley* rejected this very contention that the district court should have "inquired more

11

generally into whether the reconfigured district had taken into account traditional districting principles." *Id.* at 596. Simply put—*Sensley* slams the door shut on Plaintiffs' (and the district court's) misguided *Gingles* I analysis.

### B.     The Illustrative Districts Are Not Reasonably Configured.

It is undisputed that Cooper considered race in drawing the Illustrative Plans. ROA.10000. Plaintiffs' brief blusters through a defense of Cooper, and claims (52) that Defendants are conflating standards. Not so. As this Court recently held, §2 illustrative plans present a special risk that could "cross the line from protecting minorities against racial discrimination to the prohibited goal of mandating proportional representation." *Petteway v. Galveston Cnty.*, 111 F.4th 596, 615 (5th Cir. 2024). That risk is especially prevalent here, where Plaintiffs seek not just proportionality, but extra-proportionality. The relevant question before the district court was not whether Cooper was *aware* of race as he drew districts to exceed proportionality, but whether race *predominated* in the drawing of the Illustrative Plans such that they are not "reasonably configured" under *Gingles* I. *Robinson v. Ardoin,* 86 F.4th 574, 593 (5th Cir. 2023) (recognizing "a difference between being aware of racial considerations and being motivated by them"). While being race-conscious is permissible, impermissible racial predominance occurs when traditional redistricting considerations like compactness, contiguity, and core retention are "subordinated" to race. *Alexander,* 144 S. Ct. at 1234. Because §2 "never requires"

the adoption of districts that violate traditional redistricting criteria, or subordinate those criteria to racial considerations, *Allen v. Milligan*, 599 U.S. 1, 29–30 (2023), the district court's legal analysis of *Gingles* I is deeply flawed and requires reversal. *Cooper v. Harris*, 581 U.S. 285, 305 (2017).

The district court, at Plaintiffs' urging, ignored or improperly excluded circumstantial evidence of racial predominance it deemed went to Cooper's "subjective intent." Indeed, the district court was hyper-focused on this imaginary distinction, often claiming, even after Defendants specifically exclaimed otherwise, [7] that Defendants were attempting to testify about Cooper's motive when he drew specific district lines. ROA.9709-11, 9722-24. This makes no sense. Of course Defendants' experts had no idea what was *actually* going through Cooper's mind. But based on circumstantial evidence drawn from their own expert work, Defendants' experts could *and should* have been allowed to testify about how a district line placed in a certain area impacted a district's racial makeup, and what informed their opinions that race likely predominated over other claimed considerations of traditional districting criteria. As noted by Plaintiffs (49), *United States v. Barnes,* 979 F.3d 283 (5th Cir 2020), "stands for the uncontroversial proposition that a court may properly draw inferences concerning intent based solely on circumstantial evidence." This begs the question, if this is an "uncontroversial

---

[7] *See also* Plaintiffs' Brief 47.

13

proposition" why did Plaintiffs seek to and the district court exclude circumstantial evidence that would go to intent? Error is the only answer.

Moreover, circumstantial evidence is often used to probe the question of whether race predominated in districting. *See, e.g., Cooper*, 581 U.S. at 315-16 (crediting expert opinion "that 'race, and not party,' was 'the dominant factor' in [the district's] design"). Here, the district court failed to consider how the oddly shaped arms of districts that reached out to grab isolated Black population (as shown *supra* pp. 3-11 and by Defendant's expert Dr. Barber in the depictions below) could equate to racial predominance.



The district court also failed to examine Barber's simulations analysis of extra regional proportionality and the additional city splits in Cooper's Illustrative Plans. ROA.11454-56, 11494-96, 7340-44. The court also excluded testimony that only a "statistical impossibility" could give rise to the illustrative plans "without race being

the predominate factor."[8] ROA.10722-23. Finally, the district court ping-ponged on what evidence went to subjective intent (and was therefore excluded) versus what could be admitted. These rulings were seemingly random, and without any guiding legal principle. For example, the district court excluded Johnson's testimony about how a district boundary zig-zagged in a way that did not follow a road or community boundary (not mentioning race) (ROA.10565), and Barber's testimony that core retention could not account for the difference between his simulated maps and the Illustrative Plans (ROA.10650-51), but later allowed Johnson to testify about carving out black populations 23 miles away in the same district (ROA.10375), racial targets (ROA.10362-63), and even that Cooper failed to load any community data into Maptitude and loaded only racial data into the drawing software.[9] ROA.11235

Nor, as Plaintiffs suggest (39-40) does their community of interest analysis save these patently unreasonably configured districts. Plaintiffs offered Dr. Colten in support of the communities in Cooper's Illustrative Plans, but it is undisputed that Cooper did not consider Colten's communities in his work. ROA.10058. These

---

[8] In fact, the district court acknowledged that predominance (and simulations) was a valid defense, but only *after* Johnson testified, and other relevant evidence was already excluded. ROA.10639.

[9] Defendants' admitted evidence on racial predominance was simply ignored, including Johnson's unrebutted evidence that Cooper only had racial data available while drawing the Illustrative Plans.

post-hoc determinations must be discarded. *Bethune-Hill v. Virginia St. Bd. of Elections*, 580 U.S. 178, 189-90 (2017). Moreover, Colten's analysis was done regionally (ROA.19833-59) and thus fails to answer the relevant question of whether the geographically dispersed groups within the districts themselves "share similar interests." *LULAC*, 548 U.S. at 433; *Sensley,* 385 F.3d at 598. Here, Plaintiffs' oddly-shaped districts are supported by no evidence that would support the idea that the disparate Black communities within their Illustrative Plans share even "some common thread of relevant interests." *Miller v. Johnson,* 515 U.S. 900, 920 (1995).

When the evidence on *Gingles* I is reviewed together, it is clear that "a mistake has been made." *Sensley,* 385 F.3d at 595 (quoting *Houston,* 56 F.3d at 610).[10] These mistakes require that the opinion below be reversed or vacated.

## II.    The Court Erred in its *Gingles* II and III Analysis.

### A.    Handley Failed to Conduct the Required Analysis Under *Gingles* II and III.

Plaintiffs' brief badly misconstrues Defendant's arguments, and twists case law in attempt to save their only *Gingles* II and III evidence—Handley's testimony and reports. As ignored by Plaintiffs, *Gingles* II and III are inextricably linked and

---

[10] Defendant continues to assert that de novo review is appropriate here. *Alexander,* 144 S. Ct. at 1240-41. However, these findings were so flawed, that even under the higher standard, they cannot stand.

should be analyzed together. *Abrams v. Johnson,* 521 U.S. 74, 92 (1997). It is undisputed that *Gingles* II and III require a showing of legally significant racially polarized voting ("RPV"), which cannot occur if there is enough white crossover voting to assist the minority voters in electing the minority's preferred candidate. *Covington v. North Carolina,* 316 F.R.D. 117, 167 (M.D.N.C. 2016); *Bartlett v. Strickland*, 556 U.S. 1, 16 (2009); *Petteway,* 111 F.4th at 609. To meet this burden, Plaintiffs are required to produce a district specific, functional analysis. *Bethune-Hill*, 580 U.S. at 194. This effectiveness analysis is "used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." *Covington,* 316 F.R.D. at 169 n.46. Notably, this analysis requires evidence of the level at which a district *becomes* effective, not whether it simply is effective. *Id.*

Plaintiffs claim (52) that Defendant advocated for analysis of hypothetical districts. Not so. Instead, Defendant's brief points out two flaws in Dr. Handley's analysis. First, Handley failed to conduct any analysis on the point at which the district in question *becomes* effective. As mentioned in Defendant's brief (47-49), Handley only determined whether the districts were effective at the current BVAP level of the district. This resulted in majority-Black districts that, according to Handley (ROA.15735) were effective 100%, or close thereto, of the

time. [11] This strongly implies, as was the issue in *Covington*, that the districts would perform at a threshold of less than 50% BVAP. Handley's analysis fails to inform the Court on that point.

Contrary to Plaintiffs' position (54), Handley's analysis in this case was nothing like Dr. Lichtman's *Covington* analysis. In *Covington*, Lichtman did not just determine how often districts with their current level of BVAP would perform (or as Handley puts it, be effective) but he "assess[ed] the level of African-American voting-age population that would provide African-American voters a realistic opportunity to elect candidates of their choice." Transcript of Record at 13:8-23, *Covington v. North Carolina*, No.1:15CV399, 270 F.Supp.3d 881 (M.D.N.C. 2017) (D.E. 111). Put another way, Lichtman "performed what is known as an effectiveness analysis, an analysis focused on districts, to see at what level African-American voting-age populations do become effective in providing this realistic opportunity…" *Id.* at 14:1-5. There, Lichtman found that districts above 40%, but less than 50%, would be effective because there was enough white crossover voting that 50% BVAP was unnecessary. *Id.* at 15-16, 22-25, 47. As a result of Lichtman's testimony, North Carolina's VRA districts were struck down as racial gerrymanders because *Gingles* II and III were not met. *Covington,* 316 F.R.D. at 178.

---

[11] Section 2 only requires an equal opportunity to elect, not a guaranteed outcome. *Johnson v. De Grandy*, 512 U.S. 997, 1016-1017 (1994).

Here, Handley offered no opinion as to when the districts as-drawn would become effective.[12] Moreover, Handley cherrypicked districts for her "effectiveness scores," looking only at certain districts within regions, and even excluding majority-Black districts in the regions she focused on. *See, e.g.,* ROA.15727-28 (failing to report districts 2-3, 5, 7). Even more egregious, Handley failed to do any analysis (effectiveness or otherwise) on all regions of the state where majority-Black districts were drawn, including the Delta region, and New Orleans.[13] Handley's exclusion of Orleans Parish is especially suspicious given that this is the only area of the state where a majority-Black district was added (not just adjusted in the Illustrative Plans) that Handley failed to analyze. Moreover, as Dr. Solanky would have shown absent the district court's erroneous exclusion rulings (*infra* Part II.B), voting patterns in Orleans Parish are different than other areas of Louisiana, and display high levels of white crossover voting.

---

[12] As this Court recently held in *Petteway,* crossover districts, or districts where a minority group makes up less than a majority of the voting-age population but can still elect their candidate of choice with support of others who "crossover to support the minority's preferred candidate" are inconsistent with §2 because they "cross the line from protecting minorities against racial discrimination to the prohibited goal of mandating proportional representation." Handley's analysis fails to prove that minorities do not have enough crossover support, and Solanky's excluded analysis shows areas with high white crossover voting. 111 F.4th at 609, 612 (internal citations omitted).

[13] Handley conspicuously chose to examine suburbs of New Orleans instead of the entire region. In comparison, Handley looked at *both* Baton Rouge and it's suburban parishes.

When reviewing the entirety of the evidence, it is clear that Plaintiffs failed to (1) present *Gingles* II and III evidence for all regions where majority-Black districts were located, including Orleans Parish; and (2) produce the required effectiveness analysis. As such, Plaintiffs failed to meet their burden, and the district court's order enjoining the entirety of the Enacted Plans was clear error.

**B.    The Court Erred in Excluding Solanky, and Compounded the Error by Refusing to Reverse Course When Plaintiffs' Counsel Opened the Door.**

The district court's decision to exclude Solanky's reports and testimony on relevance and reliability grounds is derived from "a flawed legal analysis which transcended discretion." *Moss v. Ole S. Real. Est., Inc.*, 933 F.2d 1300, 1306 (5th Cir. 1991). The district court excluded Solanky because he offered "utterly no opinion on racially polarized voting." ROA.6913. But "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *Id.* If Defendants were required to offer an affirmative opinion on RPV, then the exclusion might be justified. But Defendants do not possess the burden of proof, and are not required to offer that opinion. *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). Because the district court made this finding "based on the application of an incorrect burden of proof, the finding cannot stand." *Abbott v. Perez,* 138 S. Ct. 2305, 2326 (2018).

Even assuming *arguendo* the abuse of discretion standard applies, which it does not, reversal is warranted because the district court abused its discretion in finding Solanky's opinions were irrelevant and unreliable. In assessing the admissibility of expert testimony, a court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993); Fed. R. Evid. 702[14]. Defendant engaged Solanky to perform statistical analyses of "the voting patterns and the composition of" the Enacted Plans and to rebut Handley and Cooper. ROA.11566. Both of these categories of expert analyses are relevant and reliable.

Solanky's statewide analysis of registration and voting trends of racial and partisan preferences are directly relevant to testing the assumptions Handley made in her regional, not district specific, RPV analyses. ROA.11788. Statewide voting trends also speak to the totality of the circumstances—specifically, whether the

[14] On December 1, 2023, the United States Supreme Court adopted an amendment to Fed. R. Evid. 702. According to the Advisory Committee's note to 2023 Amendment, "[n]othing in the amendment imposes any new, specific procedures" under Rule 702. In fact the notes specifically state that "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." *Id.* Therefore, even though cases prior to the 2023 Amendment are cited in this brief, the same general rules under *Daubert* continue to apply.

political process is equally open to participation such that the minority group is able to participate, and elect representative candidates of their choice. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021). Handley's own published work details the importance of shifting voter trends, particularly the movement of white voters to the Republican Party in analyzing Black voters' ability to elect their "candidate of choice." *See* Lublin, et al., *Minority Success in Non-Majority Minority Districts: Finding the "Sweet Spot"*, The Journal of Race, Ethnicity, and Politics 5, 275-98 (2020). The district court even recognized the relevance of shifting voter partisanship trends to the totality in its order. ROA.9195. Furthermore, neither Plaintiffs nor the district court disputed the accuracy or reliability of Solanky's reported data on this topic.

Solanky also used Ecological Inference RxC ("EI") modeling, the same method utilized by Handley, to analyze voting patterns by race. Because Handley's RPV analysis was performed regionally, Solanky chose to analyze particular parishes within Cooper's Illustrative Plans to verify Handley's results, and then particular precincts within the parishes. ROA.11574-11591. Solanky's EI analyses are directly relevant to rebut Handley and show that she relied on several faulty assumptions that wholly biased her regional analysis and resulted in "misleading conclusion[s] of voter polarizations"—namely that all voters across an entire parish or region vote the same way, and that her voter allocation method for early and

absentee voters was reliable. ROA.11788-95. Solanky's reports provided evidence for all of these propositions. ROA.11591-93, 11791-98, 11811-20, 11853.

At base, Solanky casts serious doubts on the assumptions, reliability, and mathematical calculations that went into Handley's analyses. (SOS Br. 49-53). It is hard to imagine a subject more proper for a rebuttal report than another expert's flawed methodology. *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 588 (E.D. Mich. 2022) ("[i]t is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports") (quoting *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.,* 829 F.Supp.2d 802, 835 (D. Minn. 2011)(collecting cases)); *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.,* 441 F.Supp.3d 745, 759 (S.D. Iowa 2019) ("[c]ourts regularly permit expert witness testimony even if the expert primarily critiques the opposing expert's approach without offering an alternative approach"); *Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.,* 2022 WL 1014139, at *3 (W.D. Tex. Apr. 5, 2022) (denying motion to exclude rebuttal report containing "new evidence for the stated goal of 'show[ing] methodological flaws'").

The district court also abused its discretion in finding that Solanky's selection of parishes and elections used were unreliable. Rule 702, as amended, requires a showing that it is more likely than not that an expert has a sufficient basis to support his opinion. When conducting a reliability inquiry, courts look at whether the method

was tested, subject to peer review and publication, and generally accepted by the scientific community. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). Courts also look at the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation. *Id.* The method used by Solanky, EI, was never challenged. In fact, it was used by Handley and King. ROA.11272-73, 11316, 15713, 19885. Yet the district court found that Solanky's methods were unreliable, claiming that his selection of parishes was not based on scientific method and that he examined too few elections. ROA.6910-13. All of these rationales are unsupported by evidence.

Solanky testified under oath at his deposition that he chose the parishes in his reports because they were mentioned in the expert reports of Handley and Cooper and, secondarily, because the data for certain precincts within those parishes was easier to clean. ROA.4253-54. This is especially important considering the limited amount of time given to Defendants' experts. (SOS Br. 6).

Maps in Cooper's report, as pointed out in Solanky's deposition, ROA.4274, show that the parishes Solanky analyzed (East Baton Rouge, Natchitoches, East Carroll, Orleans, West Baton Rouge, Caddo, Iberville, and Pointe Coupee (ROA.11578, 11592-11593)) were part of Cooper's illustrative districts, as shown below. ROA.15840, 15854:

**Figure 13: Location of 3 Additional Majority-Black Districts in Illustrative Senate Plan**

**Figure 24: Location of 6 Additional Majority-Black Districts
in Illustrative House**



It belies logic that Solanky's selection of parishes highlighted in Cooper's report as containing illustrative majority-Black districts were chosen randomly. Furthermore, Handley looked at 6/8 parishes that Solanky analyzed in her "areas of interest" (East Baton Rouge, Natchitoches, West Baton Rouge, Caddo, Iberville, and Pointe Coupee). ROA.15715. Plaintiffs' assertion (68) that Solanky "did not, in fact, disclose his underlying methodologies" for these choices is just as insulting now as it was in Solanky's deposition.[15]

Furthermore, Solanky provided specific, reproducible criteria for the elections he chose: statewide elections with (1) higher turnout rates, (2) similar to Handley with a few variations (eight elections analyzed by Handley, one additional election with a black candidate, and 3 elections with no Black candidates as a control group, ROA.11576); and (3) elections with easily-assignable data (fewer candidates in the "other" category due to time constraints imposed by the court). ROA.4230-32. Even more puzzling, the district court gave credence to and accepted the expert testimony of Plaintiffs' expert King, who conducted an EI analysis on *a single election* in Louisiana—in fact, the **exact same** 2022 U.S. Senate Election that Solanky used. ROA.9200-01, 11583-11591, 19885. These two findings cannot be squared.

---

[15] To the extent that Plaintiffs contend (68 n.21) that Legislative-Intervenors only cited representations in Defendants' briefing regarding Solanky's disclosures of his methodology, the record cites herein, which are not to briefing, correct any alleged misapprehension of fact.

Solanky's exclusion went from bad to worse, when the district court refused to re-visit the flawed exclusion order after Plaintiffs' counsel opened the door at trial. Despite the exclusion of Solanky's reports, Plaintiffs' counsel asked Handley about her untimely supplemental rebuttal report that responded only to Solanky's criticisms of her allocation method. ROA.9852-54. Notably, the first statement of that report begins with "Dr. Solanky contends." ROA.15798-15801. Defense counsel objected on this basis, arguing that if Handley could testify about her rebuttal of Solanky's work, Solanky should be allowed to testify about the actual criticisms. ROA.9810-11.

The court's first response was to reject out of hand any reconsideration of Solanky's exclusion, but puzzlingly the court went on to state that the relevant question was whether Handley's allocation methodology was "biased." ROA.9811. Shockingly, this was the *precise* question Solanky examined in his excluded reports. Defense counsel objected again, noting that Solanky was the only expert that raised "whether this allocation was bias[ed] in his expert reports" which were excluded. ROA.9814. The court not only overruled the objections, but allowed the admission of Handley's full report written solely to rebut Solanky's criticisms of her allocation method. Put another way, the district court excluded Solanky's reports, claiming they were "unhelpful," but then allowed Handley's rebuttal of the excluded materials. Solanky's exclusion goes beyond mere mistake or unfairness, it ham-strung

27

Defendants' entire defense strategy, depriving Defendants of due process to defend themselves, and in the process sanitized the record in favor of Plaintiffs. Such evidentiary gamesmanship cannot stand.

### C.     Failure to Consider Endogenous Elections Requires Reversal.

It is undisputed that the district court's ill-conceived schedule foreclosed the ability for any party to consider the 2023 election results. Importantly, the 2023 elections were the only endogenous elections, meaning that they were elections contests "within the jurisdiction and for the particular office that is at issue." *Rodriguez v. Harris Cnty.*, 964 F.Supp.2d 686, 759 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F.App'x 255 (5th Cir. 2015)[16] (citing *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993)). Plaintiffs truncate this definition (56), arguing that endogenous elections are just those for the "particular office at issue." ROA.6648-49. Under Plaintiffs' definition, any house or senate election could be endogenous. First, case law is clear that it is the district <u>at issue</u>. *Id.*  Second, Plaintiffs' definition lacks logic as previous house or senate districts tell the court nothing about the performance of the challenged districts which were reconfigured after the 2020 Census.[17]  Plaintiffs' warping of the definition is nothing more than a failed attempt to avoid this Court's precedent, which held that a district court's failure to consider

---

[16] Notably, *Rodriguez* examined elections held under the challenged districts.

[17] Cases cited in support of Plaintiffs' warped definition (56) mostly dealt with challenges to an electoral system under §2, not single-member districts.

endogenous elections is reversable error. *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1045 (5th Cir. 1990).

## III.    The District Court's Totality Findings Were Clearly Erroneous.

Even if the *Gingles* preconditions are met, the district court is required to engage in "an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality," *Allen*, 599 U.S. at 19, to determine if Plaintiffs can also prove their burden under the totality of the circumstances.

Plaintiffs claim (74-75) that the district court conducted a "thorough fact finding" in reaching its conclusion that 8/9 Senate Factors ("SF") weighed in their favor is unsupported by evidence. A review of the district court's order shows an utter lack of causal connection between historical discrimination in Louisiana and the districts at issue. ROA.9196-9209.

Regarding SF1, the district court ignored that "contemporary examples of discrimination are more probative than historical examples." *Veasey v. Abbott*, 830 F.3d 216, 257-58 (5th Cir. 2016). No evidence of contemporary acts of the Legislature were produced here. Instead, Dr. Gilpin's report was focused on pre-1982 historical examples—which do not show that Black voters suffer today from unequal access to Louisiana's political process. *N.A.A.C.P. v. Fordice*, 252 F.2d 361, 367-68 (5th Cir. 2001). The few modern examples that Gilpin provided dealt with

matters beyond the control of the Legislature—like parish-level at-large elections and polling place issues, which are set by the parish governing authroity. La. Stat. §18:533. These examples cannot support the finding that SF1 "weighs strongly in favor of the Plaintiffs." ROA.9199. Moreover, Plaintiffs misapprehend (76-77) Solanky's improperly excluded totality evidence. Solanky showed that Democratic Black voters in Louisiana participate in the political process in parity with their White Democratic counterparts. ROA.11567-74. This is highly relevant. *Chisom v. Roemer*, 501 U.S. 380, 386-87 (1991).

Similarly, Plaintiffs distort Dr. Alford's testimony that directly undermines the district court's SF2 findings. Alford showed how Handley cherry-picked statewide races to reach her conclusions. ROA.11320-25. Alford looked to a broader range of elections and found that in the elections Handley did not analyze, Black voters cohesively supported Democratic candidates, but not necessarily Black candidates, which led him to conclude that there was political, not necessarily racial, polarization. ROA.11320-25, 11329-30. When combined with the fact that Handley only analyzed one to three[18] legislative elections for each district at issue, Alford's testimony shows that the district court clearly erred by

---

[18] Plaintiffs' claim (77) that Handley's EI analysis of twenty-one "endogenous" elections supports the district court's findings is a bit misleading. Handley's EI analysis only considered one to three elections per each district under old district boundaries. ROA.15770-15773.

blindly accepting Plaintiff's cherry-picked RPV statistics under SF2. *Teague v. Attala County*, 92 F.3d 283, 291 (5th Cir. 1996).

As to SF3, Plaintiffs claim (80) that the district court properly relied on the testimony of two individuals to support the finding that Louisiana's multiple elections "breeds voter fatigue and confusion, which is amplified in poor and under educated communities." ROA.9201. However, the district court failed to make any connection between Louisiana's decentralized elections and an increased opportunity for discrimination against the minority group itself. ROA.9201-02. In other words, there was no indication that voter fatigue and confusion from numerous elections disproportionately affected the minority group.[19]

The district court's analyses on the other SFs are likewise riddled with error. For example, Plaintiffs and the district court incorrectly compare the state's 33.1% Black population for SF7 and proportionality purposes. Pl. Br. 84; ROA.9206. The correct measure is the 31.25% BVAP. *Johnson*, 512 U.S. at 1013; ROA.11442. Even so, the district court found that "Black legislators held only 36 out of 144 total State House seats in 2023" when there are only 105 State House districts in Louisiana. ROA.9206, 11489.

---

[19] Curiously, Plaintiffs repeatedly demand a special election in this case. ROA.9228-34, 9237-71, 9243-61, 9309-14.

Similarly, the district court erred in its proportionality analysis by wholly failing to consider whether the Enacted Plans were substantially proportional as mandated in *Johnson*. Section 2 has never required exact proportional representation. *Johnson*, 512 U.S. at 1014; *LULAC*, 548 U.S. at 436. But the court repeatedly suggests that the Enacted Plans "do not reflect proportionality" without any comparison to BVAP levels statewide or regionally. ROA.9210. Barber's analysis reveals that the Enacted Plans are substantially proportional statewide:

Table 1: Statewide Population and District Information

| Decennial Census: | 2000 | 2000 | 2010 | 2010 | 2020 | 2020 |
|---|---|---|---|---|---|---|
| Legislative Plan | 1990 | 2001 | 2001 | 2011 | 2011 | 2022 |
| Statewide % Black Voting Age Population (BVAP) | 29.95 | 29.95 | 30.47 | 30.47 | 31.25 | 31.25 |
| **Senate:** | | | | | | |
| Enacted Statewide Majority BVAP Senate Districts | 10 | 9 | 9 | 11 | 10 | 11 |
| Enacted % of Senate Districts Majority BVAP | 25.6 | 23.1 | 23.1 | 28.2 | 25.6 | 28.2 |
| Enacted % Difference from Population | -4.3 | -6.9 | -7.4 | -2.3 | -5.6 | -3.0 |
| Cooper Statewide Majority BVAP Senate Districts | | | | | | 14 |
| Cooper % of Senate Districts Majority BVAP | | | | | | 35.9 |
| Cooper % Difference from Population | | | | | | +4.6 |
| **House:** | | | | | | |
| Enacted Statewide Majority BVAP House Districts | 26 | 27 | 23 | 28 | 28 | 29 |
| Enacted % of House Districts Majority BVAP | 24.8 | 25.7 | 21.9 | 26.7 | 26.7 | 27.6 |
| Enacted % Difference from Population | -5.2 | -4.2 | -8.6 | -3.8 | -4.6 | -3.6 |
| Cooper Statewide Majority BVAP House Districts | | | | | | 35 |
| Cooper % of House Districts Majority BVAP | | | | | | 33.3 |
| Cooper % Difference from Population | | | | | | +2.1 |

Black population numbers are based on the any-part Black Voting Age Population.

ROA.11442. Barber's regional analysis similarly shows substantial proportionality in all challenged regions. ROA.11768-11784. Plaintiffs never rebutted this evidence, continuing to argue not just that proportionality is required, but extra-proportionality is preferred.

Moreover, Plaintiffs challenge maps that are "in substantial proportion to the minority's share of voting-age population[,]" which alone is sufficient reason for reversal on the totality. *Johnson*, 512 U.S. at 1013. Under these facts, the substantial proportionality of the Enacted Plans, and lack of evidence supporting the other SFs confirm that the district court's totality findings are clear error.

## CONCLUSION

For the reasons stated herein, in Defendant's opening brief, and all briefs filed by the Legislative Intervenors and the State, the district court's decision below should be reversed or vacated.

Respectfully submitted,

s/ Phillip Strach
Phillip J. Strach
Alyssa M. Riggins
Cassie A. Holt
NELSON MULLINS RILEY &
SCARBOROUGH LLP
301 Hillsborough Street
Suite 1400
Raleigh, NC 27603
Phone: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

John C. Walsh
John C. Conine, Jr.
SHOWS, CALI & WALSH, LLP
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Phone: (225) 346-1461
john@scwllp.com
coninej@scwllp.com

*Counsel for Appellant Nancy Landry*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing ***Brief*** with the Clerk of Court using the CM/ECF system which will send notice of such filing to all registered CM/ECF users:

Date: September 18, 2023

*s/ Phillip J. Strach*

Phillip J. Strach

*Attorney of Record for Defendant-Appellant Nancy Landry, in her official capacity as Secretary of State of Louisiana*

## CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitation set forth in set forth in FRAP 32(a)(7)(A). This brief contains 6,478 words.

2.     This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point font size in Times New Roman.

*s/ Phillip J. Strach*
Phillip J. Strach
*Attorney of Record for Defendant-Appellant Nancy Landry, in her official capacity as Secretary of State of Louisiana*