No. 24-30115

# In the United States Court of Appeals for the Fifth Circuit

DOROTHY NAIRNE, DOCTOR; CLEE E. LOWE, REVEREND; ALICE WASHINGTON, DOCTOR; BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE; LOUISIANA STATE CONFERENCE OF THE NAACP; STEVEN HARRIS, REVEREND,

*Plaintiffs-Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,

*Defendant-Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL; PHILLIP DEVILLIER, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE LOUISIANA HOUSE OF REPRESENTATIVE; CAMERON HENRY, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE LOUISIANA SENATE,

*Intervenors-Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor-Appellee*

―――――――――――――――

On Appeal from the United States District Court
for the Middle District of Louisiana, No. 3:22-CV-178

―――――――――――――――

## THE STATE OF LOUISIANA'S REPLY BRIEF

―――――――――――――――

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY
GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 326-6705
BrungardM@ag.louisiana.gov

J. BENJAMIN AGUIÑAGA
Solicitor General

MORGAN BRUNGARD
Deputy Solicitor General

*Counsel for the State of Louisiana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 2

  I.  THE STATE'S ARGUMENT THAT SECTION 2 IS
      UNCONSTITUTIONAL AS APPLIED TO LOUISIANA IS PROPERLY
      BEFORE THIS COURT ........................................................................... 2

  II.  SECTION 2 IS UNCONSTITUTIONAL AS APPLIED TO LOUISIANA. ............ 9

CONCLUSION ........................................................................................... 23

CERTIFICATE OF SERVICE ................................................................... 25

CERTIFICATE OF COMPLIANCE ......................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña,*
  515 U.S. 200 (1995).....................................................................9

*Alexander v. S.C. State Conf. of the NAACP,*
  144 S. Ct. 1221 (2024)..............................................................22

*Allen v. Milligan,*
  144 S. Ct. 476 (2023)...................................................................4

*Allen v. Milligan,*
  599 U.S. 1 (2023).............................................................. passim

*Bd. of Educ. of Okla. City Pub. Sch. v. Dowell,*
  498 U.S. 23. 7 (1991)................................................................17

*Bolling v. Sharpe,*
  347 U.S. 497 (1954).....................................................................9

*Buckley v. Valeo,*
  424 U.S. 1 (1976).........................................................................9

*Central Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, Nat'l Ass'n,*
  780 F.3d 296 (5th Cir. 2015)......................................................8

*Chisom v. Louisiana,*
  __ F.4th __, 2024 WL 3982181 (5th Cir. Aug. 29, 2024) ......................23

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)............................................................11, 14

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989)............................................................18, 23

*City of Rome v. United States,*
  446 U.S. 156 (1980)............................................................11, 14

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
  76 F.4th 425 (5th Cir. 2023) ................................................... 8

*Freeman v. Pitts,*
  503 U.S. 467 (1992) ............................................................... 17

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) .................................................. 10, 12, 16

*Hirabayashi v. United States,*
  320 U.S. 81 (1943) ................................................................. 12

*Jackson v. Widnall,*
  99 F.3d 710 (5th Cir. 1996) ................................................... 9

*Johnson v. California,*
  543 U.S. 499 (2005) ............................................................... 17

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ....................................... 13, 14

*Milliken v. Bradley,*
  433 U.S. 267 (1977) ............................................................... 17

*Morrison v. Olson,*
  487 U.S. 654 (1988) ............................................................... 23

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
  557 U.S. 193 (2009) ............................................................... 14

*Palmore v. Sidoti,*
  466 U.S. 429 (1984) ............................................................... 12

*Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) ............................................................... 16

*Rice v. Cayetano,*
  528 U.S. 495 (2000) ......................................................... 12, 23

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ............................................................. 17

*Shelby Cnty. v. Holder*,
   570 U.S. 529 (2013) ..................................................... passim

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ................................................ 11, 14, 15

*Strauder v. West Virginia*,
   100 U.S. 303 (1879) ............................................................. 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ............................................. 9, 10, 16, 22

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................................. 6

*United States v. Vaello Madero*,
   596 U.S. 159 (2022) ............................................................. 10

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975) ............................................................... 9

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................. 10

## Statutes

120 Stat. 577 §§ 2(b)(4)(C), 2(b)(8) ........................................... 19

42 U.S.C. § 1973 .................................................................. 2, 13, 22

## Other Authorities

Adam Fairclough, *Race and Democracy: The Civil Rights Struggle in Louisiana*, 1915–1972 (Univ. of Ga. Press 1995) ................................. 20

Depo P. Adegbile, *Voting Rights in Louisiana, 1982–2006*, 17 Rev. L. & S.J. 417 (2008)..................................................................................20

U.S. Dep't of Justice, Voting Determination Letters for Louisiana, https://www.justice.gov/crt/votingdetermination-letters-louisiana.....21

## Rules

Fed. R. Civ. P. 8(b)(1)(A) ..............................................................8

Fed. R. Civ. Pro. 8(b) ....................................................................6

## Constitutional Provisions

U.S. Const. amend. XV, § 1 ......................................................14

U.S. Const. amend. XV, § 2 ....................................3, 14, 18, 20

# INTRODUCTION

The State—in addition to joining the other Defendants' briefs—has raised two discrete, dispositive issues warranting reversal. The first is that Section 2 of the Voting Rights Act (VRA) does not confer a private right of action on individuals, thereby foreclosing this lawsuit from its inception and requiring reversal. Plaintiffs and the United States complain that this issue is foreclosed by binding precedent at the panel-stage—a point the State expressly acknowledged in its opening brief. As the State explained, it briefed this argument for preservation purposes and to provide Panel members an opportunity, if they so wish, to revisit the prospect of en banc review or write separately. *See* ECF No. 200 at 2–3. The State is not hiding the ball here.

The second issue—addressed in this brief—is that Section 2 is unconstitutional as applied to Louisiana because it exceeds Congress' Fifteenth Amendment authority. The United States attempts to avoid the issue altogether on the ground that it was unaware this constitutional challenge existed and thus the State has waived it. Not even Plaintiffs try that preposterous argument, and for good reason: The State repeatedly challenged Section 2's constitutionality based on

1

current conditions in Louisiana—and even notified the United States before trial of the challenge. On the merits, Plaintiffs and the United States have no answer to the constitutional question. Their view is, in effect, that Section 2's race-based dictates are immortal, forever immune from constitutional scrutiny. No matter the passage of time, and no matter that Black and non-Black Louisianans alike today have the equal opportunities the VRA was enacted to ensure and now has ensured. This is wrong, and it goes against every promise of our color-blind Constitution. The Court should reverse.

## ARGUMENT

### I. THE STATE'S ARGUMENT THAT SECTION 2 IS UNCONSTITUTIONAL AS APPLIED TO LOUISIANA IS PROPERLY BEFORE THIS COURT.

The United States devotes multiple pages to taking down a straw-man—that the State has waived its "facial" challenge to Section 2. ECF No. 220 at 11, 14–15, 29. That is not the State's argument at all. The State's position is that Section 2 is no longer constitutional *in Louisiana* because the voter data *from Louisiana* (that was introduced into evidence) shows that Black voters *in Louisiana* today have an equal opportunity to participate in the political process and "elect representatives of their choice." 42 U.S.C. § 1973(b). That is why the

2

State's opening brief uses the words "as applied" throughout, *see* ECF No. 200 at iii (once), 2 (once), 3 (three times), 14 (twice), 18 (once), 23 (once), and the word "facial" not at all. It may very well be that current voting data from other States would equally show that the VRA is no longer constitutional as applied to those States either. That evidence, however, is not part of this record, and it would be incumbent upon other States to submit such evidence in support of their own constitutional challenges to Section 2 as applied to them.

Plaintiffs and the United States try multiple arguments to shut the door on the State's as-applied challenge. None avails.

*First*, contrary to the United States' telling, the State's as-applied challenge is very much "an open issue." ECF No. 219 at 8. Courts have decided *different* constitutional challenges to Section 2. *See Allen v. Milligan*, 599 U.S. 1, 41 (2023) ("[W]e are not persuaded by Alabama's arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress."). But no court has decided whether Congress' Fifteenth Amendment "power" to require Louisiana (or any other State) to conduct race-based redistricting under Section 2 of the VRA has lapsed. U.S. Const. amend. XV, § 2; *compare Allen*, 599 U.S. at 45

(Kavanaugh, J., concurring) (noting, but "not consider[ing] [] at this time," the "temporal argument" that the "authority to conduct race-based redistricting cannot extend indefinitely into the future"); *Allen*, 599 U.S. at 86–88 (Thomas, J., joined by Gorsuch and Barrett, JJ., dissenting) (advancing argument).

Private Plaintiffs, for their part, say the State's as-applied challenge would require the Court to "disregard" *Allen*. ECF No. 220 at 88–89. But all they point to is the Supreme Court's denial, "with no noted dissents," of "*Alabama's* [post-remand] stay application"—which briefly questioned whether, as a categorical matter, Section 2 could indefinitely authorize race-based redistricting. *Id.* at 89 (emphasis added) (quoting Stay Appl. 38, *Allen v. Milligan*, No. 23A231 (U.S.) and citing *Allen v. Milligan*, 144 S. Ct. 476 (2023) (denying Stay Appl.)) A bare stay denial based on a different constitutional claim that includes no analysis and no separate writings has no bearing on Louisiana's as-applied challenge here. And the lower court decisions that Plaintiffs cite (ECF No. 220 at 89–90) involve other States that (no surprise here) never argued that Section 2 was no longer constitutional as applied to Louisiana.

4

*Second*, arguments that the State did not preserve its challenge below are baseless. The State repeatedly did so:

- The State first raised this as-applied challenge in its Answer as an affirmative Rule 12(b)(6) defense. *See* ROA.660 ¶ 6 (asserting that Plaintiffs' allegations of "remote history" are insufficient to state a claim because "burdens imposed by the [VRA] must be justified by current needs").

- The State maintained this as-applied challenge in its pre-trial brief filed in the district court in November 2023. *See, e.g.*, ROA.7046 ¶ 115 (Defs' Pre-Trial Proposed Conclusion of Law: "Congressional authority to constitutionally authorize race-based redistricting under Section 2 cannot extend indefinitely unto the future. Because it is clear that the political process is equally open to Black voters and any polarization is based on political affiliation, not race, ordering race-based districting *under these facts*, would violate the U.S. Constitution." (emphasis added and internal citations omitted) (citing *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring))).

- In that same pre-trial brief, the State gave notice that it would introduce evidence at trial to support its as-applied challenge. *See* ROA.6988–90 (Defs' Pre-Trial Proposed Finding of Fact discussing what Defendants' expert evidence would show); ROA.6990 ¶ 256 ("In other words, [Defendants' expert] concludes that it is party and not race that is driving any Black voter cohesion seen by [Plaintiffs' expert].").

- That pre-trial brief also gave notice that the evidence Plaintiffs would introduce at trial would not rebut the State's as-applied challenge. *See* ROA.6991–92 (Defs' Pre-Trial Proposed Finding of Fact: "Plaintiffs offer no evidence to show that Black residents have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Rather the evidence under the totality of the circumstances clearly shows that Black residents of Louisiana

have at least an equal opportunity to participate in the political process and to elect a candidate of their choice."); ROA.7049 ¶ 122 ("Likewise, Plaintiffs' evidence of a 'history of official discrimination,' is not recent. '[T]he authority to conduct race-based redistricting cannot extend indefinitely into the future.' Plaintiffs' reliance on the past does not justify current relief." (internal citations omitted) (alterations in original) (first quoting *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986), then quoting *Allen*, 599 U.S. at 45) (Kavanaugh, J., concurring)).

- The same day that Defendants filed their pre-trial brief, they gave special notice *to the United States* of their as-applied challenge. *See* ROA.7052–54 (Defs' Notice of Constitutional Question that "finding for Plaintiffs requires interpreting the [VRA] in a way that calls its constitutionality into question because *the [Act's] inherently race-based remedies, as applied to the facts in this matter and at this time, are not justified by present conditions . . . .*" (emphasis added)).

Unquestionably, therefore, the State raised its as-applied challenge at every turn in the district court and met the pleading standards for that defense. *See* Fed. R. Civ. Pro. 8(b).

*Third*, the United States' suggestion that it was insufficiently on notice of the State's challenge is meritless. Remarkably, despite receiving the State's *pre*-trial notice of the constitutional challenge, the United States waited until *after* trial to intervene. *See* ROA.7270–72 (Notice of Intervention); ROA.7273–74 (Notice of Appearance); ROA.7275 (Certificate of Interested Persons). The United States did not seek continuance of trial or any other accommodation to prepare its defense of

Section 2. Instead, the United States simply filed its post-trial intervention notice (without any proposed pleading), *see* ROA.7270–72, and then waited another twelve days to file its brief defending the constitutionality of Section 2, *see* ROA.7282–7303—filed on the same day as Defendants' post-trial brief, *see* ROA.7301–52.

Defendants' post-trial brief, of course, maintained their as-applied challenge. *See* ROA.7348–49 ("Congress has made no findings in recent decades that may justify § 2's limitless temporal reach, and it has made no adjustments to § 2's scope or standard tailored to current (or even recent) conditions. There can be no doubt that '[o]ur country has changed,' but § 2 has not. Its current burdens thus must be justified by current evidence that Plaintiffs have refused to offer here." (internal citations omitted) (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013)).

The United States says that "[t]he district court, like the United States, [mis]understood the State to be making a constitutional avoidance argument," and therefore "the State's 'arguments in the district court were insufficient to put the court and [the other parties] on notice of the defense." ECF No. 219 at 10, 14 (third alteration in original)

(quoting *Central Sw. Tex. Dev., L.L.C. v. JPMorgan Chase Bank, Nat'l Ass'n*, 780 F.3d 296, 301 (5th Cir. 2015)).

Only half of that statement is true. The district court got the State's as-applied challenge: It noted that "Defendants' arguments . . . do not facially challenge the constitutionality of § 2 itself," and recognized the State's position that "*any*" application of Section 2 to support a judgment against Louisiana "would violate the Constitution." ROA.9141 (emphasis added). That the United States (a) waited until after trial to intervene and (b) thereby waived the opportunity the United State otherwise would have had to participate in discovery and try to introduce counter-evidence about current voting demographics in Louisiana is no "ambush" by the State. ECF No. 219 at 14 (quoting *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 439 (5th Cir. 2023)).

At bottom, the State is not responsible for when another party decides to intervene; that calculation is beyond the State's control. The State is also not responsible for another party's misinterpretation of the State's "plain terms" defenses. Fed. R. Civ. P. 8(b)(1)(A). Nor is the State responsible for the United States' failure to counter the State's repeated arguments about Section 2's unconstitutionality in light of "current

burdens" and "current conditions" in Louisiana. ROA.7349. What the State *is* responsible for—continually advancing its arguments, supported by trial evidence—it has done. The State has advanced its as-applied constitutional challenge to Section 2 at all stages of this litigation. That does not come close to the circumstances that would warrant "deem[ing] waived" the State's as-applied challenge. ECF No. 219 at 11 (quoting *Jackson v. Widnall*, 99 F.3d 710, 716 n.9 (5th Cir. 1996)).

## II.    SECTION 2 IS UNCONSTITUTIONAL AS APPLIED TO LOUISIANA.

"The Constitution . . . forbids . . . discrimination by the General Government, or by the States, against any citizen because of his race." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 205 (2023) (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). That prohibition, regardless of which constitutional provision houses it,[1] "applies 'without regard to any differences of race,

---

[1] While some debate whether the Fifth Amendment or the Fourteenth Amendment prohibits Congress from discriminating on the basis of race, all agree that the prohibition exists. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) (per curiam))); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975) (holding that the Due Process clause of the Fifth Amendment contains a prohibition that is "precisely the same" as the Equal Protection clause of

of color, or of nationality'—it is 'universal in [its] application.'" *Id.* at 206
(alternation in original) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369
(1886)). The general rule—the constitutional "norm"—is that the
government must give "equal treatment [to] all racial and ethnic groups."
*Grutter v. Bollinger*, 539 U.S. 306, 342 (2003). And equal treatment
means that all laws—at the federal, state, and local levels—"shall be the
same for the black as for the white." *SFFA*, 600 U.S. at 202 (quoting
*Strauder v. West Virginia*, 100 U.S. 303, 307–09 (1879)).

   **A.** Race-based remedies, however, suspend this constitutional norm
and are "rare for [that] reason." *Id.* at 208. In a very circular way, race-
based remedies for violations of the Civil War Amendments allow
governments to do precisely what the Civil War Amendments prohibit.
Because of that, those Amendments limit such remedies. Under the
Fourteenth Amendment, Congress can enact race-based remedies only if
they are "congruent and proportional" to the violations they seek to cure.
*Allen*, 599 U.S. at 80 n.19 (Thomas, J., joined by Gorsuch and Barrett,

---

the Fourteenth Amendment); *United States v. Vaello Madero*, 596 U.S.
159, 167 (2022) (Thomas, J., concurring) ("Firmer ground for prohibiting
the Federal Government from discriminating on the basis of race, at least
with respect to civil rights, may well be found in the Fourteenth
Amendment's Citizenship Clause.").

JJ., dissenting) ("While our congruence-and-proportionality cases have focused primarily on the Fourteenth Amendment, they make clear that the same principles govern 'Congress' parallel power to enforce the provisions of the Fifteenth Amendment.'" (quoting *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997))).

Under Section 2 of the Fifteenth Amendment, this Court has held that Congress can enact race-based remedies through legislation[2] "prohibit[ing] practices that in and of themselves do not violate § 1 of the Amendment, *so long as* the prohibitions attacking racial discrimination in voting are 'appropriate.'" *City of Rome v. United States*, 446 U.S. 156, 177 (1980) (emphasis added). The emphasized language is important: It requires a temporal tie between prohibitions on disparate-impact discrimination (like the 1982 Amendment to Section 2 of the VRA) and the circumstances that render those prohibitions appropriate. No

---

[2] While race-based remedies are often thought of as court-imposed remedies, Section 2 of the Fifteenth Amendment gives "Congress . . . in addition to the courts . . . full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966)

temporal tie means the remedy is no longer appropriate (and so not
longer constitutional)—most likely because the remedy worked.

"A core purpose of the Fourteenth Amendment" for the States—and
so also the Fifth Amendment for the federal government—"[is] to do away
with all governmentally imposed discrimination based on race. *Grutter*,
539 U.S. at 341 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).
"Distinctions between citizens solely because of their ancestry are by
their very nature odious to a free people whose institutions are founded
upon the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)
(quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). That is
why "all governmental use of race must have a logical end point." *Grutter*,
539 U.S. at 342. Without that temporal limitation, a government's "racial
preferences   would   offend   th[e]   fundamental   equal   protection
principle." *Id.* In short, this "durational requirement" is what saves race-
based remedies from crossing into equal protection territory. *Id.*

This temporal rule is quite logical: Otherwise unconstitutional race-
based government action is allowed as a remedy only as long as it takes
to reverse the effects of the original unconstitutional race-based
government action. After all, remedies by their very nature are self-

eliminating because they eventually work or, in the language of the Fifteenth Amendment, render themselves no longer "appropriate." *See Shelby Cnty.*, 570 U.S. at 548–49 ("There is no doubt that these improvements are in large part *because of* the [VRA]. The Act has proved immensely successful at redressing racial discrimination and integrating the voting process. . . . [D]ue to the [VRA], our Nation has made great strides.").

The 1982 Amendment is just such a remedy. And it is unique among race-based remedies because it suspends the constitutional norm twice over. Congress (first layer) legislated on the basis of race (1982 Amendment) to require the States (second layer) to consider race when drawing voting districts. *See* 42 U.S.C. § 1973.

**B.** The United States argues that the doubly-race-based 1982 Amendment is constitutional because it satisfies "the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819)." ECF No. 219 at 18. Regardless of which standard applies,[3]

---

[3] The text, history, and context of the enforcement sections of the Fourteenth and Fifteenth Amendments are virtually identical. Given those shared characteristics, there is no basis for applying a diluted congruence-and-proportionality test to the Fifteenth Amendment. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 542 n.1 (2013) (applying same

the 1982 Amendment as applied to Louisiana is no longer "appropriate"—

*i.e.*, constitutional. U.S. Const. amend. XV, § 2. Even under *McCulloch*,

as "defined" by *City of Rome*, the 1982 Amendment remains "appropriate"

only until it has "carr[ied] out the objects" of the Fifteenth Amendment

and "secure[d] to all" citizens, 446 U.S. at 175 (quoting *South Carolina v.

Katzenbach*, 383 U.S. 301, 327 (1966)), the right to vote regardless of

their "race, color, or previous condition of servitude," U.S. Const. amend.

XV, § 1. And as explained in the State's opening brief (*see* ECF No. 200

at 21–23), the record here shows that Section 2 of the VRA has achieved

the objects of the Fifteenth Amendment in Louisiana.

   The United States would limit this temporal rule to "[t]he Supreme

Court's decision in *Shelby County*, striking down" VRA Section 5's

---

reasoning to "both Amendments"); *see also Allen v. Milligan*, 599 U.S. 1,
80 n.19 (2023) (Thomas, J., joined by Gorsuch and Barrett, JJ.,
dissenting) ("While our congruence-and-proportionality cases have
focused primarily on the Fourteenth Amendment, they make clear that
the same principles govern 'Congress' parallel power to enforce the
provisions of the Fifteenth Amendment.'" (quoting *City of Boerne v.
Flores*, 521 U.S. 507, 518 (1997))); *Nw. Austin Mun. Util. Dist. No. One v.
Holder*, 557 U.S. 193, 204 (2009) (declining to "resolve" whether *City of
Boerne*'s "congruence and proportionality" test or *Katzenbach*'s "rational
means" test was the proper test for deciding if "Congress exceeded its
Fifteenth Amendment enforcement power in extending [Section 5 of the
VRA]").

"preclearance regime." ECF No. 219 at 23–27 (distinguishing Section 5 from Section 2). Requiring race-based remedies to remain "appropriate" outside of the Section 5 context, says the United States, "would require continuous legislative updating . . . of myriad statutes passed under the Reconstruction Amendments." *Id.* at 27.

But this temporal limitation on race-based remedies has applied to all sections of the VRA since the year after it was enacted—long before the 1982 Amendment. *See Katzenbach*, 383 U.S. at 308 ("The constitutional propriety of the [VRA] must be judged with reference to the historical experience which it reflects.'"); *id.* at 308–15 (detailing that historical experience); *id.* at 317 (reviewing VRA Sections "4(a)–(d), 5, 6(b), 7, 9, 13(a), and certain procedural portions of [Section] 14" and deciding the constitutional appropriateness of their "actual operation in South Carolina" based on "their present status"); *id.* at 327–37 (reviewing the "present status" of those sections in South Carolina and finding it constitutionally appropriate). In *Katzenbach*, the Supreme Court ultimately held it "permissible" for Congress "to impose the [VRA's] new remedies, *at least in the absence of proof that [the relevant States] ha[d]*

15

*been free of substantial voting discrimination in recent years*." *Id.* at 330 (emphasis added).

What's more, this temporal limitation on race-based remedies extends far beyond the VRA context. *See Grutter*, 539 U.S. at 342 ("[R]ace-conscious admissions policies"—even those that satisfy strict scrutiny—"must be limited in time."); *id.* at 343 ("We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today."). Earlier this year, the Supreme Court held that the time *Grutter* predicted had come. *SFFA*, 600 U.S. at 213 ("Twenty years later, no end is in sight. . . . and—at some point— [race-based admissions policies] must end. . . . They must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment.").

Outside of university admissions policies, the Supreme Court has "identified only two compelling interests that permit resort to race-based government action." *Id.* at 207. The first "is remediating specific, identified instances of past discrimination that violated the Constitution [school segregation] or a statute [the VRA]." *Id.* (citing *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007)

(school segregation); *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) (VRA)). The second is avoiding prison "race riot[s]." *Id.* (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

In each of those two situations, temporal limitations apply to race-based remedies. That is true for race-based school-segregation remedies. *See Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 23. 7, 248 (1991) (Remedies "in school desegregation cases . . . are not intended to operate in perpetuity."); *id.* ("[A] federal court's regulatory control of [school] systems [must] not extend beyond the time required to remedy the effects of past intentional discrimination." (citing *Milliken v. Bradley*, 433 U.S., at 280–82 (1977))); *Freeman v. Pitts*, 503 U.S. 467, 506 (1992) (Scalia, J., concurring) ("At some time, we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operation of schools. We are close to that time.").

That is also true for race-based prison-riot remedies. *See Johnson*, 543 U.S. at 512–13 (explaining that "only" a "*temporary* segregation of inmates" on the basis of race to prevent "a prison race riot . . . can justify

an exception to the [equal protection] principle" (emphasis added) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment))).

Race-based voting remedies should be no different. Temporal limitations likewise apply to race-based remedial statutes like Section 2 for all the textual and precedential reasons previously explained. *See supra* 10–17.

**C.** In an attempt to show that Section 2 remains "appropriate" as applied to Louisiana, U.S. Const. amend. XV, § 2, Plaintiffs point (ECF No. 220 at 90–91) to findings Congress made in 2006 to justify reauthorizing *other sections* of the VRA (like preclearance under Section 5), not Section 2. Those sections, unlike Section 2, "were intended to be temporary" and, in the original 1965 Act, "were set to expire after five years." *Shelby Cnty.*, 570 U.S. at 538. In 1970, 1975, 1982, and 2006, Congress "reauthorized" the non-Section-2 provisions of the VRA that were subject to the sunset provision. *Id.* at 538–39.

The 2006 congressional findings cite "the continued filing of section 2 cases that originated in covered jurisdictions" and "section 2 litigation filed to prevent dilutive techniques" as evidence supporting Congress'

decision to extend the non-Section-2 provisions. 120 Stat. 577 §§ 2(b)(4)(C), 2(b)(8).[4] It would be *ipse dixit* to treat the mere existence of lawsuits as proof of Congress' continued constitutional authority to authorize those very lawsuits. Not to mention that the 2006 findings (including the citations of Section 2 lawsuits) turned out to be insufficient to save even the non-Section-2 provisions they were meant to support. *Shelby Cnty.*, 570 U.S. at 547–51 (finding Congress' decision to extend the time-limited sections was "based on decades-old data and eradicated practices"). That necessarily means the 2006 findings are also insufficient to justify continuing sections of the VRA—like Section 2— that the 2006 findings were not meant to support.

To fill the gap in the congressional record, Plaintiffs point to their own record evidence. Their view is that evidence shows Louisiana's current voting conditions support congressional authority to continue applying Section 2 in Louisiana. ECF No. 220 at 93–94. But Plaintiffs' evidence does not come close to identifying discrimination that would continue to make Section 2 "appropriate" in Louisiana. U.S. Const.

---

[4] Available at: https://www.govinfo.gov/content/pkg/STATUTE-120/pdf/STATUTE-120-Pg577.pdf#page=1.

amend. XV, § 2. For example, they cite Black incarceration, parole, probation, and felony-conviction rates, none of which suggests racial discrimination of any kind, much less *voting*-related discrimination.

The closest they get to current evidence is a one-sentence musing from the district court. *See* ECF No. 220 at 93 ("Black voter suppression continues in the form of closing polling places, restricting access to polling places, restricting access to early voting, and limiting mail-in voting." (quoting ROA.9199)). The page of the Gilpin Report that the district court's order (ROA.9199) cites to support that sentence itself considers conditions from the past. *See* ROA.16676 (Gilpin Report looking no further than "1982–2006" and citing a book about pre-1972 voting in Louisiana, a law review article discussing the Department of Justice's preclearance decisions for state and local election practices in Louisiana during "the first 17 years of the VRA[]"—or from 1965 to 1982 (obviously predating the 1982 Amendment), and a DOJ website repository of its preclearance decisions for state and local election practices in Louisiana during Section 5's lifespan).[5]

---

[5] Adam Fairclough, *Race and Democracy: The Civil Rights Struggle in Louisiana*, 1915–1972 (Univ. of Ga. Press 1995); Depo P. Adegbile, *Voting Rights in Louisiana, 1982–2006*, 17 Rev. L. & S.J. 417 (2008); U.S.

Plaintiffs run away entirely from the State's point that they left "unrebutted" Defendants' expert testimony showing any polarization "is political, not racial." ECF No. 200 at 23. They say nothing about the virtually identical Black and white Louisiana voter registration rates that the Supreme Court identified in 2004 in *Shelby County*, 470 U.S. at 546. And they say nothing about the fact that their "own evidence shows that black turnout in 2020 was higher than white turnout among voters with a bachelor's degree (76% to 74%), and *significantly* higher among voters with no high school diploma (46% to 30%)." Br. of Alabama *et al.* as *Amici Curiae* at 13–14 (citing ROA.19759). Section 2 simply is not constitutionally sustainable as applied to conditions like these.

One final note on this as-applied challenge: Pay close attention to the position Plaintiffs and the United States take on this temporal issue. They say that Section 2 can be constitutional without an express temporal limitation. *See, e.g.*, ECF No. 291 25–26 (distinguishing *Shelby County* because "Congress never imposed a sunset provision on Section 2 as it did on Section 5"). Then they say Section 2 does not need updated

Dep't of Justice, Voting Determination Letters for Louisiana, https://www.justice.gov/crt/votingdetermination-letters-louisiana.

congressional findings to remain constitutional 40-plus years later. *See generally* ECF Nos. 219, 220.

The upshot is that they would make Congress' constitutional authority to mandate race-based districting (if any exists in the first place) forever untouchable by insulating the 1982 Amendment from constitutional scrutiny. Worse, they would never restore the norm of our color-blind Constitution. Their position is "once appropriate, always appropriate" under the Constitution—no matter how "equally open" to all "race[s] or color[s]" political processes become. 42 U.S.C. § 1973. That issue, they say, is a merits issue. *See* ECF No. 220 at 91 ("The *Gingles* framework is inherently tied to current conditions . . . ."); ECF No. 219 at 29 ("The State thus seeks to bootstrap a statutory argument into a constitutional one.").

That cannot be right. For one, it forever marches States into federal court after every census to prove they "consider[ed] race *just enough.*" *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1267 (2024) (Thomas, J., concurring in part). For another, it "effectively assure[s] that race will always be relevant . . . and that the ultimate goal of eliminating" race-based redistricting "will never be achieved." *SFFA*, 600 U.S. at 224

(quoting *City of Richmond*, 488 U.S. at 495). That is the opposite of what our constitutional republic demands. *See Rice*, 528 U.S. at 517.

This Court has been especially sensitive to rejecting eternal decrees upon a State that, because of the passage of time and changed conditions, no longer have any justification in law or fact. *See Chisom v. Louisiana*, __ F.4th __, 2024 WL 3982181 (5th Cir. Aug. 29, 2024) (en banc) (dissolving decades-long consent decree against Louisiana). Yet that is the vision of Section 2 that Plaintiffs and the United States advance here—a constitutionally immortal Section 2, no matter how much time passes or how equal Louisiana voters' opportunities are today. "[T]his wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The Court should reject that argument for what it is and hold that Section 2 is unconstitutional as applied to Louisiana.

## CONCLUSION

For any of the reasons expressed in the State's briefing and other Defendants' briefing, the Court should reverse and render judgment for Defendants.

Date: September 18, 2024                    Respectfully submitted,

                                            ELIZABETH B. MURRILL
                                            Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

*/s/ Morgan Brungard*
MORGAN BRUNGARD
Deputy Solicitor General

OFFICE OF THE ATTORNEY
GENERAL
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6705
BrungardM@ag.louisiana.gov

*Counsel for the State of Louisiana*

## CERTIFICATE OF SERVICE

I certify that on September 18, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

/s/ *Morgan Brungard*
MORGAN BRUNGARD

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) because it contains 4,882 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Morgan Brungard*
MORGAN BRUNGARD

Date: September 18, 2024