No. 24-30115

# In the United States Court of Appeals for the Fifth Circuit

DOROTHY NAIRNE, DOCTOR, ET AL.,

*Plaintiffs-Appellees*

v.

NANCY LANDRY, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF LOUISIANA,

*Defendant-Appellant*

STATE OF LOUISIANA, BY AND THROUGH ATTORNEY GENERAL ELIZABETH B. MURRILL, ET AL.,

*Intervenors-Appellants*

v.

UNITED STATES OF AMERICA,

*Intervenor-Appellee*

———————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:22-CV-178, Hon. Shelly D. Dick

———————————

## PETITION FOR REHEARING EN BANC

———————————

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

MORGAN BRUNGARD
Deputy Solicitor General

CAITLIN A. HUETTEMANN
Assistant Solicitor General

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

i

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

Nowhere else in recent years have judicial commands for racial discrimination in voting been more prevalent than in Louisiana. Indeed, one district judge is single-handedly responsible for the fact that Louisiana has no congressional or state legislative map today—at every turn, ordering Louisiana to draw more majority-black districts to comply with the court's vision of the Voting Rights Act (VRA). So striking is Louisiana's story that Justice Thomas has characterized the State as "fail[ing] to thread the impossible needle created by our voting-rights precedents." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 65 (2024) (Thomas, J., concurring in part). And the Supreme Court recently took the extraordinary step of ordering reargument in Louisiana's case regarding its congressional map. This case is of a piece.

In this case, the same district court permanently enjoined the State of Louisiana from conducting elections under its state House and Senate legislative maps, finding that those maps violate Section 2 of the VRA. The basis for the district court's injunction is that, in the court's view, Louisiana should have drawn at least three more majority-black Senate districts and six more majority-black House districts. ROA.9146–47,

ii

9150, 9153. A panel of this Court affirmed. A Member of this Court held the mandate the same day. ECF 315.

This case cries out for en banc review on numerous issues detailed below—including two prominent issues warranting emphasis here because the Supreme Court is actively considering cases that bear on these issues.

*First*, en banc review is warranted on whether Section 2 contains an implied private right of action. Before merits briefing began in this appeal, the State sought initial en banc review of this question, on which a short paragraph of this Court's precedent squarely conflicts with an Eighth Circuit precedent issued ten days later. *See* ECF 125-1; *compare Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) (finding an implied private right of action), *with Ark. State. Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) (finding no implied private right of action). Even at that preliminary stage, eight Members of the Court voted for en banc review, while eight Members voted to deny (with one Member recused at that time). ECF 176. A year and a half later, this issue is now unquestionably ripe for en banc review, particularly given

the panel's rejection of the State's argument on this issue as "foreclosed by" *Robinson*. Op.52 n.26.

Intervening developments at the Supreme Court, moreover, have underscored the importance of this issue. In *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 25A62 (U.S.), the Supreme Court recently stayed (pending disposition of a petition for writ of certiorari) an Eighth Circuit decision holding that Section 2 also is unenforceable through 42 U.S.C. § 1983. The subsequently filed petition asks whether Section 2 is enforceable under *either* § 1983 or an implied private right of action, even though the underlying Eighth Circuit decision did not address the private right of action question. *See* Pet. i, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 25-253 (U.S. Sept. 2, 2025).

That petition is fully briefed, and the Supreme Court has not yet taken any action on it. If the Supreme Court denies the *Turtle Mountain* petition, then there is no reason to delay this Court's reconsideration of *Robinson* to align with the Eighth Circuit. If the Supreme Court grants the *Turtle Mountain* petition, then this Court should hold the State's en banc petition pending the Supreme Court's decision in *Turtle Mountain*

to see how, if at all, that decision affects the implied-private-right-of-action question in this case.

*Second*, en banc review is warranted on whether Section 2 unconstitutionally commands race-based redistricting. *See* Op.52–54 (rejecting the State's constitutional challenge to race-based redistricting under Section 2). As the Court is aware, the Supreme Court heard reargument in *Louisiana v. Callais*, No. 24-109 (U.S.), just 12 days ago on precisely that question in the context of Louisiana's *congressional* map. Louisiana exhaustively briefed and argued that race-based redistricting is unconstitutional, while the United States exhaustively briefed and argued that the Supreme Court should fundamentally transform the Section 2 analytical framework to avoid constitutional problems. That the Supreme Court will soon decide these issues presents an especially good reason to await that decision.

The district court itself has recognized as much and stayed remedial proceedings below pending a decision in *Callais*. Dist. Ct. ECF 345. Accordingly, the day after the panel's decision, the State likewise asked the panel to hold the rehearing deadline in abeyance pending a decision in *Callais*, emphasizing the waste of the Court's and the parties'

time and resources in en banc proceedings that may prove unnecessary or stale in light of intervening precedent. ECF 315, 320. Judge Dennis denied that request. ECF 328-2.

As a result, the State is in a difficult position. On one hand, this constitutional question plainly warrants en banc review, and the State must comply with the rehearing deadline to press that issue. On the other hand, the State believes that the Supreme Court will soon decide that question (or materially alter the Section 2 framework), which means en banc proceedings would be a waste of resources since *Callais* is likely to result in a grant, vacate, and remand—either for outright dismissal or for the district court to conduct a Section 2 analysis in the first instance under the new *Callais* framework. *See, e.g.*, *United States v. Runnels*, 2022 WL 1010695, at *3  & n.21 (5th Cir. Apr. 5, 2022) (per curiam) ("When relevant binding decisions are issued after a district court has ruled, we have, in many cases, vacated and remanded for reconsideration by the district court in light of the intervening decisions.").[1]

---

[1] The grant-vacate-remand procedure is potentially important because it would foreclose the district court from continuing down its path to judicially drawn remedial maps. (Remember, the district court has agreed to stay only remedial proceedings pending a decision in *Callais*.) Vacatur of the district court's liability decision would leave the district court no discretion to determine whether it could keep its liability

In addition, if the Supreme Court does not take *Turtle Mountain* but does change the Section 2 framework in *Callais*, judicial efficiency would counsel in favor of reconsidering *Robinson* en banc now to end this lawsuit altogether, rather than vacating and remanding for the expenditure of more time and resources despite a suspicion that there is no viable Section 2 cause of action to begin with.

\*   \*   \*

Given the shifting ground in both *Turtle Mountain* and *Callais*, the State respectfully submits that the most efficient path forward is: (a) hold this petition pending the Supreme Court's final disposition of *Turtle Mountain* and *Callais*; and (b) order the parties to submit supplemental briefs within 14 days of the Court's final disposition of *Turtle Mountain* or *Callais*, whichever comes later, to address whether plenary en banc review remains necessary or whether the en banc Court should grant, vacate, and remand to the district court with instructions to apply the Supreme Court's intervening decision(s). In the alternative, the State respectfully requests that the Court grant this petition.

---

decision despite what the Supreme Court does. And if, after vacatur, the district court insisted on finding liability again, the State would be able to appeal that liability decision—informed by the Supreme Court's intervening decisions—to this Court to consider whether the district court faithfully applied the governing law.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

INTRODUCTION AND RULE 40(B)(2) STATEMENT ...........................ii

TABLE OF AUTHORITIES ....................................................................ix

ISSUES PRESENTED ............................................................................1

STATEMENT ..........................................................................................1

ARGUMENT ...........................................................................................3

I.   EN BANC REVIEW IS WARRANTED ON WHETHER SECTION 2
     CONTAINS AN IMPLIED PRIVATE RIGHT OF ACTION. ...........................3

II.  EN BANC REVIEW IS WARRANTED ON WHETHER RACE-BASED
     REDISTRICTING UNDER SECTION 2 IS UNCONSTITUTIONAL.................6

III. EN BANC REVIEW IS WARRANTED ON WHETHER THE PANEL
     MISAPPLIED EXISTING PRECEDENT TO INVALIDATE LOUISIANA'S
     STATE LEGISLATIVE MAPS................................................................9

CONCLUSION .....................................................................................13

CERTIFICATE OF SERVICE................................................................15

CERTIFICATE OF COMPLIANCE.......................................................16

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. S.C. State Conf. of the NAACP*,
  602 U.S. 1 (2024) ..................................................................ii

*Allen v. Milligan*,
  599 U.S. 1 (2023) ......................................................... 4, 6, 13

*Ark. State. Conf. NAACP v. Ark. Bd. of Apportionment*,
  86 F.4th 1204 (8th Cir. 2023).............................. iii, 3, 4, 5

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ......................................................... 11

*Gill v. Whitford*,
  585 U.S. 48 (2018)............................................................ 11

*Louisiana v. Callais*,
  No. 24-109 (U.S.) .............................................................. v

*Medina v. Planned Parenthood S. Atlantic*,
  145 S. Ct. 2219 (2025)........................................................ 4

*Planned Parenthood of Greater Tex. Family Planning & Preventative
  Health Servs., Inc. v. Kauffman*,
  981 F.3d 347 (5th Cir. 2020)............................................. 4

*Robinson v. Ardoin*,
  37 F.4th 208 (5th Cir. 2022) ........................................... 11

*Robinson v. Ardoin*,
  86 F.4th 574 (5th Cir. 2023) ........................................... iii

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard
  College*,
  600 U.S. 181 (2023) ........................................................... 8

*Turtle Mountain Band of Chippewa Indians v. Howe*,
  No. 25-253 (U.S. Sept. 2, 2025) ......................................iv

*Turtle Mountain Band of Chippewa Indians v. Howe*,
  No. 25A62 (U.S.) ..............................................................iv

*United States v. Runnels,*
  2022 WL 1010695 (5th Cir. Apr. 5, 2022)...........................................vi

**Statutes**

42 U.S.C. § 1983.............................................................................iv, 6

52 U.S.C. § 10301.........................................................................4, 13

52 U.S.C. § 10308................................................................................5

**Other Authorities**

Abbie VanSickle, *Supreme Court Appears Skeptical of Key Provision of Voting Rights Act*, New York Times (Oct. 15, 2025),
  tinyurl.com/btv88u3w.....................................................................7

Mark Ballard, *U.S. Supreme Court case from Louisiana likely to reshape Voting Rights Act, legal experts say*, NOLA.com (Oct. 19, 2025),
  tinyurl.com/2se4k25d.......................................................................7

Rick Hasen, *Early Signs from Oral Argument in* Callais *Suggest that Section 2 of the Voting Rights Act is in Real Trouble*, Election Law Blog (Oct. 15, 2025), tinyurl.com/mu25zapz.......................................7

**Rules**

Fed. R. App. P. 40(b)(2)(C)................................................................3

**Constitutional Provisions**

La. Const. art. III, § 3........................................................................1

## ISSUES PRESENTED

1. Whether Section 2 of the VRA contains an implied private right of action.

2. Whether race-based redistricting under Section 2 is unconstitutional.

3. Whether the district court otherwise erroneously enjoined all elections under Louisiana's state Senate and House maps.

## STATEMENT

The Louisiana Constitution sets the number of state legislative districts in Louisiana: 39 Senate districts and 105 House districts. La. Const. art. III, § 3. In early 2022, the Legislature passed S.B. 1 (establishing the current Senate districts) and H.B. 14 (establishing the current House districts). Plaintiffs in this case—four black voters and two nonprofits—sued the Secretary of State, alleging that S.B. 1 and H.B. 14 unlawfully dilute black voting strength in violation of Section 2. ROA.9122. The Attorney General of Louisiana (on behalf of the State), the Louisiana Senate President, and the Louisiana Speaker of the House intervened as defendants. ROA.627–32.

The district court held a seven-day bench trial in November and December 2023. On February 8, 2024, the district court issued a 91-page

1

order (and a 15-page appendix with findings and conclusions, ROA.9213–27), concluding that "Plaintiffs have satisfied their burden of proving that the Louisiana State House and Senate electoral maps enacted by the Louisiana Legislature (S.B. 1 and H.B. 14) violate § 2 of the VRA." ROA.9122. The court thus ordered "that elections under S.B. 1 and H.B. 14 be and are hereby ENJOINED." ROA.9212.

Relevant to this petition, the district court rejected the State's argument that Section 2 contains no implied right of action. The court agreed that "a circuit split does exist" between *Robinson* and the Eighth Circuit's decision in *Arkansas State Conference NAACP*. ROA.9140. But the court deemed itself "bound" by *Robinson*'s paragraph absent a contrary "en banc decision [by this Court] or the Supreme Court." ROA.9138. The panel affirmed this holding on the ground that *Robinson* "foreclose[s]" the State's challenge. Op.52 n.26.

The district court also rejected—and the panel affirmed that rejection of—the State's challenge to "Congress's power to authorize race-based redistricting" under Section 2. Op.52; ROA.9142.

# ARGUMENT

## I.    EN BANC REVIEW IS WARRANTED ON WHETHER SECTION 2 CONTAINS AN IMPLIED PRIVATE RIGHT OF ACTION.

As eight Members of this Court agreed even before this appeal reached the panel, ECF 125-1, en banc review is necessary to resolve a split between this Court and the Eighth Circuit on the existence of an implied private right of action under Section 2. *See* Fed. R. App. P. 40(b)(2)(C).

1. In *Robinson*, this Court briefly considered "whether Section 2 can be enforced by private parties," and it acknowledged that "[t]here is no cause of action expressly created in the text of Section 2." 86 F.4th at 587. Nonetheless, the Court concluded "that there is a right for [private plaintiffs] to bring these claims." *Id.* Ten days later, however, the Eighth Circuit issued *Arkansas State Conference NAACP*, which directly splits with *Robinson*. The Eighth Circuit asked, "Did Congress give private plaintiffs the ability to sue under § 2 of the Voting Rights Act?" 86 F.4th at 1206. The Eighth Circuit concluded that "[t]ext and structure reveal that the answer is no." *Id.* at 1206–07. This is—as the district court below put it—"a circuit split." ROA.9140. And as the panel put it, Op.52 n.26, *Robinson* "foreclose[s]" any panel of this Court from reconsidering the

paragraph in *Robinson* that places this Court opposite the Eighth Circuit. This is a textbook candidate for en banc review.

2. That is especially so given that the *Robinson* paragraph is incorrect. The State's initial en banc motion catalogues this point (ECF 125-1 at 8–14), so here is just a summary.

"Under the modern test for implied rights of action, Congress must have *both* created an individual right *and* given private plaintiffs the ability to enforce it." *Ark. State Conf. NAACP*, 86 F.4th at 1209; *accord Medina v. Planned Parenthood S. Atlantic*, 145 S. Ct. 2219, 2233 (2025) (this "is a 'demanding bar' and a 'significant hurdle' that will be cleared only in the 'atypical case'"). But it did neither in Section 2. Not only does Section 2 lack "'the sort of *rights-creating language* needed to imply a private right of action,'" *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 374 (5th Cir. 2020) (en banc) (Elrod, J., concurring), but Section 2 also at most suggests *group* rights, not *individual* rights, particularly in the context of vote-dilution claims, *see, e.g.*, 52 U.S.C. § 10301(b) (referring to "members of a class of citizens"); *Allen v. Milligan*, 599 U.S. 1, 18 (2023)

(requiring plaintiffs to prove claims based on how a "minority group" acts and who "the minority's preferred candidate" is (citation omitted)).

Even if Congress had clearly and unambiguously created an individual right, moreover, Congress plainly did not include in Section 2 a "private enforcement mechanism." *Ark. State Conf. NAACP*, 86 F.4th at 1210. Indeed, not only is "[a]ny mention of private plaintiffs or private remedies ... missing," but the VRA also "lists only one plaintiff who can enforce § 2: the Attorney General." *Id.* at 1208 (citing 52 U.S.C. § 10308(d)). As the Eighth Circuit thus recognized, if the VRA's plain text "show[s] anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'" *Id.* at 1210. On both the right and remedy questions, therefore, Section 2 does not contain an implied private right of action. *See also* ECF 125-1 at 10–14 (explaining further errors in the *Robinson* paragraph).

3. As discussed above, the Supreme Court's potential consideration of this issue in *Turtle Mountain* warrants holding this petition. The Supreme Court's denial of the *Turtle Mountain* petition would underscore the need for the en banc Court itself to eliminate the existing circuit split. But, if the Supreme Court grants *Turtle Mountain*, judicial efficiency

would counsel in favor of holding this petition for a decision in *Turtle Mountain* to determine how, if at all, that decision affects the private-right-of-action question in this case.[2]

## II. EN BANC REVIEW IS WARRANTED ON WHETHER RACE-BASED REDISTRICTING UNDER SECTION 2 IS UNCONSTITUTIONAL.

Equally, if not more, important is the question whether the race-based redistricting required by Section 2 is unconstitutional. In three pages, the panel summarily rejected the State's constitutional challenge as "foreclosed by decades of binding precedent affirming Congress's broad enforcement authority under the Fifteenth Amendment." Op.52. And the panel dismissed the basic equal-protection principle that "Congress's power to authorize race-based redistricting may not 'extend indefinitely into the future.'" *Id.* (quoting *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring)).

Respectfully, the panel was wrong—and this constitutional issue is worth far more than a couple of pages. Indeed, that is why the Supreme Court ordered rebriefing and reargument on this exact question in

---

[2] As previously explained, ECF 125-1 at 9 n.3, Plaintiffs—sensing that they will lose on this implied-right-of-action question—suggested below that they could alternatively survive under § 1983. That is just wrong, and the district court rightly ignored the suggestion.

*Callais* and recently heard two-and-a-half hours of arguments from Louisiana and others.[3] And although the State does not know how the Supreme Court will decide *Callais*, multiple commentators believe that the Supreme Court will, at a minimum, alter the existing law. *See, e.g.*, Abbie VanSickle, *Supreme Court Appears Skeptical of Key Provision of Voting Rights Act*, New York Times (Oct. 15, 2025), tinyurl.com/btv88u3w; Mark Ballard, *U.S. Supreme Court case from Louisiana likely to reshape Voting Rights Act, legal experts say*, NOLA.com (Oct. 19, 2025), tinyurl.com/2se4k25d; Rick Hasen, *Early Signs from Oral Argument in* Callais *Suggest that Section 2 of the Voting Rights Act is in Real Trouble*, Election Law Blog (Oct. 15, 2025), tinyurl.com/mu25zapz.

If the Court does rule in Louisiana's favor, there are many paths the Court could take. Louisiana's reargument briefing, for example, argued that race-based redistricting is unconstitutional for many reasons, including that it (a) rests on invidious racial stereotypes, (b) uses race as a negative, and (c) has no logical endpoint—all fatal

---

[3] The oral argument audio is available at tinyurl.com/bt2pe3jy. The State's supplemental reargument opening (Aug. 27, 2025) and reply (Oct. 3, 2025) briefs, as well as the United States' brief (Sept. 24, 2025), are available at tinyurl.com/jejh2atn.

equal-protection problems under *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023). *See supra* n.2 (linking the docket containing Louisiana's briefs). For its part, the United States proposed remodeling the current *Gingles* framework for alleging Section 2 violations to include other requirements, such as requiring Section 2 plaintiffs to supply illustrative maps that do not force politically preferred incumbents out of office. *See id.*

Under any of those scenarios, *Callais* would likely result in this Court granting, vacating, and remanding so that the district court could apply *Callais* in the first instance (if not dismiss the suit outright). And even if *Callais* theoretically permitted Plaintiffs to maintain this action, it would not resolve the separate implied-right-of-action problem identified above, *see supra* Section I. For these reasons, the State respectfully submits that the most efficient path forward is: (a) hold this petition pending the Supreme Court's final disposition of *Turtle Mountain* and *Callais*; and (b) order the parties to submit supplemental briefs within 14 days of the Court's final disposition of *Turtle Mountain* or *Callais*, whichever comes later, to address whether plenary en banc review remains necessary or whether the en banc court should grant,

vacate, and remand to the district court with instructions to apply the Supreme Court's intervening decision(s).

## III. EN BANC REVIEW IS WARRANTED ON WHETHER THE PANEL MISAPPLIED EXISTING PRECEDENT TO INVALIDATE LOUISIANA'S STATE LEGISLATIVE MAPS.

The marquee issues above should not distract from the panel's (and district court's) profound errors even under existing law. Space constraints prevent a full catalogue of the errors identified across Appellants' panel-stage briefing, but here are a few examples.

1. Take Article III standing. As the panel acknowledged, Op.12 n.8, there are only four individual Plaintiffs in this case. Under current Supreme Court precedent, therefore, they have standing to challenge only the districts in which they reside. *See id.* Yet, they have demanded— and the district court and panel awarded—a blanket injunction against all 105 House districts and 39 Senate districts. ROA.9212; Op.51–52. There is no legal basis for permitting individual Plaintiffs to challenge and secure an injunction against every district in the State.

Recognizing this problem, the panel urged that Plaintiffs NAACP and Black Voters Matter have "organizational standing to challenge S.B.

1 and H.B. 14 in their entirety." Op.12.[4] But, among other problems with that theory, the panel expressly relied on these organizations' "diversion of resources to confer organizational standing": In response to Louisiana's maps, these organizations purportedly devoted resources "to convincing Black voters that their votes still mattered" and so on. Op.10. By "divert[ing] resources away from 'their core activities towards previously unplanned response strategies,'" these organizations—in the panel's view—engaged in just the right kind of resource diversion to generate organizational standing. Op.10.

But there was no diversion at all: "[A]dvancing Black political participation" is these organizations' actual "core operation[]." Op.11. This is what they do. It thus makes no sense to speak of resource diversion when these organizations are simply spending money toward the precise ends for which the organizations are operated. Moreover, the panel identified no convincing reason why this theory does not violate the Supreme Court's warning that an organization "cannot spend its way into standing simply by expending money to gather information and advocate

---

[4] The panel refused (Op.12) to address the district court's plainly erroneous finding of associational standing, *see* ECF 198 at 14–19.

against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Nor did the panel identify a single precedent that allowed an organization—which cannot vote—to supply the standing necessary to level a vote-dilution claim against literally every state legislative district. *Cf. Gill v. Whitford*, 585 U.S. 48, 65 (2018) (the right to vote is "individual and personal in nature" (citation omitted)). This is not how Article III and vote-dilution claims work.

2. And all this says nothing of the merits. One of the most egregious errors lies in the first *Gingles* precondition which requires a court to consider "the compactness of the *minority population* in the proposed district," not the compactness of "the proposed district itself." *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022). But Plaintiffs' expert said reviewing minority compactness was "not necessary," ROA.10071, while the district court agreed that "granular analysis of the distribution of minority populations within an illustrative district" was irrelevant, ROA.9167. Worse, although the panel paid lip service (Op.17 n.10) to the requirement that a minority population itself be geographically compact, the panel then refused to assess the compactness of a minority population in any given district at all—concluding only that "the Illustrative Maps

11

have *districts* which are similarly compact to, or more compact than, those in S.B. 1 and H.B. 14," Op.24 (emphasis added). Ironically, this is the exact error the district court committed in also striking down Louisiana's *congressional* map and for which Justice Alito called out the district court 12 days ago. *See Callais*, Oral Arg. Audio at 1:00:10–41, tinyurl.com/bt2pe3jy

The panel's totality-of-the-circumstances analysis likewise highlights how freewheeling this whole enterprise is. The panel wrongly counted against the State that only one justice of the Louisiana Supreme Court is black. Op.50. (Two are.) The panel likewise counted against the State that more than a quarter of the Senate and House members are black. *Id.* Similarly, the panel counted against the State the fact that "S.B. 1 and H.B. 14 do not contain a proportional number of majority-minority districts to the percentage of Black voting-age people in Louisiana." Op.44. (The gap? Less than six percent.) And at the same time, the panel effectively conceded the logical conclusion of its analysis: that the alleged Section 2 violation stems from Louisiana's failure to create *super* proportionality through "six additional majority-Black State House districts and three additional majority-black State Senate

districts beyond those in S.B. 1 and H.B. 14." Op.18; *see* Op.42–43 n.23 (oddly complaining that this is "not a demand"); *but see Allen*, 599 U.S. at 43 (Kavanaugh, J., concurring) (emphasizing that Section 2 "does not mandate a proportional number of majority-minority districts"); 52 U.S.C. § 10301 ("[N]othing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

In a jurisprudence already maligned for its incomprehensibility, these errors and others pressed to the panel make a hash of the governing law. Louisiana has no legislative map—state or congressional—right now because of these errors. The full Court's review is thus necessary to correct the erroneous course repeatedly set by the district court below and maintained by the panel.

## CONCLUSION

The Court should hold this petition pending the Supreme Court's final dispositions of *Turtle Mountain* and *Callais* as outlined above, or, in the alternative, grant the petition.

Respectfully submitted,

Dated:    October 27, 2025

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

MORGAN BRUNGARD
Deputy Solicitor General

CAITLIN A. HUETTEMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants State of Louisiana, Cameron Henry, and Phillip DeVillier*

## CERTIFICATE OF SERVICE

I certify that on October 27, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,767 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:    October 27, 2025

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 14, 2025

Lyle W. Cayce
Clerk

_____

No. 24-30115

_____

Dorothy Nairne, *Doctor*; Clee E. Lowe, Reverend; Alice Washington, *Doctor*; Black Voters Matter Capacity Building Institute; Louisiana State Conference of the NAACP; Steven Harris, Reverend,

*Plaintiffs—Appellees*,

*versus*

Nancy Landry, *in her official capacity as Secretary of State of Louisiana*,

*Defendant—Appellant*,

State of Louisiana, *by and through Attorney General Elizabeth B. Murrill*; Phillip DeVillier, *in his official capacity as Speaker of the Louisiana House of Representative*; Cameron Henry, *in his official capacity as President of the Louisiana Senate*,

*Intervenors—Appellants*,

*versus*

United States of America,

*Intervenor—Appellee*.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:22-CV-178

_____

_____

Before DENNIS, HAYNES,[†] and RAMIREZ, *Circuit Judges*.

PER CURIAM:

In 2022, the Louisiana State Senate and House of Representatives enacted new legislative maps—S.B. 1 and H.B. 14, respectively. Plaintiffs Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris, Black Voters Matter Capacity Building Institute, and the Louisiana State Conference of the National Association for the Advancement of Colored People brought this lawsuit against various state defendants, alleging that S.B. 1 and H.B. 14 dilute the voting strength of Black Louisianians in violation of § 2 of the Voting Rights Act of 1965. *See* 52 U.S.C. § 10301.

Following a seven-day bench trial, the district court concluded that S.B. 1 and H.B. 14 violated § 2 by "packing" Black voters into a small number of majority-Black districts and "cracking" other Black communities across multiple districts, thereby depriving them of the opportunity to form effective voting blocs. The court accordingly enjoined both maps in their entirety. For the reasons that follow, we AFFIRM.

I

The Louisiana State Legislature is responsible for drawing the boundaries of the state's legislative districts, the number of which is set by the Louisiana Constitution. LA. CONST. art. III, § 3. During its 2021 regular session, the Legislature adopted Rule 21 of the Joint Rules of the Senate and House of Representatives, which set forth the criteria governing redistricting. Among other requirements, Joint Rule 21 provided that each redistricting plan must comply with § 2 of the VRA.[1] Joint Rule 21, § B. The

_____

[†] JUDGE HAYNES concurs in the judgment.

[1] The Legislature adopted Joint Rule 21 by the approval of a resolution. *See* H. Con. Res. 90, 2021 Reg. Sess., eff. June 11, 2021, https://perma.cc/4DCY-QR63.

No. 24-30115

Rule further required that each plan consist of single-member districts that are substantially equal in population, encompass the entire geography of the state, and—where practicable—preserve traditional district alignments. *Id.* Heeding this mandate, the Legislature enacted new state legislative maps: S.B. 1 for the State Senate and H.B. 14 for the House of Representatives (collectively, the "Enacted Plan").

In March 2022, Plaintiffs Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris (collectively, the "Individual Plaintiffs"), Black Voters Matter Capacity Building Institute ("BVM"), and the Louisiana State Conference of the National Association for the Advancement of Colored People ("NAACP") brought this lawsuit against Kyle Ardoin in his official capacity as the then-Louisiana Secretary of State. Plaintiffs alleged that the S.B. 1 and H.B. 14 maps dilute the strength of Black voters in violation of § 2 of the VRA. Speaker of the Louisiana House of Representatives Clay Schexnayder and President of the Louisiana Senate Patrick Page Cortez, the State of Louisiana, and the United States of America eventually intervened in the lawsuit.[2]

At the outset of the case, Appellants moved for a three-judge panel pursuant to 28 U.S.C. § 2284. The district court denied the motion, concluding that § 2284 does not require a three-judge panel in cases alleging only statutory violations of the VRA, and noting that such cases regularly

---

[2] The following substitutions have been made to reflect changes in public office: (1) Nancy Landry, in her official capacity as Secretary of State, has been substituted for Kyle Ardoin; (2) Phillip DeVillier and Cameron Henry, in their official capacities as Speaker of the Louisiana House of Representatives and President of the Louisiana Senate, have been substituted for Clay Schexnayder and Patrick Page Cortez; and (3) Elizabeth B. Murrill, in her official capacity as Attorney General of Louisiana, has been substituted for Jeff Landry. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

proceed before a single judge. In June 2022, the district court set trial to begin in January 2023. The following month, Appellants jointly moved to stay the action pending the Supreme Court's decisions in *Allen v. Milligan*, 599 U.S. 1 (2023), and this court's decision in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) (*Robinson II*), two other § 2 challenges to Alabama's and Louisiana's federal congressional maps, respectively. The district court granted the motion to stay over Plaintiffs' objections. Following the Supreme Court's decision in *Milligan* in July 2023, Plaintiffs moved to reopen the case and requested an expedited hearing on their forthcoming motion for a preliminary injunction. The district court granted the motion, reopened the case, and set trial to begin November 27, 2023, notwithstanding Appellants' repeated reservations about the trial date.

The district court held a seven-day bench trial on the merits in November 2023. Plaintiffs presented testimony from seven fact witnesses: Plaintiffs Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris; Dr. Michael McClanahan, the President of the NAACP; Omari Ho-Sang, BVM's senior state organizing manager; and Cedric Glover, a former State Representative and former Mayor of Shreveport. Plaintiffs also presented seven expert witnesses: Mr. William S. Cooper, Dr. Craig Colten, Dr. Traci Burch, Dr. Robert Blakeslee Gilpin, Dr. Lisa Handley, Dr. Cory McCarten, and Dr. Marvin P. King.

Appellants presented evidence from two fact witnesses: Patrick Page Cortez, then-President of the Louisiana Senate; and Sherri Hadskey, the Louisiana Commissioner of Elections. They also called six expert witnesses: Dr. John Alford, Dr. Sean Trende, Dr. Douglas Johnson, Dr. Michael Barber, Dr. Alan Murray, and Dr. Jeffrey Lewis.

In February 2024, the district court issued its ruling, finding that S.B. 1 and H.B. 14 violated § 2 of the VRA. Specifically, it found that House

No. 24-30115

Districts ("H.D.") 2, 4, 5, 6, 13, 22, 25, 29, 34, 35, 37, 60, 61, 63, 65, 68, 69, and 70 and Senate Districts ("S.D.") 5, 7, 8, 10, 15, 19, and 39 were cracked or packed.[3] The court enjoined all elections conducted under the S.B. 1 and H.B. 14 maps and afforded Louisiana a "reasonable period of time" to address its findings and implement new, § 2-compliant maps.

Appellants raise several issues on appeal. They argue that (1) the district court lacked subject matter jurisdiction; (2) the court's standing analysis was erroneous; (3) the court's expedited trial setting was legally improper and allegedly prejudiced their ability to present an adequate defense; (4) the court's analysis of the *Gingles*[4] preconditions suffered from legal and factual infirmities; (5) the court erred in its analysis of the individual Senate Factors as well as its overall assessment of the totality of the circumstances; (6) § 2 does not provide a private cause of action; and (7) § 2 is unconstitutional as applied here. We address each alleged error seriatim.

## II

We begin with Appellants' jurisdictional arguments. First, they urge that 28 U.S.C. § 2284 mandated the case to be transferred to a three-judge panel, as Plaintiffs challenged "the apportionment of any statewide body," and that the district court—as a single judge—did not have subject matter jurisdiction to hear this case. Second, they argue that Plaintiffs lack standing to justify the relief granted by the district court. We reject both challenges,

---

[3] The terms "cracked" or "packed" describes the two ways that the "manipulation of district lines can dilute the voting strength of politically cohesive minority group members," namely by (1) "fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them," or (2) "packing them into one or a small number of districts to minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

[4] *Thornburg v. Gingles*, 478 U.S. 30 (1982).

holding that the district court had jurisdiction both to hear the case and to enjoin S.B. 1 and H.B. 14 in toto.

A

The district court correctly heard this case without convening a three-judge panel. Section 2284 provides that "[a] district court of three judges shall be convened when . . . an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." The text of the statute makes clear that § 2284 only requires a three-judge panel when plaintiffs are challenging the apportionment of a statewide legislative body via *constitutional* claims. The statute is straightforward: pure statutory challenges do not require convening a three-judge panel. *Thomas v. Reeves*, 961 F.3d 800, 802 (5th Cir. 2020) (Costa, J., concurring) ("A person on the street would read it as requiring a three-judge court only for constitutional challenges.").

Appellants counter that *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001), stands for the proposition that a three-judge panel must hear all statutory challenges to the apportionment of a statewide legislative body. Yet *Page* held that, where a plaintiff brings *both* constitutional and statutory challenges, "the constitutional hook for three-judge courts sweeps in the statutory claim." *Reeves*, 961 F.3d at 802 n.2 (Costa, J., concurring) (citing *Page*, 248 F.3d at 191). It does not support the "avant-garde view" that a three-judge panel must be convened where, as here, Plaintiffs bring only statutory challenges to state legislative districts. *Id.* at 802. "The three-judge district court statute traces back more than a century. In its long history, no court has applied the statute unless confronted with a challenge to a law's

No. 24-30115

constitutionality." *Id.* at 801.[5] We decline the invitation to break new ground. The district court correctly concluded that § 2284 does not require a three-judge panel where Plaintiffs only brought a statutory claim under § 2.

B

Louisiana's challenges to the district court's rulings on standing similarly fail. The district court found that (1) the Individual Plaintiffs have standing; (2) the NAACP has associational standing through its members; (3) the BVM has organizational standing; and (4) the NAACP has organizational standing. We review legal questions related to standing de novo. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

To have Article III standing, the plaintiff bears the burden of showing three "well-known requirements." *Id.* at 609. First, "the plaintiff must have suffered an 'injury in fact.'" *Id.* (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010)). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . .

---

[5] This concept is not novel. The Supreme Court recently heard a VRA case, which proceeded before a single district court judge, without noting any jurisdictional infirmities. *Milligan*, 599 U.S. at 16 (emphasizing that while *Milligan* proceeded before a three-judge panel, the companion case, *Caster*, proceeded along a parallel track before a single district court judge). Our own court also recently heard an appeal from this same single district court judge resolving a § 2 case. *Robinson II*, 86 F.4th 574. And our sister circuits regularly consider appeals from single judges in purely statutory challenges to statewide plans. *Rural W. Tenn. African-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 838 (6th Cir. 2000); *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006); *Old Pers. v. Brown*, 312 F.3d 1036 (9th Cir. 2002); *Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996). Although it is true that "we are not bound by previous exercises of jurisdiction in cases in which a court's power to act was not questioned but was approved sub silentio, neither should we disregard the implications of an exercise of judicial authority assumed to be proper for" the last century. *Roake v. Brumley*, 141 F.4th 614, 652 n.3 (5th Cir. 2025) (DENNIS, J., concurring) (citation modified) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962)).

th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *City of Kyle*, 626 F.3d at 237 (internal quotation marks omitted)). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *City of Kyle*, 626 F.3d at 237 (internal quotation marks omitted)). This case hinges entirely on the injury prong.[6] Appellants bring no traceability or redressability arguments, and our court has previously found that injuries arising from § 2 violations are both traceable to and redressable by the Secretary of State. *See La. NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1027–32 (M.D. La. 2020), *aff'd sub nom.*, *Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) (collecting cases and explaining why injury resulting from § 2 violation "is traceable to and redressable by the Secretary").[7] With these principles in mind, we begin with the organizational standing of the BVM and the NAACP and conclude by addressing the scope of Plaintiffs' standing.

1

The NAACP and the BVM have organizational standing to challenge S.B. 1 and H.B. 14. An organization may sue in its own right if "it meets the

---

[6] Although Appellants only challenge the injury in fact prong, we must ensure the other standing requirements are satisfied. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992) ("[The Constitution] limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"). Because we have held that the invalidity of an election statute is "without question, fairly traceable to and redressable by the . . . Secretary of State," we hold that the traceability and redressability prongs of standing are also satisfied. *OCA-Greater Hous.*, 867 F.3d at 613.

[7] The Plaintiffs' Amended Complaint named only the Secretary of State as the defendant. Although the State of Louisiana, along with the Speaker of the Louisiana House of Representatives and the President of the Louisiana Senate, later intervened in the case, Plaintiffs need only demonstrate that their injury is traceable to and redressable by the Secretary of State. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (explaining that standing requires an injury "fairly traceable to the challenged conduct of *the defendant*, and . . . likely to be redressed by a favorable judicial decision" (emphasis added)).

same standing test that applies to individuals." *Assoc. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). At issue here is a type of organizational standing referred to as resource diversion, which arises when "an organization . . . show[s] that it had [to] divert[] significant resources to counteract the defendant's conduct." *City of Kyle*, 626 F.3d at 238. In other words, the defendant's conduct must "'perceptibly impair[]' the organization's activities and consequently drain the organization's resources." *El Paso County v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). A mere "setback to [an] organization's abstract social interests," however, is insufficient. *Havens*, 455 U.S. at 379.

At the outset, Appellants argue that organizations categorically lack standing to bring vote dilution claims under the VRA because they "cannot suffer a burden on votes they do not have." Appellants' theory relies on *Gill v. Whitford*, where the Supreme Court observed that the right to vote is "individual and personal in nature." 585 U.S. 48, 65 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). But *Gill* says nothing about organizational standing. There, individual voters brought a statewide partisan gerrymandering challenge, and the Court held that the claimed injury—an abstract interest in the overall partisan balance of the legislature—was too generalized. *Id.* at 68. The Court expressly left open "consideration of other possible theories of harm not presented here." *Id. Gill* did not involve organizational plaintiffs, did not purport to abrogate *Havens*, and has never been read by any court to foreclose organizational standing in VRA vote dilution cases. *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) ("Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of the unwanted demands on their

resources." (first citing *Fla. NAACP v. Browning*, 522 F.3d 1153, 1164–65 (11th Cir. 2008); then citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); then citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014); then citing *Scott v. Schedler*, 771 F.3d 831, 836–39 (5th Cir. 2014); then citing *OCA-Greater Hous.*, 867 F.3d at 612; and then citing *Hispanic Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1243–44 (11th Cir. 2012))).

Alternatively, Appellants argue that even if organizational standing is theoretically available, the NAACP and the BVM failed to plead sufficient facts to establish it. We agree with the district court that both the NAACP and BVM sufficiently alleged a diversion of resources to confer organizational standing. The BVM, for example, shifted resources away from its core mission of Black voter engagement and capacity-building among partner organizations. In response to S.B. 1 and H.B. 14, it launched new accountability initiatives, reallocated staff, and devoted additional time and resources to convincing Black voters that their votes still mattered. Similarly, the NAACP "undertook additional organization and mobilization efforts to counteract the effects of the Enacted Maps on voter disillusionment, potential candidates, and funders' willingness to invest resources into Black communities in Louisiana." All of this shows that both organizations diverted resources away from "their core activities towards previously unplanned response strategies."

In so holding, we reject Appellants' argument that the BVM and NAACP manufactured its resource diversion. On this point, the parties offer competing interpretations of two Supreme Court decisions: *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Taking *Alliance* first, there, the Court rejected a resource diversion claim brought by medical associations who opposed the FDA's regulation of mifepristone. 602 U.S. at 396. The associations argued

they were injured because they had to expend resources drafting petitions and engaging in advocacy to oppose the FDA's actions. *Id.* at 394. But the Court held that an organization "cannot spend its way into standing" by expending money to express disagreement with a defendant's actions absent a concrete injury. *Id.*

The Court contrasted that manufactured injury with the one recognized in *Havens*, where a housing counseling organization ("HOME") alleged that a landlord's racial steering practices interfered with its counseling and referral services. *Id.* at 395. The *Havens* Court held that HOME's core functions were "perceptibly impaired," which gave rise to a cognizable injury. 455 U.S. at 379. *Alliance* reaffirmed *Havens*, explaining that organizations may establish standing when a defendant's conduct directly interferes with their "core business activities." *Alliance*, 602 U.S. at 395.

This court applied *Havens* in *OCA-Greater Houston*, where we held that a nonprofit organization had standing to challenge a Texas election law that limited interpretation assistance for voters with limited English proficiency. 867 F.3d at 612–14. Although the impairment was relatively minor, we held that even "additional time and effort" spent addressing the challenged provisions was enough to establish standing because it frustrated the organization's normal outreach activities. *Id.* at 610–12.

So too here. The record shows that S.B. 1 and H.B. 14 interfered directly with the NAACP's and the BVM's core operations—namely, advancing Black political participation. "The organizations did not simply "expend[] money to express disagreement" with the maps. *Alliance*, 602 U.S. at 394. They were forced to reallocate staff and launch new initiatives to mitigate the effects of the maps on Black voter confidence and candidate viability. As the Fourth Circuit recently explained, where a plaintiff plausibly alleges that its "organizational and voter outreach efforts have been and will

No. 24-30115

continue to be significantly stymied," that is sufficient to show impairment of its core mission. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

On this record, we agree with the district court that the NAACP and the BVM have established organizational standing to challenge S.B. 1 and H.B. 14 in their entirety. Accordingly, we do not reach the district court's alternative ruling that they also have associational standing.[8]

2

We reject Appellants' contention that the district court erred in applying a theory of statewide injury rejected by the Supreme Court in *Gill*, 585 U.S. at 48, because it enjoined S.B. 1 and H.B. 14 in full rather than only enjoining the offending districts. A review of the district court's findings does not support the allegation that it employed a theory of "statewide injury." The district court found that Black Louisianians' votes are diluted in areas around Shreveport, Baton Rouge, Lake Charles, and Natchitoches.

---

[8] Appellants concede that the Individual Plaintiffs—Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris—each have standing to challenge vote dilution in the legislative district where they reside: H.D. 60 (Nairne), H.D. 66 (Washington and Lowe), and H.D. 25 (Harris). We agree. Each is a Black registered voter residing in a district that is either cracked or packed under S.B. 1 and H.B. 14. That, on its own, is sufficient to confer standing to pursue a § 2 claim. *See Harding v. County of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020).

Accordingly, even if the BVM and the NAACP lacked organizational standing to challenge the maps in their entirety, the Individual Plaintiffs would still have standing to challenge S.B. 1 and H.B. 14 as applied to their respective districts. And as courts have recognized, a successful challenge to even a single district can have broader remedial consequences: "[a] single change in one invalidated district will, at a minimum, impact an immediately adjacent district and could impact numerous other districts, both invalidated and non-challenged." *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 878 (E.D. Va. 2019).

Specifically, "[t]he Court credit[ed] Cooper's testimony and f[ound] that Enacted Senate Districts 5, 7, 8, 10, 15, 19, and 39 were packed with [Black Voting-Age Population ('BVAP')] or that BVAP was cracked among the identified Enacted Senate Districts," and that "Enacted House Districts 2, 4, 5, 6, 13, 22, 25, 29, 34, 35, 37, 60, 61, 63, 65, 68, 69, and 70 were all packed with BVAP or that BVAP was cracked among the enacted House districts." Its order enjoining the maps in full does not constitute an attempt to dispense with standing in gross.

## III

Next, we reject Louisiana's challenge to the district court's moderately expedited November 27, 2023, trial date. District courts enjoy "exceedingly wide" discretion in managing their dockets, and we review scheduling decisions only for abuse of that discretion. *Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.*, 597 F.3d 729, 740 (5th Cir. 2010) (quoting *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549 (5th Cir. 2000)).

Here, the court reasonably expedited the schedule after lifting the stay. Following the Supreme Court's decision in *Milligan*, Plaintiffs initially sought a pretrial schedule that would permit them to move for a preliminary injunction in time to affect the 2023 legislative elections. The court, in an exercise of restraint, denied that request. Plaintiffs then asked to advance the trial so that, if their claims were proven, special elections could still be ordered as a remedy. Special elections have been used in similar circumstances where the timing of higher-court rulings prevented pre-election relief, particularly where plaintiffs had first sought and been denied such relief. *See, e.g.*, *Clark v. Roemer*, 777 F. Supp. 471, 484–85 (M.D. La. 1991); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1415 (N.D. Tex. 1990); *Tucker v. Buford*, 603 F. Supp. 276, 277–78 (N.D. Miss. 1985). Given the nature of Plaintiffs' vote-dilution claims, the potential for serious harm to

their right to vote, and the court's earlier restraint in not halting the 2023 elections, expediting trial to preserve the availability of complete relief was appropriate.

Appellants' complaints about insufficient time for expert preparation are similarly unpersuasive. Plaintiffs disputed Appellants' assertions about the time needed for expert reports and opposed each of their repeated attempts to delay the proceedings. Ultimately, Appellants filed thirteen expert reports from seven witnesses, and several experts acknowledged completing their initial reports before the court imposed the stay.

Nor did the district court abuse its discretion by proceeding without waiting for results from the 2023 Louisiana legislative elections to include in Plaintiffs' racial-polarization analysis. Plaintiffs' expert, Dr. Handley, analyzed twenty-one endogenous state legislative elections—*i.e.*, elections for the very office at issue, held under normal electoral conditions in the same districts implicated by Plaintiffs' § 2 claim. Endogenous contests are typically more probative in redistricting cases than exogenous elections for different offices because they capture voter behavior in the precise electoral setting challenged in the lawsuit.[9] *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993). Appellants identify no authority requiring experts or courts to wait for future elections before trying a case. The Supreme Court has made clear that the number of elections needed to assess polarization "will vary according to pertinent circumstances." *Gingles*, 478 U.S. at 57 n.25; *accord Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1045 (5th Cir. 1990). Courts have found even a handful of endogenous elections sufficient. *See Mo. NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1041 (E.D. Mo. 2016) (five contests adequate); *Teague v.*

---

[9] By contrast, exogenous elections are for different offices than the one at issue.

*Attala County*, 92 F.3d 283, 289–90 (5th Cir. 1996) (crediting analyses of eight and six elections, respectively); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 609 (S.D. Tex. 2018) (thirteen contests). Here, the record's twenty-one relevant contests easily meet that standard.

District courts retain inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). On this record, we cannot say the court abused its "exceedingly wide" discretion in setting a moderately expedited trial date. *HC Gun & Knife Shoes, Inc.*, 201 F.3d at 549.

## IV

We now turn to the merits of the § 2 claim. Section 2 of the VRA prohibits a state or political subdivision from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of § 2 is established by showing that, "based on the totality of circumstances," the challenged electoral process is "not equally open to participation by members of a class of citizens protected by subsection (a)," such that those members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). Although § 2 guarantees equal political opportunity, it does not establish a right to proportional representation. *Id.*

"The essence of a § 2 claim" then "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. To assess whether such a denial of opportunity has occurred, plaintiffs must first establish three

threshold conditions, commonly referred to as the *Gingles* preconditions. First, the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* at 50 ("Gingles I"). Second, the minority group must demonstrate political cohesiveness. *Id.* at 51 ("Gingles II"). Third, it must show that the white majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate. *Id.* ("Gingles III"). We review each of these "findings on the *Gingles* threshold requirements and its ultimate findings on vote dilution for clear error." *NAACP v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001) (citing *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999)).

Only if Plaintiffs satisfy these threshold requirements may we proceed to determine whether the challenged electoral practice denies minority voters an equal opportunity to participate in the political process and elect representatives of their choice, based on the totality of the circumstances. This inquiry is guided by the factors set forth in the Senate Report accompanying the 1982 amendments to the VRA. *See Gingles*, 478 U.S. at 36–37.

We first conclude that Plaintiffs' have satisfied the *Gingles* preconditions. Next, we hold that Plaintiffs' claimed § 2 violation occurred based on "the totality of the circumstances."

\*      \*      \*

Before embarking on the *Gingles* analysis, we reject any argument that the district court applied the incorrect legal standard and hold that the district court clearly articulated and applied the correct legal standard for compactness under Gingles I, such that our review is solely for clear error. Appellants argue that the district court must have committed legal error in finding a § 2 violation because "the enacted plans provide the most majority-Black districts in Louisiana history. . . . Only legal error could explain this

startling outcome." Obviously, that Louisiana's Enacted Plan is less of a violation of the VRA than before has no bearing here. The district court's analysis was thorough, reasoned, and faithful to our Gingles I caselaw. It listed the factors that determine compactness, including traditional districting principles such as maintaining communities of interest and traditional boundaries, visual assessments of the districts, contiguity, protecting incumbents, and statistical compactness measures. *See Milligan*, 599 U.S. at 18 (articulating the correct test for the first *Gingles* precondition and stating that "a district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact"). The district court then relied on the expert testimony of Mr. Cooper and Dr. Colten—both of whom it found credible—to conduct an analysis of each prong of the compactness test. In forty-one pages of detailed analysis, the district court parsed through expert testimony, made and explained its credibility determinations, and balanced the factors to assess compactness as required by our caselaw.[10] Someone had to lose, and someone had to win. Any argument that the district court applied the incorrect legal standard at Gingles I is meritless.

---

[10] Notably, the Fifth Circuit followed the Gingles I analysis in *Robinson II*, 86 F.4th 574—an analysis which remarkably resembles the approach taken in this case. Additionally, the Supreme Court in *Milligan*, 599 U.S. at 20, recently affirmed a three-judge panel's decision granting relief in another § 2 vote dilution case. *Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022). There, the district court panel parsed the numerosity and compactness requirements of Gingles I in a nearly identical manner to the instant case, stating that "[c]ompactness is about more than geography. It ultimately 'refers to the compactness of the minority population, not to the compactness of the contested district.'" *Id.* at 1010 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*)). After this statement, the district court panel in *Singleton* analyzed the visual compactness of the illustrative districts, as well as traditional redistricting principles, such as maintaining communities of interest and traditional boundaries. *Id.* at 1004–17.

No. 24-30115

A

Gingles I requires that a "'minority group' . . . be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper v. Harris*, 581 U.S. 285, 301 (2017). This precondition serves "to establish that the minority [group] has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). The analysis focuses on two metrics: numerosity and geographical compactness. *Robinson II*, 86 F.4th at 589. On the merits, the district court found that the Black population was both sufficiently large (numerosity) and geographically compact (compactness) to constitute a majority in a reasonably configured district. Based on our review of the record, we agree.

Numerosity requires proof "by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009). "This percentage is analyzed in terms of the BVAP because only eligible voters can affect the *Gingles* analysis." *Robinson II*, 86 F.4th at 590. To satisfy this requirement, Plaintiffs offered Mr. Cooper as a Gingles I expert to give opinion testimony in the fields of demographics, census data, and redistricting. Mr. Cooper also provided Illustrative Maps showing that the Black population in Louisiana was sufficiently large and compact to allow for the creation of six additional majority-Black State House districts and three additional majority-Black State Senate districts beyond those in S.B. 1 and H.B. 14, each of which has a BVAP of greater than 50% and comport with traditional redistricting criteria.[11]

_____

[11] Mr. Cooper created these Illustrative Maps for the State House and the State Senate using Maptitude, a software primarily used for redistricting purposes. In redistricting litigation, the plaintiffs typically submit several illustrative maps drawn by

No. 24-30115

A BVAP in the potential election district of greater than 50% alone is insufficient, however, as Plaintiffs must also show that a "reasonably compact majority-minority district can be drawn." *Id.* While geographical compactness is not a precise science, we must consider the visual shapes of the districts, the contiguity, the preservation of communities of interest, and various statistical compactness measures. *Id.* To assist in this analysis, Mr. Cooper prepared Illustrative Maps for each individual district. He also created two comprehensive statewide maps—depicted below:



Figure 13: Location of 3 Additional Majority-Black Districts in Illustrative Senate Plan

_____

their experts to satisfy the first requirement of *Gingles*. Importantly, the district court does not adopt or endorse these illustrative maps. Rather, the maps serve to determine whether a § 2 violation has occurred. If the maps as enacted are determined to violate the VRA, the Legislature is ordered to create new maps and "will be free to consider [the illustrative maps] or come up with new ones." *Robinson v. Ardoin*, 37 F.4th 208, 223–24 (5th Cir. 2022) (*Robinson I*).

No. 24-30115



The Illustrative Senate Map includes three additional majority-Black districts: Illustrative S.D. 38 in the Shreveport-Bossier area, Illustrative S.D. 17 in the Baton Rouge area, and Illustrative S.D. 19 in the New Orleans area. The Illustrative House Map includes six additional majority-Black districts: Illustrative H.D. 1 in the Shreveport-Bossier area, Illustrative H.D. 23 in the Natchitoches and Shreveport-Bossier areas, and Illustrative H.D. 60, 65, and 68, all in the Baton Rouge area.

The district court first found that Plaintiffs' Illustrative Maps were visually compact. And that finding was not clearly erroneous. On visual inspection, the Illustrative Districts appear geographically compact, considering the impact of the Mississippi River and the geography of Southeastern Louisiana. Indeed, the new majority-Black districts appear

more visually compact than those in S.B. 1 and H.B. 14. Additionally, each of the districts are contiguous as they are connected in one piece.

A reasonably compact district also considers the preservation of communities of interest. *Robinson I*, 37 F.4th at 218. Although Louisiana provides no definition for what constitutes a community of interest, our court has noted that shared family, culture, religion, socio-economic status, sports teams, economic interests, and education are among the factors to be considered when defining communities of interest. *Id.* at 218–20.

Plaintiffs presented testimony from Dr. Colten on the historical geography of Louisiana to identify various communities of interest. Consistent with the factors set out in our caselaw, he defined a community of interest as a "group of people with comparable, similar social, cultural, economic, [and] political interests within a given territory." He provided quantitative and qualitative testimony about the historical and current status of the parishes in which the at-issue Senate and House districts sit. He testified specifically about the different religions and industries of these discrete communities of interest as well as differences in their colonization that led to development of distinct cultural groups. Furthermore, he discussed the impact of slavery, the Civil War, and Reconstruction on these different regions of Louisiana. The district court found Dr. Colten credible and credited his testimony that Shreveport and Bossier formed a community of interest, Natchitoches and the Red River Parishes, including DeSoto Parish, formed a community of interest, the River Parishes formed a community of interest, and that Jefferson Parish is a community of interest, separate and distinct from Orleans Parish. Dr. Colten's testimony thoroughly explained how the historical development of these different regions of Louisiana resulted in the development of individual and distinct communities of interest, meriting careful consideration when drawing maps. Applying his well-defined communities of interest to the Illustrative Maps, Dr. Colten

opined that the maps preserved communities of interest more effectively than S.B. 1 and H.B. 14. Separately, Mr. Cooper also testified that in drawing his Illustrative Maps, he considered various cultural regions of Louisiana as defined by the State Legislature, as well as reviewed socioeconomic characteristics of different regions to provide contextual background.

We accept the district court's credibility assessments of Dr. Colten and Mr. Cooper and conclude there was no clear error in the district court's ruling that the Illustrative Maps respected communities of interest.

In addition to this simple "eye-test" and the assessment of communities of interest in Louisiana, courts rely upon different statistical compactness measures to assess whether the Illustrative Districts are sufficiently compact. Mr. Cooper tested both the Enacted Plan and his Illustrative Maps with traditional compactness measures such as the Reock, Polsby-Popper, and Area/Convex Hull tests.[12] Each test quantifies how closely a district resembles a compact geometric shape—typically a circle— with scores ranging from zero (least compact) to one (most compact). However, because districts are rarely perfect circles, Mr. Cooper testified

---

[12] Mr. Cooper's report provides the following definitions for each of these compactness measures: The Reock test measures how compact a district is by comparing it to a circle, since a circle is the most compact shape. It does this by finding the smallest circle that can fit around the district, then dividing the area of the district by the area of that circle. The result is a number between 0 and 1, where 1 means the district is perfectly compact like a circle. The Polsby-Popper test "computes the ratio of the district area to the area of a circle with the same perimeter: 4pArea/ (Perimeter2). The measure is always between 0 and 1, with 1 being the most compact. The Polsby-Popper test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." Finally, the Area/Convex Hull test "computes the ratio the district area to the area of the convex hull of the district (minimum convex polygon which completely contains the district). The measure is always between 0 and 1, with 1 being the most compact. The Minimum Convex Polygon test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan."

that reasonably compact districts get scores between 0.2 and 0.4. The tables below reflect the outcome of Mr. Cooper's calculations applying the Reock and Polsby-Popper methods.

**Figure 14: Compactness Scores – 2022 Senate vs. Illustrative Senate Plan**

|  | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
|  | Mean | Low | High | | Mean | Low | High |
| **2022 Senate** | | | | | | | |
| All Districts | .36 | .11 | .59 | | .18 | .05 | .35 |
| 11 Majority-Black Districts | .28 | .11 | .37 | | .14 | .05 | .29 |
| **Illustrative Senate Plan** | | | | | | | |
| All Districts | 37 | **.19** | **.59** | | **.22** | **.07** | .36 |
| 14 Majority-Black Districts | 32 | **.19** | **.43** | | **.20** | **.07** | **.36** |

**Figure 25: Compactness Scores – 2022 House vs. Illustrative House**

|  | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
|  | Mean | Low | High | | Mean | Low | High |
| **2022 House** | | | | | | | |
| All Districts (mean avg.) | .40 | .13 | .63 | | .29 | .05 | .63 |
| 29 Majority-Black Districts | .38 | .13 | .51 | | .27 | ..15 | .46 |
| **Illustrative House** | | | | | | | |
| All Districts (mean avg.) | .40 | **.16** | **.65** | | .29 | **.12** | **.71** |
| 35 Majority-Black Districts | .38 | **.21** | .51 | | **.28** | **.12** | **.50** |

Using these statistical measures, which are undisputedly the "industry de facto" standards for state legislatures and experts in redistricting cases, Mr. Cooper concluded that the Illustrative Senate Plan was unquestionably more compact than S.B. 1 and that the Illustrative House Plan was approximately as compact as H.B. 14. Comparing the results of the Reock and Polsby-Popper tests, the mean compactness score of the Illustrative Senate Map was higher (more compact) on both tests. When

looking at the results for the House Maps, H.B. 14 and the Illustrative House Map had similar mean scores, although the majority-Black districts in the Illustrative House are more compact. Based on the statistics, the Illustrative Maps have districts which are similarly compact to, or more compact than, those in S.B. 1 and H.B. 14.

Appellants attempted—without success—to rebut Mr. Cooper's calculations through the testimony of their expert, Dr. Trende, who offered his own novel compactness metrics.[13] He relied on two relatively untested methods to analyze the compactness of the districts in the Illustrative Maps: the "moment of inertia" ("MOI") method and the areal/Chen & Rodden method.[14] Both purportedly identify compact population clusters within each of Mr. Cooper's illustrative districts to show the "most compact" grouping of BVAP within each district and stop when the BVAP exceeds 50%.

The district court found Dr. Trende's testimony and analysis "fundamentally flawed," "oversimplistic," "unhelpful," "untested," and "completely useless." *Cf. Cooper*, 581 U.S. at 309 ("[W]e give singular deference to a trial court's judgments about the credibility of witnesses."

---

[13] Appellants urge that, because "[t]he district court's findings on [moment of inertia] and the areal approach are 'infected' by the district court's misunderstanding of what [Gingles I] requires," our review of the district court's rejection of Dr. Trende's testimony is de novo. As discussed above, the district court did not legally err, and all findings of fact are reviewed for clear error. And "even 'greater deference [is granted] to the trial court's findings when they are based on determinations of credibility,'" as they are here. *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (quoting *In re Luhr Bros., Inc.*, 157 F.3d 333, 337–39 (5th Cir. 1998)).

[14] The MOI method, as defined in Dr. Trende's expert report, is "the sum of squared distances from each person to their district's center." He also used an areal-based algorithm—the areal/Chen & Rodden method—which applies essentially the same procedure as the MOI method, but weights squared distances by the area of precincts rather than by BVAP. Accordingly, and for ease of reference, when we refer to the "MOI approach," we mean the MOI method and the Chen & Rodden method.

(citing Fed. R. Civ. P. 52(a)(6))). Specifically, the district court's critique pointed to (1) Dr. Trende's own testimony that the MOI approach had never been employed in a redistricting case; (2) his failure to consider any traditional redistricting criteria and his inability to determine what effect including traditional redistricting criteria would have on his analysis; (3) his general unawareness about the communities of interest; (4) his disregard for the rule of equal population among districts; and (5) his testimony that he used Mr. Cooper's traditional measures of district compactness like Reock and Polsby-Popper tests when previously serving as an expert in other VRA vote dilution cases. For these reasons, the district court found that Dr. Trende's analysis did not comply with governing caselaw and rejected it.

Appellants argue the district court erred by referring to the MOI approach as "completely useless," because compliance with Gingles I is impossible without evidence of this key population compactness measure.[15] At first blush, the argument that the MOI approach is absolutely necessary to comply with *Gingles* is perplexing because it cannot simultaneously be novel and also crucial to success in every § 2 case, as plaintiffs in § 2 cases have succeeded in showing the first *Gingles* precondition without it.[16]

---

[15] Appellants first note that the district court's finding that the "moment of inertia methodology ha[d] never been used" in a § 2 case "is patently false." They point to one singular case from the Supreme Court of Colorado, *In re Reapportionment of the Colo. Gen. Assembly*, 647 P.2d 209, 212 (Colo. 1982), which was not a VRA case. Even Dr. Trende himself conceded that the MOI approach has never been employed as a compactness measure in a redistricting case. We thus credit the district court's assessment of the historical use, or lack thereof, of the MOI approach as a measure of compactness in a VRA case.

[16] Plaintiffs rightly note that in making its Gingles I findings, "the district court relied on the same evidence recently countenanced by both this Court and the Supreme Court." *See Milligan*, 599 U.S. at 20–22 (holding that the plaintiffs were substantially likely to succeed on the merits of the first *Gingles* precondition after they showed that the illustrative maps performed better on the Polsby-Pepper test, were visually compact, and

No. 24-30115

In drawing a full map and balancing all the criteria as mandated by the Supreme Court, the Illustrative Maps balanced all the required factors, whereas Dr. Trende's approach ignores communities of interest, traditional boundaries, and the legislature's mandate of equal population among districts. *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)) ("While no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries.'"). When asked, Dr. Trende conceded that Gingles I does not require, to the exclusion of all else, that a district be drawn around the most compact population. Despite that concession, his MOI approach does exactly that—assesses population compactness to the exclusion of all else. Ultimately, the district court had before it two experts, one of whom considered and balanced all the required factors and one who did not. The district court reasonably chose to give less weight to testimony that conflicted with the Supreme Court's rule that a district is only reasonably configured if it comports with traditional districting principles. *Milligan*, 599 U.S. at 18. That choice was not clearly erroneous.

For these reasons, the district court's conclusion that Mr. Cooper's compactness approach was more compelling is well founded in our caselaw and supported by the record. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985) ("Where there are two permissible views of the evidence, the

---

satisfied traditional redistricting criteria such as equal populations, contiguity, and respecting traditional political subdivisions); *Robinson II*, 86 F.4th at 590–92 (holding there was no clear error in the district court's finding that the plaintiffs were substantially likely to succeed on the merits of the first *Gingles* precondition after they showed that the illustrative maps were both more compact mathematically under the Reock and Polsby-Popper tests as well as visually, and that they split less parishes, political subdivisions, and communities of interest).

factfinder's choice between them cannot be clearly erroneous."). The Illustrative Maps are visually compact, contiguous, comport with various communities of interest as identified by both of Plaintiffs' experts, and are as compact or more compact than S.B. 1 and H.B. 14 under several statistical compactness measures. Thus, we find no clear error in the district court's assessment that Plaintiffs' Illustrative Maps demonstrate Black Louisianans could constitute a majority in several reasonably configured districts.

Having failed to establish any error in the district court's Gingles I assessment of either numerosity or compactness, Appellants turn to Mr. Cooper's subjective intent while drawing the maps. They assert that Plaintiffs cannot establish Gingles I because Mr. Cooper impermissibly focused on race while drawing the Illustrative Maps. It is true that in redistricting cases there is a "difference 'between being aware of racial considerations,'" which is permissible, "'and being motivated by them,'" which is prohibited. *Milligan*, 599 U.S. at 30 (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Our court has instructed, however, that "redistricting will often *require* awareness of the demographics of proposed districts. This 'race consciousness does not lead inevitably to impermissible race discrimination' because Section 2 demands such consideration." *Robinson II*, 86 F.4th at 593 (emphasis added) (citing *Milligan*, 599 U.S. at 30). Here, Appellants argue that Mr. Cooper improperly crossed that line between "consciousness" and "predominance." *Milligan*, 599 U.S. at 33.[17] We review the district court's

---

[17] Relatedly, any argument that the privately prepared Illustrative Maps are themselves racial gerrymanders in violation of the Fourteenth Amendment is incorrect, as the Fourteenth Amendment can only be violated where there is state action. *McGuire v. Turnbo*, 137 F.3d 321, 323 (5th Cir. 1998) ("The Fourteenth Amendment, by definition, requires state action."). No such state action exists here, and the Legislature is under no obligation to adopt plaintiffs' demonstrative plans. *Robinson II*, 86 F.4th at 595 n.4 ("Plaintiffs' illustrative maps were not state action and do not constitute an Equal Protection violation"); *see also Robinson I*, 37 F.4th at 223 ("Moreover, even if the plaintiffs

"findings as to racial predominance only for clear error, except when the court made a legal mistake." *Cooper*, 581 U.S. at 309.

In ruling that race did not predominate the configuration of the Illustrative Maps, the district court both limited and discounted the testimony of three of Appellants' experts: (1) Dr. Murray; (2) Dr. Barber; and (3) Dr. Johnson. Appellants only challenge the district court's assessment of Dr. Barber and Dr. Johnson.

As to Dr. Barber, an expert in the field of political science, American politics, voting behavior and patterns, and simulated maps, Appellants' issues fall into two distinct groups: (1) the district court's limitation of his testimony on Mr. Cooper's subjective intent at trial; and (2) the district court's ultimate assessment that the remainder of his testimony was irrelevant. During trial, Plaintiffs objected to Dr. Barber's testimony about simulated maps on relevance grounds, arguing that because the Supreme Court in *Milligan* and our court in *Robinson II* recently rejected the use of simulated maps as a representative race-neutral sample, his testimony provided no relevant information to the resolution of the case. The district court overruled this objection, finding that "the predominan[ce] question is a defense, and the defendants are entitled to a defense."

However, the district court sustained a subsequent objection by Plaintiffs to a singular line of questioning that called for Dr. Barber to opine about Mr. Cooper's subjective intent in drawing his Illustrative Maps. Appellants properly preserved their objection to the district court's limiting

---

had engaged in racial gerrymandering as they drew their hypothetical maps, it would not follow that the Legislature is required to do the same to comply with the district court's order. Illustrative maps are just that—illustrative. The Legislature need not enact any of them. For similar reasons, we have rejected the proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose.").

of Dr. Barber's testimony, which we review for an abuse of discretion. *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011). Appellants also challenge the district court's overall assessment of Dr. Barber's testimony as not probative in its analysis of racial predominance, which we also review for an abuse of discretion. *League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997) ("'The credibility determination of witnesses, including experts, is peculiarly within the province of the district court' [and] [c]onsequently[] we give deference to the findings and credibility choices trial courts make with respect to expert testimony." (quoting *Orduna S.A. v. Zen–Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990))).

The district court did not abuse its discretion in limiting Dr. Barber's testimony about Mr. Cooper's subjective intent in drawing the Illustrative Maps. Trial counsel repeatedly conceded that Dr. Barber was "not qualified to say what Mr. Cooper was thinking" and that Appellants were "not challenging what Mr. Cooper was thinking." Concessions aside, the court permitted testimony describing the circumstantial evidence from which intent might be inferred. But whether race was the "predominant factor" in the drawing of the maps is not itself a question of fact—it is a legal conclusion reserved for the court. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("[An expert's] legal opinion [is] inadmissible."). That rule applies even in bench trials, where evidentiary safeguards are generally more relaxed. The court therefore acted within its discretion in prohibiting Dr. Barber from testifying that the circumstantial evidence established racial predominance.

Appellants contend that, by preventing Dr. Barber from opining on the legal question of whether race predominated, the district court effectively barred them from introducing any circumstantial evidence relevant to that issue. The record reflects otherwise. Dr. Barber testified extensively about his methodology and results, including his generation of 100,000 "race-

neutral" simulated plans for comparison to the Illustrative Maps. He explained in detail how the algorithm enforced equal population, geographic contiguity, compactness, and minimal parish splits, and his expert report—cited by the district court—concluded that adherence to these race-neutral criteria could not explain the Cooper Illustrative Map's boundaries. In short, Appellants were permitted to present, and did present, the very circumstantial evidence they now claim was excluded. The district court barred only Dr. Barber's opinion on "what Mr. Cooper was thinking" and the ultimate legal conclusion of racial predominance. That limited ruling was well within the court's discretion.

Appellants' second argument—challenging the district court's finding that the remainder of Dr. Barber's testimony was irrelevant—likewise fails. Dr. Barber testified that, based on his algorithm generating 100,000 simulated redistricting plans, Mr. Cooper's Illustrative Maps were designed to exceed proportionality. The district court, relying on the Supreme Court's guidance in *Milligan*, 599 U.S. at 1, found that while "[c]omputer generated maps may be probative of a state's intent in map-drawing in the context of a Fourteenth Amendment racial gerrymandering case," "the illustrative map-maker's intent is irrelevant in a statutory § 2 vote dilution case." According to Appellants' briefing, Dr. Barber offered the maps as a "benchmark set of 'comparison maps that also use the same political geography' with which plans could be compared to determine if they were 'reasonably configured,'" the same reason rejected in *Milligan*. We have held that "redistricting will often require awareness of the demographics of proposed districts," meaning that maps created without race as a consideration are useless here. *Robinson II*, 86 F.4th 574. *Milligan* said as much, rejecting Alabama's proffer of a race-blind benchmark and reiterating that "our precedents . . . clearly rejected treating discriminatory intent as a requirement for liability under § 2." 599 U.S. at 37. Section 2

"turns on the presence of discriminatory effects, not discriminatory intent." *Id.* at 24. Considering *Robinson II*'s provision that redistricting often requires awareness of race and the Supreme Court's rebuke of a race-neutral benchmark, we find no abuse of discretion in the district court's decision to exclude Dr. Barber's testimony from its analysis of racial predominance.

We likewise find no error in the district court's limitation on Dr. Johnson's testimony. The court permitted Dr. Johnson to compare the majority-minority districts in the Illustrative Maps to the Enacted Plan on relevant metrics—such as compactness, numerosity, and other traditional redistricting criteria—but barred him from testifying as to Mr. Cooper's subjective intent. As with Dr. Barber, Dr. Johnson was allowed to offer circumstantial evidence concerning the maps but could not opine whether race predominated in their creation. He lacked specific qualifications to determine Mr. Cooper's intent, and, in any event, whether race predominated is a legal question reserved for the court.

In sum, the district properly circumscribed expert testimony on the ultimate legal issue of whether race predominated in the drawing of the Illustrative Maps. Both Dr. Barber and Dr. Johnson were permitted to testify and offer circumstantial evidence to rebut Mr. Cooper's testimony that race did not predominate in his drawing of the Illustrative Maps. The fact that the district court ultimately found Mr. Cooper's testimony more compelling is not clear error. *Anderson*, 470 U.S. at 573–74.

Appellants either misunderstand the standard for racial predominance or ask us to disregard both Supreme Court and our own precedent. By emphasizing that Mr. Cooper "was looking at race while he was drawing the Illustrative Plans" as part of their argument on racial predominance, Appellants show their hand. Of course he did. "Awareness of race is permissible, and redistricting will often require awareness of the

demographics of proposed districts." *Robinson II*, 86 F.4th at 593.[18] The Supreme Court in *Milligan* made it abundantly clear that to entertain any argument that race predominates simply because it is considered in the making of Illustrative Maps leads to the "inescapable consequence" that "*Gingles* must be overruled." *Milligan*, 599 U.S. at 33. The High Court declined to take that drastic step, holding that the boundary "is between consciousness and predominance." *Id.*

Although courts have struggled to delineate this line, "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law." *Id.* Where the plaintiffs' "experts considered communities of interest, political subdivisions, parish lines, culture, religion, etc.," and the "target of reaching a 50 percent BVAP was considered alongside and subordinate to the other race-neutral traditional redistricting criteria *Gingles* requires," a district court does not clearly err in finding that "illustrative maps were not racial gerrymanders." *Robinson II*, 86 F.4th at 595. The result here is the same, and we affirm the district court's finding on Gingles I and the issue of racial predominance.

## B

The second and third *Gingles* factors are often analyzed together. The second requires that "the minority group . . . be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 50. Without political cohesion of the minority group, "it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Id.* at 51.

––––––––––––––––––––––––––

[18] *Robinson II*, 86 F.4th at 593 (holding that "race was properly considered by the Plaintiff experts when drawing their several illustrative maps," but did not predominate because "[t]he Plaintiff experts considered communities of interest, political subdivisions, parish lines, culture, religion"); *see also Robinson I*, 37 F.4th at 223–24 (rejecting a similar challenge to Mr. Cooper's Illustrative Maps in the federal corollary to this case).

The third requires "the minority [to] . . . demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (citations omitted). The geographically compact majority and minority political cohesion "showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40 (citations omitted). They also "are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Id.* Unless Plaintiffs carry their burden on both, "there neither has been a wrong nor can [there] be a remedy." *Id.* at 41.

To carry their burden on the second and third *Gingles* preconditions, Plaintiffs presented Dr. Handley as an expert in redistricting and minority vote dilution. Dr. Handley employed three separate localized analyses of racial voting patterns in the seven areas of Louisiana where Mr. Cooper's Illustrative House and Senate Maps created additional majority-BVAP districts to determine whether voting in these areas is racially polarized. Her analysis found clear racial polarization. The three statistical methods she utilized are the homogenous precinct ("HP") method, the ecological regression ("ER") method, and the ecological inference ("EI") method.[19]

---

[19] Dr. Handley explained in her report that the HP method compares the "percentage of votes received by each of the candidates in precincts that are racially or ethnically homogeneous," where a precinct is not considered homogenous unless 90% of the voters are composed of a singular race. The ER technique uses information from all precincts, not simply the homogeneous ones, "to derive estimates of the voting behavior of minorities and whites. If there is a strong linear relationship across precincts between the percentage of minorities and the percentage of votes cast for a given candidate, this relationship can be used to estimate the percent of minority and white voters supporting the candidate." Finally, the EI method uses information from all precincts "to derive estimates of the voting behavior of minorities and whites."

Both parties agree that the EI method is the most accurate and has been widely accepted by both experts and courts in redistricting cases. Dr. Handley performed the HP and ER methods as a check on her results from the EI method. Using all three methods, she analyzed sixteen recent statewide election contests that included Black candidates, explaining that courts find elections inclusive of minority candidates to be more probative for the racial polarization analysis than those that do not. She determined that in each of the seven analyzed areas where Mr. Cooper's Illustrative House and Senate Plans create additional BVAP districts, Black voters are politically cohesive because they supported different candidates than white voters in nearly every election contest analyzed. The statistics revealed that Black-preferred candidates received 82.7% of the Black vote in each of the seven areas, while they only received 12.2% of the white vote. This division was exacerbated in contests where only two candidates are considered, as the Black-preferred candidate received 93.2% of the Black vote, while they only received 15.6% of the white vote. She concluded that the Illustrative Maps, when compared to S.B. 1 and H.B. 14, provided at least one additional district that would allow Black voters to elect candidates of their choice. Based on Dr. Handley's report, the district court did not clearly err in concluding that Black voters in Louisiana are politically cohesive and that the white majority in Louisiana votes as a bloc to defeat Black voters' preferred candidates. The statistics are stark and clearly show that voting in Louisiana is intensely racially polarized, easily satisfying Gingles II and III.

In so concluding, we reject two challenges to Dr. Handley's credibility and testimony—the first, a challenge to her statistical methodology, and the second, an argument regarding white crossover voting that has been explicitly rejected by our court.

Both parties agree that, to analyze whether voting in Louisiana is racially polarized under Gingles I and II, experts use a version of the EI

analysis. As Dr. Handley's report ably explains, to conduct the EI analysis, "a database that combines election results with demographic information is required." The database is constructed using election precincts as the unit of analysis, while "the demographic composition of the precincts is based on voter registration or turnout by race if this information is available." The key issue here is that, because early and absentee votes in Louisiana are only reported at the parish level, Dr. Handley had to disaggregate the data to allocate the vote totals by precinct. Essentially, the EI analysis required information that Louisiana's Secretary of State website does not provide: where each early vote and absentee vote came from, at the precinct level. Dr. Handley stated that "[r]ather than simply ignore these votes, they have been allocated to the parish precincts proportionally based on the votes received by each of the candidates on Election Day." All parties agreed that this disaggregation process would cause some over and under estimation of vote totals by precinct.

Appellants assert, however, that this disaggregation method rendered Dr. Handley's racial polarization data unreliable. Dr. Handley submitted a supplemental report investigating the possible bias injected into her EI analysis from this allocation method in two ways: first, examining whether the voters of one party were more likely to vote early than the other party, and second, analyzing the patterns of early voters and election day voters distinctly to determine whether the degree of polarization varies between the two subsets of data. In that report, as well as at trial, she explained that the degree of polarization among early voters and election day voters are essentially the same; thus, the disaggregation of the parish data to the precinct level did not introduce bias into the EI analysis. Given that the EI analysis requires data that the Louisiana Secretary of State does not collect, statistical disaggregation of the data is inevitable. On this record, the district court acted entirely within its discretion to credit Dr. Handley's testimony

and explanation regarding both the necessity of the disaggregation process and the implications on the racial polarization data. Dr. Handley's initial report, her supplemental report, and her testimony at trial explain this vote allocation process in painstaking detail. We will not disturb the district court's well-reasoned credibility assessment of Dr. Handley and the method by which she allocated and analyzed the early vote.

Beyond challenging the disaggregation process, Appellants also argue that additional majority-Black districts are not needed in the seven analyzed areas due to significant white crossover voting, as supported by their expert Dr. Lewis, who analyzed and estimated the degree of Black voter cohesion and white voter crossover in Dr. Handley's clusters. Dr. Lewis used the EI method to analyze election data from 2015–2021, finding that, because white crossover ranged from 18% to 27% in the challenged districts, less than a 50% BVAP is necessary for a 50%-win rate in the specific districts drawn by Mr. Cooper. Our court recently rejected this exact argument, holding that "[i]llustrative districts that could perform with a BVAP of less than 50 percent with white crossover voting are not the focus of the third *Gingles* precondition analysis. The proper question to ask is this: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate usually to be defeated?" *Robinson II*, 86 F.4th at 597 (citation modified). Focusing on the correct question, and on this record, we find no error in the district court's ruling that, in Louisiana, Black voters are politically cohesive and white voters consistently vote as a bloc to defeat the candidate Black voters prefer.

Dr. Solanky, the only rebuttal expert Appellants offered on Gingles II and III, was correctly excluded prior to trial on Plaintiffs' motion in limine. The district court excluded Dr. Solanky's opinion under Federal Rule of Evidence 702, which provides that an expert may testify if the proponent demonstrates to the court that it is more likely than not that:

No. 24-30115

    a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    b. the testimony is based on sufficient facts or data;

    c. the testimony is the product of reliable principles and methods; and

    d. the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Dr. Solanky's expert report "disclosed no scientific method for his data selection;" his "conclusions [did] not reflect a reliable application of his methods to the facts of the case;" the "confidence intervals were so wide as to render his conclusions meaningless;" and "his density analysis relies upon data from only two elections." The district court concluded that "these are insufficient facts or data from which to draw such far reaching conclusions about the correlation, if any, between population density and voter behavior." In excluding Dr. Solanky's testimony, the district court cited the amendments to Rule 702 which clarified and emphasized "that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory comm. notes (2023) ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).").[20]

---

[20] Appellants first contend that the district court applied the wrong legal standard, but they do not explain what legal standard applies in lieu of Rule 702. There is no question that Federal Rule of Evidence 702 governs the admissibility of expert testimony.

Appellants raise several arguments to challenge the district court's exclusion of Dr. Solanky, all of which fail because he did not meet the basic requirements of Rule 702. Appellants first urge that his opinions were not "offered to address polarization but to demonstrate Dr. Handley's errors." There are several fundamental issues with this argument. First, as Plaintiffs correctly point out, far from only critiquing Dr. Handley's analysis, all but one of Dr. Solanky's conclusions posited his own affirmative observations about voting trends in Louisiana. Second, even if Appellants were correct that Dr. Solanky only pointed out Dr. Handley's errors—which they are not—it is irrelevant whether Dr. Solanky was retained to rebut Dr. Handley's conclusions or to provide his own opinion on voting patterns in Louisiana. Regardless, his report had to comply with the strictures of Rule 702, which provide that his testimony be based on sufficient data or facts and the result of reliable principles and methods as well as reflect a reliable application of principles and methods to the facts of the case. Fed. R. Evid. 702. Dr. Solanky's report met none of these requirements.[21]

Dr. Solanky's testimony is not the product of reliable principles, nor is it based on sufficient data. There is no explanation for why he only limited his data set for his EI analysis—in Section I and II of his report, to twelve random elections in five parishes, and in Section IV, to only two elections. By comparison, Dr. Handley analyzed over twenty elections and testified that no conclusions regarding voting patterns can be drawn from only two elections.

---

[21] Appellants cite a variety of non-binding, unpersuasive cases that permit a "rebuttal expert" to critique another expert without offering their own alternative calculations. *See, e.g.*, *Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 51 (S.D.N.Y. 2016). While those cases allowed an expert to critique another expert, they do not stand for the proposition that a rebuttal expert's testimony can be unreliable and fail to disclose any scientific method. Dr. Solanky's opinions were riddled with serious issues, and the district court's decision to exclude his testimony was not erroneous.

Furthermore, Dr. Solanky ignored a number of probative elections which include a Black candidate, again with no explanation or methodology. Even on the randomized set of elections he did analyze, Dr. Solanky provides no justification for the egregiously large confidence intervals in his report, which render his analysis borderline meaningless.[22] In light of these grievous issues with Dr. Solanky's report, we find no error in the district court's assessment.

Appellants' next argument that, even if his testimony was properly excluded in the pretrial motion, Dr. Solanky should have been permitted to testify after Plaintiffs "opened the door" during trial, is equally unpersuasive. Specifically, they argue that, when Dr. Handley was permitted to testify on direct about her supplemental response to Dr. Solanky's report, they should have been permitted to present Dr. Solanky's testimony.

This argument about opening the door entirely ignores that Dr. Solanky's testimony was excluded for being irrelevant and unreliable. *Ilyia v. Khoury*, 671 F. App'x 510, 511 (9th Cir. 2016) ("The opening-the-door doctrine may allow parties 'to introduce evidence on the same issue to rebut any false impression that might have resulted from [an] earlier admission,' but it does not allow [a litigant] to disregard the rules and introduce evidence that is highly prejudicial and unreliable.") (citations omitted). Asking Dr. Handley about her methodology did not implicate Dr. Solanky's testimony,

---

[22] Statistically, the smaller the range of the confidence interval, the less uncertainty is attached to the estimate. The confidence intervals in Dr. Solanky's report are so wide that they cover the entire range of possibilities: from no voters supporting Republicans or Democrats, to nearly all white voters supporting Republicans or Democrats. To cite a few examples, Dr. Solanky estimates that somewhere between 18.4% and 60.7% of white voters voted for a Republican and that somewhere between 37.5% and 80% of white voters voted for a Democrat in the 2022 Senate Election. He also estimates that somewhere between 12.2% and 52.5% of Black voters supported the Republican candidate in the 2022 Senate race. Because the range is so broad, this data provides no insight into racial polarization in Louisiana.

and it certainly did not resolve the glaring issues in Dr. Solanky's expert report identified by the district court, which made him unqualified as an expert under Rule 702. As such, the district court did not abuse its broad discretion in excluding his testimony. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002) (reviewing the district court's exclusion of experts under *Daubert* only for abuse of discretion).

Dr. Handley's report and testimony clearly showed evidence of racial polarization—Black Louisianians are politically cohesive and white voters consistently vote as a bloc to defeat the candidate Black voters prefer. Dr. Solanky's report was "the only evidence [Appellants] had of racially polarized voting under Gingles II and III," and the district court did not abuse its discretion in excluding it. As such, the district court's conclusion that Plaintiffs successfully established Gingles II and III is well supported by the record.

C

After a plaintiff successfully establishes the three *Gingles* preconditions, the court must determine whether a § 2 violation occurred. A § 2 violation is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State of political subdivision are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 36 (quoting 42 U.S.C. § 1973(b)).

To assess whether there is a § 2 violation based on the totality of the circumstances, we first assess proportionality. *LULAC*, 548 U.S. at 436. This requires us to compare "the percentage of total districts that are [BVAP] opportunity districts with the [BVAP] share of the citizen voting-age

population." *Id.* Proportionality is "a relevant fact in the totality of the circumstances," *Johnson*, 512 U.S. at 1000, but it is not a "safe harbor" for states in complying with § 2. "If proportionality could act as a safe harbor, it would ratify 'an unexplored premise of highly suspect validity: that in any given voting jurisdiction . . . , the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class.'" *LULAC*, 548 U.S. at 436 (citing *Johnson*, 512 U.S. at 1019). *Gingles* then instructs us to balance nine factors articulated in the Senate Judiciary Committee majority report accompanying the bill that amended § 2. 478 U.S. at 36–37. They are as follows:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process [Senate Factor One];

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized [Senate Factor Two (of particular importance)];

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group [Senate Factor Three];

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process [Senate Factor Four];

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process [Senate Factor Five];

6. whether political campaigns have been characterized by overt or subtle racial appeals [Senate Factor Six];

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. [Senate Factor Seven (of particular importance)]

8. whether there is a sufficient lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [Senate Factor Eight]; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous [Senate Factor Nine].

*Id.* (quoting S. Rep. No. 417, 97th Cong., 2d Sess., at 28–29, (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07).

While the district court must evaluate each factor and perform a flexible, fact-intensive inquiry based on "an intensely local appraisal of the design and impact of the contested electoral mechanisms," *Magnolia Bar*, 994 F.2d at 1147, *Gingles* informs us that two of the Senate Factors are of particular importance: the extent to which minority group members have been elected to office in the jurisdiction (Senate Factor Seven) and the extent to which the elections are racially polarized (Senate Factor Two). *Gingles*, 478 U.S. at 48 n.15. Moreover, Senate Factor Four is inapplicable in Louisiana because Louisiana legislative elections do not use candidate slating.

We start by rejecting the argument that we can decide this case on proportionality alone.[23] Appellants compare this case to *Johnson*, 512 U.S. at

---

[23] Appellants argue that Plaintiffs' "demand" for "more than proportionality" was unfounded, pointing to the Illustrative Maps, and argue that "the district court should have capped the number of additional majority-BVAP districts at proportionality." To be abundantly clear, this argument is a vast oversimplification. The Illustrative Maps are not a demand, and the district court did not adopt them. The district court applied the *Gingles*

1015, where they assert that the substantial proportionality of the map was so decisive that the Supreme Court reversed § 2 findings "on that basis alone." Appellants urge us to do the same here.

Appellants misstate *Johnson*'s holding, which held that "while proportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice,'" the weight afforded to the proportionality inquiry "may vary with other facts." 512 U.S. at 1020 (quoting 42 U.S.C. § 1973(b)). In rejecting the state's argument that proportionality should serve as a "safe harbor," *i.e.*, that no vote dilution occurs where the districts are substantially proportional, the Court explained that it was "chary of entertaining a simplification of the sort the State now urges upon us," in light of the "reprehensible" voter suppression tactics states have historically implemented to dilute minority voting strength. *Id.* at 1019. Because many of those same tactics "could occur even in a jurisdiction with numerically demonstrable proportionality; the harbor safe for States would thus not be safe for voters." *Id.* Therefore, we do not decide this case on proportionality alone, as the Supreme Court has explicitly rejected that suggestion. As "[n]o single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength," we assess the totality of the circumstances, beginning with the overall proportionality of S.B. 1 and H.B. 14 as a piece of the overall puzzle. *Id.* at 1020–21.

---

factors, as well as the totality of the circumstances, and found that S.B. 1 and H.B. 14 violated the VRA. It then instructed the state to create new maps which are not violative of the VRA. "Illustrative maps are just that—illustrative. . . . The Legislature will be free to consider all those proposals or come up with new ones and to weigh whatever factors it chooses alongside the requirements of *Gingles*." *Robinson I*, 37 F.4th at 223–24.

S.B. 1 and H.B. 14 do not contain a proportional number of majority-minority districts to the percentage of Black voting-age people in Louisiana. Twenty-nine out of one hundred and five House districts are majority BVAP (27.61%), and eleven out of thirty-nine Senate districts are majority BVAP (28.20%). Census data established that 33.13% of the state is Black, meaning that neither map effectuates proportionality.[24] In *Johnson*, where the Court found substantial proportionality, the Hispanic population constituted 50% of the voting-age population in Dade County, and the enacted map would provide Hispanic supermajorities in nine out of eighteen districts. *Id.* at 1014. This case more closely mirrors *LULAC*, where the Court stated that Latinos made up 22% of the population but only 16% of the Latino opportunity districts, "two districts shy of proportional representation." 548 U.S. at 438. The *LULAC* Court did not find these figures to effectuate proportionality. Rather, it stated that it "need not decide whether the two-district deficit in these cases weighs in favor of a § 2 violation" because that fact would not "overcome the other evidence of vote dilution for Latinos in District 23." *Id.* This case, with a 5–6% proportionality gap, mirrors *LULAC* (~6%). Far from "guarantee[ing] a political feast," the district court's proportionality analysis correctly found that the maps did not effectuate proportionality and that this

---

[24] Appellants argue that proportionality should be evaluated regionally, not statewide. They rely on *Johnson* for the proposition that where the plaintiffs themselves define their dilution claims in regional (rather than statewide) terms, they cannot then look to statewide proportionality data. Again, the circumstances in *Johnson* were different because the plaintiffs in that case identified only two counties, Dade and Escambia County, where the vote was allegedly diluted in violation of § 2. Here, the allegations of cracking and packing ran throughout the state, including the Shreveport/Bossier, Baton Rouge, New Orleans, Natchitoches, and Lake Charles areas. The evidence did not focus on any particular parish to the exclusion of all others, like in *Johnson*. The allegations here are much more like those in *LULAC*, where the Supreme Court rejected the regional approach to proportionality and found that where the plaintiffs allege an injury to Black and Hispanic voters throughout the state, the correct approach is to "look at proportionality statewide." *LULAC*, 548 U.S. at 436–37.

factor weighed in favor of Plaintiffs in assessing the totality of the circumstances. Based on the evidence, we conclude that this conclusion was not clearly erroneous.

Senate Factor One, "the history of voting-related discrimination in the State or political subdivision," *Gingles*, 478 U.S. at 44, weighs heavily in favor of Plaintiffs. There is no meaningful dispute that Louisiana has a history of voting-related discrimination. Appellants' argument that Plaintiffs presented no contemporary evidence of state-sponsored discrimination belies the record, which is replete with evidence of the state "closing polling places, restricting access to early voting, polling places, and limiting mail-in-voting," historically and contemporarily. Appellants' other argument—that Black voters exert effective control over the Democratic party, so they clearly have an equal opportunity to participate and elect candidates—misses the mark. Influence within a political party does not always correlate to an ability to elect candidates of your choice. *Miss. NAACP v. State Bd. of Election Comm's*, 739 F. Supp. 3d 383, 461 (S.D. Miss. 2024) ("In recent elections, the Democratic Party has had some black nominees for statewide office, including for the United States Senate and Governor, but all have been defeated."). A review of the record makes clear there is sufficient evidence to support the district court's conclusion that this factor weighed heavily in favor of Plaintiffs.

The Second Senate Factor, "the extent to which voting in the elections of the state or political subdivision is racially polarized," also weighs in favor of Plaintiffs. *Gingles*, 478 U.S. at 37. In deciding this factor, the district court credited Plaintiffs' experts, Dr. Handley and Dr. King, over Appellants' expert, Dr. Alford, a finding which we will not disturb. *Williams v. Fab-Con, Inc.*, 990 F.2d 228, 230 (5th Cir. 1993) (where "factual determination[s] [are] made by resolving conflicts in the evidence, requiring

that essential credibility determinations be made, this Court will defer to the trier of fact.").

Appellants argue Dr. Alford credibly determined that voting in Louisiana is mainly polarized based on politics, not race. They offer no rebuttal, however, to Dr. King's data, which showed that white Democrats in Louisiana preferred white candidates over Black candidates, and that the same was true for Black Democrats (who preferred Black candidates over white candidates). Notably, even when Dr. King controlled for party affiliation, *i.e.*, analyzed data for the 2022 Democratic Senate Primary where all voters were Democrats, white voters voted for the white candidate 60% of the time, while only 26% of Black voters voted for that same white candidate. Contrastingly, in that same primary, nearly 74% of Black voters voted for the Black candidate, while only 40% of white voters voted for the Black candidate. Dr. King explained that these ratios showing more than a two-to-one difference were evidence of racially polarized voting. Similarly, Dr. Handley analyzed this same data and stated that "in every area in all instances white voters gave more support to the white Democrats than the Black Democrats. Conversely, at least in the larger set, Black voters gave more support to Black Democrats than white Democrats." The data and expert testimony refute Dr. Alford's assertion that there is no evidence of racially polarized voting because it is politically based. Even controlling for political party affiliation, there was strong evidence of racially polarized voting in Louisiana, which *Gingles* found to be particularly weighty in the overall totality-of-the-circumstances inquiry. Given that we afford great deference to credibility findings, and that the district court's decision to credit Dr. Handley's and Dr. King's analyses over Dr. Alford's is well supported, we conclude that the district court did not clearly err in finding that the factor weighs in favor of Plaintiffs. *Anderson*, 470 U.S. at 575 (explaining that a district court's choice to believe "one of two or more witnesses, each of whom has told a coherent

and facially plausible story that is not contradicted by extrinsic evidence," can "virtually never be clear error").

The Third Senate Factor, "the extent to which the state . . . has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group," favors Plaintiffs as well. *Gingles*, 478 U.S. at 37. The district court found that Louisiana's majority vote requirement for its primaries and general elections created voter confusion resulting from repeated and voluminous decentralized elections, as well as voter fatigue (especially in poor and under-educated communities). Appellants argue that the district court ignored its evidence that "Louisiana does not have malapportioned legislative districts or anti-single shot provisions" and instead focused on its own "unsubstantiated opinions that Louisiana's majority-vote requirements and frequent elections discriminate against minority voters." Not so. The district court cited to the testimony of Ho-Sang and Nairne to support its conclusion that "this type of calendar of elections breeds voter fatigue and confusion." And there is no question that *Gingles* specifically noted that a majority vote requirement was listed as a type of voting practice or procedure that enhances discrimination against a minority group. *Gingles*, 478 U.S. at 45. Plaintiffs persuasively testified that repeated and voluminous decentralized elections causes voter fatigue and confusion in their communities, and Louisiana elections unquestionably utilize a majority-vote system. On this record, we find no clear error in the district court's finding that the third factor weighed in Plaintiffs' favor.

Senate Factor Five concerns the extent to which the minority group in the state bears the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political

process.[25] *Gingles*, 478 U.S. at 37. This factor, given the district court's factual findings, also strongly weighs in favor of finding a § 2 violation. Plaintiffs offered Dr. Burch, an expert in the field of racial discrimination, political participation, and barriers to voting, who found that Black Louisianans experience social and economic disparities that negatively impact their ability to register to vote and participate in elections. Louisiana's schools are "de facto segregated," predominately Black public schools are resource challenged, and Black people are underrepresented in higher education. It is also true that "segregated and disparate housing" exists in Louisiana because of government-sanctioned lending policies and a history of discriminatory public policy. What's more, the record establishes that the prevalence of disease and mortality rates is higher for Black Louisianans as compared to white Louisianans, and that Black Louisianans have less access to health insurance and healthcare. Finally, it is a "well-known and often cited" fact that Louisiana has the highest rates of incarceration in the nation. Black Louisianans are disproportionately jailed as compared to white Louisianans.

Contrary to Appellants' assertions, Dr. Burch did link her testimony on these effects of discrimination to depressed political participation of Black voters. She testified that educational attainment makes it easier for people to navigate the cost of voting, and that Black Louisianans have lower rates of education, making it more difficult for them to vote. She also stated that negative interactions with the criminal justice system "tend to demobilize voting and make people shy away from participating in politics." Plaintiffs did not solely rely on Dr. Burch's testimony, however. Plaintiffs' fact witnesses also testified that "[t]transportation barriers adversely affect

---

[25] We proceed to Senate Factor Five because, as noted, Senate Factor Four is inapplicable in Louisiana because its legislative elections do not use candidate slating.

access to voter registration and polling sites," and that "Black Louisianans are underrepresented in white collar occupations which provide the security to 'time to take off of work without losing or risking your pay' to vote." The record on this point is clear—Black Louisianans suffer from long-term effects of discrimination which impede their ability to participate in the political process.

Senate Factor Six, which examines whether political campaigns include overt racial appeals, also supports Plaintiffs. *Gingles*, 478 U.S. at 37. Plaintiffs Nairne and Ho-Sang both testified about Senator John Kennedy's re-election campaign, which famously released a video of Senator Kennedy speaking over images of Black Lives Matter protests with the quip, "[i]f you hate cops just because they're cops, the next time you're in trouble, call a crackhead." Reverend Clee Lowe also testified about how subtle racial appeals "send a clear signal that particular elected officials are 'not going to represent our interests.'" Dr. Burch similarly testified how code words used in political messaging such as "inner-city," "crime," "welfare," "urban," and "gang," are effective in influencing voter behavior. She gave specific examples from candidates for Governor, U.S. Senate, and the state legislature, which the district court cited to in its order.

In *Singleton*, 582 F. Supp. 3d at 1023, affirmed on appeal at the Supreme Court, a district court found that a commercial alleging that "Democrats are 'waging a war on whites,'" a radio interview where a Senate candidate said that the Thirteenth, Fourteenth, and Fifteenth Amendments "wreck[ed] the form of government that our forefathers intended," and a commercial where a "white man narrating as images of prominent persons of color (and only persons of color) are juxtaposed with images of the 9/11 terrorist attacks, in or on or hovering above a crackling fire, could be understood as [] racial appeals." *Id.* at 1023–24. On appeal, the Supreme Court "s[aw] no reason to disturb" the district court's "careful" findings

that "political campaigns in Alabama had been 'been characterized by overt or subtle racial appeals.'" *Milligan*, 599 U.S. at 22. Because the evidence presented in this case was like that in *Milligan*, and the record is replete with testimony from both experts and fact witnesses, we leave the district court's meticulous findings undisturbed.

The Seventh Senate Factor, which *Gingles* instructs us is of particular importance, is "the extent to which members of the minority group have been elected to public office in the jurisdiction." 478 U.S. at 37. This Senate Factor unequivocally supports Plaintiffs. No Black candidates have been elected Governor or Lieutenant Governor since Reconstruction, Louisiana has never elected a Black senator, and Black legislators held only 26 of 105 total State House seats in 2023 (and only 10 of 39 total State Senate seats). Furthermore, only one Associate Justice on the Louisiana Supreme Court is Black (Justice Piper D. Griffin, who is but the third Black justice on the Louisiana Supreme Court in its 210-year-history). Appellants' argument that the district court clearly erred by equating Senate Factor Seven to a strict proportionality requirement is not based on the district court's ruling, which simply noted how many Black legislators currently hold seats in the State House and the State Senate. There was no proportionality standard imbued into this recitation of statistics. Because Appellants do not otherwise meaningfully engage with the district court's analysis of this factor or raise any challenge to the district court cited statistics, we reject Appellants' argument.

The Eighth Senate Factor, whether elected officials are unresponsive to the needs of the minority group, also weighs in favor of Plaintiffs. *Gingles*, 478 U.S. at 37. The district court found that the extensive evidence of socioeconomic indicators discussed in Senate Factors one, two, three, and five demonstrated a lack of responsiveness on the part of elected officials. It also noted that nearly 70% of Black survey respondents indicated that their

elected officials do not care what "people like [me] think." The district court also emphasized the fact that the Legislature ignored calls from Black voters for a more representative map and, instead, pushed for a map that eliminated an existing majority-minority district in North Louisiana. Furthermore, several Plaintiffs and former State Representative Glover testified supporting the conclusion that the legislative branch is not responsive to the minority population. Because Appellants introduced no contrary evidence at trial, and do not meaningfully engage with the record, we find no clear error in the district court's conclusion that this factor weighed in favor of Plaintiffs.

We hold that the final Senate Factor, whether the policy underlying the state's use of voting qualifications is tenuous, also supports Plaintiffs' claim. *Id.* The district court found that "evidence supporting Senate Factors Three and Five demonstrates the use of voting practices and procedures is tenuous to another other than disenfranchising Black voter participation in the political process." Although the district court cited no unique record evidence in concluding that this factor weighs in favor of Plaintiffs, it did point to the evidence it had already accumulated, finding that "the use of voting practices and procedures is tenuous to anything other than disenfranchising Black voter participation in the political process." Appellants point to no case prohibiting a district court from relying on the same evidence for two Senate Factors and make no argument as to why this would constitute clear error. Because we may only reverse the district court's finding if we are "left with the definite and firm conviction that a mistake has been committed," *Anderson*, 470 U.S. at 573–574, we refuse to hold the district court clearly erred.

On this record, we can find no clear error in each of the district court's findings that all applicable Senate Factors weigh in favor of Plaintiffs. After examining the totality of the circumstances, it is clear Plaintiffs have carried

their burden of showing a § 2 violation, and we affirm the district court's judgment that S.B. 1 and H.B. 14 violate § 2 of the VRA.

V

Finally, the State's challenge to the constitutionality of § 2 is foreclosed by decades of binding precedent affirming Congress's broad enforcement authority under the Fifteenth Amendment. [26] That Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude," and it gives Congress the "power to enforce this article by appropriate legislation." U.S. CONST. amend. XV, §§ 1–2. The VRA is a direct exercise of that enforcement authority.

The State argues that conditions in Louisiana no longer justify race-conscious remedies and that Congress's Fifteenth Amendment authority to enact the 1982 amendments to the VRA has expired. It emphasizes that there are now more majority-Black districts than in 2011 (the last time Louisiana's redistricting maps were precleared by the Department of Justice), the number of minority legislators has reached an all-time high, and white voters sometimes support Black candidates. In support, the State cites a concurrence in *Allen v. Milligan*, which suggested that Congress's power to authorize race-based redistricting may not "extend indefinitely into the future." 599 U.S. at 45 (KAVANAUGH, J., concurring).

---

[26] Separately, the State's argument that § 2 of the VRA does not contain a private right of action is foreclosed by Fifth Circuit precedent. *Robinson II*, 86 F.4th at 588; *cf. In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court. This rule is strict and rigidly applied.").

But the *Milligan* majority rejected a nearly identical constitutional challenge to § 2 "as applied to redistricting," and reaffirmed that "race-based redistricting" remains a valid remedy where a state's map violates the statute. *Id.* at 41 (majority op.).[27] The State claims its argument is different, but the essence is the same: that Congress's enforcement power under the Fifteenth Amendment has somehow lapsed. There is no legal basis for this proposition, and the State offers no evidence that conditions in Louisiana have changed in the year since *Milligan* was decided.

In any event, this court, sitting en banc, and every other circuit to consider the issue have upheld the constitutionality of § 2's results test. *Veasey v. Abbott*, 830 F.3d 216, 253 n.47 (5th Cir. 2016) (en banc) ("[T]his court and many others have upheld the constitutional validity of the Section 2 results test[.]"); *see also, e.g.*, *Bush v. Vera*, 517 U.S. 952, 990–91 (1996) (O'CONNOR, J., concurring); *Jones v. City of Lubbock*, 727 F.2d 364, 373–74 (5th Cir. 1984); *United States v. Blaine County*, 363 F.3d 897, 904–05 (9th Cir. 2004); *Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999). We decline to depart from this settled and uniform precedent.

The State's assertion that Congress must periodically re-justify legislation passed under the Reconstruction Amendments finds no support in the constitutional text or caselaw. It relies on *Shelby County v. Holder*, 570 U.S. 529 (2013), which invalidated the preclearance coverage formula in § 4(b). But the Court in *Shelby County* took pains to distinguish § 2: "Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." *Id.* at 557. Section 4(b) was designed

---

[27] "And as a court of appeals, we are not free to adopt the views of [concurring or] dissenting Justices over those of the Court's majority." *Roake*, 141 F.4th at 651 (DENNIS, J., concurring).

to be temporary, with an express sunset clause. *Id.* at 546. Section 2 had no such sunset—and the Court has repeatedly called it "permanent." *Id.*

More broadly, the State's theory would impose a limitless obligation on Congress to continually refresh its legislative record for any statute enacted under the Fourteenth or Fifteenth Amendments—including laws like the Family and Medical Leave Act, Title II of the ADA, and the Fair Housing Act. The State identifies no limiting principle for this claim, and we see none. The Reconstruction Amendments do not demand that Congress re-justify its judgments on a rolling basis.

Ultimately, "[w]hen called upon to judge the constitutionality of an Act of Congress—the gravest and most delicate duty this Court is called upon to perform—we accord great weight to the decisions of Congress." *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (HOLMES, J.)). When Congress enacted the VRA, it did so based on overwhelming evidence that "sterner and more elaborate measures" were needed to address "an insidious and pervasive evil . . . perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). We decline the State's invitation to both eschew a clear mandate from the Supreme Court and disregard Congress's intent in order to grant Louisiana an exemption from "the permanent, nationwide ban on racial discrimination in voting found in § 2." *Shelby County*, 570 U.S. at 557.

## VI

For the foregoing reasons, we AFFIRM the district court's judgment.